Transcript of the Testimony of
**OFFICER GEORGE MARIN**

**Date:** January 11, 2024

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND,           )
individually and for a         )
class,                         )
                               )
          Plaintiff,           )
                               )
     vs.                       )  No. 1:23-cv-01851
                               )
THOMAS DART, Sheriff of        )
Cook County, and COOK          )
COUNTY, ILLINOIS,              )
                               )
          Defendants.          )

     This is the deposition of GEORGE J. MARIN, JR.,
called by the Plaintiff for examination, taken
via Zoom videoconferencing, taken pursuant to the
Federal Rules of Civil Procedure for the United
States District Courts pertaining to the taking
of depositions, taken before PEGGY A. ANDERSON, a
Certified Shorthand Reporter of the State of
Illinois, on January 11, 2024, at 10:00 a.m.

---

Page 2

```
1    A P P E A R A N C E S :
2
3    THE LAW OFFICES OF:
     THOMAS G. MORRISSEY, LTD.
4      BY:  MR. THOMAS G. MORRISSEY
            MR. PATRICK W. MORRISSEY
5           10257 South Western Avenue
            Chicago, Illinois  60643
6           (773) 233-7901
            tgm@morrisseylawchicago.com
7           pwm@morrisseylawchicago.com
8           Appeared on behalf of the
            Plaintiff;
9
     THE LAW OFFICES OF:
10   DEVORE RADUNSKY, LLC
11     BY:  MR. TROY RADUNSKY
            230 West Monroe Street
12          Suite 230
            Chicago, Illinois 60606
13          (312) 300-4479
            Tradunsky@drmblaw.com
14
            Appeared on behalf of the
15          Defendant, Cook County.
16
17
18
19
20
21
22
23
24
```

---

Page 3

```
1                    I N D E X
2    WITNESS                                    PAGE
3    GEORGE J. MARIN, JR.
4    DIRECT EXAMINATION BY
     MR. MORRISSEY:                                4
5    CROSS-EXAMINATION BY
     MR. RADUNSKY:                               144
6
7    DIRECT EXAMINATION BY
     MR. MORRISSEY:                              156
8
9          E X H I B I T S
10   MARKED                                     PAGE
11   PLAINTIFF'S EXHIBIT NO. 17                   53
12   PLAINTIFF'S EXHIBIT NO. 17A                  75
13   PLAINTIFF'S EXHIBIT NO. 18                  102
14   PLAINTIFF'S EXHIBIT NO. 19                  118
15   PLAINTIFF'S EXHIBIT NO. 44                   16
16   PLAINTIFF'S EXHIBIT NO. 47                   82
17
18                  *******
19
20
21
22
23
24
```

Exhibit 6 Page 1

OFFICER GEORGE MARIN
January 11, 2024

Page 4

1    (WHEREUPON, the witness
2    was first duly sworn.)
3    MR. MORRISSEY:  This is the
4    deposition of Officer Marin taken pursuant
5    to notice and continued to today's date.
6    WHEREUPON:
7    GEORGE J. MARIN, JR.,
8    called as a witness herein, having been first
9    duly sworn, was examined and testified as
10   follows:
11   D I R E C T   E X A M I N A T I O N
12   BY MR. MORRISSEY:
13   Q    Officer, I'm going to ask you a
14   series of questions this morning.  If you don't
15   understand a question, please stop me and I'll
16   rephrase it.  Is that understood?
17   A    Yes.
18   Q    Will you please state your full name,
19   Officer?
20   A    George Javier Marin, Jr.
21   Q    Mr. Marin, where did you go to high
22   school?
23   A    I'm sorry?
24   Q    Where did you go to high school?

OFFICER GEORGE MARIN
January 11, 2024

Page 5

1    A    Kankakee High School.
2    Q    Did you graduate from high school?
3    A    Yes, sir.
4    Q    In what year?
5    A    2003.
6    Q    After graduating from high school,
7    did you continue your education?
8    A    Yes.
9    Q    Where did you attend school?
10   A    I went to Robert Morris College where
11   I ended up finishing my bachelor's degree at
12   Robert Morris College in Chicago, Illinois.
13   Q    In what year did you receive your
14   bachelor's degree?
15   A    I believe it was 2007.
16   Q    Did you major in any subject matter
17   at Robert Morris?
18   A    It was business management.
19   Q    During the time between 2003 to 2007
20   when you were attending Robert Morris, did you
21   work in the field of law enforcement?
22   A    No.
23   Q    After graduating from Robert Morris
24   College, what did you do?

OFFICER GEORGE MARIN
January 11, 2024

Page 6

1    A    I ended up working warehouse, and
2    then I became employed with the Cook County
3    Medical Examiner's Office in 2010.
4    Q    Between 2007 and 2010, when you
5    worked in the warehouse, was that in the law
6    enforcement field?
7    A    No, sir.
8    Q    In 2010, you said you took a position
9    with the Cook County Medical Examiner?
10   A    Yes.
11   Q    What position did you take?
12   A    It was intake attendant.
13   Q    How long did you work for the Cook
14   County Medical Examiner?
15   A    A little over 11 years.
16   Q    In the 11 years that you worked at
17   the Cook County Medical Examiner's Office, did
18   your position change at all?
19   A    Yes.
20   Q    What are the various positions you
21   held at the Cook County Medical Examiner?
22   A    It was intake attendant and intake
23   supervisor and then forensic technician
24   supervisor.

OFFICER GEORGE MARIN
January 11, 2024

Page 7

1    Q    Were any of those positions related
2    to law enforcement?
3    A    No.
4    Q    What did you do as an intake
5    attendant?
6    A    We processed the deceased when they
7    entered our facility.  We notated the basics as
8    far as race, height, weight, what the
9    individual was wearing, clothing, and then we
10   would enter death certificates that the
11   pathologist would complete as far as the ruling
12   of, you know, how the individual passed away or
13   the manner of death, and then we would be -- we
14   were responsible for sending the bodies to the
15   funeral homes when the families make
16   arrangements.
17   Q    So your job as an intake attendant
18   involved making various official records and
19   documents in regards to processing a decedent's
20   body.  Is that fair to say?
21   A    In that office, yes.
22   Q    What did you do as a forensic
23   technician?
24   A    My time as the forensic technician

Exhibit 6 Page 2

Page 8

1 supervisor, I was responsible for the staff,
2 making sure that we were releasing the
3 decedents, bringing them in and doing the full
4 autopsies while sending out tox samples, if
5 needed, for the decedents.
6     Q    Were you trained in the field of
7 forensics science as a technician?
8     A    On-the-job training.
9     Q    When did you join the -- was the next
10 position that you had with the Cook County
11 Sheriff?
12     A    2022 is when I joined the Cook County
13 Sheriff's Department.
14     Q    Did you go directly from the Cook
15 County Medical Examiner's Office to the
16 Sheriff's Office?
17     A    No.  I had a short period of a break
18 from -- I resigned from the Medical Examiner's
19 Office and then -- in July of 2021 and ended up
20 taking the position March 2022 with the
21 Sheriff's Department as a correctional officer.
22     Q    Why did you resign from the Medical
23 Examiner's Office?
24     A    It was just change of pace and I, at

Page 9

1 the time, just wanted something more, I guess,
2 demanding and challenging.
3     Q    Between the time that you left the
4 examiner's office until the time you joined the
5 Cook County Sheriff's Office, were you
6 employed?
7     A    No.
8     Q    In what month did you join the
9 Sheriff's Office?
10     A    It was -- my official start date was
11 March 2022.
12     Q    When you joined the Sheriff's Office,
13 what division or office did you join within the
14 Sheriff's Office?
15     A    It was corrections.
16     Q    Initially, did you attend the academy
17 when you joined the Sheriff's Office?
18     A    Yes.
19     Q    Where was the training academy
20 located?
21     A    The main facility was Moraine Valley
22 Community College.
23     Q    For what period of time in 2022 did
24 you attend Moraine Valley, the academy at

Page 10

1 Moraine Valley.
2     A    I want to say it was possibly between
3 the months of March through May, June.
4     Q    Was that five days a week?
5     A    Yes.
6     Q    And was that classroom instruction?
7     A    I'm sorry?
8     Q    Did you receive classroom
9 instructions to take a position as a
10 correctional officer?
11     A    Yes.  We did have instructors
12 teaching us.
13     Q    Can you briefly describe your courses
14 that you took at Moraine Valley between March
15 of 2022 and June of March [sic] 2022?
16     A    It ranged from defensive tactics,
17 crisis intervention, first aid and a lot of the
18 instructions or instructors were teaching us
19 just our responsibilities in the jail.
20     Q    Was that online or was that actually
21 in classrooms that you attended those courses?
22     A    It was in classroom.
23     Q    Did you have to pass certain exams at
24 the academy to become a correctional officer?

Page 11

1     A    Yes.
2     Q    Now, this case involves an alleged
3 violation of Mr. Westmoreland's rights under
4 the Americans with Disabilities Act.
5         At the academy, can you tell me how
6 many courses that you were provided in regards
7 to the Americans with Disability Act?
8     A    From what I remember, it was one
9 training course.
10     Q    Do you know who the instructor was?
11     A    I do not.
12     Q    Was that a one day -- let me rephrase
13 the question.
14         At the training academy in regards to
15 issues involving the American for [sic]
16 Disability Act, was that only taught during one
17 session at the academy?
18     A    For that main subject, it was just --
19 we had -- from what I remember just like an ADA
20 training course just for that subject.
21     Q    Was that --
22     A    But throughout the -- but it ranged
23 like -- it wasn't -- it possibly was from two
24 to six hours.  I don't know the amount of hours

Exhibit 6 Page 3

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 12

```
 1   that the training instructor was there.  I
 2   don't remember.  I know it was -- we did have
 3   an ADA course.
 4        Q    Could it have been limited to a
 5   one-hour period of time?
 6        A    No.
 7        Q    Do you know the name of the
 8   instructor?
 9        A    No.
10        Q    Do you have any -- did you receive
11   any handouts or written materials in regards to
12   that one day at the academy that you were
13   taught information in regards to the ADA in
14   relation to being a correctional officer?
15        A    From what I remember, it was
16   PowerPoint.
17        Q    Do you know if it was -- the
18   instructor was a male or a female?
19        A    I do not.
20        Q    Would anything refresh your memory?
21        A    To be honest, no.
22        Q    Do you know a person by the name of
23   Sabrina Canchola Rivera [sic]?
24        A    The name does sound familiar, yes.
```

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 13

```
 1        Q    As a correctional officer, have you
 2   received an e-mail from Ms. Rivero?
 3        A    From Sabrina, I do remember receiving
 4   an e-mail.
 5        Q    Did you receive an e-mail from her in
 6   regards to Eugene Westmoreland, the plaintiff
 7   in this case?
 8        A    From what I remember, yes, it was an
 9   e-mail regarding an incident with
10   Mr. Westmoreland.
11        Q    Was that the incident on February 18th,
12   2022, which was the date Mr. Westmoreland went
13   over to Division 4 to vote?
14        A    The -- I think you have the dates
15   wrong.
16        Q    All right.  What date was the e-mail
17   involving?
18        A    I know it was February 18th.  You
19   have the year wrong.  I didn't start the
20   corrections until 2022, so that incident
21   occurred in 2023, February 18th.
22        Q    I'm sorry.  Was it February 18th,
23   2023, the date in which you received an e-mail
24   where the subject was about Mr. Westmoreland
```

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 14

```
 1   being in Division 4?
 2        A    It was regarding February 18th
 3   regarding Mr. Westmoreland, yes.
 4        Q    Prior to today's deposition, did you
 5   have an opportunity to talk to your attorney?
 6        A    We did discuss.
 7        Q    Did you review any documents prior to
 8   today's deposition in preparation to sit down
 9   and be the deponent in this deposition?
10        A    Reviewing documents, no.  It was just
11   letting me know about today.
12        Q    Did you review specifically prior to
13   today the e-mail that you received from
14   Ms. Canchola about Mr. Westmoreland on
15   February 18, 2023?
16        A    An e-mail was discussed and I did
17   remember Paul pulling it up for my own memory.
18        Q    So you reviewed that e-mail prior to
19   this dep?
20        A    It was the e-mail, yes, from myself
21   and Sabrina.
22        Q    Did you review any PowerPoints that
23   you were given at the training academy in
24   preparation for today's deposition?
```

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 15

```
 1        A    We did look at the PowerPoints, but I
 2   am not sure if it's the same information that
 3   we covered when I was in corrections.
 4        Q    What PowerPoints did you look at
 5   prior to today's deposition?
 6        A    It was --
 7             MR. RADUNSKY:  I don't think he's
 8        going to remember -- hold on.  Well, go
 9        ahead, George.  I mean, I was going to say,
10        Tom, it's the ones that we just -- it's the
11        one that we just sent you.
12             You can answer, George.
13   BY THE WITNESS:
14        A    Yes.  It was --
15             MR. RADUNSKY:  I don't think I showed
16        you the title, you know, but go ahead.
17   BY THE WITNESS:
18        A    No, it was just the PowerPoints of, I
19   guess, showing us and teaching us about how to
20   handle individuals with disabilities just like
21   an ADA training course.  I know that changes.
22   It's fluid every year.  It changes.  I just
23   can't recall if it's the PowerPoint that I did
24   review or it was the same one that I was
```

Exhibit 6 Page 4

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 16

1  instructed on back when I was in the academy.
2      MR. MORRISSEY:  Troy, what PowerPoint
3  did you just send me?
4      MR. RADUNSKY:  It's one of your
5  exhibits.  I think it's either 46 or 47.  I
6  don't know, Tom.  It's one of them.  I just
7  looked at your exhibits though to make sure
8  that -- not to make sure but to see what
9  you added, and it was one of those.
10 BY MR. MORRISSEY:
11     Q   I'm going to show you Plaintiff's
12 Exhibit Number 46.  Is this the document that
13 you reviewed prior to the deposition?
14     MR. RADUNSKY:  No, no.  That's not
15 the PowerPoint document, Tom.  So go back
16 to 43, 44.  Let's go off the record, Peggy,
17 while Tom looks for this.
18     (WHEREUPON, a discussion
19     off the record was held.)
20 BY MR. MORRISSEY:
21     Q   I'm showing you Plaintiff's Exhibit
22 Number 44.
23     Is this a document that you reviewed
24 prior to today's deposition?

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 17

1      A   Yes, sir.
2      MR. MORRISSEY:  Troy, I'm going to
3  take a three-minute break just to scan this
4  and look at it.
5      MR. RADUNSKY:  Okay.
6      MR. MORRISSEY:  So if we can take a
7  break for a couple of minutes.
8      MR. RADUNSKY:  It's 10:21, George.
9  We are going to come back at 10:25.
10     THE WITNESS:  Okay.
11     MR. RADUNSKY:  George, make sure you
12 turn off your camera and put your thing on
13 mute, okay?  So we can't hear or see
14 anything.  Okay.  Great.  Thanks.
15     (WHEREUPON, a short
16     break was had.)
17 BY MR. MORRISSEY:
18     Q   Mr. Marin, when did you look at this
19 document prior to today's deposition?
20     A   Yesterday.
21     Q   Prior to January 10th, had you seen
22 this PowerPoint before?
23     A   The same exact one, I don't believe
24 so.  I can't remember what document was shown

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 18

1  to us during the academy.
2      Q   Prior to January 10th, 2024, had you
3  seen this exact document before or was that
4  provided to you -- let me rephrase the
5  question.
6      Prior to looking at this document
7  yesterday in preparation for the deposition,
8  can you state under oath whether or not you saw
9  this exact document previous?
10     A   I can't say that I have seen this
11 exact document.
12     Q   Can you briefly -- you mentioned that
13 at the training academy there was a PowerPoint;
14 is that correct?
15     A   Yes.  The instructors -- every
16 instructor will show us a PowerPoint with what
17 they were teaching us.
18     Q   Do you have any specific memory in
19 regards to the PowerPoint that was shown to you
20 at the training academy in regards to the ADA?
21     A   As far as the coarse material?
22     Q   Correct.
23     A   It was just, from what I can
24 remember, the basics of just learning the

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 19

1  policy, showing us what the policy is, how to
2  interact with individuals that do have
3  disabilities and, you know, just an overall
4  overview of the Cook County policy of how to
5  interact with individuals, you know, if they
6  were to have a disability, from what I
7  remember.
8      Q   Do you know whether or not the
9  policy -- the PowerPoint that was shown to you
10 at the academy covered the situation involving
11 various ramps at the Cook County Jail?
12     A   Yeah, I do, you know, recall just --
13 or do remember that we were being instructed on
14 how to handle ramps.
15     Q   Did the policy specifically outline
16 to you as a cadet what a ramp is considered to
17 be in regards to your responsibility as a
18 correctional officer?
19     MR. RADUNSKY:  Just object to the
20 form of the question.  You can answer,
21 George, if you understand.
22 BY THE WITNESS:
23     A   No, I don't understand.  I --
24

Exhibit 6 Page 5

Page 20

BY MR. MORRISSEY:

Q   Sure.  You mentioned that the PowerPoint covered ramps to the best of your recollection when you were at the training academy; is that true?

A   Yes.  It did -- it did -- the instructor did go over various obstacles that we would encounter dealing with individuals that have disabilities.

Q   What obstacles other than ramps did you recall the PowerPoint instruction covering at the academy?

MR. RADUNSKY:  I'm sorry, Tom.  "Other than ramps" you said?

MR. MORRISSEY:  Yes.

MR. RADUNSKY:  Okay.  Okay.  George, go ahead.

BY THE WITNESS:

A   Other than ramps, it was obviously individuals in wheelchairs, assisting individuals that need canes, how to deal with individuals that have mental issues or the vision- and hearing-impaired individuals, how to handle those and how to deal with anyone who

Page 21

may have a disability.  So it stretched a little bit beyond from people in wheelchairs all the way to people who have hearing and vision issues.

Q   Did the PowerPoint cover providing accommodations for people who use walkers in relation to ramps?

A   I can't recall if it was specifically walkers.  I know it was just any assistance needed, the County will provide.

Q   In regards to people using canes, did the PowerPoint at the academy discuss what type of assistance be provided to an individual going up and down ramps who used a cane?

A   To my knowledge, no, I'm not sure if it was specifically on how to deal with individuals going up and down ramps if they were using a cane.

Q   Did the training academy cover what type of assistance as a correctional officer would be provided to an individual using a walker or crutches going up and down a ramp?

A   The academy did just instruct us that

Page 22

there were different levels, I guess you could say, from using a cane to a walker.  Sometimes an individual could -- only needed a cane for long distance walking but they wouldn't need it for short distance or vice versa even with the -- if an individual was using a walker, it would be the same thing as far as long distance or short distance.  It's just like a -- you know, just a notification on what the individual can and can't use.

Q   Since graduating from the academy up to the present time, have you received any instruction or training in regards to assistance a correctional officer shall provide to an inmate such as a person using a cane, walker or crutches going up or down a ramp at the Cook County Jail?

A   It's just from the instructions and just being told or, you know, them explaining to us that if individuals who did have issues like you're stating needed assistance that we would do everything we can to assist and help them.

Q   As a correctional officer, has any

Page 23

sergeant, lieutenant, superintendent, executive director ever told you what type of assistance to provide to a person with an alert for a cane, crutch or walker who requests assistance going up or down a ramp, what type of assistance you should provide?

A   No.  It was never a direct order that a certain individual needs this or that.  It was always given through medical.

Q   My question is if a person had an alert for a cane, crutch or walker, have you been given any instruction, training or direction from any supervisory person what type of assistance you can provide to those people with alerts to go up and down ramps?

A   No.  It was never just a direct this is how you need to treat certain individuals, this is how you need to handle certain situations.  No.  If someone needed a cane or wheelchair assistance, just provide it to them, and then you make sure you take the -- you know, the best route for them.

Q   But in regards to a ramp -- can you define what a ramp is?  Let me rephrase the

Exhibit 6 Page 6

1 question.
2          At the training academy, were you
3 ever instructed in regards to what are -- where
4 the ramps are at the Cook County Jail?
5     A    No.
6     Q    As a correctional officer having
7 worked in the jail since probably March --
8 since July of 2022, has anybody, any ADA
9 coordinator ever pointed out to you what are
10 considered ramps at the Cook County Jail?
11    A    No.  They never came and just -- they
12 never gave us a layout of where the ramps are.
13    Q    Do you know if there's in the
14 PowerPoint that you received at the Cook County
15 Jail in regards to providing assistance to
16 wheelchair detainees, did the PowerPoint cover
17 providing assistance in the tunnels for
18 wheelchair detainees who were being transported
19 to and from a housing tier?
20         MR. RADUNSKY:  Just for a point of
21    clarification, I know you said that the
22    PowerPoint was at the jail.  I thought he
23    said it was at the academy.  If he said
24    that there was one too at the jail and I

1    missed it --
2         MR. MORRISSEY:  I'm sorry.
3         MR. RADUNSKY:  It doesn't matter,
4    Tom.  I mean, either way is fine.
5         Go ahead.  George, you can answer
6    the question.
7         MR. MORRISSEY:  I'll rephrase the
8    question.
9         MR. RADUNSKY:  Okay.  It's fine.  I
10    mean, that was the only little caveat.  The
11    rest of it was fine, I think.
12 BY MR. MORRISSEY:
13    Q    At the training academy, in regards
14 to that PowerPoint that you were given, did the
15 PowerPoint cover providing assistance to
16 wheelchair detainees being moved from their
17 housing division to either court or to some
18 other location in the jail when they're being
19 moved in the tunnels?
20    A    It didn't specifically say the
21 tunnels from what I remember.  It was just a
22 brief, like I said, from what I remember just
23 an overview of if individuals who are in
24 wheelchairs needed assistance, we are to

1 provide the assistance.  It never clarified
2 through tunnels or through like specific areas
3 of the compound.
4    Q    To clarify, the PowerPoint that you
5 were presented at the academy, did it state
6 that when wheelchair-assisted detainees are
7 being moved or transported through the tunnels
8 at the jail or up ramps at the jail, that they
9 are to be provided assistance?
10    A    From what I remember, it was if the
11 assistance is needed and asked, then, yes, we
12 are there to provide the assistance and help
13 them.
14    Q    So at the -- in the PowerPoint at the
15 training academy, your recollection was that if
16 a wheelchair-assisted detainee requests
17 assistance being pushed either in the tunnels
18 or up a ramp at the Cook County Jail, then the
19 officer was required to assist the person?
20    A    Okay.  Like, from the PowerPoint in
21 the academy as far as verbatim, I'm not sure if
22 it said it specifically, but we were told that
23 if individuals who needed assistance are being
24 pushed through -- anywhere through the

1 compound, we are there to help them.
2    Q    My question is more narrow.  The
3 PowerPoint, the training you received at the
4 academy, was there a requirement at all times
5 for a correctional officer to push a wheelchair
6 person being moved through the tunnels at the
7 jail?
8    A    I'm not sure if it's, like I said,
9 verbatim, if it says that we need to
10 provide -- like ask them if they need
11 assistance.  It was just, you know, if they do
12 ask, that we need to help them, that we help
13 them.  It's not like it was a clear and cut
14 this is what you needed to do at all times.  It
15 was, you know, individuals who are in need, you
16 definitely help them.
17    Q    So to be clear, the PowerPoint, the
18 presentation that you were given at the academy
19 in regards to a wheelchair person being moved
20 through the tunnels at the jail, the
21 requirement was if the -- if the detainee
22 requested to be assisted or pushed, then the
23 officer should provide assistance.  Is that
24 fair to say?

Exhibit 6 Page 7

Page 28

1    A    We were provided that instruction,
2  yes.
3    Q    And if the detainee being moved
4  through the tunnels at the jail didn't request
5  assistance, then the officer was not required
6  to push the person through the tunnels.  Is
7  that fair?
8    A    Yes.
9    Q    In regards to your training at the
10  academy, that one day you had the PowerPoint,
11  was it your understanding also that in regards
12  to ramps at the Cook County Jail that if the
13  detainee in a wheelchair requested assistance
14  going up and down the ramp, then the officer
15  was required to assist the detainee by pushing
16  him or her up or down a ramp?
17        MR. RADUNSKY:  Can you read that back
18  again, Peggy?
19              (WHEREUPON, the record
20              was read as requested.)
21        MR. RADUNSKY:  Okay.  Thanks.  It's
22  been asked and answered.
23            George, you can answer it again.
24  Go ahead.

Page 29

1  BY THE WITNESS:
2    A    Yes.  As I said previously, if an
3  individual did ask for assistance, regardless
4  if it's up or down a ramp, we are to help them,
5  yes.
6  BY MR. MORRISSEY:
7    Q    And if the detainee in a wheelchair
8  doesn't orally request an officer to be pushed
9  up or down a ramp, then is it your
10  understanding the officer is not required to
11  push the person up or down the ramp?
12        MR. RADUNSKY:  Asked and answered
13    again.
14            You can answer, George.
15  BY THE WITNESS:
16    A    Correct.
17  BY MR. MORRISSEY:
18    Q    Now, after leaving the academy up
19  until today, would your answers be the same in
20  regards to the requirement for an officer to
21  push or assist a wheelchair-bound person in a
22  tunnel that the inmate first has to request
23  from the officer assistance to be pushed in a
24  tunnel?

Page 30

1    A    Yes.
2    Q    And in regards to going up or down a
3  ramp at the Cook County Jail, is it your
4  understanding since leaving the academy up to
5  the present that it's the responsibility of the
6  wheelchair person to request an officer for
7  assistance going up or down the ramp in order
8  for the officer to be required to provide
9  assistance?
10    A    Yes.
11    Q    As a correctional officer, after
12  leaving the academy in, was it, June or July of
13  2022, were you a probationary officer?
14    A    I'm sorry.  What was the question?
15        MR. RADUNSKY:  Yeah, yeah, I think I
16  heard.  I know what he's saying, George.
17  Re-ask it, Tom.
18        MR. MORRISSEY:  Yeah.
19  BY MR. MORRISSEY:
20    Q    After leaving the training academy,
21  was there a period that you were a probationary
22  officer?
23    A    Yes.
24    Q    And what period did that cover?

Page 31

1    A    It was -- I think it was a total
2  of -- I don't know if it's 16 to 18 months from
3  the time the academy started.  I think it's --
4  yeah, I can't recall if it's 16 to 18 months
5  the probation period is.
6    Q    What was your first assignment at the
7  Cook County Jail?
8    A    During probation or after probation?
9    Q    During probation.
10    A    Okay.  During the FTO short probation
11  program, it was various divisions overseeing
12  tiers.
13    Q    What divisions did you work in and
14  when?
15    A    It was the Division 11, Division 6
16  and then RTO.
17    Q    What period of time did you work in
18  Division 11?
19    A    Division 11 was maybe three to four
20  weeks.
21    Q    That would be in the summer of 2022?
22    A    Yes.
23    Q    Did you function as a tier officer in
24  Division 11?

Exhibit 6 Page 8

Page 32

```
 1        A    Yes.
 2        Q    Any other assignments other than
 3   being a tier officer?
 4        A    In Division 11, no.
 5        Q    Did you have a field officer in
 6   Division 11?
 7        A    Yes.
 8        Q    Who was your field officer?
 9        A    He was Officer Dworkin.
10        Q    Did he remain your field officer in
11   Division 6 in the RTU?
12        A    Division 6, no.
13        Q    Who was your field officer in
14   Division 6?
15        A    It was Officer Adeshina (phonetic).
16        Q    For what period of time were you in
17   Division 6?
18        A    I'm sure it just maybe a week.
19        Q    And what period -- that would have
20   been in the summer also of 2022?
21        A    Yes.
22        Q    And were you a tier officer in that
23   Division 6?
24        A    Yes.
```

Page 33

```
 1        Q    In the RTU, when did you start in the
 2   RTU?
 3        A    Possibly late August, early
 4   September.
 5        Q    Of 2022?
 6        A    Yes.
 7        Q    And how long did you work in the RTU?
 8        A    Until I left this -- to September of
 9   2023.
10        Q    In the RTU, what was your position?
11        A    It was still correction officer.
12        Q    What were your assignments in the
13   RTU?
14        A    They ranged from tier officer to
15   movement officer, distributing lunch.
16        Q    Who was your field officer in the
17   RTU?
18        A    I think it was -- it was still
19   Dworkin, but he was just more -- at that time
20   before we got released just -- we were
21   essentially our own.  He was just like -- it
22   was shadow based.
23        Q    Was Officer Dworkin assigned to the
24   RTU?
```

Page 34

```
 1        A    He is assigned throughout the
 2   compound.
 3        Q    Did he work with you on a day-to-day
 4   basis in the RTU?
 5        A    We had daily interactions, yes.
 6        Q    Since leaving the academy in June of
 7   2022 up to today, have you had any follow-up
 8   training in regards to the ADA?
 9        A    Throughout the -- your time with the
10   Sheriff's Department, you do get -- they're
11   called like LMS trainings.
12        Q    What is that training called?
13        A    The -- it's just -- LMS is just like
14   a --
15        Q    LMS?
16        A    Yes.
17        Q    What does LMS stand for?
18        A    Actually, I'm not -- I don't know the
19   actual terms.  I know it's just our -- it's
20   just like our yearly refresher program to go
21   over certain policies.
22        Q    Since leaving the academy at Moraine
23   Valley in July of 2022 to the present, have you
24   gone back to the academy for any type of
```

Page 35

```
 1   training or refreshment courses?
 2        A    Not for corrections.
 3        Q    Have you gone back to Moraine Valley
 4   for any other position at the Sheriff's Office?
 5        A    Not to Moraine Valley, no.
 6        Q    Have you gone to any other
 7   educational or training facility since leaving
 8   Moraine Valley in July of 2022?
 9        A    I just recently finished the academy
10   for Cook County Sheriff's Police.
11        Q    So you're going to -- you're being
12   trained to be a Sheriff's Police Officer?
13        A    Correct.  I finished the academy.
14        Q    For what period of time did you go to
15   the police academy?
16        A    From the time I left RTU corrections,
17   which it's late August, early September to
18   December 14th was our graduation date.
19        Q    December of last year?
20        A    Yes.
21        Q    Okay.  So you've left -- in September
22   of 2023, you left the correctional department
23   of the Sheriff.  Is that fair to say?
24        A    I don't know the exact dates, but
```

Exhibit 6 Page 9

OFFICER GEORGE MARIN
January 11, 2024

Page 36

1    yes, it was -- I left corrections, like I said,
2    August, September to begin my new career as a
3    Cook County Sheriff police officer.
4         Q    Between the time of leaving the
5    training academy as a correctional officer in
6    June of 2022 up to the present, up to the time
7    you left the correctional staff in September of
8    2023, have you received any formal training in
9    regards to the ADA?
10        A    No.
11        Q    Between June of 2022 and September of
12   2023, did you -- were you provided any
13   PowerPoints in regards to the ADA?
14        A    No.
15        Q    Between June of 2022 and September of
16   2023, did you receive any training from the ADA
17   director, Sabrina Canchola Rivero?
18        A    No.
19        Q    Between June of 2022 and September of
20   2023, did you receive any online training in
21   regards to the ADA?
22        A    I would have to go through my LMS.  I
23   can't recall if it was specifically for the
24   ADA.

