Transcript of the Testimony of
**ERIC DAVIS**

**Date:** September 21, 2023

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND,          )
                              )
            Plaintiff,        )
                              )
        vs.                   )   No. 1:23-cv-01851
                              )
THOMAS DART, Sheriff of       )
Cook County, COOK COUNTY,     )
ILLINOIS, OFFICER E.          )
ARREGUIN, and NURSE           )
JEFFERSON,                    )
                              )
            Defendants.       )

    This is the deposition of ERIC DAVIS,
called by the Plaintiff for examination, taken
via Zoom videoconferencing, taken pursuant to
the Federal Rules of Civil Procedure for the
United States District Courts pertaining to the
taking of depositions, taken before PEGGY A.
ANDERSON, a Certified Shorthand Reporter of the
State of Illinois, on September 21, 2023, at
11:00 o'clock a.m.

---

Page 2

1  A P P E A R A N C E S:
2
3     THE LAW OFFICES OF:
      THOMAS G. MORRISSEY
4        BY:  MR. THOMAS G. MORRISSEY
5           10257 South Western Avenue
            Chicago, Illinois  60643
            (773) 233-7901
6           tgm@morrisseylawchicago.com
7           Appeared on behalf of the
8           Plaintiff;
9     THE LAW OFFICES OF:
      DEVORE RADUNSKY, LLC
10       BY:  MR. TROY RADUNSKY
            230 West Monroe Street
11          Suite 230
            Chicago, Illinois 60606
12          (312) 300-4479
            Tradunsky@drmblaw.com
13
            Appeared on behalf of the
14          Defendant, Cook County.
15
16
17
18
19
20
21
22
23
24

---

Page 3

1                I N D E X
2  WITNESS                            PAGE
3  ERIC DAVIS
   DIRECT EXAMINATION BY
4  MR. MORRISSEY:                       4
5
6
7            E X H I B I T S
   MARKED                             PAGE
8  PLAINTIFF'S EXHIBIT NO. 1            7
9  PLAINTIFF'S EXHIBIT NO. 2           48
10 PLAINTIFF'S EXHIBIT NO. 3            9
11 PLAINTIFF'S EXHIBIT NO. 7           96
12 PLAINTIFF'S EXHIBIT NO. 8           87
13 PLAINTIFF'S EXHIBIT NO. 10          28
14 PLAINTIFF'S EXHIBIT NO. 11          28
15 PLAINTIFF'S EXHIBIT NO. 12          81
16
17             * * * * * * *
18
19
20
21
22
23
24

Exhibit 9 Page 1

ERIC DAVIS
September 21, 2023

Page 4

1  (WHEREUPON, the witness
2  was first duly sworn.)
3  MR. MORRISSEY:  This is the
4  deposition of Eric Davis taken pursuant to
5  notice and continued to today's date.
6  WHEREUPON:
7  ERIC DAVIS,
8  called as a witness herein, having been first
9  duly sworn, was examined and testified as
10 follows:
11  D I R E C T   E X A M I N A T I O N
12  BY MR. MORRISSEY:
13  Q    Mr. Davis, I'm going to ask you a
14 series of questions.  I'm going to ask that you
15 answer the questions orally.  If you don't
16 understand one of my questions, please tell me
17 and I'll attempt to rephrase it.
18  Can you state your name and spell
19 your last name, please?
20  A    My name is Eric Davis, D-a-v-i-s.
21  Q    Mr. Davis, what is your current
22 position with Cook County?
23  A    I am the deputy director of the
24 Department of Capital Planning and Policy for

---

ERIC DAVIS
September 21, 2023

Page 5

1  Cook County.
2  MR. RADUNSKY:  And so concludes your
3  deposition today.  We'll waive.
4  BY MR. MORRISSEY:
5  Q    In the Westmoreland case, you
6  answered interrogatories in Westmoreland versus
7  Dart?
8  A    I believe I have, yes.
9  Q    And prior to today's deposition, what
10 documents did you look at to prepare for your
11 testimony today?
12  A    I can't remember all of them.  I
13 think you all sent some documents.  I believe
14 there were some e-mails.  I assume you will
15 refresh my memory.  We have looked at different
16 documents that have been a part of this.
17  Q    When did you first -- when were
18 you -- were you sent documents by your
19 attorney?
20  A    I believe, yes, I was.
21  Q    When did you receive those documents?
22  A    I don't know.  I would have to check.
23  Q    Was it within the last week?
24  A    I think it might have been longer

---

ERIC DAVIS
September 21, 2023

Page 6

1  than a week ago.  I believe it was more than a
2  week ago, yeah.
3  Q    Did you receive the Cook County or
4  the Sheriff's answer to the complaint?
5  A    I think I got that together in the
6  same document or I believe -- yeah, I believe I
7  did.  Yeah.
8  Q    Did you receive the interrogatory
9  answers that you verified for Cook County?
10  A    Yeah, I think you or somebody sent
11 those.  I think Troy sent those.
12  Q    Well, let's -- for the record, I
13 haven't communicated --
14  A    Yeah, sorry.  Yeah, you didn't.  You
15 wouldn't send me anything.  I think Troy sent
16 them, yeah.
17  Q    Did you receive any e-mails from TJ
18 Tyrrell that you reviewed?
19  A    Could you be more specific because I
20 work with TJ on lots of things, so.
21  Q    Did you receive any e-mails that had
22 an attorney by the name of Zach Pestine on it?
23  A    I don't remember if I got anything
24 from him specifically about this case.  I don't

---

ERIC DAVIS
September 21, 2023

Page 7

1  remember anything from him about that.
2  Q    Did you review any e-mails from March
3  of 2021 in regards to the ADA requirements for
4  a ramp?
5  A    I believe I did, yes.  Yeah.
6  Q    And did you review an e-mail that you
7  sent to TJ and other members of the Sheriff or
8  Cook County's -- in regards to the ADA
9  requirements for a ramp?
10  A    That sounds familiar, yes.
11  Q    Let's take a look at Exhibit Number 1.
12  MR. RADUNSKY:  Are you going to put
13 something on the screen?
14  MR. MORRISSEY:  I'm sorry.  Peggy,
15 can I share this with -- let me go back a
16 step.
17  THE REPORTER:  It's on, Tom.  So you
18 can share.
19  MR. MORRISSEY:  I can share it now?
20 Thank you.
21  THE WITNESS:  Tom, so that you know,
22 there is something sticking down blocking
23 part of your screen.
24  MR. RADUNSKY:  He's just low on his

Exhibit 9 Page 2

ERIC DAVIS
September 21, 2023

Page 8

1   screen because he's looking at his screen.
2   That's why that's happening, Eric.  He's
3   just leaning in and that happens to people,
4   so he's fine.  Yeah, he's like me if I lean
5   in too, you'll get my huge forehead.
6        THE WITNESS:  Okay.
7        MR. RADUNSKY:  Did you get that on
8   the record, Peggy?
9        THE WITNESS:  I did.  Do you want it
10  on the record?
11       MR. RADUNSKY:  Now it's an admission
12  in a federal case.
13  BY THE WITNESS:
14   A   I can see that now, yeah.
15  BY MR. MORRISSEY:
16   Q   Mr. Davis, I'm showing you Defendant
17  Cook County's Answer to Plaintiff's Complaint.
18   A   Okay.
19   Q   You mentioned that you reviewed this
20  prior to today's deposition?
21   A   I believe I did, yes.
22   Q   I'm going to turn you to Paragraph 7 --
23  or I'm sorry -- Paragraph 9, Defendant Cook
24  County's Answer to the Complaint in this case

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 9

1   and I would ask you to read the allegation and
2   the response by Cook County.
3    A   Yeah, okay.  I read it.
4    Q   Did you assist in preparing these
5   answers to plaintiff's complaint?
6    A   I believe I did, yes.
7    Q   What did you do in assisting in
8   preparing the answers to Cook County's -- to
9   the complaint against Cook County in
10  Westmoreland versus Dart, which were filed in
11  May -- May 31st, 2023?
12   A   I think I just reviewed the questions
13  and my opinion what was asserted in the
14  paragraph -- or the question is -- if it is a
15  question, are not correct.
16   Q   Did you -- well, let me ask a
17  preliminary question.  To your knowledge, when
18  was the RTU building built with Cook County
19  Jail?
20   A   It was completed before I worked for
21  the County.  I believe it was completed in
22  2015.
23   Q   I'm going to show you Exhibit Number 3
24  for a moment.  Showing you Exhibit Number 3,

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 10

1   it's titled:  Cook County Jail, New RTU RCDC
2   Facility.
3        Do you recognize that building?
4    A   Yes.
5    Q   What is that building depicting?
6    A   It's the RTU or sometimes referred to
7   as Division 8.
8    Q   In this exhibit, in the body of the
9   exhibit it says:  The project consists of a
10  five-story cast-in-place concrete structure of
11  approximately 280,000 square feet, two
12  pedestrian tunnels connecting to the adjacent
13  buildings; is that correct --
14   A   Yes.
15   Q   -- that the RTU has two pedestrian
16  tunnels that connect to the remaining campus at
17  Cook County Jail?
18   A   Yes, that's correct.
19   Q   And as -- in your capacity with Cook
20  County, at times you have walked through those
21  two pedestrian tunnels?
22   A   Yes, I have walked both pedestrian
23  tunnels.
24   Q   When was the last time that you

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 11

1   physically walked or inspected the two
2   pedestrian tunnels leading from the RTU
3   building at the jail?
4    A   Monday of this week.
5    Q   Who were you with on Monday when you
6   physically inspected the two pedestrian
7   tunnels?
8    A   I was escorted by someone from the
9   Department of Facilities Management.
10   Q   And was that Mr. Tyrrell?
11   A   No.
12   Q   Who was that person?
13   A   I need to ask my attorney a question.
14       THE WITNESS:  Am I required to answer
15  that?
16       MR. RADUNSKY:  Yeah, you are.
17  BY THE WITNESS:
18   A   Joe Merkel.
19  BY MR. MORRISSEY:
20   Q   What time did you -- was there
21  anybody else besides Mr. Merkel with you?
22   A   No.
23   Q   Were you escorted by any member of
24  the Sheriff's Office?

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 3

ERIC DAVIS
September 21, 2023

Page 12

```
 1      A    No.
 2      Q    Mr. Davis, did you hear my question?
 3      MR. RADUNSKY:  Yeah, he responded.
 4  BY THE WITNESS:
 5      A    I said no.  Sorry.  Sorry, Tom.
 6  BY MR. MORRISSEY:
 7      Q    Other than -- I'm sorry.  Other than
 8  Mr. Merkel on Monday of this week which would
 9  have been, what, about the 18th of September,
10  anybody else that was with you?
11      A    No.
12      Q    Can you tell me your path of travel
13  on Monday, September 18th?
14      A    I came into the building via the ramp
15  on the east side and up into the building and
16  through the building and out the building on
17  the ramp on the north side.
18      Q    Let me get -- go back a step.  About
19  what time on Monday did you traverse the east
20  ramp of the RTU building?
21      A    It was probably around -- between
22  9:30 and 10:00 a.m., something like that.
23      Q    And did you have a prearrangement
24  with Mr. Merkel to be at the Cook County Jail
```

ERIC DAVIS
September 21, 2023

Page 13

```
 1  on that date?
 2      A    I had contacted DFM, and Joe was the
 3  person who was available to escort me.
 4      Q    When did you contact the Department
 5  of Facilities Management to inspect the jail?
 6      A    I believe I just called him the week
 7  before.
 8      Q    Was that by -- did you set it up by
 9  an e-mail?
10      A    No, by phone.
11      Q    Did you speak with Mr. Tyrrell --
12      A    No.
13      Q    -- in order to set up this -- well --
14      A    No, I spoke with --
15      MR. RADUNSKY:  Hold on, Eric.  Eric,
16  Eric, Eric, let Tom finish his question.  I
17  know you're going to anticipate some of his
18  questions.  Okay?  It's okay.  I mean, just
19  let Tom finish, and Tom will let you do the
20  same.
21          So, Tom, if you want to start
22  that again, go ahead.
23      MR. MORRISSEY:  Sure.
24
```

ERIC DAVIS
September 21, 2023

Page 14

```
 1  BY MR. MORRISSEY:
 2      Q    Who did you speak with in order to
 3  set up an inspection at the Cook County Jail?
 4      A    I spoke with Mike Carberry, who is
 5  one of the DFM managers at the DOC.
 6      Q    Did you tell Mr. Carberry why you
 7  wanted to inspect a portion of the Cook County
 8  Jail?
 9      A    I don't remember if I did or not.  I
10  don't think so, but I don't remember.
11      Q    Was it prearranged that Joe Merkel
12  would meet you on Monday morning?
13      A    No, I just needed somebody from DFM
14  to walk me through.  You need to understand, I
15  walk through the jail at a variety of times and
16  purposes.  I have a 24-hour all-access pass and
17  I go there for any number of the projects at
18  the campus that I'm involved in.  So I walk
19  through the jail above and below ground fairly
20  regularly.
21      Q    When you say that you frequent the
22  jail on a regular basis, how often are you in
23  the Cook County Jail building?
24      A    It varies a great deal.  Usually
```

ERIC DAVIS
September 21, 2023

Page 15

```
 1  only if I need to go see something in person
 2  that's going on or sometimes I go to walk
 3  through a site to, you know, inspect the
 4  progress of a project or if one of the project
 5  directors or project managers has a question,
 6  something they want me to see.  It varies
 7  greatly.  But whenever I need to go to the
 8  jail, I go to the jail.
 9      Q    On Monday, September 18th, did you go
10  to the jail to inspect the east ramp leading
11  from the RTU building?
12      A    I wouldn't say it was an inspection.
13  I wanted to walk through it to refresh my
14  memory.  There is another project going on that
15  I really needed to look at over there, so I
16  just went to both on the same trip.
17      Q    Did you also during that inspection
18  on Monday want to visualize and inspect the
19  north ramp leading from the RTU building?
20      A    Yeah, I walked through the ramp.  I
21  wouldn't say I inspected it but I walked
22  through, yeah.
23      MR. RADUNSKY:  That was my only
24  objection is, I mean, he's calling it a
```

Exhibit 9 Page 4

ERIC DAVIS
September 21, 2023

Page 16

```
 1    walkthrough.  You're calling it an
 2    inspection.
 3  BY MR. MORRISSEY:
 4        Q    What other purpose did you have on
 5  Monday, September 18th, to be at the jail?
 6        A    I'm not sure that's relevant.  You
 7  know, we have a lot of things going on at the
 8  jail that are confidential.
 9        THE WITNESS:  So I would ask my
10    counsel is it okay to get into those
11    specifics?
12        MR. RADUNSKY:  I mean, you're right.
13    It's not relevant but, I mean, you can be
14    very brief if you just want to tell him
15    what other things you were doing, that's
16    fine.
17  BY THE WITNESS:
18        A    I went to walk the site where we have
19  demolished Division 1 at the north end of the
20  jail.
21  BY MR. MORRISSEY:
22        Q    Prior to arriving on September 18th
23  at the Cook County Jail, had you communicated
24  with your attorney about this case?
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 17

