Transcript of the Testimony of
# SABRINA RIVERO-CANCHOLA

**Date:** December 20, 2023

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 1

                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION

EUGENE WESTMORELAND,            )
individually and for            )
a,class                         )
                                )
            Plaintiff,          )
                                )
                vs.             )   No. 1:23-cv-01851
                                )
THOMAS DART, Sheriff of         )   Part 1
Cook County and COOK            )
COUNTY, ILLINOIS,               )
                                )
            Defendants.         )


        This is Part 1 of the deposition of
SABRINA RIVERO-CANCHOLA, called by the
Plaintiff for examination, taken via Zoom
videoconferencing, taken pursuant to the
Federal Rules of Civil Procedure for the United
States District Courts pertaining to the taking
of depositions, taken before PEGGY A. ANDERSON,
a Certified Shorthand Reporter of the State of
Illinois, on December 20, 2023, at 10:00 a.m.

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

---

**Page 2**

1   APPEARANCES:
2
3       THE LAW OFFICES OF:
        THOMAS G. MORRISSEY, LTD.
4       BY:  MR. PATRICK W. MORRISSEY
           10257 South Western Avenue
5          Chicago, Illinois  60643
           (773) 233-7900
6          pwm@morrisseylawchicago.com
7          Appeared on behalf of the
           Plaintiff;
8
        THE LAW OFFICES OF:
9       DEVORE RADUNSKY, LLC
10      BY:  MR. JASON E. DEVORE
           230 West Monroe Street
11         Suite 230
           Chicago, Illinois 60606
12         (312) 300-4479
           jdevore@devoreradunsky.com
13
           Appeared on behalf of the
14         Defendant, Cook County.
15
16
17
18
19
20
21
22
23
24

---

**Page 3**

1                INDEX
        WITNESS                    PAGE
2
        SABRINA RIVERO-CANCHOLA
3
        DIRECT EXAMINATION BY
4       MR. MORRISSEY:                4
5
6
7          E X H I B I T S
        MARKED                     PAGE
8       PLAINTIFF'S EXHIBIT NO. 17     70
9       PLAINTIFF'S EXHIBIT NO. 23    151
10      PLAINTIFF'S EXHIBIT NO. 25     17
11      PLAINTIFF'S EXHIBIT NO. 26     10
12      PLAINTIFF'S EXHIBIT NO. 28     93
13      PLAINTIFF'S EXHIBIT NO. 29    118
14      PLAINTIFF'S EXHIBIT NO. 30     91
15      PLAINTIFF'S EXHIBIT NO. 37     26
16      PLAINTIFF'S EXHIBIT NO. 38    133
17      PLAINTIFF'S EXHIBIT NO. 42     76
18
19             *******
20
21
22
23
24

---

**Page 4**

1           (WHEREUPON, the witness
2           was first duly sworn.)
3           MR. MORRISSEY:  This is the
4       deposition in Westmoreland versus Dart
5       taken pursuant to notice and continued to
6       this date.
7   WHEREUPON:
8           SABRINA RIVERO-CANCHOLA,
9       called as a witness herein, having been first
10      duly sworn, was examined and testified as
11      follows:
12          D I R E C T   E X A M I N A T I O N
13          BY MR. MORRISSEY:
14      Q    Ma'am, could you please state your
15      name?
16      A    Sabrina Rivero-Canchola.
17      Q    And what is your title at the
18      Sheriff's Office?
19      A    ADA compliance officer.
20      Q    How long have you been the ADA
21      compliance officer?
22      A    Since approximately September of
23      2015.
24      Q    What are your responsibilities

---

**Page 5**

1   presently as the ADA compliance officer?
2       A    To ensure that the Cook County's
3   Sheriff's Office complies with the American's
4   with Disabilities Act and all that entails.
5       Q    And has that been your role during
6   the entire time you have been the ADA
7   compliance officer?
8       A    Yes.
9       Q    What documents did you look at to
10  prepare for testifying today?
11      A    I reviewed some e-mails.  I reviewed
12  the request to admit that were submitted to the
13  Sheriff's Office and Cook County in this case.
14  I think that's it.  That's all I can recall in
15  this moment.
16      Q    Did you review any videos in
17  preparation for your testimony?
18      A    No.
19      Q    How many e-mails did you review in
20  preparation for testifying?
21      A    I didn't count them.  I don't know.
22      Q    Do you have an approximate number of
23  e-mails you looked at?
24      A    No, I didn't count them.

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

3 (Pages 6 to 9)

---

Page 6

1    Q   Do you recall what any of the e-mails
2  discussed?
3    A   The e-mails were e-mails that had
4  been tendered in this case between Eric Davis,
5  TJ Tyrrell and possibly a couple of other
6  people.
7    Q   Did you meet with counsel to prepare
8  for your testimony today?
9    A   I did.
10    Q   How many times?
11    A   Once.
12    Q   Approximately how long did you meet
13  to prepare?
14    A   Approximately an hour or two.
15    Q   In preparation for your deposition
16  today, did you review any of your prior
17  deposition testimony?
18    A   No.
19    Q   Have you ever met Eugene Westmoreland?
20    A   I have.
21    Q   How many times?
22    A   I don't know how many times.
23  Definitely more than once.
24    Q   Do you recall any of your

---

Page 7

1  conversations with Mr. Westmoreland?
2    A   I recall the general topics of my
3  conversations with Mr. Westmoreland, yes.
4    Q   Have you taken any notes regarding
5  your conversations with Mr. Westmoreland?
6    A   No.
7    Q   What general topics do you recall
8  regarding conversations with Mr. Westmoreland?
9    A   Those would be the topics covered in
10  his grievances.
11    Q   Which grievances?
12    A   His ADA grievances.
13    Q   When Mr. Westmoreland would have been
14  in the Cook County Jail, did he use a
15  wheelchair?
16    A   He did.
17    Q   Do you know why he used a wheelchair?
18    A   I'm not privy to his medical
19  information, no.
20    Q   When Mr. Westmoreland entered the
21  Cook County Jail, was he able to walk?
22    A   I'm not sure.  I believe that he
23  didn't have a wheelchair immediately when he
24  entered the Cook County Jail.

---

Page 8

1    Q   And what do you base that off of?
2    A   His alerts.
3    Q   When he entered the jail, did he have
4  any alerts?
5    A   I believe he had a number of alerts,
6  just like every other inmate.
7    Q   Do you know whether he had any alerts
8  for a cane, crutch, walker or wheelchair when
9  he first entered the Cook County Jail?
10    A   He may have had one or more alerts
11  for accessibility devices or mobility devices
12  such as those that you listed.
13    Q   Do you know where Mr. Westmoreland
14  was housed when he initially entered the Cook
15  County Jail?
16    A   I don't know his initial housing, no.
17    Q   Do you know what division he was in?
18    A   I don't know his initial housing, no.
19    Q   Now, back in 2019, did you receive
20  regular e-mails about people who were
21  downgraded in the RTU and were eligible to be
22  moved to other divisions?
23    A   I don't know what you mean by regular
24  e-mails but, on occasion, I have received

---

Page 9

1  e-mails about people who have been downgraded,
2  yes.
3    Q   And why would you receive those
4  e-mails about people who were downgraded?
5    A   Because I work with Cermak as a
6  partner in bed control in our medical
7  buildings.
8    Q   What do you mean by "bed control"?
9    A   Bed control, maximizing the amount of
10  space that we have in our accessible divisions
11  or medical buildings to ensure that the inmates
12  that are housed there are the ones that need to
13  be housed there based on their care level.
14    Q   What do you mean by "their care
15  level"?
16    A   The medical alerts assigned to them
17  by Cermak.
18    Q   And what are the accessible
19  divisions, Ms. Rivero-Canchola?
20    A   I believe that's a question of law.
21    Q   Do you have any understanding of the
22  accessible divisions at the Cook County Jail?
23       MR. DEVORE:  Objection as to form
24    regarding what the definition of accessible

---

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 10

1    is.
2    BY THE WITNESS:
3    **A  I think that would depend on what**
4    **accessibility provision is being applied at**
5    **that time.**
6    BY MR. MORRISSEY:
7    Q  Did you ever make a statement that
8    the only ADA housing, housing that complies
9    with 2010 design standards that currently exist
10   for detainees with mobility impairments, is the
11   RTU and Cermak?
12   **A  I don't know.  I may have.  Are you**
13   **reading from a document that you would like me**
14   **to review?**
15   Q  Sure.  I will show you Exhibit 26,
16   which is an ADA Assessment and Improvements:
17   Division 2, 4, 6, 9 and 10 that's dated
18   4/3/2018 that was prepared by you.
19       Do you see this document, Ms. Rivero,
20   the first page, the 2019 business case, that's
21   dated 4/3/2018?
22   **A  That's what --**
23       MR. DEVORE:  Can you make it bigger?
24

Page 11

1    BY THE WITNESS:
2    **A  -- the Bates stamp says.**
3       THE WITNESS:  Sorry, Jason.
4       MR. DEVORE:  No, I was seeing if you
5    could make it a little bit bigger, Pat.
6       MR. MORRISSEY:  Sure.
7    BY MR. MORRISSEY:
8    Q  Do you see that, Ms. Rivero-Canchola?
9    **A  I can see it, yes.**
10   Q  I'm showing you part of the first
11   page.  Does it refresh your memory about
12   preparing this business case?
13   **A  It looks like something that was**
14   **prepared by me in conjunction with Scot**
15   **Achterhof, yes.**
16   Q  If I go down to the second page, do
17   you see it says:  Background.  And I'm zooming
18   it here, second page here.  And perhaps the
19   third sentence says:  The only ADA housing --
20   and I read that a few minutes ago.
21       Do you see that?
22   **A  Yes.  You read that in part a few**
23   **minutes ago.**
24   Q  What do you mean by "ADA housing" in

Page 12

1    this context?
2    **A  Well, I believe the document speaks**
3    **for itself, but as it says in the document, the**
4    **only ADA housing and, in parentheses, meaning**
5    **the housing that complies with 2010 design**
6    **standards that currently exist for detainees**
7    **with mobility impairments is the RTU and**
8    **Cermak.  So I believe that document speaks for**
9    **itself as to what it pertains to.**
10       MR. DEVORE:  Pat, can you show us
11   what Bates numbers these are in this case,
12   this exhibit?
13       MR. MORRISSEY:  I sent them to you
14   before the dep.  I don't think this is --
15   it says 18-- it was produced in this case
16   by my office, but I think this was produced
17   by the Sheriff in another case.
18       MR. DEVORE:  Okay.
19   BY MR. MORRISSEY:
20   Q  To your understanding
21   Ms. Rivero-Canchola, what is your understanding
22   of ADA compliant housing?
23   **A  With regard to what?**
24   Q  I'm just asking in general.  Do you

Page 13

1    have any understanding of what ADA compliant
2    housing means?
3       MR. DEVORE:  Objection, vague.
4    BY THE WITNESS:
5    **A  Your question is very vague.  ADA**
6    **compliant housing depends on the particular**
7    **housing that we're talking about and the**
8    **particular applicable standard for that time.**
9    BY MR. MORRISSEY:
10   Q  I will provide a little context in
11   the exhibit that's on the screen.  You say:
12   Division 10 is a maximum security division with
13   no ADA compliant housing.
14       Did I read that correct?
15   **A  You read that in part.  Again, the**
16   **document speaks for itself.  It says:  The only**
17   **ADA housing, and in parentheses, housing that**
18   **complies with 2010 design standards.  So when**
19   **drafting this document, we were referring to**
20   **current standards, not the standards at the**
21   **time when the divisions were built.**
22   Q  And when you say "we," who are you
23   referring to?
24   **A  I'm referring to myself and the**

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

5 (Pages 14 to 17)

---

Page 14

1  person who assisted in drafting that, which was
2  Scot Achterhof.
3       Q   Now, Ms. Rivero-Canchola, are you
4  able to prepare a list of people who use
5  wheelchairs that are currently housed in the
6  RTU?
7       A   Am I able to prepare a list?  What do
8  you mean by "able"?
9       Q   Well, can you generate a list of
10 people who are housed in the RTU that have a
11 wheelchair alert?
12      A   Off of memory, no.
13      Q   Using the Sheriff's computer system,
14 can you generate a mobility aid list
15 identifying people who use a wheelchair that
16 are housed in the RTU?
17      A   What do you mean by "Sheriff's
18 computer system"?
19      Q   When I say the computer system, I'm
20 talking about CCOMS?
21      A   You said the Sheriff's computer
22 system.  So you're referring to CCOMS, the Cook
23 County Offender Management System?
24      Q   Correct.

---

Page 15

1       A   A computer program that is leased to
2  us, that's what you are referring to, not the
3  Sheriff's computer system.
4       Q   So with that clarification, can you
5  answer the question, please?
6       A   The Cook County Offender Management
7  System can generate a report of wheelchair
8  detainees.
9       Q   And how do you do that?
10      A   I don't know.  I don't do it.
11      Q   Have you ever requested that report?
12      A   Requested what report?
13      Q   CCOMS, have you ever requested that
14 somebody from the Sheriff's Office run a report
15 to identify people who have a wheelchair alert
16 at the Cook County Jail?
17      A   No, I have never requested anyone at
18 the Sheriff's Office run a report of wheelchair
19 detainees to my knowledge.
20      Q   How about a report about people who
21 are in the RTU with a walker, cane, crutches or
22 a wheelchair?
23      A   I don't recall requesting any reports
24 of anyone in the RTU with those devices.

---

Page 16

1       Q   Who is Collin McArdle?
2       A   He's a lieutenant.
3       Q   In what building?
4       A   In the Cook County Sheriff's Office.
5       Q   Is he in the RTU?
6       A   I believe he's currently assigned to
7  the RTU.
8       Q   Who is Roxane, R-o-x-a-n-e,
9  B-o-u-t-t-e?
10      A   Roxane Boutte is a superintendant at
11 the Cook County Sheriff's Office.
12      Q   Of what division?
13      A   For what time period, Patrick?
14      Q   How about right now.
15      A   Division 6.
16      Q   How about in 2011 -- 2021?  Excuse
17 me.
18      A   I don't know where she was in 2021.
19      Q   Has she ever been the superintendent
20 of RTU?
21      A   I think so.
22      Q   Have you ever discussed with either
23 Collin McArdle or Roxane Boutte a list of all
24 inmates who are allowed to keep their devices

---

Page 17

1  on the tier?
2           MR. DEVORE:  Objection as to time --
3  or vague as to time.
4  BY THE WITNESS:
5       A   Possibly.
6  BY MR. MORRISSEY:
7       Q   What do you remember about that?
8       A   I don't know.  Is there a document
9  you would like to show me to refresh my
10 recollection?  I send a lot of e-mails to those
11 people.
12      Q   Why would you send a lot of e-mails
13 to those people?
14      A   Because they're my coworkers.
15      Q   All right.  I'll show you Exhibit 25,
16 which is an e-mail from you titled:  Mobility
17 Aid List that was sent on May 7th, 2021.
18          Ms. Rivero-Canchola, do you see the
19 e-mail that you wrote on May 7th, 2021, the
20 first half of the first page that the top of
21 the page says:  Mobility aid list?
22      A   I do see an e-mail that appears to be
23 from me in May of 2021, yes.
24      Q   Does this refresh your memory about

---

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

6 (Pages 18 to 21)

---

Page 18

1 talking to either of those individuals about a
2 list of inmates who are allowed to keep their
3 devices on the tier?
4     **A    About talking to them, no, but it**
5 **does appear to display that I've sent an e-mail**
6 **to them entitled Mobility Aid List regarding a**
7 **list of inmates who are allowed to keep devices**
8 **on their tier.**
9     Q    What is a mobility aid list?
10     **A    It's the list that appears on the**
11 **screen that you're showing me.**
12     Q    And how did you obtain this list?
13     **A    This is a generated report from**
14 **CCOMS.**
15     Q    Who generated this report?
16     **A    I don't recall.**
17     Q    Can you generate a report like this
18 from CCOMS?
19         MR. DEVORE:  Objection, asked and
20 answered.
21 BY THE WITNESS:
22     **A    I don't recall.**
23 BY MR. MORRISSEY:
24     Q    Anything refresh your memory whether

---

Page 19

1 you have the ability to generate a report from
2 CCOMS listing people who have a cane, crutch,
3 wheelchair or walker?
4     **A    I think, as we've already covered,**
5 **this e-mail lists those individuals.  So at**
6 **that time, yes, I was able to provide that**
7 **list.**
8     Q    Can you presently generate this type
9 of list for people in the RTU?
10     **A    I'm not sure.  I haven't tried.**
11     Q    On the first page of this list, it
12 has Eugene Westmoreland, and it has wheelchair
13 and there is an entry below and it says:  Walker.
14         Do you see that, Ms. Rivero-Canchola?
15     **A    I do see that.**
16     Q    Can you explain to me why there would
17 be two devices listed for Mr. Westmoreland?
18     **A    I cannot.**
19     Q    Does this list that I'm showing you,
20 does it identify people who are wheelchair long
21 distance only?
22     **A    This partial list that you're showing**
23 **me on the screen, this one page, I don't see**
24 **anyone that says wheelchair long distance only**

---

Page 20

1 on this one page.
2     Q    Have you ever generated a report from
3 CCOMS identifying people who are wheelchair
4 long distance only?
5     **A    I may have at some point.  I don't**
6 **recall.**
7     Q    And why would you have generated a
8 wheelchair long distance only report from
9 CCOMS?
10     **A    Well, if I don't recall if I did that**
11 **or not, then I would not be able to recall the**
12 **reason I would do that.**
13     Q    And how can you generate a list of
14 wheelchair long distance only alerts using
15 CCOMS?
16     **A    I think your question answered the**
17 **question.  You would generate it through CCOMS.**
18 **It's a computer-aided program that generates**
19 **reports.**
20     Q    I'm going to stop sharing my screen.
21 When a wheelchair user enters the jail, do you
22 meet with that detainee?
23     **A    Usually, depending on the time**
24 **period.**

---

Page 21

1     Q    What do you mean?
2     **A    Meaning during COVID, we tried to not**
3 **have unnecessary interactions to prevent the**
4 **spread of COVID-19.**
5     Q    How about now, do you meet with the
6 person?
7     **A    I do.**
8     Q    How soon after the person is admitted
9 to the jail do you generally meet with the
10 detainee?
11     **A    It depends on when they're admitted.**
12     Q    Why does that matter?
13     **A    Because if they're admitted on a day**
14 **where I may not be here or on a weekend when I**
15 **may not be here, then that time period would**
16 **vary on when they're -- if they're admitted on**
17 **a Monday and I'm at work or present the next**
18 **day, which is Tuesday.**
19     Q    Is it your practice to meet with new
20 inmates who use wheelchairs within the first
21 week of their admission?
22     **A    Usually, yes.**
23     Q    When you meet with these people, do
24 you generate any notes?

---

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

7 (Pages 22 to 25)

---

Page 22

1    A   No.
2    Q   Do you keep a folder for the people
3   who use wheelchairs that are incarcerated at
4   the Cook County Jail?
5    A   No.
6    Q   Why not?
7    A   Why would I have to?  That's not
8   something that I do in the scope of my
9   employment.
10    Q   Have you ever heard of the term ADA
11   accommodation plan?
12       THE REPORTER:  I'm sorry, Pat.  ADA
13   what?
14       MR. MORRISSEY:  ADA accommodation
15   plan.
16   BY THE WITNESS:
17    A   Yes.  I've heard of that term.
18   BY MR. MORRISSEY:
19    Q   What is your understanding of the ADA
20   accommodation plan at the Cook County
21   Department of Corrections?
22    A   I don't understand your question.
23    Q   What is your understanding of the ADA
24   accommodation plan?

---

Page 23

1       MR. DEVORE:  Objection is form.  It's
2   unclear what time frame.
3   BY THE WITNESS:
4    A   Yeah, I don't understand what you're
5   asking.  The phrase ADA accommodation plan can
6   vary depending on the context in which it's
7   used.
8   BY MR. MORRISSEY:
9    Q   As the ADA compliance officer, do you
10   serve as a liaison between disabled individuals
11   and the special needs committee?
12    A   The special needs committee?
13    Q   Right.
14    A   I don't know what that is.
15    Q   As the ADA compliance officer, do you
16   serve as a liaison between a disabled
17   individual and Capital Planning?
18    A   I'm not sure what you mean by
19   "liaison" in that context.  Disabled inmates
20   have no role when it comes to Capital Planning.
21   Capital Planning has no role when it comes to
22   disabled inmates within the Department of
23   Corrections.
24    Q   As the ADA compliance officer, do you

---

Page 24

1   serve as a liaison between a disabled
2   individual and the Cook County Department of
3   Corrections?
4       MR. DEVORE:  Objection, form and all
5   the prior objections that were just noted.
6   BY THE WITNESS:
7    A   Okay.  I don't understand what you
8   mean by liaison.  But my job as ADA compliance
9   officer is to work with all the branches of
10   Cook County and making sure that we are
11   complying with the needs of the disabled
12   population within our custody.
13   BY MR. MORRISSEY:
14    Q   Do you train newly hired correctional
15   officers or probationary officers?
16    A   I train newly hired correctional
17   officers, yes.
18       MR. DEVORE:  And just to be clear, we
19   are talking about right now or at any time,
20   Pat?
21   BY MR. MORRISSEY:
22    Q   Right now, right?  Is that what you
23   do, Ms. Rivero-Canchola?
24    A   Yes.

---

Page 25

1    Q   And you have done that since 2015?
2    A   Yes.
3    Q   And you provide -- walk me through
4   the training you provide to the newly hired
5   correctional officers?
6    A   Well, I think training was tendered
7   in this case, but I have a PowerPoint training
8   that I display on the screen while I provide
9   supplemental information to what's on the
10   screen to the class that's before me.
11    Q   Do you provide handouts to the people
12   who are taking your class?
13    A   No.
14    Q   When was the last time you updated
15   that PowerPoint?
16    A   I don't know.
17    Q   Have you updated it since 2015?
18    A   It's been updated since 2015.
19    Q   How many times?
20    A   More than once.
21    Q   What parts of your PowerPoint have
22   you updated?
23    A   I don't recall the specific portions
24   that were updated and when they were updated.

SABRINA RIVERO-CANCHOLA
December 20, 2023

8 (Pages 26 to 29)

Page 26

1    Q   At the end of your PowerPoint, do you
2  still have a -- do you still -- do you have
3  questions to the participants?
4    A   Give questions to participants?  Like
5  do I ask them quiz questions that are at the
6  end of the PowerPoint that you have in this
7  case?
8    Q   Correct.
9    A   Yes, I do.
10   Q   And the PowerPoint that's been
11  produced in this case, is that your current
12  PowerPoint?
13   A   I don't know which version was
14  produced in this case, so I don't know.
15       MR. DEVORE:  Perhaps you could show
16       it to her if you want her to confirm and
17       she can address it.
18  BY MR. MORRISSEY:
19   Q   I can show Exhibit 37 is your
20  PowerPoint.  Ms. Rivero-Canchola, do you see
21  Exhibit 37 it says:  Americans with
22  Disabilities Act?
23   A   I see the first page.
24   Q   Is this the first page of your

Page 27

1  current PowerPoint?
2    A   I believe so but I'm not entirely
3  sure.
4    Q   Second one says your name and your
5  title and your e-mail address.  Is this the
6  second page of your current PowerPoint?
7    A   That's my name, my title and the CCSO
8  general ADA e-mail address in the past, not the
9  current one.
10   Q   So in looking at Exhibit 37, would
11  you agree that this is a prior version of your
12  PowerPoint?
13   A   You mean looking at Page 1 and 2 that
14  you showed me?
15   Q   Right.
16   A   I would say Page 1 and 2 looks like a
17  prior version, yes.
18   Q   Do you have access to your present
19  version?
20   A   Do I have access to my present what?
21   Q   Version of the PowerPoint?
22   A   I do.
23   Q   I'm going to stop sharing.  Can you
24  tell me why only one hour of ADA training is

Page 28

1  provided to newly hired correctional officers?
2       MR. DEVORE:  Objection, assumes facts
3       not in evidence.
4  BY THE WITNESS:
5    A   Your question assumes only an hour is
6  provided, and I cannot tell you why the hour
7  that you believe is provided would only be
8  provided, no.
9  BY MR. MORRISSEY:
10   Q   Well, how many hours of ADA training
11  are provided to newly hired correctional
12  officers?
13   A   It depends on what type of training
14  you're talking about.
15   Q   Tell me the types of training you're
16  aware of.
17   A   I'm aware of the in-person training
18  that they receive, which is two hours, not one
19  hour.  They also receive online learning
20  management training on the ADA.  I don't know
21  how long that takes.  I think it's based on the
22  individual that's taking it.
23   Q   And what is that online version
24  called?

Page 29

1    A   I don't know what it's called.  It's
2  just an ADA training.
3    Q   And how do you access that ADA
4  training?
5    A   It's in the online learning
6  management system that we have.
7    Q   Did you create that online learning
8  management training?
9    A   I helped to create it with the
10  research and training department, yes.
11   Q   Are there videos on that online
12  learning training?
13   A   Are there videos?  I don't believe
14  so, no.
15   Q   Are there handouts associated with
16  the online learning training?
17   A   I don't understand your question.
18  How can an online learning training give you a
19  handout?
20   Q   Well, is there information a
21  participate can download regarding the online
22  training?
23   A   I don't know.
24   Q   Are staff required to take the online

SABRINA RIVERO-CANCHOLA
December 20, 2023

9 (Pages 30 to 33)

Page 30

1   learning training relating to ADA every year?
2       **A   They are required to take it.  I**
3   **don't know how often.**
4       Q   Has the online learning training been
5   updated over the last three years?
6       **A   It may have.  I don't know.**
7       Q   What does the online learning
8   training discuss regarding moving inmates up
9   and down ramps?
10      **A   The online learning management**
11  **training reflects the similar content that is**
12  **provided in my classroom training.**
13      Q   All right.  Provide that training.
14  Tell me what the training says regarding moving
15  detainees and wheelchairs up and down ramps.
16      **A   Well, I don't have it before me, so I**
17  **can't give it to you word for word, Patrick,**
18  **but it's in accordance with our policy and,**
19  **again, with the training that we give our**
20  **correctional officers in person.**
21      Q   Can you explain the training you give
22  regarding moving mobility-impaired inmates up
23  and down ramps?
24      **A   I can give you a general overview,**

Page 31

1   **not a word for word what's in the training, no.**
2       Q   Please provide your general overview?
3       **A   The general overview is that we**
4   **assist inmates that are in wheelchairs to**
5   **overcome any structural barriers that are in**
6   **our facility.**
7           THE WITNESS:  Jason, can I take a
8   second just to tell these people in the
9   hall they're being too loud?
10          MR. DEVORE:  Yes.  Perhaps we can
11  take a, yeah, two-minute break.
12          THE WITNESS:  I don't even need two
13  minutes.  I just need to tell them to quiet
14  down and I will leave my mic on, but
15  they're too loud.
16          MR. DEVORE:  Okay.
17          THE WITNESS:  Okay.  Sorry.
18  BY MR. MORRISSEY:
19      Q   Why do you -- why does the Sheriff's
20  Office train staff to help wheelchair users to
21  overcome structural barriers?
22      **A   Because that's the heart of the ADA**
23  **is to assist people with disabilities.**
24      Q   But I want to focus on structural

Page 32

1   barriers, Ms. Rivero-Canchola.
2       **A   Okay.**
3       Q   What is your understanding of a
4   structural barrier?
5       **A   I think that's context specific,**
6   **right?  It would depend on the situation.**
7       Q   Have you ever given examples to staff
8   about structural barriers where staff members
9   should assist a wheelchair user to overcome
10  them?
11      **A   Yeah, I probably have.**
12      Q   Can you give me the context to the
13  training you provided regarding this issue?
14      **A   You mean like generally because I**
15  **can't give you a word-for-word training that I**
16  **have provided in the past.**
17      Q   Sure.  That's fine.
18      **A   Okay.  Well, as I already stated, the**
19  **general training that I give is that it's the**
20  **policy of the Sheriff's Office to assist**
21  **disabled inmates to overcome any barriers**
22  **including those structurally, and those**
23  **barriers could vary from one situation to the**
24  **next.**

Page 33

1       Q   To your knowledge, are there any
2   structural barriers pertaining to ramps at the
3   Cook County Jail?
4       **A   It depends on what you mean by that.**
5       Q   Well, have you ever given training to
6   staff about which ramps at the Cook County Jail
7   present a structural barrier that they must
8   help a wheelchair user overcome?
9       **A   My training doesn't focus on**
10  **individual ramps, no.**
11      Q   Why not?
12      **A   Because as I already stated, my**
13  **training focuses on the general idea which is**
14  **that we comply with the ADA by assisting**
15  **disabled inmates that are in our custody to**
16  **overcome any barriers, including structural**
17  **ones.  I don't focus on specific areas of**
18  **buildings.**
19      Q   Do you provide training to the staff
20  how to assist people with canes to move up and
21  down ramps?
22      **A   I don't understand your question.**
23      Q   Does your training that you train
24  people on -- strike that.

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

---

Page 34

1      Does your training discuss helping
2  people who use a cane, crutch or walker move up
3  or down ramps?
4      A   I mean, you have my training,
5  Patrick.  So I'm not sure if it mentions
6  specifically cane, crutch, walker, people
7  moving up and down ramps.  I don't know if it
8  contains that language.
9      Q   Tell me how you would expect
10  Sheriff's employees to help somebody with a
11  cane, crutch or walker overcome structural
12  barriers that are presented by a ramp at the
13  Cook County Jail?
14      MR. DEVORE:  Objection, vague as to
15      what and where the ramp is.
16  BY THE WITNESS:
17      A   Yeah, I'm not sure I understand your
18  question.  Like I already stated, it's context
19  specific, right?  So you're providing me with
20  an incomplete hypothetical that I can't answer.
21  BY MR. MORRISSEY:
22      Q   Well, can you tell me how it's
23  context specific?
24      A   Well, it would depend on that

---

Page 35

1  person's abilities, the possible device that
2  they may have, the situation that they're in,
3  the structure that they're encountering, the
4  staff members that are present at the time.
5  All of the factors would be relevant.
6      Q   Do you keep a list of people who are
7  moved from the Cook County Jail that go to
8  court?
9      A   Do I keep a list of people that are
10  moved from Cook County Jail to court, no.
11      Q   Do you send e-mails on a daily basis
12  when a disabled person has a regularly
13  scheduled court appearance?
14      A   Not generally anymore, no.
15      Q   Did you used to?
16      A   I used to sometime ago, yes.
17      Q   And why did you used to keep that
18  list sometime ago?
19      A   I think you just changed the context
20  of your question.  You asked me if I used to
21  send an e-mail regarding inmates that go to
22  court and if I keep a list.  I used to send
23  e-mails, notifications to court, when certain
24  people would come over, yes.

---

Page 36

1      Q   And why did you stop doing that?
2      A   Because the nature of how they have
3  court here at Cook County has changed.
4      Q   And how has it changed?
5      A   Most inmates appear on Zoom.
6      Q   Do some disabled inmates attend court
7  in person to your knowledge?
8      A   I don't know what -- how you're
9  defining disabled in this context, but we do
10  have inmates with disabilities that attend
11  court at Cook County, yes.
12      Q   And if a detainee with a mobility
13  disability attends court, is staff at the Cook
14  County Department of Corrections notified that
15  they need to accommodate the person when they
16  attend court?
17      A   I don't understand your question.
18      MR. DEVORE:  Objection as to -- yeah,
19      objection as to form.  It's unclear if
20      you're talking about all detainees or just
21      disability -- detainees with certain
22      disability.
23  BY MR. MORRISSEY:
24      Q   In preparation for your deposition,

---

Page 37

1  Ms. Rivero-Canchola, did you see an e-mail that
2  you sent out a few years ago identifying some
3  mobility-impaired detainees were going to
4  attend court on a certain day?
5      A   No, I don't believe in preparation
6  for my deposition we reviewed any e-mails about
7  people going to court.
8      Q   Did you used to keep -- send e-mails
9  called an ADA movement list for each weekday?
10      A   Did I title any e-mails ADA movement
11  list?
12      Q   Right.
13      A   I don't think I did, no, not that I
14  recall.
15      Q   Did you ever receive e-mails titled
16  ADA movement list by staff?
17      A   I mean, in nine and a half years,
18  maybe. I don't know.  Is there something that
19  you would like to show me, Patrick, that you
20  would like me to look at?
21      Q   So prior to COVID, there used to be
22  e-mails identifying wheelchair users who were
23  attending court at Leighton; is that fair to
24  say?