OFFICER GEORGE MARIN
January 11, 2024

Page 37

1         Q    Did you receive any training from
2    June -- to the best of your recollection from
3    June of 2022 to September of '23 in regards to
4    moving wheelchair-assisted detainees up or down
5    a ramp at the Cook County Jail?
6         A    To the best of my knowledge, I don't
7    believe so.
8         Q    You mentioned that you were a
9    movement officer in the RTU, correct?
10        A    At times, yes.
11        Q    Which shift did you work when you
12   were assigned to the RTU?
13        A    My primary shift was 3:00 p.m. to
14   11:00 p.m.
15        Q    Do you know an officer named Alex
16   Rodriguez that worked in the RTU?
17        A    I'm not sure if it was -- the first
18   name, but I do recall knowing an Officer
19   Rodriguez in RTU.  There were quite a few.
20        Q    In the RTU, you started there in what
21   month in 2022?
22        A    It possibly was late August.
23        Q    And from August of 2022 until
24   September of 2023, you were assigned to the

OFFICER GEORGE MARIN
January 11, 2024

Page 38

1    RTU, right?
2         A    Yes, sir.
3         Q    Did you receive any -- who was your
4    direct supervisor in the RTU?
5         A    It varies throughout.  Daily it
6    varies.  There's just not one supervisor.
7         Q    Would the sergeant be your direct
8    report?
9         A    Yes.
10        Q    When you came in at roll call --
11   there would be a roll call when you started
12   before 3:00 o'clock each afternoon?
13        A    Yes.
14        Q    And at the -- would you have a
15   particular rotation where you would be assigned
16   to a particular tier or function as a
17   correctional officer in the RTU?
18        A    There were certain assignments where
19   we were put at certain tiers, you know, for a
20   couple of months; and then it will rotate
21   yearly.
22        Q    So was there a periodic -- was there
23   a rotation in regards to your assignments when
24   you were in the RTU for a set period of time?

OFFICER GEORGE MARIN
January 11, 2024

Page 39

1         A    Yes.  My assignments did vary.
2         Q    For what period of time did you work
3    as a tier officer in the RTU?
4         A    It was from the first time I started
5    to the end.  It -- I was always a tier officer
6    just given certain assignments.
7         Q    What tiers were you assigned -- when --
8    was there a particular tier or tiers that you
9    were assigned to in the RTU?
10        A    All of them with the exception of the
11   female division.
12        Q    Was there a period of time when you
13   worked on the third floor of the RTU?
14        A    Yes.
15        Q    Does the third floor house people
16   that have medical alerts for psych problems?
17        A    A majority of the building was
18   medical and psych.
19        Q    As a correctional officer, did you
20   receive specific training to work as a psych
21   officer?
22        A    We were given, like I said, crisis
23   intervention and training.
24        Q    Was that the general training you

Exhibit 6 Page 10

OFFICER GEORGE MARIN
January 11, 2024

Page 40

1  received at the academy?

2  **A    It was a general focus for the topic,**

3  **yes; but throughout the academy, the**

4  **instructors will go through scenarios and**

5  **instruct us on how to deal with all the**

6  **divisions of certain mental states.**

7  Q    Are there correctional officers that

8  are specifically trained to work with patients

9  that are -- who have mental illness?

10 **A    Not in -- no.  There were not**

11 **specific officers.  We were all capable of**

12 **working certain tiers regardless of our**

13 **extensive or nonextensive knowledge.**

14 Q    Are there certain tiers that men who

15 have psych -- have been diagnosed with psych

16 issues are -- let me rephrase the question.

17     In the RTU on the third floor, are

18 there dorms?

19 **A    It's a dorm room setting.**

20 Q    In addition, there's individual cells

21 on the third floor, correct?

22 **A    There are two tiers that do have**

23 **cells on the third floor.**

24 Q    How many tiers on the third floor

---

OFFICER GEORGE MARIN
January 11, 2024

Page 41

1  have dorms?

2     MR. RADUNSKY:  Why is this relevant,

3     Tom?  I mean, you can answer, but I don't

4     understand how any of this is relevant at

5     all to what the issues are in the case, but

6     you can answer.

7  BY THE WITNESS:

8  **A    On the third floor, there were six**

9  **tiers that were all bunk dorm room settings.**

10 BY MR. MORRISSEY:

11 Q    And you mentioned that there's two

12 tiers which had cells, correct?

13 **A    Correct.**

14 Q    On the third floor, are there tiers

15 that -- where there's segregation?

16 **A    Those would be the cell settings.**

17 Q    Are there cells where people with --

18 diagnosed with mental illness are housed?

19     MR. RADUNSKY:  Objection, relevance.

20     You can answer.

21 BY THE WITNESS:

22 **A    Possibly.  I didn't know every**

23 **individual's medical history.**

---

OFFICER GEORGE MARIN
January 11, 2024

Page 42

1  BY MR. MORRISSEY:

2  Q    You mentioned that at times you would

3  move officers -- strike that.

4     At times, you would be considered a

5  movement officer?

6  **A    Yes.**

7  Q    Did you receive any special training

8  as an RTU officer to be a movement officer?

9  **A    No, no specific training.  Everything**

10 **was covered during our FTO program.**

11 Q    Can you tell me what you said?  S --

12 I didn't catch the last thing you said.

13 **A    It's FTO program, the field training**

14 **officer.**

15 Q    And you said your field training

16 officer was Officer Dworkin?

17 **A    Yes.**

18 Q    Did Officer Dworkin -- can you

19 explain to me what training you received from

20 Officer Dworkin to work as a movement officer?

21 **A    It wasn't a movement officer**

22 **specifically.  It was just overall duties of a**

23 **correctional officer, and it was just a brief**

24 **overview of responsibilities that we may have**

---

OFFICER GEORGE MARIN
January 11, 2024

Page 43

1  **and what needs to happen if we are assigned**

2  **certain duties.**

3  Q    Did Officer Dworkin provide you with

4  any instruction or training in regards to

5  moving wheelchair-assisted detainees up and

6  down ramps at the Cook County Jail?

7  **A    No.**

8  Q    Did he provide you any instruction in

9  regards to when or if you were required to push

10 wheelchair-assisted detainees up or down ramps?

11 **A    No.  It's just the -- like I said**

12 **before, if an individual requested assistance,**

13 **you know, we do what we need -- we do what we**

14 **can to help them.**

15 Q    Are you familiar with the handbook

16 that's given to detainees upon entering the

17 Cook County Jail?

18     MR. RADUNSKY:  Are you talking about

19     the Inmate Handbook?

20     MR. MORRISSEY:  That's correct.

21     MR. RADUNSKY:  Okay.  Go ahead,

22     George.

23 BY THE WITNESS:

24 **A    The Inmate Handbook, yes.**

Exhibit 6 Page 11

Page 44

1  BY MR. MORRISSEY:
2      Q   Do you know whether or not the Inmate
3  Handbook covers the topic that wheelchair-assisted
4  detainees are required to assist -- let me strike
5  that.
6          Do you know whether or not the Inmate
7  Handbook informs detainees who are wheelchair
8  assisted that they must request assistance from
9  correctional officers going up or down ramps?
10     A   I can't recall what the Inmate
11 Handbook states.
12     Q   What is the job of a movement
13 officer?
14     A   For lack of a better word, it's just
15 an additional officer that provides assistance
16 to the overall building as far as if people
17 need breaks, provide breaks; or if individuals
18 in custody need to be escorted to certain areas
19 of the building or the compound, you just --
20 you do what you can to assist with just any
21 movement that occurs.
22     Q   Do movement officers -- let me
23 rephrase the question.
24         At roll call when you worked in the

Page 45

1  RTU, were you at times designated as the
2  movement officer?
3      A   I did have assignments as a movement
4  officer, yes.
5      Q   How does a movement officer differ
6  from being a security officer?
7      A   I'm not sure of the question.  As a
8  correction officer, we're always -- you know,
9  we provide security.  So it's not like, you
10 know, you're given a certain task and you don't
11 do the job and you just don't provide certain
12 security.  That's not how it works.  At all
13 times, we are to provide and make sure that the
14 area is safe and secure.  We are to provide
15 that assistance, so...
16     Q   On the roster, to your knowledge, is
17 there a designation for the movement officer on
18 the shift?
19     A   There is a certain assignment where,
20 for a certain period of months, you are
21 assigned as a movement officer, yes.
22     Q   So in the RTU, when you were assigned
23 there for roughly a year, were there times when
24 you were designated the movement officer for a

Page 46

1  certain period of time, like for a month or two
2  months?
3      A   It varied daily.
4      Q   So is it fair to say that you were
5  never assigned for a one-month period as the
6  movement officer on the 3:00 to 11:00 shift?
7      A   Specifically as a movement officer,
8  no.
9      Q   But on a day-to-day basis, you would
10 function at times as a movement officer?
11     A   Yes, if needed.
12     Q   Roughly during that one-year period
13 in the RTU, how frequently did you work as a
14 movement officer?
15     A   I can't -- I don't know the exact
16 numbers but it's often.
17     Q   More than 50 percent of your time as
18 an RTU officer, you were a movement officer?
19     A   No --
20         MR. RADUNSKY:  Objection.  Go ahead
21     you can answer.
22 BY THE WITNESS:
23     A   No, I can't -- like I said, I don't
24 have the numbers, so I wouldn't -- all I know

Page 47

1  is primarily a tier officer and then I was
2  given certain assignments as a movement officer
3  doing lunch.  I was never a movement officer
4  for 50 percent of the time.
5  BY MR. MORRISSEY:
6      Q   What percentage of the time as an RTU
7  officer did you work as a movement officer?
8          MR. RADUNSKY:  Objection.  He just --
9      asked and answered, Tom.  He said he did it
10     often.  I mean, how many different ways are
11     you going to ask him the same question?  He
12     said he doesn't know the percentage of
13     time.  He said he did it often, and all you
14     do is just keep tweaking the question by
15     asking the same question.  So I don't think
16     it's -- it's asked and answered.
17         MR. MORRISSEY:  Troy, will you --
18         MR. RADUNSKY:  You can answer,
19     George.
20         MR. MORRISSEY:  I'm sorry.  Troy,
21     will you just stipulate that he was often
22     the movement officer?
23         MR. RADUNSKY:  Yeah, of course.
24     That's what he said.  Of course.

Exhibit 6 Page 12

OFFICER GEORGE MARIN
January 11, 2024

Page 48

```
 1          MR. MORRISSEY:  Okay.
 2   BY MR. MORRISSEY:
 3       Q    As a movement officer, at times,
 4   would you move detainees from the RTU to the
 5   bridge going to the criminal court building?
 6          MR. RADUNSKY:  George, do you know
 7       what area he is talking about?
 8          THE WITNESS:  Yes.
 9          MR. RADUNSKY:  Okay.  You can answer.
10   BY THE WITNESS:
11       A    Yes, I have escorted individuals in
12   custody to the bridge.
13   BY MR. MORRISSEY:
14       Q    At times as a movement officer, would
15   you move detainees from the RTU to the
16   infirmary at the Cook County Jail to Cermak?
17       A    Yes.
18       Q    Did you frequently move detainees
19   from the RTU to the Cermak infirmary when you
20   were given the job of a movement officer?
21       A    Yes.
22       Q    When you moved detainees from the RTU
23   to attend or go to the Cermak building for
24   medical appointments, how would you receive
```

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 49

```
 1   notification to move a prisoner?
 2       A    We would be told certain individuals
 3   needed to go to Cermak for appointments or
 4   whatever the case is.  It was -- we were just
 5   like told who needs to go and when do they need
 6   to go; or if somebody had an issue, the tier
 7   officer would request the movement officer to
 8   take the certain individual to Cermak once
 9   medical clears them for them to go.
10       Q    Was there a particular post or
11   officer that would inform you as a movement
12   officer that a certain detainee should be moved
13   from the RTU to Cermak?
14       A    We would, at times, have a Cermak
15   officer that would tell us certain individuals
16   needed to come down for certain things or, like
17   I said before, if a medical issue happens, we
18   would be told by the tier officer that somebody
19   needs to be escorted to Cermak.
20       Q    How would you be told, through the
21   radio?
22       A    Yes.
23          MR. RADUNSKY:  Objection, foundation.
24       You could answer.  Go ahead.
```

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 50

```
 1   BY THE WITNESS:
 2       A    Yes, via the -- our radio.
 3   BY MR. MORRISSEY:
 4       Q    As a movement officer, when you moved
 5   a detainee from, let's say, a dorm on the third
 6   floor or a cell on the third floor to the
 7   Cermak infirmary, did you keep any log or
 8   record?  Was there any record that you would
 9   fill out that you moved Prisoner "X" from a
10   dorm on the third floor to Cermak?
11       A    Me personally, no.  It would be the
12   tier officer's responsibility to notate that
13   somebody is going from their tier to Cermak.
14   As a movement officer, we just move the
15   individuals.
16       Q    So the documentation would be in the
17   living -- would be in the tier officer's living
18   unit log --
19       A    Yes.
20       Q    -- if a person was moved from his or
21   her tier to Cermak?
22       A    Correct.
23       Q    When you -- did you at times have to
24   pick up detainees from Cermak and bring them
```

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 51

```
 1   back to the RTU building?
 2       A    Yes.
 3       Q    How would you receive notification to
 4   pick up a prisoner?
 5       A    The Cermak officer would radio, any
 6   free movement officer, we have one individual
 7   ready to go back and then we would get the job
 8   done.
 9       Q    Are there certain floors in the RTU
10   where wheelchair-assisted detainees are housed?
11          MR. RADUNSKY:  Where they are what,
12       Tom?
13          MR. MORRISSEY:  Wheelchair-assisted
14       detainees are housed.
15          MR. RADUNSKY:  Oh, housed.
16          Go ahead, George.  You can answer.
17   BY THE WITNESS:
18       A    From what I know, all floors are
19   capable of housing individuals in wheelchairs.
20   BY MR. MORRISSEY:
21       Q    Are there certain floors in the RTU
22   where prisoners with -- who have alerts for
23   canes, crutches and walkers are housed?
24       A    It's still throughout the entire --
```

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 13

OFFICER GEORGE MARIN
January 11, 2024

Page 52

1 all floors.  There is not a specific floor or
2 tier that houses certain individuals.  It's
3 throughout the entire building.
4      Q   Now, at times, did you -- were you
5 asked to work overtime in the RTU?
6      A   Yes.
7      Q   And as an RTU officer, did you ever
8 work the 7:00 to 3:00 shift?
9      A   Yes.
10      Q   And when you worked -- how frequently
11 during that one year in the RTU did you work
12 the 7:00 to 3:00 shift?
13      A   It was at times.  I don't know how
14 many times I worked overtime.  It was -- I
15 would at times work 7:00 to 3:00.
16      Q   And when you worked 7:00 to 3:00 in
17 the RTU, at times would you work as a movement
18 officer?
19      A   Yes.
20      Q   And on February 18th, 2023 were you
21 working the 7:00 to 3:00 shift when you moved
22 Mr. Westmoreland?
23      A   Yes.
24      Q   On the 7:00 to 3:00 shift when you

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 53

1 worked as a movement officer, would you receive
2 communications also from either a tier officer
3 or a Cermak officer to move the detainee from
4 the RTU to Cermak?
5      A   For that specific date, February 18th?
6      Q   No, not just that date.  I'm talking
7 about when you worked the 7:00 to 3:00 shift,
8 would you receive communications as a movement
9 officer to move detainees either to or from
10 Cermak?
11      A   Yes.
12      MR. MORRISSEY:  Give me one moment,
13 please.  I'm going to pull up an exhibit.
14 BY MR. MORRISSEY:
15      Q   Officer, I'm going to show you
16 Exhibit Number 17.  Do you see that on the
17 screen?
18      A   Yes.
19      Q   And looking at that picture -- I'm
20 going to play a video for a moment.
21           (Video played.)
22 BY MR. MORRISSEY:
23      Have you had an opportunity to look
24 at the video which is marked as Plaintiff's

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 54

1 Exhibit Number 17?
2      A   The one you've just shown, yes.
3      Q   Does that fairly and accurately
4 depict one of the ramps leading into the RTU
5 building?
6      A   Yes.
7      Q   And there's two ramps that lead into
8 the RTU building, correct?
9      MR. RADUNSKY:  My only objection is,
10      I mean, when you use the word "ramp," he's
11      not testifying as an ADA expert, so if
12      you're using it in that term, he's not an
13      expert in that, like he's already told you.
14           So subject to that, you can
15      answer.
16 BY MR. MORRISSEY:
17      Q   Do you understand my question,
18 Officer Marin?
19      A   I was just going to say that there
20 are two areas where the floor is at an incline,
21 yes.
22      Q   And can you identify which of the
23 two -- for purposes of this dep, do you mind if
24 I use the word ramp?  I understand you are not

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 55

1 an expert in the -- you're not an architect;
2 but if we use the word ramp, would you
3 understand what I mean?
4      MR. RADUNSKY:  I mean, that's fine.
5      We can use that word, but we're not using
6      it in the context of ADA or ADA compliance.
7      I mean, you're using it in the general
8      sense knowing that that is the intent,
9      sure, we'll agree to that.
10           George, that's fine.
11 BY MR. MORRISSEY:
12      Q   So the question is, do you know --
13 can you identify which ramp this is that leads
14 from the -- that leads into the RTU building?
15      A   I want to say it's the ramp going to
16 and from Cermak.
17      MR. RADUNSKY:  All right.  If you
18      don't know, George, you don't have to
19      guess.  He doesn't want you to guess.  If
20      you know, you know.  All right?
21 BY MR. MORRISSEY:
22      Q   For purposes of this deposition,
23 we'll say it's the ramp going to and from --
24 going from Cermak into the RTU building; is

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 14

1 that understood?

2     **A   Yes.**

3     Q   What, to your knowledge, is the

4 difference between a ramp -- well, let me

5 rephrase the question.

6     As a correction -- as a former --

7 you're not a correctional officer anymore; is

8 that fair to say?

9     **A   Correct, sir.**

10     Q   What is your official title right

11 now?

12     **A   It's Cook County Sheriff Police**

13 **Officer.**

14     Q   Congratulations.

15     **A   Thank you.**

16     Q   As a former correctional officer, can

17 you tell me your general understanding of the

18 difference between a ramp and a corridor?

19     **A   Okay.  Just from my understanding, a**

20 **corridor is -- like I would describe it as a**

21 **hallway.  And a ramp is a platform with an**

22 **angle.**

23     Q   Looking at Exhibit 17, is it fair to

24 say that's the top of the ramp leading from

---

1 Cermak toward the RTU building?

2     **A   Yes.**

3     Q   Based upon your recollection in this

4 photograph, are there any signs posted at the

5 top of this ramp to advise detainees that they

6 may request assistance going up or down this

7 Cermak ramp?

8     **A   No.**

9     Q   At the bottom of the Cermak -- at the

10 bottom of this ramp leading into the RTU, to

11 your knowledge and recollection, are there any

12 signs posted that alert a detainee that they

13 may be pushed up or down the ramp and they have

14 to request assistance?

15     **A   No.**

16     Q   Now, when we looked at the video,

17 which is Exhibit Number 17, there were two

18 wheelchair-assisted detainees, correct?

19     **A   Yes.**

20     Q   They were both going down the ramp?

21     **A   Correct.**

22     Q   Are there times as a movement officer

23 working in the RTU that you would be asked to

24 move more than one detainee in a wheelchair

---

1 over to the Cermak building?

2     **A   I wouldn't know the situation unless**

3 **I came about it, like, at that moment.**

4     Q   Based upon your recollection for over

5 a year working as a movement officer, at times,

6 did you move more than one wheelchair-assisted

7 person either to Cermak or from Cermak back to

8 the RTU?

9     MR. RADUNSKY:  You're talking about

10    at the -- I mean, can you just break that

11    down a little more?  When you say moving

12    more than one at a time, I mean, I know you

13    are not talking about hours apart.  I think

14    you are talking around generally the same

15    time, but I just want to be clear.

16    MR. MORRISSEY:  Sure.

17 BY MR. MORRISSEY:

18     Q   Just to be clear, at times as a

19 movement officer in the RTU, were you asked to

20 move more than one wheelchair-assisted detainee

21 at the same time over to Cermak for an

22 appointment?

23     **A   I can't -- at times I would have**

24 **moved, if needed, an individual in a wheelchair**

---

1 to Cermak, yes.

2     Q   My question is, at times, would you

3 move more than one wheelchair-assisted detainee

4 over to Cermak at the same time?

5     **A   Directly to Cermak, maybe just once;**

6 **but I have escorted individuals that are in**

7 **wheelchairs to Cermak.**

8     Q   Well, not just Cermak.  At times,

9 would you move more than one wheelchair-assisted

10 person at the same time to another location in

11 the jail?

12     **A   I have, yes.**

13     Q   And during those period of times when

14 you were required to move more than one

15 wheelchair-assisted person to another location

16 at the jail, were you required to go up either

17 this ramp that's in Exhibit 17 or another ramp

18 to get to that location at the jail?

19     **A   If I was taking those two routes,**

20 **yes.**

21     Q   As a correctional officer, if you

22 were moving two wheelchair persons at the same

23 time and -- could you push both of them at the

24 same time up the ramp?

Exhibit 6 Page 15

Page 60

1    A    No, I wouldn't do that.
2    Q    What would you do if you were
3 moving -- let me go back a step.
4         If you were moving two wheelchair
5 detainees from the RTU at the same time to
6 another location at the jail, is it my
7 understanding from your prior testimony that
8 unless one or both of the detainees asked to be
9 pushed, that the detainee would go up -- the
10 detainees would push themselves up the ramp by
11 themselves?
12   A    If they didn't need assistance, I
13 wouldn't push them.  And if somebody did
14 request assistance, I would push them.  The
15 individuals in custody know where they're
16 going, so they know their, more or less,
17 capabilities.  So if they were to say, hey, can
18 you help me?  I'm going to need help going up
19 the ramp or both of them at the time when I was
20 picking them up said we're both going to need
21 help going up the ramp, I would just take one
22 at a time.
23   Q    Is it fair to say that if you were
24 pushing -- strike that.

Page 61

1         Is it fair to say that if you were
2 moving -- let me rephrase the question.
3         As a movement officer, if you were
4 requested to move two wheelchair-assisted
5 detainees to Cermak and there was a ramp such
6 as depicted in Exhibit Number 17, unless the
7 wheelchair-assisted person requested assistance
8 to be pushed up the ramp, you would allow them
9 to go up the ramp on their own.  Is that fair
10 to say?
11   A    If they didn't ask for any
12 assistance, yes, they would go up the ramp on
13 their own, on their own willing.
14   Q    To your knowledge, in the Inmate
15 Handbook, is there any information given to
16 wheelchair-assisted detainees that they may be
17 disciplined if they go up a ramp or down a ramp
18 unassisted by a correctional officer?
19         MR. RADUNSKY:  Tom, you're asking if
20     the detainee would be disciplined for that?
21         MR. MORRISSEY:  That's correct.
22         MR. RADUNSKY:  Okay.  Go ahead,
23     George.  You can answer.
24

Page 62

1 BY THE WITNESS:
2    A    To my knowledge, no.
3 BY MR. MORRISSEY:
4    Q    Why not?
5    A    I'm not sure how, you know, that
6 person would be disciplined.  Like -- so as far
7 as what the Inmate Handbook states, like I
8 said, I don't know it verbatim and I wasn't
9 aware that -- you know, like you said right
10 now, it states that if they aren't pushed up a
11 ramp or if they're not assisted, they could be
12 disciplined.  I was not aware of that.
13   Q    You mentioned that at times you
14 escorted wheelchair-assisted detainees -- let
15 me ask a preliminary question.  As a movement
16 officer moving -- let me ask a foundation
17 question.
18        As a movement officer in the RTU,
19 were you ever requested to move a detainee who
20 was given an alert for a cane or a crutch or a
21 walker from the RTU to the Cermak infirmary?
22   A    I have escorted people who needed a
23 cane or a walker to Cermak, yes.
24   Q    And was that common as a movement

Page 63

1 officer in the RTU to move detainees who had
2 alerts for cane, crutches and walkers to the
3 Cermak building?
4    A    I'm sorry.  What was the question?
5    Q    Was it a common occurrence for you as
6 a movement officer to move detainees from the
7 RTU who were using canes or crutches or walkers
8 to the Cermak building?
9    A    I wouldn't say it's common, but it
10 does happen that people are moved that are on
11 crutches or in wheel -- canes, you know, from
12 Cermak to RTU.  I wouldn't say it's common.  It
13 is a medical unit but, you know, everyone has
14 their own issue like as far as disability-wise,
15 so.
16   Q    On those days that you worked as a
17 movement officer in the RTU, how often did you
18 move a detainee who had a cane, crutch or
19 walker over to the Cermak building?
20   A    At the time it needed to happen.
21   Q    And that might happen more than once
22 a week that you would move a detainee from the
23 RTU to the Cermak building who had an alert for
24 a cane, crutch or walker?

Exhibit 6 Page 16

Page 64

```
 1      A     Throughout a week, if I was given a
 2  certain assignment, yes.  It could be zero
 3  times escorting people from Cermak to RTU that
 4  are in canes or wheelchairs or it could be a
 5  couple of times that I'm escorting individuals
 6  with the fact that they have a cane or a
 7  crutch.
 8      Q     In your experience for over a year as
 9  a movement officer in the RTU, when you moved a
10  detainee who had a cane, crutch or walker from
11  the RTU to the Cermak building, do you ever
12  recall providing a wheelchair for any of those
13  individuals going up or down either the ramp
14  that's depicted in Exhibit 17 or the ramp that
15  leads to the Cermak building?
16      A     They would already have those
17  devices.
18      Q     Perhaps you don't understand my
19  question.  If a person had a cane, crutch or
20  walker and they were -- you were escorting them
21  to the Cermak building from the RTU, do you
22  ever recall providing a person with a cane,
23  walker or crutch a wheelchair to go up or down
24  either the ramp that's depicted in 17 which
```

Page 65

```
 1  leads from Cermak to the RTU or the ramp that
 2  leads to the Cermak building -- or the other
 3  ramp that leads to the Cermak building?
 4          MR. RADUNSKY:  Just objecting to
 5      relevance.  I just don't understand what
 6      this whole line of questioning has anything
 7      to do with his involvement on the date of
 8      February 18th.
 9          But you can answer, George.
10  BY THE WITNESS:
11      A     The individuals that had canes or
12  crutches, they never requested a wheelchair to
13  go up that ramp.  They were always more than
14  capable of doing so.  My experience is they
15  never personally asked me for a wheelchair.
16  BY MR. MORRISSEY:
17      Q     Was there any wheelchair that was
18  available either at the top or the bottom of
19  the ramp which we have identified as Exhibit 17
20  for you to offer to a person with a cane,
21  crutch or walker to go up --
22          MR. RADUNSKY:  Hold on.  Just
23      objection.  Tom, hold on, hold on.  Tom, I
24      don't understand.  Your client was in a
```

Page 66

```
 1  wheelchair.  There's no dispute that he was
 2  in a wheelchair.  I really think that this
 3  is all irrelevant.  I don't understand why
 4  you're asking these questions.
 5          We stipulate that your client was
 6  in a wheelchair that day.  We stipulated
 7  that George is not an expert in ADA
 8  compliance.  You know, he has a limited
 9  role -- or not a limited role but he was
10  present on February 18th and you're just
11  asking him all of these other ADA
12  questions, you know -- or I'm sorry -- ramp
13  questions or wheelchair questions, and I
14  don't understand the relevance.
15          So can you help me understand the
16  relevance here because I don't want to cut
17  off your questioning and take this to the
18  judge, but I don't understand where you're
19  going.
20          I mean, if you want to get to a
21  point, then make it, you know.  And I don't
22  think you're even listening to me now.  I
23  can't hear anything you're saying.
24          MR. MORRISSEY:  Troy, the relevance
```

Page 67

```
 1  is that Mr. Westmoreland used a cane when
 2  he was initially in the RTU going up and
 3  down to the ramp.
 4          MR. RADUNSKY:  But, Tom, that has
 5      nothing to do with George or George's
 6      involvement.  George's involvement is on
 7      February 18th, 2023 in Division 4 and
 8      that's it.
 9          I mean, so why are you asking him
10      about all of these other questions when
11      they have nothing to do with his
12      involvement?  He wasn't involved in taking
13      your client, you know, on other days or
14      other times.  You have never established
15      that.  You never said that he did.  And now
16      you're like trying to just go off into --
17      down a rabbit hole, and I'm just asking if
18      we could get to the issues in the case.
19          If you want to make -- or ask him
20      straight direct questions that cut to the
21      chase, great.  But what you're doing here
22      is, like, really wasting his time.  I think
23      that it's harassment of the witness, you
24      know.
```

Exhibit 6 Page 17

Page 68

```
 1          So I'm just asking you can we
 2   just move on and talk about the issues that
 3   he's here to talk about because he's told
 4   you what the scope of his testimony and his
 5   knowledge is on ramps, on ADA and --
 6          MR. MORRISSEY:  Troy, I don't want to
 7   belabor the point but --
 8          MR. RADUNSKY:  But you are.
 9          MR. MORRISSEY:  But he --
10          MR. RADUNSKY:  But you just asked
11   him --
12          THE REPORTER:  I can only get one
13   person at a time.
14          MR. RADUNSKY:  You just asked him,
15   Tom, and you have been asking about all of
16   these scenarios where they involve canes or
17   whatever.  And on the morning of this
18   incident on February 18th, he was in a
19   wheelchair.
20          So now you're asking questions
21   about do you have wheelchairs available at
22   different points on the ramp.  How is any
23   of that relevant to the incident on
24   February 18th?
```

Page 69

```
 1          You have already been through
 2   this stuff with Eric Davis and Sabrina, the
 3   people that actually have knowledge of this
 4   stuff, and you're just trying to take
 5   advantage of a vulnerable witness who
 6   doesn't know about ADA compliance.
 7          So I thought we were just going
 8   to really spend the time talking about the
 9   issues on the 18th, but we're an hour and a
10   half, almost two hours into this deposition
11   and you haven't even hardly discussed that,
12   you know.
13          He's told you he's a movent
14   officer that day.  He's told you, I mean,
15   his experience in the ramps and corridors,
16   and I don't know why we are not talking
17   about the issues that are germane to him,
18   Tom.
19          MR. MORRISSEY:  The reason why these
20   things are probative in deposition is
21   because they go to the policies and
22   procedures of assisting mobility-disabled
23   detainees going up and down ramps.
24          MR. RADUNSKY:  But he answered all of
```

Page 70

```
 1   those.  He told you what his knowledge was
 2   and his experience was and the scenarios
 3   that he's been involved in.  And now you're
 4   parsing his testimony into minutia and
 5   asking about just, you know, details that
 6   are not relevant and I don't want to sit
 7   here and object to all of these questions,
 8   you know, but I think it's really unfair to
 9   him, Tom; and I think if we took this to
10   Judge Gilbert and we said:  Judge, this is
11   his involvement.  This is what's been
12   disclosed in a Rule 26 disclosure, all
13   right?  This is what we know about this man
14   and look at what the first two hours of
15   questioning was about, you know?  I mean, I
16   don't understand why we're not talking
17   about the day of the incident.  He's
18   already given you enough foundation about
19   what he knows, I think, about his ADA
20   involvement, ramps and everything else.
21          So I'll let you keep going on,
22   Tom, but I just think it's really -- it's
23   harassing the witness at this point.
24          MR. MORRISSEY:  Peggy, can you read
```

Page 71

```
 1   back the least question?
 2          THE REPORTER:  Yes.  It was cut off
 3   though, Tom.
 4             (WHEREUPON, the record
 5             was read as requested.)
 6   BY MR. MORRISSEY:
 7      Q    Okay.  Let me finish the question.
 8   When you were a movement officer taking
 9   detainees from the RTU to the Cermak infirmary,
10   was there any -- for a person that had an alert
11   for a cane, crutch or walker, to your
12   recollection, was there any wheelchair that was
13   available to you to use and offer to one of
14   those detainees to go up or down either the
15   ramp that leads into the RTU or the ramp
16   that -- the ramp to access the Cermak building?
17          MR. RADUNSKY:  Just objection to
18   form.  It's an incomplete hypothetical.  It
19   also, I think, lacks foundation.  You can
20   answer.
21   BY THE WITNESS:
22      A    So every floor has a nursing station;
23   and if a person who is -- if a person is using
24   crutches or a cane disclosed to me that they
```

Exhibit 6 Page 18

Page 72

1  can't go up the ramp and that they are going to
2  need a wheelchair, you know, I would have no
3  issues going to the nurses' station, letting
4  them know that I would need to take a
5  wheelchair because they have wheelchairs
6  available.  I would need to take a wheelchair
7  to take one individual from Point A to
8  Point B, and I'll bring it right back.
9  BY MR. MORRISSEY:
10     Q    So it would have been feasible for
11  you to provide a wheelchair for a person that
12  had a cane, crutch or walker to go up or down a
13  ramp; is that fair to say?
14     A    Leaving RTU, yes.
15     Q    Would it also have been feasible for
16  you -- let me ask a preliminary question.
17         To take a prisoner or detainee from
18  the RTU to the Cermak building, is there a ramp
19  that one has to transverse to get to the Cermak
20  building?
21         MR. RADUNSKY:  Asked and answered.
22  You can answer again.
23  BY THE WITNESS:
24     A    That ramp is the ramp that heads

Page 73

1  towards Cermak.
2  BY MR. MORRISSEY:
3     Q    But is there another ramp in addition
4  to what's in Exhibit Number 17 that a person
5  leaving the RTU to enter the Cermak building
6  has to go down to enter the Cermak building?
7     A    From what I remember, that is --
8  primarily from that route is -- that's the main
9  ramp to enter from Cermak.
10     Q    To enter the Cermak building from the
11  tunnel system, is there a ramp?
12     A    Going from the top of -- you're
13  talking about from that hallway right there
14  going into Cermak, is there a ramp?
15     Q    Yes.
16     A    I would say yes, not as long as that
17  one.
18     Q    And to your knowledge, is there any
19  signs at the top of the ramp -- how do you
20  identify that ramp from the hallway or tunnel
21  to the Cermak building?
22     A    There's no indicators that it's a
23  ramp.  You could just see that there's an
24  incline.