```
 1        MR. RADUNSKY:  Objection.  That's
 2    attorney-client privilege.  Don't answer
 3    it.
 4  BY MR. MORRISSEY:
 5        Q    My question is did you have -- did
 6  you speak to any member of -- let me rephrase
 7  the question.
 8        MR. RADUNSKY:  Okay.
 9  BY MR. MORRISSEY:
10        Q    In preparing for this deposition, did
11  you meet with any attorney?
12        MR. RADUNSKY:  Objection.  That's
13    attorney-client privilege.  Just meet with
14    any attorney?
15        MR. MORRISSEY:  I'm not suggesting --
16    I'm not asking what --
17        MR. RADUNSKY:  That's fine.  If you
18    want to ask him if he's met with an
19    attorney, no, that's fine.  That's fair.
20    You can answer if you met with an attorney,
21    yeah.
22  BY THE WITNESS:
23        A    Yeah, I met with an attorney prior to
24  this deposition.  Yeah.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 18

```
 1  BY MR. MORRISSEY:
 2        Q    When did you meet with the attorney?
 3        A    I don't remember.  It's in my
 4  calendar somewhere.  I don't remember.
 5        Q    Was it within the last week?
 6        A    Yeah.  We -- I believe we talked
 7  earlier this week, yeah.
 8        Q    Was it in person or on Zoom or on the
 9  phone?
10        A    No, it was virtual.
11        Q    And any other time that you met or
12  spoke to an attorney about the Westmoreland
13  versus Dart case?
14        A    Yeah, I think we talked a couple of
15  weeks ago.  There are a lot of actions going on
16  as you're well aware.  So I tried to remember
17  the specifics for this one but I believe so,
18  yeah.
19        Q    Now, you mentioned on Monday that --
20  when you first walked through the east
21  pedestrian ramp, were you leaving the RTU
22  building and going up the east ramp?
23        A    No, I was going into the RTU
24  building, up the ramp and then through the
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 19

```
 1  building and then out the ramp on the north.
 2        Q    Okay.
 3        A    Or, actually, out the tunnel
 4  connection.  I should be clear.  The tunnel
 5  connection on the north.
 6        Q    Let me go back a step.  Is the -- you
 7  mentioned that you walked through initially the
 8  east pedestrian ramp for the RTU, correct?
 9        A    Correct.
10        Q    And were you in a tunnel?  Did you
11  have to access that east pedestrian ramp for
12  the RTU from a tunnel?
13        A    Yeah, from the underground tunnel
14  system at the jail, yes.
15        Q    Describe what part of the jail you
16  entered initially on Monday.
17        MR. RADUNSKY:  I think he just did,
18    but you can answer it again.
19  BY THE WITNESS:
20        A    I came through the tunnel and went up
21  into -- I'm not clear about what you're asking.
22  BY MR. MORRISSEY:
23        Q    You know, to enter the Cook County
24  Jail, did you come in off of 27th and
```

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 5

Page 20

1  California?
2      A   I came in at Post 5 on California,
3  which is my usual access point for that part of
4  the jail.
5      Q   Where is Post 5?
6      A   Post 5 is on California Avenue
7  immediately south of the Criminal Court
8  Administration Building or what we call the
9  CCAB.
10     Q   After you walked through Post 5 --
11     A   Yeah.
12     Q   -- what area did you initially walk
13  through in order to arrive at the east/west
14  tunnel?
15     A   I went -- go ahead.
16     Q   Give me your path of travel from the
17  point you entered the jail at Post 5 and I
18  assume you went through a security check there,
19  correct?
20     A   Yes.
21     Q   And then you exited out in the open
22  then, correct --
23     A   Correct.
24     Q   -- after Post 5?

Page 21

1      A   Yes.
2      Q   And from walking out of Post 5, the
3  security checkpoint --
4      A   Yeah.
5      Q   -- where did you walk to next?
6      A   I walked to the Cermak Health
7  Services building, and I waited in the lobby
8  there to meet Joe.
9      Q   And in relation to the RTU, is the
10  Cermak Health Service building to the east of
11  the RTU?
12     A   Yeah.
13     Q   And is it -- and if you are to walk
14  from the entrance from the Cermak building to
15  the RTU building, would you be walking north,
16  northwest?
17     A   More west than north.  If you're
18  walking at grade, yeah, more west than north.
19     Q   When you entered the Cermak facility
20  on the first floor, did you wait in the
21  vestibule for Mr. Merkel?
22     A   Yes.
23     Q   And after Mr. Merkel arrived, where
24  did you go to next?

Page 22

1      THE WITNESS:  I want to ask my attorney
2  is this relevant?  And I apologize --
3      MR. RADUNSKY:  Just tell him the
4  route that you took to get to the two
5  ramps, yeah.  I mean, he just wants to know
6  the route.  I mean, he knows you were out
7  there.  So if you can, to cut out a lot of
8  this, you can explain to him, I mean, the
9  exact route that you took to get there and
10  be as specific as you can.  I think that
11  that will get us past all of this much
12  quicker, okay?
13     THE WITNESS:  Yeah.
14     MR. RADUNSKY:  So go ahead.
15  BY THE WITNESS:
16     A   I met Joe in the lobby.  He spoke
17  with the deputies at the desk.  They let us
18  through.  I went into the Cermak building with
19  Joe.  I took the elevator down, and we walked
20  through the lower level of Cermak to the tunnel
21  and then went into Division 8.
22     MR. RADUNSKY:  Thanks.
23  BY MR. MORRISSEY:
24     Q   From the lower level of Cermak, does

Page 23

1  that connect to a tunnel?
2      A   Yeah, it connects to the tunnel on
3  the lower level.
4      Q   Approximately from the -- when you
5  exited the Cermak building on the lower
6  level --
7      A   Yeah.
8      Q   -- and walked to the, I believe it
9  would be, the top of the east pedestrian ramp
10  leading into the RTU, approximately how many
11  feet would that be?
12     A   There, from the inside of Cermak
13  through to the tunnel to the bottom of the ramp
14  leading on the east side, oh, gosh, let's see.
15  I don't know, 100 feet, 150 feet, 200 feet,
16  something like that.
17     Q   Let me -- I'm trying to understand
18  the two pedestrian ramps.  One is what you
19  described as the east ramp.  The other one you
20  described as the west ramp, correct?
21     A   No, it's the east ramp and then
22  there's a tunnel connection on the north that
23  isn't a ramp.
24     Q   Well, the diagram, the exhibit we

Exhibit 9 Page 6

1   looked at, Exhibit 3 for the RTU building, do

2   you want me to go back and describe it to you?

3       A   Yeah, sure.

4       Q   If we go back to Exhibit 3 --

5       A   Sure.

6       Q   -- it discusses two pedestrian

7   tunnels connecting to adjacent buildings?

8       A   Uh-huh.

9       Q   One of those tunnels you said was the

10   east pedestrian tunnel -- I'm sorry -- east

11   pedestrian ramp, correct?

12       A   Yeah, the one on the east is a ramp,

13   yes.

14       Q   And the one on the north you describe

15   as a tunnel?

16       A   Yes.

17       Q   What is the difference?

18       A   The difference in terms of the

19   definition relative to the Americans with

20   Disabilities Act has to do with the slope of a

21   walkway.  The slope of the walkway in the

22   tunnel connection on the north isn't steep

23   enough to require things like intermediate

24   landings or handrails or whatever.  Sidewalks

1   and that are allowed to be -- have a pitch to

2   them up to a 1 to 20 pitch without requiring

3   ramps or -- I'm sorry -- landings or handrails.

4   And clearly, that tunnel isn't steep enough to

5   require that.

6       Q   Did you measure what you described as

7   the north tunnel, the rise of the north tunnel?

8       A   No.

9       Q   Did you take any measurements that

10   day?

11       A   No.

12       Q   Have you ever taken measurements of

13   what you describe as the north tunnel?

14       A   No.

15       Q   Do you know if any member of the

16   Department of Facilities Management has ever

17   measured the rise of what you described as the

18   north tunnel?

19       A   I have no idea if they have or not.

20       Q   Do you know if any architectural firm

21   has ever measured the rise of what you

22   described as the north tunnel?

23       A   You mean since it opened?  I am not

24   aware of that, no.

1       Q   Within the last year, has any

2   architectural firm --

3       A   Not that I'm aware of.

4       Q   -- measured the rise of what you

5   described as the north tunnel?

6       A   Not that I'm aware of.

7       Q   Do you know if any outside surveyor

8   has ever measured the rise of the north tunnel?

9       A   I don't know of anybody doing that.

10       Q   Do you know of anybody for the

11   Sheriff's Office or Cook County measuring the

12   rise of the north tunnel?

13       A   I don't know, no.

14       Q   In regards to what you labeled as the

15   east pedestrian walk, same questions.  Did you

16   on Monday or last -- of this week measure the

17   rise of the east pedestrian walkway?

18       A   I did not measure the rise of the

19   east pedestrian ramp, no.

20       Q   Do you know if any architectural firm

21   within the last two or three years has measured

22   the rise of the east pedestrian ramp?

23       A   I am not aware of that having

24   occurred.

1       Q   Are you aware of anybody from Cook

2   County government measuring the rise of the

3   east pedestrian ramp?

4       A   Not that I can recall, no, but I

5   don't know.  I mean Cook County government is

6   thousands of people.  I don't know.

7       Q   Do you know if anybody from the

8   Sheriff's Office has measured the rise of the

9   east pedestrian ramp?

10       A   I have no idea.

11       Q   What is your definition --

12       MR. RADUNSKY:  Tom, if we're not

13   sharing the screen, do you want to turn it

14   off because it's easier to see.  I mean, if

15   you want to still share it, that's fine.  I

16   mean, I'm just telling you.  It's just

17   easier if it's off we can see better.

18       MR. MORRISSEY:  I'm going to share

19   more exhibits.

20       MR. RADUNSKY:  Okay.  That's fine.

21   Go ahead.

22       THE WITNESS:  Although it looks like

23   a nice place to ski.

24       MR. RADUNSKY:  I know, yeah.

Exhibit 9 Page 7

Page 28

BY MR. MORRISSEY:

Q   Did you -- were you asked -- let me rephrase the question.

I'm going to show you Exhibit Number 10.  Showing you Exhibit Number 10, do you see a drawing of what's labeled as the east tunnel corridor?

A   Yes, I see that.

MR. RADUNSKY:  For the record, it's Bates 2201.

BY MR. MORRISSEY:

Q   Let me show you Exhibit Number 11 now.  Let me ask a question about Exhibit Number 10.  What -- did you -- when was the first time that you actually looked at Exhibit Number 10?

A   I think this was in material that Troy forwarded in connection with this case.

Q   Do you know if Cook County government maintains any architectural drawings in regards to the RTU building?

A   I believe it does.

Q   As the deputy director of Capital Planning and Policy, do you have access to the

Page 29

drawings for the RTU building, the architectural drawings?

A   If needed.

Q   How would you as -- in your position with Cook County locate the architectural drawings for the RTU building?

A   Standard practice, and we pretty much follow it as well, is that drawings of this are either with the building engineer or they are in a central location.  In this case, I think that they are probably with DFM in the sort of central drawings repository at the juvenile temporary detention center.

Q   So why would the Department of Facilities Management, which is part of Cook County government, correct?

A   Uh-huh, yes.

Q   Why would the Department of Facilities Management maintain a copy of the architectural drawings of the RTU?

A   They're managing the buildings.  They need to know what the buildings are.

Q   When a county government building is erected, let's say, after let's say 2010, are

Page 30

the architectural drawings for the -- for a county building, are they provided to Capital Planning at any stage in the process?

A   Generally, although it's been our -- and we haven't obviously erected a lot of new buildings since I have been with the County, but standard practice is to give all of that stuff to Facilities Management because, as I said, they run the building then and so they need that information more than we do.

Q   Would the pedestrian ramps that connect the RTU to the remaining campus at the Cook County Jail also be -- architectural drawings also be in the possession of the Department of Facilities Management?

A   I think probably so, yeah.

Q   Looking at Exhibit Number 10, can you tell me what this exhibit portrays?

A   It appears to be an excerpt from a general architectural floor plan drawing showing an area -- I don't see a north arrow but just from the orientation of the labels, I'm assuming north is up in this image and it indicates the internal corridor, and the top

Page 31

right indicates the beginning of the access to the tunnel to the east.

Q   So when we look at the end, would these be the final blueprints that were used to construct this east tunnel corridor?

A   Yeah, probably so.

MR. RADUNSKY:  I was going to say when you say "the final blueprints," are you saying the as-built drawings or the design or the construction drawings?  But, Eric, you answered.  That's fine he answered.

BY MR. MORRISSEY:

Q   If you look at the top of Exhibit Number 10 where it says: East tunnel --

A   Correct.

Q   -- is that the area in which you would have entered the -- would have descended to go into the RTU building on Monday, September --

A   Would have taken -- it looks like that's where the ramp is, yeah.  I cannot see the plan of the whole building, but I assume that's the ramp connection -- or the tunnel

Exhibit 9 Page 8

Page 32

1  connection there, yeah.
2      Q   So you would have left the basement
3  of the Cermak Health facility, walked through
4  the east tunnel to get to this -- the top of
5  this ramp, correct, which is labeled the east
6  tunnel corridor?
7      A   I would have left the Cermak
8  building.  I would have walked through the
9  tunnel to the bottom of the ramp and entered
10 the building, yes, there where you're
11 indicating.  Yeah.
12     Q   So right where I'm indicating where
13 it says:  East tunnel at the top.  The ramp
14 descends, correct?
15     A   This isn't the plan of the ramp area.
16     Q   I'm sorry.
17     A   Yeah, this is -- the ramp is to the
18 right out of the drawing.
19     Q   Well, I'm confused.  It looks like
20 there is a -- when you go through the east
21 tunnel for the -- when you came from Cermak
22 and -- you went through the east tunnel,
23 correct?  And then there are a series of doors
24 at the top, correct?

Page 33

1      A   That's what the drawing shows, yes.
2      Q   And then when you walked through
3  those doors, there would be a landing at the
4  top?
5      A   No.
6      Q   Flat area?
7      A   No.  The plan that you're showing is
8  an area of flat floor that connects.  On the
9  right end is the end of the ramp to the tunnel,
10 and so the ramp is off the page to the right.
11 The area here is just regular floor at the
12 lower level of Division 8.  There is no ramp in
13 this drawing other than the end of it on the
14 right-hand side.  This is the part of the floor
15 it connects -- there's an area you could see --
16 there's a sliding door at the bottom at this
17 area here on the bottom of the drawing.  It's
18 an area that connects to various other rooms.
19 It connects to a janitor's closet.  It's a
20 standard corridor that has doors on hold-opens
21 and then once you leave the envelope of the
22 building, you start the ramp that goes to the
23 tunnel.  So it's the -- you know, that east
24 tunnel appears to be something that they're

Page 34

1  using to indicate that that's the way to the --
2  that's the east tunnel to -- or connection
3  rather of the ramp to the tunnel.  So the only
4  sloping part is at the very right end of the
5  image where you have that line that crosses the
6  corridor.  That's the beginning of the east
7  ramp.
8      Q   I guess I'm confused because the
9  representation that was given to us, that this
10 was a diagram of the east pedestrian ramp, and
11 this Exhibit Number 10 doesn't depict the ramp.
12     Is that fair to say?
13     A   I don't know where you got this from.
14 So I can't say, you know, what somebody was
15 asked for or what they represented that it is.
16 I can tell you what it appears to be.
17     Q   Well, this was produced by defense
18 counsel and it was represented to be the east
19 pedestrian ramp for the RTU, but it isn't.  Is
20 that what you're telling me?
21     A   It appears that it's a little part of
22 the east ramp.
23     Q   Can you tell me looking at Exhibit
24 Number 10 where would the east pedestrian ramp --

Page 35

1  what portion of the east pedestrian ramp is
2  depicted in this?
3      A   The end of the ramp that connects to
4  the building.  The wall going up and down in
5  this drawing is the boundary, if you will, of
6  the RTU building itself.  So to the right of
7  that wall is most likely unexcavated soil,
8  et cetera.  And on the left is inside the
9  building.  So that's -- that wall is the
10 building line.
11     Q   So I'm -- just looking at the top of
12 Exhibit 10, it says east, correct?
13     A   Yeah, that's what it says.  Yeah.
14     Q   And is the ramp at the top there at
15 the east tunnel?
16     A   Yeah, that's the end of the ramp.
17     Q   The end of the ramp.  All right.  So
18 the ramp would be -- if I'm looking at the top
19 of this exhibit, it would be to the right?
20     A   Correct.
21     Q   So nothing depicted in Exhibit 10
22 reflects the ramp itself?
23     A   No.  It depicts the end of the ramp
24 on the right-hand side.  I think you can see

Exhibit 9 Page 9

Page 36

1  the two little thin lines at the bottom and top
2  by the corridor, that would appear to be
3  depicting the ends of the handrails at the top
4  of the ramp.  So it indicates a portion of the
5  ramp but not the whole -- there's not none of
6  the ramp in this image, but the whole ramp is
7  not in this image.
8       Q    So you're saying that if we look
9  right where it says:  Align corridor wall with
10 tunnel wall, to the right of that, there's a
11 couple lines?
12      A    Yeah, uh-huh.
13      Q    You'd say that those are handrails,
14 correct?
15      A    That's what they appear to be, yes.
16      Q    And it's your understanding that
17 this -- that the east pedestrian ramp is
18 compliant with the ADA; is that your
19 understanding?
20      A    It appears to, yes.
21      Q    In order to be -- well, let's turn to
22 another exhibit.  Let's turn to Exhibit
23 Number 11.
24      A    Excuse me.  Can I take just a moment?

Page 37

1  I need to close the door to the room that I'm
2  in.
3            MR. MORRISSEY:  Sure.  Go ahead.
4  BY MR. MORRISSEY:
5       Q    Showing you Plaintiff's Exhibit
6  Number 11, does that appear to be a fair and
7  accurate photograph of the east pedestrian
8  ramp?
9       A    Yeah.
10      Q    And if we look at the top of that, it
11 says tunnel ramp -- tunnel camera, 0.108 CMK to
12 RTU West 2019.
13      A    Okay.
14      Q    Where the doors -- at the top of the
15 picture where the doors are, did you walk
16 through those doors in order to -- walk through
17 those doors when you left the -- let me
18 rephrase the question.
19           In your path of travel from the
20 Cermak basement, did you have to walk through
21 the -- to the -- through the doorway?
22      A    Yeah, I believe so.  If this is -- if
23 this is of that area, I believe I came from the
24 bottom of the -- or the part that's farther

Page 38

1  away in this image up the ramp, through the
2  doors, I think, if I'm oriented the right way.
3       Q    And then you would descend the ramp
4  to get into the RTU building?
5       A    I believe the ramp goes up into the
6  RTU, but I think that's the way -- I think
7  these doors that you're seeing here, I believe
8  they are the doors that are in the -- on
9  hold-opens that they showed in the plan that
10 you're looking at, but I could have it
11 backwards.  I apologize.
12      Q    So you don't recall whether or not
13 from the basement of Cermak when you walked
14 through the tunnel area to reach the east
15 pedestrian ramp whether you went up or down to
16 enter into the RTU building; is that --
17      A    I think I went up and down just to
18 have walked it more than once, you know.
19      Q    But initially when you entered that
20 tunnel, when you exited the basement of the
21 Cermak building and walked through the tunnel
22 to get to the east pedestrian ramp for the
23 RTU --
24      A    Yeah, yeah.

Page 39

1       Q    -- you would have had to have gone
2  down the ramp to enter --
3       A    Yeah.
4       Q    -- into it?
5       A    Yeah.
6       Q    Is that correct?
7            MR. RADUNSKY:  Eric, let him finish
8  before you respond, okay?
9            THE WITNESS:  Sorry.
10           MR. RADUNSKY:  It's okay.  I understand.
11  I understand what you're doing.  I mean,
12  just give Tom a chance to get the question
13  out.  It's okay.
14  BY MR. MORRISSEY:
15      Q    Is that correct?
16      A    Yes.
17      Q    Now, again, you -- do you know if any
18 measurements were ever taken of this ramp, the
19 east pedestrian ramp by any member of Cook
20 County government or the Sheriff's Office?
21      A    They may have been, but I don't
22 recall hearing -- or reading anything about it
23 or knowing about it, no.
24      Q    And no outside contractor or

Exhibit 9 Page 10

Page 40

1  professional firm ever measured it to your
2  knowledge?
3      A    I couldn't say ever.  Maybe.  I don't
4  know.
5      Q    But not in the -- not to your
6  knowledge in the last two or three years,
7  correct?
8      A    I don't believe so, no, but it may
9  have been -- you know, not that I'm aware of,
10  no.
11      Q    On the east pedestrian ramp, is there
12  an intermediate landing area?
13      A    Yes.
14      Q    Why is there an intermediate landing
15  area on the east pedestrian ramp?
16      A    That would suggest that the rise to
17  the -- from the tunnel level at that point to
18  the lower level floor in the RTU was greater
19  than 30 inches.
20      Q    Did you measure to determine whether --
21  well, let me ask a preliminary question.
22          In the bottom picture of Exhibit
23  Number 11, if you were to measure the rise of
24  the east pedestrian tunnel, how would you do

Page 41

1  that as an architect?
2      A    I suppose it would depend upon how
3  exact I needed to be or the purpose for doing
4  so.  If I just needed a rough idea within a
5  couple of inches, I could count blocks.  That's
6  not a particularly accurate way to do it, but
7  then there are tools, as you well know,
8  including a laser level and including have it
9  surveyed.  If I needed to -- for example, if I
10  needed to make modifications to this, do
11  architectural drawings to change it, I probably
12  would have it professionally surveyed.
13      Q    And to your knowledge, that hasn't
14  been done?
15      A    I'm sorry?
16      Q    That has not been done?
17      A    I'm not aware that it's been
18  surveyed, no.
19      Q    Would you -- if you were to
20  commission an architect or a surveyor to do
21  that, would you measure it from the bottom of
22  the east pedestrian ramp which is -- the bottom
23  of it would be the lower level of the ramp,
24  correct, which is the flat area, correct?

Page 42

1      A    Yeah, I'd probably do right down the
2  middle, measure what -- you know, from the
3  offset from there to the middle -- the top of
4  the part where it slopes.
5      Q    So as you descended on Monday into
6  the RTU building from the east pedestrian ramp,
7  are there doors at the foot of the ramp that
8  you have to go through?
9      A    I'm pretty sure there are, yeah.
10      Q    And is there a flat landing at the
11  end of the ramp?
12      A    I would assume so.  Again, I didn't
13  take any measurements.
14      Q    So at that landing area at the foot
15  of the ramp before you entered into the RTU
16  building itself, if you were to take a
17  measurement, would you take a measure from that
18  flat landing to the top of the east pedestrian
19  ramp to determine the rise of it?
20      A    Yeah, I would take a measurement from
21  the point at which it begins to slope up to the
22  top where it stops sloping right down the
23  middle.
24      Q    And if the rise from the bottom to

Page 43

1  the top exceeded 30 inches, then you would --
2  then the ramp would require an intermediate
3  landing, correct?
4      A    That's correct and I think if you
5  look to the left in this picture, you can see
6  that the handrail jogs at what to me seemed to
7  be an intermediate landing.  You can see that
8  the handrail is not straight.  It comes up on
9  an angle, it flattens out and then it angles up
10  again.  So that suggests that there's an
11  intermediate landing there.
12      Q    Are there requirements for an
13  intermediate landing under the ADA?
14      A    For a rise greater than 30 inches,
15  yeah.
16      Q    What are the requirements for the
17  intermediate landing?
18      A    I believe that -- and I would have to
19  check, I believe that the standard is supposed
20  to be 60 inches of flat space, and there are
21  allowances for what are called cross-slopes and
22  that kind of thing, but I believe it's 60
23  inches.
24      Q    And did you measure on Monday to

Exhibit 9 Page 11

Page 44

1  see -- let me ask a preliminary question.
2       Did you take any measurements of what
3  you claim was an intermediate landing on the
4  east pedestrian ramp to see whether the
5  required 60 inches of space was provided?
6       MR. RADUNSKY:  Objection, it's been
7    asked and answered multiple times, Tom, I
8    mean, he's told you that he didn't take
9    measurements when he did this walkthrough.
10   So, I mean, you keep asking him and he
11   keeps saying no.  So we'll stipulate that
12   he didn't take measurements when he was out
13   there the other day on any of these ramps
14   for any reason.
15 BY MR. MORRISSEY:
16      Q    To determine whether or not -- let me
17 ask a preliminary question.
18      It's fair to say that if the rise of
19 the east pedestrian ramp was over 30 inches,
20 there would have had to have been an
21 intermediate ramp, correct?
22      A    There should be, yes.
23      Q    I'm sorry.  Let me rephrase my
24 question.  There should have been an

Page 45

1  intermediate landing, correct, if the rise of
2  the ramp was more than 30 inches, correct?
3       A    Yes.  There should be an intermediate
4  landing.  And as I said from the handrail in
5  this picture, it appears that there is.
6       Q    And the intermediate landing requires
7  at least 60 inches of space, correct?
8       A    I believe that's the standard, yes.
9       Q    And if the intermediate landing
10 didn't have 60 inches, fell below the 60 inches,
11 it may not be in compliance with the 2010 ADA
12 code, correct?
13      A    If that was the case.
14      Q    Assuming that there is that
15 intermediate landing, the -- you could measure
16 the -- from the foot of the ramp, correct, to
17 the beginning of the intermediate landing to
18 determine that rise, correct?
19      A    Yes.
20      Q    That's one measurement that an
21 architect or a surveyor could take, correct?
22      A    Correct.
23      Q    And then from the -- you can take
24 another measurement from the end of the

Page 46

1  intermediate landing to the top of the
2  pedestrian ramp to take another reading of that
3  rise, correct?
4       A    Yes.
5       Q    And would that be an appropriate
6  measurement for an architect or a land surveyor
7  to take to determine whether or not this ramp
8  complied with the ADA 2010 standards?
9       A    There might be other measurements one
10 would want to take.  As I mentioned, there are
11 allowances for things called cross-slopes that
12 allows a landing to pitch one way or the other
13 a little bit.  So I would probably want to know
14 more.  I probably would want to know what the
15 whole configuration was, again, if I needed to
16 rebuild or modify that landing.
17      Q    Do you know if the intermediate
18 landing pitched either way, whether there was
19 any pitch to the intermediate landing?
20      A    It appeared that there might have
21 been but, again, I didn't take any
22 measurements.
23      Q    Going back to March of 2021, we
24 talked about there being some e-mails that were

Page 47

1  exchanged between, I guess, Mr. Tyrrell and you
2  in regards to ramps, correct?
3       A    I believe there were some e-mails
4  that I was copied on, yes.
5       Q    And there are e-mails that you
6  provided to Mr. Tyrrell and Ms. Sabrina
7  Canchola and other members of the Sheriff in
8  Cook County government in regards to the ADA
9  requirements, correct?
10      A    I believe, yeah, there were some
11 replies.  I'm not sure if they were about this
12 ramp or about Cermak or both, but I believe so,
13 yes.
14      Q    And in we go back, before we get to
15 the e-mails, if we go back to that Interrogatory
16 Number 1 that you answered under oath, Number 3
17 discusses an e-mail.  Interrogatory Number 3,
18 if you want to take a look at it -- I'm sorry.
19 Let me see.
20      MR. RADUNSKY:  I'm sorry.  What
21    exhibit is this, 1?
22      MR. MORRISSEY:  It's Exhibit 1.
23      MR. RADUNSKY:  I thought Exhibit 1
24    was the answer to the complaint.  Did I

Exhibit 9 Page 12

Page 48