---

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

11 (Pages 38 to 41)

Page 38

1    A   Prior to COVID, there used to be
2  e-mails regarding inmates in wheelchairs that
3  attended multiple courthouses, not just
4  Leighton.
5    Q   And presently, that doesn't happen
6  because most people attend court on Zoom; is
7  that fair to say?
8    A   Presently, I do not notify them by
9  e-mail that they are coming, yes.
10   Q   Why don't you do it presently?
11   A   I thought I already answered that
12 question.
13        MR. DEVORE:  Yeah.
14 BY THE WITNESS:
15   A   And the answer was the nature of how
16 inmates attend court has changed since COVID.
17 BY MR. MORRISSEY:
18   Q   Prior to COVID, did you notify Cook
19 County Department of Corrections staff that a
20 wheelchair user was going to attend Cermak, a
21 medical appointment at Cermak on a specific
22 date?
23   A   Can you rephrase that question?
24   Q   Prior to COVID, did you ever send a

Page 39

1  notification to staff members that a wheelchair
2  user would have an appointment at Cermak on a
3  specific date?
4    A   Not that I recall, no.
5    Q   Why before COVID would you send an
6  e-mail notifying a wheelchair user had court on
7  a specific day, but you wouldn't identify the
8  wheelchair user had a medical appointment at
9  Cermak?
10   A   I'm going to do my best to answer
11 this paragraph of text that you just spit out
12 at me, Patrick.
13       I think as you're aware, in the past,
14 we used to send notifications to court services
15 about wheelchair detainees that were coming
16 into their custody to put them on notice in
17 case those detainees may need an accommodation
18 while they're in their facility.
19   Q   Now, have you requested Capital
20 Planning to conduct an ADA assessment into the
21 Cook County Department of Corrections?
22   A   I believe I did.
23   Q   And when did you do that?
24   A   I believe the date is on that

Page 40

1  document that you showed us a part of.
2    Q   And why did you request Capital
3  Planning to conduct an ADA assessment of the
4  entire Cook County Jail campus?
5    A   Why did I request that?  Because I
6  wanted them to conduct an ADA assessment of the
7  entire campus.
8    Q   Is there a reason why you made that
9  request?
10   A   Yes, because I wanted them to conduct
11 an assessment of the entire campus.  I don't
12 understand your question.
13   Q   And does that include ramps in the
14 RTU?
15   A   It includes the entire campus, as you
16 stated.
17   Q   Why did you ask them to conduct an
18 assessment of the RTU ramps?
19       MR. DEVORE:  Objection, asked and
20       answered and objection as to form and
21       assuming facts not in evidence.
22 BY THE WITNESS:
23   A   Yeah, as I already stated, I asked
24 them to conduct that assessment because I

Page 41

1  wanted them to conduct an assessment of the
2  entire campus, not any specific feature of any
3  specific building but the entire campus.
4    Q   And, to your knowledge, have
5  architects reviewed or assessed any parts of
6  the jail campus based on your request?
7    A   To my knowledge, that process is
8  ongoing.
9    Q   Can you tell me your understanding of
10 the process and how it's ongoing?
11   A   My understanding is that Capital
12 Planning has begun the process of undergoing an
13 assessment of the entire campus.
14   Q   And to your knowledge, have any parts
15 of the campus been reviewed by an architect?
16   A   I don't know what you mean by
17 reviewed by an architect.
18   Q   Well, over the last six months or a
19 year, have any architects come to the Cook
20 County Jail campus to conduct ADA assessments?
21   A   Yes.  Some have come to the Cook
22 County Jail campus for various reasons, yes.
23   Q   Who has come to the Cook County Jail?
24   A   I don't know all of who has come to

SABRINA RIVERO-CANCHOLA
December 20, 2023

12 (Pages 42 to 45)

Page 42

1  the Cook County Jail, Patrick. I know that
2  Globetrotters has been at the Cook County Jail
3  at various states. I'm sure other contractors
4  have been here. It's a big place. We have a
5  lot of work.
6      Q   What parts of the jail have these
7  architects reviewed to your knowledge?
8      A   I don't know all the parts of the
9  jail the architects have reviewed.
10     Q   Do you know any of the parts?
11     A   Well, I do know that I requested all
12 of the campus to be reviewed. So like I said,
13 that process is ongoing.
14     Q   The question is do you have any
15 personal knowledge whether architects have
16 reviewed any parts of the Cook County Jail?
17         MR. DEVORE: Objection as to form.
18     Review versus inspect, I just want to make
19     a clear line of demarcation.
20 BY THE WITNESS:
21     A   Yeah, I'm not sure what you mean by
22 reviewed, and I'm not sure what the process is
23 when architects are conducting an ADA
24 assessment. I know that, as I have already

Page 43

1  stated, architects have visited the Cook County
2  Jail campus. What they have done during their
3  time here, I don't know the specific details,
4  no.
5      Q   Well, how do you know Globetrotters
6  has come to the Cook County Jail?
7      A   Because I have been present when they
8  have visited.
9      Q   And when did they visit?
10     A   Various dates on -- during this year.
11 I'm not sure of the specific dates.
12     Q   And were you present on multiple
13 times when Globetrotters was at the Cook County
14 Jail?
15     A   I was present for part of it, yes.
16     Q   And what part were you present for?
17     A   I was present for their escort
18 through parts of Cermak.
19     Q   And what parts of the Cook County
20 Jail did Globetrotters spend time looking at?
21     A   I just stated I was present for their
22 visit to Cermak.
23     Q   And what did they do at Cermak?
24     A   An assessment, like what they were

Page 44

1  hired to do.
2      Q   Was Globetrotters just hired to look
3  at Cermak?
4      A   I don't know. I don't know what the
5  terms of their contract -- their employment
6  contract is. I don't know.
7      Q   And how many people from
8  Globetrotters were present when you escorted
9  them to Cermak?
10     A   That number varied.
11     Q   Based on what?
12     A   Based on the day that they visited.
13     Q   Why did they come to Cermak on more
14 than one occasion to your knowledge?
15     A   Because they requested to.
16     Q   Did they tell you why they wanted to
17 come to Cermak more than one time?
18     A   I didn't ask them why they needed to
19 come more than once, so no.
20     Q   When they came, did they bring tools
21 to measure the ramp?
22     A   I mean, yeah, they had some tools
23 with them, yes.
24     Q   And what did they have?

Page 45

1      A   I don't know. I didn't ask them what
2  their tools are or what their specific purpose
3  was.
4      Q   Did they have to have permission from
5  the DOC to bring these tools into Cermak?
6      A   They get permission through Capital
7  Planning.
8      Q   And does Capital Planning have to ask
9  the Sheriff's Office for permission for them to
10 bring this equipment in?
11     A   I don't know Capital Planning's
12 process for obtaining access letters, so I
13 don't know.
14     Q   Was anyone from Capital Planning
15 present when you escorted Globetrotters to the
16 Cermak ramp?
17     A   Your question just assumed that I
18 escorted Globetrotters to the Cermak ramp. We
19 haven't discussed that.
20     Q   Where did you escort Globetrotters?
21     A   As I already stated, I was present
22 when they inspected Cermak.
23     Q   And where in Cermak did they inspect?
24     A   The entire building.

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 46

1  Q   And does that include the Cermak
2  ramp?
3      A   It includes the entire building.  So,
4  yes, it would include the ramp.
5      Q   And when they measured the ramp, did
6  they have a laser?
7      A   Are you assuming that they measured
8  the ramp because I didn't say that.
9      Q   Did they measure the ramp?
10     A   They inspected the ramp.
11     Q   Tell me how they inspected the ramp
12 based on your observation?
13     A   My job was to provide escort, not to
14 take notes or question what they were doing.
15 So I was just present while they were there
16 looking at the ramp.  So you would have to ask
17 them.  I don't know.
18     Q   Did they make any statements to you
19 regarding the handrails on that ramp?
20     A   They did not.
21     Q   Did they make any statements to you
22 about the rise of the ramp?
23     A   They did not.
24     Q   Did you review -- strike that.

Page 47

1      Did Globetrotters prepare a report
2  based on their inspection of Cermak to your
3  knowledge?
4      A   I haven't seen a report from
5  Globetrotters, so I don't know.
6      Q   When Globetrotters was present, did
7  you ask them to look at the RTU ramps?
8      A   No.
9      Q   Why not?
10     A   Because that's not my job.
11     Q   Whose job is it to ask an architect
12 to look at the RTU ramps?
13     A   Capital Planning's.
14     Q   And who from Capital Planning?
15     A   Well, they have an organization and
16 it probably depends on what project director is
17 assigned to what building, so I wouldn't know
18 whose responsibility it would be to direct
19 Globetrotters to assess a certain building.  I
20 don't work for them.
21     Q   Have you asked Capital Planning to
22 conduct an assessment of these RTU ramps?
23     A   For the third or fourth time now,
24 Patrick, I have said that I, as you've showed

Page 48

1  that document on the screen, requested an ADA
2  assessment of the Cook County Department of
3  Corrections campus.  So that would include all
4  of the buildings that are on the Cook County
5  Department of Corrections campus.
6          (WHEREUPON, Mr. Morrissey
7          experienced technical
8          difficulties.)
9      MR. DEVORE:  Pat, are you having some
10 technical difficulties over there?
11     THE REPORTER:  We'll be off the
12 record, right?
13     MR. DEVORE:  Yeah, maybe we should
14 take a -- since there is no question
15 pending, right, we could maybe take a
16 ten-minute break while counsel addresses
17 his computer situation.  It's 10:50, maybe
18 we could take until 11:00?
19     THE REPORTER:  Okay.  That's fine
20 with me.
21         (WHEREUPON, a short
22         break was taken.)
23 BY MR. MORRISSEY:
24     Q   When Globetrotters looked at the

Page 49

1  Cermak ramp, did they ever -- did they tell you
2  that there were any barriers with the ramp?
3      A   No.
4      Q   Did you ever ask them whether they
5  observed any barriers in the RTU -- in the
6  Cermak ramp?  Excuse me.
7      A   No.
8      Q   Why didn't you ask them?
9      A   Because they're not there to answer
10 my questions.  They are there to conduct an
11 assessment for Capital Planning.
12     Q   Did you ask them what the
13 requirements are under the ADA for a ramp?
14     A   No.
15     Q   Did you ask them whether a ramp needs
16 handrails?
17     A   Let's just, like, put this whole line
18 of questioning to bed.  So I can tell you,
19 Patrick, I didn't ask them anything.
20     Q   Who from Capital Planning is in
21 charge of having the RTU ramps be assessed by
22 architects for ADA compliance to your
23 knowledge?
24     MR. DEVORE:  Objection, asked and

SABRINA RIVERO-CANCHOLA
December 20, 2023

---

Page 50

1   answered.
2   BY THE WITNESS:
3      A  I think you already asked me a
4   similar question.  I don't know the individual
5   job responsibilities of the Capital Planning
6   members.  So you would have to ask them.
7   BY MR. MORRISSEY:
8      Q  Do you have any people from Capital
9   Planning that you are in contact with regarding
10  barriers at the Cook County Jail?
11     A  That I'm in contact with?  I mean, I
12  don't know what you mean by that, but I attend
13  meetings with various capital planning members
14  about various things.
15     Q  Does Eric Davis attend those
16  meetings?
17     A  Sometimes.
18     Q  Who else attends those meetings from
19  Capital Planning?
20     A  Whoever is designated to attend on
21  that day.  I don't know.
22     Q  Other than Eric Davis, do you know
23  anybody else from Capital Planning who have
24  attended the meetings?

---

Page 51

1      A  It would depend on the day but, yeah,
2  there's different members.  I don't keep a
3  list.
4     Q  Can you tell me any of the people
5  that you recall ever attending a meeting from
6  Capital Planning?
7     A  I think there is someone named Dave.
8  I think there's a woman named Kate.  I don't
9  know their roles but there's various people.  I
10  don't take attendance.
11     Q  Have you assessed the RTU ramps to
12  see whether they comply with the ADA?
13     A  No.
14     Q  What year was the RTU constructed?
15     A  I don't specifically recall, but I
16  think sometime around 2013 it was finalized.
17     MR. DEVORE:  Patrick, I'm sorry.
18  Just to be clear, you said "you," meaning
19  Sabrina individually, correct, in terms of
20  assessment?
21     MR. MORRISSEY:  Right, right.
22     MR. DEVORE:  Okay.
23  BY MR. MORRISSEY:
24     Q  So how many ramps are there in the

---

Page 52

1   lower level of the RTU?
2      A  The RTU doesn't have any ramps.
3     Q  What do they have?
4     A  I mean, they have floors.  The RTU
5  has floors and tiers and living units and
6  offices.  I mean, it's a building.
7     Q  How do you get from the RTU to Cermak
8  using the underground tunnel system?
9     A  You just answered your own question.
10  You could use the underground tunnel system or
11  you could walk outside.
12     Q  And if you were going to use the
13  underground tunnel system, tell me which way
14  you would walk to get to Cermak?
15     A  It depends on which way I wanted to
16  walk.  I mean, there's various ways you could
17  go.
18     Q  Tell me the different ways you could
19  go.
20     A  Through different tunnels.
21     Q  Is there one tunnel on the north side
22  of the RTU?
23     A  I'm not good with directions, but
24  there's multiple tunnels and none of them lead

---

Page 53

1   from the RTU.  I want to clarify because I
2  already said that there's no tunnels in the
3  RTU, but you keep insisting that there are.
4  The RTU is Floors 2 through 5.  So there's no
5  tunnels on Floors 2 through 5.
6     Q  Is there a first floor in that
7  building?
8     A  There's a first floor in the
9  building, yes.
10     Q  How about a ground floor in the
11  building?
12     A  There is a ground floor in the
13  building, yes, but that's not the RTU.
14     Q  What do you call that location?
15     A  Receiving, Trust and Classification.
16     Q  Is there an abbreviation you would
17  use to refer to that area?
18     A  RTC sometimes.
19     Q  And you get from the RTC to Cermak
20  using the underground tunnel system?
21     A  Are you asking me if I can get there
22  using the underground tunnel system?
23     Q  Yes.
24     A  Yes.

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 54

1    Q    And tell me how you're able to do
2    that. Tell me the pathway.
3    A    As I already stated, it would depend
4    on which tunnel I chose to use on that day.
5    Q    How many tunnel options would you
6    have?
7    A    Probably at least two. It depends.
8    Q    What does it depend on?
9    A    Again, it depends on what tunnel I'm
10   using that day.
11   Q    When inmates are moved from the RTC
12   to Cermak, do you know which tunnel route is
13   generally used?
14   A    I don't know which one is generally
15   used. They could use any of them.
16   Q    Have you given any training to staff
17   about moving inmates from the RTC to Cermak and
18   which tunnel route to use?
19   A    No, I don't give any training to tell
20   the staff which tunnel to use, no.
21   Q    Why not?
22   A    Because that's not my role.
23   Q    Does one tunnel have an incline
24   that's steeper than the other if you are going

Page 55

1    from the RTC to Cermak?
2    A    I don't know. I've never measured
3    them.
4    Q    Why haven't you measured the tunnel
5    inclines in the RTC?
6    A    Because that's not my role.
7    Q    Whose role is it?
8    A    I don't know. I guess it depends on
9    the purpose for which they're being measured.
10   Q    Have you ever received an e-mail or
11   wrote an e-mail suggesting that they should
12   measure one of the tunnels from the RTC to
13   Cermak?
14   A    Have I ever written an e-mail
15   suggesting someone measure a tunnel?
16   Q    Right.
17   A    Not that I recall. No, I have never
18   suggested somebody do that that I recall.
19   Q    Now, in the Cermak ramp, are there
20   signs to tell detainees not to move up or down
21   the ramp without an escort?
22   A    On the Cermak ramp?
23   Q    Right.
24   A    Which ramp are you referring to?

Page 56

1    Q    I'm talking about the Cermak ramp.
2    A    And I'm asking you which ramp you're
3    referring to.
4    Q    How many ramps are there in Cermak?
5    A    I guess it depends on how you define
6    ramp. Is there a specific location that you're
7    asking me about?
8    Q    Sure. The ramp to get from Cermak to
9    the RTU?
10   A    There is no ramp from Cermak to RTU
11   as I already said. There's no ramps in RTU.
12   Q    Isn't there are ramp in the lower
13   level of Cermak that leads from the basement of
14   Cermak to the RTU?
15   A    There's a ramp in the basement of
16   Cermak that leads to a tunnel corridor that
17   connects to multiple divisions. As I
18   previously stated, RTU is Levels 2 through 5.
19   There's no ramp that goes from the basement of
20   Cermak to the second floor, third floor or
21   fifth floor of RTU.
22   Q    So I'm talking about the Cermak ramp
23   leading to the tunnels in the Cook County Jail.
24   Are there signs on that ramp that tell

Page 57

1    detainees not to move up or down without an
2    officer escort?
3    A    I don't recall if there's signs that
4    say don't move up or down without an escort.
5    There may be.
6    Q    Is there a wheelchair located at the
7    Cermak ramp for inmates with mobility
8    limitations to request to use a wheelchair to
9    go up or down the Cermak ramp?
10   A    I don't understand your question.
11   Q    Right. So the Cermak ramp, is there
12   a wheelchair available for an inmate with a
13   mobility impairment to request to use the
14   wheelchair to go up or down the Cermak ramp?
15   A    Your question is really confusing.
16   Are you asking if there's wheelchairs available
17   for inmates who need them to go up or down the
18   Cermak ramp? Is that what you're asking?
19   Q    Right.
20   A    So if an inmate has an order for a
21   wheelchair and they need to use it, yeah,
22   there's wheelchairs that are provided by Cermak
23   to go anywhere that they need, yeah.
24   Q    What about for an inmate who uses a

SABRINA RIVERO-CANCHOLA
December 20, 2023

16 (Pages 58 to 61)

Page 58

1  cane, crutch or walker, are there wheelchairs
2  for that inmate to use to go up or down the
3  Cermak ramp?
4      A   Is this a hypothetical?  I mean,
5  there could be, right, hypothetically speaking
6  because you're not speaking about any specific
7  incident, right?
8      Q   Well, my question is, is there a
9  policy or procedure that you're aware of that
10  there's always a wheelchair available at the
11  Cermak ramp for an inmate with a cane, crutch
12  or walker to use to go up or down that ramp?
13      A   Okay.  As I already stated,
14  wheelchairs are available for inmates in our
15  custody depending on the Cermak order and the
16  needs of that situation.  It's very context
17  specific, and you're asking a very vague,
18  incomplete hypothetical.  So I'm not sure how
19  to answer it, but we have wheelchairs here to
20  assist detainees.
21      Q   Are there wheelchairs specifically at
22  the Cermak ramp for an inmate who uses a cane,
23  crutch or walker to go up or down that ramp?
24      A   I don't know how to answer your

Page 59

1  question any better than I already did.
2  There's wheelchairs available at the Department
3  of Corrections.  Is there a wheelchair sitting
4  there?  Is that what you're asking, that's just
5  sitting there waiting for someone that might
6  need it?
7      Q   Right.
8      A   No.  There's not a random wheelchair
9  just sitting on a ramp in a Department of
10  Corrections, no.  Wheelchairs are assigned to
11  inmates and given to them when needed, not just
12  laying around the Department of Corrections.
13      Q   What about for the RTU or the incline
14  in the RTC, are there wheelchairs at those
15  inclines that inmates can use, request to use,
16  to go up or down those inclines that have an
17  order for a cane, crutch or walker?
18      A   I don't understand your question.
19      Q   My question relates to the two
20  inclines in the RTC that lead to the tunnels.
21  Are there wheelchairs that are positioned in
22  close proximity to those inclines where an
23  inmate with a cane, crutch or walker alert can
24  request staff to be -- to use -- can request

Page 60

1  staff to place them in a wheelchair to go up or
2  down the inclines?
3      A   I'm lost.
4          MR. DEVORE:  Objection to form.  It's
5      very confusing.
6  BY MR. MORRISSEY:
7      Q   Are there wheelchairs that are
8  stationed by the inclines in the RTC tunnel
9  system?
10      A   I mean, your question assumes that
11  there's inclines, and I don't know how you
12  define that but, again, we don't have
13  wheelchairs just laying around in random areas
14  in this facility.  It's a correctional
15  facility.
16      Q   Are there notices by the inclines in
17  the RTC that an inmate should not go up or down
18  the incline without an officer escort?
19      A   I mean, again, I don't know where
20  you're referring to, but there are notices all
21  around the Department of Corrections regarding
22  various things.
23      Q   I'm talking specifically about the
24  inclines in the RTC tunnel.

Page 61

1      A   Right, but your question is assuming
2  facts that I can't give you.  So, I mean,
3  there's notices all over the facility.
4      Q   And what do the notices say?
5      A   All sorts of things.
6      Q   For example?
7      A   For example, as you're well aware,
8  it's by the Leighton courthouse about going up
9  and down the ramp without assistance.  There's
10  notices to stay off the walls.  There's notices
11  about recording.  There's notices about all
12  types of stuff.
13      Q   Is there a similar notice that's at
14  the Leighton ramp, is that notice positioned by
15  the inclines in the RTU tunnel system?
16      A   I don't understand your question.
17      Q   My question is by the two inclines in
18  the RTC tunnel system, are there notices that
19  are similar to the notices at the Leighton
20  ramp?
21      A   Again, your question assumes that
22  there's two inclines in RTU, which I don't know
23  what you mean by that, but there are several
24  notices all over the facility.  So I don't know

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 62

1  what specifically you're referring to.
2      Q   Have you received grievances from
3  detainees about moving up or down the RTC
4  inclines in the tunnel system?
5      A   I've received various grievances, but
6  I don't know if any of them use the wording
7  that you just gave me.
8      Q   And what grievances have you received
9  regarding the incline at the RTC?
10     A   Again, I don't think I received any
11 grievances regarding any inclines.  I'm using
12 your language.  I don't think that was
13 mentioned on any grievances; but I do receive
14 and have received, the reason that we are here
15 today, Patrick, Eugene Westmoreland wrote
16 grievances about various areas of the tunnels
17 in the Department of Corrections.
18     Q   And after you received his grievances
19 about the inclines in the tunnels, what did you
20 do?
21         MR. DEVORE:  Objection, assumes facts
22     not in evidence.  She just testified that
23     she didn't recall any specific grievance
24     regarding an incline, I believe, other

Page 63

1  than -- yes, go ahead.
2  BY THE WITNESS:
3      A   Yeah, I know there's various
4  grievances, but I don't remember any of them
5  using the language of inclines, but usually my
6  general process when I receive a grievance is
7  to review the grievance, any available evidence
8  which could be video, it could be talking to
9  staff, it could be talking to the inmate and
10 then answer the grievance to my -- best of my
11 abilities.
12     Q   Have you ever done any investigation
13 to see whether the RTU -- RTC inclines are
14 compliant with the ADA?
15     A   No, no.
16     Q   Why not?
17     A   Because that's not my role.
18     Q   Have you ever told -- who -- strike
19 that.
20         Who within the Sheriff's Office is
21 responsible for investigating complaints that
22 ramps or inclines are not compliant with the
23 ADA?
24     A   No one.

Page 64

1      Q   Why not?
2      A   Because the Sheriff's Office doesn't
3  build, alter or construct buildings.
4      Q   And who, to your knowledge, is
5  responsible for investigating complaints that a
6  ramp or an incline is not compliant with the
7  ADA structural standards?
8      A   I don't know that anyone is tasked
9  with that specific job title that you are
10 asking me about; but Capital Planning, as
11 you're aware, is responsible for the buildings
12 that we occupy.
13     Q   Did you preserve any videos of Eugene
14 Westmoreland moving up or down ramps?
15     A   I believe I did.
16     Q   How many?
17     A   I don't recall how many.  At least
18 one.
19     Q   And what ramp did you preserve video
20 of?
21     A   I'm not sure which one.  Possibly
22 Leighton.  Maybe others.  I don't recall.
23     Q   Have you ever spoken to
24 Mr. Westmoreland about his allegation moving up

Page 65

1  and down ramps caused his hands to burn and
2  upper body pain?
3      A   I'm not sure if I asked him about his
4  hands burning or body pain.  But as I
5  previously stated, I, as part of my grievance
6  response, I do speak with the pertinent staff
7  as well as the inmate to -- for my response.
8      Q   Now, in response to one grievance
9  about moving from RTU to court, did you speak
10 with staff about whether or not Eugene
11 Westmoreland was escorted or pushed in his
12 wheelchair?
13     A   I don't know which grievance you're
14 referencing, so.
15     Q   Well, let me ask you a preliminary
16 question.  If a detainee refuses -- strike
17 that.
18         Is it your understanding that staff
19 members must push wheelchair users up and down
20 all ramps?
21     A   All ramps?  I'm not sure that we
22 direct them to push them up and down all ramps,
23 but we do tell them that as part of
24 accommodating an inmate with a disability that

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 66

1  uses a wheelchair, we do assist them by pushing
2  them up and down ramps and through corridors
3  when necessary.
4      Q   And how does an officer know whether
5  it's necessary to push a wheelchair user up and
6  down a ramp or up and down a corridor?
7      A   Well, it's in our policy.
8      Q   And what is your understanding of the
9  policy?
10     A   My understanding of the policy is
11 what I have already told you is that we
12 accommodate inmates with disabilities by
13 assisting them when they're in a wheelchair.
14 That kind of assistance can vary from one
15 situation to the next, but it may include
16 pushing them up and down ramps.  It may include
17 pushing them through corridors.  It may include
18 other things.
19     Q   So based on your understanding of the
20 Sheriff's policy, an officer does not have to
21 push a wheelchair up a ramp?
22     A   They are advised to push them, yes,
23 unless that inmate refuses.  That is the advice
24 that I give them, yes.

Page 67

1      Q   What about corridors, is an officer
2  required to push a detainee in a wheelchair up
3  a corridor?
4      A   Up a corridor?  I'm not sure I
5  understand your question.
6      Q   Well, does a correctional officer, if
7  he's escorting a wheelchair user through a
8  corridor, does the officer have to push the
9  wheelchair user?
10     A   I mean, that's situation specific.  I
11 prefer that they push wheelchairs when able,
12 but sometimes the situation doesn't allow for
13 it or sometimes the inmate refuses.
14     Q   Can you tell me a situation that
15 would not allow an officer to push a wheelchair
16 in a corridor?
17     A   An officer escorting multiple inmates
18 or an officer that is escorting multiple
19 inmates in wheelchairs would not be able to
20 push all of those wheelchairs but, I mean,
21 there are a lot of hypothetical situations
22 where they may not be able to do that.
23     Q   Have you seen a video where an
24 officer escorts two wheelchair users and,

Page 68

1  therefore, an officer can only push one?
2      A   I have, yes.
3      Q   How many different times have you
4  seen that situation?
5      A   I don't know.  I didn't count them
6  but at least once.
7      Q   So how can an officer push two people
8  at one time if they are both in a wheelchair
9  and there is one officer escorting two
10 detainees?
11     A   I don't know.  I never said they
12 could.  Are you asking a question that --
13 whether that's possible, Patrick?  I don't
14 understand your question.
15     Q   Would an officer be violating any
16 rule or regulation to your knowledge if the
17 officer is escorting two wheelchair users in
18 the tunnel system at one time?
19     A   No.
20         MR. DEVORE:  Objection, vague.
21 BY THE WITNESS:
22     A   I don't believe based on that
23 incomplete hypothetical that you gave me that
24 that would be a violation of policy.

Page 69

1  BY MR. MORRISSEY:
2      Q   And why not?
3      A   Because an officer couldn't push more
4  than one wheelchair at a time, could they?  I
5  mean, hypothetically speaking because you're
6  giving me an incomplete hypothetical again.
7      Q   In preparation for this deposition,
8  did you see a wheelchair -- two wheelchair
9  users being escorted by one officer?
10     A   I think we already covered what I saw
11 or reviewed in preparation for this deposition,
12 so no.
13     Q   Have you ever seen somebody use the
14 handrail in the RTC corridor?
15     A   Somebody like a random person or like
16 anybody?  Sure.  Probably.
17     Q   Have you ever seen a wheelchair use
18 the -- strike that.
19         Have you ever seen a wheelchair user
20 use the handrail on the RTC east corridor?
21     A   Not that I recall.  I'm not staring
22 at their hands.  I don't know.
23     Q   How about when you've conducted
24 audits, video audits, have you ever seen any

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

---

Page 70

1  wheelchair user use a handrail in the RTC
2  corridor?
3      **A    Not that I recall.**
4      Q    What is your understanding of the
5  purpose of a handrail for a corridor?
6      **A    Are you speaking generally, Patrick,**
7  **like the general use of handrails in corridors?**
8      Q    Yes.
9      **A    I mean, they are so people can hold**
10 **onto them if needed, right?  That's what a**
11 **handrail is for.**
12     Q    And are detainees allowed to use the
13 handrails in the corridor system at the
14 Department of Corrections?
15     **A    So we don't disallow it.  So, yeah,**
16 **if they need to use the handrail, they can use**
17 **the handrail.  It's there.  It's available.**
18     Q    I'm going to show you Exhibit 17,
19 which is a video.  Give me a second.
20         Ms. Rivero-Canchola, can you see my
21 screen?
22     **A    I can see your screen.**
23     Q    And this is Exhibit 17 that I shared
24 with defense counsel before the deposition.

---

Page 71

1         Do you recognize this location?
2      **A    I do.**
3      Q    And how do you recognize this
4  location?
5      **A    It's one of the tunnels at the**
6  **Department of Corrections.**
7      Q    And where does this tunnel go?
8      **A    This tunnel goes to multiple areas.**
9      Q    Do you see that there's an incline in
10 this video?
11     **A    Are you asking me if you're -- first**
12 **of all, I'm not seeing a video.  I'm seeing a**
13 **screen shot.  Are you asking me if your screen**
14 **shot reflects an incline?  I can't tell from**
15 **this.**
16     Q    Do you see that there are handrails
17 on at least one side of this -- in this tunnel
18 corridor?
19     **A    From this picture, it appears to be a**
20 **handrail, yes, on the left-hand side.**
21     Q    Have you ever walked this corridor?
22     **A    Yes.**
23     Q    And if you go straight and down this
24 incline, where does it lead to?

---

Page 72

1      **A    Are you assuming there's an incline**
2  **there?  I'm not going to assume from this**
3  **picture that that reflects an incline.  But**
4  **this tunnel, depending on which direction you**
5  **walk, could lead to the basement of RTC.**
6      Q    And to go -- to reach the basement of
7  the RTC, do you have to go down this decline?
8         MR. DEVORE:  Objection.  She just
9         testified she didn't know if there's an
10        incline.
11 BY THE WITNESS:
12     **A    To reach the basement of RTC, you**
13 **would have to proceed through this portion of**
14 **the tunnel if you're walking in that direction**
15 **but, yeah, that's not the only direction you**
16 **could go.**
17 BY MR. MORRISSEY:
18     Q    And as you sit here today, you don't
19 know whether this tunnel has a decline?
20     **A    What I'm saying is I don't understand**
21 **how you're defining decline, so I'm not going**
22 **to use that word.**
23     Q    Do you know whether the top of this
24 corridor is higher than the bottom of this

---

Page 73

1  corridor?
2      **A    I've never measured it, Patrick, so I**
3  **don't know.**
4      Q    Well, I'll play this video.  I'm
5  going to stop the video after eight seconds.
6         Do you recognize any of these two
7  detainees in a wheelchair?
8      **A    I mean, this isn't the greatest**
9  **picture but I think so.**
10     Q    Who are they?
11     **A    Well, the one that the officer is**
12 **pushing appears to be possibly Inmate Williams.**
13 **It could be another inmate.  I'm not sure.**
14     Q    How about the inmate on the left?
15     **A    I can only see the back of his head,**
16 **so I don't know.**
17     Q    Do you know the officer?
18     **A    I'm not entirely sure who that is,**
19 **no.**
20     Q    I'll continue playing the video.  I'm
21 going to stop the video.  Do you see one of the
22 inmates being pushed by the officer, and the
23 other inmate does not have an officer escort?
24     **A    I do see that, yes.**

---

SABRINA RIVERO-CANCHOLA
December 20, 2023

20 (Pages 74 to 77)

Page 74

1    Q   Based on your -- strike that.  And
2  this is -- this can happen at the Cook County
3  Jail, one officer can escort two wheelchair
4  users at one time?
5    A   One officer can escort multiple
6  inmates at one time, yes.
7    Q   As you sit here today, do you know
8  whether this officer is required, pursuant to
9  the policy at the Sheriff's Office, to push
10  every wheelchair user up and down this
11  corridor?
12    A   I think I already stated the
13  Sheriff's Office policy is to provide
14  reasonable accommodation to our inmates with
15  disabilities including those in wheelchairs and
16  that's what this video appears to demonstrate.
17  The officer is providing that assistance.
18    Q   To only one of the two wheelchair
19  users, right?
20    A   Based on this video, he's pushing one
21  but we don't know the context of why there is
22  no one pushing the other one, and I'm not going
23  to assume that.
24    Q   If an officer does not push a

Page 75

1  wheelchair user in a corridor, is the officer
2  supposed to document the refusal of assistance?
3    A   It depends on the context.  I mean,
4  you're assuming that there was a refusal here.
5  I don't know the context of this situation.  So
6  I don't know how to answer that.
7    Q   Do you see this inmate in the
8  wheelchair on the left is -- has his hand on
9  the railing?
10    A   From this still shot, it appears
11  that, yeah, his hand is on the railing.
12    Q   And based on this still shot -- and I
13  can continue playing the video.  I'm stopping
14  the video.  Did you see that inmate use the
15  railing while he was moving down this corridor
16  in his wheelchair?
17    A   It looks like he is using the railing
18  from this video, yes.
19    Q   And is it permissible for a
20  wheelchair user like this inmate to use a hand
21  railing?
22    A   I think you already asked me that,
23  and I said the handrails are there for a
24  reason, sure.  So we don't disallow them from

Page 76

1  using them.
2    Q   Have you ever watched video of Eugene
3  Westmoreland walking up this corridor?
4    A   No.
5    Q   I'm going to share my screen again
6  and show you Exhibit 42.
7       Ms. Rivero-Canchola, do you see this
8  is another video of that corridor?
9    A   I mean, this appears to be a
10  different video of possibly the same corridor.
11  I cannot tell from this still shot.
12    Q   Well, do you see the top of it, of
13  this video, says Tunnel-Cam_0.108_CMK_to_RTU_West?
14    A   Yes.  It says that at the top of this
15  still shot.
16    Q   And is that how some of the cameras
17  are labeled at the Cook County Jail?
18    A   Yeah, it could be how they're
19  labeled.  A lot of -- they're labeled a lot of
20  ways.
21    Q   So from looking at this exhibit
22  compared to the prior exhibit, you don't know
23  whether this is the same corridor that we're
24  looking at?

Page 77

1    A   I didn't study the caption on the
2  top, Patrick.  So it appears to be the same
3  corridor, but I'm not sure.
4    Q   Do you want me to flip back to the
5  prior video so you could compare the name of
6  the camera?
7    A   I mean, if it's relevant to your
8  question.  Are you going to ask me a question
9  about this video that you're showing because it
10  doesn't appear to be Eugene Westmoreland, the
11  reason we're here today.
12    Q   This is Eugene Westmoreland.
13    A   Oh, is it?  Okay.  I didn't know
14  that.  So you asked me if I ever saw him
15  walking up the ramp and I said no.  So I sure
16  the heck can't tell who that is in that video.
17    Q   Do you know Officer Richard?
18    A   I know multiple officers with the
19  name Richard.
20    Q   How about Officer William Richard?
21    A   What?  I didn't hear what you said.
22    Q   Officer William Richard?
23    A   I don't usually know their first
24  names.