Page 74

1     Q    For purposes of this deposition, can
2  we refer to that as the Cermak ramp?
3     A    This one?
4     Q    No.  This one here in Exhibit 17 is
5  the ramp or the incline that --
6         MR. RADUNSKY:  Is that the east?  I
7  mean, is that the one or the --
8         MR. MORRISSEY:  Yeah.
9         MR. RADUNSKY:  I mean, if he's not
10  familiar with it, Tom, I don't want to
11  refer to it as one way or the other.  If
12  you want to show him a picture and ask him
13  if he can recognize it, that's fine; but I
14  don't want to put on the record that he's
15  familiar with something that he's not, and
16  he seems like he's not entirely.
17         MR. MORRISSEY:  Give me one moment,
18  Troy, and I will do that.
19         MR. RADUNSKY:  Okay.  Tom, do you
20  have any idea how much longer you are going
21  to be?  I feel like I'm scared to ask that
22  question.
23         MR. MORRISSEY:  I would say less than
24  an hour and a half.

Page 75

1         MR. RADUNSKY:  Really?  Okay.  That's
2  good.  I appreciate that.
3  BY THE WITNESS:
4     A    From the picture you were saying,
5  it's just kind of hard to tell.  Like --
6         MR. RADUNSKY:  Well, let's see what
7  he can put up on the screen and if you
8  recognize it.
9         Hold on one second.  It looks
10  like he is working with his IT department.
11  BY MR. MORRISSEY:
12     Q    Exhibit 17A.
13         MR. RADUNSKY:  Oh, 17A.  Okay.
14         MR. MORRISSEY:  And this is a
15  picture, I think, we shared with you.  The
16  picture is 3885 [sic] --
17         MR. MORRISSEY:  Okay.
18         MR. MORRISSEY:  -- during our
19  inspection of August of 2023.
20  BY MR. MORRISSEY:
21     Q    Officer Marin, I'm showing you what
22  is -- will be marked as Plaintiff's Exhibit 17A.
23  Can you look at that?  Do you see that photograph
24  on your screen?

Exhibit 6 Page 19

OFFICER GEORGE MARIN
January 11, 2024

Page 76

1    A    Yes, I see it.
2    Q    And does that fairly and accurately
3  represent the ramp or the incline descending
4  from hallway or corridor or tunnel into the
5  Cermak building?
6    A    It is a hallway that is downstairs in
7  the basement, yes, going into Cermak.  I would
8  need to walk through it personally.
9    Q    To your knowledge and recollection,
10 was there a notice or an order that was posted
11 at the top or the bottom of this Cermak ramp to
12 alert the detainees as far as what they must
13 do?
14   A    No.
15   Q    To your knowledge, was there a notice
16 or order that said:  You are not to go up or
17 down any ramps without an officer.  You must
18 wait for an officer to escort you.  If you need
19 assistance to go up or down the ramp, please
20 request help.  If you go up or down the ramp
21 without an officer's escort, it will result in
22 a disciplinary ticket for violating a direct
23 order.
24        Based upon your memory and

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 77

1  recollection, when you were a movement officer,
2  did you ever see a sign with that information
3  either at the top or the bottom of the Cermak
4  ramp?
5    A    I don't recall.
6    Q    You mentioned that as a correctional
7  officer and movement officer in the RTU, if a
8  person requested a wheelchair because of a
9  mobility disability to go to the Cermak
10 building, you could access a wheelchair in the
11 doctor's office or nurse's office in the RTU;
12 is that fair to say?
13       MR. RADUNSKY:  Did you understand
14   that question, George?  I think I do.  If
15   you don't -- you can answer.
16       Tom, I think you could ask it a
17   little cleaner.
18       MR. MORRISSEY:  All right.
19       MR. RADUNSKY:  Yeah, clean that up.
20       MR. MORRISSEY:  Thanks for the help,
21   Troy.
22       MR. RADUNSKY:  Yes, yes, yes.  I know
23   what you're saying, but I'm not the
24   witness, so I don't want to tell him.  Go

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 78

1    ahead.
2  BY MR. MORRISSEY:
3    Q    You previously testified that if a
4  person with a cane, walker or crutch when you
5  were a movement officer asked for or requested
6  assistance going up either the RTU ramp or the
7  Cermak ramp, you would have gone in the RTU and
8  grabbed a wheelchair from the doctor's office
9  or the nurses' station; is that correct?
10   A    From the nurses' station, if needed,
11 yes.
12   Q    And that never happened to the best
13 of your recollection as a movement officer?
14   A    Personally me, no.
15   Q    Do you know if any other officer ever
16 took a wheelchair from the RTU to assist a
17 person with a cane, walker or crutch who was
18 being moved from the RTU to Cermak to assist
19 them?
20   A    There have been, at times, officers
21 using a nurse's wheelchair to take a person
22 from RTU to Cermak.
23   Q    Is that for a detainee who has an
24 alert for a cane, crutch or walker?

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 79

1    A    That's for whoever needs assistance
2  being escorted to Cermak.
3    Q    So is that -- generally, to your
4  recollection, was that because there was a
5  medical emergency in the RTU that required a
6  detainee to be moved from the RTU to the Cermak
7  building?
8        MR. RADUNSKY:  Objection, foundation.
9    You can answer, George, if you know.
10   Speculation.
11       You can answer.
12 BY THE WITNESS:
13   A    This -- like I said before,
14 previously, it's requested by the individual.
15 BY MR. MORRISSEY:
16   Q    On February 18th, 2023, you were
17 acting as a movement officer?
18   A    For which shift?
19   Q    For the 3:00 to -- for the 7:00 to
20 3:00 shift?
21   A    Between those hours, I was a movement
22 officer.
23       MR. MORRISSEY:  Give me one moment
24   while I pull up the --

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 20

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 80

1      MR. RADUNSKY:  Sure.  You know, we
2  haven't had a break.  It's 11:50.  Do you
3  want to take 10 minutes?
4      MR. MORRISSEY:  We can take 10 minutes,
5  sure.
6      MR. RADUNSKY:  George, are you cool
7  with 10?
8      THE WITNESS:  That's perfect.  Thank
9  you.
10     MR. RADUNSKY:  Peggy, we'll be back
11 in 10 minutes, okay?
12     THE REPORTER:  Okay.
13     MR. MORRISSEY:  All right.  Thanks a
14 lot, Troy.
15     MR. RADUNSKY:  Okay.
16              (WHEREUPON, a short
17              break was had.)
18 BY MR. MORRISSEY:
19     Q   Officer Marin, as you sit here today,
20 do you have any independent recollection of
21 February 18th, 2023?
22     A   I do recall some parts of the
23 incident.
24     Q   Do you recall, for instance,

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 81

1  working -- being asked to work on the 7:00 to
2  3:00 shift that day?
3      A   Yes, I was working that particular
4  shift that day.
5      Q   Now, you were provided, I assume,
6  some videos of the incident of Mr. Westmoreland
7  falling going up a ramp, a metal ramp, in
8  Division 4, correct?
9      MR. RADUNSKY:  No, I didn't show him
10     any videos.
11     MR. MORRISSEY:  All right.  Well, let
12     me ask him.
13 BY MR. MORRISSEY:
14     Q   Did you see any pictures or films in
15 preparation for today's deposition?
16     A   As far as videos from that day, no.
17     Q   Did you see any pictures from that
18 day?
19     A   It was, I believe, just a still shot.
20     MR. RADUNSKY:  Tom, I actually showed
21     him this exhibit that you're showing him.
22     MR. MORRISSEY:  All right.  Thank
23     you.
24     MR. RADUNSKY:  That's it.  That's all

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 82

1  he's seen.
2      MR. MORRISSEY:  Okay.
3      MR. RADUNSKY:  And I don't think that
4  that's -- and I don't know.  I could be
5  wrong.  That was taken by your expert.  I
6  was going to say I don't think that's from
7  the day of the accident and that you blew
8  that up.  I don't know, but I think that's
9  one of your expert's pictures, right?
10 BY MR. MORRISSEY:
11     Q   Showing you Exhibit Number 47, is
12 this one of the photographs you looked at in
13 preparing for today's deposition?
14     A   No.
15     Q   Did you see a similar photograph
16 depicting a metal ramp in Division 4 in
17 preparing for today's deposition?
18     A   I was shown a photo of that area.  As
19 far as that exact photo, that particular photo,
20 no.
21     Q   And you previously testified that you
22 reviewed an e-mail that you provided to
23 Ms. Sabrina Canchola Rivera in regards to the
24 incident on February 18th, 2023, correct?

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 83

1      A   Yes.
2      Q   Any other documents that you reviewed
3  in preparing for today's date -- today's dep,
4  in preparing for today's deposition?
5      A   No.
6      Q   Prior to looking at the e-mail you
7  sent to Ms. Canchola on March 9th, 2023, did
8  you have any recollection of working on
9  February 18, 2023?
10     MR. RADUNSKY:  Asked and answered.
11     He just answered that a couple of minutes
12     ago.
13          You can answer again.
14 BY THE WITNESS:
15     A   Yes.  I do remember various moments
16 that day.
17 BY MR. MORRISSEY:
18     Q   Did reviewing Ms. -- the e-mail that
19 you sent to Ms. Rivero refresh your memory in
20 regards to specifically Mr. Westmoreland
21 falling on a ramp inside Division 4?
22     A   Yes.
23     Q   Prior to looking at your e-mail to
24 Ms. Rivero-Canchola on March 9th, 2023, did you

Exhibit 6 Page 21

OFFICER GEORGE MARIN
January 11, 2024

Page 84

1   have any personal recollection of his falling?
2          MR. RADUNSKY:  He just answered that
3   three times.  Three times.  You can answer
4   it again, George, for the fourth time.
5   BY THE WITNESS:
6          A    Like I said, the e-mail was like a
7   basis of a refresher.  But still it's just
8   various moments for that date.
9   BY MR. MORRISSEY:
10         Q    What do you recall in regards to
11  working as -- were you working as a movement
12  officer on the 7:00 to 3:00 shift on
13  February 18th, 2023?
14         A    So for that particular -- for
15  February 18th, for that particular day and
16  shift, I was a movement officer to escort
17  individuals in custody, detainees, I'm not sure
18  how you want to reference them, from RTU to
19  Division 4 for voting.
20         Q    Were you the only officer in the RTU
21  that day that was moving detainees to Division 4
22  to vote?
23         A    No.  I believe there was a group.
24  There was a group of us.

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 85

1          Q    And were you assigned specifically to
2   move wheelchair detainees from the RTU to
3   Division 4 to vote?
4          A    No.  It wasn't a specific task.
5          Q    How many times during that day did
6   you move detainees from the RTU to Division 4
7   to vote?
8          A    It was numerous times, multiple
9   times.
10         Q    Did you follow the same -- was there
11  any supervisor that accompanied you when you
12  picked up detainees from the RTU on February 18th,
13  2023 and moved them to the voting area in
14  Division 4?
15         A    For certain high risk individuals, we
16  did have supervisor presence with us.
17         Q    Do you recall whether or not on
18  September -- I'm sorry -- February 18th, 2023,
19  whether or not you actually were the officer
20  that moved Mr. Westmoreland to Division 4 to
21  vote?
22         MR. RADUNSKY:  Tom, when you say
23  actually moved, can you just clarify what
24  you're saying?

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 86

1          MR. MORRISSEY:  Sure.
2          MR. RADUNSKY:  Do you mean did he put
3   his hands -- okay.  Go ahead.
4          MR. MORRISSEY:  Let me rephrase it.
5          MR. RADUNSKY:  Yeah, please.  Thanks.
6   BY MR. MORRISSEY:
7          Q    Were you the escort officer for
8   Mr. Westmoreland on February 18, 2023 from the
9   RTU to go over to Division 4 to vote?
10         A    I did escort the group that
11  Mr. Westmoreland was in to and from.
12         Q    How many detainees -- do you recall
13  what time of the day that you escorted
14  Mr. Westmoreland and other detainees to
15  Division 4 to vote?
16         A    It was afternoon.
17         Q    Do you recall whether there was any
18  other officers with you when you escorted
19  Mr. Westmoreland and other detainees from the
20  RTU to Division 4 that day?
21         A    Like I said, there was a group of us
22  that were constantly moving detainees from RTU
23  to Division 4.  There was a group of us.
24         Q    Were you responsible for a certain

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 87

1   number of detainees being moved from the RTU to
2   Division 4?
3          A    Not a specific amount.
4          Q    How many detainees were with you that
5   afternoon when you moved Mr. Westmoreland to
6   Division 4?
7          A    In that group alone, it was eight.
8          Q    Mr. Westmoreland was in the
9   wheelchair that day, correct?
10         A    Yes.
11         Q    Were there any other -- the other
12  seven detainees that were being moved on
13  February 18 to Division 4 to vote, were any of
14  the other detainees in a wheelchair?
15         A    Along with Mr. Westmoreland, there
16  were three additional detainees.
17         Q    We previously looked at the depiction
18  of the ramp which was in Exhibit 17, do you
19  recall, in your deposition?
20         A    Yes.
21         Q    In order to get to Division 4 from
22  the RTU, was it -- was that the course of
23  travel that you took?  Did you have to bring
24  the eight detainees up that ramp?

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 22

OFFICER GEORGE MARIN
January 11, 2024

Page 88

1     A    That ramp, no.
2     Q    Tell me the path of travel from the
3  RTU that afternoon with three wheelchair
4  detainees in addition to Mr. Westmoreland and
5  four other prisoners that you took going from
6  the RTU to Division 4?
7         MR. RADUNSKY:  I'm sorry.  I was
8     looking away.  What are we talking about,
9     the route from RTU to Division 4?
10        MR. MORRISSEY:  That's correct.
11        MR. RADUNSKY:  Okay.  Sorry.  George,
12    go ahead.  I didn't mean to interrupt.
13 BY THE WITNESS:
14    A    So leaving -- gathering the group of
15 detainees, we all took an elevator down to what
16 is considered the basement.  After the basement,
17 we made a right, went through multiple doors to
18 take that route to Division 4.
19 BY MR. MORRISSEY:
20    Q    Was there any incline when you got
21 down -- let me ask a preliminary question.
22        What floor was Mr. Westmoreland
23 housed on in the RTU?
24    A    The third floor.

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 89

1     Q    And you said you took an elevator to
2  the lower level of the RTU; is that fair to
3  say?
4     A    Yes.
5     Q    Are there two inclines or ramps that
6  are at the basement of the RTU?
7     A    For that route itself?
8     Q    Yes.
9     A    We did go up a slight ramp.
10    Q    And that would -- if you exited the
11 doors for the RTU, would that have been the
12 incline on the left?
13        MR. RADUNSKY:  Are we in the
14    basement, Tom?
15        MR. MORRISSEY:  We're in the basement
16    of the RTU.
17        MR. RADUNSKY:  Go ahead, George.
18 BY THE WITNESS:
19    A    Yeah, no, it's -- once you get off
20 the elevators, you would make a right.  So you
21 would go -- you would just take a path on your
22 right hand -- like, once you leave, make a
23 right, take that path through multiple doors
24 and then you would enter an area that is like

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 90

1  going to discharging and laundry, like that
2  area.  There's a, I think, a small slight ramp.
3  BY MR. MORRISSEY:
4     Q    And from -- I'm showing you the
5  Exhibit Number 17.
6         At the bottom of Exhibit Number 17
7  are doors leading to the RTU basement; is that
8  fair to say?
9     A    There are multiple doors.
10    Q    And leading to the RTU building, the
11 basement of the RTU?
12    A    In the elevator entrance, yes.
13    Q    So if you are at the bottom of this
14 Exhibit 17 ramp, which I think Troy identifies
15 as the east ramp, if you're coming out of the
16 basement of the RTU, is the incline that you're
17 talking about on the left as far as your course
18 of travel on February 18th?
19    A    So the entrance that we're talking
20 about is on the opposite end.  So it would be
21 further right, extremely further right.
22    Q    But there's an incline when you
23 exited the RTU basement that day to get into
24 the main hallway or tunnel of the jail,

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 91

1  correct?
2     A    There is a path that has an incline,
3  yes.
4     Q    And just for purposes of this
5  deposition, when you exit the basement of the
6  RTU, in order to get into the tunnel system,
7  you either take one or two paths of travel up
8  inclines, one of which is depicted in Exhibit 17
9  and the other is the incline that you took that
10 day, correct, on February 18th?
11    A    Yes, leaving RTU there are paths that
12 have slight ramps.
13    Q    There's two, correct?
14    A    There are -- well, yes, there are two
15 ramps from either side, left or right.
16    Q    So you took -- you didn't take the
17 ramp which is depicted in Exhibit 17.  You took
18 the other ramp with the eight detainees leaving
19 the RTU to go to Division 4 to vote on
20 February 18th, 2023, correct?
21    A    Yes.
22    Q    To your recollection, did you push
23 Mr. Westmoreland up that other incline?
24    A    That particular day or just overall?

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 23

Q No, that day.
**A That day, no.**
Q Did you push any of the other three people up that incline?
**A No.**
Q Why not?
**A There wasn't a need to push the individuals that were in wheelchairs. They already had -- there were already detainees pushing them.**
Q Why were there detainees pushing the inmates in wheelchairs up that incline from the RTU?
**A I'm not sure. It wasn't like it was -- there was any specific plans or orders. It was we were given a voting list, and the individuals that wanted to vote next wanted to come. The people who were in wheelchairs already had people that were going to push them, so it would be a small group that were leaving at once rather than one person leaving one at a time. It was -- when I already got to the tier, the four individuals that were in wheelchairs already had the people that were**

**going to push them.**
Q Do you recall Mr. Westmoreland asking you to be pushed by an inmate up that incline from the RTU?
**A No. It was to -- they already had -- like I said before, they already had a group that was going to push them.**
Q Do you know if there's a requirement of inmates to push people in wheelchairs up and down inclines?
**A No. There's -- it's not like it's stated in policy that a detainee can't push another detainee.**
Q Is there any type of order that you can give an inmate to push a person up or down a ramp or an incline?
**A No, I --**
MR. RADUNSKY: Just object to form. That's okay. You can answer. Go ahead, George. Go ahead. You can answer.
BY THE WITNESS:
**A No, I can't force a detainee to push someone else.**

BY MR. MORRISSEY:
Q So based upon your knowledge as a correctional officer, you can't order an able-body detainee to push a person in a wheelchair up or down a ramp?
**A Another officer, I could ask for assistance and have them push the person in a wheelchair, yes. But another detainee, no, I can't order another detainee to push another person.**
Q Why not?
**A Why can't I have somebody -- like why can't I order a detainee to push another detainee?**
Q Correct.
**A It's not my job to, you know, enforce one detainee to, like, help out another individual. You know, because they could refuse at any time. Then, you know, it's not like I could enforce any discipline if they did refuse, no. There's -- I don't have that authority to force individuals to do something, that, you know, they're -- they don't have to do. Like I said, if it was another officer,**

**yes, I could tell the officer, hey, help me. We are going to, you know, push individuals that are in wheelchairs; but I can't tell a detainee to do it because they could ultimately refuse.**
Q After you went up that incline from the RTU on February 18, tell me the course of travel that you took to get to Division 4.
**A It's just a long path of walking through, you know, different long tunnels. Just different long halls to different -- because you are going through different buildings in the basement. So you are going to pass, you know, discharges, Division 5. You know, you're underneath the basement, so it's just a long walk from one area to another.**
Q How did you enter Division 4 that day for the inmates to -- when you were moving the eight inmates, four who were in wheelchairs? How did you gain entrance to Division 4?
**A It was through an elevator.**
Q Showing you what has been marked as Exhibit Number 47, do you recognize that location?

OFFICER GEORGE MARIN
January 11, 2024

Page 96

1    A    Yes.

2    Q    Is that a fair and accurate depiction

3  of the stairway and ramp to enter into the --

4  it looks like the basement of Division 4?

5    A    That's the first floor of Division 4.

6    Q    Is it a fair and accurate photograph

7  of the first floor of Division 4?

8    A    Yes.

9    Q    From the RTU building, was there

10 another path of travel available to you to gain

11 access to the first floor of Division 4 that

12 you could have taken?

13   A    Coming from like the outside, yes.

14   Q    How would you have taken

15 Mr. Westmoreland and the other three

16 wheelchair-bound detainees to Division 4 from

17 the RTU by the other path of travel?

18   A    So going from RTU from the third

19 floor to now, this time, the first floor,

20 making a right and then exiting through that

21 area and using the garage doors, having them,

22 you know, open the garage doors so we could

23 then walk through the, you know, pathway to the

24 gym in Division 4.

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 97

1    Q    Did the ADA director, Ms. Canchola

2  Rivero instruct you in regards to a path of

3  travel that day for all the disabled prisoners

4  housed in the RTU to vote?

5    A    No.

6    Q    Did any supervisor for the Sheriff's

7  Office advise you in regards to a path of

8  travel that would avoid going up or down this

9  ramp in Division 4 to vote?

10   A    I don't recall a specific supervisor

11 giving me those orders.  I just know we took

12 the tunnels because weather permitting.

13   Q    Now, you mentioned that from the

14 tunnel area you had to go down an elevator to

15 get to this area where -- located in Division 4,

16 correct?

17   A    Yes.

18   Q    And you were able to put all eight

19 detainees in the same elevator and descend from

20 the tunnel down to this area so you could enter

21 Division 4?

22   A    So for Division 4, no.

23   Q    How many detainees were you able to

24 put in the elevator at any one time to get down

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 98

1  to the entrance to Division 4?

2    A    Detainees, all that are not in

3  wheelchairs, maybe around eight.  Individuals

4  that -- you know, wheelchair assistance, along

5  with someone else, regardless of its a detainee

6  or not, a total of four.

7    Q    Was there another officer with you?

8    A    Escorting them, no, it was just

9  myself.

10   Q    So you had to leave some inmates

11 unescorted while some of the inmates went down

12 the elevator to get -- to gain access to

13 Division 4?

14   A    No.  There was a Division 4 officer

15 that gave us access to where you see the door

16 entry right there, they were right there

17 waiting for the two -- or the total of four to

18 come up.

19   Q    But you had to go down an elevator

20 from the tunnel to get to -- in the -- let me

21 rephrase the question.

22        In Exhibit 47, there's a metal ramp,

23 correct?

24   A    That ramp right there.

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 99

1    Q    Yes.

2        MR. RADUNSKY:  Yeah, that's

3    Exhibit 47, George.

4  BY THE WITNESS:

5    A    Yes.  That ramp right there is in

6  Division 4.

7  BY MR. MORRISSEY:

8    Q    And there's no handrails on -- for

9  most of that metal ramp, correct?

10   A    On the right -- no, on the right side

11 it appears -- or, you know, looking at it on

12 the left side, there isn't any handrails.

13   Q    And it's a steep metal ramp, correct?

14 You would agree?

15       MR. RADUNSKY:  Just object to the

16   form -- or to the term "steep."

17       You can answer, George.

18 BY THE WITNESS:

19   A    Yeah, I think that's more of a

20 subjective question because, to you, it might

21 be steep.  To me, it's just a slight angle.

22 BY MR. MORRISSEY:

23   Q    But to the left of the ramp, there

24 are about six or seven steps to descend,

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 25

1  correct?
2      **A    Yes.**
3      Q    And the ramp covers part of those
4  seven steps, correct?
5      **A    It does.**
6      Q    And at the top of the ramp, there's a
7  doorway?
8      **A    Correct.**
9      Q    And if you open that doorway, does
10 that gain entrance to the area, the vestibule
11 where the elevator is located?
12     **A    Yes.  It does allow you to go into**
13 **another vestibule for elevator access.**
14     Q    And you're saying that there is an
15 officer that's stationed in that vestibule at
16 the entrance to Division 4 where the wheelchair
17 people were staged periodically before voting?
18     **A    I wouldn't say specifically he's**
19 **there, stationed there specifically.  I just**
20 **know that I did need an officer at that area**
21 **because those doors are locked.  You need keys**
22 **to enter.  So he needed to assist me gathering**
23 **all of the detainees and still allowing us all**
24 **through those doors.**

1      Q    So to open that door at the top of
2  Photograph Number 47, Exhibit Number 47,
3  required an officer to open the door.  It's a
4  locked door?
5      **A    Correct.  It's a locked door.**
6      Q    Okay.  Now, did you gather all eight
7  detainees in that vestibule after they
8  descended down to the vestibule before
9  proceeding down that ramp for those individuals
10 to vote?
11     **A    Yes, all of them I was -- I gathered**
12 **all eight detainees before we continued on.**
13     Q    To your knowledge, was one of the
14 detainees rather overweight?
15         MR. RADUNSKY:  Object to form.
16 BY MR. MORRISSEY:
17     Q    Did one detainee to your recollection
18 have to be brought down backwards because he
19 appeared to be over 300 pounds?
20     **A    There was an individual that was**
21 **slightly larger than myself, yes, in a**
22 **wheelchair.**
23     Q    To your recollection -- you don't
24 seem to be -- you seem to be a relatively fit

1  correctional officer actually.
2          MR. RADUNSKY:  You're not 300 pounds.
3      We're not stipulating to that.  Go ahead.
4  BY MR. MORRISSEY:
5      Q    Are you stipulating that you are in
6  pretty good shape?
7          MR. RADUNSKY:  Yeah, exactly.  Right.
8          MR. MORRISSEY:  That's what I
9      thought.
10         MR. RADUNSKY:  Yeah.
11 BY MR. MORRISSEY:
12     Q    To your recollection, did the
13 heavier-set wheelchair person have to get out
14 of his wheelchair and walk down the ramp?
15     **A    At that moment, I don't recall.**
16     Q    Let me show you Exhibit 18.  Showing
17 you a video marked as Exhibit 18.  I'm going to
18 stop the Video Number 18 at that point.
19 Do you see yourself in that video at
20 this point?
21     **A    No.**
22     Q    Does that refresh your memory that an
23 overweight detainee got out of his or her --
24 his wheelchair and walked down the steps and --

1      **A    Yes, it does appear so.**
2      Q    Where were you at this point if you
3  recall?
4      **A    I would still be at the other**
5  **entrance where the other remaining four**
6  **detainees were at.**
7      Q    So you would be inside the vestibule
8  while the -- at the time that this overweight
9  detainee got out of his chair and walked down
10 the steps to avoid going down the ramp?
11         MR. RADUNSKY:  Just object to the
12     characterization of "overweight," but you
13     can answer, George.
14 BY THE WITNESS:
15     **A    Yeah, I wouldn't say I was still in**
16 **the vestibule.  I'm sure I was in that area**
17 **where the stairs and the ramp were.**
18 BY MR. MORRISSEY:
19     Q    Do you have any recollection of when
20 you left the RTU with the four wheelchair-assisted
21 detainees and the four able-body detainees,
22 whether or not there was any difficulty in
23 moving this overweight detainee up the incline
24 from the RTU to get into the tunnel hallway?

Exhibit 6 Page 26

OFFICER GEORGE MARIN
January 11, 2024

Page 104

1    A    No.

2    Q    You don't recall?

3    A    No, I don't recall.

4    Q    I'm going to continue the video.  I'm

5  going to stop it for a moment.

6         Are you the gentleman that's on the

7  left-hand side where the arrow is pointed?

8    A    Yes.

9    Q    Do you know where Mr. Westmoreland --

10 is Mr. Westmoreland depicted in this picture?

11   A    He is not the first individual in the

12 wheelchair.  No, he is not.

13   Q    Prior to February 18, 2023, do you

14 recall having any contact with Mr. Westmoreland?

15   A    Just brief, you know, interactions if

16 I was to work that tier.

17   Q    Did you work -- prior to February 18,

18 2023, had you worked in a tier where

19 Mr. Westmoreland was housed?

20   A    Yes.

21   Q    For how long a period?

22   A    The duration of my shift, the eight

23 hours; or if I was assigned there, it would be

24 just for the eight hours unless I stayed for

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 105

1  overtime.

2    Q    Was that on more than one day that

3  you were the tier officer for Mr. Westmoreland?

4    A    Yes.

5    Q    To your recollection, was -- in your

6  interaction as the tier officer for

7  Mr. Westmoreland, was he always respectful to

8  you?

9    A    Yes.  We were both respectful to one

10 another.

11   Q    Did it appear that he was very

12 compliant with any requests or orders that you

13 gave him as his tier officer?

14   A    He was, yes.

15   Q    How would you describe

16 Mr. Westmoreland's conduct when you were his

17 tier officer?

18   A    I would say normal.  It wasn't any

19 negative interactions he and I had.

20   Q    Do you know from talking to other

21 officers whether that was the same, that

22 Mr. Westmoreland generally got along with the

23 correctional staff?

24   A    I'm not sure how other staff members

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 106

1  helped him out.

2    Q    But he was never disrespectful to you

3  as an officer, correct?

4    A    To me personally, no.

5    Q    Did you ever engage him when you were

6  the tier officer or did he engage you in

7  conversation?