```
 1    miss that?
 2          MR. MORRISSEY:  I'm sorry.
 3          MR. RADUNSKY:  That's okay.  That's
 4    okay.
 5          MR. MORRISSEY:  It's Exhibit 2.  I'm
 6    sorry.
 7          MR. RADUNSKY:  Okay.  Hold on.
 8    BY MR. MORRISSEY:
 9       Q    All right.  Looking at Interrogatory
10    Number 2 that you verified for Cook County, if
11    we go to Paragraph 3, it says:  On March 8th,
12    2021 at 2:53, Timothy Tyrrell wrote the
13    following in an e-mail:  Also I checked the
14    ramp from the same tunnel going into the
15    basement of Division 8.  This appears to be
16    slightly out of compliance.  I can show you or
17    Sabrina this as well.  Looks to me like whoever
18    did the concrete work is to blame for this.
19    Might want to add this one in as well if County
20    is having someone make these ADA compliant.
21    Let me know if you need anything further.  And
22    then it says:  Identify with reasonable
23    specificity the ramp referred -- referenced in
24    this portion of Mr. Tyrrell's e-mail.  The
```

Page 49

```
 1    answer is:  The ramp is the east of the RTU in
 2    the underground tunnel system.
 3          My question is when you made that --
 4    when you verified that answer for Cook County,
 5    were you referring to the ramp that we have
 6    just discussed, the east pedestrian ramp
 7    leading into the RTU?
 8       A    Yes.
 9       Q    After receiving that e-mail from
10    Mr. Tyrrell, did you talk to him about why he
11    thought the east pedestrian ramp to the RTU was
12    slightly out of compliance with the ADA?
13       A    I don't remember speaking to him
14    about it.  As I recall, this was actually part
15    of an exchange about the Cermak ramp, and he
16    just sort of added this in.  So I probably
17    didn't talk to him about it at the time.
18       Q    Since that time, have you talked to
19    Mr. Tyrrell about his observation that the east
20    pedestrian ramp was not in compliance with the
21    ADA?
22       A    Yeah.  I talked to him about it in
23    passing, and he responded to me because I
24    probably -- he had been deposed or, I don't
```

Page 50

```
 1    know, whatever, and he responded, which is what
 2    I thought, he has no expertise to make that
 3    kind of an evaluation, so...
 4       Q    All right.  Well, Mr. Tyrrell, is he
 5    the manager of Facilities Management for the
 6    Cook County campus?
 7       A    He's one of -- he's a manager, not
 8    the manager.  There are multiple managers.
 9       Q    What's his title with Cook County if
10    you know?
11       A    I don't -- I don't remember his
12    specific title.
13       Q    When did you have that conversation
14    with Mr. Tyrrell?
15       A    Oh, probably within -- probably
16    within the last couple of months or something,
17    I suspect, you know, or proximate to the time
18    we started getting questions about this.  I
19    don't know.  I couldn't say.
20       Q    What have you done after having that
21    conversation with Mr. Tyrrell to determine
22    whether or not his observation was correct that
23    the east pedestrian ramp is out of compliance
24    with the ADA?
```

Page 51