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

21 (Pages 78 to 81)

Page 78

1      Q    Is there an Officer Richard that
2   works in the RTU that moves detainees
3   generally?
4      A    I mean, there was multiple officers
5   named Richard that worked in the RTU.
6      Q    All right.  I'm going to continue --
7   I'm going to play this video exhibit.  Do you
8   see how that inmate stumbled when he was moving
9   through that corridor?
10     A    Yeah, he appears to stumble.  Yes.
11     Q    And did you see the inmate reach out
12  to the hand railing after he stumbled?
13     A    It looks like he went to catch his
14  balance, yes.
15     Q    From looking at this image of the
16  corridor, and this is the east corridor, do you
17  see any signs around this corridor regarding
18  movement by detainees up or down this corridor?
19     A    Can you rephrase your question?
20     Q    You mentioned how Leighton has a
21  notice for detainees who go up and down the
22  ramp?
23     A    Correct.
24     Q    From looking at this image of the

Page 79

1   corridor from RTC to Cermak, do you see any
2   signs or postings?
3      A    In this image, no, I don't see any
4   signs or postings.
5      Q    What is your understanding of the
6   allegations in this lawsuit?
7      A    Which one?
8      Q    Mr. Westmoreland's lawsuit that we
9   are here for today?
10     A    Well, Mr. Westmoreland has multiple
11  lawsuits, but I believe for the case that we
12  were here to discuss today, although we haven't
13  really spent much time on it, is
14  Mr. Westmoreland's allegations regarding the
15  accommodations that he was provided while in
16  our custody.
17     Q    Relating to what?
18     A    Relating to his time in our custody.
19     Q    Do you have any more specific
20  information about the allegations that we're
21  here for today?
22     A    I mean, Mr. Westmoreland made a lot
23  of allegations.  He was a pretty litigious
24  person, but he made all sorts of allegations

Page 80

1   about inmate movement, housing, toilets being
2   broken, I think being relocated from one tier
3   to another.  He made a lot of allegations.
4      Q    Did you talk to Mr. Westmoreland
5   about all of his various allegations?
6      A    As I previously stated, whenever I
7   received a grievance from an inmate as part of
8   my process, I discuss those allegations.
9      Q    Did any of Mr. Westmoreland's
10  allegations have merit?
11     A    I don't believe they do, no.
12     Q    So none of them have merit?
13     A    I don't know what you mean by merit,
14  Patrick.  I mean, I guess that's a legal
15  conclusion it sounds like.
16     Q    Well, did you consider any of
17  Mr. Westmoreland's allegations to be frivolous?
18        MR. DEVORE:  Objection as to form and
19     I just want to make it clear we're talking
20     about grievances in this case, correct?
21  BY THE WITNESS:
22     A    Yeah, what are we talking about?  I'm
23  not quite sure.  We went in so many directions
24  at this point in this deposition, I'm not sure

Page 81

1   what you're asking me, Patrick.
2   BY MR. MORRISSEY:
3      Q    Well, you mentioned that
4   Mr. Westmoreland was litigious, right?
5      A    He is, as most of your clients are,
6   yes.
7      Q    And why do you call Mr. Westmoreland
8   litigious?
9      A    Well, in my opinion, Mr. Westmoreland
10  was always kind of gearing actions and making
11  complaints in a way to get some kind of
12  secondary gain, monetary gain, file a lawsuit.
13     Q    So what secondary gain did
14  Mr. Westmoreland have by filing his lawsuits?
15     A    He wants money.
16     Q    For what?
17     A    To pad his commissary account while
18  he's in prison.
19     Q    Is there anything wrong with
20  Mr. Westmoreland seeking compensation for
21  allegations he believed were wrong at the Cook
22  County Jail?
23        MR. DEVORE:  Objection, it requests a
24     response outside the knowledge of this

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 82

1　　particular witness.
2　BY THE WITNESS:
3　　　**A　I don't even know what you're asking**
4　**me at this point.  I think generally it's wrong**
5　**to lie about facts or exaggerate or attempt to**
6　**set up our staff in order to file a lawsuit and**
7　**get funds or be compensated, as in your words,**
8　**for an injury that didn't occur.**
9　BY MR. MORRISSEY:
10　　　Q　You're aware that he had a lawsuit
11　that settled, correct?
12　　　**A　I'm aware he had a lawsuit that**
13　**settled.**
14　　　Q　And is it your belief he lied or
15　exaggerated to get compensation in that case?
16　　　　MR. DEVORE:  Objection, calls for
17　　　speculation and also deals with issues not
18　　　related to this case.
19　BY THE WITNESS:
20　　　**A　Also seems to, I don't know, assume**
21　**that settlement equals a liability or that we**
22　**assumed some kind of wrongdoing there, which is**
23　**really unethical on your part, Patrick.  I**
24　**mean, so are you using -- are you saying that**

Page 83

1　**because we settled, we admitted wrongdoing?  I**
2　**don't like that.**
3　BY MR. MORRISSEY:
4　　　Q　Well, I'm asking you do you believe
5　Mr. Westmoreland lied or exaggerated in the
6　litigation that was resolved by the Sheriff's
7　Office?
8　　　　MR. DEVORE:  Objection, calls for
9　　　speculation.
10　BY THE WITNESS:
11　　　**A　I didn't get to review all of that**
12　**information unfortunately because the case**
13　**didn't go to trial.  So I'm going to reserve my**
14　**judgment, but I do -- will say that, in**
15　**general, I found Mr. Westmoreland's claims to**
16　**be untruthful often.**
17　BY MR. MORRISSEY:
18　　　Q　Tell me what was untruthful about
19　claims made by Mr. Westmoreland.
20　　　**A　I think you can see that in my**
21　**grievance answers that were tendered in this**
22　**case.  Often Mr. Westmoreland was exaggerating**
23　**facts or not providing complete facts on what**
24　**occurred that day saying that he was not**

Page 84

1　**assisted when, in fact, he declined assistance**
2　**in certain situations or saying that a toilet**
3　**was broken when it wasn't broken.  I mean,**
4　**there were multiple instances where**
5　**Mr. Westmoreland misrepresented things.**
6　　　Q　What facts did he exaggerate?
7　　　**A　I think I just answered that.**
8　　　Q　Can you tell me what facts he
9　exaggerated?
10　　　**A　If you want to review my grievances**
11　**that we tendered in this case, Patrick, yes, I**
12　**can read my responses to you.  I mean, I do an**
13　**investigation every time a grievance is filed.**
14　**So you can see my answer and where I disagree**
15　**with Westmoreland's version of the facts.**
16　　　Q　Do you remember a grievance was
17　written by Mr. Westmoreland saying that there
18　was a long steep noncompliant RTU ramp?
19　　　**A　I believe he wrote a couple of**
20　**grievances about ramps, yeah.**
21　　　Q　Do you know whether that's accurate,
22　whether there is a long steep noncompliant RTU
23　ramp?
24　　　　MR. DEVORE:  Objection, vague.

Page 85

1　BY THE WITNESS:
2　　　**A　Yeah, I don't know how he was**
3　**evaluating whether it's noncompliant.  I mean,**
4　**I don't know how an inmate evaluates ADA**
5　**compliance, but that was his opinion, yeah, not**
6　**a statement of law.**
7　BY MR. MORRISSEY:
8　　　Q　Is it your opinion that statement was
9　an exaggeration?
10　　　　MR. DEVORE:  Objection, vague as to
11　　　what statement and what grievance, what
12　　　time frame.
13　BY THE WITNESS:
14　　　**A　So if you're referring to the**
15　**statement that Westmoreland makes about a long**
16　**noncompliant ramp, I believe that's his**
17　**personal opinion, not a fact and not a**
18　**statement of law.**
19　BY MR. MORRISSEY:
20　　　Q　Did you do anything to investigate
21　whether Mr. Westmoreland's statement is true or
22　not true about there being a long steep
23　noncompliant RTU ramp?
24　　　**A　I think as we already discussed, it's**

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 86

1  not my job to evaluate the accessibility of the
2  buildings that we occupy, and that's why I
3  requested that Capital Planning do that because
4  that's their function. I don't take
5  measurements.
6      Q   Did you make a request to Capital
7  Planning after you received Mr. Westmoreland's
8  grievance or did you do it before?
9      A   I mean, if you want to put that
10 document back up on the screen, Patrick, and
11 refer to the date. I don't remember the date
12 on that document versus the date on
13 Westmoreland's grievance, so I don't know.
14     Q   Well, I'll put the document up. It's
15 Exhibit 26. Do you see the FY19 Business Case,
16 Ms. Rivero-Canchola?
17     A   I see that the date on the project
18 title is April 3rd, 2018.
19     Q   So is that the date that you
20 requested Capital Planning to conduct the
21 entire ADA assessment of the Cook County
22 Department of Corrections?
23     A   That was the date this document was
24 drafted.

Page 87

1      Q   And after this document was drafted,
2  was it transmitted to Capital Planning?
3      A   I believe it was, yes.
4      Q   So this FY19 Business Case dated
5  4/3/2018, this is what you're referring to as
6  your request to conduct an ADA assessment of
7  the entire Cook County Jail campus; is that
8  true?
9      A   That's what this document says, yes.
10 I believe the document speaks for itself.
11     Q   After you helped prepare this
12 document, have you been in contact with Capital
13 Planning to see how they're coming along with
14 the ADA assessment?
15     A   I have monthly meetings with Capital
16 Planning about all of their projects, which
17 they provide updates about, not just this one.
18 So I'm constantly in contact with them about
19 all of their projects.
20     Q   So it's been about four or maybe five
21 years, and we're still waiting for Capital
22 Planning to conduct this ADA assessment; is
23 that fair?
24     MR. DEVORE: Objection, assumes facts

Page 88

1  not in evidence, misstates prior testimony.
2  BY THE WITNESS:
3      A   Right. Yeah, I don't think that's
4  fair, no.
5  BY MR. MORRISSEY:
6      Q   Why isn't that fair?
7      A   I don't think we're still waiting.
8  As I previously said, we're in process.
9      Q   But Capital Planning has not told you
10 whether the RTU corridors have been analyzed
11 for ADA accessibility; is that true?
12     A   They have not told me that, no.
13     Q   And Capital Planning hasn't told you
14 about the progress of doing the ADA assessment
15 for Cermak, correct?
16     A   I think we already talked about this,
17 and the ADA assessment for Cermak is ongoing.
18     Q   Right, but you haven't received any
19 report from -- relating to the ADA assessment
20 at Cermak; is that fair to say?
21     A   Correct. You already asked me that.
22     Q   So if you haven't received the
23 results of the ADA assessment for the RTU
24 corridors, how do you know whether

Page 89

1  Mr. Westmoreland's statement at the RTU ramp is
2  not ADA compliant, how do you know whether
3  that's true or false?
4      A   I think I already stated that that's
5  his personal opinion and not a statement of law
6  or not a statement of fact. I think once we
7  have the completed ADA assessment of all the
8  Department of Correction buildings, we'll have
9  a better answer to that.
10     Q   Do you have any time when you expect
11 to have that assessment?
12     MR. DEVORE: Objection, asked and
13 answered.
14 BY THE WITNESS:
15     A   No, I don't work for Capital
16 Planning, so I have no idea.
17 BY MR. MORRISSEY:
18     Q   Have you asked Capital Planning when
19 they expect to have the assessment of the RTU
20 corridors?
21     A   I have not asked them for a completed
22 date, no, and like I've already stated, it's in
23 process. Their entire assessment is ongoing.
24     Q   Do you have access to Eugene

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

24 (Pages 90 to 93)

## Page 90

1  Westmoreland's medical records?
2      **A   I do not have access directly to his**
3  **medical records, no.**
4      Q   When you responded to his grievances,
5  did you look at his medical records?
6      **A   If I responded to his grievance that**
7  **would have referenced something in the medical**
8  **record, it would have been because I have**
9  **talked with one of the medical providers, not**
10 **accessed his records.**
11     Q   Is it fair to say when you respond to
12 a detainee grievance, you do not directly look
13 into the detainee's medical records?
14     **A   I do not directly look in the**
15 **detainee's medical records, no.**
16     Q   And so your knowledge comes from
17 talking verbally or by e-mail with the medical
18 staff members?
19     **A   My knowledge comes from talking to**
20 **his medical providers who do have access to the**
21 **medical record, yes.**
22     Q   Do the medical providers ever give
23 you the medical records?
24     **A   No.**

## Page 91

1      Q   Why not?
2      **A   Because they wouldn't need to or have**
3  **to. That's not the scope of my employment.**
4      Q   Is it fair to say you don't have
5  access to detainee medical records because of
6  HIPAA?
7      **A   No, I wouldn't say that's fair to say**
8  **because HIPAA contains exemptions for**
9  **information sharing within correctional**
10 **facilities.**
11     Q   And what types of information can you
12 obtain?
13     **A   I don't know. I would refer you**
14 **specifically to HIPAA and those exemptions.**
15     Q   When you were preparing for your
16 deposition, did you see that some of
17 Mr. Westmoreland's complaints on the inmate
18 grievance form were marked noncompliant
19 grievance?
20     **A   No.**
21     Q   Now, I'm going to show you Exhibit 30.
22 Do you see this document was marked noncompliant
23 grievance, and it was given Control Number
24 NC2204949?

## Page 92

1      **A   I do see that.**
2      Q   And do you see Mr. Westmoreland is
3  complaining about a long steep noncompliant RTU
4  ramp, and date of incident is 12/16/22 and the
5  time is between 9:00 and perhaps noon. Do you
6  see that?
7      **A   I do see that, yeah. I believe the**
8  **document speaks for itself.**
9      Q   And do you see he alleges that moving
10 up and down the RTU ramp caused his hands to
11 burn and upper body pain?
12     **A   It says: Caused my hands, right and**
13 **left, to burn, upper body pain in my already**
14 **damaged upper body, yes, shoulder, back, neck**
15 **and upper arms.**
16     Q   And do you see this form was
17 responded by D. Wilson, and D. Wilson says it
18 was a repeat submission of 2022X18190?
19     **A   That's what it says, yes.**
20     Q   Is it fair to say you never reviewed
21 this form by Mr. Westmoreland?
22     **A   If it's a noncompliant grievance, no,**
23 **it would not have been tendered to me.**
24     Q   Is it fair to say you're not making

## Page 93

1  any statements whether or not Mr. Westmoreland
2  was being accurate in this form?
3      **A   As I have already stated, I haven't**
4  **reviewed this form. So I'm not making any**
5  **statements, period, regarding that.**
6      Q   And would you agree this form is a
7  complaint about the RTU ramp, Exhibit 30?
8      **A   I would agree that that is what it**
9  **says: A long steap, even though steep is**
10 **misspelled, noncompliance RTU ramp. That's**
11 **what it says.**
12     Q   And the required location, it says:
13 RTU ramp leading to Cermak and back to RTU. Do
14 you see that?
15     **A   That's what it says.**
16     Q   Now, if I show you Exhibit 28 -- I
17 want you to remember this control number that
18 they say it's a repeat. Do you see that,
19 2022X18190?
20     **A   18190, correct.**
21     Q   If we go to Exhibit 28, do you see
22 this is -- 18190 is the control number?
23     **A   It is.**
24     Q   And do you see this is a grievance by

SABRINA RIVERO-CANCHOLA
December 20, 2023

25 (Pages 94 to 97)

Page 94

1    Mr. Westmoreland regarding -- concerning the
2    steep noncompliant ramps I used yesterday to
3    reach Cermak?
4        A    That's what it says.  Concerning the
5    steep in the noncompliant ramps is what's
6    written there, Patrick.
7        Q    And do you see there's 1 of 2 on the
8    top right of this form?
9        A    Yes.
10       Q    An the next page it's 2 of 2, do you
11   see that on Page 2 of 7?
12       A    Yes.
13       Q    And this complaint talks about
14   another issue, right, not moving up or down
15   ramps, right?
16       A    I mean, would you like me to read it,
17   Patrick, before you ask me a question about it
18   because I have already said I didn't get an
19   opportunity to read it, so.
20       Q    Well, you can read this to yourself.
21       A    Thank you.  Okay.
22       Q    Do you agree this complaint does not
23   address ramps?
24       A    This complaint, I think it speaks for

Page 95

1    itself but it seems to be about wheelchair --
2    him sitting in a wheelchair and going to a
3    doctor's appointment and being in Cermak.
4        Q    And it's the same control number as
5    the one we looked at from the page before,
6    right? It ends with 18190?
7        A    Correct, but it is Page 2 of that
8    grievance.
9        Q    To your knowledge, do sometimes
10   social workers combine two grievances into one
11   control number?
12       A    I don't have any knowledge of how the
13   social workers provide control numbers, so I
14   don't know.  This grievance has one control
15   number, Patrick.  We've already addressed that.
16       Q    And the control numbers are provided
17   by who?
18       A    By Inmate Services.
19       Q    And that's a branch of the Sheriff's
20   Office?
21       A    It is a department within the Cook
22   County Sheriff's Office.
23       Q    And do you see you responded to this
24   grievance on Page 3?

Page 96

1        A    Yes, I did.
2        Q    Tell me what you did to respond to
3    this grievance?
4        A    As I previously stated, I do the same
5    things to respond to every grievance.  I
6    reviewed the available evidence.  I speak with
7    the pertinent staff and the inmate, and then I
8    answer the grievance to the best of my ability.
9        Q    Did you review the video of
10   Mr. Westmoreland going up or down any inclines
11   from the RTU to Cermak and back?
12       A    Well, in the grievance, it states I
13   reviewed the available evidence.  I don't
14   remember what available evidence there was at
15   this point because this is December of 2022.
16       Q    Do you know whether you preserved the
17   video of Mr. Westmoreland going up or down any
18   of the inclines?
19       A    Any of what -- any of what inclines,
20   Patrick?
21       Q    The inclines from traveling from the
22   RTU to Cermak?
23       A    I believe we already addressed what
24   videos that I requested to preserve, and I said

Page 97

1    I preserved at least one video of him, and I
2    believe it was the Leighton courthouse
3    movement.
4        Q    If you were -- when you were
5    responding to this video, why didn't you
6    preserve the video of Mr. Westmoreland going up
7    or down any of the corridor inclines?
8        A    Well, your question is assuming that
9    I reviewed the video, which as I've stated, I
10   reviewed the available evidence at that time.
11   This was in 2022, so a year ago in December.  I
12   don't remember what evidence was available at
13   that time.
14       Q    How long are the videos retained
15   unless they are preserved?
16       A    Videos run on a 30-day loop as you're
17   aware.
18       Q    Do you know which officer was
19   escorting Mr. Westmoreland to Cermak and back?
20       A    As I sit here today, no, I don't
21   recall who was escorting him a year ago during
22   this grievance.
23       Q    Do you recall how you communicated
24   with the transporting officer when you were

SABRINA RIVERO-CANCHOLA
December 20, 2023

26 (Pages 98 to 101)

Page 98

1 investigating this grievance?
2    A   No.
3    Q   If an inmate in a wheelchair declines
4 or refuses assistance, is the officer, pursuant
5 to policy, supposed to document that?
6    A   Our policy does say they are supposed
7 to document refusals of assistance, yes.
8    Q   Is it required by their policy?
9    A   As I just stated, our policy is that
10 they document refusals of assistance.
11    Q   Was there any documentation that
12 Mr. Westmoreland refused assistance up or down
13 any corridor inclines or declines?
14    A   As I've already stated, when
15 answering this grievance, I reviewed the
16 available evidence before answering. And since
17 this was a year ago, I don't remember what that
18 evidence was.
19    Q   Did you talk to Mr. Westmoreland
20 about whether he refused to have an officer
21 push his wheelchair?
22    A   I spoke to Mr. Westmoreland about all
23 of his ADA grievances.
24    Q   And what did he say?

Page 99

1    A   Of course he denied that he refused
2 assistance.
3    Q   Why do you say "of course he denied"?
4    A   Because they always deny that they
5 refused assistance.
6    Q   Did you provide subsequent training
7 to the officers who escorted Mr. Westmoreland
8 about pushing wheelchairs?
9    A   I'm not sure what follow-up action I
10 took at this particular grievance but whenever
11 there has been a deviation from a policy such
12 as not documenting a refusal, I will always
13 remind the staff member of what the policy is.
14    Q   And how is a staff member supposed to
15 document refusals?
16    A   It could be various ways.
17    Q   Tell me how they are supposed to do
18 it. Tell me the various ways a staff member
19 could document a detainee refused to let an
20 officer push his or her wheelchair?
21    A   Well, since video doesn't have audio,
22 they could document it in various ways. They
23 could send me an e-mail saying the inmate
24 refused. They could send their shift commander

Page 100

1 an e-mail. They could do an informational
2 report in CCOMS. They could do a memo. I
3 mean, it would depend on the particular
4 situation and the officer's method for wanting
5 to document them.
6    Q   So the Sheriff's Office to your
7 knowledge doesn't give any standard direction
8 how staff members should document this, a
9 refusal by an inmate?
10    A   The direction that I give during my
11 training when I train new officers in the
12 academy was I don't care how you document it,
13 whether it be by e-mail, by memo or by incident
14 report in CCOMS that our policy is that it
15 should be documented.
16    Q   Have you ever received an e-mail
17 documenting refusal?
18    A   I may have. I'm not sure.
19    Q   When you receive an e-mail
20 documenting refusal, what do you do to make
21 sure it's maintained by the Sheriff's Office?
22    A   I don't maintain e-mails, so I don't
23 do anything to maintain e-mails. Our IT
24 department does that.

Page 101

1    Q   Right, but do you keep a -- do you
2 compile the information of situations where
3 wheelchair users refuse to be pushed by staff?
4    A   What do you mean by "compile"?
5    Q   I mean do you save the information,
6 all the instances where wheelchair users refuse
7 to be pushed?
8    A   I don't delete e-mails. So if an
9 e-mail was sent to me, then I'm sure IT would
10 have a record of that; but as I mentioned,
11 that's not the only way a documentation could
12 occur.
13    Q   Do you know how the shift commander
14 keeps track of the documentation that an inmate
15 in a wheelchair refused assistance?
16    A   No.
17    Q   Now, to your knowledge,
18 Ms. Rivero-Canchola, what is the NCCHC?
19    A   What does the what?
20    Q   Have you ever heard of the NCCHC?
21    A   No, I don't know what you are
22 referring to.
23    Q   Let me ask you another question.
24 When an inmate refuses a service, are there

Page 102

1  guidelines to demonstrate how the refusal
2  should be documented?
3      **A   I mean, your question is incredibly**
4  **vague.  I have no idea what you mean by**
5  **service.  It sounds like an incomplete**
6  **hypothetical.**
7      Q   Well, when an inmate refuses to be
8  pushed by an officer in his wheelchair, does
9  the inmate have to sign anything acknowledging
10  that he or she refused to be pushed by the
11  officer?
12      **A   No.  We don't have a policy on**
13  **requiring inmates to sign refusals of**
14  **assistance, and generally inmates refuse to**
15  **sign anything that we provide them.  So, no, we**
16  **don't do that.**
17      Q   Why not?
18      **A   I think I just answered that.**
19  **Generally, inmates don't sign things that we**
20  **ask them to sign.  And our policy is that the**
21  **officer document the refusal, not that the**
22  **inmate document the refusal.**
23      Q   But when inmates refuse medical care,
24  Ms. Rivero-Canchola, don't the inmates have to

Page 103

1  sign a refusal for healthcare?
2      MR. DEVORE: Objection --
3  BY THE WITNESS:
4      **A   So --**
5      MR. DEVORE:  -- outside the scope of
6  this litigation.
7      THE WITNESS: Yeah, sorry, Jason, for
8  interrupting you.
9      MR. DEVORE: No problem.
10  BY THE WITNESS:
11      **A   So there is a refusal of medical**
12  **services form that can be provided to them when**
13  **they refuse, depending on where they are**
14  **refusing services.  Do they sign that every**
15  **time, definitely not, no.**
16  BY MR. MORRISSEY:
17      Q   What happens when an inmate refuses
18  to sign a refusal for healthcare services?
19      **A   Normally, the staff member would sign**
20  **as witness that they refused.**
21      Q   Doesn't it require two staff members?
22      **A   I mean, it could, Patrick.  Are you --**
23  **do you want to show me a document that you're**
24  **referring to because you seem to have more**

Page 104

1  **knowledge of these inmate medical refusals than**
2  **I do.**
3      Q   Let me ask you this:  Why wouldn't
4  you have a similar process when an inmate in a
5  wheelchair refuses assistance moving up or down
6  in a corridor or up and down a ramp?
7      MR. DEVORE: Objection, calls for
8  speculation.  Go ahead.
9  BY THE WITNESS:
10      **A   Yes.  It sounds like you're asking me**
11  **to speculate on why we don't have the same**
12  **process that another Cook County entity has for**
13  **inmates refusing medical care.  It seems like**
14  **those are two very different situations.**
15  BY MR. MORRISSEY:
16      Q   Do you see Mr. Westmoreland appealed
17  the response to your grievance?
18      **A   He did.**
19      Q   And do you see that Mr. Westmoreland
20  disputes your statements?
21      MR. DEVORE:  And we are referring to
22  Exhibit 28 still, right?
23      MR. MORRISSEY:  Right.
24

Page 105

1  BY THE WITNESS:
2      **A   Exhibit 28, yes, provides**
3  **Mr. Westmoreland's answer to the appeal, which,**
4  **yes, disputes the facts that I discovered when**
5  **investigating this grievance.**
6  BY MR. MORRISSEY:
7      Q   And when you responded to
8  Mr. Westmoreland's grievance, was it your
9  understanding he was complaining about the RTU
10  incline and the Cermak incline -- strike that.
11      What inclines do you believe
12  Mr. Westmoreland was complaining about in his
13  grievance that you responded to?
14      **A   If you want to scroll back up,**
15  **Patrick, I mean, we can cover the topic again**
16  **of the wheelchair, but...**
17      Q   All right.  Well, I'm back to Page 1.
18  So when you responded to this, what ramps did
19  you understand Mr. Westmoreland to be
20  complaining about, was it the Cermak ramp?  Was
21  it the RTU ramp?
22      **A   So his grievance says:  Required**
23  **specific location, RTU Cermak transport.**
24      Q   So based on your review and

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 106

1  investigation, what ramps did you believe he
2  was complaining about?
3      A   My review would involve the path of
4  travel for Mr. Westmoreland on that given day.
5      Q   Tell me what path of travel you would
6  have investigated?
7      A   I think as we already covered,
8  there's multiple paths of travel from RTC, the
9  basement of RTU, to Cermak.  So it could have
10  been multiple paths to travel.  Do I remember
11  which one he took that day over a year ago, no.
12      Q   Based on your investigation, were
13  there any inclines Mr. Westmoreland had to
14  traverse when he was moving from RTC to Cermak?
15      A   I mean, I don't know what your
16  definition of inclines is; but as we have
17  already covered, there's a vast tunnel system
18  in the Cook County Sheriff's Office.  So it has
19  a lot of corridors.  It could have ramps.  It
20  could have a lot of different things, so.
21      Q   So when you were investigating this
22  grievance, you weren't limited to just the
23  Cermak ramp when you were investigating these
24  allegations, correct?

Page 107

1      A   Right.  As I've previously stated, my
2  review would involve the path of travel that
3  Mr. Westmoreland took on this date that he
4  provided on the grievance, which was
5  December 12th of 2022.
6      Q   And during this path of travel, which
7  sections of his travel was an officer supposed
8  to be pushing Mr. Westmoreland?
9      A   As I have already stated, I don't
10  know which path of travel that he took, and I
11  think we also covered what the responsibilities
12  are within our policy, which is to assist
13  inmates who are disabled in whatever capacity
14  that entails for that specific situation.
15      Q   So it's specific to the inmate,
16  right, when the officer has to assist; is that
17  fair?
18      A   It's specific to the situation.  So
19  it could include the inmate's needs at that
20  time.  It could include how many inmates are being
21  transported.  It could include a lot of
22  different factors.
23      Q   Did you give staff any specific

Page 108

1  training about what inclines or what parts of
2  the corridor from the RTC to Cermak the staff
3  should help push a wheelchair user?
4      A   I think you have already asked me
5  that, and I said in my training we don't
6  discuss specific areas of specific buildings.
7      Q   And what's the difference between a
8  corridor and a ramp based on your understanding,
9  Ms. Rivero-Canchola?
10      A   I guess that depends on the context,
11  right?  The ADA has different requirements for
12  ramps than it does for other areas of the
13  facility.
14      Q   Can you give me examples of what's in
15  a ramp at the Department of Corrections?
16      A   Can I give you an example of a ramp?
17      Q   Right.
18      A   Sure.  The Leighton ramp, that's a
19  ramp.
20      Q   Why is that a ramp compared to a
21  corridor?
22      A   Because the ADA says it is.
23      Q   How about Cermak, the incline from
24  the basement of Cermak to the RTU, is that a

Page 109

1  ramp?
2      A   It could be based on the
3  measurements.  I don't know.  I didn't measure
4  it.  So it depends on what the standard was at
5  the time when Cermak and that tunnel was built
6  and what they were required to comply with.
7      Q   To your knowledge, are there any
8  ramps in the RTC?
9      A   I believe that's a legal conclusion
10  since the ADA has specifications for what
11  qualifies as a ramp and what doesn't.  So I'm
12  going to leave that legal conclusion to the
13  people who are responsible for making it.
14      Q   Now, does the written policy say that
15  staff members should push subjects up and down
16  ramps in CCSO facilities?
17      A   The policy says that that is an
18  example of the type of accommodation you could
19  give to an inmate in a wheelchair, yes.
20      Q   But there's no specific explanation
21  in the policy that a staff member shall push a
22  wheelchair subject up and down corridors?
23      A   Are you -- is that a statement or a
24  question?

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 110

1    Q   Well, that's a question.
2    A   It didn't sound like a question.  As
3    I've stated, our policy provides the different
4    type of accommodations that you could
5    potentially give to an inmate in a wheelchair
6    and pushing their wheelchair through corridors
7    or up and down ramps is specifically stated in
8    the policy as a type of accommodation that can
9    be provided.
10   Q   Now, do you have any knowledge or
11   understanding why the east corridor tunnel has
12   hand railings on both sides?
13   A   The east corridor tunnel.  Which
14   portion of the east tunnel are you referring
15   to?
16   Q   Well, remember we watched that video
17   of the wheelchair user holding onto a railing
18   going down the tunnel?
19   A   So that picture that you purported to
20   be part of the tunnel would not be
21   directionally east.  If you are going from the
22   Cermak building to RTU, I don't think that's
23   east but, you know, I'm not good with
24   directions but I don't think that's east.  I

Page 111

1    think that's west.
2    Q   Well, you looked at the admissions by
3    the Sheriff in this case, right?
4    A   I did look at the RTAs.
5    Q   And you acknowledge one of the
6    locations is called the east corridor?
7    A   Correct.  That's in one of the RTAs.
8    Q   And the east corridor has -- they
9    admitted it has hand railings, right?
10   A   So in that RTA, that is the language.
11   However, that portion of the tunnel that you
12   put up on the screen and are trying to get me
13   to say is east runs in two directions, right?
14   So if it runs from Cermak to RTU, it would have
15   to be east and west and your direction appeared
16   to be facing west.  Again, I'm not -- I'm not
17   going to say that I'm great with directions,
18   but I think if you're going from Cermak to RTU,
19   you're going west.
20   Q   But why does that location have
21   handrails?
22   A   I don't know, Patrick.  I didn't
23   build the building.
24   Q   Did you ever ask anybody to

Page 112

1    understand why that corridor has handrails?
2    A   No.
3    Q   Why not?
4    A   That's not within the scope of my
5    employment.
6    Q   Is that within the scope of anybody's
7    employment at the Cook County Sheriff's Office
8    to your knowledge?
9        MR. DEVORE:  Objection, calls for
10   speculation.
11   BY THE WITNESS:
12   A   As I'm able to guess at this point,
13   no.  The Sheriff's Office is a tenant in the
14   buildings of Cook County.  So we don't have
15   anything to do with the structures itself.
16   BY MR. MORRISSEY:
17   Q   And the north corridor was also
18   discussed in the RTAs that the Sheriff's Office
19   answered, right?
20   A   I believe that's written in the RTAs,
21   yes.
22   Q   And did you see in the RTAs there's
23   generally an admission that there are no
24   handrails along the north corridor?

Page 113

1    A   I believe so, but I didn't write
2    them, Patrick.  So when they're answering these
3    RTAs, I don't know which picture in their head
4    they have of the tunnel or which part of the
5    tunnel they're referring to because I didn't
6    write them.
7        MR. DEVORE:  And if you could provide
8    the actual request to admit, it would be
9    helpful, I think.
10   BY MR. MORRISSEY:
11   Q   Can you tell me, Ms. Rivero, why
12   people would use the north corridor?
13   A   I mean, I can speculate.  That's an
14   incomplete hypothetical.  Like generally why
15   they would use a north part of the tunnel?  It
16   depends on where they're going.  Like I said,
17   there's a vast tunnel system here that takes
18   you to different divisions and different areas.
19   So the reason they would use it could vary.
20   Q   If you are going to court which
21   corridor would you use, the east/west corridor
22   or the north/south corridor?
23   A   You could use both.
24   Q   Is one pathway quicker to get to

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 114

1    Leighton courthouse?
2        **A  Well, I don't know.  I never timed**
3    **it.**
4        Q  Do you have any understanding about
5    whether one passageway is quicker to reach the
6    Leighton courthouse than the other?
7        **A  No.  I've never timed it.**
8        Q  Do you know which path of travel
9    staff generally use to move somebody who is
10   housed in the RTU to the Leighton courthouse,
11   the east/west or the north/south corridor?
12       **A  They could use either.**
13       Q  Do you know which way is normally
14   used by staff members that escort detainees in
15   wheelchairs?
16       **A  That would depend on the officer**
17   **escorting.  They could use either.**
18       Q  How about if a detainee is housed in
19   the RTU and the detainee had a medical
20   appointment at Cermak, do you know which
21   corridor is quicker to reach the RTU?  Is it
22   the north/south corridor or the east/west
23   corridor?
24       **A  I don't know.  I never timed it.**

Page 115

1        Q  Do you know which corridor is
2    generally used?
3        **A  They could use either.**
4        Q  Yeah, but I'm asking, like, do you
5    know which one is generally used?
6       **A  No, I don't know which one is**
7   **generally used.  They could use either.**
8       MR. DEVORE:  And objection assumes
9    facts not in evidence.
10  BY MR. MORRISSEY:
11      Q  Have you ever provided direction
12   which corridor a staff should use when they are
13   escorting a wheelchair user from RTU to Cermak?
14      **A  You already asked me that.  No.**
15      Q  Why wouldn't you give direction about
16   which corridor they should use?
17      **A  I don't provide directions to staff**
18   **on what tunnels they should use to get to their**
19   **destination.**
20      Q  Now, if somebody is being moved from
21   RTU to Division 4 to vote, which corridor would
22   be used to transport the wheelchair user?
23      **A  Technically, it could be any.**
24      Q  So it could either be the east/west

Page 116

1    corridor or the north/south corridor?
2        **A  Correct.**
3        Q  How long does it take to travel the
4    corridors from the RTC to Division 4?
5       **A  I don't know.  I never timed it.**
6       Q  Do you know approximately how far it
7    is in blocks?
8       **A  No, I never measured it.**
9       MR. MORRISSEY:  All right.  Do you
10  want to take a lunch break, like 45
11  minutes?
12      MR. DEVORE:  How long do you think?
13  I could go as short as needed.
14      MR. MORRISSEY:  Well, I have to go to
15  a sandwich shop to get a sandwich, so it's
16  going to take me -- well, I think 45 should
17  be fine and then come back and probably
18  finish up in an hour and a half or so.
19  Okay?
20      MR. DEVORE:  Sabrina?
21      THE WITNESS:  I mean, I have a job to
22  do that's not just depositions.  We've
23  already been at this for two and a half
24  hours.  So if I can skip lunch, Pat, I

Page 117

1    think that you can.  So I would rather
2  proceed with the deposition and get that
3  done and then eat.
4        (WHEREUPON, a discussion
5        was held off the record.)
6        (WHEREUPON, a lunch break
7        was had.)
8      MR. DEVORE:  So before we took the
9  break, you know, our witness was wanting
10  to -- saying that she wanted to get through
11  as quickly as possible, and one of the
12  reasons for that, a big reason for that,
13  there's some transportation issues that
14  require her to get in her mode of
15  transportation by 2:00, otherwise be left,
16  which is what we would like to do is
17  obviously if we can finish it by then, it
18  would be fantastic.
19        Alternatively, I'm not sure what
20  the timing would be, but it may be from
21  2:00 to 3:00.  I'm not sure.  And I just
22  wanted to make a record of that, that we
23  are trying to get things wrapped up and
24  there was a reason why we were making that

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

31 (Pages 118 to 121)

---

Page 118

1    request before we took the break for lunch.
2         MR. MORRISSEY: I didn't -- nobody
3    told me about this before the break. I
4    needed lunch. I took a -- I agreed to come
5    back by 1:00 per the request to not have a
6    45. So why don't we just keep going. At
7    2:00, we'll have to address this.
8    BY MR. MORRISSEY:
9         Q   Ms. Rivero-Canchola, I'm going to
10   show you Exhibit 29, which is another grievance
11   by Mr. Westmoreland. Do you see my screen? I
12   could zoom in.
13        Do you see this is a grievance with
14   Eugene Westmoreland's name with Control Number
15   2021 10912?
16        A   Yes, I see that.
17        Q   Is this a grievance -- I will show
18   you the contents of the grievance zoomed in so
19   you could see. Is this a grievance that you
20   looked at to prepare for your deposition today?
21        A   I believe I did, yes.
22        Q   And I'll show you the next page where
23   you have your response.
24        Do you see your response?