8    A    If needed, yes, we would talk to one

9  another but I can't recall a specific situation

10 where I had a full-blown conversation with him.

11   Q    Did you know that he was a music

12 instructor in the outside world?

13   A    No.  As far as anything personally

14 regarding Mr. Westmoreland, no.

15   Q    What were you doing as you were

16 walking down the hallway here in the basement

17 of division -- or on the first floor of

18 Division 4?

19   A    Walking, gathering the inmates so

20 they could go vote, making sure they had all of

21 their IDs and paperwork.

22   Q    Were any of the officers that are

23 depicted in division -- in Photograph Number 18,

24 do you recognize any of those officers as being

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 107

1  from the RTU.

2    A    No.

3    Q    Do you know the names of any of the

4  officers?  For instance, the first gentleman in

5  Exhibit Number 18 at 2:31 in the video, do you

6  recognize the gentleman who is -- the white

7  gentleman with the white mask?

8    A    I don't know his name, but I have

9  seen him in RTU.

10   Q    So you would say that he was an RTU

11 officer on February 18th?

12   A    I would say possibly.  It depends.  I

13 would need to know his name to see if he was an

14 RTU officer or not.

15   Q    Do you know the name of the woman

16 that's standing to his right at 2 minutes and

17 31 seconds in Exhibit 18?

18   A    No.

19   Q    How about the gentleman directly to

20 his left, the African American gentleman that

21 looks like he's holding a bottle?

22   A    No.

23   Q    To your knowledge, was he an RTU

24 officer also?

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 27

Page 108

1  **A   To my knowledge, the only RTU officer**
2  **who I did see around was the first officer that**
3  **you pointed out.**
4      Q   We'll continue the video from
5  Exhibit 18.
6      Do you know if Mr. Westmoreland was
7  the last gentleman that we saw in the video in
8  Exhibit 18 at approximately 2 minutes and
9  51 seconds?
10     **A   No, I don't recall if that was**
11  **Mr. Westmoreland or not.**
12     Q   We're going to turn to now Exhibit
13  Number 19.
14     MR. RADUNSKY:  Guys, can we take a
15  quick break just because I have to go to
16  the bathroom?
17     MR. MORRISSEY:  Sure.
18     MR. RADUNSKY:  Can we come back at
19  12:45 just because I've got to run down the
20  hall; is that okay?
21     MR. MORRISSEY:  Sure.  Go ahead.
22     MR. RADUNSKY:  All right.  George,
23  I'm running to the bathroom.  Turn off the
24  video and all of that stuff.

Page 109

1      (WHEREUPON, a short
2      break was had.)
3  BY MR. MORRISSEY:
4      Q   To your knowledge that day, were any
5  of the -- well, let me ask a preliminary
6  question.
7      We just looked at Exhibit 18 for
8  three wheelchair-assisted detainees going down
9  to that ramp to enter Division 4's first floor,
10  correct?
11     **A   At that moment, yes.  There were four**
12  **individuals that were in wheelchairs coming**
13  **down that ramp.**
14     Q   Did you give any instructions to the
15  detainees pushing them down the ramp as far as
16  how they were to navigate that steep ramp?
17     **A   It wasn't, like, just an actual**
18  **order.  It was -- you know, I did let them know**
19  **that they had to, you know, take their time**
20  **going down the ramp.  I didn't want them to go**
21  **too fast down the ramp, you know, just for**
22  **simple just, you know, safety issues.  It's --**
23  **it's just at the ramp going down, you know,**
24  **when you're going downhill, obviously you go**

Page 110

1  **down faster.  So I just -- you know, I did let**
2  **them know that it is obviously one at a time,**
3  **and they should take their time going down.**
4      Q   Could one of the wheelchair detainees
5  in your opinion gone down the ramp without any
6  assistance?
7      **A   That's up to that person individually.**
8      Q   Was there any warning sign that you
9  saw on that ramp for wheelchair people to be
10  cautious going up or down the ramp?
11     **A   Not that I recall.**
12     Q   Was there any signage up saying that
13  if you're in a wheelchair, you should request
14  assistance from an officer to go up or down
15  that ramp?
16     **A   Not that I recall.**
17     Q   As an officer, were you required or
18  ordered to provide assistance to a wheelchair
19  person going up or down that ramp to enter
20  Division 4?
21     MR. RADUNSKY:  Asked and answered
22  multiple times.
23      You can answer, George.  Go
24  ahead.

Page 111

1  BY THE WITNESS:
2      **A   Like I have said previously, if the**
3  **detainee wanted assistance or he wanted me to**
4  **push them up and down certain ramps, I would.**
5  BY MR. MORRISSEY:
6      Q   Do you know if any officer has ever
7  been disciplined specifically in regards to this
8  metal ramp in the first floor of Division 4 not
9  providing assistance for a detainee in a
10  wheelchair going up or down the ramp?
11     **A   Not to my knowledge.**
12     Q   To your knowledge, has any
13  correctional officer during the time you were a
14  correctional officer at the jail ever been
15  reprimanded or disciplined by a sergeant or a
16  supervisor for not assisting a wheelchair
17  person going up or down a ramp at the Cook
18  County Jail?
19     **A   Not that I recall.**
20     Q   To your knowledge, was there any
21  requirement of a correctional officer to
22  document if a detainee was not assisted going
23  up or down a ramp at the Cook County Jail?
24     **A   The only documentation we would do**

Exhibit 6 Page 28

OFFICER GEORGE MARIN
January 11, 2024

Page 112

1  are just overall refusals.  We wouldn't
2  document if a detainee refused our assistance.
3      Q    Did you offer any assistance to
4  Mr. Westmoreland going up or down this ramp to
5  enter the first floor of Division 4?
6      A    There was no need for me to offer any
7  assistance because he already had somebody
8  pushing him.
9      Q    Had you ever documented as a movement
10  officer when a wheelchair -- let me ask a
11  preliminary question.
12           To your knowledge, when you moved
13  detainees in wheelchairs as a movement officer
14  up and down ramps at the Cook County Jail, to
15  your knowledge, did any wheelchair person ever
16  refuse your assistance to go up or down a ramp?
17      A    I've had detainees just overall
18  refuse me just to push them or assist them.  It
19  was never documented.
20      Q    Were you required -- you say -- let
21  me go back a step.
22           Specifically, do you have any
23  recollection of any wheelchair-assisted person
24  refusing your assistance going up or down a

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 113

1  ramp?
2      A    Going up or down a ramp, no.
3      Q    You mentioned that there were times
4  when a wheelchair-assisted detainee refused
5  your assistance in a wheelchair, correct?
6      A    Yes.
7      Q    Can you tell me about those
8  occasions?
9      A    I can't remember the specific, like,
10  detainee's name, but there have been times
11  where I had been movement officer and I would
12  get their ID and just let them know, hey,
13  you're going to the dispensary or you're going
14  to get an x-ray done at Cermak, and I'll start
15  pushing them and they'll say, hey, no, I'm good
16  or if -- same scenario but I'm like when I grab
17  their ID and I'll say, hey, do you need me to
18  push you, they're like, no, I'm good.
19           There's been times where they're good
20  pushing themselves throughout, you know, the
21  compound or the division; but if they, for some
22  reason, needed help going up certain ramps and
23  said, hey, you know, can you push me, I would
24  be more than happy to help them.  But there

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 114

1  have been times where if I was escorting a
2  certain detainee, they wouldn't want any
3  assistance from me; and if they got to a
4  certain point where -- a couple of occasions
5  where they did just get tired more or less, you
6  know, pushing themselves, I would go ahead and
7  push them.
8      Q    In the hallways or tunnels or
9  corridors when a detainee refused your
10  assistance to push them, would you document in
11  the Sheriff's log that they didn't want
12  assistance?
13      A    I wouldn't document --
14           MR. RADUNSKY:  Answer the question.
15           In that hypothetical, Tom, are
16  you assuming that nobody -- like he asked
17  an inmate if he wants to be pushed, an
18  inmate says no and then somebody else may
19  end up doing it, not George?  Are you
20  saying that or are you saying no other
21  officer asked him -- asked that detainee to
22  be pushed, and it's just George that was
23  asked?
24           MR. MORRISSEY:  Let me rephrase.

TOOMEY REPORTING
312-853-0648

OFFICER GEORGE MARIN
January 11, 2024

Page 115

1           MR. RADUNSKY:  Yeah, there's a lot --
2           yeah, because I just don't understand.
3  BY MR. MORRISSEY:
4      Q    On those few occasions when you
5  offered to push a wheelchair person in a
6  hallway or tunnel or corridor at the Cook
7  County Jail and that person said no or
8  declined, did you document that in any log?
9      A    No, I did not document it.  I would
10  only document if they refused to go to certain
11  locations.
12      Q    To your knowledge, where would you --
13  in that scenario where you were pushing a
14  detainee in a hallway, corridor or tunnel and
15  you offered assistance to the wheelchair person
16  to push them, where would you document it based
17  upon your knowledge?  What procedure would
18  there be for you to document it?
19      A    To my knowledge, there isn't a log of
20  approvals or refusals pushing individuals in
21  wheelchairs.
22      Q    Who would you contact in a situation
23  where a detainee refused your offer to push
24  them in a hallway tunnel at the Cook County

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 29

OFFICER GEORGE MARIN
January 11, 2024

Page 116

1   Jail?
2        A    You said who would I notify if they
3   refused?
4        Q    Right.
5        A    No one.
6        Q    Was there ever a time when you were a
7   movement officer in the RTU where you offered
8   to push a detainee up a ramp and they refused?
9        A    I'm sorry.  I'm trying to -- what was
10  the question?
11       Q    My question, when you were a movement
12  officer as a correctional officer moving a
13  person up or down a ramp at the Cook County
14  Jail, was there ever a time you offered to push
15  the wheelchair person up the ramp when they
16  refused?
17       MR. RADUNSKY:  I think he just
18       answered that, but you can answer again,
19       George.
20  BY THE WITNESS:
21       A    There would be times where I would
22  ask if they needed to be pushed or I would take
23  it upon myself to just push them, you know, to
24  help them, and they would tell me personally,

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 117

1   like if we're going to Cermak up the ramp, no,
2   I don't need any help or, yes, I do need help.
3   Like, they would tell me that they do need help
4   or that they don't at that time.  And then if,
5   you know, we're just going to Cermak, I would
6   just let it be known to the Cermak officer,
7   like, you know, hey, you know, he came -- just
8   because sometimes the Cermak officer will bring
9   them on his own or he would radio if he was too
10  busy.  I would just tell the Cermak officer
11  like, hey, he refused or he didn't want my
12  help, you know, coming back.  Maybe he'll take
13  your help.  You know, just so he's aware that,
14  you know, at that time that he didn't need
15  assistance.  But like I said, it will be at
16  random times where an inmate will, you know
17  refuse my help from -- initially pushing them
18  or going up the ramp.  They will say, no,
19  they're more than capable.
20       Q    On those occasions when you offered a
21  detainee to -- in a wheelchair to go up or down
22  a ramp and the detainee was wheelchair
23  assisted, did you ever document the refusal of
24  your offer to push them up or down a ramp?

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 118

1        MR. RADUNSKY:  It's been asked and
2        answered multiple times.  You can answer it
3        again, George, for the last time.
4   BY THE WITNESS:
5        A    Again, no.  There was no
6   documentation.  There was no log of approvals
7   or refusals pushing somebody in a wheelchair.
8   Like I said, I would just go ahead and just
9   give the Cermak officer a heads up that I did
10  help him or I didn't help him just so he's
11  aware when he brings him back he knows, you
12  know, how to deal with the inmate or the
13  detainee because some of them get extremely
14  offended if you do try to assist them.
15  BY MR. MORRISSEY:
16       Q    Turning to Exhibit Number 19 now, I'm
17  going to play a video which is depicted in
18  number -- Exhibit 19.
19            (Video played.)
20  BY MR. MORRISSEY:
21       Q    I'm going to stop it at .37 seconds.
22  Have you seen yourself in that video so far?
23       A    I was with the group going towards
24  the stairs.

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 119

1        Q    Let's go -- can I go back so you can
2   point yourself out?
3        A    Yes.
4        Q    Thanks.  I'm going to start it over
5   again.  I'm going to try to go backwards and
6   play it and tell me -- I'm going to play it.
7   Tell me when you appear in the video.  Let me
8   run it back.
9            (Video played.)
10  BY THE WITNESS:
11       A    Yeah, the officer waving the
12  detainees to come down, that does appear to be
13  me.
14  BY MR. MORRISSEY:
15       Q    So are you the -- I have the cursor
16  on the first officer.  Is that you?
17       A    Yes, that does appear to be me.
18       Q    So at 12 seconds in the video
19  depicted in Exhibit 19, you're the officer
20  depicted -- the first officer walking toward
21  the ramp, correct?
22       A    I believe so, yes.
23       Q    And you're directly in front of a
24  prisoner with a cane, correct?

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 30

OFFICER GEORGE MARIN
January 11, 2024

Page 120

1     **A**    **He does have a cane.**
2     Q    I'm going to continue the video.
3                 (Video played.)
4   BY MR. MORRISSEY:
5     Q    Now, I'm going to stop it at
6   29 seconds.  Do you see in the video that
7   you're going up the steps on the left side?
8     **A**    **It appears that I am by the steps.**
9     Q    Do you know if you were ascending the
10  steps or were you at the bottom of the steps?
11     **A**    **I would be at the bottom.**
12     Q    Do you have any recollection where
13  you were at the time of Mr. Westmoreland's
14  wheelchair tipping over?  Were you at the
15  bottom of the steps or at the top?
16     **A**    **My recollection would be at the**
17  **bottom.**
18     Q    We are going to continue the video.
19               (Video played.)
20  BY MR. MORRISSEY:
21     Q    Now, I'm stopping it at 48 seconds.
22  Do you see on the left-hand side there were a
23  series of inmates going up the steps?  Do you
24  know if you were up the steps or at the bottom

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 121

1  of the steps at 48 seconds into this Exhibit 19?
2     **A**    **I believe I'm either on the steps or**
3  **at the bottom of the steps because I'm, at that**
4  **point, just letting them -- letting the group**
5  **know that what -- there's like a, I guess -- I**
6  **don't know how you would call it, maybe like a**
7  **small lip that they would need to get over the**
8  **lip before they come up the slight ramp.**
9     Q    So at the bottom of this makeshift
10  metal ramp, there was some type of obstruction
11  would you call it or a lip or a curb?
12     **A**    **To my knowledge, it's -- like I said,**
13  **I'm not the one who designed the ramp.  It**
14  **looks like it wasn't a smooth transition from**
15  **the ramp to the floor.**
16     Q    So the --
17     **A**    **Because the ramp is still angled so**
18  **there has to be some kind of, you know, slight**
19  **angle where it's not a smooth flat surface.**
20     Q    Do you see the -- at 48 seconds,
21  there's an inmate that looks like he's
22  beginning to break into a jog or a run.  Do you
23  see that gentleman?
24     **A**    **I -- he appears to possibly like lift**

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 122

1  **the front -- like possibly lifting the front or**
2  **angling his -- angling the seat so the front**
3  **wheels are kind of elevated slightly.**
4     Q    Do you know the name of that prisoner
5  that's pushing him?  That's Mr. Westmoreland in
6  the wheelchair, correct?
7     **A**    **Possibly.  I didn't see him.  I just**
8  **see the inmate who was pushing him, not the**
9  **actual -- you can't tell the person who is in**
10  **the wheelchair.**
11     Q    We'll continue the -- now he's
12  breaking into a run at 53 seconds, correct?
13     **A**    **It looked like it, yes, from the time**
14  **you had -- from the time you pressed play.**
15     Q    And on the left-hand side, are you
16  still at the base of the stairs?
17     **A**    **Like I said, I'm either at the base**
18  **of the stairs or on the steps because a**
19  **majority of all the other inmates or detainees**
20  **are at the top floor.  I just have to make sure**
21  **I keep some visual on them.**
22     Q    Do you recall giving any instruction
23  to this inmate in regards to running with the
24  wheelchair-assisted detainee toward the ramp?

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 123

1     **A**    **I recall letting the group know that**
2  **they have to lift the front, which is why he,**
3  **it appears right now to, you know, get in**
4  **preparation to go up the ramp; but I do recall**
5  **just letting him know that the front wheels**
6  **need to be up before they do push up somebody**
7  **up the ramp.**
8     Q    So is it your lay opinion that the
9  wheelchair person on his own couldn't go up
10  that metal makeshift ramp?
11     **A**    **Him personally, not sure.  Like I**
12  **said, everyone is different.  So, you know, if**
13  **somebody is strong enough to wheel themselves**
14  **up a ramp, I'm sure they will but it just all**
15  **depends on the individual.**
16     Q    Did you have training, sufficient
17  training from the Cook County Sheriff in
18  regards to your responsibilities under the ADA
19  at this point in regards to a disabled person
20  going up or down this ramp?
21     **A**    **Up and down a ramp --**
22     Q    Well, let me rephrase the question.
23  Had the Sheriff's Office given you any training
24  on whether or not this ramp on the first floor

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 31

OFFICER GEORGE MARIN
January 11, 2024

Page 124

1 of Division 4 was accessible for a wheelchair
2 detainee under the ADA?
3     MR. RADUNSKY: Just object to form.
4     Hold on. I think it calls for an expert
5     opinion. I don't think he's qualified to
6     give such an opinion given also what he's
7     told you about his background and his
8     expertise which he has none in this field.
9            Subject to that, George, you can
10     answer.
11 BY THE WITNESS:
12     **A    Yeah, regarding this specific ramp,**
13 **no, there wasn't any specific training how to**
14 **handle, you know, this specific ramp that's in**
15 **the video.**
16 BY MR. MORRISSEY:
17     Q    In Video Number 17, we'll go back to
18 17, the video which depicts the ramp that leads
19 from Cermak into the RTU, had any supervisor or
20 ADA coordinator for the Sheriff's Office ever
21 told you whether this ramp was accessible for a
22 wheelchair-assisted detainee?
23     **A    That specific ramp itself, no. It**
24 **was just from my recollection just a broad**

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 125

1 **overview on how to handle ramps. It didn't**
2 **specify, you know, the type of ramp. It's just**
3 **ramp overall in general.**
4     Q    Based upon your recollection and
5 training, did any Sheriff's employee or
6 supervisor ever tell you that the Cermak ramp,
7 the ramp from the tunnel that goes into the
8 Cermak building, whether or not that ramp was
9 accessible or not for disabled people?
10     **A    No.**
11     Q    And in regards to the RTU ramp which
12 is depicted in Exhibit Number 17, has anybody
13 in the Sheriff's Office ever alerted you or, to
14 your knowledge, the other correctional staff
15 that this is a ramp where you need -- where you
16 must push a detainee up or down that ramp in a
17 wheelchair?
18     **A    No.**
19     Q    In regards to the Cermak ramp, has
20 any person employed by the Sheriff's Office
21 ever informed you or any other officer to your
22 knowledge that the Cermak ramp -- for the
23 Cermak ramp for a person in a wheelchair going
24 up or down the ramp, that person must be

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 126

1 offered to be pushed up or down the ramp by an
2 officer?
3     **A    No. We were never ordered or**
4 **instructed that -- personally me, I would ask**
5 **if I'm escorting somebody if they want help**
6 **going up the ramp.**
7     Q    But nobody from the Sheriff's Office
8 ever told you that for the Cermak ramp, you
9 have to offer assistance to go up that ramp?
10     MR. RADUNSKY: Asked and answered.
11     You can answer it again. Go ahead.
12 BY THE WITNESS:
13     **A    No. It's just overall just me, you**
14 **know, caring and being a nice person trying to**
15 **help somebody. I was never ordered by a**
16 **supervisor, hey, this is what you need to do**
17 **going up a ramp. It's just if somebody needed**
18 **assistance, I would ask, hey, do you need help**
19 **and they would tell me yes or no.**
20 BY MR. MORRISSEY:
21     Q    Going back to Exhibit Number 19,
22 we're almost done here.
23     **A    Okay.**
24     Q    And I appreciate your time.

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 127

1     **A    No, no. Thank you.**
2            (Video played.)
3 BY MR. MORRISSEY:
4     Q    I'm going to stop the video now at --
5 the video of Exhibit 19 at 54 seconds. Where
6 were you positioned when -- at this point in
7 time, 54 seconds into the video of Exhibit 19?
8     **A    Like I said, I was possibly -- I was**
9 **near the stairs either in the middle of the**
10 **stairs viewing the rest of the detainees right**
11 **there by the ramp, you know, to the left by the**
12 **stairs.**
13     Q    Were you focused on the detainees at
14 the top of the steps or were you looking at the
15 person in the wheelchair at the time -- at this
16 time at 54 seconds?
17     **A    Both. I knew that I had detainees at**
18 **the top of the stairs, and I knew I had a**
19 **detainee coming up the ramp, which was -- my**
20 **focus was more on them, like I said, because I**
21 **was given instructions that they had to lift**
22 **the front, you know, for the little lip and**
23 **just, you know, make sure that the wheels are**
24 **up so they can come up the ramp smoothly.**

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 32

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 128

1    Q   What did you observe at approximately --
2 what did you observe as the last detainee in
3 the wheelchair reached the metal makeshift
4 ramp, what happened?
5    A   It looked like the person who was
6 pushing him for some odd reason was building up
7 momentum heading towards the ramp, and then as
8 I clearly said earlier, like, if you don't lift
9 that front wheel, you're going to get stuck and
10 it appears that that's what happened. The
11 front wheel caught the ramp and the wheelchair
12 didn't go up anymore.
13    Q   What happened to the detainee who we
14 now know is Mr. Westmoreland when the
15 wheelchair struck the bottom of the curb of the
16 metal ramp?
17    A   At that time, he slightly fell out of
18 the chair from the push.
19    Q   Did Mr. Westmoreland fall forward
20 onto the ramp?
21    A   From my memory, it's around the ramp
22 area. I'm not sure if it was directly on the
23 ramp or to the left.
24    Q   Do you remember where Mr. Westmoreland

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 129

1 landed on the ramp?
2    A   Again, like I said, it's towards the
3 base of the ramp.
4    Q   Do you know what part of his body hit
5 the ramp?
6    A   To my recollection, I would say hands
7 because that's the first thing you do when you
8 attempt to fall, you brace yourself.
9    Q   Do you have -- I understand it's now,
10 you know, four or five months later. Do you
11 have a personal recollection of what part of
12 Mr. Westmoreland's body struck the ramp?
13    A   No, no. I don't know which body part
14 fell first or hit the ramp or the floor first.
15    Q   Do you recall whether or not
16 Mr. Westmoreland said anything, yelled out
17 before he hit the ramp?
18    A   Not to my knowledge.
19    Q   Do you know if the gentleman,
20 detainee who was pushing him, yelled out
21 anything when Mr. Westmoreland was thrown from
22 the wheelchair?
23    A   No. Like I said, it happened so
24 quickly where he was building up speed up until

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 130

1 the point of impact when Mr. Westmoreland fell
2 out of the wheelchair.
3    Q   Did you hear anything when
4 Mr. Westmoreland fell out of the wheelchair or
5 was thrown from the wheelchair?
6    A   Aside from just the wheelchair
7 hitting the ramp, like if there was any words
8 stated, I -- not to my knowledge, not to my
9 recollection.
10    Q   I'm going to continue the video now
11 at 54 seconds.
12          (Video played.)
13 BY MR. MORRISSEY:
14    Q   I'm going to stop it at 1 minute and
15 4 seconds. Did you see perhaps you're making
16 movement perhaps down to where Mr. Westmoreland
17 was thrown from the wheelchair?
18    A   At that point, it was just to see if
19 he was okay and if he needed help up, but it
20 happened so quickly where another detainee
21 helped Mr. Westmoreland to the wheelchair.
22    Q   In this picture at 1 minute 4 seconds,
23 it appears like -- and it's not a very clear
24 picture I understand, but it appears that

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 131

1 you're directly to the left of the wheelchair
2 and the inmate that had been pushing him; is
3 that fair to say?
4    A   I was near the stairs, yes.
5    Q   All right. We'll continue it.
6          (Video played.)
7 BY MR. MORRISSEY:
8    Q   At 1 minute and 10 seconds, it looks
9 like now that there is an inmate that's down
10 there also at the base of the stairs along with
11 you?
12    A   The one who helped Mr. Westmoreland
13 to the wheelchair, yes.
14    Q   And was the inmate helping to get him
15 back into the wheelchair from the ground?
16    A   I think he was just helping the foot
17 placement of where his legs are.
18    Q   We'll continue it.
19          (Video played.)
20 BY MR. MORRISSEY:
21    Q   Did you take any -- we're at 1 minute
22 and 44 seconds. Did you take any statement
23 from Mr. Westmoreland at that time?
24    A   I asked if he was okay.

Exhibit 6 Page 33

OFFICER GEORGE MARIN
January 11, 2024

Page 132

1  Q    Did you do any report that day?
2  A    Generating a report, no, of the
3  incident, no.
4  Q    Are there reports when there is an
5  unusual incident where a person might fall or
6  injure themselves?
7  A    There's --
8       MR. RADUNSKY:  I will just object to
9  the foundation.  I mean, if it's a serious --
10 yeah, go ahead, serious accident.  Go ahead.
11 BY THE WITNESS:
12 A    Yeah, if a person falls out of a
13 wheelchair or falls out of a bunk, like the
14 bed, like there isn't like an incident report
15 that's generated from our -- on our behalf that
16 says, you know, inmate John Doe fell out of
17 wheelchair.  Like that's -- there isn't any
18 incident report generated for just falling out
19 of a chair unless it's a severe thing where he
20 has to go to Cermak or if 911 has to be called.
21 Q    Is there a form called an Incident
22 Report?
23 A    Yeah, there is an incident report
24 depending on the magnitude of the situation.

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 133

1  Like I said, if he has to go to Cermak for --
2  due to an emergency or if 911 has to be called,
3  then an incident report needs to be generated.
4  Q    And would that be generated by the
5  tier officer or the movement officer if the
6  person fell?
7  A    It would be generated by the tier
8  officer or the Cermak officer.
9  Q    Does the incident report then get
10 reviewed by a supervisor or sergeant or perhaps
11 the superintendent or the watch commander?
12 A    It would have to be approved or
13 viewed by a supervisor or a sergeant, yes.
14 Q    And on the incident report, there's a
15 spot for the officer to fill out what happened,
16 correct?
17 A    A narrative, correct.
18 Q    A narrative.  And there's a -- in the
19 narrative, above the narrative, it says the
20 location of the incident and the time and who
21 was present, correct?
22 A    Yes.
23 Q    And then there is a narrative in the
24 incident report for the watch commander or the

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 134

1  supervisor to fill out, correct?
2  A    I believe there is a narrative based
3  on the findings and their investigation.  They
4  do input a small narrative on the situation.
5  Q    And then the incident report, to your
6  knowledge, then goes to the watch commander or
7  the superintendent?
8  A    The supervisor will review all
9  incident reports.
10 Q    So, in this case, you didn't generate
11 an incident report, correct?
12 A    I did not.
13 Q    Do you know if anybody else did an
14 incident report?
15 A    To the best of my knowledge, no.
16 Q    We'll continue the video on Exhibit 19.
17      (Video played.)
18 BY MR. MORRISSEY:
19 Q    That concludes the video from
20 Exhibit 19.  Do you have any recollection after
21 Mr. Westmoreland was brought up finally that
22 makeshift ramp in Division 4 what happened
23 after that?
24 A    So throughout the escort walk, I

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 135

1  asked Mr. Westmoreland a couple of times if he
2  was okay, if he, you know, needed to go to
3  Cermak or anything.  He, you know, said he was
4  fine.
5       When we arrived to the tier, I did
6  let the tier officer know that Mr. Westmoreland
7  fell out of the wheelchair, and I let the
8  sergeant know also.
9  Q    Do you know what time Mr. Westmoreland
10 fell?
11      MR. RADUNSKY:  Based on your video,
12 Tom?
13      MR. MORRISSEY:  No, no.
14 BY MR. MORRISSEY:
15 Q    Based upon your recollection.
16      MR. RADUNSKY:  Oh, well, okay.  I
17 don't think it's going to be different than
18 the video.
19      But you can answer, George.
20 BY THE WITNESS:
21 A    Like I said earlier, like around
22 noon, like the afternoon time.  The video
23 clearly shows like 12:50 but from what I said
24 earlier, like around -- yeah, it was afternoon.