```
 1       A    So the County is developing a request
 2    for qualifications and hopes to issue it very
 3    soon for the assessment of the entire campus
 4    except for the Cermak building and the Leighton
 5    Criminal Courthouse, which you might call a
 6    wraparound assessment of the entire campus,
 7    which would include this ramp.  When we have
 8    that firm on board, they would be doing things
 9    like, you know, getting -- digging at a very
10    specific level to do things like measure this
11    particular ramp.  If they feel that they need
12    to survey it, they will have them survey it.
13    So we are moving to contract someone to give us
14    definitive third-party answers to all of these
15    questions.
16       Q    You were deposed several times before
17    about this request for qualifications for an
18    architectural firm, correct?
19       A    I believe I was deposed in connection
20    with the Cermak facility, which is not part of
21    what I just referenced.
22       Q    Has there been an architect retained
23    pursuant to request for qualification for the
24    Cermak ramp?
```

Exhibit 9 Page 13

Page 52

1    MR. RADUNSKY: Cermak or RTU? I
2    think you just got confused, Tom.
3    BY MR. MORRISSEY:
4    Q    You do a distinction, Mr. Davis, in
5    regards to a request for qualification, and you
6    excluded the Cermak ramp, correct?
7    A    In the wraparound assessment that I
8    referred to, yes, I'm including Cermak because
9    we've already hired someone to do Cermak and
10   they're working right now.
11   Q    So that -- when you do a request for
12   qualifications, that has to go to the County
13   board initially, correct?
14   A    At the time that they're contracted,
15   yes.
16   Q    And then is there another step before
17   that architectural firm can be hired?
18   A    To be clear, the request for
19   qualifications is issued by our procurement
20   department. Upon completion of the standard
21   procurement process and the identification of a
22   successful vendor and their fees, that proposed
23   contract is brought to board of commissioners
24   who votes to approve the contract. There are

Page 53

1    some procedural elements after the board
2    approval that are required to be conducted
3    prior to issuing a notice to proceed, you know,
4    for a particular contract, but I can say that
5    in the case of Cermak, that has been awarded.
6    They have been issued the notice to proceed.
7    They are working right now.
8    Q    How long did the process take with
9    Cermak when -- from the time that there was a
10   request for qualifications to -- that goes out
11   to the public? It's a public bid, correct?
12   A    Yes, it's a public bid. It's a --
13   Q    And how long with Cermak, just to get
14   a gauge of what we're looking at, in regards to
15   the request for qualifications for the RTU?
16   A    So --
17   Q    Let's look at how long it took for
18   the request for qualifications as far as the
19   Cermak building because it was my understanding
20   before that was a request that included the
21   entire DOC campus; isn't that correct?
22   A    No, that's not correct. No.
23        MR. RADUNSKY: No.
24

Page 54

1    BY THE WITNESS:
2    A    We hired a firm specifically for the
3    Cermak facility. We are also doing a
4    wraparound for the balance of the DOC campus,
5    again, separate from the Leighton Criminal
6    Courthouse because that's another assessment.
7        So there actually will be three
8    different contracts involving assessment of
9    facilities on the DOC campus -- on the 26th and
10   California campus. The largest one by far will
11   be the one that I was referring to that will
12   include the RTU.
13       But to your question about the time,
14   yeah, generally in the marketplace, you want to
15   have an RFQ out on the market around a month,
16   sometimes maybe six weeks depending upon how
17   complex something is.
18   Q    How long was the request for
19   qualifications in regards to Cermak?
20   A    I think it was out a month. I would
21   be surprised if it was less than that. I don't
22   recall the exact dates but I would be surprised
23   if it was less than a month.
24   Q    And how long did it take before the

Page 55

1    board -- from the time the request for
2    qualifications went out until the board
3    approved the contract for the winning
4    architect, how long did that take?
5    A    I would have to check my records. I
6    don't recall. It's multiple months.
7    Q    Was it more than a year?
8    A    I don't think it was quite a year,
9    no. It was awhile but it wasn't quite a year.
10   No, I don't believe it was a year.
11   Q    And then you say after a contract is
12   awarded, there's still other procedural hurdles
13   before the architectural firm can begin
14   marketing?
15   A    They're relatively brief. There are
16   things like having the State's Attorney
17   double-check the language of the contract.
18   There are a couple of things that have to be
19   done by budget but they're relatively brief
20   before we issue a purchase order to the vendor
21   and then issue a notice to proceed.
22   Q    So as I recall, I deposed you in
23   January of 2022 and you talked about this
24   request for qualifications for an architectural

Exhibit 9 Page 14

ERIC DAVIS
September 21, 2023

Page 56

1 firm, and we're in -- we're almost two years
2 out now, and there hasn't been any work
3 performed by an architect to determine whether
4 the Cermak ramp is compliant with the ADA; is
5 that fair to say?
6       MR. RADUNSKY:  Just hold on,
7   objection.  I mean, that relates to the
8   walker case and you asked all of those
9   questions in the walker case.  The Cermak
10   ramp is not what we're talking about here
11   today, so just object to relevance.
12       MR. MORRISSEY:  Well --
13       MR. RADUNSKY:  Let me finish my
14   objection.
15       MR. MORRISSEY:  Sure.  Go ahead.  I'm
16   sorry.
17       MR. RADUNSKY:  I just object to
18   relevance.  If you're trying to get at how
19   long is it going to take under the current
20   RFQ for them to finally come out and
21   inspect it and we're talking about the RTU
22   ramp, that's different.  So that's my
23   objection, Tom.
24       MR. MORRISSEY:  All right.  That's

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 57

1 fine.
2 BY MR. MORRISSEY:
3     Q   Is it fair to say that we're about at
4 least 18 months later for the Cermak assessment
5 of that ramp from the point at which the RFQ
6 was released?
7       MR. RADUNSKY:  Same objection to
8   relevance.  You can answer, Eric.
9 BY THE WITNESS:
10     A   I don't know.  I don't believe the
11 Cermak one had been issued when you deposed me
12 in January of '22.  I believe it was advertised
13 later in 2022.  I would have to check, but I
14 believe that it had, at that time, that we were
15 looking to get that or it may have even been in
16 procurement being evaluated but hadn't been
17 advertised to the street yet.  I don't think it
18 was out to the street yet in January of '22.
19 The procurement process before hitting the
20 street can take awhile.
21     Q   As I recall from your prior
22 deposition that there had been a change in the
23 head of the procurement office for the Cook
24 County government, and they were developing new

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 58

1 protocols for this RFQ; is that correct?
2     A   Gosh, I'd have to -- I don't know
3 what you're specifically referencing.  During
4 my six years at the county, yes, the chief
5 procurement officer has changed.  I don't know
6 when you're referring to specifically although
7 when -- not that long after the new CPO came
8 in, we did do a -- we did change the process
9 for those procurements, but I don't know when
10 you're specifically asking about.
11     Q   Would you agree that the extent of
12 the assessment that the new RFQ will cover will
13 be much more complicated than just assessing
14 one ramp or the Cermak ramp?
15     A   Yes, it will be very large.  There
16 are approximately 60 buildings involved.
17       MR. RADUNSKY:  Can we take a break in
18   like two minutes?  Go ahead, Tom.
19       MR. MORRISSEY:  If you want to take a
20   break --
21       MR. RADUNSKY:  Do you want to do it
22   right now?  That's fine.
23       MR. MORRISSEY:  Do you want to go to
24   lunch or is that -- a lunch break?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 59

1       MR. RADUNSKY:  Well, let me ask you a
2   couple of things.  I mean, how much longer
3   do you think you're going to go and then
4   maybe we can make that decision?
5       MR. MORRISSEY:  Maybe I got about an
6   hour and a half because I think -- go off
7   the record.
8       (WHEREUPON, a short
9       break was had.)
10       MR. MORRISSEY:  Let's go back on the
11   record for Mr. Davis' sake.
12 BY MR. MORRISSEY:
13     Q   Previously you said that if you were
14 to measure the east pedestrian ramp, you would
15 do it down the middle of the ramp, correct?
16     A   Yeah.
17     Q   And would you use a tape measure or a
18 laser?
19     A   It depends, again, as I think I said
20 before, it depends on the use.  If I just
21 wanted to get a pretty good understanding of
22 the reality, I might use a laser level; but
23 otherwise, I would probably hire a professional
24 surveyor to do it.

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 15

Page 60

1  Q    Let's assume that the floor at the
2  foot of the ramp was not level, perfectly
3  level --
4  A    Okay.
5  Q    -- would that perhaps throw off the
6  calculation with the laser?
7  A    I wouldn't think so, no.
8  Q    Why -- is there any standard in the
9  architectural field in regards to how to
10 measure the rise of a ramp, whether to do it in
11 the center or along the sides of the ramp?
12 A    I don't know that there is anything
13 that I would characterize as a standard in the
14 profession.  Most of the time when we do
15 drawings of things like a ramp, we give an
16 indication in the plan of the direction of the
17 ramp with an arrow, and that's usually right
18 down the middle of the ramp.  And then you
19 would show spot grades at the top and bottom to
20 indicate what you want to -- you want to go
21 from this elevation here to this elevation
22 here.
23 Q    Could there be variants on a ramp
24 whether -- as far as how the rise whether it's

Page 61

1  measured in the middle or either the right or
2  left side of the ramp?
3  A    Of course.  If there are --
4  Q    Could that variance be as much as a
5  half inch?
6  A    I would say definitely, so it depends
7  on the width of the ramp.  The ADA allows
8  what's called cross-slope.  So you have to
9  understand that the standards for ramps are
10 written for both interior ramps and exterior
11 ramps.  And an outside ramp, in the presence of
12 rain, needs to drain.  So the ADA recognizes
13 that ramps can vary and slope slightly so that
14 water drains off so that ice doesn't collect.
15 It's really only one standard though.  It's the
16 same standard for an inside ramp as an outside.
17     So the answer would be, yes.  It
18 could be at a varying height at the top within,
19 I believe, it's 148 is the standard for
20 cross-slopes.  So if you had a four-foot wide
21 ramp, which you wouldn't because ramps are
22 usually five-foot wide.  But if you had a
23 four-foot wide ramp, it could vary up to an
24 inch.  If it was more than four-foot wide, it

Page 62

1  could vary more than an inch and still be
2  within the standards for a cross-slope on a
3  ramp.
4  Q    But that's for an exterior ramp.
5  A    No, it's for a ramp.  They don't
6  differentiate.  The code does not
7  differentiate.
8  Q    Would it make more sense since this
9  is for the ADA to measure the rise of the ramp
10 along the side where the railings are?
11 A    You're asking me what the code says.
12 I'm telling you what the code says.
13 Q    So what you're saying is the code is
14 silent in regards to where on a ramp you would
15 measure the rise; is that fair to say?
16 A    Correct.  I think that's fair to say,
17 yeah.
18     MR. RADUNSKY:  Can I just ask, I
19 mean, which code you were referring to just
20 for the record.
21     MR. MORRISSEY:  I'm referring to the
22 ADA.
23     MR. RADUNSKY:  Okay.  I didn't know
24 what year.  I'm sorry.  Obviously it's ADA.

Page 63

1  What year, the 2010?
2  BY MR. MORRISSEY:
3  Q    Is there any difference in regards to
4  the measurement -- where to measure a ramp as
5  far as measuring the rise between the 1991
6  standards and the 2010 standards to your
7  knowledge?
8  A    I'm not aware of either one
9  stipulating where you make such a measurement.
10 I'm telling you the architectural convention [sic]
11 because it gets drawn that way is to do it down
12 the middle of the ramp just because that's the
13 most convenient place to put the arrow.  But I
14 don't believe that that's responsive to any --
15 I'm not aware that that's responsive to any
16 code stipulation as to where you measure a
17 ramp.
18 Q    Now, is there a -- in regards to
19 handrails --
20 A    I want to clarify something in a
21 previous answer.  I said architectural
22 convention.  I mean architectural convenience.
23 It's easier to put it in the middle of the
24 ramp.  It's not a standard or anything like

Exhibit 9 Page 16

Page 64

1   that.  Sorry.  Go ahead.
2       Q    In regards to the east pedestrian
3   ramp for the RTU, because it's more than
4   6 inches, the ramp, there's a requirement that
5   there be handrails, correct?
6       A    Yes.
7       Q    And how far do the handrails have to
8   extend beyond the top of the ramp?
9       A    **Typically, it's 12 inches beyond the**
10  **bottom of the ramp.  The answer is it depends.**
11  **Some jurisdictions have different requirements**
12  **that may extend that, but typically it's**
13  **12 inches, I believe.**
14      Q    So would it be 12 inches that the
15  handrails have to extend 12 inches beyond where
16  the bottom of the ramp ends?
17      A    **Beyond the sloping part, if you want**
18  **to say it that way, yeah.**
19      Q    So the handrails have to extend at
20  the bottom of the ramp where it's flat, where
21  it begins to be flat, correct?
22      A    **Correct.**
23      Q    And would that also be true at the
24  top of the ramp?

Page 65

1       A    **Yes.**
2       Q    That the handrails have to extend
3   12 inches beyond the flat area where the flat
4   area begins?
5       A    **Yes.**
6       Q    Now, when you were inspecting or
7   walking through on Monday the east pedestrian
8   ramp, did you notice where the handrails end at
9   the top of the ramp of the east ramp?
10      A    **They appear to extend at least**
11  **12 inches past the top of the sloping part of**
12  **the ramp.**
13      Q    Did you take any measurement or
14  anything?
15      A    **No.**
16      Q    How about on Monday, did you happen
17  to notice whether the handrails extend 12 inches
18  where the bottom of the ramp levels off and is
19  flat?
20      A    **It appeared to also be 12 inches**
21  **beyond the end of the slowing part.**
22      Q    If your assumption is incorrect and
23  the handrails at the top and the bottom of the
24  east pedestrian ramp do not extend 12 inches,

Page 66

1   then the handrails wouldn't be in compliance,
2   correct, with the ADA code?
3       A    **Hypothetically, that would probably**
4   **be the case there.  Again, there are some other**
5   **factors like the cross-slope and blah, blah,**
6   **blah but, you know, where the break is, et**
7   **cetera.  But, in general, yeah, I would say so.**
8   **That's one of the reasons that we're hiring**
9   **people to get definitive answers to these kinds**
10  **of things.**
11      Q    In March of -- we already talked
12  about it.  In March of 2021, one of the
13  managers for the Department of Facilities
14  Management told you that the -- this east
15  pedestrian ramp did not appear to be compliant.
16  My question is why 18 months later has Cook
17  County, to your knowledge, not done anything to
18  determine whether or not Mr. Tyrrell is correct
19  that the east pedestrian ramp is not compliant
20  with the ADA code?
21      A    **I disagree with the characterization**
22  **that the County has done nothing.  As I said,**
23  **we've been developing an RFQ, which as we**
24  **discussed earlier, would be by far the largest**

Page 67

1   **of the assessments that we've been doing on our**
2   **facilities.  It takes awhile, but we have been**
3   **developing the wraparound assessment of the**
4   **DOC.  So I don't accept your characterization**
5   **that the County has done nothing since then.**
6       Q    And other than requesting a request
7   for a proposal from -- I'm sorry -- request for
8   qualification -- Let me go back.
9           Has that request for qualifications
10  been issued by the procurement office?
11      A    **Not yet.  We're actually -- we're**
12  **getting it out to them to start their process**
13  **here very soon.  It's been, as you could**
14  **imagine, a very complicated development, but we**
15  **are looking to have them get that out -- or get**
16  **it to them so they can review it and they can**
17  **get it out in the next month or two.**
18      Q    So Capital Planning has to prepare
19  that request for qualifications, correct?
20      A    **That's correct.**
21      Q    And then that will take a month or
22  two for Capital Planning to prepare the request
23  for qualifications?
24      A    **I believe you mean to ask will it**

Exhibit 9 Page 17

ERIC DAVIS
September 21, 2023

Page 68

1  take the procurement department a month because
2  if we issue it to them today, it would take --
3  to procurement today, it would take them one,
4  two, three months depending on the size and
5  complexity of their workload to actually issue
6  it to the street.
7      Q   But as of today, Capital Planning
8  hasn't forwarded the proposal to procurement to
9  request a request for qualifications to
10 licensed architects; is that fair to say?
11     A   It's 99 percent done.  There are a
12 couple of things involving forms and things
13 that we have to fill out for transmittal that
14 I've got to review and get them out, but I'm
15 expecting to have it to procurement even
16 frankly in the next few days.
17     Q   And then it could be to the end of
18 this year when the request for qualifications
19 actually is issued to the public?
20     A   I would expect it would get issued
21 probably end of October, beginning of November.
22     Q   And then that -- because it's a
23 complex request involving multiple buildings,
24 correct, how much time are you going to allow

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 69

1  the public to review and determine whether or
2  not they want to submit their qualifications?
3      A   We'll probably allow at least a
4  month, probably six weeks given the size of it.
5  There are -- as you know, we have done, are
6  doing -- and are doing several of these and
7  have hired and actually, as we're talking right
8  now, hired two other firms to do other reviews
9  of other County facilities at today's Cook
10 County Board meeting.
11         We want to make sure we are
12 advertising as broadly as possible and
13 sometimes it takes awhile for word to reach,
14 you know, big national firms that may have a
15 small office here but may be great for this,
16 and they can move resources for the project.
17 We want to make sure we have the best
18 opportunity to get the best possible team for
19 this.  It will be a team.  It won't be a single
20 firm because it's a very large assignment.
21     Q   On Monday after you descended the
22 east pedestrian ramp, which way did you have to
23 turn to walkthrough the -- I guess you called
24 it the north pedestrian -- you called it a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 70

1  tunnel.  I'm going to call it a ramp.
2      A   I believe when I exited the top of
3  that ramp, I think you turn right.  If I
4  remember, I think you turn right and then you
5  go through the doors that are in that plan
6  excerpt that you have and you go down that
7  corridor and then you go -- or, no, it might
8  be -- no, I take that back.  It might be left.
9  I would have to see.  Out of there, it might
10 be -- I believe it's left.  Yeah, I'm pretty --
11 okay.  Yeah, I'm turned around.  Yeah, I
12 believe it's left at that point.
13     Q   So I'm correct, on Monday, you walked
14 out of the basement of Cermak, you went through
15 a tunnel and then you reached the top of the
16 east pedestrian ramp, correct, and you decided --
17     A   No.
18     Q   -- and you descended that ramp?
19     A   No.
20     Q   No?
21     A   No.  I came from the -- I walked -- I
22 walked through the east ramp.  I believe I went
23 back and forth once, and then into the RTU and
24 then out the north entrance, the north tunnel

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 71

1  entrance.
2      Q   So did you physically go into the RTU
3  building --
4      A   Yes.
5      Q   -- first?  Let me rephrase it.  After
6  you walked through the east pedestrian ramp,
7  after you walked that ramp, you went into the
8  RTU building, correct?
9      A   Yes.
10     Q   And did you meet with anybody in the
11 RTU building?
12     A   No.
13     Q   Why did you --
14     A   I was with Joe Merkel, but we didn't
15 meet with anybody else.
16     Q   Why did you go into the RTU building
17 at that time?
18     A   Because that was the easiest way to
19 get to the north tunnel entrance.  I wanted to
20 walk through both.
21     Q   So the east tunnel and the north
22 pedestrian ramp, in order to access it, you
23 have to go into the RTU building?
24     A   To go from the east ramp to the north

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 18

1  tunnel entrance, yes, you have to walk -- you
2  walk into the RTU, and then you go to the north
3  tunnel entrance.  So you'd walk through the
4  lower level of the RTU, yes.
5       Q    Describe the north pedestrian ramp.
6  How long is it?
7       A    The north tunnel is -- there's a
8  tunnel connection there and, again, I don't
9  characterize it as a ramp.  It's quite long.
10  It's a very shallow slope, but it's quite long.
11  I want to say it's more than 50 feet long but I
12  could be -- that's just a guesstimate.  I
13  didn't measure it.
14       Q    Did you measure the slope of the
15  north ramp?
16            MR. RADUNSKY:  Asked and answered
17       multiple times, Tom.  You know he didn't
18       measure anything when he was out there on
19       Monday.  I think he said it eight or nine
20       times now.
21            But, Eric, you can answer the
22       question again.
23  BY THE WITNESS:
24       A    I did not measure the north tunnel

1  connection out of the RTU.
2  BY MR. MORRISSEY:
3       Q    If the north -- Let me ask a
4  preliminary question.  When you left the RTU
5  building to proceed to the north tunnel/ramp,
6  were you looking up?  Would you have ascended
7  the north tunnel ramp to go back into the DOC
8  campus?
9       A    My recollection is that the tunnel
10  connection out of the lower level of the RTU to
11  the overall tunnel system is slightly -- sloped
12  down slightly, but I could -- I believe it
13  sloped down, yeah.
14       Q    So from the RTU building, if one
15  wanted to connect using the north tunnel/ramp,
16  you would be descending to enter into the main
17  tunnel system at the jail; is that what you're
18  saying?
19       A    I believe that's right.  But, again,
20  I was really headed to Division 1, so I was
21  just kind of walking through.
22       Q    If the slope of the north tunnel ramp
23  was steeper than 1 to 20, would that require
24  handrails?

1       A    Yes.
2       Q    Do you know if there are any
3  architectural drawings of this north
4  tunnel/ramp?
5       A    There probably are.  We're trying to
6  find out if there are other drawings.  I
7  haven't been successful yet, but...
8       Q    What efforts have you taken
9  personally to determine if there are drawings,
10  architectural drawings?
11       A    I actually asked Joe when I was out
12  there, and he suggested -- because sometimes,
13  like I mentioned, sometimes they're on site.
14  And so I tend to ask around to some of the
15  other people who may have the drawings.  I did
16  ask about somebody on our floor that takes care
17  of some drawings upstairs, and there wasn't
18  anything upstairs in our building at 69 West
19  Washington.  So I would assume that DFM has
20  them somewhere.  I've just got to ask around
21  and find them.
22            MR. RADUNSKY:  And for the record, I
23       mean, if there are more drawings like we
24       said, Tom, we'll be happy to produce them.

1       I know that this is something that we have
2       been talking about for a while.  But we're
3       still actively looking like we have told
4       you.  It's not giving up the fight.
5  BY MR. MORRISSEY:
6       Q    Well, aren't -- if the building was
7  built, completed in 2015, logically wouldn't
8  they be scanned into a computer system?
9            MR. RADUNSKY:  I have -- off the
10       record.
11            MR. MORRISSEY:  I'm not asking you,
12       Troy.
13            MR. RADUNSKY:  Oh, I'm sorry.  I'm
14       sorry.  Go ahead.
15            MR. MORRISSEY:  I don't depose
16       lawyers.
17            MR. RADUNSKY:  That's true.  I
18       thought we were having a different
19       discussion.  Go ahead.  Sorry.
20            Re-ask the question.  Ask your
21       question.
22  BY MR. MORRISSEY:
23       Q    Mr. Davis, wouldn't they be --
24  wouldn't the drawings have been scanned if the

Exhibit 9 Page 19

ERIC DAVIS
September 21, 2023

Page 76

1  building was completed in 2015?
2      A    I wouldn't know why.  It would be --
3  again, I wasn't working at the County in 2015,
4  so I don't know what their processes were at
5  that time.  It would be my assumption that they
6  would have a hard copy, a printed copy
7  someplace and there probably also would be
8  digital files.  So you wouldn't need to scan
9  them because you probably have the digital
10 files, but I haven't found them yet but I
11 could -- you know, I plan to keep looking.
12     Q    Do you know who the architectural
13 firm was that designed the RTU building?
14     A    I don't know who the architect of
15 record was.  I know that Roula Architects was
16 involved in it.  They may have been the
17 architect of record.  I think another firm was
18 the design architect, but I'm not sure.  I know
19 Roula was involved, but I don't know whether
20 she was the designer or the architect of
21 record.
22         MR. RADUNSKY:  Can you spell that,
23     Eric, Roula?
24         THE WITNESS:  Roula is spelled

ERIC DAVIS
September 21, 2023

Page 77

1      R-o-u-l-a.  I believe that was Roula's Web
2      page that Tom was showing us earlier.
3          MR. RADUNSKY:  Okay.
4          MR. MORRISSEY:  R-u --
5          MR. RADUNSKY:  R-o-u-l-a, Tom.
6          MR. RADUNSKY:  Okay.
7  BY MR. MORRISSEY:
8      Q    And they're an architectural firm in
9  Chicago?
10     A    Correct.  And I know they were
11 involved in the project but, like I said, I
12 wasn't working at the County.  I don't know if
13 she was the design architect and somebody else
14 was the architect of record or if somebody else
15 was the design architect and she was the
16 architect of record.  I don't know.  Typically
17 you have both on a project that size.
18     Q    Do you know who the contractor was?
19     A    I believe it was Walsh.
20     Q    Typically, in your experience, does
21 the general contractor maintain architectural
22 drawings for 10 or 20 years?
23     A    I don't know what the standards are
24 for maintaining them.  Typically in a project

ERIC DAVIS
September 21, 2023

Page 78

1  like that, the contractor is responsible for
2  providing the owner with what are called
3  as-built drawings.  As to whether or not they
4  keep the as-builts themselves, I have no idea.
5  I think the warranty period is either only one
6  or two years on a new building like that except
7  for equipment.  So they may or may not keep
8  them.  I really don't know.
9      Q    If the -- do you have an idea what
10 the rise of the north tunnel ramp is?
11     A    Again, I don't believe it's a ramp.
12 I think it's a corridor.  There is a rise to
13 some degree.  I don't know what it is.  It did
14 seem to be less than the rise on the east side,
15 but I can't speak to it one way or the other
16 and I haven't taken any measurements.
17     Q    Generally, if the -- generally for
18 a -- what does the ADA define as a ramp?
19     A    The definition of a ramp is somewhat
20 complex and has certain exceptions.  But in
21 general, any continuous walkway that's longer
22 than I believe it's 3 feet that is of a slope
23 greater -- or greater -- or 1 to 20 or greater,
24 then it's considered a ramp and needs to have --

ERIC DAVIS
September 21, 2023

Page 79

1  and is subject to things like the maximum rise
2  before you have an intermediate landing,
3  requires handrails, requires the, you know, the
4  traffic surface and all that kind of -- not
5  traffic surface, not on ramps.
6          THE REPORTER:  Requires what?  What
7      did you say?
8  BY THE WITNESS:
9      A    I'm sorry.  There's a requirement for
10 stairs of a change in the floor material so
11 that you're walking along and you have an
12 auditory ability to know, oh, there's a stair
13 coming.  But I believe that since a ramp is a
14 continuous surface that a ramp doesn't have
15 that requirement, but it does have the
16 requirement for handrails, and it does have the
17 requirement for intermediate landings.
18         THE WITNESS:  Did you get that,
19     Peggy?
20         THE REPORTER:  Yes.
21 BY THE WITNESS:
22     A    In general, anything with a slope of
23 1 to 20 or greater is considered a ramp in the
24 ADA.

Exhibit 9 Page 20

Page 80