---

Page 119

1         A   Yes.
2         Q   And then there's an appeal and a
3    response to an appeal. Do you see that?
4         A   I see an appeal and a response to an
5    appeal, yes.
6         Q   Going to the contents of the
7    grievance, do you see Mr. Westmoreland is
8    complaining about an incident on August 10,
9    2021 and August 11, 2021?
10        A   Correct.
11        Q   When you investigated this complaint
12   on behalf of the Sheriff, which ramps were you
13   looking at to investigate Mr. Westmoreland's
14   complaint?
15        A   I review all pertinent evidence at
16   the time of investigating the grievance. I'm
17   not saying that I would have to look at a
18   specific ramp to answer his grievance. I don't
19   think that's necessary.
20        Q   And do you see in this grievance he
21   is complaining about being housed in RTU,
22   Tier 3F?
23        A   In his grievance, it states that he's
24   housed on 3F, yes.

---

Page 120

1         Q   So if a detainee is going to the
2    court building at 26th and California in August
3    of 2021, is it fair to say you don't know which
4    corridors he would maneuver through when
5    leaving his tier on the RTU to reach the
6    Leighton courthouse?
7         A   No. That's not fair to say. As I
8    stated previously, there's multiple corridors
9    he could take. I didn't say that there's -- I
10   don't know which ones they are.
11        Q   Do you know which corridors
12   Mr. Westmoreland took relating to this
13   grievance?
14        A   On this specific date, no.
15        Q   How many ramps would there be from
16   Mr. Westmoreland's tier on 3F to the Leighton
17   courthouse, how many ramps would he have to go
18   up and down to reach the courthouse?
19        A   Well, I don't know how you define
20   ramp, and I never counted the number of ramps
21   between the Residential Treatment Unit and the
22   Leighton courthouse.
23        Q   Based on your review of this
24   grievance and your investigation, would you

---

Page 121

1    have looked at the RTU corridor?
2         A   No, I don't need to look at the
3    corridors as I mentioned before. There's no
4    reason to go and look at the corridor or the
5    ramps.
6         Q   Why not?
7         A   Because I'm familiar with the layout
8    of the buildings.
9         Q   And would you agree this grievance
10   identifies ramps in the RTU?
11        A   This grievance alleges that he
12   encountered problems using his wheelchairs to
13   go up and down several ramps.
14        Q   And does he identify specific
15   locations of the incident?
16        A   He writes, and I think the grievance
17   speaks for itself: On my way from RTU building
18   to the court building, I encountered problems
19   using my wheelchair going up and down several
20   ramps. He does not specify the location of
21   those ramps.
22        Q   But under required specific location
23   of incident, does he provide additional
24   information?

---

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 122

1    A    He writes the RTU building and the
2  court building.
3        Q    And he also says halls, right?
4        A    Next to that it says halls, yes.
5        Q    Did you speak to Mr. Westmoreland
6  about this grievance when you were conducting
7  your investigation?
8        A    As I have stated previously, it is my
9  practice to speak with inmates regarding their
10  grievances during my investigation of that
11  grievance.
12        Q    And when you spoke with
13  Mr. Westmoreland, did you take any notes
14  regarding your conversations?
15        A    No.  I did not take any notes.
16        Q    Do you see he identifies a specific
17  Officer Anderson not pushing him?
18        A    He does.
19        Q    Do you know Officer Anderson?
20        A    I don't.
21        Q    Is there usually one officer that
22  pushes or escorts a detainee from the RTU to
23  the Leighton courthouse?
24        A    Is there usually?  I don't know what

Page 123

1  that means.  There could be one officer.  There
2  could be more than one officer conducting
3  movement.  It just depends on the day.
4        Q    Is it the same group of officers that
5  would escort the inmate from RTU to the
6  Leighton courthouse?
7        MR. DEVORE:  Objection as to time
8    frame.
9  BY THE WITNESS:
10        A    Yeah, so people were being escorted
11  every day to court.  So would it be the exact
12  same officer every day, no.
13  BY MR. MORRISSEY:
14        Q    During this time, was there a Cook
15  County court movement team?
16        A    There may have been.  I don't know
17  time frame for the movement team, but they
18  didn't do the escorts from the RTU building to
19  the court building.
20        Q    Where did they do escorts from?
21        A    From receiving to the court building.
22        Q    Is that like bullpen 34-5 by the
23  lunches?
24        A    It's from receiving.  It could be any

Page 124

1  area of receiving to the court building.
2        Q    Is receiving where some inmates are
3  held before going to court at Leighton?
4        A    Receiving is an area in the Cook
5  County Jail where a lot of things occur, but
6  there are holding cells in receiving.
7        Q    And are those holding cells at times
8  used for people who are being transitioned from
9  their housing division to Leighton courthouse?
10        A    They are used for all types of
11  things.  That could be one of them, yes.
12        Q    Is there a Cook County court movement
13  team presently?
14        A    There is no specific team dedicated
15  to court movement.  Receiving handles most of
16  the movement and most of it is done on video as
17  we've already discussed.
18        Q    Do you see this allegation that
19  Mr. Westmoreland says is the reason Officer
20  Anderson didn't push me is because he had
21  another wheelchair inmate who he pushed?
22        A    That's his allegation in the
23  grievance, yes.
24        Q    And, at times, you're aware that a

Page 125

1  wheelchair is not pushed because the officer is
2  pushing another wheelchair user; is that fair?
3        A    I mean, we reviewed a video of that
4  exact circumstance, did we not?  So, yeah,
5  there could be times when an officer is
6  escorting more than one wheelchair.
7        Q    When you conducted your investigation
8  about Mr. Westmoreland being moved to court on
9  August 10, 2021, do you know whether there was
10  one officer or more than one officers moving
11  Mr. Westmoreland?
12        A    I don't recall.  That was over two
13  years ago.
14        Q    And you also see in this grievance he
15  complained about the restroom in the holding
16  cell?
17        A    I could not use the restroom in the
18  holding cell.  Yes.  I don't know which holding
19  cell he's referring to, but yes.
20        Q    Now I'm showing you Page 2 of
21  Exhibit 29 and it's your response that you
22  provided on August 20th, 2021.  Do you see
23  that?
24        A    I see that, yes.

SABRINA RIVERO-CANCHOLA
December 20, 2023

33 (Pages 126 to 129)

Page 126

1    Q   You write in part: Staff will be
2  reminded to document any refusals of assistance
3  while being transported via wheelchair?
4    A   Correct.
5    Q   How did you remind staff about that?
6    A   As we previously discussed, if there
7  is a deviation in policy regarding escorting
8  wheelchairs, I will speak to the staff usually
9  verbally in person regarding that deviation.
10   Q   Do you have any documentation about
11 speaking with any staff regarding deviation of
12 a policy?
13   A   About this grievance, not that I
14 recall, no.
15   Q   Over the last three years, do you
16 know the names of any staff members who
17 deviated from policy by not pushing a
18 wheelchair user?
19   MR. DEVORE:  Objection, calls for
20 speculation.
21 BY THE WITNESS:
22   A   No, I don't write down names of staff
23 members that deviate from policy.
24

Page 127

1  BY MR. MORRISSEY:
2    Q   Do you have the ability to discipline
3  staff members?
4    A   Discipline occurs through the chain
5  of command.
6    Q   Right.  So do you have the ability to
7  discipline staff members?
8    A   I'm outside of their chain of
9  command.
10   Q   So is it your understanding that
11 Mr. Westmoreland refused assistance while being
12 transported in the tunnel system?
13   A   That is my understanding and that
14 would be why I would write that staff will be
15 reminded to document refusals.
16   Q   And you don't know whether there was
17 one officer escorting two wheelchair users to
18 court on the date Mr. Westmoreland complained
19 of problems moving up and down ramps?
20   A   No.  As I've already stated, that was
21 over two years ago.  I don't remember how many
22 people were in the photo or videos that I may
23 have reviewed.
24   Q   How do you know Mr. Westmoreland was

Page 128

1  not placed in a holding cell behind 304?
2    A   Because I would have reviewed the
3  available video behind those holding cells, and
4  it's our policy to not place wheelchair users
5  in those holding cells.
6    Q   You also mentioned:  Nor were there
7  any injuries according to medical records.
8        Did you look at the medical records?
9    A   As I've stated previously, I don't
10 look at medical records.  I confer with the
11 medical providers.
12   Q   Do you know which medical providers
13 you conferred with relating to this grievance
14 investigation?
15   A   No, I don't recall.  That was over
16 two years ago.
17   Q   Do you have any idea what the medical
18 provider did to investigate whether there were
19 any injuries in the medical records?
20   A   Well, I'm sure they would review the
21 medical records for any triage or examination
22 of the inmate's injuries.
23   Q   Did they look at the Health Service
24 Request Forms?

Page 129

1    A   The medical record would contain
2  Health Service Request Forms.
3    Q   Who would you have gone to, the
4  dispensary doctor in the RTU?
5    A   I think I already answered that.  I
6  don't recall who I spoke to.  This was over two
7  years ago.
8    Q   And do you see Mr. Westmoreland
9  appealed this grievance and received a response
10 to his appeal?
11   A   I do see that, yes.
12   Q   Was there anything more
13 Mr. Westmoreland had to do to use the grievance
14 system to complain about the RTU ramps in this
15 grievance?
16   A   I don't know what you mean by that
17 question.
18   Q   Well, after he appealed this response
19 by you and received a response to his appeal by
20 Mr. Mueller, what else could he have done to
21 have his complaint be reviewed administratively
22 by the Sheriff's Office to your knowledge?
23   A   Well, this would be an exhaustion of
24 the administrative remedies if he appealed this

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 130

1  grievance and received a response to the
2  appeal.
3      Q    So he exhausted about the RTU tunnels
4  in this grievance?
5      A    Exhausted regarding the complaint in
6  the grievance.
7      Q    And what was the complaint in the
8  grievance?
9      A    I mean, Patrick, we're wasting time.
10  You just showed it to me.  So do you want me to
11  read it into the record what it says.  It's
12  already an exhibit in this deposition.
13      Q    Well, would you agree that he
14  complained about the RTU corridors in this
15  grievance?
16      A    This grievance says on my way from
17  the RTU building to the court building on
18  8/10/21 between the hours of 9:00 a.m. and
19  10:00 a.m., I encountered problems using my
20  wheelchair going up and down several ramps.
21      Now, I don't see the word corridor in
22  this grievance, but you seem to be reading that
23  into it.
24      Q    But earlier you said you didn't know

Page 131

1  whether the RTU in the -- the lower level of
2  the RTU has ramps, right?  So I'm trying to use
3  the word you've used in this deposition about
4  whether the ramps are corridors, okay?
5      A    Yeah, but that's not -- you're asking
6  me a question about the grievance, not about my
7  previous testimony.  You asked me if he wrote a
8  grievance about the corridor, and this
9  grievance doesn't say anything about corridors.
10      Q    Does this grievance address the RTU
11  ramp?
12      A    This grievance makes allegations
13  about him having difficulties or encountering
14  problems going up and down several ramps.  I
15  think it speaks for itself as to what it says.
16      Q    And based on your investigation, was
17  one of the ramps that he alleged the RTU ramp?
18      A    Again, Patrick, the RTU doesn't have
19  ramps because the RTU is from second floor to
20  the fifth floor.  So the RTU doesn't have a
21  ramp.  So you're trying to define something
22  that in my opinion doesn't exist.
23      Q    Did you tell Mr. Westmoreland that
24  there are no ramps in the RTU?

Page 132

1      A    No.  No, Patrick, I didn't.
2      Q    Why didn't you say that in response
3  to his grievance?
4      A    Because it wasn't relevant in my
5  investigation or in my answer to the grievance.
6  I answered it the way I answered it.  The
7  document speaks for itself.
8      Q    When you say that staff will be
9  reminded to document any refusals of
10  assistance, are you talking about assistance in
11  the RTC to the courthouse?
12      A    I'm referring to our policy, which is
13  to document refusals of assistance when a staff
14  member attempts to assist an inmate in a
15  wheelchair by pushing their chair.  If they
16  refuse, per policy, they should be documenting
17  that as we've already discussed.
18      Q    Now, Ms. Rivero-Canchola, are there
19  policies that you're required to follow as an
20  employee of the Sheriff's Office?
21      A    You're asking me what policies I'm
22  required to follow?
23      Q    No.  I said are there policies?
24      A    Are there policies?  Sure, yeah,

Page 133

1  there's policies.
2      Q    And is one of the policies Policy 801
3  titled Disabilities of Individuals Determined
4  in the Department?
5      A    There's a lot of policies, but I'm
6  sure that's probably one of them.  If you are
7  referring me to a document that you want to
8  show.
9      Q    All right.  I will show you the
10  document, but my preliminary question: Did you
11  review any policies, written policies, in
12  preparation for your deposition today?
13      A    I did not.
14      Q    I will show you Exhibit 38.
15  Exhibit 38 is coming up.  Do you see Policy 801
16  in front of you, Ms. Rivero-Canchola?
17      A    I do see Policy 801, yes.
18      Q    And are you familiar with this
19  policy?
20      A    I am familiar with that policy, yes.
21      Q    And do you see 801.3, it says:
22  Executive Director Responsibilities?
23      A    It does, yes.
24      Q    And it says:  The executive director

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 134

1  or authorized designee, in coordination with
2  the responsible physician and the ADA
3  coordinator, will establish procedures to
4  assess and reasonably accommodate disabilities
5  of individuals detained in the department?
6      A    Yes.
7      Q    Who is the responsible physician?
8      A    I don't know what physician this is
9  referring to; but as you're aware that Cermak
10  does have a physician that leads their
11  department.
12      Q    Is there somebody that you work with
13  that's known as the responsible physician that
14  you work with to establish accommodations for
15  people?
16      A    To my knowledge, no one holds that
17  specific title in Cermak, but I work with
18  all -- a lot of the physicians at Cermak?
19      Q    And do you work directly with the
20  executive director or has there been somebody
21  authorized by the executive director that you
22  work with?
23      A    I work with everyone in the Sheriff's
24  Office.

Page 135

1      Q    The question is about the executive
2  director.  Do you work with the executive
3  director regarding establishing procedures to
4  help or accommodate disabled people or do you
5  work with designee?
6      A    It depends on the situation and the
7  specific issue that we're discussing.  So as
8  you can see from this policy, the executive
9  director has certain responsibilities.  And at
10  times, that could be working with me and
11  someone from Cermak to assess and reasonably
12  accommodate inmates with disabilities that are
13  in our custody.  I think the document speaks
14  for itself.
15      Q    And pursuant to this policy, have you
16  established housing areas that are equipped to
17  meet the needs of physically disabled
18  detainees?
19      A    No.
20      Q    Have you -- pursuant to this policy,
21  have you established classification criteria to
22  make housing assignments to individuals with
23  disabilities?
24      A    Have I established classification

Page 136

1  criteria, no.
2      Q    Have you worked with the responsible
3  physician and/or the executive director to do
4  that?
5      A    I don't understand your question.
6  These are overall general responsibilities
7  within a policy, and they could mean different
8  things on different days.  So, yeah, we all
9  have a role in making sure that we accommodate
10  inmates with disabilities in our custody as
11  defined by this policy.  But do I specifically
12  set that criteria, which is what you're asking,
13  no, I do not.
14      Q    Well, tell me working with the other
15  stakeholders, tell me what you have done to
16  establish classification criteria to make
17  housing assignments for individuals with
18  disabilities?
19      A    As I stated at the beginning of this
20  deposition, my role as ADA compliance officer
21  is to make sure that the office complies with
22  the Americans with Disabilities Act and all
23  that entails.  So what that may look like on
24  one day to the next, on one situation to the

Page 137

1  next, it varies.  And you're asking a very
2  broad question that I am having difficulty
3  answering.
4      Q    Tell me the different locations at
5  the Cook County Jail where somebody with a
6  wheelchair alert may be housed?
7      A    It depends on the type of wheelchair
8  alert, and it depends on the inmate's medical
9  status assigned to them by Cermak.
10      Q    Can you tell me the different
11  locations where the person could be housed?
12      A    It depends on the wheelchair alert
13  and the medical level assigned to them by
14  Cermak.  They could be assigned anywhere.
15  Especially if they have a long distance
16  wheelchair alert, they could be assigned to any
17  division depending on the classification
18  assigned to them by Cermak.
19      Q    And you're aware that none of the
20  divisions other than RTU and Cermak have
21  accessible housing that meet the 2010 design
22  standards?
23      A    Is that a legal conclusion that
24  you're trying to get me to make?

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 138

1      Q    Well, you wrote that business case,
2   right, and we read this at the -- I'm trying to
3   make this quicker.  If you want me to pull up
4   your business case, I can.  But you wrote the
5   business case saying that only Cermak and the
6   RTU meet the accessible standards for the 2010
7   design standards, right?
8      A    In my opinion, yes.  Those are the
9   only buildings that are designed to meet the
10  2010 standards.  That doesn't mean that those
11  were the standards that were applicable at the
12  time the buildings were constructed or
13  designed.
14     Q    Well, then why would people who use
15  wheelchairs for long distance be housed in
16  Division 10 or Division 6?
17         MR. DEVORE:  Objection, calls for
18     speculation.
19  BY THE WITNESS:
20     A    I mean, that depends on the
21  individual's abilities, Patrick.  I know that
22  you often like to think that auxiliary aid
23  automatically means a person is disabled and in
24  need of accessibility in their housing, and

Page 139

1   that's not how things work here.  So every
2   inmate has different abilities.  And when they
3   get assessed by the medical provider at that
4   time, they are assigned a level of housing and
5   we house them based on that level of housing.
6      Q    How would a guard provide
7   accommodations to somebody with those
8   conditions?
9          MR. DEVORE:  Objection, calls for
10     speculation.
11  BY THE WITNESS:
12     A    With what conditions?  I don't know
13  what hypothetical you're trying to provide.
14  BY MR. MORRISSEY:
15     Q    Somebody who has a mobility
16  limitation, Ms. Rivero-Canchola, how would the
17  guard know what accommodations would be
18  required under the law for the person who has
19  to go up or down a ramp?
20     A    What kind of mobility limitation?
21  Each inmate has different abilities and
22  disabilities.  So mobility limitations vary
23  from one person to the next.  I don't know how
24  to answer the question.

Page 140

1      Q    How would the guards that are within
2   the chain of command, how would they know the
3   abilities or disabilities of a detainee who has
4   a mobility impairment that a doctor determines
5   should use a cane, crutch or walker?
6      A    Well, first of all, we don't have
7   guards.  We have correctional officers that are
8   deputy sheriffs, and they follow the alerts
9   that are in the jail management system and that
10  gives them guidance on how to deal with the
11  inmates that are in their custody.
12     Q    Well, how could a correctional
13  officer accommodate somebody with a walker go
14  up or down the RTU ramp?
15         MR. DEVORE:  Objection, vague.
16  BY THE WITNESS:
17     A    That's an incomplete hypothetical.
18  So it depends on the situation.  I don't know
19  how to answer that without more information.  I
20  can't answer your incomplete hypotheticals
21  without more information.
22  BY MR. MORRISSEY:
23     Q    So the person -- let's say the person
24  has an alert for a walker, Ms. Rivero-Canchola,

Page 141

1   tell me what accommodations a correctional
2   officer has available at his or her disposal to
3   accommodate that person who needs a walker to
4   go up or down the RTU corridor that's going
5   east/west?
6      A    But your question assumes they need
7   some sort of accommodation to go through that
8   corridor because you're making that assumption
9   because they may very well may not need an
10  accommodation.  So why would an officer assume
11  that they need one?
12     Q    Well, assuming the person needs an
13  accommodation, what is available to a
14  correctional officer to assist a person with a
15  walker to traverse up and down that east
16  corridor?
17     A    Again, that is situation specific to
18  the needs of the inmate and what is existing at
19  the time.  So I cannot answer your incomplete
20  hypotheticals appropriately because they don't
21  give me enough information to provide a
22  complete answer.
23     Q    Well, you're aware that the RTU ramp
24  didn't used to have handrails, right?

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 142

1     A   No, I'm not aware of that.
2     Q   Excuse me.  On the Cermak ramp.
3   You're aware that handrails were recently
4   installed within the last year, right?
5     A   It has handrails that were recently
6   installed, yes, new ones, but there were
7   existing rails along the side of the Cermak
8   ramp.
9     Q   So before those handrails were
10   recently installed, what accommodations did
11   staff members provide people with mobility
12   impairments to go up and down the Cermak ramp?
13     A   I don't know how to answer your
14   question because it makes several assumptions.
15   First, it assumes that the rail that was there
16   before wasn't a handrail and that this one is
17   brand new.  And second, it assumes that they
18   needed some sort of accommodation to go up and
19   down that ramp.  I can't answer your incomplete
20   hypothetical.
21     Q   So if a person with a mobility
22   impairment needs an accommodation to traverse a
23   ramp or a corridor, is it incumbent on the
24   detainee to request help from the correctional

Page 143

1   officer?
2     A   If the need isn't readily apparent
3   that they cannot go up or down that corridor,
4   yes, then it would be on the inmate to request
5   what assistance they need if it's not readily
6   apparent.
7         Now each inmate gets assessed by
8   Cermak for what their needs are when it comes
9   to auxiliary aids, mobility aids to impairment.
10   So if they needed something more than what they
11   had, then Cermak would have gave them that.
12   That's not a correctional officer duty to make
13   the conclusion on whether an inmate needs a
14   specific mobility aid.
15     Q   So, let's say, an inmate with a
16   walker was going up the Cermak ramp and this
17   was before the handrails were recently
18   installed, if the inmate asked for assistance
19   from the officer, what types of assistance
20   would be available for the officer to help the
21   inmate traverse the ramp?
22     A   It's situation specific.  So it could
23   be a wheelchair, maybe we take another path,
24   maybe they take the Cushman Cart, maybe they

Page 144

1   call a paramedic or a nurse to assist.  I mean,
2   I can't go through all the possible
3   hypotheticals that can exist in that situation.
4     Q   So one method could be a wheelchair
5   could be available upon request for an inmate
6   to go up or down a corridor or a ramp, right?
7     A   If needed, sure.  They could provide
8   a wheelchair if available and if needed.
9     Q   And that wouldn't be difficult for
10   the Sheriff's Office to do?
11     A   I'm not going to speculate on the
12   difficulties in an unknown situation and
13   incomplete hypothetical that you're providing
14   me.
15     Q   What about -- you mentioned there's a
16   cart, right?  That inmate could be assisted up
17   or down a ramp or a corridor?
18     A   Sometimes.  Sometimes officers from
19   divisions that are far away would bring a
20   Cushman Cart along with them but not always.
21     Q   Could that accommodate a wheelchair?
22     A   I don't know what you mean by that.
23     Q   Does the Cushman -- how do you say
24   the cart's name?

Page 145

1     A   It's Cushman Cart but you weren't
2   asking me about an inmate in a wheelchair.  You
3   asked me about an inmate with a walker that
4   walks up and down the ramps.  So now you're
5   changing the context of your incomplete
6   hypothetical.
7     Q   So we'll talk about a cane or --
8   let's talk about a walker.  An officer could
9   have an inmate use a cart to get -- a motorized
10   cart to go up or down a ramp or a corridor,
11   correct?
12     A   Possibly, if one is available; but as
13   I already stated, one might not be available.
14   It's not available to every officer.
15     Q   Do the officers have instructions
16   that they are allowed to use the cart to help
17   escort an inmate up and down a ramp or a
18   corridor?
19     A   No.  They do not have specific
20   instructions regarding Cushman Carts.
21     Q   How about using a wheelchair for
22   somebody who uses a walker, do they have
23   instructions about using that to traverse a
24   ramp or corridor?

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 146

1     A   I believe our policy provides
2  guidelines on the different types of
3  accommodations that can be provided.  So if you
4  want to call that instructions, fine,
5  instructions, policy, guidelines.
6     Q   How about for wheelchair users, are
7  there carts that you could put a wheelchair
8  user on to traverse up and down ramps or
9  corridors?
10    A   I'm not aware of any carts that you
11 could put a wheelchair on.
12    Q   Have you ever -- do you have personal
13 knowledge about a cart ever being used to help
14 a person with crutches or a cane go up and down
15 a ramp?
16    A   I have seen officers use Cushman
17 Carts for a variety of reasons including
18 transporting inmates from other divisions that
19 may have assistive devices and some who do not
20 have assistive devices.
21    Q   So it's feasible to do that?
22    A   As I have already stated, that is
23 situation dependent because not every officer
24 has access to a Cushman Cart, not every

Page 147

1  division has access to a Cushman Cart and one
2  is not available in every single situation.
3     So I can't appropriately answer your
4  incomplete hypothetical.
5     Q   So how do inmates know they have
6  access to all of these resources or all of
7  these accommodations?
8     A   The Inmate Handbook provides
9  information about how an officer could contact
10 the ADA compliance officer, being me, if they
11 need information about the accommodations that
12 are available to them while they are in our
13 custody.
14    Q   But is there anything near the ramp
15 that says there are a host of accommodations
16 that can be provided to help somebody up and
17 down a ramp or a corridor?
18    A   I think as we've previously
19 discussed, there's a bunch of different signs
20 in our facility, some which say don't proceed
21 up the ramp without assistance.  But is there a
22 list on the ramp of the types of accommodations
23 that can be provided, no.
24    Q   So if somebody reached out to you, a

Page 148

1  staff member reached out to you for guidance
2  about the types of accommodations that they
3  could provide to somebody who uses a cane or a
4  walker, what would you tell the officer?
5     A   It depends on the situation that
6  they're describing.
7     Q   Going up a ramp.
8         MR. DEVORE:  Objection.  I don't know
9     how many times you've asked the same line
10    of questioning, but I think it's been five.
11 BY THE WITNESS:
12    A   There's different kinds of
13 accommodations, Patrick.  Again, I can't
14 speculate on all the different hypothetical
15 situations that could present themselves at the
16 jail.  So that type of accommodation could look
17 different from one situation to the next.
18 BY MR. MORRISSEY:
19    Q   Have you ever given advise to a staff
20 member about the different accommodations that
21 are available?
22    A   Absolutely.
23    Q   And you don't -- you can't recall
24 what you told the staff member?

Page 149

1     A   I mean, I tell them all sorts of
2  things, especially during my training.  But am
3  I recalling a specific instance of that, no.
4     Q   Now, Ms. Rivero-Canchola, do you
5  remember e-mails you received about the RTU
6  ramp perhaps not being compliant with the ADA?
7     A   As I discussed at the beginning of
8  this deposition, I did review some e-mails from
9  TJ Tyrrell and some other members within Cook
10 County regarding several different ramps.  I
11 think just the Cermak ramp was the primary ramp
12 represented in those e-mails.
13    Q   But wasn't one ramp discussing the
14 RTU ramp?
15    A   The what?
16    Q   One of the e-mails mentions the RTU
17 ramp, right?
18    A   I think as I've already stated, it's
19 my opinion that there are no RTU ramps because
20 there couldn't possibly be a ramp that went all
21 the way up to the second floor of the building.
22 So is it referenced somewhere in an e-mail that
23 someone is referring to this RTU ramp, I
24 believe that it is.  And if you would like to

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

---

Page 150

1  put the exhibit up so we can specifically
2  discuss that, then fine, but I'm not going to
3  use that language because I don't believe there
4  is a ramp in RTU.
5      Q   Has your understanding changed in the
6  last three years?
7      A   My understanding of what?
8      Q   About whether there was a ramp in the
9  RTU because a couple of years ago, you said
10  that there was a ramp in the RTU in an e-mail.
11     A   Again, Patrick, the RTU is the second
12  floor through the fifth floor of that building.
13  The basement and first floor is Receiving,
14  Trust and Classification.  So maybe I was just
15  using the language that was already in the
16  e-mail, but there are no ramps in RTU because
17  RTU begins on the second floor of that
18  building.
19     Q   Are there ramps in the RTC?
20     A   Yes.  There are ramps in the RTC.
21     Q   How many ramps are there in the RTC?
22     A   You asked me this already.  I haven't
23  counted them.  I don't know.
24     Q   And other than the east/west and the

---

Page 151

1  north/south corridor, where else are there
2  ramps in the RTC?
3      A   I don't know.  I didn't count them.
4      Q   Do you know generally where other
5  ramps are in the RTC?
6          MR. DEVORE:  Objection.  She's
7  testified to this.
8  BY THE WITNESS:
9      A   No, Patrick.  Sorry.  I can't recount
10  every single ramp in this tunnel system that we
11  have.
12  BY MR. MORRISSEY:
13     Q   I'm going to show you Exhibit 23.  Do
14  you see this e-mail, 23, Page 1?
15     A   Yes.
16     Q   And I'm going to go to another page.
17  I think it's the second.  The second page is an
18  e-mail from you dated March 9th, 2021 at
19  2:00 p.m.  Do you see that?
20     A   Yes.
21     Q   And it says: I believe the
22  litigation in question is asking about the old
23  ramp outside the Cermak basement entrance.  I
24  don't believe it has any landings, but I'm not

---

Page 152

1  sure if that was required at the time it was
2  built.  Zach, can you clarify what you need?
3  Either way I think it's good to have the
4  measurements of the RTU basement ramp as well.
5  Is that your word?
6      A   That is my word there because if you
7  look through that chain of e-mails that you're
8  presenting one page of, that is the language
9  that was being used.
10     Q   Do some people call the basement of
11  the RTU the RTU?
12     A   I mean, you are.  So you're some
13  people, so I guess so.
14     Q   And when you're referencing landings,
15  what are you talking about in this e-mail?
16     A   A flat surface at the base or the top
17  of a ramp.
18     Q   Do you know whether the RTC ramp, any
19  of the RTC ramps have landings?
20     A   I think they do.
21     Q   Which ones have landings?
22     A   I don't know.  I haven't inspected
23  them or measured them.
24     Q   And do you have any idea how long the

---

Page 153

1  landing has to be?
2      A   According to who?
3      Q   According to the ADA, the 2010 ADA?
4      A   So that would depend on when the
5  building was built.  It has -- there are
6  different standards as you're aware.  There's
7  the Illinois Accessibility Code, there's the
8  current standards.  It all depends on the
9  building that we're talking about and the
10  applicable standard.
11     Q   Why did you say it's a good idea to
12  have measurements of the RTU basement ramp as
13  well?
14     A   I don't know.  It's within the
15  context of this conversation that we're having,
16  Patrick, and the e-mail.  I think you can see
17  the entire thing.
18     Q   After you wrote this e-mail in March
19  of 2021, do you know whether anybody measured
20  the RTU -- or the RTC ramps?
21     A   I'm not sure if anyone has measured
22  the RTC ramps.  I don't recall.
23     Q   Anything refresh your memory?
24     A   No.  No.

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 154

1    Q   How many people presently are in the
2   RTU that use wheelchairs full time?
3       A   I don't know.
4       Q   Do you have any idea?
5       A   Isn't that what I don't know means?
6   No.  I don't count them.
7       Q   Are there more than two people that
8   use wheelchairs?
9       A   There could be.
10      Q   When is the last time you did a
11  census of how many wheelchair users are housed
12  in the RTU?
13      A   A census?  I don't know what you mean
14  by that.
15      Q   When is the last time you counted the
16  number of wheelchair users in the RTU?
17      A   I don't count the number of
18  wheelchair users in a given division, Patrick.
19  So I don't know.
20      Q   In the last two users, do you know
21  how many wheelchair users have been housed in
22  the RTU?
23      A   No.
24      Q   Do you have any idea?