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 34

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 136

```
 1       Q    Do you know whether or not the tier
 2  officer or the sergeant made any documentation
 3  about the -- Mr. Westmoreland falling out of
 4  his wheelchair?
 5       A    Not to my knowledge.
 6       Q    Did you do anything else that day in
 7  relationship to Mr. Westmoreland falling?
 8       A    Aside from notifying the tier officer
 9  and the sergeant, no.
10       Q    Did you notify any medical personnel?
11       A    No.
12       Q    On February 18th, 2023, how did you
13  happen to be escorting these inmates over to
14  Division 4 to vote?
15       A    Like what do you mean, walking?
16       Q    Well, it says in an e-mail that you
17  sent to this Ms. Canchola that you volunteered?
18       A    Yes, for the overtime.
19       Q    Oh, you were -- but you were already
20  working that day 7:00 to 3:00, correct?
21       A    No.  3:00 to 11:00 is my primary
22  shift.  7:00 to 3:00 would have been overtime.
23       Q    And did they have you come in
24  specifically overtime on election day,
```

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 137

```
 1  February 18th, 2023 to move detainees from the
 2  RTU to Division 4 to vote?
 3       A    There was a group assigned for
 4  movement -- voting movement only.
 5       Q    And you were asked to do that, come
 6  in especially on that day to move inmates over
 7  to Division 4 to vote; is that fair to say?
 8       A    Yes, I was part of the team that was
 9  helping them move.
10       Q    Did -- how many other officers were
11  enlisted to move people from the RTU over to
12  Division 4 to vote on election day?
13       A    That specific day, I can't recall.
14  It ranged from five to eight officers possibly.
15       Q    Did you have to show up in the RTU
16  for roll call on February 18th before 7:00 a.m.?
17       A    No.
18       Q    Where did you report on February 18th,
19  2023 for duty on the 7:00 to 3:00 shift?
20       A    It was still at RTU.  It was slightly
21  before voting started, and we just reported to
22  the shift commander and he gave us, you know,
23  the assignments as far as who all has to vote
24  and the team as far as who is helping to move.
```

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 138

```
 1       Q    Who was the shift commander?
 2       A    That particular day, I don't
 3  remember.
 4       Q    All five to eight officers that were
 5  on this voting detail were brought in by the
 6  shift commander that day?
 7       A    No.  The shift commander was given a
 8  list of who is going to help with the voting,
 9  and then that's how he just -- you know, he
10  knew who was assigned for voting movement or
11  movement for RTU and for regular day-to-day
12  stuff.
13       Q    Does the -- to your knowledge, on the
14  7:00 to 3:00 shift on February 18th, 2023,
15  would there be a record perhaps on the roster
16  who the shift commander was on that shift?
17       A    I'm sure there is.  I'm not sure how
18  the shift commanders handle, you know, who was
19  in charge, who is not in charge.  I don't
20  remember if somebody -- if there was a specific
21  supervisor for the movement of voting.  Every
22  shift and every -- you know, shift has a
23  different shift commander.
24       Q    And the shift commander is the head
```

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 139

```
 1  of the RTU on that day, correct?  Each shift
 2  has a shift commander?
 3       A    There are multiple sergeants and
 4  lieutenants.
 5       Q    But there is one person that acts as
 6  the overall shift commander on a watch,
 7  correct, in the RTU?
 8       A    Correct.
 9       Q    And when you came in on February 18,
10  2023, what time did you report that day?
11       A    I think it was -- I would say it's
12  before 9:00 a.m.
13       Q    So you weren't working the 7:00 to
14  3:00.  You were working a different time
15  period?
16       A    I was working the 7:00 to 3:00 shift
17  but not those specific hours.  I was only
18  assigned to work the voting hours for that
19  shift.
20       Q    Did you continue on after the 7:00 to
21  3:00 shift concluded on your regular 3:00 to
22  11:00 shift?
23       A    I did finish out my regular 3:00 to
24  11:00 shift, yes.
```

Exhibit 6 Page 35

OFFICER GEORGE MARIN
January 11, 2024

Page 140

1    Q    So in addition to working a -- did
2  you get credit for a full shift then on voting
3  day if you came in --
4    A    Got credit for -- are you saying for
5  my regular shift or for the overtime shift?
6    Q    For the overtime shift.
7    A    The only credit I was given were the
8  amount of hours I worked.  So it was from --
9  you know, if I clocked in before 9:00, it was
10 from that time to 3:00 p.m. and then my regular
11 shift started at 3:00 to 11:00.
12   Q    What room did you report to on
13 February 18th, 2023?
14   A    The lieutenant's office.
15   Q    And who was the lieutenant that day?
16   A    Again, I don't remember.
17   Q    Where is the lieutenant's office
18 located in the RTU?
19   A    On the second floor near security.
20   Q    And were all the officers that were
21 working the special assignment, did they all
22 report in that room that morning?
23   A    There were some that reported to the
24 lieutenant's area.  Most of us, if we got there

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 141

1  early enough was sitting around security.  So
2  we would just tell those who were coming in,
3  hey, we got to report to this floor first and
4  get started.
5    Q    Was there any instruction given to
6  you and the other men and women that were
7  working on this specific task, the voting task
8  on February 18, 2023 in regards to how they
9  were going to move prisoners from the RTU to
10 Division 4 to vote?
11   MR. RADUNSKY:  Asked and answered.
12   You can answer it again.
13 BY THE WITNESS:
14   A    So it was a handful of us that were
15 movement for voting.  We were just told who --
16 what floors needed to vote and then just grab
17 the detainees that were eligible to vote and
18 then we took them to Division 4.
19 BY MR. MORRISSEY:
20   Q    The -- some of those detainees were
21 in wheelchairs, correct, on the third floor that
22 you were working to transport to Division 4,
23 correct?
24   A    Throughout the building, there were

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 142

1  people in wheelchairs that were going to vote.
2    Q    Did the shift commander tell you the
3  route of passage for the disabled people to go
4  over to 4?
5    A    No.  Like I said earlier, there were
6  no specific orders.  It was just weather
7  permitting to access the outside area or just
8  utilize the tunnels.
9    Q    Were you aware prior to February 18,
10 2023 that the first floor of division -- to
11 access the first floor of Division 4 that there
12 was a steep makeshift ramp?
13   MR. RADUNSKY:  Just object to the
14   form, "steep makeshift ramp."
15        Subject to that, you can answer.
16 BY THE WITNESS:
17   A    So prior to taking the group of
18 Mr. Westmoreland, I did take that route to
19 escort detainees.
20 BY MR. MORRISSEY:
21   Q    On more than one occasion?
22   A    Multiple occasions.  It was
23 throughout that day.
24   Q    Was that route of travel -- was

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 143

1  Division 4 used for video court?
2    A    I'm not a Division 4 officer, so I
3  wouldn't know their main function, but I would
4  say they did utilize the gym for court.
5    Q    So as a movement officer in the RTU
6  on occasions, you would move wheelchair-
7  assisted detainees from the RTU over to
8  Division 4 to go to court, to go to video
9  court; is that fair to say?
10   A    Myself, me, no.
11   Q    But you were aware that on an ongoing
12 basis, disabled people were brought over to
13 Division 4 to attend court, correct?
14   A    I was made aware that previously
15 Division 4, the gym area, was used for court.
16   MR. RADUNSKY:  How much more you got,
17   Tom?
18   MR. MORRISSEY:  Not much more.
19   MR. RADUNSKY:  That's what you said
20   an hour ago.
21 BY MR. MORRISSEY:
22   Q    That morning on February 18th, 2023,
23 did the shift commander give you any
24 instructions or warnings about this ramp that

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 36

OFFICER GEORGE MARIN
January 11, 2024

Page 144

1  was in Division 4 when you were transporting
2  detainees in wheelchairs?
3      A   No.
4      MR. MORRISSEY:  I have nothing
5  further.  I appreciate your time.
6      MR. RADUNSKY:  No problem.
7      THE WITNESS:  Thank you.
8      MR. RADUNSKY:  All right.  George,
9  just a couple.  Let me go back to my notes.
10         C R O S S - E X A M I N A T I O N
11     BY MR. RADUNSKY:
12     Q   Under your training, do you know if
13 an inmate can refuse to be pushed by an officer
14 if they have someone else that they want to
15 push them?
16     A   My training, yeah, if someone who was
17 in a wheelchair wanted another detainee to push
18 them, that would be perfectly fine.  We
19 wouldn't refuse that on our behalf.
20     Q   Let me ask you this.  In your
21 experience in the time that you were there in
22 the RTU, do inmates in wheelchairs typically
23 prefer to be pushed by other inmates instead of
24 staff?

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 145

1      A   From my experience at RTU, yes, a
2  majority of inmates much rather have another
3  inmate push than any staff member.
4      Q   Have you ever seen Mr. Westmoreland
5  pushed in his wheelchair by other inmates, any
6  other inmates before February 18, 2023?
7      A   Throughout that time, just, you know,
8  just regular passing if I worked the tier or if
9  I was taking him to religious service and there
10 was a group of them going to religious service,
11 then at times, yes.
12     Q   When you say that staff, you know,
13 would normally push, when you see staff do it
14 and they are pushing inmates around in their
15 wheelchairs, is that typically nurses and
16 medical staff or is it officers?  Is one more
17 predominant than another?  I mean, what's your
18 observation?
19     A   Primarily it's nursing staff; but if
20 an officer needed to -- like we've seen
21 individuals before, like if it was a bigger guy
22 the nurse couldn't push, then an officer would
23 have no issue with that.
24     Q   I'm assuming during your time over

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 146

1  there, there were instances where you
2  approached inmates and asked them if they
3  wanted to be pushed in their wheelchair if you
4  thought that they may need help?
5      A   Yes.  I actually, not too long before
6  I left, I ended up pushing Mr. Westmoreland up
7  the ramp that we seen to the bridge.
8      Q   After this incident?
9      A   Yeah.  Like well after the incident.
10     Q   Okay.  And when was that?  I mean,
11 when you say "well after the incident," do you
12 know how long afterwards?
13     A   It was slightly before I came to the
14 Sheriff's Police, I was taking him to the
15 bridge.  So we used that route and, you know, I
16 asked if he wanted me to push him.  He said,
17 yeah, that's fine and I went ahead and pushed
18 him up the ramp, but he said he was perfectly
19 fine taking over after.
20     Q   In the days after the accident when
21 you saw him in his wheelchair, were other
22 inmates pushing him and pushing him places like
23 they were on the date of the incident?
24     A   At times, they would just, like,

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 147

1  casually, walking and talking throughout the
2  dayroom --
3      Q   Okay.
4      A   -- stuff like that.
5      Q   Mr. Westmoreland has -- was at the
6  Cook County Jail before, I think, you even
7  started working there and was there a couple of
8  years before this incident, and I don't know
9  how long you had seen him on the RTU or how
10 frequently; but given how long he had been at
11 the jail, even before you got there, did you
12 believe that he understood, given your
13 observations that he could ask an officer to
14 push him if that's really what he wanted?
15     MR. MORRISSEY:  I'm going to --
16 BY THE WITNESS:
17     A   Yes.
18     MR. MORRISSEY:  That's fine.
19 BY MR. RADUNSKY:
20     Q   In other words, my point is he had
21 been in the RTU for quite a long period of time
22 even before you got there.  You know, he would
23 have been familiar with the process.  In other
24 words, if he wanted somebody to transport him

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 37

OFFICER GEORGE MARIN
January 11, 2024

Page 148

1  from staff or an officer, he knew that he could
2  just ask, correct?
3      A    Yes.
4      Q    Had he ever told you that he didn't
5  understand at any point that he could ask an
6  officer or staff to push him in a wheelchair?
7      A    No, I never had that situation.
8      Q    Did Mr. Westmoreland that day
9  February 18, 2023, did he ever ask you to push
10 him in his wheelchair?
11     A    No.
12     Q    And you never refused, correct,
13 because he didn't ask you?
14     A    Correct, because he already had
15 somebody pushing him.
16     Q    So in that scenario, because he
17 already had somebody pushing him, that wouldn't
18 be termed a refusal, correct?
19     A    No, not at all.
20     Q    Has any inmate in a wheelchair or any
21 other mobility device ever told you that they
22 asked an officer for assistance and that
23 officer refused?
24     A    No.

OFFICER GEORGE MARIN
January 11, 2024

Page 149

1      Q    The policy that Tom was talking about
2  earlier regarding movement up and down ramps,
3  does it prevent inmates from pushing other
4  inmates in wheelchairs?
5      A    No, not at all.
6      Q    Now, I think you said this about the
7  signage in the hallways that -- well, let me
8  ask it this way.
9           Do you recall or don't you recall or
10 I don't remember the answer if there was
11 signage in the hallways that specifically
12 discussed transport of inmates and who could do
13 it or not do it or how it should be done?
14     A    I don't recall.
15     Q    If there were signs there, you don't
16 remember exactly what they said?
17          MR. MORRISSEY:  I'm going to object.
18     He said he doesn't recall.
19          MR. RADUNSKY:  Okay.  That's fair
20     enough.
21 BY MR. RADUNSKY:
22     Q    Did you believe that Mr. Watkins, and
23 that's the inmate that was pushing
24 Mr. Westmoreland, based on your observation of

OFFICER GEORGE MARIN
January 11, 2024

Page 150

1  Mr. Watkins if he was physically fit and
2  physically capable of pushing Mr. Westmoreland
3  up the ramp?  I know you're not a doctor, just
4  your own personal observations.
5      A    My observation is that he was capable
6  of doing so.
7      Q    Did Mr. Watkins or Mr. Westmoreland
8  ever express any concern that Mr. Watkins
9  didn't have the physical abilities to transport
10 Mr. Westmoreland?
11     A    No.
12     Q    When -- right before this accident
13 when they were approaching the ramp, did you
14 believe that there was going to be an accident
15 or did you feel that they were going to make it
16 safely up the ramp?
17     A    I did believe that because, like I
18 said, there was a brief time where the first
19 group did struggle a little bit going up; and
20 throughout the time, I was letting them know
21 that they got to lift the front.
22          So from what the video shows, it kind
23 of does show that they were, I guess, prepping
24 themselves on how to approach the ramp.  I

OFFICER GEORGE MARIN
January 11, 2024

Page 151

1  thought that it would have been a smooth
2  transition; but for whatever reason, no, it
3  didn't occur that way.  I thought they, you
4  know, were going to go up this smoothly.  I
5  didn't -- I had no doubt that there was going
6  to be an issue like that.
7      Q    When we looked at the video and I
8  think it was Exhibit Number 19 -- Tom doesn't
9  have to play it again -- but did you see that
10 another group or two that were in a wheelchair
11 had gone up the ramp after voting before
12 Mr. Westmoreland and Mr. Watkins?
13     A    Yes.
14     Q    And that group or groups of people
15 that were in the wheelchairs, did they have any
16 issues getting up or down the ramp?
17     A    No.  You could see that there's a
18 slight pause where they were adjusting the
19 wheels to go up.
20     Q    And, you know, let me ask you this:
21 Did any of the groups that you took up and down
22 the ramp that morning, did any of them have any
23 accidents or falls on the ramp other than
24 Mr. Westmoreland?

Exhibit 6 Page 38

OFFICER GEORGE MARIN
January 11, 2024

Page 152

1      A    No.
2      Q    Did anybody else that was going up
3  the ramp -- I guess Tom used the word run.  Did
4  anybody else run towards the ramp in the same
5  manner at the same speed that we saw
6  Mr. Watkins doing with Mr. Westmoreland?
7      A    No.  That was the -- those are the
8  only two individuals that displayed that
9  action.
10     Q    And did you say that you would have
11 mentioned the lip at the bottom of the ramp to
12 go down slowly when they were using the ramp
13 before this accident?
14     A    Yes, I did notify and let them know
15 that they had to take their time going down.
16     Q    And you also mentioned lifting up the
17 wheels when they were going back up the ramp,
18 that it's something that they should consider?
19     A    Yes.
20     Q    All right.  If you had any idea that
21 this was going to happen that there was going
22 to be an accident, would you just have done it
23 yourself and pushed him?
24     A    Yeah.  You know, looking back at it

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 153

1  now, if -- with the circumstance, I would have
2  had no issue pushing all of them up the ramp if
3  I didn't think they were capable of doing so.
4      Q    I know we talked about the group of
5  eight, and four of those people of those eight
6  were in a wheelchair.  How many other groups
7  did you bring to voting that day?
8      A    I want to say around a dozen just
9  random groups --
10     Q    Okay.
11     A    -- that day alone.
12     Q    Did you bring groups in after
13 Westmoreland's accident?
14     A    Yes.  It was multiple groups before
15 and well after.
16     Q    And, again, and I know I just asked
17 you this, there was no incidences or accidents
18 or similar events that occurred to
19 Mr. Westmoreland?
20     A    No.
21     Q    Okay.  Oh, I wanted to ask you this,
22 and I don't know if this got brought out.  I
23 know that you said when you were talking to Tom
24 about the two routes that you could have taken

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 154

1  in Division 4, and you mentioned that there was
2  another route that could be taken but unless
3  weather affected it.
4           Was weather a factor, I mean, on the
5  morning of this incident such that you couldn't
6  take that other route?
7      A    Yes.  It was, you know, slightly cold
8  and, you know, you can't provide, you know,
9  thick winter jackets for all and it was raining
10 also.  So I think it was just more feasible to
11 use the basement tunnels.
12     Q    Let me ask you this:  If you were
13 able to come from the outside if the weather
14 was good, would you have gotten to Division 4
15 faster?
16     A    A lot faster.
17     Q    Okay.  So going the other route that
18 you guys took, that would take more time?
19     A    Because there's so many doors you
20 have to go through, yes, it took more time.
21 Going through the outside, you probably only
22 had two, three doors you had to pass.
23     Q    That metal ramp that we have been
24 looking at in Division 4, do you have any idea

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 155

1  if that ramp is supposed to comply with ADA
2  code or requirements?
3      A    No.  No, I don't.
4           (WHEREUPON, Patrick Morrissey
5           entered the deposition
6           proceedings.)
7  BY MR. RADUNSKY:
8      Q    Just one more question about his
9  injuries.  Did you see any visible signs of
10 injury on Mr. Westmoreland that morning like
11 blood or bruising or anything else?
12     A    Immediately at that time and even
13 during the escort, no.
14     MR. RADUNSKY:  Okay.  I think that's
15     all I've got.
16          So, Tom, did you have any
17     follow-up?  I don't want to just say we're
18     reserving before...
19     THE REPORTER:  Tom, you're on mute.
20     MR. RADUNSKY:  Is Tom on mute?  I
21     don't even see his little mute thing there.
22     MR. MORRISSEY:  We'll be done in
23     about -- very shortly.
24

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 39

Page 156

1  R E D I R E C T  E X A M I N A T I O N
2       BY MR. MORRISSEY:
3       Q   Officer, on February 18th, 2023, did
4  your shift commander tell you that it was your
5  responsibility in transporting wheelchair-
6  assisted detainees, that when it came to this
7  ramp in Division 4 that it was your responsibility
8  to push Mr. Westmoreland up and down that ramp?
9       MR. RADUNSKY:  It's asked and
10      answered.
11           You can answer it again.  Go
12      ahead, George.
13  BY THE WITNESS:
14      A   No.
15  BY MR. MORRISSEY:
16      Q   In your entire period as a
17  correctional officer at the jail, did any
18  supervisor ever tell you as an officer when you
19  move a wheelchair person up or down a ramp,
20  that it's your responsibility as a correctional
21  officer to push the person either up or down
22  the ramp?
23      MR. RADUNSKY:  Same objection.  Asked
24      and answered.  You can answer it again.

Page 157

1  BY THE WITNESS:
2       A   No.
3  BY MR. MORRISSEY:
4       Q   Final question.  To your knowledge --
5       MR. RADUNSKY:  $64,000 question.
6       MR. MORRISSEY:  I hope it is.
7       MR. RADUNSKY:  Go ahead.
8       MR. MORRISSEY:  Let it be 64 -- I
9       won't go there, Troy.
10  BY MR. MORRISSEY:
11      Q   To your knowledge --
12      MR. RADUNSKY:  I heard it.
13  BY MR. MORRISSEY:
14      Q   To your knowledge, is there any
15  written communication or oral communication
16  given to disabled prisoners at the jail who use
17  a wheelchair that they must ask a correctional
18  officer to be pushed up or down a ramp at the
19  jail?
20      A   To my knowledge, no.
21      MR. MORRISSEY:  I have nothing more.
22      Thank you for your time, Officer, and good
23      luck in your new career.
24      MR. RADUNSKY:  Great.  We will

Page 158

1  reserve signature.  And, George, you are
2  free to go.  Thanks for the time.
3       THE WITNESS:  Perfect.  Thank you.
4  You guys have a good one.
5       MR. RADUNSKY:  No problem.  No problem.
6       MR. MORRISSEY:  Thanks a lot.
7       THE REPORTER:  Tom, do you need this
8  written?
9       MR. MORRISSEY:  Probably.  Let me
10  give you a call.
11      MR. RADUNSKY:  Peggy, if he orders
12  it, I want a copy, mini, index, like what I
13  usually get.
14      THE REPORTER:  Okay.  Thank you.
15
16      FURTHER DEPONENT SAITH NOT....

Page 159

1       IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3
4  EUGENE WESTMORELAND,        )
   individually and for a      )
   class,                      )
5                              )
        Plaintiff,             )
6                              )
        vs.                    )  No. 1:23-cv-01851
7                              )
   THOMAS DART, Sheriff of     )
8  Cook County, and COOK       )
   COUNTY, ILLINOIS,           )
9                              )
        Defendants.            )
10
11      I, GEORGE J. MARIN, JR., being first duly
12  sworn, on oath, say that I am the deponent in
13  the aforesaid deposition, that I have read the
    foregoing transcript of my deposition,
14  consisting of pages 1-159 inclusive, taken at
15  the aforesaid time and place and that the
16  foregoing is a true and correct transcript of
17  my testimony so given.
18
19      _____
20          GEORGE J. MARIN, JR.
21  SUBSCRIBED AND SWORN TO
    me before this _____ day
22
23  of _____, A.D. 2024.
24  _____, Notary Public

Exhibit 6 Page 40

OFFICER GEORGE MARIN
January 11, 2024

Page 160

1  STATE OF ILLINOIS )
             ) ss:
2  COUNTY OF C O O K )

3       I, Peggy A. Anderson, a Certified

4  Shorthand Reporter in the State of Illinois do

5  hereby certify:

6       That previous to the commencement of

7  the examination of the witness, the witness was

8  duly sworn to testify the whole truth

9  concerning the matters herein;

10      That the foregoing deposition

11 transcript was reported stenographically by me,

12 was thereafter reduced to typewriting under my

13 personal direction, and constitutes a true

14 record of the testimony given and the

15 proceedings had;

16      That the said deposition was taken

17 before me at the time and place specified;

18      That the said deposition was

19 adjourned as stated herein;

20      That I am not a relative or employee

21 or attorney or counsel, nor a relative or

22 employee of such attorney or counsel for any of

23 the parties hereto, nor interested directly or

24 indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 161

1       IN WITNESS WHEREOF, I do hereunto set

2  my hand this 17th day of January, 2024.

6  Peggy A. Anderson

7  Certified Shorthand Reporter

8  License No. 084-003813

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 1

**A**

A.D 159:22
a.m 1:18
  137:16
  139:12
abilities
  150:9
able 97:18,23
  154:13
able-body
  94:4 103:21
academy
  9:16,19,24
  10:24 11:5
  11:14,17
  12:12 14:23
  16:1 18:1
  18:13,20
  19:10 20:5
  20:12 21:12
  21:20,24
  22:11 24:2
  24:23 25:13
  26:5,15,21
  27:4,18
  28:10 29:18
  30:4,12,20
  31:3 34:6
  34:22,24
  35:9,13,15
  36:5 40:1,3
access 71:16
  77:10 96:11
  98:12,15
  100:13
  142:7,11
accessible
  124:1,21
  125:9
accident 82:7
  132:10
  146:20
  150:12,14
  152:13,22

153:13
accidents
  151:23
  153:17
accommod...
  21:6
accompanied
  85:11
accurate 96:2
  96:6
accurately
  38:12 86:16
  87:5 88:3
  135:22,24
ago 83:12
  143:20
agree 55:9
  99:14
ahead 15:9
  15:16 20:17
  121:19
angled
  121:15
angling 122:2
  122:2
answer 15:12
  19:20 25:5
  28:23 29:14
  41:3,6,20
  46:21 47:18
  48:9 49:24
  51:16 54:15
  61:23 65:9
  69:6 70:19
  97:1 123:18
  124:2,20
  146:17
  156:12
  157:7
aid 10:17
alert 23:3,11
  57:12 62:20
  63:23 71:10
  76:12 78:24
alerted
  125:13
alerts 23:13
  39:16 51:22
  63:2

151:18
advantage
  69:5
advise 57:5
  97:7
aforesaid
  159:13,16
African
  11:15
  107:20
afternoon
  38:12 86:16
  87:5 88:3
  135:22,24
ago 83:12
  143:20
agree 55:9
  99:14
ahead 15:9
  15:16 20:17
  121:19
angled
  121:15
angling 122:2
  122:2
answer 15:12
  19:20 25:5
  28:23 29:14
  41:3,6,20
  46:21 47:18
  48:9 49:24
  51:16 54:15
  61:23 65:9
  69:6 70:19
  97:1 123:18
  124:2,20
  146:17
  156:12
  157:7
aid 10:17
alert 23:3,11
  57:12 62:20
  63:23 71:10
  76:12 78:24
alerted
  125:13
alerts 23:13
  39:16 51:22
  63:2

135:19
141:12
142:15
149:10
156:11,24
answered
  28:22 29:12
  47:9,16
  69:24 72:21
  83:10,11
  84:2 110:21
  116:8 118:2
  126:10
  141:11
  156:10,24
answers
  29:19
anybody 24:8
  125:12
  134:13
anymore
  56:7 128:12
  128:10
appear 103:1
  105:11
  119:7,12,17
appears
  61:23 65:9
  63:1 63:10
  121:24
123:3
  120:9
appoint...
  28:22 29:12
  84:19 47:6
  47:18,6
  52:5 57:23
  58:19 60:8
  65:15 68:10
  68:14 72:21
  78:5 81:1

Alex 37:15
alleged 11:2
allow 61:8
  100:12
allowing
  100:23
American
  11:15
  107:20
Americans
  11:4,7
amount
  11:24 87:3
  140:8
Anderson
  1:16 160:3
  161:7
angled
  121:15
angling 122:2
  122:2
answer 58:13
appear 103:1
areas 26:2
  44:18 54:20
arrangeme...
  7:16
arrived 135:5
  arrow 104:7
ascending
  120:9
asked 26:11
  28:22 29:12
  84:19 47:6
  assist 22:22
  26:19 28:15
  29:21 44:4
  44:20 78:16
  78:18
  100:22

150:24
approached
  146:2
approaching
  150:13
approvals
  115:20
approved
  133:12
approxima...
  108:1 118:1
architect
  55:1
area 45:14
area 45:14
  48:7 82:18
  85:13 89:24
  92:4 96:16
  96:21 97:14
  97:15,20
  100:10,20
  103:16
  128:8
  140:24
  142:7
  143:15
areas 26:2
  44:18 54:20
arrangeme...
  7:16
arrived 135:5
arrow 104:7
ascending
  120:9
asked 26:11
  28:22 29:12
assist 22:22
  26:19 28:15
  29:21 44:4
  44:20 78:16
  78:18
  100:22

TOOMEY REPORTING
312-853-0648

---

OFFICER GEORGE MARIN
January 11, 2024

Page 2

83:10
110:21
114:16,21
114:21,23
118:1
126:10
131:24
135:1 137:5
141:11
146:2,16
148:22
153:16
156:9,23
asking 47:15
  61:19 66:4
  66:11 67:9
  67:17 68:1
  68:15,20
  70:5 93:2
assigned
  33:23 34:1
  37:12,24
  38:15 39:7
  39:9 43:1
  45:21,22
  46:5 85:1
  104:23
  137:3
  138:10
  139:18
assignment
  31:6 45:19
  64:2 140:21
assignments
  32:2 33:12
  38:18,23
  39:1,6 45:3
  47:2 137:23
assist 22:22
  26:19 28:15
  29:21 44:4
  44:20 78:16
  78:18
  100:22

112:18
118:14
assistance
  21:9,13,21
  22:14,21
  24:17 25:15
  25:24 26:1
  26:9,11,12
  26:17,23
  27:11,23
  28:5,13
  29:3,23
  30:7,9
  43:12 44:8
  44:15 45:15
  57:6,14
  60:12,14
  61:7,12
  76:19 78:6
  98:4 110:6
  110:14,18
  112:2,3,7
  112:16,24
  113:5 114:3
  115:4 118:6
  121:6
  126:21
  128:3,18
  129:1,17
  130:3,10
  131:10,15
  132:16
  135:3,24
  143:11,14

114:16
145:24
attempt
  72:8 80:10
100:18
108:18
attend 5:9
  9:16,24
  48:23
  143:13
attendant
  124:17
attending
  10:21
attorney 14:5
  160:21,22
August 33:3
  34:24 15
  37:22,23
  75:19
authority
  94:22
autopsies 8:4
available
  76:24 94:2
  115:16
  125:4 134:2
  131:19
Avenue 2:5
avoid 97:8
  103:10
129:6,18
62:12
  117:13
  118:11
142:9
143:11,14

51:1,7 58:7
  60:3 71:1
  72:8 80:10
  100:18
108:18
108:11
119:1,8
124:17
believe 5:15
  115:16
  144:9
152:17,24
background
  147:12
backup 2:5
backwards
  124:7
149:22
150:14,17
base 122:16
  122:17
based 33:22
  57:3 58:4
  76:23 94:2
  115:16
  150:19
121:2 134:2
  146:15
149:24
basement
  76:7 88:16
  88:16 89:6
  89:14,15
  90:7,11,16
  90:23 91:5
  95:13,15
  96:4 106:16
  154:11
B 3:9 72:8
bachelor's
  5:11,14
back 16:1,15
  17:9 28:17
  34:24 35:3

108:16,23
60:3 71:1
72:8 80:10
108:18
108:11
121:22
132:15
144:19
belabor 68:7
believe 5:15
  115:16
  144:9
119:22
121:2 134:2
146:15
brief 25:22
background
  147:12
  142:23
best 20:3
  151:7
beyond 21:2
  117:8 153:7
bigger
  1:59:19
bit 21:2
blew 82:7
blood 155:11
bodies 7:14
body 7:20
  129:4,12,13
  138:5
  149:12
  42:23
bottle 107:21
  bottom 57:9
  57:10 65:18
  76:11 77:3
  96:6,13
  120:10,11
  121:3,9
  128:15
  154:3
  157:1 58:1
  5:11,14
15:14
brace 129:8
break 8:17

17:3,7,16
58:10 80:2
80:17
108:15
121:22
breaking
  122:12
breaks 44:17
  44:17
bridge 48:5
  48:12 146:7
  146:15
brief 25:22
briefly 10:13
  18:12
bring 50:24
  42:23
bringing 8:3
bring 50:24
  151:12
brings
  118:11
broad 124:24
brought
  101:18
  134:21
138:5
143:12
153:22
bruising
  76:11 77:3
building
  39:17 44:16
  44:19 48:5
  48:23 51:1
  52:3 54:5,8
  55:14,24
  57:1 58:1
  63:3 8,19
  63:23 64:11

TOOMEY REPORTING
312-853-0648

Exhibit 6 Page 41

## OFFICER GEORGE MARIN
### January 11, 2024

Page 3

| | | | | |
|---|---|---|---|---|
| 64:15,21 | 64:6,10,19 | 50:7,10,13 | 51:9,21 | cleaner 77:17 | 143:23 |
| 65:2,3 | 64:22 65:20 | 50:21,24 | 52:2 64:2 | clear 27:13 | 156:4 |
| 71:16 72:18 | 67:1 71:11 | 51:5 53:3,4 | 85:15 86:24 | 27:17 58:15 | commanders |
| 72:20 73:5 | 71:24 72:12 | 53:10 55:16 | 111:4 | 58:18 | 138:18 |
| 73:6,10,21 | 78:4,17,24 | 55:24 57:1 | 113:22 | 130:23 | commence... |
| 76:5 77:10 | 129:4 | 57:7,9 58:1 | 114:2,4 | clearly 128:8 | 160:6 |
| 79:7 90:10 | 120:1 | 58:7,7,21 | 115:10 | 128:9 | common |
| 96:9 125:8 | canes 20:21 | 59:1,4,5,7,8 | certificates | clears 49:9 | 62:24 63:5 |
| 128:6 | 21:11 51:23 | 61:5 62:21 | 7:10 | client 65:24 | 63:9,12 |
| 129:24 | 63:7,11 | 62:23 63:3 | Certified | 66:5 67:13 | communic... |
| 141:24 | 64:4 65:11 | 63:8,12,19 | 1:17 160:3 | clocked | 157:15,15 |
| buildings | 68:16 | 63:23 64:3 | 161:8 | 140:9 | communic... |
| 95:13 | capabilities | 64:11,15,21 | certify 160:5 | clothing 7:9 | 53:2,8 |
| bunk 41:9 | 60:17 | 65:1,2,3 | chair 103:9 | coarse 18:21 | Community |
| 132:13 | capable | 71:9,16 | 128:18 | code 155:2 | 9:22 |
| business 5:18 | 40:11 51:19 | 72:18,19 | 132:19 | code 154:7 | complete |
| busy 117:10 | 65:14 | 73:1,5,6,9 | challenging | College 5:10 | 7:11 |
| | 117:19 | 73:10,14,21 | 9:2 | 5:12,24 | compliance |
| **C** | 150:2,5 | 74:2 76:5,7 | change 6:18 | 9:22 | 55:6 66:8 |
| C 2:1 4:11 | 153:3 | 76:11 77:3 | 8:24 | complete | 69:6 |
| 144:10 | career 36:2 | 77:9 78:7 | changes | 119:9 | compliant |
| 156:1 160:2 | 157:23 | 78:18,22 | 15:21,22 | 49:16 92:18 | 105:12 |
| call 38:10,11 | caring | 79:2,6 | characteriz... | 98:18 | comply 155:1 |
| 44:24 121:6 | 120:14 | 113:14 | 103:22 | 108:18 | compound |
| 121:11 | case 11:2 | 117:1,5,6,8 | charge | 119:12 | 26:3 27:1 |
| 137:16 | 13:7 41:5 | 117:10 | 138:19,19 | 121:8 | 34:2 44:19 |
| 158:10 | 49:4 67:18 | 118:9 | chase 67:21 | 124:19 | 113:21 |
| called 1:12 | casually | 124:19 | Chicago 2:5 | 136:23 | concern |
| 4:8 34:11 | 117:12 | 125:6,8,19 | 2:12 5:12 | 137:5 | 150:8 |
| 34:12 | catch 42:12 | 125:22,23 | circumstan... | coming 91:15 | concerning |
| 132:20,21 | caught | 126:8 | 153:1 | 96:13 | 160:9 |
| 133:3 | 110:10 | 132:20 | Civil 1:14 | 109:12 | concluded |
| calls 124:4 | cautions | 133:1,8 | clarification | 117:19 | 139:21 |
| camera 17:12 | 110:10 | 135:3 | 24:21 | 123:1 | concludes |
| Camchola | caveat 25:10 | certain 10:23 | clarified 26:1 | 123:6 | 134:19 |
| 32:23 34:14 | cell 41:16 | 23:8,17,18 | clarify 26:4 | 141:2 | conduct |
| 36:17 82:23 | 50:6 | 34:21 38:18 | 85:23 | classroom | 105:16 |
| 83:7 97:1 | cells 40:20,23 | 38:19 39:6 | class 1:4 | 133:1,24 | Congratula... |
| 116:19 | 41:12,17 | 40:6,12,14 | 159:4 | 134:6 | 56:14 |
| cane 21:15,19 | Cermak | 43:24 48:18 | classroom | 137:22 | consider |
| 22:2,3,15 | 48:16,19,23 | 45:20 46:1 | 106:5,22 | 138:16,23 | 152:18 |
| 23:4,11,19 | 49:3,8,13 | 47:2 49:2,8 | classrooms | 139:2,6 | considered |
| 62:20,23 | 49:14,19 | 49:12,15,16 | 10:21 | 142:2 | 19:16 24:10 |
| 63:2,18,24 | | | clean 77:19 | | 42:4 88:16 |