```
 1   BY MR. MORRISSEY:
 2       Q    Give me a moment.  When you inspected
 3   the north tunnel ramp on Monday, was there a
 4   handrail?
 5       A    So when I walked through --
 6       MR. RADUNSKY:  Objection.  Thank you.
 7   You beat me to it, Eric.  Go ahead.
 8   BY THE WITNESS:
 9       A    You mean when I walked through the
10   north corridor there was no handrail there,
11   correct.
12   BY MR. MORRISSEY:
13       Q    There was no -- there was neither a
14   handrail on the right or left side of the north
15   tunnel/ramp, correct?
16       A    That's my recollection.  There was no
17   handrail in the tunnel.
18       Q    Approximately how many feet was the
19   north tunnel ramp?
20       A    I think I answered that before, but
21   my recollection it was on the order of 50 feet
22   or more.
23       Q    Was there any intermediate landing?
24       A    I didn't perceive one.
```

Page 81

```
 1       Q    Did you -- did you also walk through
 2   or inspect the Division 4 last Monday?
 3       A    No.
 4       Q    Have you been in the -- in Division 4
 5   in the last six months?
 6       A    In the last six months, I believe so,
 7   yeah.  I think we walked around the -- because
 8   we are doing some exterior renovations on
 9   Division 5, which is right next to it.  I think
10   we walked through.  I don't remember if we went
11   into 4 or not.  I don't think we went into 4.
12       Q    I'm going to show you a photograph in
13   regards to Division 4.  It's Exhibit Number 12.
14            Showing you a photograph that's
15   depicted in Exhibit 12, do you recognize that
16   as being that metal ramp at the bottom of
17   Exhibit 12?
18            Do you see that?
19       A    So the picture is not very clear.  I
20   see something at the end of the corridor, which
21   it's not -- the resolution, it's just -- there
22   are too many pixels.  It's hard to tell whether
23   that is or not.  I don't -- I mean, I can't
24   tell you one way or the other.  It looks like
```

Page 82

```
 1   it might be.
 2       Q    In the last year or two in -- to your
 3   knowledge, have you been in Division 4?
 4       A    Yes.
 5       Q    And have you been in an area where
 6   there was a metal temporary ramp over a flight
 7   of stairs?
 8       A    I just -- and excuse me.  I want to
 9   check with counsel.
10       THE WITNESS:  I thought this was
11   about the RTU.
12       MR. RADUNSKY:  It is.  I mean, he can
13   ask about this.  This is all part of the
14   lawsuit, too.  This ramp also --
15       THE WITNESS:  Oh, this is?
16       MR. RADUNSKY:  Yeah, yeah, this is
17   fair.  This is fine.  Let him ask.  Yeah.
18       THE WITNESS:  All right.  Sure.
19       MR. RADUNSKY:  Uh-huh.
20   BY THE WITNESS:
21       A    Yeah, I -- there -- and forgive me.
22   I -- there is a, I believe it's aluminum,
23   aluminum ramp, a convenience ramp there.
24
```

Page 83