Page 155

1       A   No.
2       Q   Is it -- is it rare for there to be
3   10 wheelchair users housed in the RTU at any
4   given period of time?
5       A   Is it rare?
6       Q   Right.
7           MR. DEVORE:  Objection, vague.
8   BY THE WITNESS:
9       A   I don't know.  I haven't -- again, I
10  have not counted the number of wheelchairs in
11  RTU.  So I'm not going to comment on the rarity
12  of that circumstance.
13  BY MR. MORRISSEY:
14      Q   Did you review the interrogatory
15  answers by the Sheriff's Office in this case
16  about the number of wheelchair users that were
17  housed in the RTU at a given point in time?
18      A   I don't recall an RTA about that.
19  The RTAs that I recall were about the buildings
20  and the structures.
21      Q   What about an interrogatory answer?
22      A   No, I didn't review any
23  interrogatories.
24      Q   Do you know how many different

Page 156

1   wheelchair users have gone up or down the RTC
2   ramps in the last two years?
3       A   No.
4       Q   Would it be under 10?
5       A   I don't know.  That's what I don't
6   know means.
7       Q   How would you identify how many
8   wheelchair users have been housed in the RTU
9   over the last two years?
10      A   How would I identify them?  I would
11  not be able to identify how many inmates are
12  housed using wheelchairs in RTU in past years.
13      Q   Do you know whether anybody within
14  the Sheriff's Office could do that?
15      A   I'm sure someone would have the
16  ability to pool past data, but that would not
17  be me.
18      Q   Now, do you know Officer Marin?
19      A   I do know Officer Marin, yes.
20      Q   What is Officer Marin's first name?
21      A   I believe it's George.
22      Q   Have you trained Officer Marin
23  regarding the ADA?
24      A   I mean, I don't recall specifically

Page 157

1   training him, but as we have already covered, I
2   train all new members of the Cook County
3   Sheriff's Department beginning in September of
4   2015, and they also receive ADA online learning
5   management training.
6       Q   Do you know whether Officer Marin
7   started working as a correctional officer after
8   2015?
9       A   I have no idea when he started
10  working as a correctional officer.
11      Q   And if he started working before
12  2015, he wouldn't have been trained during
13  orientation by you, correct?
14      A   He wouldn't have been trained by me,
15  correct, but he would have been trained by
16  someone else.
17      Q   Now, when Eugene Westmoreland went to
18  vote on February 18, 2023, do you know the path
19  of travel he took from RTU to Division 4?
20      A   Do I know the path of travel?  No, I
21  don't remember observing his path of travel
22  from RTU to Division 4.
23      Q   Well, did you ask Officer Marin which
24  way he took to escort Mr. Westmoreland from RTU

SABRINA RIVERO-CANCHOLA
December 20, 2023

41 (Pages 158 to 161)

Page 158

1  to Division 4 to vote?
2  **A   No.**
3  Q   Why not?
4  **A   Because that wasn't the allegations**
5  **contained in Mr. Westmoreland's grievance.  It**
6  **wasn't about the path of travel from RTU to**
7  **Division 4 that I recall.**
8  Q   When Mr. Westmoreland went to vote on
9  February 18, 2023, was he being escorted with
10 other detainees by Officer Marin?
11 **A   I believe he was being escorted with**
12 **multiple detainees that day, yes.**
13 Q   And how many officers were with
14 Officer Marin escorting these detainees to
15 vote?
16 **A   I'm not sure.**
17 Q   Do you know whether Officer Marin was
18 the only officer escorting these detainees?
19 **A   He may have been.  I'm not sure.**
20 Q   And when Mr. Westmoreland was being
21 escorted to vote and back, was he being
22 escorted with more than one wheelchair user?
23 **A   Possibly.**
24 Q   Why would more than one wheelchair

Page 159

1  user be escorted with an officer at one time?
2  **A   I think we already covered this.  You**
3  **asked this already.  So officers have to do**
4  **mass movement of inmates at times.  So that may**
5  **mean escorting one or more inmates that are in**
6  **a wheelchair or more than one inmates who are**
7  **walking without a wheelchair.**
8  Q   When you use the term "mass
9  movement," are you talking about one officer
10 moving more than one inmate at a time?
11 **A   When I use the term mass movement,**
12 **I'm saying moving more than one inmate.  I'm**
13 **not making a determination how many officers**
14 **are moving that group of inmates.**
15 Q   So when Mr. Westmoreland was being
16 moved to Division 4 to vote with more than one
17 wheelchair user, explain how Officer Marin was
18 supposed to push all the wheelchair users?
19 **A   What?  Can you rephrase your**
20 **question?**
21 Q   Right.  Officer Marin escorted
22 Mr. Westmoreland along with some other
23 wheelchair users to vote, right?
24 **A   I don't know.  Is that a fact?  Like**

Page 160

1  **I said, I'm not sure if there was more than one**
2  **wheelchair in that group.  I don't recall.**
3  Q   Well, when you spoke -- did you speak
4  to Officer Marin about his movement of
5  Mr. Westmoreland to vote?
6  **A   Yes.  I spoke with him about**
7  **Mr. Westmoreland and the allegations contained**
8  **in the grievance, not about any other inmate.**
9  Q   And what did Officer Marin say to
10 you?
11 **A   He said what's reflected in the**
12 **e-mail that he sent me, which was tendered in**
13 **this case.**
14 Q   Why -- did you ask Officer Marin why
15 he wasn't pushing Mr. Westmoreland that day?
16 **A   I don't know if I asked him that**
17 **specific question.  I mean, there was another**
18 **inmate pushing Mr. Westmoreland and Officer**
19 **Marin was doing mass movement of inmates.  So I**
20 **know from a safety and security perspective,**
21 **when you're moving more than one inmate, you**
22 **like to keep your hands free.**
23 Q   So did Officer Marin deviate from
24 Sheriff policy on the date that Eugene

Page 161

1  Westmoreland was brought to Division 4 to vote?
2  **A   Deviate how?**
3  Q   Well, you previously said staff are
4  required to push inmates up and down ramps at
5  the Cook County Jail, right?
6  **A   I think that mischaracterizes my**
7  **previous testimony.  But Officer Marin provided**
8  **accommodations to Westmoreland via the other**
9  **inmate who was assisting Westmoreland in that**
10 **wheelchair, and I do not have personal knowledge**
11 **as to whether that was Mr. Westmoreland's**
12 **request that he be pushed by another inmate and**
13 **not Officer Marin.  I'm not going to speculate**
14 **on that, but Mr. Westmoreland was assisted,**
15 **which is the Sheriff's Office policy.**
16      MR. DEVORE:  And your question
17 regarding the office policy does call for
18 speculation as noted by the witness.
19 BY MR. MORRISSEY:
20 Q   I'm going to show you Exhibit [sic] 148.
21 Exhibit 148 is titled:  Communication and
22 Interaction with Individuals with Disabilities.
23 Do you see this, Ms. Rivero-Canchola?
24 **A   I do, yes.**

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

---

Page 162

1    Q    Is this policy applicable at the
2  Department of Corrections?
3    A    We have multiple policies, and the
4  numbers have changed over time.  So I'm not
5  sure if that one is the correct policy number
6  at this time; but at one point, yes, it has
7  been the policy.
8    Q    And if we go down to -- let me get
9  the right page here.  If we go down to Page 259
10  of the policy document -- do you see on Page 258,
11  it says:  148.6.8 Arrests, Bookings, Court
12  Remands and Court Appearances?
13    A    I see that.
14    Q    And do you say -- do you see where it
15  says:  Absent specific and articulable safety
16  or security concerns, members shall provide
17  assistance to wheelchair-bound subjects who are
18  in the Sheriff's Office custody.  This includes
19  but is not limited to:  Pushing subjects up and
20  down ramps throughout corridors in Sheriff's
21  Office facilities?
22    A    It does say that, yes.
23    Q    Was this language implemented because
24  of the Lacy litigation?

---

Page 163

1        MR. DEVORE:  Objection, calls for
2    speculation.
3  BY THE WITNESS:
4    A    So Lacy litigation commenced before
5  my employment as ADA compliance officer, but I
6  believe that some of our policies were crafted
7  to address that, but some of our policies were
8  crafted to address DOJ concerns and other
9  matters of the Sheriff's Office.
10  BY MR. MORRISSEY:
11    Q    And so this -- is this policy in
12  effect today that staff members shall push
13  subjects up and down ramps and through
14  corridors in Sheriff's Office facilities?
15    A    So I think the document speaks for
16  itself, and that portion that you read says
17  absent specific and articulable safety or
18  security concerns, members shall provide
19  assistance to wheelchair-bound subjects and
20  then gives examples of what that assistance
21  could include.  And since we are hopefully
22  talking about Westmoreland, which we've spent a
23  lot of time not talking about Westmoreland,
24  that assistance at that day that Officer Marin

---

Page 164

1  escorted him to Division 4, I could say he had
2  a specific and articulable safety or security
3  concern that he would say why he didn't
4  personally push Westmoreland or maybe there
5  were other reasons.  I'm not going to speculate
6  on that, but he was doing mass movement, and my
7  preference is that they keep their hands free
8  when they are doing mass movements.
9    Q    Did Officer Marin say that's why he
10  didn't push Mr. Westmoreland up and down ramps
11  and through the corridors when he voted?
12    A    Marin said what is contained in the
13  e-mail that he sent me that was tendered in
14  this case, which is why I had him send the
15  e-mail so we would have a clear record of what
16  it was that he conveyed to me that day.
17    Q    Well, my question is at any point,
18  did he tell you any specific and articulable
19  safety or security concern why he didn't push
20  Westmoreland?
21    A    Well, your question assumes that I
22  would have asked that, and the allegation
23  contained in the grievance wasn't about who was
24  doing the pushing.  It was about the fall.

---

Page 165

1    Q    Now, have you given training to staff
2  about using inmates to push wheelchairs
3  throughout the DOC compound?
4    A    What?
5    Q    Have you given direction to
6  correctional officers about circumstances when
7  the correctional officer should ask other
8  inmates to push a wheelchair user up and down
9  ramps and in corridors?
10    A    Again --
11        MR. DEVORE:  Objection, form, already
12    testified.
13        But go ahead.
14  BY THE WITNESS:
15    A    Yeah, I don't know how to more
16  thoroughly answer this.  I provide training to
17  all of our new employees regarding
18  accommodating inmates with disabilities.
19  Sometimes we address hypothetical situations.
20  It could include mass movement like that, but
21  it can include other things too.
22    Q    So do you have any specific
23  recollection about providing training to staff
24  about having other inmates push wheelchairs?

---

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 166

1      MR. DEVORE: Objection --
2   BY THE WITNESS:
3      A   I do say -- and I think we already
4   answered that --
5      THE REPORTER: I'm sorry. I couldn't
6   hear your objection, Mr. Devore.
7      MR. DEVORE: It's asked and answered.
8      THE WITNESS: Yeah.
9      MR. DEVORE: It's been covered at
10  length and it's -- you know, obviously it's
11  duplicative, calls for speculation in
12  certain parts as well.
13  BY THE WITNESS:
14     A   And it's 1:58 p.m. and I'm answering
15  the same question again, which is I provide a
16  lot of advice and training to staff about
17  accommodations for inmates, and I believe that
18  I've already stated that an accommodation could
19  include having another inmate push that
20  wheelchair so that the officer can focus on
21  safety and security when moving more than one
22  inmate.
23  BY MR. MORRISSEY:
24     Q   Did you ever train Officer Marin

Page 167

1   about the path of travel to bring a wheelchair
2   user from -- who's housed in the RTU over to
3   Division 4?
4      A   No.
5      Q   Do you know whether correctional
6   staff have been trained about the path of
7   travel to move a wheelchair user who is housed
8   in RTU over to Division 4 to vote?
9      MR. DEVORE: Objection, vague, calls
10  for speculation.
11  BY THE WITNESS:
12     A   No, I don't know anything about that.
13  BY MR. MORRISSEY:
14     Q   Is there -- are there accessible
15  paths of travel to your knowledge from the RTU
16  to Division 4 to vote?
17     A   I mean, that's a legal conclusion on
18  whether or not a path of travel is accessible,
19  but I do know that there are various routes to
20  take to get into the gym of Division 4 to vote.
21     Q   And do you know about the training
22  Officer Marin had about the paths to bring a
23  wheelchair user from RTU to Division 4 to vote?
24     A   You just asked me that two questions

Page 168

1   prior. No, I don't.
2      Q   So do inmates have a choice about
3   which path they travel when they go from the
4   RTU to Division 4 to vote?
5      A   No. Inmates do not have a choice on
6   how they are moved in our facility.
7      Q   Tell me why inmates do not have the
8   choice.
9      A   Because they're in --
10     MR. DEVORE: Objection, calls for
11  speculation.
12  BY THE WITNESS:
13     A   And so off topic but, yeah, they're
14  inmates in the Department of Corrections, so
15  they have limited rights here, Patrick.
16  BY MR. MORRISSEY:
17     Q   And is it fair to say that inmates
18  don't have a choice when they're leaving the
19  RTU whether the inmate goes through the RTC
20  east/west corridor or the north/south corridor?
21     MR. DEVORE: Same objection.
22  BY THE WITNESS:
23     A   Inmates have limited rights here. So
24  do they get to dictate their path of travel to

Page 169

1   a destination, no.
2   BY MR. MORRISSEY:
3      Q   Why not?
4      A   I just answered that.
5      MR. DEVORE: Same objection.
6   BY THE WITNESS:
7      A   They're inmates. They have limited
8   rights here. They don't get to dictate their
9   path of travel.
10  BY MR. MORRISSEY:
11     Q   Why did Officer Marin escort
12  Mr. Westmoreland to Division 4 using the metal
13  ramp?
14     MR. DEVORE: Objection, speculation,
15  assumes facts not in evidence.
16  BY THE WITNESS:
17     A   Yeah, I don't know. I don't know.
18  I'm not Officer Marin, so I wasn't there. So I
19  don't know.
20  BY MR. MORRISSEY:
21     Q   Have you ever laid eyes on that metal
22  ramp in Division 4 that goes to the area in the
23  lower level where people vote?
24     A   I have seen a metal ramp over a set

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 170

1 of stairs in the basement of Division 4 that's
2 used to transport laundry carts and food carts.
3 Yes, I've seen that.
4  Q   Have you ever seen inmates move or up
5 or down that metal ramp?
6  A   Other than the video I reviewed of
7 Westmoreland doing that on the day of the vote,
8 no.
9  Q   Why was Mr. Westmoreland directed to
10 go up and down that metal ramp on the day he
11 voted?
12      MR. DEVORE:  Objection, assumes facts
13 not in evidence, calls for speculation.
14 BY THE WITNESS:
15  A   I already answered that.  I don't
16 know.  You should ask Officer Marin why he went
17 that way.
18 BY MR. MORRISSEY:
19  Q   Did Officer Marin violate any policy
20 or procedure by directing Mr. Westmoreland to
21 traverse that metal ramp in Division 4?
22      MR. DEVORE:  Objection, calls for
23 speculation, lack of foundation, calls for
24 a legal conclusion, assumes facts not in

Page 171

1 evidence, argumentative.
2 BY THE WITNESS:
3  A   Yeah, I think you're speculating that
4 Officer Marin directed the inmate to push
5 Westmoreland up or down that ramp, and I'm not
6 sure that was their path of travel on the way
7 there because I only observed on the way back,
8 them traversing that ramp.  So I think there's
9 a lot of assumptions you're making in that
10 question.
11 BY MR. MORRISSEY:
12  Q   Did you watch video showing some
13 inmates had to get out of their wheelchairs to
14 go down that metal ramp in Division 4?
15  A   No.  No.
16      MR. MORRISSEY:  Do you need to leave
17 now?  So we can --
18      THE WITNESS:  Yeah, because you took
19 a 30-minute break two hours into the
20 deposition, and there's a ride that I need
21 to take to get home because I carpooled
22 today, so.
23      MR. DEVORE:  So what -- what time
24 frame will we be looking at, Sabrina?

Page 172

1      THE WITNESS:  I mean, I have to go to
2 Orland Park, so it could be an hour.  It
3 could be a little bit more.  I don't know,
4 but I will definitely pick it up as soon as
5 I get home.
6      MR. DEVORE:  Okay.
7      MR. MORRISSEY:  Well, why don't we
8 just continue this to a different day
9 because I don't want to --
10      MR. DEVORE:  How much do you think
11 you have left?  I know it may be
12 difficult to --
13      MR. MORRISSEY:  Probably about an
14 hour, hour and a half.  I think we should
15 continue this another day because I don't
16 want to --
17      THE WITNESS:  So we gave you 45 minutes,
18 Patrick, but you are not going to give us
19 one hour; is what you're saying?
20      MR. MORRISSEY:  Peggy, I assume --
21 are we off the record?
22      THE REPORTER:  Do you want to go off
23 the record?
24      MR. DEVORE:  Yeah, let's go off the

Page 173

1 record.
2          (WHEREUPON, a discussion
3          off the record was held.)
4      MR. MORRISSEY:  We talked on the
5 record and the witness has a carpool and
6 has to leave.  I prefer to finish this path of
7 a different date, given the circumstances and
8 limitations on me and notification by the
9 court reporter that she has commitments at
10 a certain time today.  I would prefer we
11 just continue this next year.
12      I raised a preference that I
13 prefer not to do it Friday because it's the
14 holidays, and I have some personal matters
15 that I prefer to address.  I would just
16 like to talk to counsel about this.
17      MR. DEVORE:  Understood.  And we
18 would like to be able to try to get this
19 done between 3:00 and 4:30 and see how much
20 we can possibly do and if there's any
21 mop-up, perhaps on Friday morning finish it
22 up then but we understand counsel's -- what
23 he said on the record.
24      MR. MORRISSEY:  All right.  So we're

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

45 (Pages 174 to 177)

Page 174

1 going to stop the dep, and I will confer
2 with defense counsel and hopefully next
3 year we can address this, you know.
4 Thanks, everybody. And happy new year and
5 happy holidays. I'll take a copy, Peggy.
6 THE REPORTER: Mr. DeVore, do you
7 need a copy?
8 THE WITNESS: I reserve signature,
9 Jason.
10 MR. DEVORE: Yes, we would like a
11 copy.
12 THE REPORTER: Patrick, are you okay
13 with two-week delivery?
14 MR. MORRISSEY: Yeah, that's fine.
15 See you, everybody.
16 THE REPORTER: Bye.
17 (WHEREUPON, proceedings
18 were continued to January 4,
19 2024.)
20
21
22
23
24

Page 176

1 STATE OF ILLINOIS )
) ss:
2 COUNTY OF C O O K )
3 I, Peggy A. Anderson, a Certified
4 Shorthand Reporter in the State of Illinois do
5 hereby certify:
6 That previous to the commencement of
7 the examination of the witness, the witness was
8 duly sworn to testify the whole truth
9 concerning the matters herein;
10 That the foregoing deposition
11 transcript was reported stenographically by me,
12 was thereafter reduced to typewriting under my
13 personal direction, and constitutes a true
14 record of the testimony given and the
15 proceedings had;
16 That the said deposition was taken
17 before me at the time and place specified;
18 That the said deposition was
19 adjourned as stated herein;
20 That I am not a relative or employee
21 or attorney or counsel, nor a relative or
22 employee of such attorney or counsel for any of
23 the parties hereto, nor interested directly or
24 indirectly in the outcome of this action.

Page 175

1 IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
2 EASTERN DIVISION
3
EUGENE WESTMORELAND, )
4 individually and for )
a,class )
5 )
Plaintiff, )
6 )
vs. ) No. 1:23-cv-01851
7 )
THOMAS DART, Sheriff of ) Part 1
8 Cook County and COOK )
COUNTY, ILLINOIS, )
9 )
Defendants. )
10
11 I, SABRINA RIVERO-CANCHOLA, being
12 first duly sworn, on oath, say that I am the
13 deponent in the aforesaid deposition, that I
14 have read Part 1 of the foregoing transcript of
15 my deposition, consisting of pages 1-175
16 inclusive, taken at the aforesaid time and
17 place and that the foregoing is a true and
18 correct transcript of my testimony so given.
19
20 _____
SABRINA RIVERO-CANCHOLA
21
SUBSCRIBED AND SWORN TO
22 me before this _____ day
23 of _____, A.D. 2024.
24 _____

Page 177

1 IN WITNESS WHEREOF, I do hereunto set
2 my hand this 1st day of January, 2024.
3
4
5
6 _____
7 Peggy A. Anderson
8 Certified Shorthand Reporter
9 License No. 084-003813
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 1

**A**

**a,class** 1:4
175:4
**A.D** 175:23
**a.m** 1:19
130:18,19
**abbreviation**
53:16
**abilities** 35:1
63:11
138:21
139:2,21
140:3
**ability** 19:1
96:8 127:2
127:6
156:16
**able** 7:21
14:4,7,8
19:6 20:11
54:1 67:11
67:19,22
112:12
156:11
173:18
**absent**
162:15
163:17
**Absolutely**
148:22
**academy**
100:12
**access** 27:18
27:20 29:3
45:12 89:24
90:2,20
91:5 146:24
147:1,6
**accessed**
90:10
**accessibility**
8:11 10:4
86:1 88:11
138:24

153:7
**accessible**
9:10,18,22
9:24 137:21
138:6
167:14,18
**accommod...**
36:15 66:12
134:4 135:4
135:12
136:9
140:13
141:3
144:21
**accommod...**
65:24
165:18
**accommod...**
22:11,14,20
22:24 23:5
39:17 74:14
109:18
110:8 141:7
141:10,13
142:18,22
148:16
166:18
**accommod...**
79:15 110:4
134:14
139:7,17
141:1
142:10
146:3 147:7
147:11,15
147:22
148:2,13,20
161:8
166:17
**account**
81:17
**accurate**
84:21 93:2
**Achterhof**

11:15 14:2
**acknowledge**
111:5
**acknowled...**
102:9
**Act** 5:4 26:22
136:22
**action** 99:9
176:24
**actions** 81:10
**actual** 113:8
**ADA** 4:19,20
5:1,6 7:12
10:8,16
11:19,24
12:4,22
13:1,5,13
13:17 22:10
22:12,14,19
22:23 23:5
23:9,15,24
24:8 27:8
27:24 28:10
28:20 29:2
29:3 30:1
31:22 33:14
37:9,10,16
39:20 40:3
40:6 41:20
42:23 48:1
49:13,22
51:12 63:14
63:23 64:7
85:4 86:21
87:6,14,22
88:11,14,17
88:19,23
89:2,7
98:23
108:11,22
109:10
134:2
136:20
147:10

149:6 153:3
153:3
156:23
157:4 163:5
**additional**
121:23
**address**
26:17 27:5
27:8 94:23
118:7
131:10
163:7,8
165:19
173:15
174:3
**addressed**
95:15 96:23
**addresses**
48:16
**adjourned**
176:19
**administra...**
129:24
**administra...**
129:21
**admission**
21:21
112:23
**admissions**
111:2
**admit** 5:12
113:8
**admitted**
21:8,11,13
21:16 83:1
111:9
**advice** 66:23
166:16
**advise** 148:19
**advised** 66:22
**aforesaid**
175:13,16
**ago** 11:20,23
35:16,18

37:2 97:11
97:21 98:17
106:11
125:13
127:21
128:16
129:7 150:9
**agree** 27:11
93:6,8
94:22 121:9
130:13
**agreed** 118:4
**ahead** 63:1
104:8
165:13
**aid** 14:14
17:17,21
18:6,9
138:22
143:14
**aids** 143:9,9
**alert** 14:11
15:15 59:23
137:6,8,12
137:16
140:24
**alerts** 8:2,4,5
8:7,10 9:16
20:14 140:8
**allegation**
64:24
124:18,22
164:22
**allegations**
79:6,14,20
79:23,24
80:3,5,8,10
80:17 81:21
106:24
131:12
158:4 160:7
**alleged**
131:17
**alleges** 92:9

121:11
**allow** 67:12
67:15
**allowed**
16:24 18:2
18:7 70:12
145:16
**alter** 64:3
**Alternatively**
117:19
**American's**
5:3
**Americans**
26:21
136:22
**amount** 9:9
**analyzed**
88:10
**and/or** 136:3
**Anderson**
1:17 122:17
122:19
124:20
176:3 177:7
**answer** 15:5
34:20 38:15
39:10 49:9
58:19,24
63:10 75:6
84:14 89:9
96:8 105:3
119:18
132:5
139:24
140:19,20
141:19,22
142:13,19
147:3
155:21
165:16
**answered**
18:20 20:16
38:11 40:20
50:1 52:9

SABRINA RIVERO-CANCHOLA
December 20, 2023

84:7 89:13
102:18
112:19
129:5 132:6
132:6 166:4
166:7 169:4
170:15
**answering**
98:15,16
113:2 137:3
166:14
**answers**
83:21
155:15
**anybody**
50:23 69:16
111:24
153:19
156:13
**anybody's**
112:6
**anymore**
35:14
**apparent**
143:2,6
**appeal** 105:3
119:2,3,4,5
129:10,19
130:2
**appealed**
104:16
129:9,18,24
**appear** 18:5
36:5 77:10
**appearance**
35:13
**Appearances**
162:12
**appeared** 2:7
2:13 111:15
**appears**
17:22 18:10
71:19 73:12
74:16 75:10

76:9 77:2
78:10
**applicable**
13:8 138:11
153:10
162:1
**applied** 10:4
**appointment**
38:21 39:2
39:8 95:3
114:20
**appropriat...**
141:20
147:3
**approximate**
5:22
**approxima...**
4:22 6:12
6:14 116:6
**April** 86:18
**architect**
41:15,17
47:11
**architects**
41:5,19
42:7,9,15
42:23 43:1
49:22
**area** 53:17
124:1,4
169:22
**areas** 33:17
60:13 62:16
71:8 108:6
108:12
113:18
135:16
**argumenta...**
171:1
**arms** 92:15
**Arrests**
162:11
**articulable**
162:15

163:17
164:2,18
**asked** 18:19
35:20 40:19
40:23 47:21
49:24 50:3
65:3 75:22
77:14 88:21
89:12,18,21
108:4
115:14
131:7
143:18
145:3 148:9
150:22
159:3
160:16
164:22
166:7
167:24
**asking** 12:24
23:5 53:21
56:2,7
57:16,18
58:17 59:4
64:10 68:12
71:11,13
81:1 82:3
83:4 104:10
115:4 131:5
132:21
136:12
137:1 145:2
151:22
**assess** 47:19
134:4
135:11
**assessed** 41:5
49:21 51:11
139:3 143:7
**assessment**
10:16 39:20
40:3,6,11
40:18,24

41:1,13
42:24 43:24
47:22 48:2
49:11 51:20
86:21 87:6
87:14,22
88:14,17,19
88:23 89:7
89:11,19,23
**assessments**
41:20
**assigned** 9:16
16:6 47:17
59:10 137:9
137:13,14
137:16,18
139:4
**assignments**
135:22
136:17
**assist** 31:4,23
32:9,20
33:20 58:20
66:1 107:12
107:16
132:14
141:14
144:1
**assistance**
61:9 66:14
74:17 75:2
84:1 98:4,7
98:10,12
99:2,5
101:15
102:14
104:5 126:2
127:11
132:10,10
132:13
143:5,18,19
147:21
162:17
163:19,20

163:24
**assisted** 14:1
84:1 144:16
161:14
**assisting**
33:14 66:13
161:9
**assistive**
146:19,20
**associated**
29:15
**assume** 72:2
74:23 82:20
141:10
172:20
**assumed**
45:17 82:22
**assumes** 28:2
28:5 60:10
61:21 62:21
87:24 115:8
141:6
142:15,17
164:21
169:15
170:12,24
**assuming**
40:21 46:7
61:1 72:1
75:4 97:8
141:12
**assumption**
141:8
**assumptions**
142:14
171:9
**attempt** 82:5
**attempts**
132:14
**attend** 36:6
36:10,16
37:4 38:6
38:16,20
50:12,15,20

**attendance**
51:10
**attended**
38:3 50:24
**attending**
37:23 51:5
**attends** 36:13
50:18
**attorney**
176:21,22
**audio** 99:21
**audits** 69:24
69:24
**August** 119:8
119:9 120:2
125:9,22
**authorized**
134:1,21
**automatica...**
138:23
**auxiliary**
138:22
143:9
**available**
57:12,16
58:10,14
59:2 63:7
70:17 96:6
96:13,14
97:10,12
98:16 128:3
141:2,13
143:20
144:5,8
145:12,13
145:14
147:2,12
148:21
**Avenue** 2:4
**aware** 28:16
28:17 39:13
58:9 61:7
64:11 82:10
82:12 97:17

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 3

124:24
134:9
137:19
141:23
142:1,3
146:10
153:6

**B**

**B** 3:6
**B-o-u-t-t-e**
16:9
**back** 8:19
73:15 77:4
86:10 92:14
93:13 96:11
97:19
105:14,17
116:17
118:5
158:21
171:7
**Background**
11:17
**balance**
78:14
**barrier** 32:4
33:7
**barriers** 31:5
31:21 32:1
32:8,21,23
33:2,16
34:12 49:2
49:5 50:10
**base** 8:1
152:16
**based** 9:13
28:21 41:6
44:11,12
46:12 47:2
66:19 68:22
74:1,20
75:12
105:24

106:12
108:8 109:2
120:23
131:16
139:5
**basement**
56:13,15,19
72:5,6,12
106:9
108:24
150:13
151:23
152:4,10
153:12
170:1
**basis** 35:11
**Bates** 11:2
12:11
**bed** 9:6,8,9
49:18
**beginning**
136:19
149:7 157:3
**begins** 150:17
**begun** 41:12
**behalf** 2:7,13
119:12
**belief** 82:14
**believe** 7:22
8:5 9:20
12:2,8 16:6
27:2 28:7
29:13 37:5
39:22,24
62:24 64:15
68:22 79:11
80:11 83:4
84:19 85:16
87:3,10
92:7 96:23
97:2 105:11
106:1 109:9
112:20
113:1

118:21
146:1
149:24
150:3
151:21,24
156:21
158:11
163:6
166:17
**believed**
81:21
**best** 39:10
63:10 96:8
**better** 59:1
89:9
**big** 42:4
117:12
**bigger** 10:23
11:5
**bit** 11:5 172:3
**blocks** 116:7
**body** 65:2,4
92:11,13,14
**Bookings**
162:11
**bottom** 72:24
**Boutte** 16:10
16:23
**branch** 95:19
**branches**
24:9
**brand** 142:17
**break** 31:11
48:16,22
116:10
117:6,9
118:1,3
171:19
**bring** 44:20
45:5,10
144:19
167:1,22
**broad** 137:2
**broken** 80:2

84:3,3
**brought**
161:1
**build** 64:3
111:23
**building** 16:3
41:3 45:24
46:3 47:17
47:19 52:6
53:7,9,11
53:13
110:22
111:23
120:2
121:17,18
122:1,2
123:18,19
123:21
124:1
130:17,17
149:21
150:12,18
153:5,9
**buildings** 9:7
9:11 33:18
48:4 64:3
64:11 86:2
89:8 108:6
112:14
121:8 138:9
138:12
155:19
**built** 13:21
109:5 152:2
153:5
**bullpen**
123:22
**bunch** 147:19
**burn** 65:1
92:11,13
**burning** 65:4
**business**
10:20 11:12
86:15 87:4

138:1,4,5
**Bye** 174:16

**C**

**C** 2:1 4:12
176:2
**California**
120:2
**call** 53:14
81:7 144:1
146:4
152:10
161:17
**called** 1:12
4:9 28:24
29:1 37:9
111:6
**calls** 82:16
83:8 104:7
112:9
126:19
138:17
139:9 163:1
166:11
167:9
168:10
170:13,22
170:23
**camera** 77:6
**cameras**
76:16
**campus** 40:4
40:7,11,15
41:2,3,6,13
41:15,20,22
42:12 43:2
48:3,5 87:7
**cane** 8:8
15:21 19:2
34:2,6,11
58:1,11,22
59:17,23
140:5 145:7
146:14

148:3
**canes** 33:20
**capacity**
107:13
**capital** 23:17
23:20,21
39:19 40:2
41:11 45:6
45:8,11,14
47:13,14,21
49:11,20
50:5,8,13
50:19,23
51:6 64:10
86:3,6,20
87:2,12,15
87:21 88:9
88:13 89:15
89:18
**caption** 77:1
**care** 9:13,14
100:12
102:23
104:13
**carpool** 173:5
**carpooled**
171:21
**cart** 143:24
144:16,20
145:1,9,10
145:16
146:13,24
147:1
**cart's** 144:24
**carts** 145:20
146:7,10,17
170:2,2
**case** 5:13 6:4
10:20 11:12
12:11,15,17
25:7 26:7
26:11,14
39:17 79:11
80:20 82:15

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 4

82:18 83:12
83:22 84:11
86:15 87:4
111:3 138:1
138:4,5
155:15
160:13
164:14
**catch** 78:13
**caused** 65:1
92:10,12
**CCOMS**
14:20,22
15:13 18:14
18:18 19:2
20:3,9,15
20:17 100:2
100:14
**CCSO** 27:7
109:16
**cell** 125:16,18
125:19
128:1
**cells** 124:6,7
128:3,5
**census**
154:11,13
**Cermak** 9:5
9:17 10:11
12:8 38:20
38:21 39:2
39:9 43:18
43:22,23
44:3,9,13
44:17 45:5
45:16,18,22
45:23 46:1
47:2 49:1,6
52:7,14
53:19 54:12
54:17 55:1
55:13,19,22
56:1,4,8,10
56:13,14,16

56:20,22
57:7,9,11
57:14,18,22
58:3,11,15
58:22 79:1
88:15,17,20
93:13 94:3
95:3 96:11
96:22 97:19
105:10,20
105:23
106:9,14,23
108:2,23,24
109:5
110:22
111:14,18
114:20
115:13
134:9,17,18
135:11
137:9,14,18
137:20
138:5 142:2
142:7,12
143:8,11,16
149:11
151:23
**certain** 35:23
36:21 37:4
47:19 84:2
135:9
166:12
173:10
**Certified**
1:18 176:3
177:8
**certify** 176:5
**chain** 127:4,8
140:2 152:7
**chair** 132:15
**changed**
35:19 36:3
36:4 38:16
150:5 162:4

**changing**
145:5
**charge** 49:21
**Chicago** 2:5
2:11
**choice** 168:2
168:5,8,18
**chose** 54:4
**circumstance**
125:4
155:12
**circumstan...**
165:6 173:7
**Civil** 1:15
**claims** 83:15
83:19
**clarification**
15:4
**clarify** 53:1
152:2
**class** 25:10,12
**classification**
53:15
135:21,24
136:16
137:17
150:14
**classroom**
30:12
**clear** 24:18
42:19 51:18
80:19
164:15
**clients** 81:5
**close** 59:22
**Code** 153:7
**Collin** 16:1
16:23
**combine**
95:10
**come** 35:24
41:19,21,23
41:24 43:6
44:13,17,19