## OFFICER GEORGE MARIN
### January 11, 2024

Page 4

| | | | | | |
|---|---|---|---|---|---|
| consisting | 24:9 124:20 | 36:7 38:17 | 147:6 159:8 | 78:4,17,24 | 97:3 105:2 |
| 159:15 | copy 158:12 | 39:19 40:7 | 159:8 160:2 | crutches | 105:17 122:1 |
| constantly | correct 18:14 | 42:23 44:9 | couple 17:14 | 21:23 22:16 | 136:6,20,24 |
| 86:22 | 18:22 29:16 | 56:7,16 | 38:20 64:5 | 51:23 63:2 | 137:6,12,13 |
| constitutes | 35:13 37:9 | 59:21 61:18 | 83:11 114:4 | 63:7,11 | 138:2,12 |
| 160:13 | 40:21 41:12 | 77:6 94:3 | 135:1 144:7 | 65:12 71:24 | 139:1,10 |
| contact | 41:13 43:20 | 102:1 | 147:7 | curb 121:11 | 140:3,15 |
| 104:14 | 50:22 54:8 | 105:23 | course 11:9 | 128:15 | 142:23 |
| 152:13 | 56:9 57:18 | 111:13,14 | 11:20 12:3 | cursor | 143:23 |
| context 55:6 | 57:21 61:21 | 111:21 | 15:21 47:23 | 119:15 | 148:8 153:7 |
| continue 5:7 | 78:9 81:8 | 116:12 | 47:24 87:22 | custody | 153:11 |
| 104:4 108:4 | 82:24 87:9 | 125:14 | 90:17 95:7 | 44:18 48:12 | 159:21 |
| 120:2,18 | 88:10 91:1 | 156:17,20 | courses 10:13 | 48:13 49:10 | 161:2 |
| 122:11 | 91:10,13,20 | 157:17 | 10:21 11:6 | cut 27:13 | day-to-day |
| 130:10 | 94:15 97:16 | corrections | 35:1 | 66:16 67:20 | 34:3 46:19 |
| 131:5,18 | 98:23 99:9 | 9:15 13:20 | court 1:1 | 71:2 | 138:11 |
| 134:16 | 99:13 100:1 | 15:3 35:2 | 25:17 48:5 | | dayroom |
| 139:20 | 100:4,8 | 35:16 36:1 | 143:4,8,9 | **D** | 147:2 |
| continued | 101:5 106:3 | corrode | 143:13,15 | D 3:1 4:11 | days 10:4 |
| 4:5 101:12 | 109:10 | 56:18,20 | 159:1 | 156:1 | 63:16 67:13 |
| conversation | 113:5 | 159:1 | Courts 1:15 | daily 34:5 | 71:2 |
| 106:7,10 | 122:6,12 | 76:4 115:6 | cover 21:5,20 | 38:5 46:3 | deal 20:21,24 |
| Cook 1:8,8 | 122:6,12 | corridors | 39:24 | DART 1:7 | 21:17 40:5 |
| 2:15 6:2,9 | 123:16,17 | 69:15 114:9 | County 1:8,8 | 159:7 | 118:12 |
| 6:13,17,21 | 133:21 | counsel | 160:21,22 | date 4:5 9:10 | dealing 20:8 |
| 8:10,12,14 | 136:20 | 160:21,22 | 19:10 20:3 | 13:12,16,23 | death 7:10,13 |
| 9:5 19:4,11 | 139:1,7,8 | County 1:8,8 | 42:10 | 35:18 53:5 | deceased 7:1 |
| 22:17 24:4 | 139:1,7,8 | 2:15 6:2,9 | covering | 53:6 65:7 | 7:19 |
| 24:10,14 | 141:21,23 | 6:14,17,21 | 20:11 | 83:3 84:8 | decedents 8:3 |
| 26:18 28:12 | 143:13 | 8:10,12,15 | covers 44:3 | 146:23 | December |
| 30:3 31:7 | 148:2,12,14 | 9:5 19:4,11 | 100:3 | dates 13:14 | 35:18,19 |
| 35:10 36:3 | 148:18 | 21:10 22:17 | credit 140:2 | 35:24 | decedents |
| 37:5 43:6 | 153:3 | 24:4,10,14 | 144:8 | day 12:2 | 8:5 |
| 43:17 48:16 | correction | 26:18 28:12 | criminal 48:5 | 12:12 28:10 | declined |
| 56:12 | 33:11 45:8 | 30:3 31:7 | crisis 10:17 | 66:6 69:21 | 115:8 |
| 111:23 | 45:12,14 | 35:10 37:5 | 39:22 | 146:24 | Defendant |
| 112:14 | correctional | 43:6 43:17 | CROSS-E... | 81:4,16,18 | 2:15 |
| 115:6,24 | 8:21 10:10 | 48:16 56:12 | 3:5 | 82:7 83:16 | Defendants |
| 116:13 | 10:24 12:14 | 56:12 | crunch 23:4 | 84:12 85:8 | 1:9 159:9 |
| 123:17 | 13:1 19:18 | 111:23 | 23:11 62:20 | 85:5 86:13 | defensive |
| 147:6 159:8 | 21:21 22:14 | 112:14 | 63:18,24 | 86:20 87:9 | 10:16 |
| 159:8 | 22:24 24:6 | 115:7,24 | 64:7,10,19 | 90:21 91:12 | define 23:24 |
| cool 80:6 | 27:5 30:11 | 116:13 | 64:23 65:21 | 91:24 92:1 | definitely |
| coordinator | 35:22 36:5 | 123:17 | 66:4 69:9,19 | 92:2 95:17 | 27:16 |

## OFFICER GEORGE MARIN
### January 11, 2024

Page 5

| | | | | |
|---|---|---|---|---|
| degree 5:11 | 159:13,14 | 115:14,23 | 110:4 | 36:17 97:1 | 106:2 |
| 5:14 | 160:10,16 | 116:8 | 112:13,17 | disabilities | distance 22:4 |
| demanding | 160:18 | 117:21,22 | 119:12 | 11:4 15:20 | 22:5,7,8 |
| 9:2 | depositions | 118:13 | 122:19 | 19:3 20:9 | distributing |
| dep 14:19 | 1:16 | 122:12 | 123:11 | disability | 33:15 |
| 54:23 83:3 | descend | 124:2,22 | 127:17 | 11:7,16 | District 1:1,1 |
| department | 122:24 | 124:2,22 | 127:1 | 19:6 21:1 | 1:15 159:1 |
| 8:13,21 | descended | 125:16 | 137:1 | 77:9 | 159:1 |
| 34:10 35:22 | 101:8 | 128:2,13 | 141:20 | division 1:2 | division 1:2 |
| 75:10 | descending | 129:20 | 143:7 144:2 | 9:13 13:13 | |
| depending | 76:3 | 130:20 | 156:4 | 14:1 25:17 | |
| 132:24 | describe | 144:17 | device 148:21 | 31:15,15,18 | |
| depends | 10:13 56:20 | detainee's | 123:19 | 31:19,24 | |
| 107:12 | 105:15 | 113:10 | 125:9 142:3 | 32:4,6,11 | |
| 123:15 | designated | detainees | 143:12 | 32:12,14,17 | |
| depict 54:4 | 45:1,24 | 24:16,18 | 146:13,20 | 32:23 39:11 | |
| depicted 61:6 | designation | 25:16 26:6 | 40:15 41:18 | 67:7 81:8 | |
| 64:14,24 | 45:15 | 37:4 43:5 | differ 45:5 | 82:16 83:21 | |
| 91:8,17 | designed | 43:10,16 | difference | 84:19 21 | |
| 104:10 | 121:13 | 44:4,7 48:4 | 56:4,18 | disciplinary | 85:3,6,14 | |
| 106:23 | detail 138:5 | 48:15,18,22 | different | 76:22 | 85:20 86:9 | |
| 118:17 | details 70:5 | 50:24 51:10 | 72:6 77:8 | discipline | 86:15,20,23 | |
| 119:19,20 | detective | 51:14 53:9 | 85:20 95:11 | 94:20 | 87:2,6,13 |
| 125:12 | 26:16 27:21 | 57:5,18 | 111:12,22 | disciplined | 87:21 88:6 | |
| depicting | 28:3,13,15 | 60:5,8,10 | 123:12 | 61:17,20 | 88:9,18 | |
| 82:16 | 29:7 49:12 | 61:5,16 | 137:15 | 62:6,12 | 91:19 95:8 | |
| depiction | 50:5 53:3 | 62:14 63:1 | 138:10 | 111:7,15 | 95:14,17,20 | |
| 87:17 96:2 | 57:12,24 | 63:6 69:23 | direct 3:3,6 | disclosed | 96:4,5,7,11 | |
| depicts | 58:20 59:3 | 71:9,14 | 6:17 12:6 | 70:12 71:24 | 96:16,24 | |
| 124:18 | 60:9 61:20 | 76:12 84:17 | 71:2 12:7 | disclosure | 97:2,9,18 | |
| deponent | 62:19 63:18 | 84:21 85:2 | 8:6 | 70:12 | 97:22 98:1 | |
| 14:9 159:16 | 63:22 64:10 | 85:6,12 | 237:16 | discuss 14:16 | 98:13,14 | |
| 159:12 | 72:17 78:23 | 86:12,14,19 | 38:4,7 | 21:12 | 99:6 100:16 | |
| deposition | 79:6 93:12 | 86:22 87:1 | 67:20 76:22 | discussed | 100:16,17,18 | |
| 1:11 4:4 | 93:13,22 | 87:4,12,14 | direction | 14:16 69:11 | 106:23 | |
| 14:4,8 9:24 | 94:4,8,9,13 | 87:16 88:4 | 116:8 | 149:12 | 108:3 109:7 | |
| 15:16 13 | 94:14,17 | 88:4,15 | direct 33:6 | discussion | 109:9 | |
| 16:24 17:19 | 95:4 98:5 | 91:19 95:8 | 24:11 | 16:18 | 111:8 112:5 | |
| 18:7 55:22 | 101:17 | 92:11 96:16 | 55:5 107:19 | dispensary | 116:23 | |
| 69:10,20 | 102:23 | 97:19,22,23 | 119:23 | 113:13 | 124:1 | |
| 74:1 81:15 | 103:9,23 | 98:2 100:23 | 121:1 | 124:1 | 134:22 | |
| 82:13,17 | 111:3,22 | 99:5 107:19 | 128:22 | 134:22 | 16:14 | |
| 83:4 87:19 | 112:2 113:4 | 103:6,21,21 | 131:1 | displayed | 115:6 | |
| 91:5 155:5 | 114:2,9,21 | 109:8,15 | director 23:2 | 162:8 | 137:2,7,12 | |

## OFFICER GEORGE MARIN
### January 11, 2024

Page 6

| | | | | |
|---|---|---|---|---|
| 141:22 | 90:7,9 | 135:21,24 | eligible | Eric 69:2 | 39:10 |
| 142:10,11 | 96:21,22 | 142:5 149:2 | 147:17 | escort 76:18 | executive |
| 143:1,2,8 | 100:21,24 | early 33:3 | emergency | 76:21 84:16 | 23:1 |
| 143:15,16 | 104:9,15 | 35:17 141:1 | 79:5 133:2 | 85:2,12,24 | exhibit 3:11 |
| 144:1 154:1 | doorway | east 74:6 | employed | 134:22 | 3:12,13,14 |
| 154:14,24 | 100:7,9 | 90:15 | 9:6 125:20 | 142:19 | 3:15,16 |
| 156:7 159:2 | dorm 40:19 | EASTERN | employee | 155:13 | 16:12,21 |
| divisions | 50:10 | 41:9 50:10 | 125:5 | 159:24 | 53:13,16 |
| 31:11,13 | dorms 40:18 | economic | 160:20,22 | escorted | 54:1 56:23 |
| 40:6 | 41:1 | 35:7 | encounter | 44:18 48:11 | 57:17 59:17 |
| doctor 150:3 | downfall | eight 6:17,24 | 20:8 | 62:14,22 | 61:6 64:14 |
| doctor's | 91:18 95:19 | ended 5:11 | encourage | 93:2 86:13 | 73:6,10,20 |
| 77:11 78:8 | downhill | 97:18 98:3 | 6:1 8:19 | 86:18 | 74:4 75:12 |
| document | 109:24 | 97:18 98:3 | 146:6 | escorting | 75:22 81:21 |
| 50:16 | downstairs | 101:6,12 | enforce 94:16 | 84:20 85:2 | 82:11 87:18 |
| 51:14 | 76:6 | 104:22,24 | 94:20 | 98:8 114:1 | 90:5 91:8 |
| 118:6 136:2 | dozen 153:8 | 137:14 | enforcement | 126:5 | 91:8,17 |
| 52:8 55:6 | dragged | 138:4 133:5 | 5:21 6:6 7:2 | especially | 95:23 98:22 |
| 112:9,19 | 45:20 | due 133:2 | 153:5 | 137:6 | 99:3 101:2 |
| documents | duly 4:2,9 | 127:9 | either 16:5 | enlisted | 102:16,17 |
| 7:19 14:7 | 42:18,20 | 129:12 | 25:4,17 | 5:23 | 107:5,17 |
| 14:10 83:2 | 43:3 | 156:21 | 26:17 53:2 | essentially | 108:5,6,12 |
| Doe 132:16 | | election | 57:19 | 67:3 | 109:7 |
| doing 8:3 | **E** | 137:12 | enter 7:10 | establish | 119:10 |
| 43:3 6:14 | E 2:1,1 3:1,9 | 154:4 11:4 | 73:16,10 | 1:12 3:3,6 | 121:1 |
| 67:21 | 4:11,11 | elevated | 144:20 | 160:7 | 125:12 |
| 106:15 | 144:10 | 122:3 | entered 7:7 | Eugene 1:3 | 127:4 |
| 114:19 | 156:1,1,1 | elevator | entering | 13:6 159:3 | 127:5,22 |
| 150:6 152:6 | 155:3,22 | 88:15 89:1 | 43:16 | events 133:18 | 127:5,22 |
| 153:3 | 13:23 14:15 | 90:12 95:21 | entire 51:24 | exact 17:23 | 128:12 |
| door 98:15 | 13:5 9:16 | 97:14,19,24 | 52:3 156:16 | 18:3,9,11 | 153:16,20 |
| 101:1,3,4,5 | 13:23 14:13 | 98:12,19 | entirely | 52:10 | exhibits 16:5 |
| 101:6,7,11 | 84:6 136:16 | 100:10,16 | 98:10 153:9 | examination | |
| doors 88:17 | earlier 128:8 | 89:20 | entry 98:16 | 1:12 3:3,6 | exit 91:5 |
| 89:11,23 | | elevators | | exited 90:10 | |

Exhibit 6 Page 42

66:7 82:5
124:4
expert's 82:9
expertise
124:8
explain 42:19
explaining
22:19
express 150:8
extensive
40:13
extremely
90:21
118:13

**F**
facility 7:7
9:21 35:7
fact 64:6
factor 154:14
fair 7:20
27:24 28:7
35:23 46:4
56:8,23
60:23 61:1
61:9 72:13
77:12 89:2
90:8 96:2,6
131:3 137:7
143:9
149:19
fairly 54:3
76:2
fall 128:19
129:8 132:5
128:18 132:6
harassing 81:7
83:21 84:1
132:18
136:3,7
falls 132:12
132:13
151:23
familiar
12:24 43:15
74:10,15

147:23
families 7:15
far 7:8,11
18:21 22:7
26:21 44:16
62:6 63:14
76:12 81:16
82:19 90:17
106:13
109:15
118:22
137:23,24
fast 109:21
faster 110:1
154:15,16
feasible
72:10,15
154:10
February
13:11,18,21
13:22 14:2
14:15 52:20
53:5 65:8
66:10 67:7
68:18,24
79:16 80:21
82:24 83:9
84:13,15
85:12,18
86:8 87:13
90:18 91:10
91:20 95:7
104:13,17
107:11
136:12
137:1,16
35:13
finishing
5:11
first 4:2,8
10:17 29:22
31:6 37:17
39:4 70:14
96:5 141:16
fluid 15:22
focus 40:12
127:20
focused

feel 74:21
150:15
fell 128:17
129:14
130:1,4
132:16
133:6 135:7
135:10
female 12:18
150:18
field 5:21 6:6
8:6 32:5,8
32:10,13
33:16 42:13
42:15 124:8
fill 50:9
133:15
134:1
films 81:14
Final 157:4
finally
134:21
findings
134:3
fine 25:4,9,11
55:4,10
74:13 135:4
144:18
146:17,19
147:18
finish 71:7
139:23
finished 35:9

107:4 108:2
109:9 111:8
112:5
119:16,20
123:24
129:7,14,14
141:3
142:10,11
150:18
150:1
fit 101:24
150:1
five 10:1,4
120:10
137:14
forensic 6:23
7:22,24
forensics 8:7
form 19:20
71:18 93:18
99:16
flat 121:19
floor 39:13
39:15 40:17
40:21,23,24
41:8,14
50:6,6,10
52:7,14,20
71:22 88:22
88:24 96:5
96:7,11,19
103:20,21
109:11
129:10
153:5
floors 51:9
51:18,21
52:1 141:16
fluid 15:22
focus 40:12
127:20
focused

147:10
follow 85:10
follow-up
112:5
foot 131:16
force 93:22
94:22
foregoing
159:14,17
160:10
forensic 6:23
7:22,24
forensics 8:7
form 19:20
71:18 93:18
99:16
101:15
121:24
142:14
formal 36:8
former 56:6
76:11
forward
58:18
foundation
49:23 62:16
70:18 71:19
70:18 72:19
72:3
four 31:19
88:5 92:23
95:19 98:6
98:17 103:5
103:20,21
109:11
129:10
153:5
fourth 84:4
56:6
158:2
frequently
46:13 48:18
52:10

147:10
file 219:23
122:1,1,2
123:2,5
125:21
127:22
128:9,11
137:12
150:21
**FTO** 31:10
42:10,13
full 4:18 8:3
140:2
**full-blown**
136:10
**function**
31:23 38:16
46:10 143:3
**funeral** 7:15
**further** 90:21
90:21 144:5
158:16

**G**
**G** 2:3,4
gain 95:20
96:10 98:12
100:5
garage 96:21
96:22
gather 101:6
gathered
101:11
gathering
88:14
100:22
100:19
general 39:24
40:2 55:7
56:17 125:3
generally
58:14 79:3
105:22
generate
134:10
generated
132:15,18

133:3,4,7
Generating
132:2
gentleman
104:6 107:4
107:6,7,19
107:20
108:7
129:19
George 1:11
3:2 4:7,20
15:9,12
17:8,11
19:21 20:16
23:8,20
25:10 27:14
29:14 30:16
43:22 47:19
48:6 51:16
55:16
61:23 65:9
66:7 67:5
80:6 84:4
88:11 89:17
93:20 99:7
99:17
103:13
108:22
114:19,22
116:19
135:19
144:8
159:11,19
George's
158:2
germane
69:17
getting
151:16

Gilbert 70:10
give 53:12
73:7 79:23
93:15
give 6:21
102:13
143:23
145:20 147:4
150:15
given 14:23
23:9,12
39:6,22
59:17 80:24
98:19
99:18 99:23
115:16
126:5,18,20
128:1 130:23
132:10 133:19
134:13 135:3
151:4 152:15
155:21 157:9
158:2
go 4:21,24
8:14 19:8
15:16 16:15
16:16 20:7
20:17 23:15
25:5 28:24
34:20 35:14
36:22 40:4
42:16 56:11
48:23 49:3
59:16 60:3
60:9 61:9
61:12,17,22
64:23 65:13

17:9 21:14
21:18,23
72:1,12
22:16 23:5
28:14 30:2
30:7 35:11
37:3 38:13
44:9 47:11
48:5 50:13
54:19 55:15
55:23,24
57:6,20
60:16,18,18
60:20,21
64:13 66:19
67:2 69:7
69:23 70:21
72:1,3
73:12,14
74:20 76:7
78:6 81:7
82:6 88:5
90:19 92:19
96:18 97:8
102:17
103:10
109:8,20,23
111:10,17
113:8 116:7
113:24 121:5
126:9,11
128:12
132:10,10
132:12 135:8
142:3 143:8
143:8 144:9
151:4,19
152:12
153:21,22
155:4 157:7
155:7,9,13
157:17,19
162:1
gotten 154:14
grab 113:16
143:9
grabbed 73:8
graded 78:8
graduate 5:2
graduating
5:6,23
22:11
graduation
35:18
great 17:14
67:21
ground
131:15
group 84:23
84:24 86:10
86:21,23
87:7 88:14
92:20 93:6
118:23

125:23
126:6,17,21
124:7 128:9
127:4 128:9
137:10,14
145:10
145:12 146:3
150:19
150:19
150:14,15
153:14
guess 9:1
15:19 22:1
55:19,19
121:5
122:19
150:22
153:2,3
guy 145:21
guys 108:14
154:8
158:4
gym 96:24
143:4,15

**H**
**H** 3:9
half 69:10
74:24
hall 108:20
halls 95:11
hallway
56:21 73:13
73:20 76:4
76:6 90:24
103:24
106:16
115:6,14,24
149:11
149:16
hallways
113:18
hand 89:22
84:24 86:10
86:21,23
hand 89:22
161:2
handbook
43:15,19,24
44:3,7,11

61:15 62:7
handful
141:14
handle 15:20
19:14 20:24
23:18
124:14
124:11
138:18
handouts
12:11
handrails
99:8,12
hands 86:3
129:6
happen 43:1
63:10,20,21
136:13
152:21
happened
78:12 128:4
128:10,13
129:23
130:20
133:15
134:22
happens
49:17
happy 113:24
harassing
70:23
harassment
67:21
hard 75:5
he'll 117:12
head 138:24
heading
128:7
heads 72:24
118:9
hear 17:13
66:23 130:3
heard 30:16
157:12

hearing 21:3
hearing-im...
20:23
heavier-set
102:13
height 7:8
held 6:21
help 22:22
26:12 27:1
27:12,12,16
29:4 43:14
60:18,18,21
66:15 76:20
76:24 87:24
95:1 113:22
113:24
114:17
118:10
126:5,15,18
130:19
135:15
134:22
helped 106:1
130:21
131:12
helping
131:14,16
137:9,24
hereto
160:23
hereunto
161:1
hey 60:17
95:1 113:12
113:15,17
113:23
117:8
117:17,17
high 4:21,24
5:1,2,6

85:15
history 41:23
129:17
hitting 130:7
hold 15:8
65:22,23,23
75:9 124:4
holding
107:21
hole 67:17
homes 7:15
honest 12:21
hope 157:6
hour 69:9
74:24
143:20
hours 11:24
11:24 58:13
69:10 70:14
79:21
104:23,24
139:17,18
140:8
house 39:15
housed 41:18
51:10,14,15
51:23 88:23
97:4 104:19
134:4
146:8,9,11
146:3
147:8 154:5
incline 54:20
hypothetical
71:18
114:15

**I**
**ID** 113:12,17
idea 74:20
152:20
154:24
identified
65:19
identifies

90:14
identify
54:22 55:13
73:20
**Ifn** 106:21
**Illinois** 1:1,8
1:18 2:5,12
5:12 159:1
159:8 160:1
160:4
illness 40:9
41:18
**Immediately**
155:12
impact 130:1
124:23
131:19
incidences
153:17
incident 13:9
13:11,20
68:18,23
70:17 80:23
81:6 82:24
132:3,5,14
132:18,21
133:13,14
133:24 134:4
134:5,9,11
146:8,9,11
146:23
individual's
41:23
individual's
1:4 110:7
individuals
11:15 13:17
15:20 19:2
19:5 20:8
20:20,21,22
22:23 23:7
25:23 26:23
27:15 44:17
48:11 49:2
49:15 50:15
90:22 91:2
91:9,23
92:12 93:6
64:5,13
65:11 84:17
85:17 92:18
92:17,23
94:22 95:2

99:15
incomplete
71:18
independent
80:20
index 158:12
indicators
73:22
indirectly
160:24
infirmary
48:16,19
50:7 62:21
71:9
inform 49:11
information
12:13 15:2
61:15 77:2
informed
153:2
informs 44:7
initially 9:16
67:2 117:17
injuries
155:9
injury 155:10
inmate 22:15
29:22 43:19
43:24 44:2
44:6,10
61:14 62:7
93:3,15
114:18 116:8
118:12
121:21
123:8,23
131:2,9,14
145:3
148:20
149:23
inmates
92:12 93:9
95:18,10
98:10,11
106:19

120:23
122:19
136:13
137:6
144:22,23
145:2,5,6
145:14
149:3,4,12
149:18
intake 12:6
instance
88:12
instant
80:24 107:4
instances
146:1
instruct
21:24 40:5
97:2
instructed
16:1 19:13
24:3 126:4
instruction
10:6 20:11
22:13 23:12
145:4
instructions
10:16
20:18
109:14
146:3
instructor
118:24
instructors
11:10 12:1
18:16 20:7
106:12
instructors
10:11,18
115:18 40:4

intake 6:12
6:22,22 7:4
7:17
intent 55:8
interact 19:2
jail 10:19
19:11 22:17
24:4,7,10
24:15,22,24
25:18 26:8
27:7,20
28:4,12
30:3 31:7
37:5 43:6
43:7 38:4
59:11,16,18
60:6 90:24
111:14,18
111:23
112:14
115:7 116:1
116:14
147:6,11
156:17,19
160:22
Javier 4:20
job 7:17
44:12 45:11
48:20 51:7
51:22 53:14
55:21,22
123:23
24:13,21
25:18 26:8
joined 8:12
8:24 69:9
162:1
joins 8:9:8
9:13

**J**
**J** 1:11 3:2 4:7
159:11,19
jackets 154:9
jail 10:19
19:11 22:17
24:4,7,10
24:15,22,24
25:18 26:8
27:7,20
28:4,12
30:3 31:7
37:5 43:6
Jr 1:11 3:2
4:7,20
159:11,19
judge 66:18
70:10,10

**July** 8:19
24:8 30:12
34:23 35:8
**June** 10:3,15
30:12 34:6
56:6,11,15
36:19 37:2
37:3

**K**
**K** 160:2
Kankakee
5:1
keep 47:14
50:7 70:21
122:21
keys 100:21
kind 75:5
77:18 88:2
98:4 99:11
knew 127:17
127:18
131:18
138:10
148:1
know 7:12
11:10,24
12:2,17,17
12:22 13:18
14:11 15:16
15:21 16:6
19:3,5,8,12
22:19 23:22
24:11,12
46:1 82:3
30:16 31:2
34:18,19
35:24 37:11
38:19 41:22
44:6 45:8
45:10 46:15
46:24 47:12
48:6 51:16

52:13 55:12
55:18,20,20
58:2,12
59:13 60:1
60:17 62:12
67:13,24
69:6,12,16
132:8
140:14
143:22
145:1 147:2
149:17
150:19,19
153:4 154:8
groups
151:14,21
153:6,9,12
153:14
151:15
121:5
122:12
150:22
guide 145:21
108:14
154:8
158:4
143:4,15

124:14
126:12
126:14
127:11,22
128:9
129:4,10,13
148:12,23
153:19
145:7,12
146:12,15
147:8,22
150:3,20
152:14,24
153:4,16,22
154:7,8
knowing
37:18 55:8
knowledge
21:16 37:6
40:13 48:18
56:3 57:11
61:14 62:2
70:1 73:18
81:22 84:10
112:12,15
154:3 159:18
105:22
107:23
108:1 109:4
111:11,12
112:12,15
115:12,17
117:14,16
118:12,12
120:10 124:5
121:12
132:5,12 121
123:3,5,12
121:12

Exhibit 6 Page 43

125:14,22
129:18
130:8 134:6
134:15
136:5
138:13
157:4,11,14
157:20
known 117:6
knows 70:19
118:11

**L**

lack 44:14
lacks 71:19
landed 129:1
larger 101:21
late 33:3
35:17 37:22
laundry 90:1
law 2:2,9
5:21 6:5 7:2
lay 123:8
layout 24:12
lead 54:7
leading 54:4
56:24 57:10
90:7,10
leads 55:13
55:14 64:15
65:1,2,3
71:15
learning
18:24
leave 89:22
98:10
leaving 29:18
30:4,12,20
34:6,22
35:7 36:4
72:14 73:5
88:14 91:11
91:18 92:21
92:21

left 9:3 33:8
35:16,21,22
36:1,7
89:12 90:17
91:15 99:12
99:22 103:20
103:20
107:20
127:1
128:23
131:1 146:6
left-hand
104:7
120:22
122:15
legs 131:17
let's 16:16
50:5 75:6
let's 16:16
letting 14:11
72:3 121:4
121:4 123:1
123:5
150:20
lieutenant 89:2
levels 22:11
License
161:9
lieutenant
23:1 140:15
lieutenant's
140:14,17
140:24
lieutenants
98:10
lift 121:24
123:2
127:21
138:8
150:21
lifting 122:1
152:16
limited 12:4

66:8,9
line 65:6
lip 121:7,8,11
127:22
152:11
list 92:16
138:8
listening
66:22
little 6:15
21:2 25:10
58:11 77:17
127:22
150:19
155:21
living 50:17
50:17
LLC 2:10
LMS 34:11
34:13,15,17
36:22
located 9:20
97:15
100:11
140:18
location
25:18 59:10
59:15,18
60:6 95:24
133:20
locations
115:11
locked
100:21
101:4,5
log 50:7,18
114:11
115:8,19
118:6
long 6:13
22:4,7 33:7
73:16 95:9
95:10,11,16
104:21