```
 1   BY MR. MORRISSEY:
 2       Q    Does the ADA have a provision that
 3   permits -- let me ask a question, a preliminary
 4   question.
 5            How familiar are you with -- well,
 6   let me ask something initially.  Where -- to
 7   your recollection, where is this aluminum ramp
 8   located in the Division 4 building?  Is it in
 9   the basement?
10       A    So there is a corridor that connects
11   Division 4 to the, what's called, the Division 4
12   gym, and I believe this is an image from a
13   ceiling-mounted camera in that corridor.  There
14   are -- it's a double-loaded corridor.  There
15   are small rooms to either side, sort of
16   classroom-size rooms, a series of them that
17   lead to a stair that takes you up to the
18   entrance level of Division 4.  The temporary or
19   convenience ramp on the right is, I believe,
20   something that's been put there.  We didn't --
21   Capital, as best I know, didn't put it there
22   that connects to the corridor level which is
23   basically the same level as the gym, which is
24   east of Division 4, to the entry level where
```

Exhibit 9 Page 21

Page 84

1  the security desk is at Division 4.  So it
2  connects up there.
3      I should note that there is a -- from
4  this level, there is a tunnel immediately below
5  this corridor that is a part of the tunnel
6  system that goes underneath the middle of the
7  gym and goes all the way in Division 5.  At the
8  back of the gym, there is an elevator from the
9  tunnel level to this level and also when you
10  walk down this tunnel all the way to the end to
11  that stair, at the top of that stair at that
12  level, there is also an elevator that takes you
13  to the entrance level of Division 4.
14      So from an accessibility standpoint,
15  you can access either this level or the
16  entrance level of Division 4 via elevators from
17  the tunnel.  You don't need to take this ramp.
18  That's why I refer to it as a convenience ramp.
19      Q    You're familiar with the U.S. Access
20  Board Technical Guide for Ramps and -- Curbs
21  and Ramps?
22      A    In general, yes.
23      Q    I'm going to show you -- to your
24  knowledge, under the ADA or the Access Board

Page 85

1  Technical Guide, is there any such thing as
2  what you call a convenient ramp -- convenience
3  ramp?
4      A    I don't recall whether there is or
5  not.  That's just my characterization of it.
6  My evaluation in a sort of preliminary nature
7  is that it's not required to access this level
8  or the level up above, but there may be items
9  in the Access Board or something like that that
10  would speak to this.  I don't know.
11      Q    Would you -- in the exhibit that's in
12  front of you, the photograph of the -- you
13  would call this the lower level of Division 4?
14      A    I would call it ground level of the
15  Division 4 gym because this is really the part
16  that -- the same floor level as the gym that --
17  you could turn around.  You would be walking
18  into the gym.
19      Q    In this ground level of Division 4
20  where the gym is, would you characterize that
21  metal, quote, unquote, convenience ramp as
22  portable?
23      A    Yes.
24      Q    And based upon your understanding of

Page 86

1  the ADA requirements, can a ramp be portable?
2      A    Yes.  There are times where, for
3  example, if you have, you know, a concert,
4  right, and you build a stage and the stage is
5  temporary, it still has to be accessible.  And
6  the people that sell portable stages also
7  provide accessible ramps to those portable
8  stages.  So I believe that there are accessible
9  ramps that are portable.
10      Q    Do you know if this basement area of
11  Division 4 was used for voting in --
12      A    I have no idea.
13      THE REPORTER:  I'm sorry.  What was
14  the question?
15      MR. RADUNSKY:  Hold on.  You guys are
16  talking over -- yeah, exactly.
17      MR. MORRISSEY:  Let me ask the
18  question again.
19      MR. RADUNSKY:  Okay.  Start again.
20  BY THE WITNESS:
21      A    My fault.  I'm sorry.
22  BY MR. MORRISSEY:
23      Q    This basement area of Division 4
24  where the gym is located was used in February

Page 87

1  of 2023 for municipal voting?
2      A    It's my understanding that they used
3  the gym for voting.  I don't know if they used
4  this part of the building also or not.
5      Q    I'm going to turn you to Exhibit
6  Number 8.
7      MR. RADUNSKY:  Tom, what was that
8  exhibit, that last one, that picture?  Was
9  that 12?
10      THE REPORTER:  It was 12.
11      MR. RADUNSKY:  It was 12, Peggy?
12  Thanks.
13  BY MR. MORRISSEY:
14      Q    I'm showing you Exhibit Number 8.
15  It's U.S. Access Board Technical Guide.  You're
16  familiar with these technical guides by the
17  Access Board, correct?
18      A    Yes.  And I believe that the diagram
19  that you're showing parenthetically is actually
20  something that I provided in conversation about
21  the Cermak ramp, which was a different case.
22  I'm very familiar with this.
23      Q    Okay.  So we'll come back to the
24  diagram, and we can look at what you sent to

Exhibit 9 Page 22

ERIC DAVIS
September 21, 2023

Page 88

1  Merkel and everybody else which was a cut and
2  paste of this initial diagram but if we go to
3  Page 17 of this Group Exhibit A.
4       MR. RADUNSKY:  I'm sorry.  Tom, you
5    said 17 total --
6       MR. MORRISSEY:  Yeah.
7       MR. RADUNSKY:  How many total pages,
8    17?  Thanks.
9       MR. MORRISSEY:  I don't know.
10 BY MR. MORRISSEY:
11      Q    There's a question and answer, and it
12 says:  Can ramps be portable and provided after
13 construction as an adaptation, and it states:
14 All required ramps and curb ramps must be
15 permanent and installed at the time of
16 construction or alterations with few
17 exceptions.
18      Does that -- is that consistent with
19 your understanding in regards to portable ramps
20 not being permissible under the ADA?
21      A    As I -- an example that I gave
22 earlier when I noted about a temporary stage
23 where at the end of this paragraph it says:
24 Only ramps serving temporary structures can be

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 89

1  temporary or portable.
2       That's the kind of example I was
3  referring to in that case because I believe
4  your question was can a ramp be portable, and I
5  believe that a ramp can be portable if it's
6  with a temporary structure.  At the top of this
7  paragraph is the word required.  All required
8  ramps and curb ramps must be permanent.
9       It is not clear to me right now, and
10 I have not done the investigation whether or
11 not the ramp that you're showing in the picture
12 is a required ramp or is a ramp for
13 convenience.
14      If it was a ramp that was required,
15 then, yes, it should be permanent, but it's not
16 clear to me whether or not that particular ramp
17 was required.
18      Q    You used the word "convenience."
19 Where is that in the ADA code?  Is that defined
20 in the code?
21      A    I think I referred to it as a term
22 that I was using, that I'm referring to it as a
23 convenience ramp.  I don't know if that term
24 is -- appears at all in this.  That's, as I

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 90

1  mentioned, is a way that I'm referring to it.
2       Q    Do you know if the lower level of
3  Division 4 where the gym and those classrooms,
4  I believe, is that a temporary structure down
5  there, the gym and the classrooms in the lower
6  level of Division 4?
7       A    No.  It's a permanent structure.
8       Q    So the temporary exception wouldn't
9  apply to the ramp that's depicted in screen
10 shot 12, in Exhibit 12, correct?
11      A    No.  As I said, if an analysis
12 indicated that it was required to be a ramp
13 there, if it was required, as it says in this
14 paragraph then, yes, it should be permanent.
15 I'm not aware -- just from looking at it on a
16 cursory basis, it doesn't appear to me that a
17 permanent ramp would be required in that
18 location.
19      Q    Why not if it's -- you personally
20 walked through the basement of Division 4.
21 You've seen that portable metal ramp that's
22 covering the stairway, correct, many times?
23      A    Yes.
24      Q    Why then would you consider that just

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 91

1  a temporary ramp for convenience if it's there --
2  if the Sheriff or the County has left that
3  temporary -- let me rephrase it.
4       In the multiple times that you have
5  seen that metal structure over the stairs in
6  the lower level of Division 4, why is that
7  permissible under the ADA and not a required --
8  and why isn't there a permanent ramp at that
9  location if it's used for programs and services
10 for disabled people to access?
11      MR. RADUNSKY:  Eric, I don't
12   understand the question, but you can answer
13   it if you do.  Go ahead.
14      THE WITNESS:  Yeah, I do.
15      MR. RADUNSKY:  Okay.
16 BY THE WITNESS:
17      A    So first I want to correct and remind
18 you that the photograph that you showed is
19 really at the ground level.  You can walk down
20 this corridor and turn to either side and go
21 out a door at grade.  So it is the ground floor
22 level that we are looking there in that
23 photograph that you had.  So -- and then as I
24 answered earlier, if you are -- if you have a

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 23

Page 92

1  detainee who is disabled and you need to move
2  them to Division 4 and, let's say, that you're
3  up in the gym and you have to go to Division 4,
4  as I mentioned, just, if you will, back stage,
5  literally behind the stage in the gym is an
6  elevator that takes you to the lower level.
7  There is a tunnel.  Immediately below this
8  corridor, there is a tunnel, a part of the
9  tunnel system.
10      So if I'm in the gym and, let's say
11  somebody is -- you used the example of voting.
12  Let's say I'm voting in the gym.  The deputy,
13  as far as accessibility, can take someone to
14  the elevator, can take them down to the lower
15  level of the tunnel, can take them through the
16  tunnel which runs underneath this corridor, can
17  take them to the elevator that's in Division 4
18  and can take them up to the ground floor of
19  Division 4.
20      There is a fully accessible route
21  from the Division 4 gym to Division 4, and
22  that's why I referred to this as a convenience
23  ramp from my admittedly cursor analysis and,
24  again, it will be part of the overall study.

Page 93

1  It appears that a ramp in this location is not
2  required to provide access either to the ground
3  floor level or to the Division 4.  I would also
4  note as a Sheriff's deputy, they have physical
5  requirements of the ability to walk, climb
6  stairs, lift things, et cetera that make it
7  that you don't need a ramp in that location for
8  a Sheriff's deputy.
9      Q    All right.  My question is do you
10  have any knowledge whether or not the Sheriff
11  at times uses this metal portable structure in
12  the basement of Division 4 to transfer
13  wheelchair users or people with disability to
14  the lower level of Division 4 for programs and
15  services?
16      A    I can tell you that I've never seen
17  that.  I don't know whether they do or not.
18  I'm Capital Planning.  We build the buildings.
19  We don't operate them.  The Sheriff operates
20  the building.  So I can't say one way or the
21  other whether they did.  As I said, it's a
22  convenience ramp.  I do know that there's a
23  kitchen close by, for example, that they bring
24  food on carts.  This would be the way that you

Page 94

1  might bring food if there was that kind of
2  thing or laundry, things like that, for
3  convenience.
4      But, no, I couldn't speak to whether
5  the sheriffs use this for somebody in a
6  wheelchair or not.  We don't -- that's not part
7  of what Capital Planning does, and I have not
8  seen it.
9      Q    To your knowledge, if the Sheriff
10  used this metal structure to transport disabled
11  detainees for programs and services in the
12  lower level of Division 4, that wouldn't be
13  compliant with the ADA, correct, using that
14  structure as a ramp would not be in compliance
15  with the ADA?
16      A    Again, I don't -- I can't speak to
17  the operational side.  I honestly don't -- I
18  would have to investigate what the rules are in
19  a secure environment for operations.  I don't --
20  I don't know if that's -- you know, because
21  somebody is there pushing them, I don't know if
22  that allows them to use a steeper ramp.  I
23  honestly don't know because we don't do
24  operations.

Page 95

1      Q    To your knowledge, that metal
2  structure is there all the time, correct?  The
3  metal portable ramp has been there each time
4  you have been in the lower area of Division 4
5  in the last two or three years, correct?
6      A    I can't say if -- when I have been to
7  the ground level of Division 4 if it's been
8  there every single time.  I believe so.  But
9  they may have moved it.  So, again, I can't say
10  whether it's been moved or not.  I have no
11  idea.
12      Q    And would you agree that the rise of
13  that metal structure that's used as a ramp is
14  greater than 6 inches?
15      A    Yes.
16      Q    So if that was used as a ramp by the
17  Sheriff to move detainees to programs and
18  services in the lower level of Division 4,
19  there would have to be handrails, correct?
20      A    Again, I don't know what the
21  requirements are if, in a secure environment,
22  you're pushing somebody in a wheelchair.  So I
23  really can't say one way or the other.  I don't
24  know what the applicable standard would be

Exhibit 9 Page 24

1  because it's a different condition when someone
2  is in custody and in a secure environment. I
3  don't know what the requirements are
4  operationally.
5      Q   Do you know if there's any different
6  requirements for a ramp under the ADA for -- in
7  a custodial setting, in a correctional setting?
8      A   My recollection from other
9  investigations is that there are circumstances
10  where it's allowed to be different. I believe
11  the term in the applicable ordinance or law is
12  if it's an operational necessity for the law
13  enforcement personnel, but I don't know -- I
14  can't say definitively one way or the other. I
15  think there's some kind of exception but I
16  can't give you the exact parameters of it.
17      Q   Let's turn to Exhibit 7 which you
18  spoke of. Showing you Exhibit 7, do you
19  recognize this as an e-mail that you sent to
20  Timothy Tyrrell and other members of the
21  Sheriff and the Cook County including --
22      A   Yes.
23      Q   -- Joe Merkel and Sabrina Canchola?
24      A   That's correct. This is an e-mail

1  about the Cermak ramp, and you see I sent them
2  this in connection with that, questions about
3  that.
4      Q   Where is this diagram limited to the
5  Cermak ramp?
6      A   It says in the subject of the e-mail,
7  Cermak ramp.
8      Q   Do you know if the requirements for
9  this under the ADA for the Cermak ramp are
10  different than the requirements for the two
11  pedestrian ramps in the RTU and the Division 4
12  movable metal contraption that's in the lower
13  level of Division 4? I don't know how to
14  describe it.
15      MR. RADUNSKY:  I know you don't. I
16      know you're trying. It's funny. Do your
17      best.
18  BY MR. MORRISSEY:
19      Q   Anything under the ADA code? Do you
20  understand the question?
21      A   I think I understand the question.
22      Q   Let me rephrase it, make it better.
23  We've looked at the north, and we've looked at
24  the east tunnel ramp for the RTU. We've looked

1  at the north tunnel ramp for the RTU, and now
2  we've looked at the portable metal structure
3  that's over the stairways in the lower level of
4  Division 4.
5      Is there any difference as far as the
6  ADA requirements for a ramp -- for those ramps
7  as opposed to the Cermak ramp? Do they all
8  have to comply with your diagram?
9      A   So, again, and this relates to the
10  excerpt from the Access Board that you referred
11  to earlier. In those circumstances where a
12  ramp is required, this is part of -- or helps
13  clarify what the definition is of an accessible
14  ramp, and the example in the RTU from my
15  walkthrough is that there is a ramp on the east
16  side connecting to the tunnel and the RTU that
17  is required to be an accessible ramp; and from
18  what I have seen, is an accessible ramp. There
19  is also a connection out of the RTU to the
20  north to the tunnel, which does not appear to
21  be an area where a ramp is required.
22      So in those circumstances where a
23  ramp is required for accessibility, this
24  illustrates many of the characteristics of a

1  ramp if it's to be considered accessible.
2      Q   So for the division -- let's take
3  Division 4, the portable metal fixture over --
4  I shouldn't call it a fixture. Portable metal
5  structure that's over the staircase. It
6  certainly has a rise over 6 inches, correct?
7      MR. RADUNSKY:  Asked and answered.
8  BY THE WITNESS:
9      A   Yeah.
10      MR. RADUNSKY:  You can answer. Go
11      ahead. Yeah.
12  BY THE WITNESS:
13      A   Yeah, I think, Tom, for people of our
14  age, I think the term thingamabob also applies
15  but the structure, the ramp-ish structure there
16  in Division 4 connecting the ground level by
17  the gym to the entry level of 4 is greater than
18  6 inches and, yes, would -- yeah, it's greater
19  than 6 inches.
20  BY MR. MORRISSEY:
21      Q   And if -- therefore, if it is a ramp,
22  then it would have to have handrails, correct?
23      A   Correct. If the analysis of the
24  building as a whole and, again, the ADA is a

Exhibit 9 Page 25

ERIC DAVIS
September 21, 2023

Page 100

1  wholistic circumstance, if the circumstances
2  indicated that a ramp was required there, then,