116:17
118:4
**comes** 23:20
23:21 90:16
90:19 143:8
**coming** 38:9
39:15 87:13
133:15
**command**
127:5,9
140:2
**commander**
99:24
101:13
**commenced**
163:4
**commence...**
176:6
**comment**
155:11
**commissary**
81:17
**commitme...**
173:9
**committee**
23:11,12
**communic...**
97:23
**Communic...**
161:21
**compare** 77:5
**compared**
76:2
108:20
**compensated**
82:7
**compensati...**
81:20 82:15
**compile**
101:2,4
**complain**
129:14
**complained**
125:15

127:18
130:14
**complaining**
92:3 105:9
105:12,20
106:2 119:8
119:21
**complaint**
93:7 94:13
94:22,24
119:11,14
129:21
130:5,7
**complaints**
63:21 64:5
81:11 91:17
**complete**
83:23
141:22
**completed**
89:7,21
**compliance**
4:19,21 5:1
5:7 23:9,15
23:24 24:8
49:22 85:5
136:20
147:10
163:5
**compliant**
12:22 13:1
13:6,13
63:14,22
64:6 89:2
149:6
**complies** 5:3
10:8 12:5
13:18
136:21
**comply** 33:14
51:12 109:6
**complying**
24:11
**compound**

165:3
**computer**
14:13,18,19
14:21 15:1
15:3 48:17
**computer-...**
20:18
**concern**
164:3,19
**concerning**
94:1,4
176:9
**concerns**
162:16
163:8,18
**conclusion**
80:15 109:9
109:12
137:23
143:13
167:17
170:24
**conditions**
139:8,12
**conduct**
39:20 40:3
40:6,10,17
40:24 41:1
41:20 47:22
49:10 86:20
87:6,22
**conducted**
69:23 125:7
**conducting**
42:23 122:6
123:2
**confer** 128:10
174:1
**conferred**
128:13
**confirm**
26:16
**confusing**
57:15 60:5

SABRINA RIVERO-CANCHOLA
December 20, 2023

conjunction
  11:14
connects
  56:17
consider
  80:16
consisting
  175:15
constantly
  87:18
constitutes
  176:13
construct
  64:3
constructed
  51:14
  138:12
contact 50:9
  50:11 87:12
  87:18 147:9
contain 129:1
contained
  158:5 160:7
  164:12,23
contains 34:8
  91:8
content 30:11
contents
  118:18
  119:6
context 12:1
  13:10 23:6
  23:19 32:5
  32:12 34:18
  34:23 35:19
  36:9 58:16
  74:21 75:3
  75:5 108:10
  145:5
  153:15
continue
  73:20 75:13
  78:6 172:8
  172:15

173:11
continued
  4:5 174:18
contract 44:5
  44:6
contractors
  42:3
control 9:6,8
  9:9 91:23
  93:17,22
  95:4,11,13
  95:14,16
  118:14
conversation
  153:15
conversatio...
  7:1,3,5,8
  122:14
conveyed
  164:16
Cook 1:8,8
  2:14 5:2,13
  7:14,21,24
  8:9,14 9:22
  14:22 15:6
  15:16 16:4
  16:11 22:4
  22:20 24:2
  24:10 33:3
  33:6 34:13
  35:7,10
  36:3,11,13
  38:18 39:21
  40:4 41:19
  41:21,23
  42:1,2,16
  43:1,6,13
  43:19 48:2
  48:4 50:10
  56:23 74:2
  76:17 81:21
  86:21 87:7
  95:21
  104:12

106:18
112:7,14
123:14
124:4,12
137:5 149:9
157:2 161:5
175:8,8
coordination
  134:1
coordinator
  134:3
copy 174:5,7
  174:11
correct 13:14
  14:24 26:8
  51:19 78:23
  80:20 82:11
  88:15,21
  93:20 95:7
  106:24
  111:7 116:2
  119:10
  126:4
  145:11
  157:13,15
  162:5
  175:18
Correction
  89:8
correctional
  24:14,16
  25:5 28:1
  28:11 30:20
  60:14 67:6
  91:9 140:7
  140:12
  141:1,14
  142:24
  143:12
  157:7,10
  165:6,7
  167:5
Corrections
  22:21 23:23

24:3 36:14
38:19 39:21
48:3,5 59:3
59:10,12
60:21 62:17
70:14 71:6
86:22
108:15
162:2
168:14
corridor
  56:16 66:6
  67:3,4,8,16
  69:14,20
  70:2,5,13
  71:18,21
  72:24 73:1
  74:11 75:1
  75:15 76:3
  76:8,10,23
  77:3 78:9
  78:16,16,17
  78:18 79:1
  97:7 98:13
  104:6 108:2
  108:8,21
  110:11,13
  111:6,8
  112:1,17,24
  113:12,21
  113:21,22
  114:11,21
  114:22,23
  115:1,12,16
  115:21
  116:1,1
  121:1,4
  130:21
  131:8 141:4
  141:8,16
  142:23
  143:3 144:6
  144:17
  145:10,18

145:24
147:17
151:1
168:20,20
corridors
  66:2,17
  67:1 70:7
  88:10,24
  89:20
  106:19
  109:22
  110:6 116:4
  120:4,8,11
  121:3
  130:14
  131:4,9
  146:9
  162:20
  163:14
  164:11
  165:9
counsel 6:7
  48:16 70:24
  173:16
  174:2
  176:21,22
counsel's
  173:22
count 5:21,24
  68:5 151:3
  154:6,17
counted
  120:20
  150:23
  154:15
  155:10
County 1:8,8
  2:14 5:13
  7:14,21,24
  8:9,15 9:22
  15:16 16:4
  16:11 22:4
  22:20 24:2

24:10 33:3
33:6 34:13
35:7,10
36:3,11,14
38:19 39:21
40:4 41:20
41:22,23
42:1,2,16
43:1,6,13
43:19 48:2
48:4 50:10
56:23 74:2
76:17 81:22
86:21 87:7
95:22
104:12
106:18
112:7,14
123:15
124:5,12
137:5
149:10
157:2 161:5
175:8,8
176:2
County's 5:2
couple 6:5
  84:19 150:9
course 99:1,3
court 1:1
  35:8,10,13
  35:22,23
  36:3,6,11
  36:13,16
  37:4,7,23
  38:6,16
  39:6,14
  65:9 113:20
  120:2
  121:18
  122:2
  123:11,15
  123:19,21
  124:1,3,12

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 6

124:15
125:8
127:18
130:17
162:11,12
173:9 175:1
**courthouse**
61:8 97:2
114:1,6,10
120:6,17,18
120:22
122:23
123:6 124:9
132:11
**courthouses**
38:3
**Courts** 1:16
**cover** 105:15
**covered** 7:9
19:4 69:10
106:7,17
107:11
157:1 159:2
166:9
**COVID** 21:2
37:21 38:1
38:16,18,24
39:5
**COVID-19**
21:4
**coworkers**
17:14
**crafted** 163:6
163:8
**create** 29:7,9
**criteria**
135:21
136:1,12,16
**crutch** 8:8
19:2 34:2,6
34:11 58:1
58:11,23
59:17,23
140:5

**crutches**
15:21
146:14
**current** 13:20
26:11 27:1
27:6,9
153:8
**currently**
10:9 12:6
14:5 16:6
**Cushman**
143:24
144:20,23
145:1,20
146:16,24
147:1
**custody**
24:12 33:15
39:16 58:15
79:16,18
135:13
136:10
140:11
147:13
162:18

———— **D** ————
**D** 3:1 4:12
92:17,17
**daily** 35:11
**damaged**
92:14
**Dart** 1:7 4:4
175:7
**data** 156:16
**date** 4:6
38:22 39:3
39:24 86:11
86:11,12,17
86:19,23
89:22 92:4
107:3
120:14
127:18

160:24
173:7
**dated** 10:17
10:21 87:4
151:18
**dates** 43:10
43:11
**Dave** 51:7
**Davis** 6:4
50:15,22
**day** 21:13,18
37:4 39:7
44:12 50:21
51:1 54:4
54:10 83:24
106:4,11
123:3,11,12
136:24
158:12
160:15
163:24
164:16
170:7,10
172:8,15
175:22
177:2
**days** 136:8
**deal** 140:10
**deals** 82:17
**December**
1:19 96:15
97:11 107:5
**decline** 72:7
72:19,21
**declined** 84:1
**declines** 98:3
98:13
**dedicated**
124:14
**Defendant**
2:14
**Defendants**
1:9 175:9
**defense** 70:24

174:2
**define** 56:5
60:12
120:19
131:21
**defined**
136:11
**defining** 36:9
72:21
**definitely**
6:23 103:15
172:4
**definition**
9:24 106:16
**delete** 101:8
**delivery**
174:13
**demarkation**
42:19
**demonstrate**
74:16 102:1
**denied** 99:1,3
**deny** 99:4
**dep** 12:14
174:1
**department**
22:21 23:22
24:2 29:10
36:14 38:19
39:21 48:2
48:5 59:2,9
59:12 60:21
62:17 70:14
71:6 86:22
89:8 95:21
100:24
108:15
133:4 134:5
134:11
157:3 162:2
168:14
**depend** 10:3
32:6 34:24
51:1 54:3,8

100:3
114:16
153:4
**dependent**
146:23
**depending**
20:23 23:6
58:15 72:4
103:13
137:17
**depends** 13:6
21:11 28:13
33:4 47:16
52:15 54:7
54:9 55:8
56:5 75:3
108:10
109:4
113:16
123:3 135:6
137:7,8,12
138:20
140:18
148:5 153:8
**deponent**
175:13
**deposition**
1:11 4:4
6:15,17
36:24 37:6
69:7,11
70:24 80:24
91:16 117:2
118:20
130:12
131:3
133:12
136:20
149:8
171:20
175:13,15
176:10,16
176:18
**depositions**

1:17 116:22
**deputy** 140:8
**describing**
148:6
**design** 10:9
12:5 13:18
137:21
138:7
**designated**
50:20
**designed**
138:9,13
**designee**
134:1 135:5
**destination**
115:19
169:1
**details** 43:3
**detained**
134:5
**detainee**
20:22 21:10
36:12 65:16
67:2 90:12
91:5 99:19
114:18,19
120:1
122:22
140:3
142:24
**detainee's**
90:13,15
**detainees**
10:10 12:6
15:8,19
30:15 36:20
36:21 37:3
39:15,17
55:20 57:1
58:20 62:3
68:10 70:12
73:7 78:2
78:18,21
114:14

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 7

135:18
158:10,12
158:14,18
**determinat...**
159:13
**Determined**
133:3
**determines**
140:4
**deviate**
126:23
160:23
161:2
**deviated**
126:17
**deviation**
99:11 126:7
126:9,11
**device** 35:1
**devices** 8:11
8:11 15:24
16:24 18:3
18:7 19:17
146:19,20
**Devore** 2:9
2:10 9:23
10:23 11:4
12:10,18
13:3 17:2
18:19 23:1
24:4,18
26:15 28:2
31:10,16
34:14 36:18
38:13 40:19
42:17 48:9
48:13 49:24
51:17,22
60:4 62:21
68:20 72:8
80:18 81:23
82:16 83:8
84:24 85:10
87:24 89:12

103:2,5,9
104:7,21
112:9 113:7
115:8
116:12,20
117:8 123:7
126:19
138:17
139:9
140:15
148:8 151:6
155:7
161:16
163:1
165:11
166:1,6,7,9
167:9
168:10,21
169:5,14
170:12,22
171:23
172:6,10,24
173:17
174:6,10
**dictate**
168:24
169:8
**difference**
108:7
**different** 51:2
52:18,20
68:3 76:10
104:14
106:20
107:23
108:11
110:3
113:18,18
136:7,8
137:4,10
139:2,21
146:2
147:19
148:12,14

148:17,20
149:10
153:6
155:24
172:8 173:7
**difficult**
144:9
172:12
**difficulties**
48:8,10
131:13
144:12
**difficulty**
137:2
**direct** 3:3
47:18 65:22
**directed**
170:9 171:4
**directing**
170:20
**direction**
72:4,14,15
100:7,10
111:15
115:11,15
165:5
176:13
**directionally**
110:21
**directions**
52:23 80:23
110:24
111:13,17
115:17
**directly** 90:2
90:12,14
134:19
176:23
**director**
47:16
133:22,24
134:20,21
135:2,3,9
136:3

**disabilities**
5:4 26:22
31:23 36:10
66:12 74:15
133:3 134:4
135:12,23
136:10,18
136:22
139:22
140:3
161:22
165:18
**disability**
36:13,21,22
65:24
**disabled**
23:10,16,19
23:22 24:1
24:11 32:21
33:15 35:12
36:6,9
107:13
135:4,17
138:23
**disagree**
84:14
**disallow**
70:15 75:24
**discipline**
127:2,4,7
**discovered**
105:4
**discuss** 30:8
34:1 79:12
80:8 108:6
150:2
**discussed** 6:2
16:22 45:19
85:24
112:18
124:17
126:6
132:17
147:19

149:7
**discussing**
135:7
149:13
**discussion**
117:4 173:2
**dispensary**
129:4
**display** 18:5
25:8
**disposal**
141:2
**disputes**
104:20
105:4
**distance**
19:21,24
20:4,8,14
137:15
138:15
**District** 1:1,1
1:16 175:1
175:1
**division** 1:2
8:17 10:17
13:12,12
16:12,15
115:21
116:4 124:9
137:17
138:16,16
147:1
154:18
157:19,22
158:1,7
159:16
161:1 164:1
167:3,8,16
167:20,23
168:4
169:12,22
170:1,21
171:14
175:2

**divisions** 8:22
9:10,19,22
13:21 56:17
113:18
137:20
144:19
146:18
**DOC** 45:5
165:3
**doctor** 129:4
140:4
**doctor's** 95:3
**document**
10:13,19
12:2,3,8
13:16,19
17:8 40:1
48:1 75:2
86:10,12,14
86:23 87:1
87:9,10,12
91:22 92:8
98:5,7,10
99:15,19,22
100:5,8,12
102:21,22
103:23
126:2
127:15
132:7,9,13
133:7,10
135:13
162:10
163:15
**documenta...**
98:11
101:11,14
126:10
**documented**
100:15
102:2
**documenting**
99:12
100:17,20

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 8

132:16
documents
5:9
doing 36:1
46:14 88:14
160:19
164:6,8,24
170:7
DOJ 163:8
downgraded
8:21 9:1,4
download
29:21
drafted 86:24
87:1
drafting
13:19 14:1
duly 4:2,10
175:12
176:8
duplicative
166:11
duty 143:12

**E**

E 2:1,1,10 3:1
3:6 4:12,12
e-mail 17:16
17:19,22
18:5 19:5
27:5,8
35:21 37:1
38:9 39:6
55:10,11,14
90:17 99:23
100:1,13,16
100:19
101:9
149:22
150:10,16
151:14,18
152:15
153:16,18
160:12

164:13,15
e-mails 5:11
5:19,23 6:1
6:3,3 8:20
8:24 9:1,4
17:10,12
35:11,23
37:6,8,10
37:15,22
38:2 100:22
100:23
101:8 149:5
149:8,12,16
152:7
earlier
130:24
east 69:20
78:16
110:11,13
110:14,21
110:23,24
111:6,8,13
111:15
141:15
east/west
113:21
114:11,22
115:24
141:5
150:24
168:20
EASTERN
1:2 175:2
eat 117:3
effect 163:12
eight 73:5
either 16:22
18:1 114:12
114:17
115:3,7,24
152:3
eligible 8:21
employee
132:20

176:20,22
employees
34:10
165:17
employment
22:9 44:5
91:3 112:5
112:7 163:5
encountered
121:12,18
130:19
encountering
35:3 131:13
ends 95:6
ensure 5:2
9:11
entails 5:4
107:14
136:23
entered 7:20
7:24 8:3,9
8:14
enters 20:21
entire 5:6
40:4,7,11
40:15 41:2
41:3,13
45:24 46:3
86:21 87:7
89:23
153:17
entirely 27:2
73:18
entitled 18:6
entity 104:12
entrance
151:23
entry 19:13
equals 82:21
equipment
45:10
equipped
135:16
Eric 6:4

50:15,22
escort 43:17
45:20 46:13
55:21 57:2
57:4 60:18
73:23 74:3
74:5 114:14
123:5
145:17
157:24
169:11
escorted 44:8
45:15,18
65:11 69:9
99:7 123:10
158:9,11,21
158:22
159:1,21
164:1
escorting
67:7,17,18
68:9,17
97:19,21
114:17
115:13
125:6 126:7
127:17
158:14,18
159:5
escorts 67:24
122:22
123:18,20
especially
137:15
149:2
establish
134:3,14
136:16
established
135:16,21
135:24
establishing
135:3
Eugene 1:3

6:19 19:12
62:15 64:13
65:10 76:2
77:10,12
89:24
118:14
157:17
160:24
175:3
evaluate 86:1
evaluates
85:4
evaluating
85:3
everybody
174:4,15
evidence 28:3
40:21 62:22
63:7 88:1
96:6,13,14
97:10,12
98:16,18
115:9
119:15
169:15
170:13
171:1
exact 123:11
125:4
exaggerate
82:5 84:6
exaggerated
82:15 83:5
84:9
exaggerating
83:22
exaggeration
85:9
examination
1:13 3:3
128:21
176:7
examined
4:10

example 61:6
61:7 108:16
109:18
examples
32:7 108:14
163:20
Excuse 16:16
49:6 142:2
executive
133:22,24
134:20,21
135:1,2,8
136:3
exemptions
91:8,14
exhausted
130:3,5
exhaustion
129:23
exhibit 3:8,9
3:10,11,12
3:13,14,15
3:16,17
10:15 12:12
13:11 17:15
26:19,21
27:10 70:18
70:23 76:6
76:21,22
78:7 86:15
91:21 93:7
93:16,21
104:22
105:2
118:10
125:21
130:12
133:14,15
150:1
151:13
161:20,21
exist 10:9
12:6 131:22
144:3

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 9

existing
  141:18
  142:7
expect 34:9
  89:10,19
experienced
  48:7
explain 19:16
  30:21
  159:17
explanation
  109:20
eyes 169:21
_____
        F
facilities
  91:10
  109:16
  162:21
  163:14
facility 31:6
  39:18 60:14
  60:15 61:3
  61:24
  108:13
  147:20
  168:6
facing 111:16
fact 84:1
  85:17 89:6
  159:24
factors 35:5
  107:23
facts 28:2
  40:21 61:2
  62:21 82:5
  83:23,23
  84:6,8,15
  87:24 105:4
  115:9
  169:15
  170:12,24
fair 37:23
  38:7 87:23

88:4,6,20
90:11 91:4
91:7 92:20
92:24
107:17
120:3,7
125:2
168:17
fall 164:24
false 89:3
familiar
  121:7
  133:18,20
fantastic
  117:18
far 116:6
  144:19
feasible
  146:21
feature 41:2
February
  157:18
  158:9
Federal 1:15
fifth 56:21
  131:20
  150:12
file 81:12
  82:6
filed 84:13
filing 81:14
finalized
  51:16
fine 32:17
  48:19
  116:17
  146:4 150:2
  174:14
finish 116:18
  117:17
  173:6,21
first 4:2,9 8:9
  10:20 11:10
  17:20,20

19:11 21:20
26:23,24
53:6,8
71:11 77:23
140:6
142:15
150:13
156:20
175:12
five 87:20
  148:10
flat 152:16
flip 77:4
floor 53:6,8
  53:10,12
  56:20,20,21
  131:19,20
  149:21
  150:12,12
  150:13,17
floors 52:4,5
  53:4,5
focus 31:24
  33:9,17
  166:20
focuses 33:13
folder 22:2
follow 132:19
  132:22
  140:8
follow-up
  99:9
follows 4:11
food 170:2
foregoing
  175:14,17
  176:10
form 9:23
  23:1 24:4
  36:19 40:20
  42:17 60:4
  80:18 91:18
  92:16,21
  93:2,4,6

94:8 103:12
165:11
Forms 128:24
  129:2
found 83:15
foundation
  170:23
four 87:20
fourth 47:23
frame 23:2
  85:12 123:8
  123:17
  171:24
free 160:22
  164:7
Friday
  173:13,21
frivolous
  80:17
front 133:16
full 154:2
function 86:4
funds 82:7
FY19 86:15
  87:4
_____
        G
G 2:3
gain 81:12,12
  81:13
gearing 81:10
general 7:2,7
  12:24 27:8
  30:24 31:2
  31:3 32:19
  33:13 63:6
  70:7 83:15
  136:6
generally
  21:9 32:14
  35:14 54:13
  54:14 70:6
  78:3 82:4
  102:14,19

112:23
113:14
114:9 115:2
115:5,7
151:4
generate 14:9
  14:14 15:7
  18:17 19:1
  19:8 20:13
  20:17 21:24
generated
  18:13,15
  20:2,7
generates
  20:18
George
  156:12
give 26:4
  29:18 30:17
  30:19,21,24
  32:12,15,19
  54:19 61:2
  66:24 70:19
  90:22 100:7
  100:10
  107:24
  108:14,16
  109:19
  110:5
  115:15
  141:21
  172:18
given 32:7
  33:5 54:16
  59:11 91:23
  106:4
  148:19
  154:18
  155:4,17
  165:1,5
  173:7
  175:18
  176:14
gives 140:10

163:20
giving 69:6
Globetrott...
  42:2 43:5
  43:13,20
  44:2,8
  45:15,18,20
  47:1,5,6,19
  48:24
go 11:16 35:7
  35:21 52:17
  52:19 57:9
  57:14,17,23
  58:2,12,23
  59:16 60:1
  60:17 63:1
  71:7,23
  72:6,7,16
  78:21 83:13
  93:21 104:8
  116:13,14
  120:17
  121:4,13
  139:19
  140:13
  141:4,7
  142:12,18
  143:3 144:2
  144:6
  145:10
  146:14
  151:16
  162:8,9
  165:13
  168:3
  170:10
  171:14
  172:1,22,24
goes 56:19
  71:8 168:19
  169:22
going 20:20
  27:23 37:3
  37:7 38:20

SABRINA RIVERO-CANCHOLA
December 20, 2023

39:10 52:12
54:24 61:8
70:18 72:2
72:21 73:5
73:21 74:22
76:5 77:8
78:6,7
83:13 91:21
95:2 96:10
96:17 97:6
109:12
110:18,21
111:17,18
111:19
113:16,20
116:16
118:6,9
119:6 120:1
121:19
124:3
130:20
131:14
141:4
143:16
144:11
148:7 150:2
151:13,16
155:11
161:13,20
164:5
172:18
174:1
**good** 52:23
110:23
152:3
153:11
**great** 111:17
**greatest** 73:8
**grievance**
62:23 63:6
63:7,10
65:5,8,13
80:7 83:21
84:13,16

85:11 86:8
86:13 90:6
90:12 91:18
91:19,23
92:22 93:24
95:8,14,24
96:3,5,8,12
97:22 98:1
98:15 99:10
104:17
105:5,8,13
105:22
106:22
107:4
118:10,13
118:17,18
118:19
119:7,16,18
119:20,23
120:13,24
121:9,11,16
122:6,11
124:23
125:14
126:13
128:13
129:9,13,15
130:1,4,6,8
130:15,16
130:22
131:6,8,9
131:10,12
132:3,5
158:5 160:8
164:23
**grievances**
7:10,11,12
62:2,5,8,11
62:13,16,18
63:4 80:20
84:10,20
90:4 95:10
98:23
122:10

**ground** 53:10
53:12
**group** 123:4
159:14
160:2
**guard** 139:6
139:17
**guards** 140:1
140:7
**guess** 55:8
56:5 80:14
108:10
112:12
152:13
**guidance**
140:10
148:1
**guidelines**
102:1 146:2
146:5
**gym** 167:20

―――――――
**H**
**H** 3:6
**half** 17:20
37:17
116:18,23
172:14
**hall** 31:9
**halls** 122:3,4
**hand** 75:8,11
75:20 78:12
110:12
111:9 177:2
**Handbook**
147:8
**handles**
124:15
**handout**
29:19
**handouts**
25:11 29:15
**handrail**
69:14,20

70:1,5,11
70:16,17
71:20
142:16
**handrails**
46:19 49:16
70:7,13
71:16 75:23
111:21
112:1,24
141:24
142:3,5,9
143:17
**hands** 65:1,4
69:22 92:10
92:12
160:22
164:7
**happen** 38:5
74:2
**happens**
103:17
**happy** 174:4
174:5
**head** 73:15
113:3
**Health**
128:23
129:2
**healthcare**
103:1,18
**hear** 77:21
166:6
**heard** 22:10
22:17
101:20
**heart** 31:22
**heck** 77:16
**held** 117:5
124:3 173:3
**help** 31:20
33:8 34:10
108:3 135:4
142:24

143:20
145:16
146:13
147:16
**helped** 29:9
87:11
**helpful** 113:9
**helping** 34:1
**hereto** 176:23
**hereunto**
177:1
**higher** 72:24
**HIPAA** 91:6
91:8,14
**hired** 24:14
24:16 25:4
28:1,11
44:1,2
**hold** 70:9
**holding**
110:17
124:6,7
125:15,18
125:18
128:1,3,5
**holds** 134:16
**holidays**
173:14
174:5
**home** 171:21
172:5
**hopefully**
163:21
174:2
**host** 147:15
**hour** 6:14
27:24 28:5
28:6,19
116:18
172:2,14,14
172:19
**hours** 28:10
28:18
116:24

130:18
171:19
**house** 139:5
**housed** 8:14
9:12,13
14:5,10,16
114:10,18
119:21,24
137:6,11
138:15
154:11,21
155:3,17
156:8,12
167:2,7
**housing** 8:16
8:18 10:8,8
11:19,24
12:4,5,22
13:2,6,7,13
13:17,17
80:1 124:9
135:16,22
136:17
137:21
138:24
139:4,5
**hypothetical**
34:20 58:4
58:18 67:21
68:23 69:6
102:6
113:14
139:13
140:17
142:20
144:13
145:6 147:4
148:14
165:19
**hypothetic...**
58:5 69:5
**hypotheticals**
140:20
141:20

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 11

144:3

**I**

**idea** 33:13
 89:16 102:4
 128:17
 152:24
 153:11
 154:4,24
 157:9
**identifies**
 121:10
 122:16
**identify**
 15:15 19:20
 39:7 121:14
 156:7,10,11
**identifying**
 14:15 20:3
 37:2,22
**Illinois** 1:1,8
 1:19 2:5,11
 153:7 175:1
 175:8 176:1
 176:4
**image** 78:15
 78:24 79:3
**immediately**
 7:23
**impairment**
 57:13 140:4
 142:22
 143:9
**impairments**
 10:10 12:7
 142:12
**implemented**
 162:23
**Improveme...**
 10:16
**in-person**
 28:17
**incarcerated**
 22:3

**incident** 58:7
 92:4 100:13
 119:8
 121:15,23
**incline** 54:23
 59:13 60:18
 62:9,24
 64:6 71:9
 71:14,24
 72:1,3,10
 105:10,10
 108:23
**inclines** 55:5
 59:15,16,20
 59:22 60:2
 60:8,11,16
 60:24 61:15
 61:17,22
 62:4,11,19
 63:5,13,22
 96:10,18,19
 96:21 97:7
 98:13
 105:11
 106:13,16
 108:1
**include** 40:13
 46:1,4 48:3
 66:15,16,17
 107:19,20
 107:21,22
 163:21
 165:20,21
 166:19
**includes**
 40:15 46:3
 162:18
**including**
 32:22 33:16
 74:15
 146:17
**inclusive**
 175:16
**incomplete**

34:20 58:18
 68:23 69:6
 102:5
 113:14
 140:17,20
 141:19
 142:19
 144:13
 145:5 147:4
**incredibly**
 102:3
**incumbent**
 142:23
**indirectly**
 176:24
**individual**
 23:17 24:2
 28:22 33:10
 50:4
**individual's**
 138:21
**individually**
 1:4 51:19
 175:4
**individuals**
 18:1 19:5
 23:10 133:3
 134:5
 135:22
 136:17
 161:22
**information**
 7:19 25:9
 29:20 79:20
 83:12 91:9
 91:11 101:2
 101:5
 121:24
 140:19,21
 141:21
 147:9,11
**informatio...**
 100:1
**initial** 8:16

8:18
**initially** 8:14
**injuries**
 128:7,19,22
**injury** 82:8
**inmate** 8:6
 57:12,20,24
 58:2,11,22
 59:23 60:17
 63:9 65:7
 65:24 66:23
 67:13 73:12
 73:13,14,23
 75:7,14,20
 78:8,11
 80:1,7 85:4
 91:17 95:18
 96:7 98:3
 99:23 100:9
 101:14,24
 102:7,9,22
 103:17
 104:1,4
 107:15
 109:19
 110:5 123:5
 124:21
 132:14
 139:2,21
 141:18
 143:4,7,13
 143:15,18
 143:21
 144:5,16
 145:2,3,9
 145:17
 147:8
 159:10,12
 160:8,18,21
 161:9,12
 166:19,22
 168:19
 171:4
**inmate's**

107:19
 128:22
 137:8
**inmates** 9:11
 16:24 18:2
 18:7 21:20
 23:19,22
 30:8,22
 31:4 32:21
 33:15 35:21
 36:5,6,10
 38:2,16
 54:11,17
 57:7,17
 58:14 59:11
 59:15 66:12
 67:17,19
 73:22 74:6
 74:14
 102:13,14
 102:19,23
 102:24
 104:13
 107:13,21
 122:9 124:2
 135:12
 136:10
 140:11
 146:18
 147:5
 156:11
 159:4,5,6
 159:14
 160:19
 161:4 165:2
 165:8,18,24
 166:17
 168:2,5,7
 168:14,17
 168:23
 169:7 170:4
 171:13
**insisting** 53:3
**inspect** 42:18

45:23
**inspected**
 45:22 46:10
 46:11
 152:22
**inspection**
 47:2
**installed**
 142:4,6,10
 143:18
**instance**
 149:3
**instances**
 84:4 101:6
**instructions**
 145:15,20
 145:23
 146:4,5
**Interaction**
 161:22
**interactions**
 21:3
**interested**
 176:23
**interrogato...**
 155:23
**interrogato...**
 155:14,21
**interrupting**
 103:8
**investigate**
 85:20
 119:13
 128:18
**investigated**
 106:6
 119:11
**investigating**
 63:21 64:5
 98:1 105:5
 106:21,23
 119:16
**investigation**
 63:12 84:13

SABRINA RIVERO-CANCHOLA
December 20, 2023

106:1,12
120:24
122:7,10
125:7
128:14
131:16
132:5
**involve** 106:3
107:2
**issue** 32:13
94:14 135:7
**issues** 82:17
117:13

---

**J**

**jail** 7:14,21
7:24 8:3,9
8:15 9:22
15:16 20:21
21:9 22:4
33:3,6
34:13 35:7
35:10 40:4
41:6,20,22
41:23 42:1
42:2,6,9,16
43:2,6,14
43:20 50:10
56:23 74:3
76:17 81:22
87:7 124:5
137:5 140:9
148:16
161:5
**January**
174:18
177:2
**Jason** 2:10
11:3 31:7
103:7 174:9
**jdevore@d...**
2:12
**job** 24:8
46:13 47:10

47:11 50:5
64:9 86:1
116:21
**judgment**
83:14

---

**K**

**K** 176:2
**Kate** 51:8
**keep** 16:24
18:2,7 22:2
35:6,9,17
35:22 37:8
51:2 53:3
101:1 118:6
160:22
164:7
**keeps** 101:14
**kind** 66:14
81:10,11
82:22
139:20
**kinds** 148:12
**know** 5:21
6:22 7:17
8:7,13,16
8:17,18,23
10:12 15:10
16:18 17:8
23:14 25:16
26:13,14
28:20 29:1
29:23 30:3
30:6 34:7
36:8 37:18
41:16,24
42:1,8,10
42:11,24
43:3,5 44:4
44:4,6 45:1
45:11,13
46:17 47:5
47:17 50:4
50:12,21,22

51:9 54:12
54:14 55:2
55:8 58:24
60:11,19
61:22,24
62:6 63:3
64:8 65:13
66:4 68:5
68:11 69:22
72:9,19,23
73:3,16,17
74:7,21
75:5,6
76:22 77:13
77:17,18,23
80:13 82:3
82:20 84:21
85:2,4
86:13 88:24
89:2 91:13
95:14 96:16
97:18
101:13,21
106:15
107:10
109:3
110:23
111:22
113:3 114:2
114:8,13,20
114:24
115:1,5,6
116:5,6
117:9 120:3
120:10,11
120:19
122:19,24
123:16
125:9,18
126:16
127:16,24
128:12
129:16
130:24

134:8
138:21
139:12,17
139:23
140:2,18
142:13
144:22
147:5 148:8
150:23
151:3,4
152:18,22
153:14,19
154:3,5,13
154:19,20
155:9,24
156:5,6,13
156:18,19
157:6,18,20
158:17
159:24
160:16,20
165:15
166:10
167:5,12,19
167:21
169:17,17
169:19
170:16
172:3,11
174:3
**knowledge**
15:19 33:1
36:7 41:4,7
41:14 42:7
42:15 44:14
47:3 49:23
64:4 68:16
81:24 90:16
90:19 95:9
95:12 100:7
101:17
104:1 109:7
110:10
112:8

129:22
134:16
146:13
161:10
167:15
**known**
134:13

---

**L**

**labeled** 76:17
76:19,19
**lack** 170:23
**Lacy** 162:24
163:4
**laid** 169:21
**landing** 153:1
**landings**
151:24
152:14,19
152:21
**language**
34:8 62:12
63:5 111:10
150:3,15
152:8
162:23
**laser** 46:6
**laundry**
170:2
**law** 2:2,8
9:20 85:6
85:18 89:5
139:18
**lawsuit** 79:6
79:8 81:12
82:6,10,12
**lawsuits**
79:11 81:14
**laying** 59:12
60:13
**layout** 121:7
**lead** 52:24
59:20 71:24
72:5