146:5,12
147:9,10,21
longer 74:20
look 65:1,4
17:4,18
53:20 70:14
75:23
looked 16:7
57:16 82:12
87:17 109:7
122:13
128:15 151:7
looking 18:6
53:19 56:23
83:6,23
88:9 91:11
127:14
152:24
looks 16:17
75:9 96:4
107:21
121:14,21
131:8
lot 10:17
80:14 115:1
154:16
158:6
lower 89:2
lock 157:23
lunch 33:15
47:3

**M**

M 4:11
144:10
156:1
magnitude
132:24
main 9:21
11:18 73:8
90:24 143:3
major 5:16
majority
39:17

122:19
145:2
makeshift
121:9
123:10
134:22
142:12,14
making 7:18
8:2 96:20
106:20
130:15
male 12:18
man 70:13
management
5:18
manner 7:13
152:5
March 8:20
9:11 10:3
10:14,15
24:7 83:7
83:24
Marin 1:11
3:2 4:4,7,20
4:21 17:18
54:18 75:21
82:16
mark 107:7
material
18:21
materials
12:1
matter 5:16
25:3
matters
160:9
mean 15:9
25:4,10

41:3 47:10
54:10 55:3
55:4,7
58:10,12
66:20 67:9
69:14 70:15
74:7,9 86:2
88:12 132:9
145:16
145:17
146:10
154:4
medical 6:3,9
6:14,17,21
8:15,18,22
23:9 39:16
39:18 41:23
48:24 49:9
49:17 63:13
79:5 136:10
145:16
member
145:3
members
105:24
memory
12:20 14:17
18:18 76:24
83:19
men 40:14
141:6
mental 20:22
40:6,9
41:18
mentioned
18:12 20:2
37:8 41:11
42:2 62:13
77:6 97:13
113:3
152:11,16
154:1

metal 81:7
82:16 98:22
99:9,13
111:8
121:10
123:10
128:3,16
154:23
middle 127:9
mind 54:23
mini 158:12
minute
130:14,22
131:8,21
minutes 17:7
30:3,4,11
83:11
107:16
116:20
minutia 70:4
missed 25:1
mobility 77:9
148:21
mobility-di...
69:22
moment
53:12,20
58:3 74:17
79:23
102:15
104:5
109:11
moments
83:15 84:8
momentum
128:7
Monroe 2:11
month 9:8
37:21 46:1
months 10:3
31:2,4
38:20 45:20
46:2 129:10
Moraine 9:21

9:24 10:1
10:14 34:22
35:3,5,8
morning 4:14
68:17
89:15 90:3
94:1 99:7
99:22
151:22
101:16
155:10
Morris 5:10
112:17
109:3 111:5
105:20
Morrissey
2:3,4,4 3:4
3:7 4:3,12
16:2,10,20
17:2,6,17
20:1,15
28:18,19
29:6,17
30:18,19
131:7,20
134:18
135:13,14
141:20
143:24
153:18
155:2,12
156:2,15
157:6,11,21
158:9
161:21

82:2,10
83:17 84:9
85:2,6
137:1,6,9
137:11,24
141:9 143:6
156:19
moved 25:16
25:19 26:7
27:6,19
28:3 48:22
49:12 50:4
50:9,20
52:21 58:24
63:10 64:9
78:18 79:6
85:13,20,23
87:1,5,12
112:12
movement
33:15 37:9
93:2 42:20
44:21,22
45:2,3,5,17
45:21,24
46:6,7,10
46:14,18
47:2,3,7,22
48:3,14,20
49:7,11
50:4,14
51:6 52:17
53:1,8
57:22 58:5
58:19 61:3
63:6,17
64:9 71:8
77:1,7 78:5
78:13 79:17
79:21 84:11
84:16 112:9

113:11
116:7,11
116:13,16
131:12,17
131:18,21
133:5 137:4
137:4
139:10,11
138:21
141:15
143:5 149:2
143:5 149:22
movement 60:13
moving 37:4
43:5 58:11
122:11 123:2
27:10,12,15
49:23 40:7
44:18 49:5
60:12,18,20
72:2,4,6
76:8,18
92:7 100:20
100:21
110:13
117:7
117:22,3
117:14
121:7 123:6
125:16,18
146:4 158:7
needed 8:5
21:10 22:3
22:21 23:19
25:24 26:11
26:23 27:14
46:11 49:3
49:16 58:24
62:22 63:20
78:10
100:22
106:8
116:22
126:12
130:19
135:2

middle 127:9
mind 54:23
Morris 5:10
moved 25:16
movement
movement 60:13
moving 37:4

**N**

N 2:1 3:1
4:11,11
144:10,10
156:1,1
name 4:18
12:7,22,24
37:18 107:8
107:13,15
111:10
100:22
106:8
116:22
126:12
named 37:15
names 107:3
narrative
133:17,18
139:10,11
135:2

141:16
145:20
needs 23:8
43:1 49:5
49:19 79:1
133:3
negative
110:15
never 23:7,16
24:11,12
26:1 46:5
47:3 65:12
65:15 67:14
67:15 78:12
106:2
112:17
126:3,15
new 36:2
157:23
nice 126:14
nonextensive
40:13
noon 135:22
normal
105:18
normally
145:13
NORTHE...
1:1 159:1
Notary
161:9
notate 50:12
notated 7:7
notes 144:9
notice 4:5
76:10,15
notification
22:9 49:1
116:2
136:10
152:14
notifying

136:8
number
16:12,22
53:16 54:1
57:17 61:6
73:4 82:11
87:1 90:5,6
95:23 101:2
110:2
102:18
107:5
108:13
118:16,18
124:17
125:12
126:21
128:1
numbers
46:16,24
numerous
85:8
nurse 145:22
nurse's 77:11
78:21
nurses
145:15
nurses' 72:3
78:9,10
nursing
71:22
145:19

**O**

O 4:11
144:10,10
156:1 160:2
occur 151:3
oath 18:8
159:12
object 19:19
70:7 93:18
99:15
101:15

103:11
124:3 132:8
142:13
149:17
objecting
65:4
objection
41:19 46:20
47:8 49:23
54:9 65:23
71:17 79:8
156:23
observation
145:18
145:19
150:5
observations
147:13
150:4
observe
128:1,2
obstacles
20:7,10
obstruction
23:8
obviously
20:19
109:24
110:2
occasion
142:21
occasions
113:8 114:4
115:4
117:20
142:22
143:6
occur 151:3
occurred
13:21
32:3,5,8,9
32:10,13,15
33:14,15,16
33:23 35:12
occurs 44:21

odd 128:6
offended
118:14
offer 65:20
117:2,13
112:6
115:23
117:24
126:9
offered 115:5
115:15
116:7,14
117:20
118:6,20
offices 121:8
121:22
office 6:3,17
7:21 8:15
8:16,19,23
9:4,5,9,12
9:13,14,17
35:4 77:11
77:11 78:8
83:14 124:7
124:20
125:13,20
126:10
140:14,17
140:17,18
142:12
149:18
150:23
office's 23:8
31:13 33:2
32:1,5,8,9
32:13,18,23
33:10,13,15
33:14,15,16
33:23 35:12
offices 121:8

36:3,5 37:9
37:15,18
38:17 39:3
39:5,19,21
42:5,8,8,14
42:16,16,18
42:20,20,21
43:4,23
44:11,13,15
44:15,17,23
45:2,4,5,6,8
45:17,21,24
46:6,7,10
46:14,18,18
47:1,2,3,7,7
47:22,8,9
48:14,20
49:7,11
50:4,14,16
51:5,6,9
52:18 53:1
53:8,13,15
53:15 63:17
64:18 96:7
97:4 99:4
100:14,17
103:4 108:4
109:8
110:14,17
111:6,13,14
112:2,17
112:10,13
113:11
114:21
116:7,12,12
117:6,8,10
117:18,19
119:19,20
125:21
126:2 133:5
133:5,8,8
135:3 135:18
135:18

**O**

150:17
106:3,6
107:11,14
107:24
126:6
134:14
141:14,15
141:16,17
141:17,18
142:12,18
143:3
offers 40:7
officer 8:19
12:14,23
119:9
officer's
50:12,17
76:21
officers 40:7
40:11 42:3
44:9,22
PAGE 3:1,10
160:3 161:7
pages 159:15
pages 159:15
41:17 44:16
62:22 63:10
64:3 69:3
30:5 36:20
99:24 93:9
58:7 59:10
108:7,18
151:10
115:14
154:17
105:12
137:15
151:18
137:11
151:4
105:3,6,13
140:20

145:16
OFFICES
2:2,9
official 7:18
one's 9:10
Oh 51:15
75:13
115:16
136:19
153:21
146:10
147:3
149:10
153:10,21
154:17
158:14

one-month
46:5
one-year
46:12
ones 15:10
ongoing
143:11
online 10:20
36:20
open 96:22
100:9 101:1
101:3
opinion
110:5 123:8
124:5,6
opportunity
14:5 53:23
order 23:7
29:8,10,20
29:23 30:6
30:8,11,13
32:3,5,8,9
33:12,13,15
33:14,15,16
ordered
110:18
126:3,15
orders 92:15
153:10,21
154:17
105:12
117:20
142:22
143:6
original
89:12 90:2
oral 157:15
orally 29:8
82:2 86:3
88:11 93:19
101:6
126:23
130:19
134:23
135:2,16
146:10
147:3
149:10
outcome
160:24
over 49:9
59:5 63:21
89:19,22
116:2
106:12
141:9
overall 19:3

95:14
154:22
112:17
112:12
122:13
139:6
overseeing
4:19
overtime
52:5,14
96:10,17
97:2,7
pathologist
7:11
paths 91:7,11
pathway
96:23
patients 40:8
Patrick 2:4
155:4
Paul 14:17
pause 151:18
Peggy 1:16
16:16 28:18
70:24 80:10
158:11
160:8 161:7
168:17,22
21:6,11
23:14 29:15
41:17 44:16
62:22 63:10
64:3 69:3
30:5 36:20
99:24 93:9
58:7 59:10
108:7,18
151:10
115:14
154:17
105:12
137:15
151:18
137:11
151:4
105:3,6,13
140:20

47:6,12
perfect 80:8
158:3
passage
144:8
period 8:17
9:23 12:5
30:21,24
122:9 123:9
pathologist
32:16,19
126:14
127:15
128:5 132:5
132:12
133:6 139:5
156:19,21
personal 84:1
129:11
146:2
160:13
personally
50:11 65:15
76:8 78:14
106:4,13
123:11
124:24
personnel
23:10 136:10
26:19 27:6
27:19 28:6
29:11,21
116:15
phonetic
161:8
photo 82:18
82:19,19
photograph
57:4 75:23
72:11 73:4
77:8 78:4
78:17,21
86:22 106:20
photographs
82:12

**P**

P 2:1,1
pan 37:13,14
140:10
pace 8:24
PAGE 3:1,10
160:3 161:7
pages 159:15
paperwork
106:21
parsing 70:4
part 100:3
129:4,11,13
137:8
particular
38:15,16
39:8 49:10
81:3 82:19
84:14,15
91:24 138:2
percent
160:23
parts 80:22
pass 10:23

## OFFICER GEORGE MARIN
### January 11, 2024
Page 15

| | | | | | |
|---|---|---|---|---|---|
| physical 150:9 | 134:17 | 137:14 | 36:6 66:10 | 158:9 | 21:13,22 |
| physically 150:1,2 | please 4:15 4:18 53:13 76:19 86:5 | post 49:10 | 133:21 | probation 31:5,8,8,9 31:10 | 26:9 28:1 36:12 81:5 |
| pick 50:24 51:4 | point 24:20 66:21 68:7 70:23 72:7 72:8 102:18 102:20 103:2 114:4 119:2 121:4 123:19 126:7 130:1 130:18 147:20 148:5 | posted 57:4 57:12 76:10 | presentation 27:18 | probationa... | 82:22 |
| picked 85:12 | | pounds 26:5 | presented 26:5 | probative 69:20 | provides 44:15 |
| picking 10:20 | | PowerPoint 12:16 15:23 16:2,15 17:22 18:13 18:16,19 19:9 20:3 20:11 21:5 21:12 24:14 24:22 25:4 25:14,15 26:4,14,20 27:3,17 28:10 | pressed 122:14 | problem 144:6 158:5 158:5 | providing 21:5 24:15 24:17 25:15 64:12,22 62:22 111:9 |
| picture 53:19 74:12 75:4 75:15,16 104:10 130:22,24 | | | pretty 102:6 | problems 39:16 | psych 39:16 39:18,20 40:15,15 |
| pictures 81:14,17 82:9 | | | prevent 149:3 | procedure 1:14 115:17 | Public 159:23 |
| place 159:16 160:17 | pointed 24:9 104:7 108:3 | | previous 18:9 160:6 | procedures 69:22 | pull 53:13 79:24 |
| placement 148:16 | points 65:22 | PowerPoints 14:22 15:1 15:4,18 36:13 | previously 29:2 78:3 79:14 82:21 87:17 111:2 143:14 | proceeding 101:9 | pulling 14:17 |
| places 146:22 | police 35:10 35:12,15 36:3 56:12 141:14 | predominant 145:17 | primarily 47:1 73:8 145:19 | proceedings 2:9 | purposes 54:23 55:22 74:1 91:4 |
| plaintiff's 1:5 1:12 2:8 13:6 159:5 | policies 34:21 69:21 | prefer 144:23 | primary 37:13 136:21 | process 105:6 160:15 | pursuant 1:13 4:4 |
| Plaintiff's 3:11,12,13 3:14,15,16 16:11,21 53:24 75:22 | policy 19:1,1 19:4,9,15 93:12 149:1 | preliminary 62:15 72:16 88:21 109:5 112:11 | prior 14:4,7 14:12 18:6 15:15 16:13 16:24 17:19 17:21 18:2 18:6 60:7 83:6,23 104:13,17 142:9,17 | processed 7:6 | push 27:5 28:6 29:11 29:21 43:9 |
| plans 92:15 | position 6:8 6:11,18 8:10,20 10:9 33:10 35:4 | preparation 14:8,24 18:7 81:15 123:4 | prisoner 49:1 50:9 51:4 72:17 119:24 122:4 | processing 7:19 | 55:5,6,9 73:14,15,24 |
| platform 56:21 | positioned 127:6 | preparing 82:13,17 83:4 | prisoners 150:23 51:22 88:5 97:3 141:9 157:16 | program 31:11 34:20 32:13,14 60:13,14 60:22 92:3 | 93:1,7,9,12 94:4,7,9,13 95:2 111:4 112:18 113:18,23 114:7,10 115:5,16,23 116:8,14,23 117:24 |
| play 53:20 118:17 119:6,6 121:2,4 151:9 | positions 6:20 7:1 | prepping 150:23 | probably 24:7 154:21 | provide 21:10 22:14 33:3,6,14 23:20 26:1 26:12 27:10 27:23 30:8 43:3,8 44:17 45:9 45:11,13,14 51:8 59:12 61:5,8,9,12 61:17,17 62:11 64:13 68:20 | 123:6 128:18 |
| played 53:21 118:19 119:9 120:3 120:19 127:2 130:12 131:6,19 | possibly 10:2 11:23 33:3 37:22 41:22 107:12 121:24 122:7 127:8 | presence 85:16 present 22:12 30:5 34:23 | | provided 11:6 18:4 | |

### TOOMEY REPORTING
### 312-853-0648

## OFFICER GEORGE MARIN
### January 11, 2024
Page 16

| | | | | | |
|---|---|---|---|---|---|
| 144:15,17 | **Q** | 156:1,1 | 102:7,10 | 65:19 66:12 | 124:12,14 |
| 145:3,13,22 | qualified 124:5 | rabbit 67:17 | 103:11 | 67:3 68:22 | 124:18,21 |
| 146:16 | question 4:15 11:13 18:5 19:20 23:10 24:1 25:6,8 27:2 30:14 40:16 44:23 45:7 47:11 47:14,15 54:17 55:12 56:5 59:2 61:2 62:15 62:17 63:4 64:19 71:1 71:7 72:16 74:22 77:14 88:21 98:21 99:20 109:6 112:11 114:14 116:10,11 123:22 158:8 157:4 157:5 | race 7:8 | 104:18 | 71:15,15,16 | 124:3 |
| 147:14 | | radio 49:21 50:2 51:5 115:1 | 108:22 | 72:1,13,18 | 125:8,11,15 |
| 148:6,9 | | RADUNSKY 2:10,11 3:5 | 112:10 | 72:24,24 | 125:21,23,6,7 |
| 156:8,21 | | 15:7,15 | 114:1 | 73:3,9,11 | 126:12,9 |
| pushed 26:17 26:24 27:22 | | 16:4,14 | 115:1 | 73:14,19,20 | 125:22,23 |
| 29:8,23 | | 17:5,8,11 | 116:10 | 73:23 74:2 | 126:17 |
| 57:13 60:9 | | 19:19 20:13 | 128:2 | 74:5 76:3 | 126:1,6,8,9 |
| 61:8 62:10 | | 20:16 24:20 | 132:8 | 76:11,19,20 | 127:11,19 |
| 93:3 114:17 | | 25:3,9 | 135:11,16 | 77:4 78:6,7 | 127:14,18 |
| 124:6,22 | | 28:17,21 | 141:1 | 81:7,7 | 128:4,7,11 |
| 116:22 | | 29:12 30:15 | 142:13 | 82:16 87:21 | 128:14,23 |
| 126:1 | | 41:2,19 | 143:16,19 | 87:18,24 | 128:6,9,21 |
| 144:13,23 | | 43:18,21 | 144:6,8,11 | 88:1 89:9 | 129:1,5,9 |
| 145:5 146:3 | | 48:21 49:23 | 147:19 | 90:2,14,15 | 129:3,7,20 |
| 146:17 | | 49:23 51:11 | 148:9 | 91:17,18 | 129:9,17 |
| 152:23 | | 51:15 54:9 | 155:6,9,23 | 93:16 94:5 | 129:17 |
| 157:18 | | 58:9 61:19 | 155:7,17 | 93:19 94:3 | |
| pushing 28:15 60:24 | | 61:22 65:4 | 157:5,12 | 95:7 96:22 | raised 154:9 |
| 112:11 | | 65:22 67:4 | 157:18 | 97:23 100:3 | ramp 19:16 |
| 109:15 | | 68:8,10,14 | 48:6,9 | 100:24,6,7 | 21:23 22:16 |
| 112:8 | | 69:24 71:17 | 49:23 51:11 | 100:14 | 23:5,23,24 |
| 115:13,20 | questioning 65:6 66:17 70:15 | 72:21 74:6 | 51:15 57:2 | 102:7,9,10 | 19:16,20 |
| 114:6 | | 74:9,19 | 55:4,9,22 | 110:5,9,10 | 19:16,23 |
| 115:13,20 | questions 4:14 66:4 66:12,13,13 67:10,20 79:8 80:1,6 82:3 87:6 88:11 89:13 89:17 93:18 99:2,15 101:15 | 75:1,6,13 | 57:15,16,23 | 110:5,9,10 | 150:12,17 |
| 117:17 | | 75:17 77:13 | 58:1,9 | 111:23 | 152:11,17 |
| 128:9 129:2 | | 77:19,22 | 60:6,7,18 | 111:20 | |
| 128:8 128:6 | | 79:8 80:1,6 | 61:5,8 9,12 | 116:8,13,15 | 155:1 156:7 |
| 129:20 | | 82:3 87:6 | 61:17,17 | 117:1,18,22 | 156:16,19,22 |
| 131:12 | | 82:8 85:22 | 62:11 64:13 | 117:18,22 | 157:18 |
| 145:14 | | 86:2,5 88:7 | 63:24 68:20 | 121:24 | ramps 19:11 |
| 146:6,22,22 | | 88:8 89:9 | 6:17,1,7 | 122:1,5,16 | 20:10,14,19 |
| 149:3,23 | | 89:17 93:18 | 61:17 64:13 | 121:5,17 | 21:7,14,18 |
| 150:2 153:2 | | 99:2,15 | 61:17,13 | 122:4,7 | 23:15 24:4 |
| put 17:12 38:19 74:14 75:7 86:2 97:18,24 | **R** | 101:15 | 64:14,24 123:14,20 101:5 51:1,3,13 | 121:24 123:21,24 | 24:10,12 26:8 28:12 |
| | 2:1,4,11 144:10 | | | | 44:9 54:4,7 68:5 69:15 |

### TOOMEY REPORTING
### 312-853-0648

## OFFICER GEORGE MARIN
### January 11, 2024
Page 17

| | | | | | |
|---|---|---|---|---|---|
| 69:23 70:20 | 111:19 | 130:9 | 106:14 | relevance 41:19 65:5 | 141:3 |
| 76:17 89:5 | 122:22 | 134:20 | 124:12 | reported 137:21 | reported 137:21 |
| 91:12,15 | 123:1,4 | 135:15 | 149:2 | relevant 41:2 41:4 68:23 | 140:23 |
| 111:4 | 129:15 | record 16:16 16:19 28:19 50:8,8 71:4 74:14 | regardless 29:3 40:12 | | 160:11 |
| 112:14 | 137:13 | | regards 7:19 11:1,6,18 12:11,13 13:6 18:19 21:11 22:13 | 70:6 | Reporter 1:17 68:12 |
| 113:22 | 149:9,9,14 149:18 | 138:15 | | religious 145:9,10 | 71:2 80:12 |
| 125:1 149:2 | receive 5:13 10:8 12:10 13:5 36:16 36:20 37:1 38:3 39:20 42:7 48:24 51:3 53:1,8 | 160:14 | | remain 32:10 | 155:19 |
| random 117:16 153:9 | | records 7:18 13:6 18:19 21:11 22:13 23:23 24:3 24:15 25:13 27:19 28:9 28:11 29:20 30:2 34:8 36:9,13,21 37:3 38:23 43:4,9 82:23 83:20 97:7 111:7 112:24 118:7 148:18 | | remaining 103:5 | 158:7,14 160:4 161:8 |
| ranged 10:16 11:22 33:14 137:14 | received 13:2 13:23 14:13 22:12 24:14 27:3 36:8 40:1 42:19 | | | remember 11:8,19 12:2,15 27:19 28:9 31:18 | reports 132:4 134:9 |
| Re-ask 30:17 | | | reduced 160:12 | | represent 76:3 |
| reached 128:3 | | | refer 74:2,11 | | reprimanded 111:15 |
| read 28:17,20 70:24 71:5 159:13 | receiving 13:3 | | reference 84:18 | 14:17 15:8 17:24 18:24 | request 28:4 29:8,22 |
| ready 51:7 | recognize 74:13 75:8 95:23 | | refresh 12:20 83:19 30:4 36:9,13,21 37:3,18 | 17:13 25:21,22 26:10 73:7 83:15 113:9 85:4 | 30:6 44:8 49:7 57:6 |
| really 66:2 67:22 69:8 70:8,22 75:1 147:14 | recommend 106:24 107:6 | | refresher 34:20 84:7 | | 57:14 60:14 76:20 |
| reason 69:10 113:22 128:6 151:2 | recollection 20:4 26:15 37:2 57:3 57:11 58:4 71:12 76:9 77:1 78:13 94:21 95:5 | | refreshment 82:23 83:20 97:7 111:7 | reminder 24:6 13:8 | 110:13 |
| recall 15:23 19:12 20:11 21:8 31:4 36:23 37:18 44:10 64:12 64:22 77:5 80:22,24 84:18 85:17 86:12,17 87:19 93:2 97:10 102:15 103:3 104:2 104:3,14 106:9 108:10 110:11,16 | | | refusal 117:23 148:18 125:11,19 | rephrase 4:16 11:12 28:4 23:9 25:7 48:4 23:24 44:23 41:5 61:2 64:7,9 62:19 65:12 65:1,0,12 79:22 | requested 27:22 28:13 28:20 43:12 61:4,7 62:19 65:1,0,12 71:5 77:8 78:5 79:14 requests 23:4 26:16 105:12 106:3 |
| | | | refusals 112:1 141:8 | | |
| | | | refuse 94:19 94:21 95:5 112:16,18 117:17 144:13,19 | | |
| | recall 15:23 | | related 7:1 | relation 122:8 | required 26:19 28:5 28:15 29:10 30:8 43:9 44:4 59:14 59:16 79:5 101:3 111:20 112:20 |
| | | | refused 112:2 113:4 114:9 115:10,23 116:3,8,16 117:1 148:12,23 | report 38:8 132:1,2,14 132:18,22 132:23 133:24 134:6,9,14 135:3,18 136:13 137:21 138:8 138:21 140:22 | |
| | | | refusing 124:24 125:4 129:6 129:11 | | |
| 110:11,16 | 129:11 | 129:11 | regarding 13:9 14:2,3 | releasing 8:2 | requirement |

### TOOMEY REPORTING
### 312-853-0648

## OFFICER GEORGE MARIN
### January 11, 2024
Page 18

| | | | | | |
|---|---|---|---|---|---|
| 27:4,21 | 91:15 96:20 | 154:2,6,17 | 89:2,6,11 | safe 45:14 | 118:21 |
| 29:20 93:8 | 98:16,16,24 | routes 59:19 | 89:16 90:7 | safely 150:16 | 119:18 |
| 111:21 | 99:5,10,10 | 153:24 | 90:10,11,16 | safety 109:22 | 120:6,21 |
| requireme... | 102:7 | **RTO** 31:16 | 90:23 93:4 | SAITH | 121:1,20 |
| 155:2 | 107:16 | **RTU** 32:11 | 91:11,19 | 158:16 | 122:12 |
| reserve 158:11 | 108:22 | 33:1,2,7,10 | 93:13 93:4 | samples 8:4 | 127:5,7,16 |
| reserving 155:18 | 116:4 123:3 | 33:13,17,24 | 95:7 96:9 | saw 18:8 | 130:11,15 |
| resign 8:22 | 127:10 | 34:4 35:16 | 96:17,18 | son 3:2,22 | 130:22 |
| resigned 8:18 | 131:5 144:8 | 37:9 12,16 | 97:10,10 | saying 30:16 | 131:8,22 |
| respectful 105:7,9 | 150:12 | 47:10,20 | 103:24 | 66:23 73:4 | secure 45:14 |
| responsibil... | rights 11:3 | 39:9,13 | 107:1,9,10 | 77:23 85:24 | security 45:6 |
| 10:19 42:24 | risk 85:15 | 40:17 42:8 | 107:14,23 | 140:19 | 45:9,12 |
| 123:19 | Rivera 122:3 | 124:19 | 108:4 116:7 | says 27:9 | 149:1 |
| responsibili... | 36:17 83:19 | 100:14 | 116:17 119:7 | 74:18 39:17 | 141:1 |
| 19:17 30:5 | 47:6 48:4 | 111:2 | 137:20 | 72:23 85:24 | 143:10,16 |
| 70:24 71:5 | 48:15,19,22 | 138:11 | 140:4 | 75:23 76:1 | 145:13 |
| 159:13 | 49:13 51:1 | 139:1,7 | says 27:9 | 81:17 82:15 | 146:7 147:9 |
| responsible | Rivero-Ca... | 51:9,21 | 140:18 | 98:15 | segregation |
| 7:14 8:1 | 83:24 | 140:18 | 141:9 143:5 | scan 17:3 | 41:15 |
| 86:24 | Robert 5:10 | 52:5,7,11 | 139:10 | scared 74:21 | send 16:3 |
| rest 25:11 | 5:12,17,20 | 52:17 53:4 | 142:21 | scenario | sending 7:14 |
| 127:10 | 5:23 | 54:8 | 144:22 | 40:4 68:16 | 8:4 |
| result 76:21 | Rodriguez | 55:14,24 | 146:18 | 70:2 | sense 55:8 |
| review 14:7 | 37:16,19 | 57:1,10,23 | 147:21 | school 4:22 | sent 15:11 |
| 14:12,22 | 127:10 | 58:8,19 | Rule 70:12 | 4:24 5:1,2,6 | |
| 15:24 134:8 | roll 38:10,11 | 60:5 62:18 | Rules 1:14 | 18:3,10 | |
| reviewed | 44:24 | 62:21 63:1 | 115:18 | 155:9,21 | |
| 14:18 16:13 | room 40:19 | 63:23 64:3 | ruling 7:11 | 2:24 | |
| 16:23 82:22 | 41:9 140:12 | 64:9,11,21 | run 108:19 | science 8:7 | |
| 82:23 133:10 | 62:9 | 65:1,0,2 | running | scope 68:4 | |
| 133:22 | 68:18 | 122:3 | 72:14,18 | screen 53:17 | |
| reserving | roster 45:16 | 153:3,4 | 73:5 77:7 | 75:7,24 | |
| 14:10 83:18 | 138:15 | | 78:7,16,18 | seat 122:2 | |
| rotate 38:20 | 73:3 77:7 | 69:2 70:13 | 78:22 79:5 | second 75:9 | |
| 62:9 70:13 | rotation | 140:22 | 80:8 85:6 | 75:7,24 | |
| 73:5 77:7 | 38:15,23 | roughly | 86:9,20,22 | Sabrina | 144:10 |
| 77:18 80:13 | route 23:22 | 45:23 46:12 | 87:1,22 | 12:23 13:3 | 143:4 |
| 81:11,22 | 82:9 88:7 | 88:18 89:7 | 88:3,6,9,23 | 14:21 16:17 | seen 55:8 |
| 82:9 88:7 | 85:6,12 | 86:9,20 | 89:20 91:6 | 69:2 82:22 | sent 15:11 |
| 89:20,22,23 | 86:9,20,22 | 87:1,22 | 90:21,24 | 89:2,23 | |
| 90:21,21 | 146:15 | 88:3,6,9,23 | 146:15 | 69:2 82:23 | |