3  yes, that ramp would need to comply with this,
4  and I would also say, yes, if it's a required
5  ramp, because it's a permanent structure, it
6  would need to be a permanent ramp.
7      Q    And for the -- What you describe as
8  the north tunnel/ramp, if under the ADA it fits
9  the requirement as a ramp, then it would --
10 since it's -- the rise is greater -- you would
11 agree that the rise is greater than 6 inches,
12 correct?
13     A    Again, it's a wholistic
14 determination.  But given that my perception is
15 that the slope is greater than 1 to 20, that,
16 no, it's not -- would not be required for that
17 tunnel connection.
18     Q    So it's your -- from inspecting or
19 walking through the north tunnel ramp, the rise
20 is not greater than 6 inches; is that what
21 you're --
22     A    No, I believe the north tunnel ramp
23 rise is greater than 6 inches, but I believe
24 that the slope is greater than 1 to 20.  So it

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 101

1  would not be required.
2      Q    What would the height be of the north
3  ramp if it was greater than 50 feet long?
4      A    I'm not understanding your question.
5      Q    Sure.  If the height of the north
6  ramp -- strike that.
7           If the length of the north ramp was
8  greater than 50 feet -- let me -- assuming the
9  length of the ramp was greater than --
10          MR. RADUNSKY:  Sorry to interrupt.
11 Does anybody know who that yelling is?
12          MR. MORRISSEY:  Give me a moment,
13 okay?
14          MR. RADUNSKY:  Sure.
15          MR. MORRISSEY:  We are going to take
16 a one-minute break.
17          MR. RADUNSKY:  No problem.
18          MR. MORRISSEY:  Somebody in the
19 peanut gallery is yelling at me.
20          MR. RADUNSKY:  No problem.  No
21 problem.  One minute.  Okay.
22                    (WHEREUPON, a short
23                     break was had.)
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 102

1  BY MR. MORRISSEY:
2      Q    So you estimated on Monday that the
3  horizontal length of the north/tunnel ramp is
4  about 50 feet, correct?
5      A    Plus or minus, yes, something on that
6  order.
7      Q    What would be the maximum vertical
8  length in inches for the slope to be less than
9  1 to 20?
10     A    I'm not sure what you're asking for
11 the slope to be less than -- in other words --
12 you mean if the slope was shallower than 1 to
13 20 what is the maximum length -- or maximum
14 rise rather?
15     Q    What is the maximum vertical height?
16     A    It's infinite.  If you've got a
17 sidewalk and it's sloped less than 1 to 20,
18 there is no limitation on the rise that I'm
19 aware of.
20     Q    So let's assume the bottom of the
21 north ramp is -- from the bottom to the top of
22 the ramp has a rise of, let's say, 26 inches,
23 is there a requirement to have a handrail?
24     A    Again, stipulating that the slope is

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 103

1  greater than 1 to 20, there is no requirement
2  for a handrail, no.
3      Q    And what -- where are you referring
4  to in the ADA code for that?
5      A    I don't believe I can refer to things
6  while we're in this deposition, but that's the
7  general -- the general limitation is that if it's
8  less than -- if it's shallower than 1 to 20, then
9  there is no requirement for a ramp.  I would
10 have to research --
11     Q    You mean there is no requirement for
12 a handrail, correct?
13     A    It is -- well, no, there is no
14 requirement that it be considered a ramp.  In
15 other words, if it is 1 to 20 or steeper,
16 then -- and it's longer than 6 feet, then it
17 has to be configured as a ramp in order to be
18 accessible.  But since that tunnel connection
19 is not steeper than 1 to 20, it doesn't appear
20 to be steeper than 1 to 20, it doesn't appear
21 that there is any requirement for a handrail or
22 an intermediate landing regardless of the
23 length.
24     Q    But as we spoke before, you just

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 26

1  don't know, correct?
2       A    I have not measured it.  That's
3  correct.  I can only tell you about my
4  perception from walking through it.
5       Q    Okay.  Why --
6       A    And again --
7       Q    Let me ask you this.  Let me ask you
8  a very basic --
9            MR. RADUNSKY:  You guys are
10       interrupting each other.  One at a time.
11  BY THE WITNESS:
12       A    Let me finish my answer.  That is one
13  of the things that when we assess the entire
14  campus, we will make an affirmative
15  determination of that.
16  BY MR. MORRISSEY:
17       Q    Do you have a general oversight of
18  capital improvements at the Cook County Jail?
19       A    Yes.
20       Q    Why then in your capacity as a deputy
21  of Capital Planning, why wouldn't you just
22  simply measure the north ramp to determine if
23  there was any validity to this complaint?
24            How long would it take you as an

1  architect to measure?
2       A    Well, first of all, I generally
3  wouldn't have the tools.  You know, as I said,
4  if you wanted a rough idea, you could probably
5  count the block coursing but that's pretty
6  inexact.  If I thought it was close and I
7  needed to measure it, I would need to use
8  something like a laser level or a transit,
9  which I don't have and I don't know how to
10  operate.  I would hire somebody or have someone
11  do it.
12       Q    Previously, you used Joe Merkel,
13  correct, for the Cermak ramp?
14       A    I believe that Joe was assigned to do
15  that by TJ at the time.  I don't think that was
16  a stipulation that Capital Planning asked for.
17  I'm glad that he did.  He seemed to be correct,
18  but I don't believe that was a direction that
19  came from Capital Planning.
20       Q    Joe Merkel has a laser from what I
21  gather or has access to a laser, correct?
22       A    A laser level, yes.
23       Q    Yeah, and he was with you on Monday,
24  correct?

1       A    Correct.
2       Q    And you walked through all of these
3  areas in part to prepare for today's
4  deposition, correct?
5       A    Yeah.  I wanted to walk through it
6  again, yeah.
7       Q    And you, as an architect, have access
8  to a ruler, correct?
9       A    In the digital age, I couldn't tell
10  you -- I have one somewhere.  A straight ruler,
11  I'm not sure I have a ruler handy because I
12  don't do manual drawings anymore.  I probably
13  have one somewhere.
14       Q    And you knew it was -- these
15  questions were going to be asked of you whether
16  or not the north and the east ramp were
17  accessible according to the County's opinion
18  and yet you didn't do any measurements,
19  correct?
20            Is that fair to say?
21            MR. RADUNSKY:  Objection.  Hold on.
22       Objection.  It's argumentative.  He's asked
23       and answered, you know, but you can -- go
24       ahead.  You can answer, Eric.

1  BY THE WITNESS:
2       A    I want to add some additional
3  information.  I didn't know it was Joe that was
4  going to be walking me through until that
5  morning when I was walking the sight.  I knew
6  somebody from DFM, but I didn't know it was Joe
7  Merkel until that morning.
8  BY MR. MORRISSEY:
9       Q    But you knew the -- you were going to
10  be questioned today about whether, from the
11  County's standpoint, these ramps were
12  accessible or not, I assume, correct?
13            MR. RADUNSKY:  Again, it's
14       argumentative.
15            You can answer.
16  BY THE WITNESS:
17       A    I knew that you were going to be
18  asking -- I thought you were only going to be
19  asking about the RTU ramps.  I didn't
20  remember -- or realize you were going to talk
21  about Division 4; but, yeah, that's why I
22  wanted to refresh my memory about what they
23  looked like and also knowing that we're in the
24  process of hiring somebody to find a definitive

Exhibit 9 Page 27

Page 108

1  answer one way or the other.

2      Q   Why don't we take -- I'm about

3  wrapped up.  Why don't we take a five-minute

4  break and see if we have anything additional,

5  okay?

6          MR. RADUNSKY.  Great.  Eric, five

7      minutes, okay?

8          THE WITNESS:  Yeah, I'm just going to

9      turn my mike off.  I will be here.

10                 (WHEREUPON, a short

11                 break was had.)

12  BY MR. MORRISSEY:

13      Q   Is there a process after the

14  architect prepares their report -- well, let me

15  rephrase the question.

16         You have a request for qualifications

17  out -- or you don't have.  After you -- after

18  the request for qualifications is released to

19  the public, then the contractor has to be

20  chosen by Capital Planning, correct?

21      A   So the answer to that question is

22  somewhat complicated.  When we issue a request

23  for qualifications and the vendors have

24  submitted their -- have submitted their

Page 109

1  qualifications, we have a process whereby we

2  evaluate and identify what we call the most

3  qualified firm or the most qualified team.

4          We then go into negotiations with

5  that firm.  We do things like walk the site.

6  We answer all those specific questions, and we

7  negotiate what their fee is going to be.  This

8  is the process that the federal government

9  follows, that the state follows and others

10  follow to make sure that we get the most

11  qualified firm from the marketplace because

12  these kinds of things are very important in

13  terms of qualifications, and we don't want them

14  to be based upon price.

15         Okay.  Once that's done and we've

16  hired the architect, the architect develops the

17  drawings and so a part of it depends on how the

18  project is going to be delivered.  If we have a

19  project that is smaller or more localized, we

20  may use our job order contracting or JOC

21  methodology to construct.  In that case, the

22  contractor will be on board before the

23  architect is finished so that the two of them

24  can work together.

Page 110

1          In the traditional design, bid,

2  build, the architect creates their drawings,

3  they are submitted to the market for bid.  Any

4  contractors anywhere submit their bids.  Those

5  bids are evaluated and they are chosen.

6          So it depends as far as going

7  straight to the contractor, sometimes the

8  contractor is involved during design.

9  Sometimes they're not.

10      Q   Let's go back one step.  After the

11  qualifications come in, do the architects in

12  this case that meet the qualification

13  standards, do they all get an opportunity to

14  walk the site to see whether or not they want

15  to bid on the project?

16      A   So in this case, again, because there

17  are requests for qualification, we outline the

18  general scope of the project in the

19  solicitation.  We do not for RFQs generally do

20  site walks with all of the firms who may be

21  interested, and I think you can understand why.

22  You're talking about the Cook County Jail.  We

23  don't necessarily want to take 25 firms and all

24  of their people wandering through the jail.  We

Page 111

1  would rather only do that with the people who

2  are going to do the work.  So we identify the

3  most qualified firm, and then we negotiate

4  their fee.  If for some reason we're not able

5  to come to agreement with that most qualified

6  team, we go to the second ranked team by the

7  evaluation committee.  So there's actually a

8  numerical ranking system.  And if the first

9  one, we're not successful with them, we end

10  those negotiations and then negotiate with the

11  second highest ranked firm.

12         So they don't give us a price until

13  we have that one firm and they've had a

14  chance -- that's when we give them a chance to

15  walk the site, we give them the drawings that

16  we have, all that sort of thing.  We only

17  provide that to the firm once we've identified,

18  you know, which firm that is.

19      Q   So at that stage when you select the

20  qualified bidder or you rank them, in regards

21  to this project that you're describing that

22  you're sometime this year going to do the

23  request for qualifications, how many different

24  sites would the architect that's selected have

Exhibit 9 Page 28

Page 112

1  to walk through before actually preparing a bid
2  to do the work?
3      A    We would leave that actually to the
4  design firm.  We would say here's the
5  boundaries of the area that we want you to
6  assess, and then they can frankly walk however
7  much they want to because it's in the County's
8  best interest for them to have examined every
9  situation and every condition so that they
10 understand how much work they are going to have
11 to do.
12          If they want to walk the whole site
13 and all the floors of all the buildings, they
14 can do that.  If they only want to just do a
15 general walk-around at a couple of sites, they
16 can do that.
17          We want to afford the designer the
18 opportunity to understand at a sufficient level
19 of detail the level of effort, and that's the
20 term we use, level of effort, that it's going
21 to take for them to develop the drawings and
22 evaluations that are necessary.
23          So there isn't anything finite.  We
24 don't say, oh, you can only go to five

Page 113

1  buildings or here are the four you can visit.
2  We leave it up to them in this case -- well, in
3  every case so that they've been able to see all
4  of the conditions and take that into account
5  when they develop their proposal for what their
6  fee would be.
7      Q    So the RFQ that would include these
8  three ramps that we talked about today, in
9  addition to those three ramps, what other areas
10 are encompassed in the RFQ?
11     A    Generally everything between
12 Sacramento Avenue, 31st Street, California --
13 I'm sorry.  Excuse me.  It actually goes east
14 of there because it includes Division 11.  So
15 everything from Sacramento to 31st Street over
16 to the train tracks and up to 26th Street and
17 across.  Everything that is a part of the
18 Department of Corrections except for, as I
19 mentioned, Cermak Health Services facility and
20 the Leighton Criminal Courthouse.  Any
21 County-owned Department of Corrections
22 facilities or land in that area will be a part
23 of what is evaluated.
24          So there will be buildings.  There

Page 114

1  will be land.  There would be a garage, parking
2  lots.  There will be all kinds of things in
3  between there.
4          We want the assessment of the entire
5  facility so that we can identify, if there are
6  any deficiencies, what those are and what we
7  need to be doing.  We want an objective view of
8  what we should be doing about them.
9      Q    And once --
10     A    You're going to have a lot of fun
11 with it, Tom, I'm sure.
12     Q    I don't know if I'd classify that as
13 fun.  It's work, right?
14          After the selected architect does
15 their review of these facilities at the DOC,
16 they then -- that person or firm has to come up
17 with a bid, an estimate, how much they're going
18 to have to charge for this work, correct?
19     A    Actually, they will walk it -- before
20 they've actually performed an assessment, we
21 will pay them for the assessment.  We're asking
22 them to walk around and get an idea of what
23 it's going to take from their standpoint to do
24 the assessment and also to do the preliminary

Page 115

1  design.  You know, they're going to be
2  developing multiple packages for implementation.
3  So we want them to be able to -- you know, the
4  assessment task itself is a big job, and so we
5  want them to tell us how many hours they think
6  it's going to take and who has to be there, all
7  of that kind of stuff.
8      Q    Well, I understand they're going to
9  get paid for the --
10     A    They won't do a bid -- they'll use
11 those walkthroughs to identify their fee.
12 We'll negotiate that.  When we have agreement
13 on their fee, they will do the assessment and
14 they will do the preliminary design.
15     Q    Does their -- when does their fee --
16 does their fee have to be approved by the
17 County board?
18     A    Yes.
19     Q    And when does that take place?
20     A    Okay.  So let's assume the project
21 goes to the street beginning of November and
22 it's out -- or actually, yeah, probably
23 beginning of November.  Given that you have got
24 the holidays, we probably wouldn't be receiving

Exhibit 9 Page 29

ERIC DAVIS
September 21, 2023

Page 116

1  the responses until early in the new year, you
2  know, first part of January just because it's
3  hard to get people to respond to things in that
4  time of year.
5          Once we have those, they have to be
6  evaluated.  As I said, we have to score them
7  and then we do the walkthroughs probably in,
8  let's see, by then it will be February, March,
9  something like that.  We'll walk through the
10 site with them.  We'll negotiate.  We'll expect
11 to have them under contract -- I'm sorry --
12 have agreement with them in, like, maybe April,
13 May, something like that.  And it would go to
14 the County board then, you know, May, June,
15 July, something in that area.  The County board
16 approval is a two-month process because you
17 introduce things, and then they are voted upon
18 the following month.
19         So we would hope to have them under
20 contract before the end of the summer, but I
21 don't know how long that will take.  There are
22 any number of factors that could affect that.
23 I would like to get it sooner than that, but
24 that's kind of the environment in public

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 117

1  procurement that -- that's what we work in.
2      Q    Is there any time estimate when they
3  do their assessment?
4      A    Okay.  So let's follow that
5  hypothetical.  Let's say we get them the