**leading** 56:23
93:13
**leads** 56:13
56:16
134:10
**learning**
28:19 29:5
29:7,12,16
29:18 30:1
30:4,7,10
157:4
**leased** 15:1
**leave** 31:14
109:12
171:16
173:6
**leaving** 120:5
168:18
**left** 73:14
75:8 92:13
117:15
172:11
**left-hand**
71:20
**legal** 80:14
109:9,12
137:23
167:17
170:24
**Leighton**
37:23 38:4
61:8,14,19
64:22 78:20
97:2 108:18
114:1,6,10
120:6,16,22
122:23
123:6 124:3
124:9
**length** 166:10
**let's** 49:17
140:23
143:15
145:8

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 13

172:24
letters 45:12
level 9:13,15
  52:1 56:13
  131:1
  137:13
  139:4,5
  169:23
Levels 56:18
liability
  82:21
liaison 23:10
  23:16,19
  24:1,8
License 177:9
lie 82:5
lied 82:14
  83:5
lieutenant
  16:2
limitation
  139:16,20
limitations
  57:8 139:22
  173:8
limited
  106:22
  162:19
  168:15,23
  169:7
line 42:19
  49:17 148:9
list 14:4,7,9
  14:14 16:23
  17:17,21
  18:2,6,7,9
  18:10,12
  19:7,9,11
  19:19,22
  20:13 35:6
  35:9,18,22
  37:9,11,16
  51:3 147:22
listed 8:12

19:17
listing 19:2
lists 19:5
litigation
  83:6 103:6
  151:22
  162:24
  163:4
litigious
  79:23 81:4
  81:8
little 11:5
  13:10 172:3
living 52:5
LLC 2:9
located 57:6
location
  53:14 56:6
  71:1,4
  93:12
  105:23
  111:20
  121:20,22
locations
  111:6
  121:15
  137:4,11
long 4:20
  6:12 19:20
  19:24 20:4
  20:8,14
  28:21 84:18
  84:22 85:15
  85:22 92:3
  93:9 97:14
  116:3,12
  137:15
  138:15
  152:24
look 5:9
  37:20 44:2
  47:7,12
  90:5,12,14
  111:4

119:17
121:2,4
128:8,10,23
136:23
148:16
152:7
looked 5:23
  48:24 95:5
  111:2
  118:20
  121:1
looking 27:10
  27:13 43:20
  46:16 76:21
  76:24 78:15
  78:24
  119:13
  171:24
looks 11:13
  27:16 75:17
  78:13
loop 97:16
lost 60:3
lot 17:10,12
  42:5 67:21
  76:19,19
  79:22 80:3
  106:19,20
  107:22
  124:5 133:5
  134:18
  163:23
  166:16
  171:9
loud 31:9,15
lower 52:1
  56:12 131:1
  169:23
lunch 116:10
  116:24
  117:6 118:1
  118:4
lunches
  123:23

**M**

M 4:12
Ma'am 4:14
maintain
  100:22,23
maintained
  100:21
making 24:10
  81:10 92:24
  93:4 109:13
  117:24
  136:9 141:8
  159:13
  171:9
management
  14:23 15:6
  28:20 29:6
  29:8 30:10
  140:9 157:5
maneuver
  120:4
March
  151:18
  153:18
Marin 156:18
  156:19,22
  157:6,23
  158:10,14
  158:17
  159:17,21
  160:4,9,14
  160:19,23
  161:7,13
  163:24
  164:9,12
  166:24
  167:22
  169:11,18
  170:16,19
  171:4
Marin's
  156:20
marked 3:7
  91:18,22

mass 159:4,8
  159:11
  160:19
  164:6,8
  165:20
matter 21:12
matters
  163:9
  173:14
  176:9
maximizing
  9:9
maximum
  13:12
McArdle
  16:1,23
mean 8:23
  9:8,14
  11:24 14:8
  14:17 21:1
  23:18 24:8
  27:13 32:14
  33:4 34:4
  37:17 41:16
  42:21 44:22
  50:11,12
  52:4,6,16
  58:4 60:10
  60:19 61:2
  61:23 67:10
  67:20 69:5
  70:9 73:8
  75:3 76:9
  77:7 78:4
  79:22 80:13
  80:14 82:24
  84:3,12
  85:3 86:9
  94:16 100:3
  101:4,5
  102:3,4
  103:22
  105:15
  106:15

113:13
116:21
125:3
129:16
130:9 136:7
138:10,20
144:1,22
149:1
152:12
154:13
156:24
159:5
160:17
167:17
172:1
meaning 12:4
  21:2 51:18
means 13:2
  123:1
  138:23
  154:5 156:6
measure
  44:21 46:9
  55:12,15
  109:3
measured
  46:5,7 55:2
  55:4,9 73:2
  116:8
  152:23
  153:19,21
measureme...
  86:5 109:3
  152:4
  153:12
medical 7:18
  9:6,11,16
  38:21 39:8
  90:1,3,5,7,9
  90:13,15,17
  90:20,21,22
  90:23 91:5
  102:23
  103:11

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 14

104:1,13
114:19
128:7,8,10
128:11,12
128:17,19
128:21
129:1 137:8
137:13
139:3
**meet** 6:7,12
20:22 21:5
21:9,19,23
135:17
137:21
138:6,9
**meeting** 51:5
**meetings**
50:13,16,18
50:24 87:15
**member**
99:13,14,18
103:19
109:21
132:14
148:1,20,24
**members**
32:8 35:4
39:1 50:6
50:13 51:2
65:19 90:18
100:8
103:21
109:15
114:14
126:16,23
127:3,7
142:11
149:9 157:2
162:16
163:12,18
**memo** 100:2
100:13
**memory**
11:11 14:12

17:24 18:24
153:23
**mentioned**
62:13 78:20
81:3 101:10
121:3 128:6
144:15
**mentions**
34:5 149:16
**merit** 80:10
80:12,13
**met** 6:19
**metal** 169:12
169:21,24
170:5,10,21
171:14
**method** 100:4
144:4
**mic** 31:14
**minutes**
11:20,23
31:13
116:11
172:17
**mischaract...**
161:6
**misreprese...**
84:5
**misspelled**
93:10
**misstates**
88:1
**mobility** 8:11
10:10 12:7
14:14 17:16
17:21 18:6
18:9 36:12
57:7,13
139:15,20
139:22
140:4
142:11,21
143:9,14
**mobility-i...**

30:22 37:3
**mode** 117:14
**moment** 5:15
**Monday**
21:17
**monetary**
81:12
**money** 81:15
**Monroe** 2:10
**monthly**
87:15
**months** 41:18
**mop-up**
173:21
**morning**
173:21
**Morrissey**
2:3,4 3:4
4:3,13 10:6
11:6,7
12:13,19
13:9 17:6
18:23 22:14
22:18 23:8
24:13,21
26:18 28:9
31:18 34:21
36:23 38:17
48:6,23
50:7 51:21
51:23 60:6
69:1 72:17
81:2 82:9
83:3,17
85:7,19
88:5 89:17
103:16
104:15,23
105:6
112:16
113:10
115:10
116:9,14
118:2,8

123:13
127:1
139:14
140:22
148:18
151:12
155:13
161:19
163:10
166:23
167:13
168:16
169:2,10,20
170:18
171:11,16
172:7,13,20
173:4,24
174:14
**motorized**
145:9
**move** 33:20
34:2 55:20
57:1,4
114:9 167:7
170:4
**moved** 8:22
35:7,10
54:11
115:20
125:8
159:16
168:6
**movement**
37:9,10,16
78:18 80:1
97:3 123:3
123:15,17
124:12,15
124:16
159:4,9,11
160:4,19
164:6
165:20
**movements**

164:8
**moves** 78:2
**moving** 30:8
30:14,22
34:7 54:17
62:3 64:14
64:24 65:9
75:15 78:8
92:9 94:14
104:5
106:14
125:10
127:19
159:10,12
159:14
160:21
166:21
**Mueller**
129:20
**multiple** 38:3
43:12 52:24
56:17 67:17
67:18 71:8
74:5 77:18
78:4 79:10
84:4 106:8
106:10
120:8
158:12
162:3

—————
**N**
**N** 2:1 3:1
4:12,12
**name** 4:15
27:4,7 77:5
77:19
118:14
144:24
156:20
**named** 51:7,8
78:5
**names** 77:24
126:16,22

**nature** 36:2
38:15
**NC2204949**
91:24
**NCCHC**
101:18,20
**near** 147:14
**necessary**
66:3,5
119:19
**neck** 92:14
**need** 9:12
31:12,13
36:15 39:17
57:17,21,23
59:6 70:16
91:2 121:2
138:24
141:6,9,11
143:2,5
147:11
152:2
171:16,20
174:7
**needed** 44:18
59:11 70:10
116:13
118:4
142:18
143:10
144:7,8
**needs** 23:11
23:12 24:11
49:15 58:16
107:19
135:17
141:3,12,18
142:22
143:8,13
**never** 15:17
55:2,17
68:11 73:2
92:20 114:2
114:7,24

SABRINA RIVERO-CANCHOLA
December 20, 2023

116:5,8
120:20
**new** 21:19
100:11
142:6,17
157:2
165:17
174:4
**newly** 24:14
24:16 25:4
28:1,11
**nine** 37:17
**noncompli...**
93:10
**noncompli...**
84:18,22
85:3,16,23
91:18,22
92:3,22
94:2,5
**noon** 92:5
**normally**
103:19
114:13
**north** 52:21
112:17,24
113:12,15
**north/south**
113:22
114:11,22
116:1 151:1
168:20
**NORTHE...**
1:1 175:1
**noted** 24:5
161:18
**notes** 7:4
21:24 46:14
122:13,15
**notice** 4:5
39:16 61:13
61:14 78:21
**notices** 60:16
60:20 61:3

61:4,10,10
61:11,18,19
61:24
**notification**
39:1 173:8
**notifications**
35:23 39:14
**notified**
36:14
**notify** 38:8
38:18
**notifying**
39:6
**number** 5:22
8:5 44:10
91:23 93:17
93:22 95:4
95:11,15
118:14
120:20
154:16,17
155:10,16
162:5
**numbers**
12:11 95:13
95:16 162:4
**nurse** 144:1

─────────
**O**

**O** 4:12 176:2
176:2
**oath** 175:12
**objection**
9:23 13:3
17:2 18:19
23:1 24:4
28:2 34:14
36:18,19
40:19,20
42:17 49:24
60:4 62:21
68:20 72:8
80:18 81:23
82:16 83:8

84:24 85:10
87:24 89:12
103:2 104:7
112:9 115:8
123:7
126:19
138:17
139:9
140:15
148:8 151:6
155:7 163:1
165:11
166:1,6
167:9
168:10,21
169:5,14
170:12,22
**objections**
24:5
**observation**
46:12
**observed**
49:5 171:7
**observing**
157:21
**obtain** 18:12
91:12
**obtaining**
45:12
**obviously**
117:17
166:10
**occasion** 8:24
44:14
**occupy** 64:12
86:2
**occur** 82:8
101:12
124:5
**occurred**
83:24
**occurs** 127:4
**Offender**
14:23 15:6

**office** 4:18
5:3,13
12:16 15:14
15:18 16:4
16:11 31:20
32:20 45:9
63:20 64:2
74:9,13
83:7 95:20
95:22 100:6
100:21
106:18
112:7,13,18
129:22
132:20
134:24
136:21
144:10
155:15
156:14
161:15,17
162:18,21
163:9,14
**officer** 4:19
4:21 5:1,7
23:9,15,24
24:9 57:2
60:18 66:4
66:20 67:1
67:6,8,15
67:17,18,24
68:1,7,9,15
68:17 69:3
69:9 73:11
73:17,22,23
74:3,5,8,17
74:24 75:1
77:17,20,22
78:1 97:18
97:24 98:4
98:20 99:20
102:8,11,21
107:7,16
114:16

122:17,19
122:21
123:1,2,12
124:19
125:1,5,10
127:17
136:20
140:13
141:2,10,14
143:1,12,19
143:20
145:8,14
146:23
147:9,10
148:4
156:18,19
156:20,22
157:6,7,10
157:23
158:10,14
158:17,18
159:1,9,17
159:21
160:4,9,14
160:18,23
161:7,13
163:5,24
164:9 165:7
166:20,24
167:22
169:11,18
170:16,19
171:4
**officer's**
100:4
**officers** 24:15
24:15,17
25:5 28:1
28:12 30:20
77:18 78:4
99:7 100:11
123:4
125:10
140:7

144:18
145:15
146:16
158:13
159:3,13
165:6
**offices** 2:2,8
52:6
**Oh** 77:13
**okay** 12:18
24:7 31:16
31:17 32:2
32:18 48:19
51:22 58:13
77:13 94:21
116:19
131:4 172:6
174:12
**old** 151:22
**once** 6:11,23
25:20 44:19
68:6 89:6
**ones** 9:12
33:17
120:10
142:6
152:21
**ongoing** 41:8
41:10 42:13
88:17 89:23
**online** 28:19
28:23 29:5
29:7,11,16
29:18,21,24
30:4,7,10
157:4
**opinion** 81:9
85:5,8,17
89:5 131:22
138:8
149:19
**opportunity**
94:19
**options** 54:5

SABRINA RIVERO-CANCHOLA
December 20, 2023

**order** 57:20
58:15 59:17
82:6
**organization**
47:15
**orientation**
157:13
**Orland** 172:2
**outcome**
176:24
**outside** 52:11
81:24 103:5
127:8
151:23
**overall** 136:6
**overcome**
31:5,21
32:9,21
33:8,16
34:11
**overview**
30:24 31:2
31:3

**P**

**P** 2:1,1
**p.m** 151:19
166:14
**pad** 81:17
**page** 3:1,7
10:20 11:11
11:16,18
17:20,21
19:11,23
20:1 26:23
26:24 27:6
27:13,16
94:10,11
95:5,7,24
105:17
118:22
125:20
151:14,16
151:17

152:8 162:9
162:9,10
**pages** 175:15
**pain** 65:2,4
92:11,13
**paragraph**
39:11
**paramedic**
144:1
**parentheses**
12:4 13:17
**Park** 172:2
**part** 1:7,11
11:10,22
13:15 40:1
43:15,16
65:5,23
80:7 82:23
110:20
113:4,15
126:1 175:7
175:14
**partial** 19:22
**participants**
26:3,4
**participate**
29:21
**particular**
13:6,8 82:1
99:10 100:3
**parties**
176:23
**partner** 9:6
**parts** 25:21
41:5,14
42:6,8,10
42:16 43:18
43:19 108:1
166:12
**passageway**
114:5
**Pat** 11:5
12:10 22:12
24:20 48:9

116:24
**path** 106:3,5
107:2,6,10
114:8
143:23
157:18,20
157:21
158:6 167:1
167:6,18
168:3,24
169:9 171:6
**paths** 106:8
106:10
167:15,22
**pathway** 54:2
113:24
**Patrick** 2:4
16:13 30:17
34:5 37:19
39:12 42:1
47:24 49:19
51:17 62:15
68:13 70:6
73:2 77:2
80:14 81:1
82:23 84:11
86:10 94:6
94:17 95:15
96:20
103:22
105:15
111:22
113:2 130:9
131:18
132:1
138:21
148:13
150:11
151:9
153:16
154:18
168:15
172:18
174:12

**Peggy** 1:17
172:20
174:5 176:3
177:7
**pending**
48:15
**people** 6:6
8:20 9:1,4
14:4,10,15
15:15,20
17:11,13
19:2,9,20
20:3 21:23
22:2 25:11
31:8,23
33:20,24
34:2,6 35:6
35:9,24
37:7 38:6
44:7 50:8
51:4,9 68:7
70:9 109:13
113:12
123:10
124:8
127:22
134:15
135:4
138:14
142:11
152:10,13
154:1,7
169:23
**period** 16:13
20:24 21:15
93:5 155:4
**permissible**
75:19
**permission**
45:4,6,9
**person** 14:1
21:6,8
30:20 35:12
36:7,15

69:15 79:24
126:9
137:11
138:23
139:18,23
140:23,23
141:3,12,14
142:21
146:14
**person's** 35:1
**personal**
42:15 85:17
89:5 146:12
161:10
173:14
176:13
**personally**
164:4
**perspective**
160:20
**pertaining**
1:16 33:2
**pertains** 12:9
**pertinent**
65:6 96:7
119:15
**photo** 127:22
**phrase** 23:5
**physically**
135:17
**physician**
134:2,7,8
134:10,13
136:3
**physicians**
134:18
**pick** 172:4
**picture** 71:19
72:3 73:9
110:19
113:3
**place** 42:4
60:1 128:4
175:17

176:17
**placed** 128:1
**Plaintiff** 1:5
1:13 2:7
175:5
**PLAINTIF...**
3:8,9,10,11
3:12,13,14
3:15,16,17
**plan** 22:11,15
22:20,24
23:5
**planning**
23:17,20,21
39:20 40:3
41:12 45:7
45:8,14
47:14,21
49:11,20
50:5,9,13
50:19,23
51:6 64:10
86:3,7,20
87:2,13,16
87:22 88:9
88:13 89:16
89:18
**Planning's**
45:11 47:13
**play** 73:4
78:7
**playing** 73:20
75:13
**please** 4:14
15:5 31:2
**point** 20:5
80:24 82:4
96:15
112:12
155:17
162:6
164:17
**policies**
132:19,21

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

132:23,24
133:1,2,5
133:11,11
162:3 163:6
163:7
policy 30:18
32:20 58:9
66:7,9,10
66:20 68:24
74:9,13
98:5,6,8,9
99:11,13
100:14
102:12,20
107:12
109:14,17
109:21
110:3,8
126:7,12,17
126:23
128:4
132:12,16
133:2,15,17
133:19,20
135:8,15,20
136:7,11
146:1,5
160:24
161:15,17
162:1,5,7
162:10
163:11
170:19
pool 156:16
population
24:12
portion 72:13
110:14
111:11
163:16
portions
25:23
positioned
59:21 61:14

possible 35:1
68:13
117:11
144:2
possibly 6:5
17:5 64:21
73:12 76:10
145:12
149:20
158:23
173:20
postings 79:2
79:4
potentially
110:5
PowerPoint
25:7,15,21
26:1,6,10
26:12,20
27:1,6,12
27:21
practice
21:19 122:9
prefer 67:11
173:6,10,13
173:15
preference
164:7
173:12
preliminary
65:15
133:10
preparation
5:17,20
6:15 36:24
37:5 69:7
69:11
133:12
prepare 5:10
6:7,13 14:4
14:7 47:1
87:11
118:20
prepared

10:18 11:14
preparing
11:12 91:15
present 21:17
27:18,20
33:7 35:4
43:7,12,15
43:16,17,21
44:8 45:15
45:21 46:15
47:6 148:15
presented
34:12
presenting
152:8
presently 5:1
19:8 38:5,8
38:10
124:13
154:1
preserve
64:13,19
96:24 97:6
preserved
96:16 97:1
97:15
pretty 79:23
prevent 21:3
previous
131:7 161:7
176:6
previously
56:18 65:5
80:6 88:8
96:4 107:1
120:8 122:8
126:6 128:9
147:18
161:3
primary
149:11
prior 6:16
24:5 27:11
27:17 37:21

38:1,18,24
76:22 77:5
88:1 168:1
prison 81:18
privy 7:18
probably
32:11 47:16
54:7 69:16
116:17
133:6
172:13
probationary
24:15
problem
103:9
problems
121:12,18
127:19
130:19
131:14
procedure
1:15 58:9
170:20
procedures
134:3 135:3
proceed
72:13 117:2
147:20
proceedings
174:17
176:15
process 41:7
41:10,12
42:13,22
45:12 63:6
80:8 88:8
89:23 104:4
104:12
produced
12:15,16
26:11,14
program 15:1
20:18
progress

88:14
project 47:16
86:17
projects
87:16,19
provide
13:10 19:6
25:3,4,8,11
30:13 31:2
33:19 46:13
74:13 87:17
95:13 99:6
102:15
113:7
115:17
121:23
139:6,13
141:21
142:11
144:7 148:3
162:16
163:18
165:16
166:15
provided
28:1,6,7,8
28:11 30:12
32:13,16
57:22 79:15
95:16
103:12
107:4 110:9
115:11
125:22
146:3
147:16,23
161:7
provider
128:18
139:3
providers
90:9,20,22
128:11,12
provides

105:2 110:3
146:1 147:8
providing
34:19 74:17
83:23
144:13
165:23
provision
10:4
proximity
59:22
pull 138:3
purported
110:19
purpose 45:2
55:9 70:5
pursuant
1:14 4:5
74:8 98:4
135:15,20
push 65:19
65:22 66:5
66:21,22
67:2,8,11
67:15,20
68:1,7 69:3
74:9,24
98:21 99:20
108:3
109:15,21
124:20
159:18
161:4
163:12
164:4,10,19
165:2,8,24
166:19
171:4
pushed 65:11
73:22 101:3
101:7 102:8
102:10
124:21
125:1

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

161:12
**pushes**
122:22
**pushing** 66:1
66:16,17
73:12 74:20
74:22 99:8
107:8 110:6
122:17
125:2
126:17
132:15
160:15,18
162:19
164:24
**put** 39:16
49:17 86:9
86:14
111:12
146:7,11
150:1
**pwm@mor...**
2:6

**Q**
**qualifies**
109:11
**question** 9:20
13:5 15:5
20:16,17
22:22 28:5
29:17 33:22
34:18 35:20
36:17 38:12
38:23 40:12
42:14 45:17
46:14 48:14
50:4 52:9
57:10,15
58:8 59:1
59:18,19
60:10 61:1
61:16,17,21
65:16 67:5

68:12,14
77:8,8
78:19 94:17
97:8 101:23
102:3
109:24
110:1,2
129:17
131:6
133:10
135:1 136:5
137:2
139:24
141:6
142:14
151:22
159:20
160:17
161:16
164:17,21
166:15
171:10
**questioning**
49:18
148:10
**questions**
26:3,4,5
49:10
167:24
**quicker**
113:24
114:5,21
138:3
**quickly**
117:11
**quiet** 31:13
**quite** 80:23
**quiz** 26:5

**R**
**R** 2:1 4:12
**R-o-x-a-n-e**
16:8
**RADUNSKY**

2:9
**rail** 142:15
**railing** 75:9
75:11,15,17
75:21 78:12
110:17
**railings**
110:12
111:9
**rails** 142:7
**raised** 173:12
**ramp** 34:12
34:15 44:21
45:16,18
46:2,4,5,8,9
46:10,11,16
46:19,22
49:1,2,6,13
49:15 55:19
55:21,22,24
56:1,2,6,8
56:10,12,15
56:19,22,24
57:7,9,11
57:14,18
58:3,11,12
58:22,23
59:9 61:9
61:14,20
64:6,19
66:6,21
77:15 78:22
84:18,23
85:16,23
89:1 92:4
92:10 93:7
93:10,13
104:6
105:20,21
106:23
108:8,15,16
108:18,19
108:20
109:1,11

119:18
120:20
131:11,17
131:21
139:19
140:14
141:23
142:2,8,12
142:19,23
143:16,21
144:6,17
145:10,17
145:24
146:15
147:14,17
147:21,22
148:7 149:6
149:11,11
149:13,14
149:17,20
149:23
150:4,8,10
151:10,23
152:4,17,18
153:12
169:13,22
169:24
170:5,10,21
171:5,8,14
**ramps** 30:9
30:15,23
33:2,6,10
33:21 34:3
34:7 40:13
40:18 47:7
47:12,22
49:21 51:11
51:24 52:2
56:4,11
63:22 64:14
65:1,20,21
65:22 66:2
66:16 84:20
94:2,5,15

94:23
105:18
106:1,19
108:12
109:8,16
110:7
119:12
120:15,17
120:20
121:5,10,13
121:20,21
127:19
129:14
130:20
131:2,4,14
131:17,19
131:24
145:4 146:8
149:10,19
150:16,19
150:20,21
151:2,5
152:19
153:20,22
156:2 161:4
162:20
163:13
164:10
165:9
**random** 59:8
60:13 69:15
**rare** 155:2,5
**rarity** 155:11
**reach** 72:6,12
78:11 94:3
114:5,21
120:5,18
**reached**
147:24
148:1
**read** 11:20,22
13:14,15
84:12 94:16
94:19,20

130:11
138:2
163:16
175:14
**readily** 143:2
143:5
**reading**
10:13
130:22
**really** 57:15
79:13 82:23
**reason** 20:12
40:8 62:14
75:24 77:11
113:19
117:12,24
121:4
124:19
**reasonable**
74:14
**reasonably**
134:4
135:11
**reasons** 41:22
117:12
146:17
164:5
**recall** 5:14
6:1,24 7:2,7
15:23 18:16
18:22 20:6
20:10,11
25:23 37:14
39:4 51:5
51:15 55:17
55:18 57:3
62:23 64:17
64:22 69:21
70:3 97:21
97:23
125:12
126:14
128:15
129:6

SABRINA RIVERO-CANCHOLA
December 20, 2023

148:23
153:22
155:18,19
156:24
158:7 160:2
**recalling**
149:3
**receive** 8:19
9:3 28:18
28:19 37:15
62:13 63:6
100:19
157:4
**received** 8:24
55:10 62:2
62:5,8,10
62:14,18
80:7 86:7
88:18,22
100:16
129:9,19
130:1 149:5
**receiving**
53:15
123:21,24
124:1,2,4,6
124:15
150:13
**recognize**
71:1,3 73:6
**recollection**
17:10
165:23
**record** 48:12
90:8,21
101:10
117:5,22
129:1
130:11
164:15
172:21,23
173:1,3,5
173:23
176:14

**recording**
61:11
**records** 90:1
90:3,5,10
90:13,15,23
91:5 128:7
128:8,10,19
128:21
**recount**
151:9
**reduced**
176:12
**refer** 53:17
86:11 91:13
**referenced**
90:7 149:22
**referencing**
65:14
152:14
**referring**
13:19,23,24
14:22 15:2
55:24 56:3
60:20 62:1
85:14 87:5
101:22
103:24
104:21
110:14
113:5
125:19
132:12
133:7 134:9
149:23
**reflected**
160:11
**reflects** 30:11
71:14 72:3
**refresh** 11:11
17:9,24
18:24
153:23
**refusal** 75:2,4
99:12 100:9

100:17,20
102:1,21,22
103:1,11,18
**refusals** 98:7
98:10 99:15
102:13
104:1 126:2
127:15
132:9,13
**refuse** 101:3
101:6
102:14,23
103:13
132:16
**refused** 98:12
98:20 99:1
99:5,19,24
101:15
102:10
103:20
127:11
**refuses** 65:16
66:23 67:13
98:4 101:24
102:7
103:17
104:5
**refusing**
103:14
104:13
**regard** 12:23
**regarding** 7:4
7:8 9:24
18:6 29:21
30:8,14,22
32:13 35:21
38:2 46:19
50:9 60:21
62:9,11,24
78:17 79:14
93:5 94:1
122:9,14
126:7,9,11
130:5 135:3

145:20
149:10
156:23
161:17
165:17
**regular** 8:20
8:23
**regularly**
35:12
**regulation**
68:16
**related** 82:18
**relates** 59:19
**relating** 30:1
79:17,18
88:19
120:12
128:13
**relative**
176:20,21
**relevant** 35:5
77:7 132:4
**relocated**
80:2
**Remands**
162:12
**remedies**
129:24
**remember**
17:7 63:4
84:16 86:11
93:17 96:14
97:12 98:17
106:10
110:16
127:21
149:5
157:21
**remind** 99:13
126:5
**reminded**
126:2
127:15
132:9

**repeat** 92:18
93:18
**rephrase**
38:23 78:19
159:19
**report** 15:7
15:11,12,14
15:18,20
18:13,15,17
19:1 20:2,8
47:1,4
88:19 100:2
100:14
**reported**
176:11
**reporter** 1:18
22:12 48:11
48:19 166:5
172:22
173:9 174:6
174:12,16
176:4 177:8
**reports** 15:23
20:19
**represented**
149:12
**request** 5:12
40:2,5,9
41:6 57:8
57:13 59:15
59:24,24
86:6 87:6
113:8 118:1
118:5
128:24
129:2
142:24
143:4 144:5
161:12
**requested**
15:11,12,13
15:17 39:19
42:11 44:15
48:1 86:3

86:20 96:24
**requesting**
15:23
**requests**
81:23
**require**
103:21
117:14
**required**
29:24 30:2
67:2 74:8
93:12 98:8
105:22
109:6
121:22
132:19,22
139:18
152:1 161:4
**requirements**
49:13
108:11
**requiring**
102:13
**research**
29:10
**reserve** 83:13
174:8
**Residential**
120:21
**resolved** 83:6
**resources**
147:6
**respond**
90:11 96:2
96:5
**responded**
90:4,6
92:17 95:23
105:7,13,18
**responding**
97:5
**response** 65:6
65:7,8
81:24

TOOMEY REPORTING
312-853-0648

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 20

| | | | | | |
|---|---|---|---|---|---|
| 104:17 | 41:15,17 | 141:24 | **RTA** 111:10 | 56:14,18,21 | 156:8,12 |
| 118:23,24 | 42:7,9,12 | 142:4 144:6 | 155:18 | 59:13 61:15 | 157:19,22 |
| 119:3,4 | 42:16,22 | 144:16 | **RTAs** 111:4 | 61:22 63:13 | 157:24 |
| 125:21 | 69:11 92:20 | 149:17 | 111:7 | 65:9 78:2,5 | 158:6 167:2 |
| 129:9,18,19 | 93:4 96:6 | 155:6 | 112:18,20 | 84:18,22 | 167:8,15,23 |
| 130:1 132:2 | 96:13 97:9 | 159:21,23 | 112:22 | 85:23 88:10 | 168:4,19 |
| **responses** | 97:10 98:15 | 161:5 162:9 | 113:3 | 88:23 89:1 | **rule** 68:16 |
| 84:12 | 125:3 | 173:24 | 155:19 | 89:19 92:3 | **Rules** 1:15 |
| **responsibile** | 127:23 | **rights** 168:15 | **RTC** 53:18 | 92:10 93:7 | **run** 15:14,18 |
| 134:13 | 128:2 | 168:23 | 53:19 54:11 | 93:10,13,13 | 97:16 |
| **responsibili...** | 129:21 | 169:8 | 54:17 55:1 | 96:11,22 | **runs** 111:13 |
| 4:24 50:5 | 170:6 | **rise** 46:22 | 55:5,12 | 105:9,21,23 | 111:14 |
| 107:11 | **Richard** | **Rivero** 10:19 | 59:14,20 | 106:9 | |
| 133:22 | 77:17,19,20 | 113:11 | 60:8,17,24 | 108:24 | **S** |
| 135:9 136:6 | 77:22 78:1 | **Rivero-Ca...** | 61:18 62:3 | 110:22 | **S** 2:1 3:6 |
| **responsibili...** | 78:5 | 1:12 3:2 4:8 | 62:9 63:13 | 111:14,18 | **Sabrina** 1:12 |
| 47:18 | **ride** 171:20 | 4:16 9:19 | 69:14,20 | 114:10,19 | 3:2 4:8,16 |
| **responsible** | **right** 16:14 | 11:8 12:21 | 70:1 72:5,7 | 114:21 | 51:19 |
| 63:21 64:5 | 17:15 23:13 | 14:3 17:18 | 72:12 79:1 | 115:13,21 | 116:20 |
| 64:11 | 24:19,22,22 | 19:14 24:23 | 106:8,14 | 119:21 | 171:24 |
| 109:13 | 27:15 30:13 | 26:20 32:1 | 108:2 109:8 | 120:5 121:1 | 175:11,20 |
| 134:2,7 | 32:6 34:19 | 37:1 70:20 | 116:4 | 121:10,17 | **safety** 160:20 |
| 136:2 | 37:12 48:12 | 76:7 86:16 | 132:11 | 122:1,22 | 162:15 |
| **restroom** | 48:15 51:21 | 101:18 | 150:19,20 | 123:5,18 | 163:17 |
| 125:15,17 | 51:21 55:16 | 102:24 | 150:21 | 129:4,14 | 164:2,19 |
| **results** 88:23 | 55:23 57:11 | 108:9 118:9 | 151:2,5 | 130:3,14,17 | 166:21 |
| **retained** | 57:19 58:5 | 132:18 | 152:18,19 | 131:1,2,10 | **sandwich** |
| 97:14 | 58:7 59:7 | 133:16 | 153:20,22 | 131:17,18 | 116:15,15 |
| **review** 5:16 | 61:1 70:10 | 139:16 | 156:1 | 131:19,20 | **save** 101:5 |
| 5:19 6:16 | 74:19 78:6 | 140:24 | 168:19 | 131:24 | **saw** 69:10 |
| 10:14 42:18 | 81:4 88:3 | 149:4 | **RTU** 8:21 | 137:20 | 77:14 |
| 46:24 63:7 | 88:18 92:12 | 161:23 | 10:11 12:7 | 138:6 | **saying** 72:20 |
| 83:11 84:10 | 94:8,14,15 | 175:11,20 | 14:6,10,16 | 140:14 | 82:24 83:24 |
| 96:9 105:24 | 95:6 101:1 | **role** 5:5 23:20 | 15:21,24 | 141:4,23 | 84:2,17 |
| 106:3 107:2 | 104:22,23 | 23:21 54:22 | 16:5,7,20 | 149:5,14,16 | 99:23 |
| 119:15 | 105:17 | 55:6,7 | 19:9 40:14 | 149:19,23 | 117:10 |
| 120:23 | 107:1,16 | 63:17 136:9 | 40:18 47:7 | 150:4,9,10 | 119:17 |
| 128:20 | 108:11,17 | 136:20 | 47:12,22 | 150:11,16 | 138:5 |
| 133:11 | 111:3,9,13 | **roles** 51:9 | 49:5,21 | 150:17 | 159:12 |
| 149:8 | 112:19 | **route** 54:12 | 51:11,14 | 152:4,11,11 | 172:19 |
| 155:14,22 | 116:9 122:3 | 54:18 | 52:1,2,4,7 | 153:12,20 | **says** 11:2,17 |
| **reviewed** | 127:6 131:2 | **routes** 167:19 | 52:22 53:1 | 154:2,12,16 | 11:19 12:3 |
| 5:11,11 | 133:9 138:2 | **Roxane** 16:8 | 53:3,4,13 | 154:22 | 12:15 13:16 |
| 37:6 41:5 | 138:7 | 16:10,23 | 56:9,10,11 | 155:3,11,17 | 17:21 19:13 |