### TOOMEY REPORTING
### 312-853-0648

Exhibit 6 Page 45

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 19

| | | | | |
|---|---|---|---|---|
| 136:17 | 97:6 114:11 | 137:15 | **situation** | 10:7 13:22 | ss 160:1 |
| **September** | 123:23 | 150:23 | 19:10 58:2 | 20:13 25:2 | **staff** 8:1 36:7 |
| 33:4,8 | 124:20 | **showed** 15:15 | 106:9 | 30:14 47:20 | 105:23,24 |
| 35:17,21 | 125:5,13,20 | 81:20 | 115:22 | 63:4 66:12 | 125:14 |
| 36:2,7,11 | 126:7 | **showing** | 132:24 | 85:18 88:7 | 144:24 |
| 36:15,19 | 146:14 | 15:19 16:21 | 134:4 148:7 | 88:11 116:9 | 145:3,12,13 |
| 37:3,24 | **shift** 37:11,13 | 19:1 75:21 | **situations** | **sound** 12:24 | 145:16,19 |
| 85:18 | 45:18 46:6 | 81:21 82:11 | 23:19 | **South** 2:5 | 148:1,6 |
| **sergeant** 23:1 | 52:8,12,21 | 90:4 95:22 | **six** 11:24 | **special** 42:7 | **staged** |
| 38:7 111:15 | 52:24 53:7 | 102:16 | 41:8 99:24 | 140:21 | 100:17 |
| 133:10,13 | 79:18,20 | **shown** 17:24 | **slight** 89:9 | **specific** 18:18 | **stairs** 103:17 |
| 135:8 136:2 | 81:2,4 | 18:19 19:9 | 90:2 91:12 | 26:2 39:20 | 118:24 |
| 136:9 | 84:12,16 | 54:2 82:18 | 99:21 121:8 | 40:11 42:9 | 122:16,18 |
| **sergeants** | 104:22 | **shows** 135:23 | 121:18 | 52:1 53:5 | 127:9,10,12 |
| 139:3 | 136:22 | 150:22 | 151:18 | 85:4 87:3 | 127:18 |
| **series** 4:14 | 137:19,22 | **sic** 10:15 | **slightly** | 92:15 97:10 | 131:4,10 |
| 120:23 | 138:1,6,7 | 11:15 12:23 | 101:21 | 106:9 113:9 | **stairway** 96:3 |
| **serious** 132:9 | 138:14,16 | 75:16 | 122:3 | 124:12,13 | **stand** 34:17 |
| 132:10 | 138:16,18 | **side** 91:15 | 124:17,18 | 124:14,23 | **standing** |
| **service** 145:9 | 138:22,22 | 99:10,12 | 128:17 | 137:13 | 107:16 |
| 145:10 | 138:23,24 | 104:7 120:7 | 146:13 | 138:20 | **start** 9:10 |
| **session** 11:17 | 139:1,2,6 | 120:22 | 154:7 | 139:17 | 13:19 33:1 |
| **set** 38:24 | 139:16,19 | 122:15 | **slowly** 152:12 | 141:7 142:6 | 113:14 |
| 161:1 | 139:21,22 | **sign** 77:2 | **small** 90:2 | **specifically** | 119:4 |
| **setting** 40:19 | 139:24 | 110:8 | 92:20 121:7 | 14:12 19:15 | **started** 31:3 |
| **settings** 41:9 | 140:2,5,5,6 | **signage** | 134:4 | 24:8 37:2 | 37:20 38:11 |
| 41:16 | 140:11 | 110:12 | **smooth** | 25:20 26:22 | 39:4 137:21 |
| **seven** 87:12 | 142:2 | 149:7,11 | 121:14,19 | 36:23 40:8 | 140:11 |
| 99:24 100:4 | 143:23 | **signature** | 151:1 | 42:22 46:7 | 141:4 147:7 |
| **severe** 132:19 | 156:4 | 158:1 | **smoothly** | 83:20 85:1 | **state** 1:17 |
| **shadow** | **short** 8:17 | **signs** 57:4,12 | 127:24 | 100:18,19 | 4:18 18:8 |
| 33:22 | 17:15 22:5 | 73:19 | 151:4 | 111:7 | 26:5 160:1 |
| **shape** 102:6 | 22:8 31:10 | 149:15 | **somebody** | 112:22 | 160:4 |
| **shared** 75:15 | 80:16 109:1 | 155:9 | 49:6,18 | 136:24 | **stated** 93:12 |
| **Sheriff** 1:7 | **Shorthand** | **similar** 82:15 | 50:13 60:13 | 149:11 | 130:8 |
| 8:11 35:23 | 1:17 160:4 | 153:18 | 94:12 112:7 | **specified** | 160:19 |
| 36:3 56:12 | 161:8 | **simple** | 114:18 | 160:19 | **statement** |
| 123:17 | **shortly** | 109:22 | 138:7 135:6 | **specify** 125:2 | 131:22 |
| 159:7 | 155:23 | **sir** 5:3 6:7 | 123:13 | **Speculation** | 2:6 |
| **Sheriff's** 8:13 | **shot** 81:19 | 17:1 38:2 | 126:5,15,17 | 9:10 | 60:22 159:5 |
| 8:16,21 9:5 | 116:13,15 | 49:20 54:13 | 138:20 | **speed** 129:24 | **stating** 22:21 |
| 9:9,12,14 | 18:16 53:15 | 80:19 | 147:24 | 152:5 | 150:9 |
| 9:17 34:10 | 74:12 81:9 | **sitting** 141:1 | 148:15,17 | **spend** 69:8 | **station** 71:22 |
| 35:4,10,12 | 102:16 | | **sorry** 4:23 | **spot** 133:15 | |

**TOOMEY REPORTING**
312-853-0648

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 20

| | | | | |
|---|---|---|---|---|
| 72:3 78:9 | 44:4 60:24 | 23:13 | 91:7,16 | 7:24 8:7 | 132:19 |
| 78:10 | 109:12 | **strong** | **supposed** | **tell** 11:5 | 155:23 |
| **stationed** | 133:3 | 155:1 | 109:19 110:3 | 42:11 49:15 | **things** 49:16 |
| 100:15,19 | **struck** | **sure** 8:2 15:2 | 110:9 | 56:17 75:5 | 69:20 |
| **stayed** | 128:15 | 16:7,8 | 51:22 | 77:24 88:2 | **think** 13:14 |
| 104:24 | 129:17 | 17:11 20:2 | 131:21,22 | 95:1,3,7 | 15:7,15 |
| **step** 99:13 | **struggle** | 21:16 23:21 | 142:12,13 | 113:7 | 16:5 25:11 |
| 99:16,21 | 150:19 | 26:21 27:8 | 42:18 | 116:8 | 30:15 31:1 |
| 100:16 | 26:21 | 32:18 37:17 | 152:15 | 117:3,10 | 31:3 33:18 |
| 142:12,14 | **stuff** 69:3,4 | 45:7,13 | 154:6,18 | 119:6,7 | 47:15 58:13 |
| **stenograph...** | 108:24 | 55:9 58:16 | **taken** 1:12,13 | 122:9 125:6 | 66:2,22 |
| 160:11 | 138:12 | 62:5 80:1,5 | 1:16 4:4 | 126:19 | 67:22 70:8 |
| **step** 60:3 | 147:4 | 84:17 86:1 | 82:5 96:12 | 140:12 142:2 | 70:9,19,22 |
| 112:21 | **subject** 5:16 | 92:14 | 96:14 | 156:4,18 | 71:19 75:15 |
| **steps** 99:24 | 11:18,20 | 103:16 | 153:24 | **term** 54:12 | 77:14,16 |
| 100:4 | 103:14 | 126:8 | 154:2 | 95:16 | 82:3,6,8 |
| 102:4 | 142:15 | 108:17,21 | 159:15 | 154:8 | 90:22,24 |
| 103:10 | **subjective** | 122:20 | 160:16 | **termed** | 99:19 |
| 120:10,15 | 99:20 | 123:11,14 | 148:18 | 148:18 | 116:17 |
| 120:23,24 | **SUBSCRI...** | 127:23 | 106:8 | **terms** 34:19 | 124:4,15 |
| 121:1,2,3 | 159:21 | 128:22 | 116:22 | **testified** 4:9 | 131:16 |
| 122:18 | **sufficient** | 138:17,17 | **testify** 160:8 | 133:8 |
| 127:14 | 123:16 | **surface** | 48:7 53:6 | **testifying** | 147:6 149:6 |
| **stipulate** | **Suite** 2:12 | 121:19 | 52:9 113:14 | 139:11 | 151:8 153:3 |
| 47:21 66:5 | **summer** | **swarm** 4:2,9 | 69:8,16 | 147:6 149:6 | 168:8 153:3 |
| **stipulated** | 31:21 32:20 | 159:12,21 | 70:16 73:13 | 160:4,14 | 154:14 |
| 66:6 | **superinten...** | 160:8 | 88:8 90:17 | 160:14 | **third** 39:13 |
| **stipulating** | 23:1 133:11 | **system** 73:11 | 90:19 | **tgm@morr...** | 40:21,23,24 |
| 102:3,5 | 134:17 | 91:6 | 109:20 | 2:6 | 41:8,14 |
| **stop** 4:15 | **supervisor** | **T** | 147:1 149:1 | **Thank** 56:15 | 50:5,6,10 |
| 102:18 | 6:23,24 8:1 | **T** 3:9 4:11,11 | 153:23 | 80:8 81:22 | 88:24 96:18 |
| 104:6 | 38:4,6 | 144:10 | **tack** 45:10 | 125:1 144:7 | 124:4,5 |
| 118:21 | 85:11,16 | 156:1,1 | 85:4 141:7 | 157:22 | **THOMAS** |
| 120:5 127:4 | 97:6,10 | 151:16 | 141:7 | 158:3,14 | 1:7 2:3,4 |
| 130:14 | 119:18 | **taught** 11:16 | **Thanks** | **Thanks** | 159:7 |
| **stopping** | 121:6 | 12:13 | 17:14 28:21 | 17:14 28:21 | **thought** |
| 120:21 | 125:6 | 117:14 28:21 | 179:8 | 2:6 | 24:22 69:7 |
| **straight** | 126:16 | **teaching** | 77:20 80:13 | **thick** 154:9 | 102:19 144:6 |
| 67:20 | 60:21 66:17 | 23:13 60:8 | 86:5 119:4 | **thing** 77:12 | 151:1,3 |
| **Street** 2:11 | 69:4 72:4,6 | 69:4 72:4,6 | 128:2,6 | 22:7 42:12 | **three** 31:19 |
| **stretched** | 72:7,17 | 74:8 | 78:21 80:3 | 129:7 | 84:3,3 |
| 21:1 | 156:18 | **technician** | 80:4 88:18 | | 87:16 88:3 |
| **strike** 42:3 | **supervisory** | 86:3 | 89:21,23 | 7:23 7:23 | |

**TOOMEY REPORTING**
312-853-0648

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 21

| | | | | |
|---|---|---|---|---|
| 92:3 96:15 | 59:24 60:5 | 58:5,18,23 | 65:23 67:4 | 34:12 35:1 | 157:9 |
| 109:8 | 60:19,22 | 59:2,8,13 | 68:15 69:18 | 35:7 36:5,8 | 159:17 |
| 154:22 | 63:20 67:22 | 62:13 64:3 | 70:9,22 | 36:16,20 | 160:13 |
| **three-minute** | 68:13 69:8 | 64:5 67:14 | 71:3 74:10 | 37:1 39:20 | **truth** 160:8 |
| 17:3 | 84:4 86:13 | 58:20 84:3 | 74:19 77:16 | 39:23,24 | **try** 118:14 |
| **thrown** | 92:22 94:19 | 84:3 85:5,8 | 81:20 85:22 | 42:7,9,13 | 119:5 |
| 129:21 | 96:19 97:24 | 85:9 110:22 | 89:14 | 42:15,19 | **trying** 67:16 |
| **ticket** 76:22 | 103:8 | 113:3,10,19 | 114:15 | 44:13 123:16 | 69:4 116:9 |
| **tier** 24:19 | 109:19 | 114:1 | 135:12 | 123:17,23 | 126:14 |
| 31:23 32:3 | 110:2,3 | 116:21 | 143:17 | 124:13 | **tunnel** 29:22 |
| 32:22 33:14 | 111:13 | 118:2 135:1 | 149:1 151:8 | 125:5 | 73:20 76:4 |
| 38:16 39:3 | 116:6,14 | 145:11 | 152:3 | 144:12,16 | 90:24 91:6 |
| 39:5,8 47:1 | 117:4,14 | 146:24 | 153:23 | 144:21 147:6 | 97:14,20 |
| 49:6,18 | 118:3 | **tipping** | 155:16,19 | | 98:20 |
| 50:12,13,17 | 122:13,14 | 120:14 | 156:20 | 98:20 | 103:24 |
| 50:21 52:2 | 122:24 | 158:7 | **today's** 4:1 | 98:12 | 115:6,14,24 |
| 104:16,18 | 127:7,15,16 | **tire** 95:6 | 56:10 | 97:12 | 125:7 |
| 105:3,6,13 | 128:17 | **today** 14:11 | 76:11 77:3 | 151:2 | **tunnels** 24:17 |
| 105:17 | 133:20 | 14:13 29:19 | 100:6 101:1 | **transport** | 25:19,21 |
| 106:6 133:5 | 139:10,14 | **today's** 4:5 | 120:5 | 26:2,7,17 | 26:7,20 |
| 133:7 135:5 | 140:10 | 14:4,8,24 | 122:20 | 147:24 | 27:6,20 |
| 135:6 136:1 | 144:5,21 | 15:5 16:24 | 127:14,18 | 149:12 | 28:4,6 |
| 143:6 145:8 | 145:7,24 | 17:19 81:15 | 149:20 | **transported** | 95:10 97:12 |
| **tiers** 31:12 | 145:22 | 82:13,17 | **total** 31:1 | 24:18 26:7 | 114:8 142:8 |
| 38:19 39:7 | 147:21 | 83:3,3,4 | 98:6,17 | **transporting** | 154:11 |
| 39:8 40:12 | 150:18,24 | **told** 22:19 | **tox** 8:4 | 144:1 156:5 | **turn** 17:12 |
| 40:14,22,24 | 152:15 | 23:2 26:22 | **Tradunsky...** | **transverse** | 108:12,23 |
| 41:9,12,14 | 154:18,20 | 49:2 54:13 | 2:13 | 72:19 | 118:16 |
| **time** 5:19 | 155:12 | 49:20 54:13 | **trained** 8:6 | 74:18 87:23 | **tweaking** |
| 7:24 9:1,3,4 | 155:22 | 68:3 69:13 | 35:12 40:8 | 88:2 90:18 | 47:12 |
| 9:23 12:5 | 158:2 | 69:14 70:1 | **training** 8:8 | 91:7 95:8 | **two** 11:23 |
| 22:12 31:3 | 159:16 | 9:11 11:9 | 9:19 11:9 | 96:10,17 | 42:21 61:8 |
| 31:17 32:16 | 160:17 | 11:14 20:7 | 90:10 | 98:3 | 154:3,4,13 |
| 33:19 34:9 | times 27:4,14 | 126:8 | 11:14 20:7 | 97:3,8 | 40:9 |
| 35:14,16 | 37:10 42:2 | 141:15 | 12:1 14:23 | 142:24 | 32:18 63:22 |
| 36:4,6 | 42:4 45:1 | 148:4,21 | 15:21 18:13 | **treat** 23:17 | 66:1 |
| 38:24 39:2 | 45:13,23 | **Tom** 135:10 | 20:20 21:9 | 7:1 9:2 | |
| 39:4,12 | 46:10 48:3 | 16:6,15,17 | 22:20 25:4 | 16:2 17:2 | **weeks** 31:20 |
| 46:1,17 | 48:14 49:14 | 20:13 25:4 | 23:22 | 47:17,20 | **weight** 7:8 |
| 47:4,6,13 | 50:23 52:4 | 47:3 52:12 | 23:17 23:20 | 70:14 89:5 | **went** 5:10 |
| 58:12,15,21 | 52:13,14,15 | 47:9 51:12 | 25:19,21 | 91:7,13,14 | 13:12 88:17 |
| 59:4,10,23 | 52:17 57:22 | 61:19 65:23 | 20:30 34:8 | 80:14 90:14 | 95:6 98:11 |

**TOOMEY REPORTING**
312-853-0648

---

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 22

| | | | | |
|---|---|---|---|---|
| 152:8 | **United** 1:1,14 | 118:22 | 137:23 | 119:20 | 133:24 |
| 153:24 | 159:1 | 119:7,9,18 | 140:16 | 136:15 | 134:6 139:6 |
| 154:22 | **unusual** | 120:2,3,6 | 141:17 | 147:1 | **Watkins** |
| **type** 21:12,21 | 132:5 | 120:18,19 | 142:1 | **want** 10:2 | 149:12 |
| 23:2,5,13 | **use** 21:6 | 124:15,17 | **voting** 84:19 | 55:15,19 | 150:1,7,8 |
| 34:24 93:14 | 22:10 54:10 | 124:18 | 85:13 92:16 | 58:15 65:16 | 151:12 |
| 121:10 | 54:24 55:2 | 100:17 | 100:17 | 66:20 67:19 | 153:6 |
| 121:12 | 55:5 71:13 | 130:10,12 | **vs** 1:6 159:6 | 68:6 70:6 | **waving** |
| **typewriting** | 154:11 | 131:6,19 | 138:5,8,10 | 74:10,12,14 | 119:11 |
| 160:12 | 157:16 | 134:16,17 | 138:21 | 77:24 80:3 | **way** 21:3 |
| **typically** | **usually** | 138:24 | 139:18 | 84:18 | 25:4 74:11 |
| 144:22 | 158:13 | 135:11,18 | 140:2 141:7 | 99:18 | 149:8 151:3 |
| 145:15 | **utilize** 142:8 | 141:15 | 141:15 | 111:4,21,1 | **ways** 47:10 |
| | 143:4 | 141:15 | 151:11 | 117:11 | **we'll** 55:9,23 |
| **U** | | 143:1,8 | 151:11 | 146:5 | 80:10 108:4 |
| **ultimately** | **V** | 143:1,8 | 153:7 | **wanted** 9:1 | 122:11 |
| 95:4 | **Valley** 9:21 | vs 1:6 159:6 | 126:5 | 142:14 | 124:17 |
| **unassisted** | 9:24 10:1 | 1:13 | vulnerable | 153:8 | 131:5,18 |
| 61:18 | 43:1 | **videos** 81:6 | 69:5 | 124:7 | 149:16 |
| **underneath** | 35:3,5,8 | 81:10,16 | | 131:5,18 | 155:22 |
| 95:15 | **varied** 46:3 | **viewed** | **W** | **wanted** 9:1 | **we're** 45:8 |
| **understand** | **varies** 38:5,6 | 133:13 | **W** 2:4 | 92:17,17 | 55:5 60:20 |
| 4:15 19:21 | **various** 6:20 | **viewing** | **wait** 76:18 | 94:3,6 | 69:9 70:16 |
| 19:23 41:4 | 7:18 19:11 | 127:10 | **waiting** 98:17 | 153:13 | 74:18,19 |
| 54:17 72:14 | 127:10 | **violating** | **walk** 76:8 | 144:7 | 108:12 |
| 55:3 64:18 | **valid** 76:22 | 76:22 | 145:16,23 | **wants** 114:17 | 117:1,5 |
| 65:5,24 | 56:3 | **violation** | 102:14 | **warehouse** | 124:22 |
| 66:3,14,15 | **verbatim** | 160:2 | **walked** | 26:2 | 131:21 |
| 66:18 70:16 | 26:21 27:9 | **visible** 155:9 | 102:24 | **warning** | 155:17 |
| 77:13 115:2 | 62:8 | **vision** 20:24 | 103:9 | 110:8 | **we've** 145:20 |
| 130:24 | **versa** 22:5 | **vision-** 20:23 | **walker** 21:23 | | **weapon** 7:9 |
| 148:5 | **vestibule** | **visual** 122:21 | 22:2,6,16 | **warrants** | **weather** |
| **understand...** | 100:10,13 | **volunteered** | 23:4,11 | 143:24 | 97:12 142:6 |
| 28:11 29:10 | 100:15 | 136:17 | 62:21,23 | **wasn't** 11:23 | 154:3,4,13 |
| 30:4 56:17 | 101:7,8 | 55:18 | 63:19,24 | 42:21 62:8 | **week** 10:4 |
| 56:19 60:7 | 108:19 | 105:17 | 64:10,20,23 | 67:12 85:4 | 32:18 63:22 |
| **understood** | 56:3 53:3 | 22:5 | 65:21 71:11 | 92:7,14 | 66:1 |
| 4:16 56:1 | 57:16 | 102:17,18 | 72:12 78:4 | 108:19 | **weeks** 31:20 |
| 147:12 | 102:17,18 | 97:9 101:10 | 78:17,24 | 160:1 | **weight** 7:8 |
| **unescorted** | 108:24 | 100:16 | 109:16 | 124:14 | **went** 5:10 |
| 98:11 | 22:5 | 136:14 | **walking** 22:4 | 144:12,19 | 13:12 88:17 |
| **unfair** 70:8 | 104:4 107:5 | 137:2,12 | 60:13 106:16 | **watch** 133:11 | 95:6 98:11 |
| **unit** 50:18 | 108:4,7,24 | | 106:19 | | 146:17 |
| 63:13 | 118:17,19 | | | | |

**TOOMEY REPORTING**
312-853-0648

Exhibit 6 Page 46

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 23

| | | | | | |
|---|---|---|---|---|---|
| weren't | 129:12 | 130:2,4,5,6 | 141:21 | 142:16 | 139:13,14 |
| 139:13 | 153:13 | 130:17,21 | 142:1 144:2 | 144:7 | 139:16 |
| West 2:11 | wheel 63:11 | 131:1,13,15 | 144:22 | 147:16 | 140:1,21 |
| Western 2:5 | 123:13 | 132:13,17 | 145:15 | 156:13 | 141:7,22 |
| Westmorel... | 128:9,11 | 135:7 136:4 | 149:4 | 157:1 158:3 | 147:7 |
| 1:3 13:6,10 | wheelchair | 144:17 | 151:15 | 160:7,7 | works 45:12 |
| 13:12,24 | 23:20 24:16 | 145:5 146:3 | wheels 122:3 | 161:1 | world 106:12 |
| 14:3,14 | 24:18 25:16 | 146:21 | 123:5 | woman | wouldn't |
| 52:22 67:1 | 27:5,19 | 148:6,10,20 | 127:23 | 107:15 | 22:4 46:24 |
| 81:6 83:20 | 28:13 29:7 | 151:10 | 151:19 | women 141:6 | 58:2 60:1 |
| 85:20 86:8 | 30:6 44:7 | 153:6 | 152:17 | word 44:14 | 60:13 63:9 |
| 86:11,14,19 | 57:24 58:24 | 156:19 | WHEREOF | 54:10,24 | 63:12 |
| 87:5,8,15 | 59:22 60:4 | 157:17 | 161:1 | 55:2,5 | 100:18 |
| 88:4,22 | 64:12,23 | wheelchair- | white 107:6,7 | 152:8 | 103:15 |
| 91:23 93:2 | 65:12,15,17 | 143:6 156:5 | willing 61:13 | words 130:7 | 112:1 114:2 |
| 96:15 104:9 | 66:1,2,6,13 | wheelchair... | winter 154:9 | 147:20,24 | 114:13 |
| 104:10,14 | 68:19 71:12 | 26:6,16 | witness 3:1 | work 5:21 | 143:3 |
| 104:19 | 72:2,5,6,11 | 37:4 43:5 | 4:1,8 15:13 | 6:13 31:13 | 144:19 |
| 105:3,7,22 | 77:8,10 | 43:10 44:3 | 15:17 17:10 | 31:17 33:7 | 148:17 |
| 106:14 | 78:8,16,21 | 51:10,13 | 19:22 20:18 | 34:3 37:11 | written 12:11 |
| 108:6,11 | 85:2 87:9 | 57:18 58:6 | 29:1,15 | 39:2,20 | 157:15 |
| 112:4 122:5 | 87:14 88:3 | 58:20 59:3 | 41:7,21 | 40:8 42:20 | 158:8 |
| 128:14,19 | 94:5,8 98:4 | 59:9,15 | 43:23 46:22 | 46:13 47:7 | wrong 13:15 |
| 128:24 | 100:16 | 61:4,7,16 | 48:8,10 | 52:5,8,11 | 13:19 82:5 |
| 129:16,21 | 101:22 | 62:14 | 50:1 51:17 | 52:15,17 | |
| 130:1,4,16 | 102:13,14 | 103:20 | 62:1 65:10 | 81:1 104:16 | **X** |
| 130:21 | 102:24 | 109:8 | 67:23 69:5 | 104:17 | X 3:1,9 4:11 |
| 131:12,23 | 104:12 | 112:23 | 70:23 71:21 | 139:18 | 50:9 144:10 |
| 134:21 | 110:4,9,13 | 113:4 | 72:23 75:3 | worked 6:5 | 156:1 |
| 135:1,6,9 | 110:18 | 122:17 | 77:24 79:12 | 6:16 24:7 | x-ray 11:13 14 |
| 136:3,7 | 111:10,16 | 124:22 | 80:8 83:14 | 37:16 39:13 | |
| 142:18 | 112:10,15 | wheelchair... | 84:5 88:13 | 44:24 52:10 | **Y** |
| 145:4 146:6 | 113:5 115:5 | 29:21 96:16 | 89:18 93:21 | 52:14,16 | yeah 19:12 |
| 147:5 148:8 | 115:15 | wheelchairs | 99:4,18 | 53:1,7 | 30:15,15,18 |
| 149:24 | 116:15 | 20:20 21:2 | 103:14 | 63:16 | 31:4 47:23 |
| 150:2,7,10 | 117:21,22 | 25:24 51:19 | 111:1 | 104:18 | 74:8 77:19 |
| 151:12,24 | 118:7 | 59:7 64:4 | 116:20 | 140:8 145:8 | 86:5 89:19 |
| 152:6 | 120:14 | 68:21 72:5 | 118:4 | working 6:1 | 99:2,19 |
| 153:19 | 122:6,10 | 92:8,12,18 | 119:10 | 40:12 52:21 | 102:7,10 |
| 155:10 | 123:9 124:1 | 92:24 93:9 | 121:4 | 57:23 58:5 | 103:15 |
| 156:8 159:3 | 125:17,23 | 95:3,19 | 126:12 | 75:10 81:1 | 115:1,2 |
| Westmorel... | 127:15 | 98:3 109:12 | 132:11 | 81:3 83:8 | 119:11 |
| 11:3 105:10 | 128:3,11,15 | 112:13 | 135:20 | 84:11,11 | 124:12 |
| 120:13 | 129:22 | 115:21 | 136:20 | | 132:10,12 |
| | | | | | 132:23 |

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 24

| | | | | | |
|---|---|---|---|---|---|
| 135:24 | **11:00** 37:14 | 66:10 67:7 | **2023** 13:21 | 139:21,21 | 154:14,24 |
| 144:16 | 46:6 136:21 | 69:9 79:16 | 33:9 35:22 | 139:23 | 156:7 |
| 146:9 17 | 139:22,24 | 80:21 82:24 | 36:8,12,16 | 140:10,11 | **4's** 109:9 |
| 152:24 | 140:11 | 84:13,15 | 36:20 37:24 | **300** 101:19 | **43** 16:16 |
| **year** 5:4,13 | **11:50** 80:2 | 85:12,18 | 52:20 67:7 | 102:2 | **44** 3:15 16:16 |
| 13:19 15:22 | **118** 3:14 | 88:20 89:10 | 75:19 79:16 | **300-479** | 16:22 |
| 35:19 45:23 | 12:11 9:18 | 90:18 91:10 | 80:21 82:24 | 2:13 | 131:22 |
| 52:11 58:5 | **12:45** 108:19 | 91:20 | 80:21 82:24 | **31** 107:17 | **45** 3:16 5:12 |
| 64:8 | **12:50** 135:23 | 107:11 | 83:7 9,24 | **312** 2:13 | **47** 3:16 16:5 |
| **yearly** 34:20 | **144** 3:5 | 136:12 | 84:13 85:13 | **37** 118:21 | 82:11 95:23 |
| 38:21 | **14th** 35:18 | 137:1,16,18 | 85:18 86:8 | **3885** 75:16 | 98:22 99:3 |
| **years** 6:15,16 | **156** 3:7 | 138:14 | 91:20 | | 101:2,2 |
| 147:8 | 163:15 31:2 | 140:13 | 104:13,18 | **4** | **48** 120:21 |
| **yelled** 129:16 | 31:4 | 143:22 | 136:12 | **4** 3:4 13:13 | 121:1,20 |
| 129:20 | **173** 1:1 53:16 | 156:3 | 137:1,19 | 14:1 67:7 | |
| **yesterday** | 54:1 56:23 | **193** 3:14 | 138:14 | 81:8 82:16 | **5** |
| 17:20 18:7 | 57:17 59:17 | 108:13 | 139:10 | 83:21 84:19 | **5** 95:14 |
| | 61:6 64:14 | 118:16,18 | 140:13 | 84:21 85:3 | **50** 46:17 47:4 |
| **Z** | 64:24 65:19 | 119:19 | 141:8 | 85:6,14,20 | **51** 108:9 |
| **zero** 64:2 | 73:4 74:4 | 121:1 | 142:10 | 86:9,15,20 | **53** 3:11 |
| **Zoom** 1:13 | 87:18 90:5 | 126:21 | 143:22 | 86:23 87:2 | 122:12 |
| | 90:6,14 | 127:5,7 | 145:6 148:9 | 86:6,13,21 | **54** 127:5,7,16 |
| **0** | 124:17,18 | 134:16,20 | 156:3 | 88:6,9,18 | 130:11 |
| **084-003** 813 | 125:12 | 151:8 | **2024** 1:18 | 91:19 95:8 | |
| 161:9 | **17A** 3:12 | | 18:2 159:22 | 95:17,20 | **6** |
| | 75:12,13,22 | **2** | 161:2 | 96:4,5,7,11 | **6** 31:15 32:11 |
| **1** | 131:8,21 | **2** 107:16 | **23** 37:3 | 96:16,24 | 32:12,14,17 |
| **1** 130:14,22 | **17th** 161:2 | 108:8 | **230** 2:11,12 | 97:9,15,21 | 32:23 |
| 131:8,21 | **183** 3:13 14:15 | 2:31 107:5 | **233-7901** 2:6 | 97:22 98:1 | **60606** 2:12 |
| **1-159** 159:15 | 31:2,4 8:9 | **2003** 5:5,19 | **26** 70:12 | 98:13,14 | **60643** 2:5 |
| **1:23-cv-01...** | 86:8 87:13 | **2007** 3:15 19 | **29** 120:6 | 99:6 100:16 | **617** 8:8 |
| 1:6 159:6 | 95:7 102:16 | 6:4 | | 106:18 | **64,000** 157:5 |
| 10 80:3,4,7 | 102:17,18 | **2010** 6:3,4,8 | **3** | 110:20 | |
| 80:11 131:8 | 104:13,17 | **2021** 8:19 | **3:00** 37:13 | 111:8 112:5 | **7** |
| **10:00** 1:18 | 106:23 | **2022** 8:12,20 | 38:12 46:6 | 124:1 | **7:00** 52:8,12 |
| **10:21** 17:8 | 107:5,17 | 9:11,23 | 52:8,12,15 | 130:15,22 | 52:15,16,21 |
| **10:25** 17:9 | 108:5,8 | 10:15,15 | 52:16,21,24 | 132:14 | 52:24 53:7 |
| **102** 3:13 | 109:7 139:9 | 13:12,20 | 53:7 79:19 | 136:14 | 79:19 81:1 |
| 139:9 | 141:8 142:9 | 29:20 81:2 | 79:20 81:2 | 137:2,7,12 | 84:12 |
| **10257** 2:5 | 145:8 148:9 | 31:23 32:20 | 84:12 | 141:10,18 | 136:20,22 |
| **10th** 7:21 | **18th** 13:11,18 | 33:5 34:7 | 136:20,21 | 141:22 | 137:16,19 |
| 18:2 | 13:21,22 | 34:23 35:8 | 136:21,15 | 142:4,11 | 139:20 |
| **11** 1:18 6:15 | 14:22 52:20 | 36:6,11,15 | 137:19 | 143:1,2,8 | **75** 3:12 |
| 6:16 31:15 | 53:5 65:8 | 36:19 37:3 | 138:14 | 143:13,15 | |
| 31:18,19,24 | | 37:21,23 | 139:14,16 | 144:1 154:1 | |
| 32:4,6 | | | | | |

**OFFICER GEORGE MARIN**
**January 11, 2024**

Page 25

| | | | | | |
|---|---|---|---|---|---|
| **773** 2:6 | | | | | |
| **8** | | | | | |
| **82** 3:16 | | | | | |
| **9** | | | | | |
| **9:00** 139:12 | | | | | |
| 140:9 | | | | | |
| **911** 132:20 | | | | | |
| 133:2 | | | | | |
| **9th** 83:7,24 | | | | | |

Exhibit 6 Page 47