6  board-approved contract by the end of summer of
7  24.  So they're under contract.  They're going
8  to have to walk the whole site, which it's
9  going to be a team, not an individual.  It will
10 be multiple firms.  You know, they would be
11 doing assessments.  I would expect it would
12 take them six months to do those assessments
13 because that's a lot.  So we're probably
14 looking, you know, next fall, winter before we
15 have their preliminary assessments, and then
16 they're going to have to do a bunch of drawings
17 and that sort of thing as well to sort of
18 illustrate their recommendations, and so it's
19 probably the following year before we've got,
20 you know, things that we can break out in
21 individual packages.
22         Again, this is -- you're talking
23 about a campus that is approximately 5 million
24 square feet.  It's an enormous enterprise, and

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 118

1  I think it's fair to say it's a reflection of
2  the commitment to our department to addressing
3  these issues.
4          The Department of Justice came.  They
5  issued the Barrier's Report.  They did not
6  cover the whole campus.  We're covering the
7  whole campus.  So, you know, we're trying to be
8  as diligent and thorough and objective as we
9  can but it takes time.
10     Q    So their assessment, best case
11 scenario, isn't until, let's say, December of
12 2024.  Do they then give you a report, Capital
13 Planning, or do they give it to the Sheriff?
14 How does that go?
15     A    We're the owners of the -- the Bureau
16 of Asset Management are the owners of the
17 facility.  We would review their assessment at
18 that time.  It would be my expectation that we
19 would review them with folks and the Sheriff at
20 that time to get their input because they know
21 the operations of the facility, what their
22 needs are.  Sometimes, and I would expect
23 during assessment, they would probably have
24 consultations with the Sheriff because there

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
September 21, 2023

Page 119

1  are elements of operation that may affect what
2  you do and don't need.  You know, what are
3  areas that are secure and have these
4  limitations?  What are areas that are not
5  secure?  And then, you know, access to the
6  public, those kinds of things.  So I would
7  expect they would be -- we would be putting
8  them in contact with people from the Sheriff's
9  Office during the assessment, certainly during
10 their walk-arounds.  And, yes, once they have
11 an indication of, you know, here's what we
12 think, we probably would go through with the
13 Sheriff too, yeah.  But at the end of the day,
14 Asset Management owns the buildings.
15     Q    So the report -- what would the
16 report be entitled?  What's the title of the
17 report?
18     A    I have no idea.  I have no idea.
19         MR. RADUNSKY:  Speculation, right.
20 BY THE WITNESS:
21     A    It could be called any number of
22 things.  Some version of, you know,
23 Accessibility Assessment of the Department of
24 Corrections Campus or something like that.  I

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 30

Page 120

1 don't know.  You know, something like that.
2 BY MR. MORRISSEY:
3     Q    Is there any priority given to
4 pending litigation to speed up this process?
5     A    Well, since -- I would give an
6 example.  We did accelerate the Cermak ramp or
7 the Cermak building assessment out of that
8 larger goal frankly to get you answers faster
9 because it was easier to take a single firm on
10 a single assignment and break that out because,
11 quite frankly, to answer questions related to
12 litigation.
13         It wasn't until this stuff started
14 arriving for this that we got something about
15 the RTU because it's a new building, why would
16 there be anything to look at there.
17         So, you know, we're trying to be both
18 thorough and yeah, responsive.  Yeah.  You
19 know, it's certainly fair to say that we broke
20 out and accelerated the assessment of the
21 Cermak building in part in response to
22 litigation, but I think it's in the taxpayer's
23 best interest that we get our arms around the
24 whole problem rather than randomly breaking

Page 121

1 things out depending upon which building you
2 decide to sue us about.
3     Q    The report for the Cermak ramp you
4 mentioned, has that been tendered to Capital
5 Planning?
6     A    I haven't received that yet, but this
7 is about the RTU.  One of the key people was
8 very ill and I had expected frankly to have
9 this before today, but we haven't received it.
10 He was not doing well.  So we don't -- I hoped
11 to get it this week, but that's not going to
12 happen.
13         MR. RADUNSKY:  There's a free
14     question on the Walker case for you, Tom,
15     and answer.
16 BY MR. MORRISSEY:
17     Q    So basically, Joe Merkel points out a
18 problem in March of 2021 involving the east
19 ramp for the RTU that the structure does not
20 appear to qualify -- appears to be not in
21 compliance with the ADA.  The County will not
22 have a report or do any type of analysis of it
23 until sometime, at best, in December of 2025
24 more than four and a half years later; is that

Page 122

1 fair to say?
2         MR. RADUNSKY:  Tom, your question was
3     correct but you said Joe Merkel and not TJ.
4         MR. MORRISSEY:  I'm sorry.  Let me
5     rephrase it.
6 BY MR. MORRISSEY:
7     Q    TJ Tyrell points out a problem as
8 the manager of Facilities Management in March
9 of 2021, says the north ramp leading to the RTU
10 does not appear to be ADA accessible.  I'm
11 sorry.  The east ramp.  I'm sorry.  I have it
12 wrong.
13         He says the east ramp doesn't appear
14 to be compliant with the ADA.  It won't be
15 until December of 2025 before the Cook County
16 or the Sheriff does an assessment to determine
17 whether or not TJ Tyrell's observation is true
18 or not; is that fair to say?
19     A    TJ made a random comment in the
20 middle of a series of discussions about Cermak,
21 which, as I mentioned, we have accelerated and
22 are moving forward on.  Honestly, that was
23 really the focus at that point.
24         He was asking a question about an

Page 123

1 almost new building, which, to my mind, if you
2 see a comment like that it's like, yeah, if you
3 probably fine, you know, because it's a
4 building, and besides TJ wouldn't know one way
5 or the other.  We'll get to it, but I wouldn't
6 say that that -- in the absence of your
7 lawsuit, that doesn't necessarily identify it
8 to us as a priority at that point.
9         And, again, we're trying to balance
10 the urgent needs, in this case Cermak, with the
11 larger need to get our arms around the whole
12 project.
13         So your question suggests a level of
14 indifference that I would think is completely
15 uncalled for.
16     Q    Well --
17     A    No, no.  I want to finish this.  When
18 you took a minute's break, I checked -- I have
19 to check my e-mails because I get 60, 80
20 e-mails at a time.  The two that I responded to
21 during that one-minute break were both about
22 ADA issues on completely different matters.
23 Okay?
24         So we're working all over the map

Exhibit 9 Page 31

Page 124

1  about this stuff.  Okay?  And I have to say I
2  really object to any insinuation that we're not
3  being as aggressive and efficient and thorough
4  and professional as we can be.  This is really
5  important.  It's important to the County at a
6  policy level.  It's important to me personally
7  as a professional.  And so your comment
8  suggests a level of indifference that is, I
9  think, just not warranted.  It takes time to
10 buy things in government because there's lots
11 of questions because the money is the public's.
12 It's not like the private sector.  It takes
13 awhile.  And so, yeah, I mean, is it going to
14 take awhile to get this, yeah, you're talking
15 about 5 million square feet.  Okay?  So, I
16 mean, we're getting there as efficiently as we
17 know how to do balancing, like I said, with
18 things like Cermak because, okay, let's
19 accelerate that.  But if every time somebody
20 makes some random comment in an e-mail, hey, I
21 don't know if this looks right, we stop
22 everything and we go look at that, we'd never
23 get anything done.
24      Q    Do you know Sabrina Canchola?

Page 125

1      A    Yes.
2      Q    The Sheriff's ADA coordinator?
3      A    Yes.
4      Q    And does -- Sabrina or somebody from
5  the Sheriff's Office can provide a business
6  case report to Capital Planning to have some
7  type of improvement of their facilities,
8  correct?
9      A    Yes.
10     Q    In a business case?
11     A    Yes.
12     Q    You're aware that Sabrina Canchola in
13 fiscal year 2019 provided a business case in
14 regards to ADA assessments and improvements in
15 Division 2, 4, 6, 9 and 10, you're aware of
16 that?
17     A    Yes.  And we put it in the CIP and
18 there was every effort to do that.  You
19 mentioned before the challenges that we've had
20 because of the change with the procurement
21 director and the need to completely re-do our
22 templates.  We tried once with the old method
23 because it was 2019 and then had to back up and
24 completely renegotiate what the basic format of

Page 126

1  these RFQs and RFPs were.  They used to be
2  RFPs.  They are now RFQs.
3           We also, as you know well, attempted
4  to acquire architects on a task order basis,
5  which was denied by the Board of Commissions.
6  Some of the elements that Sabrina was asking
7  about would have been able to be addressed had
8  we been able to do that.  But as you know from
9  other litigation, we were denied the
10 opportunity to do that.  We have been trying as
11 best we can.  We are certainly not ignoring
12 Sabrina's request.  We are trying to find the
13 best and fastest way to get this stuff done.
14     Q    The CIP is what, capital planning --
15     A    CIP, the Capital Improvement Plan.
16 It's approved by the board of commissioners
17 every November.  It's a public document.
18     Q    And you recall that in that business
19 case, Sabrina Canchola said Division 10 is a
20 maximum security division with no ADA compliant
21 housing.  Detainees with mobility disabilities
22 that require auxiliary aides but do not require
23 medical housing are housed in Divisions 2, 4,
24 6, 9 and 10 and the only ADA housing that

Page 127

1  are -- that comply with the 2010 standards are
2  Cermak and the RTU and that detainees are not
3  provided accessible cells, toilets and showers.
4  This was in 2019.
5           My question is what, if anything, has
6  been done since April of 2018 to provide
7  accessible housing for disabled people at the
8  Cook County Jail?
9           THE WITNESS:  Troy, you had -- is
10          there an objection?
11          MR. RADUNSKY:  There is.  I mean,
12          it's just objection to relevance.  There's
13          other divisions, other housing.  I don't
14          see what it has to do with the RTU.  I
15          mean, if you could focus it on the RTU,
16          that would be great.
17               Eric, I mean, I can't tell you
18          not to answer the question so go ahead and
19          just, you know, I guess, be brief.
20 BY THE WITNESS:
21     A    Tom, there was a long preamble.  Can
22 you repeat the question part?
23 BY MR. MORRISSEY:
24     Q    The question is you're aware of

Exhibit 9 Page 32

ERIC DAVIS
September 21, 2023

Page 128

1 Sabrina's business case in April of 2018 where
2 she said that at the jail, there's little or no
3 accessible housing for disabled people.
4          My question is from April of 2018 to
5 the present, the County is now getting around
6 to doing a request for qualifications for --
7 from architects to assess whether or not -- the
8 degree in which these divisions are not
9 accessible for disabled people; is that
10 correct?
11     A    No --
12          MR. RADUNSKY:  Hold on.  Same
13     objection.  I also, again, just object to
14     relevance.  Her e-mail is in reference to
15     other divisions.
16                Subject to that, go ahead.  You
17     can answer, Eric.
18 BY THE WITNESS:
19     A    And I object, Tom, to your
20 characterization of now getting around to
21 implying that there have been no actions taken
22 to that point.
23          Her business case was received.  It
24 was included in the report to the Board of

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 129

1 Commissioners, which was approved.  As I
2 mentioned before, there were challenges in
3 getting somebody hired, multiple challenges.
4 We have tried many different ways to crack this
5 particular nut and only recently have been able
6 to be successful to push something out
7 to the street to address that.
8          But to say now "getting around to," I
9 think is a mischaracterization of our efforts.
10 I would also note that her request was only 2,
11 4, 8 and 10 or whatever you listed where we're
12 actually expanding it beyond that to include
13 the entire campus and all of the horizontal
14 surfaces and not just the buildings.
15          So we're actually taking a more
16 aggressive, more inclusive approach to
17 addressing it than even she asked in that.  We
18 are not doing nothing.  We have been trying any
19 number of ways to get this done.
20          As I mentioned, we broke out a piece
21 of it because of the time.  Cermak had not been
22 assessed.  So we broke Cermak out and
23 accelerated that.  So to say that, you know,
24 we're just getting around to it I think

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 130

1 mischaracterizes the County's action.
2 BY MR. MORRISSEY:
3     Q    Well, let me rephrase it.  The
4 request for qualifications which will go out at
5 some point maybe this year is going to address
6 the concerns that Sabrina raised in April of
7 2018 in her business case, correct?
8     A    It will include those, yes.
9     Q    I'm not finding fault with Capital
10 Planning or you personally, but that's just the
11 nature of government; is that fair to say?
12 That it takes that long to actually do an
13 assessment when the client, and I suppose
14 Sabrina Canchola would be considered a client
15 of Capital Planning, raises an issue in regards
16 to ADA accessibility?
17     A    That's correct, yes.  And I would
18 note just by the way we are -- this fall in
19 October, are going to be submitting for
20 approval in November a Capital Improvement Plan
21 where we were not able to address all of the
22 requests that our various user agencies did.
23 The top three priorities for the projects that
24 we did advance are life safety, ADA and

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 131

1 anything that's building critical systems.
2 Those projects all went through.  It is an
3 absolute priority.  We've set it in writing
4 many times.  It is a first-level priority for
5 us in developing our capital plans.
6          MR. MORRISSEY:  All right.  I have
7 nothing further.  Thanks for your day and
8 hopefully you can interview that person.
9          THE WITNESS:  Yeah, I got six minutes
10 to go, but I appreciate your efforts to get
11 me done before 2:00 o'clock.
12          MR. RADUNSKY:  No questions.  We will
13 reserve judgment.
14          MR. MORRISSEY:  All right.  Thanks.
15
16          FURTHER DEPONENT SAITH NOT...
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 33

ERIC DAVIS
September 21, 2023

Page 132

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   EUGENE WESTMORELAND,          )
4                                 )
              Plaintiff,          )
5                                 )
              vs.                 )   No. 21-cv-4330
6                                 )
    THOMAS DART, Sheriff of       )
7   Cook County, COOK COUNTY,     )
    ILLINOIS, OFFICER E.          )
8   ARREGUIN, and NURSE           )
    JEFFERSON,                    )
9                                 )
              Defendants.         )
10
11         I, ERIC DAVIS, being first duly
12  sworn, on oath, say that I am the deponent in
13  the aforesaid deposition, that I have read the
14  foregoing transcript of my deposition,
15  consisting of pages 1-132 inclusive, taken at
16  the aforesaid time and place and that the
17  foregoing is a true and correct transcript of
18  my testimony so given.
19
                        _____
20                            ERIC DAVIS

21  SUBSCRIBED AND SWORN TO
    me before this _____ day
22  of _____, A.D. 2023.
23  _____
    Notary Public
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 133

```
1   STATE OF ILLINOIS )
                      )  ss:
2   COUNTY OF C O O K )

3           I, Peggy A. Anderson, a Certified
4   Shorthand Reporter in the State of Illinois do
5   hereby certify:

6           That previous to the commencement of
7   the examination of the witness, the witness was
8   duly sworn to testify the whole truth
9   concerning the matters herein;

10          That the foregoing deposition
11  transcript was reported stenographically by me,
12  was thereafter reduced to typewriting under my
13  personal direction, and constitutes a true
14  record of the testimony given and the
15  proceedings had;

16          That the said deposition was taken
17  before me at the time and place specified;

18          That the said deposition was
19  adjourned as stated herein;

20          That I am not a relative or employee
21  or attorney or counsel, nor a relative or
22  employee of such attorney or counsel for any of
23  the parties hereto, nor interested directly or
24  indirectly in the outcome of this action.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
September 21, 2023

Page 134

```
1           IN WITNESS WHEREOF, I do hereunto set
2   my hand this 23rd day of October, 2023.
3
4
5
6
7   Peggy A. Anderson
8   Certified Shorthand Reporter
9   License No. 084-003813
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 9 Page 34