TOOMEY REPORTING
312-853-0648

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 21

19:24 26:21
27:4 30:14
76:13,14
87:9 92:12
92:17,19
93:9,11,12
93:15 94:4
105:22
108:22
109:17
122:3,4
124:19
130:11,16
131:15
133:21,24
147:15
151:21
162:11,15
163:16
**scheduled**
35:13
**scope** 22:8
91:3 103:5
112:4,6
**Scot** 11:14
14:2
**screen** 13:11
18:11 19:23
20:20 25:8
25:10 48:1
70:21,22
71:13,13
76:5 86:10
111:12
118:11
**scroll** 105:14
**second** 11:16
11:18 27:4
27:6 31:8
56:20 70:19
131:19
142:17
149:21
150:11,17

151:17,17
**secondary**
81:12,13
**seconds** 73:5
**sections**
107:7
**security**
13:12
160:20
162:16
163:18
164:2,19
166:21
**see** 10:19
11:8,9,17
11:21 17:18
17:22 19:14
19:15,23
26:20,23
37:1 51:12
63:13 69:8
70:20,22
71:9,16
73:15,21,24
75:7,14
76:7,12
78:8,11,17
79:1,3
83:20 84:14
86:15,17
87:13 91:16
91:22 92:1
92:2,6,7,9
92:16 93:14
93:18,21,24
94:7,11
95:23
104:16,19
112:22
118:11,13
118:16,19
118:24
119:3,4,7
119:20

122:16
124:18
125:14,22
125:24
129:8,11
130:21
133:15,17
133:21
135:8
151:14,19
153:16
161:23
162:10,13
162:14
173:19
174:15
**seeing** 11:4
71:12,12
**seeking** 81:20
**seen** 47:4
67:23 68:4
69:13,17,19
69:24
146:16
169:24
170:3,4
**send** 17:10,12
35:11,21,22
37:8 38:24
39:5,14
99:23,24
164:14
**sent** 12:13
17:17 18:5
37:2 101:9
160:12
164:13
**sentence**
11:19
**September**
4:22 157:3
**serve** 23:10
23:16 24:1
**service**

101:24
102:5
128:23
129:2
**services**
39:14 95:18
103:12,14
103:18
**set** 82:6
136:12
169:24
177:1
**settled** 82:11
82:13 83:1
**settlement**
82:21
**share** 76:5
**shared** 70:23
**sharing** 20:20
27:23 91:9
**Sheriff** 1:7
12:17 111:3
119:12
160:24
175:7
**Sheriff's** 4:18
5:3,13
14:13,17,21
15:3,14,18
16:4,11
31:19 32:20
34:10 45:9
63:20 64:2
66:20 74:9
74:13 83:6
95:19,22
100:6,21
106:18
112:7,13,18
129:22
132:20
134:23
144:10
155:15

156:14
157:3
161:15
162:18,20
163:9,14
**sheriffs** 140:8
**shift** 99:24
101:13
**shop** 116:15
**short** 48:21
116:13
**Shorthand**
1:18 176:4
177:8
**shot** 71:13,14
75:10,12
76:11,15
**shoulder**
92:14
**show** 10:15
12:10 17:9
17:15 26:15
26:19 37:19
70:18 76:6
91:21 93:16
103:23
118:10,17
118:22
133:8,9,14
151:13
161:20
**showed** 27:14
40:1 47:24
130:10
**showing**
11:10 18:11
19:19,22
77:9 125:20
171:12
**sic** 161:20
**side** 52:21
71:17,20
142:7
**sides** 110:12

**sign** 102:9,13
102:15,19
102:20
103:1,14,18
103:19
**signature**
174:8
**signs** 55:20
56:24 57:3
78:17 79:2
79:4 147:19
**similar** 30:11
50:4 61:13
61:19 104:4
**single** 147:2
151:10
**sit** 72:18 74:7
97:20
**sitting** 59:3,5
59:9 95:2
**situation**
32:6,23
35:2 48:17
58:16 66:15
67:10,12,14
68:4 75:5
100:4
107:14,18
135:6
136:24
140:18
141:17
143:22
144:3,12
146:23
147:2 148:5
148:17
**situations**
67:21 84:2
101:2
104:14
148:15
165:19
**six** 41:18

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 22

| | | | | | |
|---|---|---|---|---|---|
| **skip** 116:24 | 135:13 | 109:10 | 38:19 39:1 | 157:9,11 | **steap** 93:9 |
| **social** 95:10 | 163:15 | **specified** | 54:16,20 | **state** 1:18 | **steep** 84:18 |
| 95:13 | **special** 23:11 | 176:17 | 59:24 60:1 | 4:14 176:1 | 84:22 85:22 |
| **somebody** | 23:12 | **specify** | 63:9 65:6 | 176:4 | 92:3 93:9 |
| 15:14 34:10 | **specific** 25:23 | 121:20 | 65:10,18 | **stated** 32:18 | 94:2,5 |
| 55:18 69:13 | 32:5 33:17 | **speculate** | 82:6 90:18 | 33:12 34:18 | **steeper** 54:24 |
| 69:15 114:9 | 34:19,23 | 104:11 | 96:7 99:13 | 40:16,23 | **stenograph...** |
| 115:20 | 38:21 39:3 | 113:13 | 99:14,18 | 43:1,21 | 176:11 |
| 134:12,20 | 39:7 41:2,3 | 144:11 | 100:8 101:3 | 45:21 54:3 | **stop** 20:20 |
| 137:5 139:7 | 43:3,11 | 148:14 | 103:19,21 | 56:18 58:13 | 27:23 36:1 |
| 139:15 | 45:2 56:6 | 161:13 | 107:24 | 65:5 74:12 | 73:5,21 |
| 140:13 | 58:6,17 | 164:5 | 108:2 | 80:6 89:4 | 174:1 |
| 145:22 | 62:23 64:9 | **speculating** | 109:15,21 | 89:22 93:3 | **stopping** |
| 147:16,24 | 67:10 79:19 | 171:3 | 114:9,14 | 96:4 97:9 | 75:13 |
| 148:3 | 105:23 | **speculation** | 115:12,17 | 98:9,14 | **straight** |
| **soon** 21:8 | 107:14,15 | 82:17 83:9 | 126:1,5,8 | 107:1,9 | 71:23 |
| 172:4 | 107:18,24 | 104:8 | 126:11,16 | 110:3,7 | **Street** 2:10 |
| **sorry** 11:3 | 108:6,6 | 112:10 | 126:22 | 120:8 122:8 | **strike** 33:24 |
| 22:12 31:17 | 109:20 | 126:20 | 127:3,7,14 | 127:20 | 46:24 63:18 |
| 51:17 103:7 | 119:18 | 138:18 | 132:8,13 | 128:9 | 65:16 69:18 |
| 151:9 166:5 | 120:14 | 139:10 | 142:11 | 136:19 | 74:1 105:10 |
| **sort** 141:7 | 121:14,22 | 161:18 | 148:1,19,24 | 145:13 | **structural** |
| 142:18 | 122:16 | 163:2 | 161:3 | 146:22 | 31:5,21,24 |
| **sorts** 61:5 | 124:14 | 166:11 | 163:12 | 149:18 | 32:4,8 33:2 |
| 79:24 149:1 | 134:17 | 167:10 | 165:1,23 | 166:18 | 33:7,16 |
| **sound** 110:2 | 135:7 | 168:11 | 166:16 | 176:19 | 34:11 64:7 |
| **sounds** 80:15 | 141:17 | 169:14 | 167:6 | **statement** | **structurally** |
| 102:5 | 143:14,22 | 170:13,23 | **stairs** 170:1 | 10:7 85:6,8 | 32:22 |
| 104:10 | 145:19 | **spend** 43:20 | **stakeholders** | 85:11,15,18 | **structure** |
| **South** 2:4 | 149:3 | **spent** 79:13 | 136:15 | 85:21 89:1 | 35:3 107:20 |
| **space** 9:10 | 160:17 | 163:22 | **stamp** 11:2 | 89:5,6 | **structures** |
| **speak** 65:6,9 | 162:15 | **spit** 39:11 | **standard** | 109:23 | 112:15 |
| 96:6 122:5 | 163:17 | **spoke** 98:22 | 13:8 100:7 | **statements** | 155:20 |
| 122:9 126:8 | 164:2,18 | 122:12 | 109:4 | 46:18,21 | **study** 77:1 |
| 160:3 | 165:22 | 129:6 160:3 | 153:10 | 93:1,5 | **stuff** 61:12 |
| **speaking** | **specifically** | 160:6 | **standards** | 104:20 | **stumble** |
| 58:5,6 69:5 | 34:6 51:15 | **spoken** 64:23 | 10:9 12:6 | **states** 1:1,16 | 78:10 |
| 70:6 126:11 | 58:21 60:23 | **spread** 21:4 | 13:18,20,20 | 42:3 96:12 | **stumbled** |
| **speaks** 12:2,8 | 62:1 91:14 | **ss** 176:1 | 64:7 137:22 | 119:23 | 78:8,12 |
| 13:16 87:10 | 110:7 | **staff** 29:24 | 138:6,7,10 | 175:1 | **subject** |
| 92:8 94:24 | 136:11 | 31:20 32:7 | 138:11 | **stationed** | 109:22 |
| 121:17 | 150:1 | 32:8 33:6 | 153:6,8 | 60:8 | **subjects** |
| 131:15 | 156:24 | 33:19 35:4 | **staring** 69:21 | **status** 137:9 | 109:15 |
| 132:7 | **specificatio...** | 36:13 37:16 | **started** 157:7 | **stay** 61:10 | 162:17,19 |

SABRINA RIVERO-CANCHOLA
December 20, 2023

Page 23

| | | | | | |
|---|---|---|---|---|---|
| 163:13,19 | 128:20 | 174:5 | 52:18 54:1 | **text** 39:11 | 135:13 |
| **submission** | 132:24 | **taken** 1:13,14 | 54:2,19 | **Thank** 94:21 | 138:22 |
| 92:18 | 133:6 136:9 | 1:17 4:5 7:4 | 55:20 56:24 | **Thanks** 174:4 | 147:18 |
| **submitted** | 136:21 | 48:22 | 65:23 67:14 | **thing** 153:17 | 148:10 |
| 5:12 | 144:7 152:1 | 175:16 | 71:14 76:11 | **things** 50:14 | 149:11,18 |
| **SUBSCRI...** | 153:21 | 176:16 | 77:16 83:18 | 60:22 61:5 | 151:17 |
| 175:21 | 156:15 | **takes** 28:21 | 84:8 96:2 | 66:18 84:5 | 152:3,20 |
| **subsequent** | 158:16,19 | 113:17 | 99:17,18 | 96:5 102:19 | 153:16 |
| 99:6 | 160:1 162:5 | **talk** 80:4 | 106:5 | 106:20 | 159:2 161:6 |
| **suggested** | 171:6 | 98:19 145:7 | 113:11 | 117:23 | 163:15 |
| 55:18 | **surface** | 145:8 | 131:23 | 124:5,11 | 166:3 171:3 |
| **suggesting** | 152:16 | 173:16 | 136:14,15 | 136:8 139:1 | 171:8 |
| 55:11,15 | **sworn** 4:2,10 | **talked** 88:16 | 137:4,10 | 149:2 | 172:10,14 |
| **Suite** 2:11 | 175:12,21 | 90:9 173:4 | 141:1 148:4 | 165:21 | **third** 11:19 |
| **superinten...** | 176:8 | **talking** 13:7 | 149:1 | **think** 5:14 | 47:23 56:20 |
| 16:10 | **system** 14:13 | 14:20 18:1 | 164:18 | 10:3 12:14 | **THOMAS** |
| **superinten...** | 14:18,19,22 | 18:4 24:19 | 168:7 | 12:16 16:21 | 1:7 2:3 |
| 16:19 | 14:23 15:3 | 28:14 36:20 | **ten-minute** | 19:4 20:16 | 175:7 |
| **supplemental** | 15:7 29:6 | 56:1,22 | 48:16 | 25:6 28:21 | **thoroughly** |
| 25:9 | 52:8,10,13 | 60:23 63:8 | **tenant** | 32:5 35:19 | 165:16 |
| **supposed** | 53:20,22 | 63:9 80:19 | 112:13 | 37:13 39:13 | **thought** |
| 75:2 98:5,6 | 60:9 61:15 | 80:22 90:17 | **tendered** 6:4 | 50:3 51:7,8 | 38:11 |
| 99:14,17 | 61:18 62:4 | 90:19 | 25:6 83:21 | 51:16 62:10 | **three** 30:5 |
| 107:7 | 68:18 70:13 | 132:10 | 84:11 92:23 | 62:12 69:10 | 126:15 |
| 159:18 | 106:17 | 152:15 | 160:12 | 73:9 74:12 | 150:6 |
| **sure** 7:22 | 113:17 | 153:9 159:9 | 164:13 | 75:22 80:2 | **tier** 17:1 18:3 |
| 10:15 11:6 | 127:12 | 163:22,23 | **term** 22:10 | 82:4 83:20 | 18:8 80:2 |
| 19:10 23:18 | 129:14 | **talks** 94:13 | 22:17 159:8 | 84:7 85:24 | 119:22 |
| 24:10 27:3 | 140:9 | **tasked** 64:8 | 159:11 | 88:3,7,16 | 120:5,16 |
| 32:17 34:5 | 151:10 | **team** 123:15 | **terms** 44:5 | 89:4,6 | **tiers** 52:5 |
| 34:17 42:3 | _____ | 123:17 | 51:19 | 94:24 | **time** 5:6 10:5 |
| 42:21,22 | **T** | 124:13,14 | **testified** 4:10 | 102:18 | 13:8,21 |
| 43:11 56:8 | **T** 3:6 4:12,12 | **technical** | 62:22 72:9 | 106:7 | 16:13 17:2 |
| 58:18 64:21 | **take** 29:24 | 48:7,10 | 151:7 | 107:11 | 17:3 19:6 |
| 65:3,21 | 30:2 31:7 | **Technically** | 165:12 | 108:4 | 20:23 21:15 |
| 67:4 69:16 | 31:11 46:14 | 115:23 | **testify** 176:8 | 110:22,24 | 23:2 24:19 |
| 73:13,18 | 48:14,15,18 | **tell** 27:24 | **testifying** | 111:1,18 | 25:14 35:4 |
| 75:24 77:3 | 51:10 86:4 | 28:6,15 | 5:10,20 | 113:9 | 43:3,20 |
| 77:15 80:23 | 116:3,10,16 | 30:14 31:8 | **testimony** | 116:12,16 | 44:17 47:23 |
| 80:24 99:9 | 120:9 | 31:13 34:9 | 5:17 6:8,17 | 117:1 | 68:8,18 |
| 100:18,21 | 122:13,15 | 34:22 41:9 | 88:1 131:7 | 119:19 | 69:4 74:4,6 |
| 101:9 | 143:23,24 | 44:16 46:11 | 161:7 | 121:16 | 79:13,18 |
| 108:18 | 167:20 | 49:1,18 | 175:18 | 129:5 | 84:13 85:12 |
| 117:19,21 | 171:21 | 51:4 52:13 | 176:14 | 131:15 | 89:10 92:5 |

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 24

| | | | | | |
|---|---|---|---|---|---|
| 97:10,13 | 79:9,12,21 | 30:4,8,11 | 167:7,15,18 | 60:24 61:15 | 171:19 |
| 103:15 | 97:20 | 30:12,13,14 | 168:3,24 | 61:18 62:4 | **two-minute** |
| 107:20 | 118:20 | 30:19,21 | 169:9 171:6 | 68:18 71:7 | 31:11 |
| 109:5 | 133:12 | 31:1 32:13 | **traveling** | 71:8,17 | **two-week** |
| 119:16 | 163:12 | 32:15,19 | 96:21 | 72:4,14,19 | 174:13 |
| 123:7,14,17 | 171:22 | 33:5,9,13 | **traverse** | 106:17 | **type** 19:8 |
| 130:9 | 173:10 | 33:19,23 | 106:14 | 109:5 | 28:13 |
| 138:12 | **toilet** 84:2 | 34:1,4 | 141:15 | 110:11,13 | 109:18 |
| 139:4 | **toilets** 80:1 | 54:16,19 | 142:22 | 110:14,18 | 110:4,8 |
| 141:19 | **told** 63:18 | 99:6 100:11 | 143:21 | 110:20 | 137:7 |
| 152:1 154:2 | 66:11 88:9 | 108:1,5 | 145:23 | 111:11 | 148:16 |
| 154:10,15 | 88:12,13 | 149:2 157:1 | 146:8 | 113:4,5,15 | **types** 28:15 |
| 155:4,17 | 118:3 | 157:5 165:1 | 170:21 | 113:17 | 61:12 91:11 |
| 159:1,10 | 148:24 | 165:16,23 | **traversing** | 127:12 | 124:10 |
| 162:4,6 | **tools** 44:20 | 166:16 | 171:8 | 151:10 | 143:19 |
| 163:23 | 44:22 45:2 | 167:21 | **Treatment** | **Tunnel-Ca...** | 146:2 |
| 171:23 | 45:5 | **transcript** | 120:21 | 76:13 | 147:22 |
| 173:10 | **top** 17:20 | 175:14,18 | **triage** 128:21 | **tunnels** 52:20 | 148:2 |
| 175:16 | 72:23 76:12 | 176:11 | **trial** 83:13 | 52:24 53:2 | **typewriting** |
| 176:17 | 76:14 77:2 | **transitioned** | **tried** 19:10 | 53:5 55:12 | 176:12 |
| **timed** 114:2,7 | 94:8 152:16 | 124:8 | 21:2 | 56:23 59:20 | **Tyrrell** 6:5 |
| 114:24 | **topic** 105:15 | **transmitted** | **true** 85:21,22 | 62:16,19 | 149:9 |
| 116:5 | 168:13 | 87:2 | 87:8 88:11 | 71:5 115:18 | |
| **times** 6:10,21 | **topics** 7:2,7,9 | **transport** | 89:3 175:17 | 130:3 | **U** |
| 6:22 25:19 | **track** 101:14 | 105:23 | 176:13 | **two** 6:14 | **unclear** 23:2 |
| 43:13 68:3 | **train** 24:14 | 115:22 | **Trust** 53:15 | 19:17 28:18 | 36:19 |
| 124:7,24 | 24:16 31:20 | 170:2 | 150:14 | 31:12 54:7 | **undergoing** |
| 125:5 | 33:23 | **transportat...** | **truth** 176:8 | 59:19 61:17 | 41:12 |
| 135:10 | 100:11 | 117:13,15 | **try** 173:18 | 61:22 67:24 | **underground** |
| 148:9 159:4 | 157:2 | **transported** | **trying** 111:12 | 68:7,9,17 | 52:8,10,13 |
| **timing** | 166:24 | 107:22 | 117:23 | 69:8 73:6 | 53:20,22 |
| 117:20 | **trained** | 126:3 | 131:2,21 | 74:3,18 | **understand** |
| **title** 4:17 27:5 | 156:22 | 127:12 | 137:24 | 95:10 | 22:22 23:4 |
| 27:7 37:10 | 157:12,14 | **transporting** | 138:2 | 103:21 | 24:7 29:17 |
| 64:9 86:18 | 157:15 | 97:24 | 139:13 | 104:14 | 33:22 34:17 |
| 134:17 | 167:6 | 146:18 | **Tuesday** | 111:13 | 36:17 40:12 |
| **titled** 17:16 | **training** 25:4 | **travel** 106:4,5 | 21:18 | 116:23 | 57:10 59:18 |
| 37:15 133:3 | 25:6,7 | 106:8,10 | **tunnel** 52:8 | 125:12 | 61:16 67:5 |
| 161:21 | 27:24 28:10 | 107:2,6,7 | 52:10,13,21 | 127:17,21 | 68:14 72:20 |
| **TJ** 6:5 149:9 | 28:13,15,17 | 107:10 | 53:20,22 | 128:16 | 105:19 |
| **today** 5:10 | 28:20 29:2 | 114:8 116:3 | 54:4,5,9,12 | 129:6 154:7 | 112:1 136:5 |
| 6:8,16 | 29:4,8,10 | 157:19,20 | 54:18,20,23 | 154:20 | 173:22 |
| 62:15 72:18 | 29:12,16,18 | 157:21 | 55:4,15 | 156:2,9 | **understand...** |
| 74:7 77:11 | 29:22 30:1 | 158:6 167:1 | 56:16 60:8 | 167:24 | 9:21 12:20 |

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 25

12:21 13:1
22:19,23
32:3 41:9
41:11 65:18
66:8,10,19
70:4 79:5
105:9 108:8
110:11
114:4
127:10,13
150:5,7
**Understood**
173:17
**unethical**
82:23
**unfortunat...**
83:12
**Unit** 120:21
**United** 1:1,15
175:1
**units** 52:5
**unknown**
144:12
**unnecessary**
21:3
**untruthful**
83:16,18
**updated**
25:14,17,18
25:22,24,24
30:5
**updates**
87:17
**upper** 65:2
92:11,13,14
92:15
**use** 7:14 14:4
14:15 21:20
22:3 34:2
52:10,12
53:17 54:4
54:15,18,20
57:8,13,21
58:2,12

59:15,15,24
62:6 69:13
69:17,20
70:1,7,12
70:16,16
72:22 75:14
75:20
113:12,15
113:19,21
113:23
114:9,12,17
115:3,7,12
115:16,18
125:17
129:13
131:2
138:14
140:5 145:9
145:16
146:16
150:3 154:2
154:8 159:8
159:11
**user** 20:21
32:9 33:8
38:20 39:2
39:6,8 66:5
67:7,9
69:19 70:1
74:10 75:1
75:20 108:3
110:17
115:13,22
125:2
126:18
146:8
158:22
159:1,17
165:8 167:2
167:7,23
**users** 31:20
37:22 65:19
67:24 68:17
69:9 74:4

74:19 101:3
101:6
127:17
128:4 146:6
154:11,16
154:18,20
154:21
155:3,16
156:1,8
159:18,23
**uses** 57:24
58:22 66:1
145:22
148:3
**usually** 20:23
21:22 63:5
77:23
122:21,24
126:8

___

**V**

**vague** 13:3,5
17:3 34:14
58:17 68:20
84:24 85:10
102:4
140:15
155:7 167:9
**varied** 44:10
**varies** 137:1
**variety**
146:17
**various** 41:22
42:3 43:10
50:13,14
51:9 52:16
60:22 62:5
62:16 63:3
80:5 99:16
99:18,22
167:19
**vary** 21:16
23:6 32:23
66:14

113:19
139:22
**vast** 106:17
113:17
**verbally**
90:17 126:9
**version** 26:13
27:11,17,19
27:21 28:23
84:15
**versus** 4:4
42:18 86:12
**video** 63:8
64:19 67:23
69:24 70:19
71:10,12
73:4,5,20
73:21 74:16
74:20 75:13
75:14,18
76:2,8,10
76:13 77:5
77:9,16
78:7 96:9
96:17 97:1
97:5,6,9
99:21
110:16
124:16
125:3 128:3
170:6
171:12
**videoconfe...**
1:14
**videos** 5:16
29:11,13
64:13 96:24
97:14,16
127:22
**violate**
170:19
**violating**
68:15
**violation**

68:24
**visit** 43:9,22
**visited** 43:1,8
44:12
**vote** 115:21
157:18
158:1,8,15
158:21
159:16,23
160:5 161:1
167:8,16,20
167:23
168:4
169:23
170:7
**voted** 164:11
170:11
**vs** 1:6 175:6

___

**W**

**W** 2:4
**waiting** 59:5
87:21 88:7
**walk** 7:21
25:3 52:11
52:14,16
72:5
**walked** 71:21
**walker** 8:8
15:21 19:3
19:13 34:2
34:6,11
58:1,12,23
59:17,23
140:5,13,24
141:3,15
143:16
145:3,8,22
148:4
**walking**
72:14 76:3
77:15 159:7
**walks** 145:4
**walls** 61:10

**want** 26:16
31:24 42:18
53:1 77:4
80:19 84:10
86:9 93:17
103:23
105:14
116:10
130:10
133:7 138:3
146:4 172:9
172:16,22
**wanted** 40:6
40:10 41:1
44:16 52:15
117:10,22
**wanting**
100:4 117:9
**wants** 81:15
**wasn't** 84:3
132:4
142:16
149:13
158:4,6
160:15
164:23
169:18
**wasting**
130:9
**watch** 171:12
**watched** 76:2
110:16
**way** 52:13,15
81:11
101:11
114:13
121:17
130:16
132:6
149:21
152:3
157:24
170:17
171:6,7

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

Page 26

| | | | | | |
|---|---|---|---|---|---|
| **ways** 52:16 | 64:24 65:11 | 83:15 84:15 | 109:19,22 | 121:12 | 163:3 |
| 52:18 76:20 | 76:3 77:10 | 85:21 86:7 | 110:5,6,17 | 126:8 | 165:14 |
| 99:16,18,22 | 77:12 79:10 | 86:13 89:1 | 115:13,22 | 138:15 | 166:2,8,13 |
| **we'll** 48:11 | 79:22 80:4 | 90:1 91:17 | 121:19 | 154:2,8 | 167:11 |
| 89:8 118:7 | 81:4,7,9,14 | 105:3,8 | 124:21 | 155:10 | 168:12,22 |
| 145:7 | 81:20 83:5 | 118:14 | 125:1,2,6 | 156:12 | 169:6,16 |
| **we're** 13:7 | 83:19,22 | 119:13 | 126:3,18 | 165:2,24 | 170:14 |
| 76:23 77:11 | 84:5,17 | 120:16 | 127:17 | 171:13 | 171:2,18 |
| 79:20 80:19 | 85:15 92:2 | 158:5 | 128:4 | **WHEREOF** | 172:1,17 |
| 87:21 88:7 | 92:21 93:1 | 161:11 | 130:20 | 177:1 | 173:5 174:8 |
| 88:8 130:9 | 94:1 96:10 | **wheelchair** | 132:15 | **William** | 176:7,7 |
| 135:7 153:9 | 96:17 97:6 | 7:15,17,23 | 137:6,7,12 | 77:20,22 | 177:1 |
| 153:15 | 97:19 98:12 | 8:8 14:11 | 137:16 | **Williams** | **woman** 51:8 |
| 173:24 | 98:19,22 | 14:15 15:7 | 143:23 | 73:12 | **word** 30:17 |
| **we've** 19:4 | 99:7 104:16 | 15:15,18,22 | 144:4,8,21 | **Wilson** 92:17 | 30:17 31:1 |
| 95:15 | 104:19 | 19:3,12,20 | 145:2,21 | 92:17 | 31:1 72:22 |
| 116:22 | 105:12,19 | 19:24 20:3 | 146:6,7,11 | **witness** 3:1 | 130:21 |
| 124:17 | 106:4,13 | 20:8,14,21 | 154:11,16 | 4:1,9 10:2 | 131:3 152:5 |
| 132:17 | 107:3,8 | 31:20 32:9 | 154:18,21 | 11:1,3 13:4 | 152:6 |
| 147:18 | 118:11 | 33:8 37:22 | 155:3,16 | 17:4 18:21 | **word-for-w...** |
| 163:22 | 119:7 | 38:20 39:1 | 156:1,8 | 22:16 23:3 | 32:15 |
| **week** 21:21 | 120:12 | 39:6,8,15 | 158:22,24 | 24:6 28:4 | **wording** 62:6 |
| **weekday** 37:9 | 122:5,13 | 57:6,8,12 | 159:6,7,17 | 31:7,12,17 | **words** 82:7 |
| **weekend** | 124:19 | 57:14,21 | 159:18,23 | 34:16 38:14 | **work** 9:5 |
| 21:14 | 125:8,11 | 58:10 59:3 | 160:2 | 40:22 42:20 | 21:17 24:9 |
| **went** 78:13 | 127:11,18 | 59:8 60:1 | 161:10 | 50:2 63:2 | 42:5 47:20 |
| 80:23 | 127:24 | 65:12,19 | 165:8 | 68:21 72:11 | 89:15 |
| 149:20 | 129:8,13 | 66:1,5,13 | 166:20 | 80:21 82:1 | 134:12,14 |
| 157:17 | 131:23 | 66:21 67:2 | 167:1,7,23 | 82:2,19 | 134:17,19 |
| 158:8 | 157:17,24 | 67:7,9,15 | **wheelchair...** | 83:10 85:1 | 134:22,23 |
| 170:16 | 158:8,20 | 67:24 68:8 | 162:17 | 85:13 88:2 | 135:2,5 |
| **weren't** | 159:15,22 | 68:17 69:4 | 163:19 | 89:14 103:3 | 139:1 |
| 106:22 | 160:5,7,15 | 69:8,8,17 | **wheelchairs** | 103:7,10,20 | **worked** 78:5 |
| 145:1 | 160:18 | 69:19 70:1 | 14:5 21:20 | 104:9 105:1 | 136:2 |
| **west** 2:10 | 161:1,8,9 | 73:7 74:3 | 22:3 30:15 | 112:11 | **workers** |
| 111:1,15,16 | 161:14 | 74:10,18 | 31:4 38:2 | 116:21 | 95:10,13 |
| 111:19 | 163:22,23 | 75:1,8,16 | 57:16,22 | 117:9 123:9 | **working** |
| **Western** 2:4 | 164:4,10,20 | 75:20 95:1 | 58:1,14,19 | 126:21 | 135:10 |
| **Westmorel...** | 169:12 | 95:2 98:3 | 58:21 59:2 | 138:19 | 136:14 |
| 1:3 4:4 6:19 | 170:7,9,20 | 98:21 99:20 | 59:10,14,21 | 139:11 | 157:7,10,11 |
| 7:1,3,5,8,13 | 171:5 175:3 | 101:3,6,15 | 60:7,13 | 140:16 | **works** 78:2 |
| 7:20 8:13 | **Westmorel...** | 102:8 104:5 | 67:11,19,20 | 148:11 | **wouldn't** |
| 19:12,17 | 79:8,14 | 105:16 | 74:15 99:8 | 151:8 155:8 | 39:7 47:17 |
| 62:15 64:14 | 80:9,17 | 108:3 | 114:15 | 161:18 | 91:2,7 |

**SABRINA RIVERO-CANCHOLA**
**December 20, 2023**

104:3
115:15
144:9
157:12,14
**wrapped**
117:23
**write** 113:1,6
126:1,22
127:14
**writes** 121:16
122:1
**written** 55:14
84:17 94:6
109:14
112:20
133:11
**wrong** 81:19
81:21 82:4
**wrongdoing**
82:22 83:1
**wrote** 17:19
55:11 62:15
84:19 131:7
138:1,4
153:18

**X**

**X** 3:1,6 4:12

**Y**

**yeah** 23:4
31:11 32:11
34:17 36:18
38:13 40:23
42:21 44:22
48:13 51:1
57:21,23
63:3 70:15
72:15 75:11
76:18 78:10
80:22 84:20
85:2,5 88:3
92:7 103:7
115:4

123:10
125:4 131:5
132:24
136:8
165:15
166:8
168:13
169:17
171:3,18
172:24
174:14
**year** 30:1
41:19 43:10
51:14 97:11
97:21 98:17
106:11
142:4
173:11
174:3,4
**years** 30:5
37:2,17
87:21
125:13
126:15
127:21
128:16
129:7 150:6
150:9 156:2
156:9,12
**yesterday**
94:2

**Z**

**Zach** 152:2
**zoom** 1:13
36:5 38:6
118:12
**zoomed**
118:18
**zooming**
11:17

**0**

084-003813

177:9

**1**

**1** 1:7,11
27:13,16
94:7 105:17
151:14
175:7,14
**1-175** 175:15
**1:00** 118:5
**1:23-cv-01...**
1:6 175:6
**1:58** 166:14
**10** 3:11 10:17
13:12 119:8
125:9
138:16
155:3 156:4
**10:00** 1:19
130:19
**10:50** 48:17
**10257** 2:4
**10912** 118:15
**11** 119:9
**11:00** 48:18
**118** 3:13
**12/16/22** 92:4
**12th** 107:5
**133** 3:16
**148** 161:20
161:21
**148.6.8**
162:11
**151** 3:9
**17** 3:8,10
70:18,23
**18** 157:18
158:9
**18-** 12:15
**18190** 93:20
93:22 95:6
**1st** 177:2

**2**

**2** 10:17 27:13
27:16 53:4
53:5 56:18
94:7,10,10
94:11 95:7
125:20
**2:00** 117:15
117:21
118:7
151:19
**20** 1:19
**2010** 10:9
12:5 13:18
137:21
138:6,10
153:3
**2011** 16:16
**2013** 51:16
**2015** 4:23
25:1,17,18
157:4,8,12
**2018** 86:18
**2019** 8:19
10:20
**2021** 16:16
16:18 17:17
17:19,23
118:15
119:9,9
120:3 125:9
125:22
151:18
153:19
**2022** 96:15
97:11 107:5
**2022X18190**
92:18 93:19
**2023** 1:19
157:18
158:9
**2024** 174:19
175:23
177:2
**20th** 125:22

**23** 3:9 151:13
151:14
**230** 2:10,11
**233-7900** 2:5
**25** 3:10 17:15
**258** 162:10
**259** 162:9
**26** 3:11,15
10:15 86:15
**26th** 120:2
**28** 3:12 93:16
93:21
104:22
105:2
**29** 3:13
118:10
125:21

**3**

**3** 95:24
**3:00** 117:21
173:19
**30** 3:14 91:21
93:7
**30-day** 97:16
**30-minute**
171:19
**300-4479**
2:12
**304** 128:1
**312** 2:12
**34-5** 123:22
**37** 3:15 26:19
26:21 27:10
**38** 3:16
133:14,15
**3F** 119:22,24
120:16
**3rd** 86:18

**4**

**4** 3:4 10:17
115:21
116:4

157:19,22
158:1,7
159:16
161:1 164:1
167:3,8,16
167:20,23
168:4
169:12,22
170:1,21
171:14
174:18
**4/3/2018**
10:18,21
87:5
**4:30** 173:19
**42** 3:17 76:6
**45** 116:10,16
118:6
172:17

**5**

**5** 53:4,5
56:18

**6**

**6** 10:17 16:15
138:16
**60606** 2:11
**60643** 2:5

**7**

**7** 94:11
**70** 3:8
**76** 3:17
**773** 2:5
**7th** 17:17,19

**8**

**8/10/21**
130:18
**801** 133:2,15
133:17
**801.3** 133:21

**9**

SABRINA RIVERO-CANCHOLA
December 20, 2023

**9** 10:17
**9:00** 92:5
  130:18
**91** 3:14
**93** 3:12
**9th** 151:18