Transcript of the Testimony of
**ERIC DAVIS**

**Date:** June 5, 2024

**Case:** WESTMORELAND VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

ERIC DAVIS
June 5, 2024

Page 130

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND,        )
                            )
        Plaintiff,          )
                            )
        vs.                 )  No. 23-cv-1851
                            )
COOK COUNTY SHERIFF         )  Day 2
THOMAS DART, et al.,        )
                            )
        Defendants.         )

    This is Day 2 of the deposition of
ERIC DAVIS, taken via Zoom videoconferencing,
called by the Plaintiff for examination,
taken pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before PEGGY A. ANDERSON, a Certified Shorthand
Reporter of the State of Illinois, on June 5,
2024, at 2:00 p.m.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 131

1  A P P E A R A N C E S:
2
3          THE LAW OFFICES OF:
           THOMAS G. MORRISSEY
4
           BY:  MR. THOMAS G. MORRISSEY
5               MR. PATRICK MORRISSEY
                10257 South Western Avenue
6               Chicago, Illinois  60643
                (773) 233-7901
7               tgm@morrisseylawchicago.com
                pwm@morrisseylawchicago.com
8
                Appeared on behalf of the
9               Plaintiff;
10
11         THE LAW OFFICES OF:
           DEVORE RADUNSKY
12         BY:  MR. ZACHARY STILLMAN
                MR. JASON DEVORE
13              230 West Monroe Street
                Suite 230
14              Chicago, Illinois 60606
                (312) 300-4479
15              jdevore@devoreradunsky.com
                zstillman@devoreradunsky.com
16
                Appeared on behalf of the
17              Defendants.
18
19  ALSO PRESENT:
    Ms. Hannah Cohen, Law Clerk
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 132

1                I N D E X
2   WITNESS                            PAGE
3   ERIC DAVIS
4   DIRECT EXAMINATION BY
    MR. MORRISSEY:                     133
5   CROSS-EXAMINATION BY
6   MR. STILLMAN:                      251
7   REDIRECT EXAMINATION BY
    MR. MORRISSEY:                     254
8
9
10
11              E X H I B I T S
12  MARKED                             PAGE
13  PLAINTIFF'S EXHIBIT NO. 1          142
14  PLAINTIFF'S EXHIBIT NO. 8          162
15
16
17              *******
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 1

ERIC DAVIS
June 5, 2024

Page 133

```
 1              (WHEREUPON, the witness
 2              was first duly sworn.)
 3   WHEREUPON:
 4              ERIC DAVIS,
 5   called as a witness herein, having been first
 6   duly sworn, was examined and testified as
 7   follows:
 8        D I R E C T   E X A M I N A T I O N
 9        BY MR. MORRISSEY:
10        Q    Good afternoon.  Mr. Davis, I believe
11   I didn't ask you this, but can you tell me a
12   little bit about your license as an architect,
13   your licensure?
14        A    I am an Illinois licensed architect.
15        Q    And when did you become licensed as
16   an architect?
17        A    1989.
18        Q    And did you previously work for
19   Globetrotters?
20        A    In 1998, I believe it was, yes, 20 --
21   or whatever that is, 26 years ago, yeah.
22        Q    Did you ever provide architectural
23   services in the private sector for public
24   entities?
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 134

```
 1        A    Most of my career has been
 2   architectural services in the private sector
 3   for public entities.
 4        Q    Do you consider -- are you
 5   qualified -- Let me rephrase the question.
 6             What are your qualifications in
 7   regards to an understanding of the 1991 and the
 8   2010 ADA standards?
 9        A    Well, there is no separate
10   certification or licensure specific to ADA, but
11   my qualifications about the ADA and
12   understanding of it are -- include licensure
13   which is the location where the ADA is
14   exercised and enforced.
15             In addition, I have taken, I believe
16   it was, an eight-part course through continuing
17   education specifically about the Americans with
18   Disabilities Act.  I have -- I also took
19   another one.  There was a course I took
20   recently in interpreting the 2010 CIP -- or ADA
21   rather specific to that.  I have also taught
22   aspects of the Americans with Disabilities Act
23   to graduate architecture students at the School
24   of the Art Institute of Chicago.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 135

```
 1        So both in terms of my professional
 2   licensure in general and in specific education,
 3   I have a fair degree of understanding of the
 4   ADA and have for some time.
 5        THE REPORTER:  Tom, can you give me
 6   just one moment?
 7             (WHEREUPON, the record
 8              was read as requested.)
 9   BY MR. MORRISSEY:
10        Q    So would you rate your understanding
11   of the ADA to be very strong?
12        A    Yes.
13        Q    In regards to this east corridor ramp
14   that's the part of the Westmoreland case, can
15   you tell me your understanding of how the 2010
16   standards define what is a ramp?
17        A    Well, you have it on your screen
18   there, but a ramp is -- as it notes, is a
19   walking surface with the slope steeper than
20   1 in 20.
21        Q    And would you agree that in regards
22   to this east corridor ramp, east corridor
23   passageway, that it would fall within the
24   definition of a ramp because it is steeper than
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 136

```
 1   1 to 20?
 2        A    Yes.  The east corridor, yes.
 3        Q    And because it's defined as a ramp,
 4   does that mean it has to -- the slope of the
 5   ramp has to be less than 1 to 12 -- I'm sorry.
 6   Let me ask the next question.
 7             Under Section 405, it says:  Ramps
 8   have the following requirements.  Under "A" it
 9   says:  405.2, Slope.  Ramp's run shall have a
10   running slope not steeper than 1 to 12 inches.
11        A    Yes.
12        Q    Do you agree that that's the standard
13   for a slope for a run?
14        A    That is the limitation.
15        Q    When you say a "limitation," what do
16   you mean in regards to the 2010 standards?
17        A    So a ramp under the ADA could be
18   anywhere between a slope of 1 in 12 and a
19   slope -- generally 1 in 12 and 1 in 20.
20             In other words, if you had a section
21   of walkway that had a slope that was 1 in 16,
22   that's still a ramp.  It's not required to be
23   as steep as 1 in 12, but if it's steeper than
24   1 in 20, it's treated as a ramp.
```

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 2

ERIC DAVIS
June 5, 2024

Page 137

1  So any sloping walking surface
2  between a slope of 1 in 20 and 1 in 12 is
3  considered a ramp in general under the ADA.
4      Q    And if a ramp has a run that's
5  steeper than 1 to 12, that would be violating
6  the 2010 standards?
7      A    That's correct.  For an area of
8  walkway that is steeper than 1 to 12, yes, that
9  would not be considered to be compliant, if a
10 compliant ramp is called for in that location.
11     Q    And if the steepness was 1 to 10,
12 would that be a significant steepness in
13 regards to the 2010 standards in regards to a
14 slope?
15     A    As far as characterizing it as
16 significant, I think that's a subjective term.
17 It would not be compliant.
18     Q    Well, I'm not -- when you say
19 something is not compliant, that means it
20 violates the 2010 ADA code, correct?
21     A    And/or any other applicable codes,
22 yeah.
23     Q    Is there anything in the 2010
24 standards or the 1991 standards that provide

ERIC DAVIS
June 5, 2024

Page 138

1  for a -- less than a 1 to 12 steepness for a
2  ramp, ramp run?
3      A    So to be clear, if you're asking if
4  such things are allowed in buildings, that's
5  one question.  If you are asking are there
6  ramps like that that are considered compliant
7  with the ADA codes, that's another matter.  And
8  I say that because it is feasible within
9  buildings to have sections of walkways that
10 are -- and I want to be clear and complete,
11 that's why I'm saying this.
12          There may be situations in buildings
13 that have walkways that are steeper than 1 in
14 12.  But because they are not designated as an
15 accessible route, they may be allowed to be
16 steeper.  But if there are areas in the path of
17 travel that are considered to be or need to be
18 accessible and you have an area that's steeper
19 than that, then, no, it would not be allowed.
20          In other words, you can have areas
21 steeper, like in a building, but not on what's
22 called an accessible route.
23     Q    Is the RTU east corridor considered a
24 path of travel for detainees at the Cook County

ERIC DAVIS
June 5, 2024

Page 139

1  Jail?
2      A    It's considered an accessible route,
3  yes, and it is a path of travel, yes.
4      Q    So if the path of travel had a run --
5  Let me rephrase it.
6          If the east corridor ramp has a run
7  which is steeper than 1 to 12, that would
8  violate the 1991 and the 2010 ADA standards for
9  it?
10          MR. MORRISSEY:  Was there a response,
11 Peggy?
12          THE REPORTER:  I didn't hear one.
13 BY THE WITNESS:
14     A    I said correct, yeah.
15 BY MR. MORRISSEY:
16     Q    I didn't hear you, Mr. Davis.  I'm
17 sorry.
18     A    Okay.
19     Q    Going down to Number D -- or I'm
20 sorry -- Number B under Section 405, it says:
21 405.5.
22          For a ramp, are handrails required?
23     A    In general, yes.
24     Q    And if we look at -- I'm sorry.  I

ERIC DAVIS
June 5, 2024

Page 140

1  had the wrong section.
2          Section 505 --
3      A    Right.
4      Q    -- for handrails.  Under 505.4, as
5  far as heights, it says:  The top of the
6  gripping surface of the handrail shall be
7  34 inches minimum and 38 inches maximum
8  vertically above ramp surface.
9          Now, as an ADA expert, when it says
10 the gripping surface of a handrail shall be
11 34 inches minimum, if it's less than 34 inches
12 minimum from the ramp -- vertically from the
13 ramp's surface, would that be a violation of
14 the 2010 ADA code?
15     A    Yes.
16     Q    Why does the -- Can you provide an
17 explanation for me why the ADA 2010 code
18 requires a gripping surface for a handrail
19 shall be at minimum 34 inches vertically above
20 the ramp's surface?
21     A    So standards like this, when they are
22 developed and refined, can address a variety of
23 needs.  I would have to do some investigation
24 on the specific history of this particular

Exhibit 2 Page 3

ERIC DAVIS
June 5, 2024

Page 141

1  item; however, I expect that that standard was
2  developed by the experts with the Department of
3  Justice in response to the specific dimensional
4  requirements of people in wheelchairs, people
5  using walkers, people using canes.
6          I suspect it is intended to
7  address -- to get the optimal location relative
8  to a variety of needs.
9      Q   So it's your understanding that for
10 all of these code requirements under -- for a
11 ramp, there's a reason behind it?
12     A   Yes.
13     Q   And the reasons are to -- are to
14 provide a universal standards so that disabled
15 people with many varieties of needs can
16 utilize, for instance, a ramp to go up and
17 down.
18          Is that fair to say?
19     A   I'm not sure it's always possible to
20 be universal, which is the term that you used,
21 but I think it's optimal, is probably a better
22 way to characterize.  But in general, yes.
23     Q   And if we look at the 505-10.1,
24 Top and Bottom Extensions at Ramps, it says:

ERIC DAVIS
June 5, 2024

Page 142

1  Ramp handrails shall extend horizontally above
2  the landing for 12 inches minimum beyond the
3  top and bottom of the ramps -- ramp runs.  And
4  then there is a configuration right below it.
5  And it's included in Globetrotters' report,
6  which is Exhibit Number 1.
7      A   Uh-huh.
8      Q   Can you explain why for the top of a
9  ramp, why there is a need for a 12-inch minimum
10 extension of the handrail?
11     A   So -- and I'm not someone who is
12 typically using a wheelchair or a ramp or a
13 cane -- I mean, a wheel or a cane, but in
14 general, when you approach a ramp, you sort of
15 need to prepare to go up it or down it.  If you
16 need to use it in part to help steady yourself,
17 the idea is to get yourself able to be steady
18 before you proceed onto the ramp.
19          I suspect that that's an element that
20 was calculated as providing sufficient
21 opportunity for somebody in a wheelchair
22 or with a walker or with a cane to steady
23 themselves before going up or down a ramp.
24          I would note that in the case of a

ERIC DAVIS
June 5, 2024

Page 143

1  stair, this has been altered from the '91 ADA.
2  At the bottom in the case of a stair, there
3  used to be a requirement for an extension past
4  the end of the stair and an additional distance.
5  So it would end up being like a 1 foot 11 inches,
6  and they changed it, I believe in the 2010 ADA,
7  to be just the 12 inches.
8          So it's based on the evaluation of
9  the need to steady one's self going up or down
10 a ramp or flight of stairs.
11     Q   And the reason for the -- your
12 understanding of why the 2010 ADA standards
13 require a 12-inch extension of the handrails at
14 the top and bottom of the ramp is to provide
15 the optimal opportunity for a variety of
16 wheelchair, walkers, or cane users to be able
17 to access a ramp.
18          Is that fair to say?
19     A   That's a fair paraphrasing of what I
20 said, yes.
21     Q   Did I misstate that?
22     A   No.
23     Q   Or can you perhaps state it in a more
24 professional manner than I did?

ERIC DAVIS
June 5, 2024

Page 144

1      A   I believe I said so before.  So I'm
2  fine with your characterization of it.
3      Q   And if the extension of a handrail,
4  let's say at the bottom of a ramp, is less than
5  the minimum of 12 inches, let's say it was
6  11 inches, that would be in violation of the
7  ADA 2010 standards.
8          Is that fair to say?
9      A   Yes.
10     Q   To your understanding of the ADA 2010
11 code, does it provide any wiggle room for a
12 public entity built -- for a building built
13 after 2010 to have an extension, handrail
14 extension, of less than 12 inches at either the
15 top or the bottom of the ramps?
16     A   Allowing for possible variations due
17 to construction tolerances, which I don't know
18 if they would apply in this case, I would say
19 in general, no, that it's supposed to be
20 12 inches.
21     Q   As an architect, when you were in
22 private practice, I guess -- well, as the
23 deputy of Capital Planning with responsibility
24 for overseeing -- oversight of design and

Exhibit 2 Page 4

ERIC DAVIS
June 5, 2024

Page 145

1  construction of work at the Cook County Jail
2  and the courthouses, would you advise
3  contractors for Cook County to install a
4  handrail that was less than -- that didn't have
5  a 12-inch extension of a handrail at the bottom
6  of a ramp?
7      A    Unless there was some kind of
8  obstruction, which sometimes happens, or some
9  other physical condition that prevented that
10 from being constructed that way, no.  I would
11 say that they would need -- if there was --
12 let's say the wall turned and there was no way
13 to do that without creating another obstruction
14 or it would block a door or things like, absent
15 those kind of conditions, if it was just a
16 standard run, I would say no, it needs to be
17 12 inches.
18     Q    Are there avenues for contractors and
19 architects and engineers to seek approval of an
20 exception when designing a public building that
21 includes a ramp if there's -- if there are
22 physical obstructions that preclude the strict
23 compliance under the 2010 standards for a ramp?
24     A    So let's use this particular location

ERIC DAVIS
June 5, 2024

Page 146

1  as an example.  Now, to be clear, I wasn't
2  working at the County when this was
3  constructed, but it would have applied in this
4  case because of the timeline of when it's
5  constructed.
6           The licensed architect designing the
7  ramp should be indicating that the handrail
8  should extend 12 inches beyond.  If there was a
9  variance or something precluding that, you
10 know, they would bring that to their attention.
11          If I was an owner, if I were in this
12 position and the architect said in the course
13 of developing or presenting the drawings, hey,
14 I understand that there's supposed to be
15 12 inches, there is this condition over here, I
16 as an architect consider it to be compliant or
17 allowable to have an exception in this case.
18 As the owner, I'm not taking a licensure
19 responsibility, I have an oversight, but the
20 licensure is really the architect of record.
21          The other piece of it is that the
22 drawings that the architect does, would in this
23 case go to the city of Chicago and the mayor's
24 office of people with disabilities during the

ERIC DAVIS
June 5, 2024

Page 147

1  permitting process and they would review that.
2           They may have a question and say, for
3  example, hey, I'm looking at this floor plan.
4  It's showing a handrail extension is less than
5  12 inches.  What's going on?  That's a fairly
6  common circumstance in the profession.  The
7  plan reviewer may have a question.  The
8  licensed architect may make their case; and
9  then in that case, the city of Chicago, which
10 in that case would be the authority having
11 jurisdiction, may make a ruling to say we
12 consider this to be consistent with the
13 applicable laws.  That's how these things go.
14     Q    Well, my question wasn't about the
15 city of Chicago.  It was about the federal
16 government.
17          The federal government enforces ADA
18 standards, correct?
19     A    The federal government sets the
20 standards, yes.  They establish the laws.
21     Q    So my question really was directed to
22 is there any agency with the federal government
23 that during the design phase of a building, an
24 architect of record can seek out an exception

ERIC DAVIS
June 5, 2024

Page 148

1  from one of the requirements for a ramp if
2  there is some physical obstruction that
3  precludes strict compliance under the 2010
4  standards?
5      A    There is a mechanism that the
6  Department of Justice has where they have
7  technical advisors where a practicing architect
8  can call them and ask them for their
9  interpretation, but usually when you do that --
10 and I have done that in private practice on
11 other projects.  You can ask and say, here is
12 an area that I don't understand.  My
13 interpretation is this.  Do you think I'm
14 interpreting this correctly?
15          The Department of Justice or
16 technical representative may say, yes, I think
17 it is a reasonable variation or, no, it's not.
18 However, in almost every case, I believe,
19 legally -- and you're the lawyer, I'm not -- in
20 that case they delegate the enforcement
21 responsibility to the local agency having
22 jurisdiction, just as there may be federal
23 laws, but Chicago police may arrest someone.
24          So it's a situation where they

Exhibit 2 Page 5

ERIC DAVIS
June 5, 2024

Page 149

1  delegate that, but then similarly the city of
2  Chicago may turn around and consult the DOJ
3  also.
4          But, yes, there is a mechanism, an
5  ADA help line that they have that allows
6  architects to seek guidance from the Department
7  of Justice.  It's not very typical.  It's
8  usually only very unusual situations.  The
9  normal situation is for that to be handled by
10  the local permitting authority.
11      Q   Now, you have had an opportunity to
12  review the blueprints or drawings for this east
13  corridor ramp?
14      A   Yes.
15      Q   Mr. Davis, have you reviewed the
16  construction drawings for the east corridor
17  ramp?
18      A   Yes, I have.
19      Q   Do you know if the construction --
20  would you call them construction drawings or
21  the permitted drawings?  How do you describe
22  the final drawings for a project such as the
23  RTAs?
24      A   This is an ongoing source of -- I

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 150

1  have discussed this several times.
2  Colloquially in the profession they are
3  referred to as construction documents.  The
4  reality is because contractors often produce
5  something that are called shop drawings, and
6  those shop drawings are actually the basis for
7  what physically gets constructed.
8          They get called construction
9  documents.  I prefer to call them contract
10  documents, but, yeah, they're colloquially
11  referred to as construction documents.
12      Q   So you have reviewed what you would
13  confirm are the contract documents for the
14  construction of the east corridor ramp?
15      A   It was a few months ago, but, yes, I
16  believe I have, yeah.
17      Q   For the top landing --
18              (WHEREUPON, an interruption
19               in the proceedings
20               occurred.)
21          THE WITNESS:  Jason, you need to mute
22      yourself.  Thank you.
23              I'm sorry, Tom.
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 151

1  BY MR. MORRISSEY:
2      Q   For the top landing --
3      A   Yes.
4      Q   For the east corridor ramp --
5      A   Yes.
6      Q   -- for the construction drawings or
7  contract drawings, did it have a top landing of
8  9 inches?
9      A   I don't know if it was -- if the
10  document showed 9 inches.  I believe that
11  the -- my recollection from reviewing it was
12  that there was a variance between the top and
13  bottom elevation numbers that were provided in
14  the architectural drawings from the top and
15  bottom elevation drawings that were provided in
16  the structural drawings.  I think there was
17  some variance there.
18          Typically in an element like this
19  that was constructed out of reinforced
20  concrete, you would follow the structure
21  drawings.
22          My recollection is that there was a
23  variance in the drawings between what the
24  architectural plans were showing for the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 152

1  elevations and what the structural drawings
2  were showing for the elevations.  I don't
3  recall the 9-inch dimension that was revealed
4  in the Globetrotters' report as having been a
5  dimension that was specified.  I don't think
6  that -- I can't imagine that they would
7  stipulate 9 inches.
8          I can only speculate that the actual
9  offset turned out to be different from what
10  they thought was out there and they may have
11  extended it or, in connecting the dots, may
12  have needed to make the ramp at the top longer
13  than they had expected to do.  I don't know.
14          As I said, when I looked at the
15  drawings, there was some variance in the
16  elevations, but I don't know the construction
17  history of that part of the building.
18      Q   The top landing for the east corridor
19  ramp is 85 percent short of the required -- the
20  minimum required element for a landing.  The
21  landing has to be 60 inches minimum, correct?
22      A   I believe we discussed this
23  yesterday.  Yes, that's approximately -- yeah.
24  I don't know if it was 85 percent, but that

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 6

Page 153

1  sounds about right.
2      Q   Well, if we look at Page 10 of the
3  report, I think Globetrotters calculated it as
4  85 percent short.
5          Do you see where it talks about the
6  top landing being 85 percent short of the
7  required length?  That would be 85 percent
8  short of the minimum required length for the
9  top landing, correct?
10     A   I don't know if I have the same
11 version that you do.  I need to check with --
12 because as I said, this was commissioned by
13 counsel.  The version that I have doesn't
14 include -- doesn't coincide with what you have
15 on the screen here.
16     Q   All right.  Well, this is the
17 document that was filed initially.
18     A   Okay.  I mean, I believe you.  I'm
19 just saying -- I'm looking at the version of it
20 that I have, and it's different than that.
21     Q   What document do you have?
22     A   It must have been an earlier version.
23 I don't know.
24     Q   Well, can you tell me exactly when

Page 154

1  you received the earlier version?
2      A   Oh, it is a draft.  I'm sorry.  This
3  is an earlier version.  I don't know when I got
4  it.
5      Q   What is the date of the draft?
6      A   I think this draft is maybe in March.
7  It's not clear to me.  What is the date on the
8  cover of yours?
9      Q   My date is April 1st.  It was
10 filed --
11     A   Oh, no, this is -- yeah, I have one
12 March 25th.  So I have the wrong one.  Okay.
13     Q   It was filed on April 6th, 2024.
14         MR. STILLMAN:  Eric, the one in
15 your -- there's the version of it that's
16 attached to your Declaration that we sent
17 you.
18         THE WITNESS:  Oh, is that the final
19 one?  Okay.  I'm sorry.
20         MR. STILLMAN:  Yeah.
21         THE WITNESS:  I had just pulled up
22 the regular version that I had.  Let me
23 look in here so I'm following the right
24 thing.

Page 155

1          Yeah.  Okay.  I have got the --
2  April Fools' Day.  Okay.  Okay.  I was
3  looking at the wrong one.  I'm sorry, Tom.
4  Can you ask your question again?
5  BY MR. MORRISSEY:
6      Q   Sure.  What Globetrotters found based
7  upon their LIDAR -- use of the LIDAR was that
8  the upper ramp, the landing is 85 percent short
9  of the required length for the top landing, the
10 minimum required length for the top landing.
11     A   Right.
12     Q   Wouldn't that -- wouldn't an
13 architect of record have been aware of that
14 deficiency when the project was completed?
15     A   I would expect that to be the case,
16 yeah.  I am at a loss to understand why it
17 would have been constructed this way.  I simply
18 don't know.
19     Q   And when a project of the -- the
20 magnitude of the RTU building and the east
21 corridor ramp was a project publicly stated to
22 be in excess of $84 million, my understanding
23 having litigated this issue in previous years.
24         Can you explain to me the normal

Page 156

1  process for Cook County to approve the
2  construction of a project at the completion to
3  make sure that it complies with all
4  requirements, code requirements, including the
5  2010 ADA standards?
6      A   So typical process, which I assume
7  would have been followed at this time, would
8  have been to have the architect of record
9  review the conditions as constructed, and
10 there's a process called final acceptance that
11 typically the architect of record would sign
12 off on saying that the building as constructed
13 is consistent with the intent of the drawings.
14         There are sometimes variations in
15 construction that occur because of what are
16 called means and methods; but as long as they
17 are following the intent, the architect would
18 typically sign off.
19         So I can only suspect that the
20 architect of record may have gone through and
21 approved it and hadn't checked this particular
22 element.  I'm only speculating.  But typically
23 the architect of record would go through to
24 verify for the owner, in this case the County,

Exhibit 2 Page 7

ERIC DAVIS
June 5, 2024

Page 157

```
 1   that the building that is constructed was
 2   consistent with their drawings and with their
 3   intent.
 4       Q   Going down a little further here for
 5   the intermediate landing.  Now, I don't think
 6   we discussed this before, but for a ramp that
 7   has a rise above -- I'm sorry.  Let me rephrase
 8   the question.
 9       By going back to Page 6 of
10   Globetrotters' report, defines the requirements
11   for a ramp.  In "D" it talks about, under
12   405.6, Rise:  The rise for any ramp run shall
13   be 30 inches, and then it uses the word
14   maximum.
15       A   Yes.
16       Q   Can you tell me -- first of all,
17   explain what a rise is in relation to a ramp.
18       A   It's the vertical distance measured
19   between the bottom of the area of the ramp and
20   the top.  And when I say that, the distance
21   between the part where the ramp starts to slope
22   up and the part where the ramp stops sloping
23   up.
24       Q    In reviewing Globetrotters' report,
```

ERIC DAVIS
June 5, 2024

Page 158

```
 1   would you agree that the east corridor ramp,
 2   the rise of the east corridor ramp, greatly
 3   exceeds 30 inches?
 4       A   You mean the ramp overall or do you
 5   mean the sections of the ramp as identified
 6   here as upper and lower?
 7       Q   I mean starting at the bottom of the
 8   ramp to the top of the east corridor ramp, that
 9   rise exceeds -- that run exceeds 30 inches?
10       A   So if you're asking is the rise
11   between the bottom landing of the ramp and the
12   top landing of the ramp greater than 30 inches,
13   yes, the rise is greater which would
14   necessitate an intermediate landing, which is I
15   think what you're asking.
16       Q   So in regards to an intermediate
17   landing, if we go to Page 10.
18       For a ramp that requires an
19   intermediate landing, the length of the landing
20   has to be a minimum of 60 inches; is that
21   correct?
22       A   Yes.
23       Q   Why does the 2010 standard, and also
24   I believe the 1991 ADA standard, require a
```

ERIC DAVIS
June 5, 2024

Page 159

```
 1   minimum of a 60-inch length for an intermediate
 2   landing?
 3       A   So it's my understanding that the
 4   purpose of the intermediate landing is to
 5   provide a place of rest or relief for an
 6   individual that is attempting to negotiate or
 7   go up or down the ramp over a certain distance.
 8   But beyond that, there is -- and, again, this
 9   is a compromise worked out with individuals
10   that are disabled and the Department of Justice
11   and architects, et cetera, in the construction
12   of the law.
13       It is needed to provide a place of
14   rest between going up or down one section and
15   the next.  I believe it is also related to
16   having a place -- let's say you are coming down
17   a ramp and you are in a wheelchair.  If the
18   ramp was continuous, it might accelerate too
19   much and really create a hazardous condition
20   and just sort of facilitate one's ability to
21   stop and not end up rolling all the way down
22   the ramp.
23       There is a need for that in stairs,
24   and I believe it's a similar need in ramps.
```

ERIC DAVIS
June 5, 2024

Page 160

```
 1   But it's basically to provide a place of
 2   respite.  And if the person, let's say, in the
 3   wheelchair needs to adjust the direction they
 4   are going, they can do it on a stable level
 5   platform rather than having to try and do that
 6   in the middle of a ramp.
 7       Q   I was going to mention that Mr. Darr,
 8   the Globetrotters' lead architect, mentioned
 9   that for a person that is wheelchair-assisted,
10   if they were going up the east corridor ramp
11   and got to the intermediate landing and
12   decided, well, maybe I have to go back into my
13   housing unit, the intermediate landing ought to
14   give them enough clear space to be able to turn
15   around and change the direction and go back
16   down the ramp.
17       Is that fair to say?
18       A   That's also true and that relates,
19   Tom, to what you were going through yesterday
20   in terms of the 60-inch minimum turning area in
21   toilet stalls and other areas like that.  It's
22   a relatively standard dimension that allows
23   people in wheelchairs to maneuver.  And as you
24   are relating from Mr. Darr's statement that,
```

Exhibit 2 Page 8

Page 161

1  yes, it would allow somebody also to turn
2  around, yes.
3      Q   So when we're talking about 60 inches
4  being the minimum length for an intermediate
5  landing, the reason that that code requirement
6  under the 2010 standard is there, based upon
7  your understanding, is to provide, again, an
8  optimal length for the intermediate landing --
9  I'm sorry.  Let me rephrase the question.
10         The reason for at least the minimum
11  of a 60-inch length for an intermediate landing
12  is to have a standard that optimizes the
13  opportunity for a whole variety of disabled
14  individuals, be they need a wheelchair or a
15  walker or a cane, to be able to navigate this
16  ramp without difficulty.
17         Is that fair to say?
18      A   I wouldn't use the word optimizes
19  because optimally it may be longer than that.
20  I believe the 60 inches is considered to be a
21  minimum.  In other words, you would need at
22  least 60 inches.  You could have a landing
23  that's 72 inches.  That might be seen as more
24  optimal.

Page 162

1      You used the word optimal, Tom, and I
2  think maybe if we said that it needs at least
3  60 inches is a better way to characterize it.
4      Q   Well, yeah, I think I misspoke.  What
5  I was referring to, and I think you agree with
6  me, that the 60-inch minimum standard for a
7  landing is there to provide at least a minimal
8  standard for a whole host of people that have
9  mobility disabilities --
10      A   I would agree with that.
11      Q   -- would you agree?
12      A   Yeah, I would agree with that, yes.
13      Q   And anything less than a 60-inch
14  minimum intermediate landing would -- would
15  be -- would not accomplish the same opportunity
16  for people in wheelchairs, walkers and canes to
17  be able to navigate a corridor which is defined
18  under the ADA as a ramp?
19      A   I agree with what you're saying.
20      Q   Going back to the handrails -- Let me
21  go back to your Declaration which is Exhibit 8
22  for a moment.
23         Now, part of your responsibilities --
24  Your Declaration in this case is Exhibit 8.  Do

Page 163

1  you have that in front of you?
2      A   Yes.
3      Q   In Paragraph 2 you say:  In part, my
4  duties and responsibilities also include the
5  overseeing, development and implementation of
6  Cook County's Capital Improvement Plan which
7  involves engaging both architects and
8  contractors to perform that work and working
9  with our user groups to make sure that we are
10  accomplishing their needs within the resources
11  available.
12         My question is on an ongoing basis in
13  regards to the Department of Corrections, your
14  responsibilities include working with the
15  Sheriff's Office to improve the accessibility
16  at the Cook County Jail.
17         Is that fair to say?
18      A   Yes.
19      Q   And part of your responsibilities,
20  when you're notified of a violation -- well,
21  let me go back a step.
22         At the Cook County Department of
23  Corrections campus, there are a few buildings
24  that were built after the 1991 ADA standards

Page 164

1  were in effect, correct?
2      A   Yes.
3      Q   And those buildings would include the
4  RTU building?
5      A   Yes.
6      Q   The Cermak Health Service facility?
7      A   Yes.
8      Q   Are there any other buildings on the
9  campus of the -- the jail campus that were
10  built after the 2000 -- after 1991?
11      A   Yes.
12      Q   What other buildings were built after
13  1991, to your knowledge?
14      A   Two of them that come to mind are
15  entry posts.  There is an entry post at post --
16  I believe it's Post 5 on the east side.  That
17  is a place where the public and staff enter the
18  DOC campus.
19         There is a similar kind on the entry
20  post on the west side, on the Sacramento side,
21  that is of the same vintage.  I believe they
22  were designed by the same architect.  They were
23  done before I came to the County.  But they are
24  clearly post 1991.

Exhibit 2 Page 9

ERIC DAVIS
June 5, 2024

Page 165

1       I would have to check.  There may be
2  one or more other structures on the campus that
3  were constructed after that point.  I would
4  have to go through the records.
5     Q   So you identify in Exhibit 8 that
6  there are approximately 60 buildings that
7  encompass -- that are within the confines of
8  the Cook County Jail campus, correct?
9     A   That's correct.
10    Q   And other than the four facilities
11  that you just mentioned, there are -- those
12  buildings were all pre-passage of the ADA,
13  correct?
14    A   I would have to go back and look.  I
15  don't know the vintage of -- offhand the
16  vintage of divisions -- well, actually no.
17  Division 11 was built after '91, I believe.  So
18  that's another one that would be post '91.
19       I don't know about the vintage of
20  Divisions 9 and 10.  They are around that same
21  time, but I don't recall offhand whether they
22  were before or after '91.
23       So there are -- there are housing
24  units as well as the RTU as well as the entry

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 166

1  posts, that sort of thing.  I would need to go
2  back to the records and check.
3     Q   Are there known -- well, let me ask a
4  preliminary question.
5       Under the 1991 -- under the -- when
6  the ADA was passed in 19 -- I believe it was
7  1990, did Congress provide different
8  requirements, code requirements, under the 1991
9  ADA standards for buildings that were built
10  prior to 1991 and those buildings that were
11  built after 1991 for public entities such as
12  Cook County?
13    A   I believe the Department of Justice
14  issued guidance to agencies about how to
15  address pre- and post-ADA buildings.  It would
16  be logical for them to have done so.
17    Q   Based upon your general understanding
18  of the ADA for buildings that were built prior
19  to the passage of the ADA, public entities
20  still have to provide reasonable accommodations
21  for the public when using those facilities,
22  correct?
23    A   We can get into what you mean by
24  "reasonable," but there are some requirements

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 167

1  for all buildings, regardless of their vintage,
2  and then there are other requirements for
3  buildings based upon when they were
4  constructed.
5       In some cases, as you know, if they
6  were construct -- building was constructed
7  prior to the ADA that receive federal funding,
8  there may have been, you know, UFAS
9  requirements, other things.  So there are
10  different requirements for different kinds of
11  buildings.
12    Q   Well, that's correct.  So if a public
13  entity like Cook County received federal
14  funding for, like, Division 10 that was built
15  prior to 1991 but between, let's say, 1988 and
16  1991, they still would have to follow UFAS
17  standards in regards to building construction.
18       Is that what you are saying?
19    A   I would have to go back and research,
20  but that's the kind of example I'm referring
21  to.  I can't speak to the specifics of the
22  Division 10 example without investigating it.
23    Q   But in general, if the Rehab Act --
24  in general, if a public entity had not received

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 168

1  federal funding prior to 1991, the public
2  entity would still have to provide reasonable
3  accommodations for the general public when
4  they're using a public facility, correct?
5    A   Again, each case is specific.
6  Another -- it's not the example that you are
7  referring to, but sometimes the answers to how
8  public accommodation is to be accomplished may
9  be impacted if there are historic preservation
10  concerns or if there are existing structural
11  conditions that would inhibit a particular
12  accommodation.  It's really specific to the
13  location and time and configuration and things
14  like that.
15       But in general, you know, yes, there
16  are certain minimum requirements that they try
17  to achieve.  It's not necessarily feasible in
18  100 percent of the cases, which is why you have
19  a review process.
20       But, yeah, in general, there are sort
21  of minimum standards that you are supposed to
22  achieve or try to achieve, and there are other
23  caveats and qualifications on that as well.
24    Q   For new construction after 1991,

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 10

ERIC DAVIS
June 5, 2024

Page 169

1  under the ADA, newly constructed public
2  buildings were required to comply with the 1991
3  ADX [sic] standards, correct?
4      A    1991 ADA, I think is what you meant
5  to say, yes.
6      Q    Yeah.  And for a public building that
7  was built after 2010, the 2010 ADA standards
8  would apply?
9      A    I don't recall what the specific date
10 of enactment is or the date it took effect.
11 The effective date of the 2010 standards may
12 have been in 2011, for example.  But in
13 general, yes.
14          If there was a new building built in,
15 let's say, 2013, then, yes, it should be
16 compliant with the 2010 standards.
17     Q    And clearly in regards to the RTU and
18 the RTU corridor, Globetrotters reported that
19 that they were required to comply with the 2010
20 standards?
21     A    Yes.
22     Q    And to your knowledge, the RTU
23 doesn't fall into any exemptions such as
24 historical preservation or any other exception

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 170

1  to the 2010 standards?
2      A    I'm not aware of it.  It certainly
3  wouldn't fall under historic preservation
4  exception.  I believe there may be exceptions
5  of a specific nature that have to do with
6  security requirements, security operations
7  requirements, but I can't speak to those on an
8  individual basis.  I don't know what -- if
9  there are any exemptions relative to how the
10 facilities operated.  I can only tell you about
11 its physical condition.
12          And like I said, there are some
13 circumstances where because of the needs of
14 safety and security of the detainees that there
15 may be -- and I emphasize there may be exemptions
16 allowed.  But in general, no, it's supposed to
17 be compliant.
18     Q    In regards to when a ramp, because
19 the rise exceeds 30 inches, requires an
20 intermediate landing --
21     A    Yes.
22     Q    -- with a minimum length of
23 60 inches, to your knowledge, does the 2010 ADA
24 standards allow a government to have

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 171

1  intermediate landing which, let's say, is
2  57 inches in length instead of the minimum of
3  60 inches by providing a reasonable
4  accommodation by pushing wheelchair members of
5  the public up or down the ramp?
6      A    To simplify matters, should the
7  intermediate landing be 60 inches?  Yes.  Is
8  57 inches the same as 60?  No.
9      Q    So my question is more focused.  For
10 a building that doesn't have to comply with the
11 Rehab Act or was built before 1991, a public
12 entity may provide a reasonable accommodation
13 when an intermediate landing for a ramp is less
14 than the 60 inches in length.
15          Is that fair to say?
16     A    I'm not sure I understand your
17 question.  Are you asking if an intermediate
18 landing on something constructed is -- we will
19 use the 57 inches -- that the public agency is
20 supposed to provide an accommodation such as
21 having somebody in a wheelchair always be
22 escorted or provide assistance to that person?
23          Is that the kind of thing that you
24 are asking?  It's not clear.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 172

1      Q    My question is assuming that, let's
2  say, a building on the Cook County correction
3  campus was built in 1980 and had a ramp that
4  was -- that the rise was greater than 30 inches
5  which required an intermediate landing and also
6  that intermediate landing was, let's say,
7  57 inches in length, would it be permissible
8  under the ADA code in 1991 for the public
9  entity to provide a reasonable accommodation
10 for a wheelchair person going up or down the
11 ramp?
12     A    I have to investigate the specific
13 condition, Tom.  I can't give you an answer
14 about -- that specific about how or what sort
15 of accommodations would be allowable for a
16 building of that vintage under the '91 version
17 of the ADA.  I would need to research that a
18 little bit.
19     Q    Okay.  Well, let's say the building
20 instead was built in 2012 and was required
21 under the 2010 standards to have an
22 intermediate landing because the rise exceeded
23 30 inches.  And let's also assume that the
24 intermediate landing length was only 57 inches.

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 11

ERIC DAVIS
June 5, 2024

Page 173

1  The question that I have is, does the 2010 ADA
2  code permit the public entity to an exception
3  to the requirement for 60 inches for a minimum
4  length because the public entity has a
5  procedure to provide assistance for a
6  wheelchair person going up and down the ramp?
7       A    I don't believe so, but, again, what
8  you are talking about is an operational
9  question, so I don't know if the operational
10 provision of assistance provides an allowable
11 exception.
12           I would say in terms of the facility,
13 it's not compliant.  But I don't know if that
14 operational accommodation is such that it would
15 provide an allowable exception.  I don't know.
16      Q    Do you know if the 2010 ADA code has
17 a specific provision that allows a public
18 entity, such as the sheriff in this case, to
19 have an intermediate landing that's less than
20 60 inches in length where an intermediate
21 landing is required because the rise is --
22 exceeds 30 inches?  Do you know if there is any
23 provision that provides an operational
24 exception for the Sheriff in the ADA 2010

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 174

1  standards?
2       A    I think I just answered.  The answer
3  is, no, I don't know if there is or is not.
4       Q    Where would you look to try to find
5  the answer to that question?
6       A    So -- well, first of all,
7  operationally what I would do is I would start
8  by consulting our consultant -- if there was a
9  question like that, I would start by consulting
10 with our -- team's ADA advisor, which I
11 believe you mentioned yesterday in deposition
12 is the firm of LCM, and then specifically Kate
13 Susmilch from there.
14           If I was looking for something like
15 that, realistically I -- because I'm the deputy
16 director, I probably wouldn't take the time to
17 look it up myself; I would have somebody else
18 do that.
19           However, if I was asked to do that
20 specifically, I would start by going through
21 the ADA itself, and then I probably would also
22 consult -- there are a series of guidances that
23 the DOJ provides through their Website that can
24 provide -- there are, you know, FAQ sheets.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 175

1  There are technical consultants.  I probably
2  would consult a variety of sources to see if
3  there was something that was deemed to be
4  permissible in terms of an operational
5  accommodation.
6       Q    Has the Cook County Sheriff's office
7  ever requested you or your department in
8  Capital Planning to review whether or not
9  there's an operational exception for an
10 intermediate landing for a corridor ramp that's
11 less than 60 inches in length where an
12 intermediate landing is required because the
13 ramp has a rise of over 30 inches?
14      A    I'm not aware of a request like that
15 coming from the Sheriff.  That may have
16 occurred, but I'm not aware of it, no.  I'm not
17 aware of any requests like that.
18      Q    Has Cook County government, to your
19 knowledge, ever sought a legal opinion in
20 regards to whether or not assisting a
21 wheelchair person up and down a ramp is
22 permissible when the ramp itself was built
23 after 2011 and did not comply with the 60-inch
24 minimum length for an intermediate landing?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 176

1       A    I'm not aware of them asking whether
2  or not that's allowable.  No, I'm not aware of
3  them asking for that.  I think that the -- if I
4  remember correctly, and I'm not an expert on
5  their operations, the desire is to maintain
6  security so that an individual would
7  automatically be escorted; but I don't know if
8  that's -- I'm not aware of a request or an
9  inquiry about whether or not that complies.
10 I'm not aware of that kind of question having
11 been asked.
12      Q    To your knowledge, has -- have you or
13 the Department of Capital Planning or anybody
14 to your knowledge in the Cook County government
15 ever been requested by the Sheriff's Office to
16 opine whether pushing wheelchair detainees up
17 and down the Cermak ramp is an exception from
18 the requirement for the Cermak ramp to be a
19 minimum of 60 inches in length?
20      A    I think this is the same question
21 that you have asked a couple of times.  I'm not
22 aware of them asking a question like this about
23 the operational side, whether or not that's
24 allowable.  I'm not aware of them asking that

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 12

ERIC DAVIS
June 5, 2024

Page 177

1  one way or the other.
2       Q.   You're the person for Cook County
3  that provides advice to users such as the
4  Sheriff in regards to complying with the ADA
5  requirements under the 2010 and the 1991
6  standards.
7            Is that fair to say?
8       A.   Only regarding the facilities
9  themselves.  I don't provide advice to the
10  Sheriff on operations.
11       Q.   So in regards -- you have thoroughly
12  reviewed Globetrotters' April 1st, 2024 report
13  in regards to the east corridor.
14            Is that fair to say?
15       A.   I don't know how one would define
16  "thoroughly."  Have I gone through and reviewed
17  it?  Yes, I have.  I have reviewed it.
18  Thoroughly is a different question.  I don't
19  know how you would characterize that.
20       Q.   As the representative for Capital
21  Planning in regards to accessibility issues, do
22  you agree with the Globetrotters' findings that
23  the top landing violates the 2010 code because
24  the length of the landing is less than

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 178

1  60 inches?
2       A.   I don't disagree with their
3  assertion.
4       Q.   And do you agree with the assertion
5  of Globetrotters or the recommendation or the
6  assessment -- Let me go back a step.
7            Exhibit 8 -- I'm sorry.  Exhibit
8  Number 1, which is the -- is titled Tunnel
9  Corridor Accessibility Assessment.  As the
10  deputy of Capital Planning, is it your opinion
11  that Globetrotters did a thorough and
12  professional assessment of the east corridor
13  ramp for Cook County?
14       A.   I would say in general that their
15  report seems to be pretty comprehensive, yeah.
16  I mean, I can't stipulate as to perfection.
17  But I would say it seems to be pretty thorough
18  and professional.
19       Q.   As a person that's well versed in the
20  ADA, is there any -- anything in their report
21  that's Exhibit 1 that you disagree with in
22  regards to their findings in regards to the
23  areas where the east corridor ramp is out of
24  compliance with the 2010 ADA code?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 179

1       A.   In terms of their citation of
2  elements that are not compliant, yes, I would
3  say -- I'm not aware of anything that I might
4  take issue with in terms of their analysis of
5  whether things are or are not compliant.
6       Q.   What do you mean by the term
7  "element"?
8       A.   There are a series of things that
9  they identify.  There's a whole group of --
10  they look at -- as you say, they look at the
11  landing, they look at the ramp, they look at
12  the landing, they look at the handrails, you
13  know, all of those elements.
14       Q.   As an architect, what other elements
15  of the east corridor ramp would you expect a
16  firm like Globetrotters to have reviewed in
17  doing an assessment of the east corridor ramp
18  to determine whether it complied with the ADA
19  standards?
20       A.   I'm not aware of them having missed
21  any aspect in terms of assessing the
22  accessibility of the east tunnel corridor ramp.
23  I'm not aware of anything that they're missing
24  in terms of having assessed whether or not it

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 180

1  is accessible.
2       Q.   Including six elements for the east
3  corridor ramp, Globetrotters made certain
4  findings whether or not -- for each element
5  whether the ramp was in compliance or out of
6  compliance with the ADA.
7            Is that fair to say?
8       A.   They listed the six components in
9  their report, yes.
10       Q.   If, hypothetically, the Globetrotters
11  found only one element to be out of compliance,
12  let's say the 12-inch extension of the
13  handrails at the top and bottom to the ramp,
14  would the ramp be out of compliance with the
15  ADA 2010 standards?
16       A.   I hesitate to use -- Well, okay.  I
17  would say yes, if there was only one element
18  and they only looked at one thing and the
19  element in question was not compliant with the
20  standard that the ramp would not be considered
21  accessible, yes.
22       Q.   Assuming that, hypothetically,
23  Globetrotters looked at the six elements that
24  they did on Page 10 and 11 and found only that

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 13

Page 181

1  the bottom length -- the bottom handrail
2  extension and the top handrail extensions were
3  out of compliance with the minimum of 12 inches
4  per extension, would the east corridor ramp
5  still be out of compliance with the current
6  2010 standards?
7      A    Yes.
8      Q    I didn't hear it.
9      A    Yes.
10     Q    It's one of the --
11     A    Yes.
12     Q    One of the problems I find is as
13  somebody that's litigated for 45 years, being
14  on Zoom, that sometimes you don't pick up a
15  response, and probably the deponent probably
16  doesn't hear the question.  But you answered
17  affirmatively?
18     A    I answered in the affirmative, yes.
19     Q    In this case, Globetrotters, you
20  would agree, did a professional job in
21  assessing the east corridor ramp.
22          Is that fair to say?
23     A    That's fair to say.
24     Q    And they found that the top landing

Page 182

1  was in violation of the code.
2          They found the upper ramp was not in
3  compliance with the code because the last 4.27
4  feet of the run at the top has a rise of 4.56
5  for a slope of 1 to 11.
6          Three, they found the intermediate
7  landing was not in compliance with the minimum
8  60-inch requirement for the length because it
9  was only 57 inches, and the lower portion of
10  the floor surface is not compliant because the
11  lower 3 1/2 percent of the overall run is
12  11.7 percent steeper than permitted by the code
13  and had a slope of, I believe, 1 to 8.5 and the
14  handrails were not compliant with the ADA 2010
15  standards because the handrails, the bottom of
16  the lower -- Let me rephrase it.
17          The handrails were approximately
18  33 inches above the floor ramp at certain
19  locations which was less than the required
20  34 inches.
21          And finally, as you previously said,
22  the handrail extensions didn't meet the code
23  requirement of 12 inches minimum.
24          Is that a fair assessment by

Page 183

1  Globetrotters of the violations they found with
2  the -- violations of the 2010 code standards
3  under the ADA for the east corridor ramp?
4      A    I think that's a fair summary of
5  their analysis, yes.
6      Q    So as the deputy director for the
7  Cook County Capital Planning with
8  responsibilities for oversight under the ADA,
9  would you agree that the east corridor ramp
10  is -- violates the 2010 code standards under
11  the ADA?
12     A    I would say, yes, it is correct to
13  say it's not in compliance.  That's correct,
14  yes.
15     Q    As the -- in your position, have you
16  provided any guidance to the Sheriff of Cook
17  County in regards to coming into compliance
18  with the 2010 ADA standards in regards to the
19  east corridor ramp?
20     A    Have I provided them with what?  I'm
21  sorry.  I didn't quite hear everything.
22     Q    Sure.  To your knowledge, have you
23  provided any direction to the Sheriff of Cook
24  County in regards to the east corridor ramp not

Page 184

1  being in compliance with the 2010 ADA
2  standards?
3      A    I -- we talked about so many
4  different accessibility issues.  If you're
5  asking have I told them, hey, that RTU ramp is
6  not compliant, I don't think we've actually
7  issued any kind of, like, information or
8  anything like that.
9          In this case, I don't know -- as
10  there's litigation about it, I don't know --
11  you know, what would have been shared or not
12  shared.  I know that the counsel commissioned
13  this report.
14          So I don't recall telling them
15  specifically, hey, we have this study that says
16  it's out of compliance.  I don't know why I
17  would, because we deal with the buildings, and
18  they deal with operations.  But I don't
19  remember, like, specifically, if you want to
20  characterize it that way, you know, warning
21  them or anything.  I don't think we have done
22  anything along those lines.
23     Q    Would you agree that for a wheelchair
24  user housed in the RTU that has an

Exhibit 2 Page 14

ERIC DAVIS
June 5, 2024

Page 185

1    appointment -- Let me rephrase the question.
2        A    Actually, Tom, if you don't mind,
3    could we take a brief break?  I need to use the
4    restroom.
5        Q    Sure.  Do you want to come back at
6    3:30?
7        A    Sure.
8        Q    That's great.  We'll see you.
9        A    Thanks.
10                     (WHEREUPON, a short
11                     break was had.)
12   BY MR. MORRISSEY:
13       Q    The Exhibit 1, the tunnel corridor
14   report by Globetrotters, does the east tunnel
15   corridor provide a path of travel for detainees
16   that are wheelchair bound and housed in the RTU
17   building?
18              MR. STILLMAN:  I'm going to object to
19        asked and answered.
20              Go ahead.  You can answer, Eric.
21   BY THE WITNESS:
22       A    It is a path of travel.
23   BY MR. MORRISSEY:
24       Q    For wheelchair and other disabled

ERIC DAVIS
June 5, 2024

Page 186

1    prisoners that are housed in the RTU.
2             Is that fair to say?
3        A    It is a path of travel for detainees,
4    yes.
5        Q    And the RTU building houses, to your
6    understanding, people that are
7    wheelchair-assisted, use walkers and canes.
8             Is that fair to say also?
9        A    It's my understanding that
10   individuals with those disabilities, yes, are
11   housed there.  Not necessarily all, but that
12   there are people that have disabilities there.
13       Q    Are there people that have
14   disabilities, mobility disabilities such as
15   wheelchair, walkers and canes, do any of those
16   individuals on a daily basis use the east
17   corridor ramp to go to the Cermak infirmary?
18       A    I don't know because I haven't
19   observed them myself.  My understanding is
20   that, yes, it is a route from the RTU to
21   Cermak.
22             And there is a -- there is a short
23   tunnel between the east corridor ramp and the
24   Cermak corridor ramp.

ERIC DAVIS
June 5, 2024

Page 187

1             Is that fair to say?
2        A    Yes.
3        Q    Approximately how long is that -- the
4    length of that tunnel between the top of the
5    east corridor ramp and the top of the Cermak
6    corridor ramp?
7        A    I don't know offhand.  I would have
8    to look on -- I would have to look into
9    drawings.
10       Q    Is it less than 60 feet?
11       A    I would say probably, yeah.
12       Q    I believe Globetrotters, you
13   testified yesterday, found that the Cermak
14   corridor ramp violated the 2000 -- violated the
15   ADA 1991 standards because the intermediate
16   ramp was less -- the length of the intermediate
17   ramp was less than 60 inches.
18             Is that fair to say?
19       A    I believe your question just now was
20   about Cermak, or is it about what the
21   intermediate ramp landing, what --
22       Q    I'm sorry.  My question is directed
23   to the recommendations and findings by
24   Globetrotters in regards to the Cermak corridor

ERIC DAVIS
June 5, 2024

Page 188

1    ramp.  And the question is, it's your
2    understanding that Globetrotters found that the
3    Cermak corridor ramp also violated the 1991 ADA
4    standards?
5              MR. STILLMAN:  Objection, relevance.
6         You can answer.
7    BY THE WITNESS:
8        A    Yeah.  Yes, I'm aware that that was
9    their assessment.  Yes.
10   BY MR. MORRISSEY:
11       Q    And you testified yesterday that Cook
12   County is in the process of renovating the
13   Cermak corridor ramp.
14             Is that fair to say?
15       A    Yes.  Yes.  For some reason when I
16   just say yes, it doesn't seem to come through.
17   I don't know what the deal is there, but yes.
18       Q    Your Declaration, Exhibit Number 8,
19   discusses a timetable for addressing ADA
20   violations -- Well, let me rephrase the
21   question.
22             Your Declaration in this case --
23   Westmoreland, which is Exhibit Number 8,
24   discusses assessing the entire Cook County

Exhibit 2 Page 15

ERIC DAVIS
June 5, 2024

Page 189

```
 1   corrections campus to determine whether there
 2   are any ADA violations.
 3            Is that fair to say?
 4        A    That's correct, yes.
 5        Q    And part of -- and Phase I -- Well,
 6   let me rephrase it.
 7            That request for qualifications is
 8   broken down into three discrete parts for the
 9   Cook County campus?
10        A    Yes, that's correct.
11        Q    What parts of the Cook County
12   corrections department campus is included
13   within Phase I?
14        A    To be clear, it's not a phase.  It's
15   packages.  Phase suggests that we might do one
16   before the other.
17            But if you are referring to Package 1
18   as is stipulated in the RFQ, essentially from a
19   line that runs south of the existing Cermak
20   facility, south of the RTU, north of the dorms
21   and north of Division 6, yeah.
22            So the RTU and Cermak and Division 5
23   and the connecting tunnels between Cermak,
24   Division 5 and the RTU would be included in
```

ERIC DAVIS
June 5, 2024

Page 190

```
 1   Package 1.
 2        Q    In Package 1, would the RTU building
 3   be included?
 4        A    I believe that's what I just said,
 5   yes.
 6        Q    And are there known ADA violations
 7   presently in regards to the RTU building?
 8        A    I believe that's what we are
 9   discussing here.
10        Q    Well, other than the east corridor
11   ramp, are there other known ADA violations in
12   the RTU housing building?
13        A    I have no idea, Tom, that's why we
14   were putting out the RFQ to have people look at
15   it comprehensively.
16        Q    Is the RFQ for Part 1 or Package 1
17   including the east corridor ramp?
18        A    Yes.
19        Q    Pardon?
20        A    Yes, sir.  Yes, it is.
21        Q    So Cook County is going to expend
22   more money to assess the east corridor ramp a
23   second time when Globetrotters has already done
24   a thorough analysis for the Sheriff of Cook
```

ERIC DAVIS
June 5, 2024

Page 191

```
 1   County?
 2        A    We will include the information from
 3   Globetrotters' assessment in the information
 4   that is provided to the successful vendor for
 5   Package 1 as is outlined in my remarks.  The
 6   intent is to look at -- in this case, to look
 7   at the east RTU ramp in the context of its
 8   surroundings, both in the context as you have
 9   been asking about, about a route from the RTU
10   to Cermak via the ramp, also about the route
11   from the RTU to the north on the corridor to
12   Division 5.
13            The intent is to look at it
14   comprehensively.  We would expect that they
15   would review Globetrotters' report and probably
16   include it as an attachment or some kind of
17   reference.  I would expect that the extent to
18   which they would duplicate the effort of the
19   Globetrotters' review, however, be
20   limited to reviewing what Globetrotters has
21   done.
22            We are not asking the firm to conduct
23   a full assessment a second time in this case,
24   simply to take this information and incorporate
```

ERIC DAVIS
June 5, 2024

Page 192

```
 1   it into a broader analysis of the various paths
 2   of travel and the various elements that they
 3   find in the surrounding context.
 4        Q    Does the Package 1 RFQ also involve
 5   reviewing the accessibility of the Cermak
 6   corridor ramp?
 7        A    Yes.  We will ask them to look at
 8   that report as well, yeah.
 9        Q    Does the RFQ that was issued by Cook
10   County and now is -- the bid is -- or the date
11   for responding now is, what, today?
12        A    Today.  In the meeting immediately
13   before this meeting, Tom, it was confirmed to
14   us by the procurement department that the
15   period of submittals -- actually it's after
16   3:00 o'clock -- has ended, that they have
17   received submittals for that and that the
18   period, as I have said -- and I believe that
19   the response period ended at 3:00 o'clock, so
20   about 45 minutes ago.
21        Q    Did the RFQ specifically say that --
22   for Package 1 that the
23   architectural/engineering firm would be
24   assessing the east corridor ramp, the Cermak
```

Exhibit 2 Page 16

ERIC DAVIS
June 5, 2024

Page 193

1  corridor ramp and the north corridor passageway
2  for the RTU?
3       A    It didn't specifically stipulate
4  those because it's a request for
5  qualifications.  We are looking for the
6  qualifications of the firm.
7            As the RFQ stipulates, once we have
8  identified the most qualified team for the
9  assignment for Package 1, we will share with
10  them all of the information that we have
11  available about the entire campus, building
12  floor plans, anything -- and things like the
13  analysis of the Cermak ramp and the analysis of
14  the RTU ramp, we'll provide all of that
15  information to them.
16            In the interest of brevity and
17  clarity, we are looking at this stage in the
18  process to identify the most qualified firm to
19  do that.  We are not giving them a complete
20  laundry list of every single document that we
21  would provide to them.  We are simply
22  indicating the areas so that they can
23  understand what the need is and submit their
24  response to suggest why they would be the most

ERIC DAVIS
June 5, 2024

Page 194

1  qualified firm.
2       Q    Digressing for a moment.  Yesterday
3  you said LCM.  You were going to call them this
4  morning to see whether or not the top
5  landing -- doors at the top landing could be
6  moved so that there would be a minimum of
7  60 inches length for the top landing of the
8  east corridor ramp.  Did you call LCM?
9       A    I looked at -- I realized that Kate
10  was the woman -- I found out this morning that
11  Kate, the woman from LCM that is our lead on
12  this project, is off on PTO today.  I believe
13  she's in Washington at the AIA convention or
14  some other conference.  I will talk to her when
15  I get back.  I didn't realize she would be out,
16  but apparently she's out today.
17       Q    Now the RFQ, did that ask people to
18  bid on specific packages?
19       A    No, it indicated we'll look at the
20  submittals and evaluate which team or firm
21  seems to make the most sense for which of the
22  packages.
23       Q    So why if -- Well, let me go back a
24  step.

ERIC DAVIS
June 5, 2024

Page 195

1            The notice to proceed to HDR for
2  design work of the Cermak corridor ramp has not
3  been issued?
4            MR. STILLMAN:  Objection, relevance.
5       You can answer.
6  BY THE WITNESS:
7       A    We talked about it yesterday.  In the
8  meeting, as I mentioned today that we had with
9  procurement, I spoke specifically about that
10  issue to the procurement folks, and I have been
11  assured that they will be issuing the PO within
12  the next couple of days.
13  BY MR. MORRISSEY:
14       Q    Okay.
15       A    I can't stipulate as which day it
16  will happen, but I did ask and I stressed the
17  importance of getting that out, and so we are
18  looking to have that issued here very shortly.
19       Q    So as of today, the HDR has not been
20  given the green light to begin drawings.
21       A    That's correct.
22       Q    Is that fair to say?
23       A    That's correct.
24       Q    And has there been any amendment to

ERIC DAVIS
June 5, 2024

Page 196

1  the contract to Globetrotters due to the fact
2  that they will not be providing preliminary
3  drawings under their contract for the east
4  corridor -- I'm sorry.  Let me rephrase the
5  question.
6            Under the transfer package,
7  Globetrotters is contractually required to
8  provide preliminary drawings for the renovation
9  of the Cermak corridor ramp.
10            Is that fair to say?
11       A    Yes, and I can tell you, Tom, that I
12  also spoke with procurement today about that
13  specific item and, in fact, I actually
14  mentioned what you put on the screen in our
15  deposition yesterday to underscore the urgency
16  of this.  And similarly, I have been assured --
17  they had a question regarding the amount of
18  board action, et cetera, and I have been
19  assured that they are going to be issuing that
20  contract modification to Globetrotters, again
21  in the next couple of days, so that they should
22  be able to proceed with the development of the
23  transfer package.  So we expect to have the
24  notice to proceed for Globetrotters here in the

Exhibit 2 Page 17

ERIC DAVIS
June 5, 2024

Page 197

1   next couple of days.
2       Q   Why is there suddenly an urgency --
3   first of all, who have you spoken to from
4   procurement in regards to the HDR notice to
5   proceed?
6       A   Deputy Chief Procurement Officer
7   Robert Stuart.
8       Q   And that was this morning?
9       A   That was this afternoon actually,
10  immediately before this -- immediately before
11  this meeting.
12      Q   Okay.
13      A   And I should note -- to be clear, it
14  is our regular meeting that we have with them
15  every two weeks.  It happened to be this
16  afternoon at 1:00 o'clock.
17      Q   Robert Stuart is -- As of today,
18  Globetrotters has not been advised that their
19  transfer package will not include the
20  preliminary drawings for the Cermak corridor
21  renovation.
22          Is that what you're saying?
23      A   No.  You're talking about two
24  different things.  You're talking about --

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 198

1       Q   Well, let me -- On March 12th, 2024,
2   you were deposed in Walker.
3       A   Yeah.
4       Q   And you made this statement in
5   regards to the Globetrotters transfer package:
6   It is the drawings and specifications -- or
7   preliminary drawings and specifications --
8               (Reporter clarification.)
9           MR. MORRISSEY:  I'm sorry.  I was
10      talking away from the microphone.  All
11      right.
12  BY MR. MORRISSEY:
13      Q   On March 12th, 2024, you made this
14  statement in your deposition in regards to
15  Globetrotters transfer package:  The transfer
16  package is the drawings and specifications --
17  or preliminary drawings and specifications to
18  stipulate the elements of the design that are
19  to be constructed.  Because we are doing an
20  assessment ahead of time, we need to have
21  clarity on the assessment before we start the
22  transfer package.  So I couldn't tell you when,
23  offhand, when they started the development of
24  the transfer package.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 199

1           Did you -- Do you recall making that
2   statement in regards to the duties and
3   responsibilities of Globetrotters under their
4   contract for the Cermak corridor ramp?
5           MR. STILLMAN:  Just objection,
6       relevance.
7           You can answer.
8   BY THE WITNESS:
9       A   I believe you that you're reading my
10  transcript correctly.
11  BY MR. MORRISSEY:
12      Q   In March you said that it was
13  necessary for Globetrotters to do the
14  preliminary drawings, which would make up about
15  30 percent or more of the actual drawings to go
16  to permit for the Cermak corridor ramp.  Why is
17  that no longer the case now?
18          MR. STILLMAN:  Objection, relevance.
19  BY THE WITNESS:
20      A   I don't -- What do you mean it's no
21  longer the case?  I'm not understanding.
22  BY MR. MORRISSEY:
23      Q   Is Globetrotters still -- do they
24  still have the assignment to do the drawings

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 200

1   and specifications --
2           MR. STILLMAN:  Objection, relevance.
3   BY MR. MORRISSEY:
4       Q   -- for the Cermak corridor ramp?
5       A   Tom, as I believe we discussed in
6   yesterday's deposition, because there have
7   been -- there has been a relatively
8   straightforward approach delineated in their
9   assessment relative to the ramp itself, we have
10  chosen to accelerate that portion of the scope
11  of the Cermak upgrades and proceed to the
12  architect of record services.
13          If what you're asking is are we going
14  to then have to wait until the transfer package
15  drawings of the ramp part of Cermak are
16  complete before HDR can begin, the answer is
17  no.  We feel that the drawings that they've
18  provided so far, that are in the assessment
19  report, are sufficient for HDR as the architect
20  of record for the assignment for the Cermak
21  ramp to go ahead and proceed to construction
22  documents without waiting for that portion of
23  the transfer package for Cermak that would be
24  specific to the ramp.

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 18

ERIC DAVIS
June 5, 2024

Page 201

1    We feel that it's not necessary for
2  them to include that.  We are moving ahead with
3  that.
4    I believe that that intent has been
5  communicated to the Globetrotters team, and
6  they are simply waiting for the contract
7  modification to be executed, to be transmitted
8  to them so that they know that they, in fact,
9  have the contract for finishing the whole work
10 before they proceed to execute the transfer
11 package drawings and specifications.
12    Q    Just to be clear, is Globetrotters
13 being paid for doing the preliminary drawings
14 for the Cermak corridor ramp?
15    MR. STILLMAN:  Objection, relevance.
16 BY THE WITNESS:
17    A    Define what you mean by "preliminary
18 drawings."  They include preliminary drawings
19 in their assessment.  Do you mean the transfer
20 package drawings?
21 BY MR. MORRISSEY:
22    Q    That's correct.  The transfer package
23 you said would include drawings and
24 specifications -- or preliminary drawings and

ERIC DAVIS
June 5, 2024

Page 202

1  specifications to -- and specifications to
2  stipulate the elements of the design that are
3  to be constructed.
4    A    I believe --
5    Q    Are they still required to do that
6  under the contract?
7    MR. STILLMAN:  Objection, relevance.
8    Go ahead.
9 BY THE WITNESS:
10    A    As I tried to explain just a moment
11 ago, the drawing and specifications for the
12 ramp portion of their assignment for Cermak in
13 the transfer package, we are not going to
14 require them to go take that additional step
15 because that would delay implementation.
16    We are -- they will provide drawings
17 and specifications for the balance of the
18 upgrades that they recommend for the transfer
19 package for the entire building, and, yes,
20 technically the production of the transfer
21 package drawings and specs for the ramp itself
22 remain in their scope of work.
23    What we are saying is that they don't
24 have to complete that part of the assessment

ERIC DAVIS
June 5, 2024

Page 203

1  for the transfer package.  They can do it for
2  the rest of the building.  They don't need to
3  do it for the other because we are moving to
4  architect of record.
5 BY MR. MORRISSEY:
6    Q    So the architect of record, HDR, when
7  they receive this notice to proceed --
8    A    Yes.
9    Q    -- they will do drawings not only for
10 the Cermak corridor ramp but also to correct
11 the violations that were noted by Globetrotters
12 in their assessment of the Cermak facility?
13    A    No.
14    MR. STILLMAN:  Objection, relevance.
15 BY THE WITNESS:
16    A    No, just the ramp.  Their assignment
17 in the task order is the architect of record
18 services just for the ramp.  The rest of it is
19 proceeding in our regular process for
20 Globetrotters to complete the transfer package,
21 and that will go to an architect of record
22 firm.
23 BY MR. MORRISSEY:
24    Q    So will the permit drawings for the

ERIC DAVIS
June 5, 2024

Page 204

1  Cermak corridor ramp be issued in -- by the end
2  of 2024 and demolition beginning on the Cermak
3  corridor ramp?
4    MR. STILLMAN:  Objection, relevance.
5 BY THE WITNESS:
6    A    That is our hope and expectation.  I
7  should note in a case like this, because the
8  scope is relatively clearly defined for the
9  ramp, one of the options we are going to look
10 at is the ability of HDR to do what is called
11 self-certification, which is an accelerated
12 permit process which allows architects for
13 projects of relatively confined scope to go
14 ahead and conduct the permitting process
15 themself and to certify to the city that their
16 work is compliant.
17    We are hopeful that they will be able
18 to do that, but we need HDR to do their
19 evaluation first.  We are going to try to get
20 it done by self-certification which would
21 eliminate the need for a permit for the rest of
22 the work -- or the -- yeah, for the rest of the
23 drawings.
24    MR. STILLMAN:  Tom, how much longer

Exhibit 2 Page 19

ERIC DAVIS
June 5, 2024

Page 205

```
 1    do you think you're going to need?
 2         MR. MORRISSEY:  At least another
 3    hour.
 4         MR. STILLMAN:  Of course.  Of that
 5    hour, do you think most of those questions
 6    will be about the Westmoreland case or
 7    you'll just keep asking about Cermak?
 8  BY MR. MORRISSEY:
 9    Q   Looking at your Declaration, which is
10  Exhibit 8, Number 7, you make a statement:
11  Given the enormous size and scope of the
12  project, a holistic approach must be considered
13  in the design and construction of the project
14  including the ADA design throughout the
15  project.  The sequence of work on a project of
16  this size requires careful consideration and
17  planning of each element or location in the
18  context of its surrounding areas and their
19  accessibility requirements so that the project
20  addresses the need for access seamlessly and
21  that the work can be constructed in the most
22  expeditious, cost-effective, efficient and safe
23  manner.
24         Number 8, it says:  The path of
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 206

```
 1    travel throughout the campus that might require
 2    ADA compliance is vast and not just limited to
 3    the east RTU ramp.  The County's goal is to
 4    ensure the entire project complies with the ADA
 5    standards, not just the ramps.
 6         Can you explain -- you previously
 7    said that a path of travel for a wheelchair
 8    person housed in the RTU headed to the
 9    infirmary includes the east corridor ramp and
10    the Cermak corridor ramp.
11         Can you explain why it's efficient
12    and cost-effective to complete the Cermak
13    corridor ramp within the next two years and
14    hold off on assessing and addressing the east
15    corridor ramp?
16         MR. STILLMAN:  Objection, relevance.
17  BY THE WITNESS:
18    A   We have not held off assessing the
19  east corridor ramp.  The report from
20  Globetrotters, the assessment that's attached
21  to that document, is the assessment of the east
22  corridor ramp.  We haven't held off on that at
23  all.  So I don't understand your question.
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 207

```
 1  BY MR. MORRISSEY:
 2    Q   My question is assuming just for the
 3  moment that in the next year Cook County is
 4  going to renovate the Cermak corridor ramp to
 5  bring it into compliance with the 1991 ADA
 6  code, why doesn't Cook County at the same time
 7  proceed to renovate the east corridor ramp to
 8  bring it into compliance with the 2010 code?
 9    A   I believe I answered that elsewhere
10  in --
11         MR. STILLMAN:  Objection, asked and
12    answered.
13         Sorry.  Go ahead.
14  BY THE WITNESS:
15    A   Yeah, I think I answered that
16  elsewhere, among other places, in element -- in
17  Item 10 in the same report.  I think the answer
18  to your question is right there.
19  BY MR. MORRISSEY:
20    Q   Well, why don't you tell me what the
21  answer is.  I'm asking in a deposition, not
22  something that was drafted.  Perhaps --
23    A   You are asking in a deposition that
24  includes what I said.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 208

```
 1    Q   Well, what I'm asking you
 2  specifically.  Why don't -- well, let me ask
 3  you --
 4         (Reporter clarification.)
 5         MR. MORRISSEY:  I'm sorry.  I'm
 6    sorry.
 7  BY MR. MORRISSEY:
 8    Q   Can you explain -- Let me ask some
 9  preliminary questions.  Cook County knows --
10    A   You said preliminary?
11    Q   Cook County knows for certain that
12  the east corridor ramp violates the 2010 ADA
13  standards.
14         Is that clear to you?
15    A   Yes.
16    Q   And it's known by Cook County and the
17  Sheriff that on a daily basis wheelchair
18  detainees are moving from the RTU building up
19  the east corridor ramp and going down the
20  Cermak tunnel ramp to go to medical
21  appointments in the Cermak Health Service
22  building, correct?
23    A   I believe that's one of the routes
24  that's available to them.  Whether they use it
```

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 20

Page 209

1  or not, I don't know.  I assume that they do,
2  but, yes.  Okay.  Sure.
3      Q    So on a daily basis, Cook County and
4  the Sheriff know, based upon Globetrotters'
5  assessment, that the east corridor ramp
6  violates the ADA 2000 [sic] standards for a
7  host of reasons, at least five or six
8  violations of the 2010 standards, correct?
9      A    We are aware that there are a series
10 of uncomplied elements, yes.
11     Q    And give me your projection, your
12 best-case projection, when the east corridor
13 RTU ramp will be renovated completely to comply
14 with the 2010 accessibility standards.
15     A    So I'm going to give your answer,
16 Tom, in a way that maybe saves you the trouble
17 of some other questions.
18         The assertion that we make in this
19 testimony is that it is more efficient and
20 actually quicker to take the comprehensive
21 approach toward the ADA upgrades on the
22 Department of Corrections campus through the
23 comprehensive, and if you want to use the term
24 wraparound approach, from the RFQ to do the

Page 210

1  entire campus in a holistic manner.  And the
2  reason for that is you.
3         The reason for that is if we had to
4  stop and do individual procurements for each
5  element that was determined to be uncompliant,
6  it would take 50 years.  We want to address
7  this in a comprehensive way.  Because if we
8  stopped and broke out the east ramp also, you
9  would move on someplace else and we would have
10 to stop and do a design and construction for
11 that one.
12         We are looking to hire a firm to
13 assess and design and actually follow through
14 in construction for the work of the entire
15 campus.  That's also in this statement.  Okay?
16 We manage to get procurement to understand that
17 it was quicker, more efficient and more
18 cost-effective to do a wraparound approach like
19 this and to not do the preliminary design and
20 transfer package and architect of record
21 approach which we're doing at Cermak, but
22 rather to hire firms that analyze the whole
23 area and do drawings for the whole area and
24 stick around to be our architect during

Page 211

1  construction for all of the renovations.
2         If we broke them out individually,
3  like what you are talking about in the case of
4  the RTU, we would be doing a disservice to
5  everyone else in the rest of the campus because
6  each piece individually, if approached and
7  designed individually, would take a lot longer,
8  as you know, to procure the design services and
9  the construction services.
10         We are trying to our best to be
11 efficient and cost-effective, and so that's why
12 we want to include the east tunnel ramp in the
13 assessment, design and construction of the
14 necessary upgrades for the entire campus.
15         Now, if we did what you are talking
16 about, Tom, we would have to stop -- and you're
17 already complaining about how long it takes HDR
18 to be under contract for the Cermak ramp.  You
19 would find yourself in a similar situation in
20 the time it takes on an individual assignment
21 for the RTU ramp.  You would then complain
22 about how long it took to get a contractor on
23 board to construct it.
24         We are attempting to be complete and

Page 212

1  efficient and effective and cost-effective.  It
2  is a judgment call, but it is about -- we have
3  to look at the whole situation, not just about
4  what you happen to be suing us about on a
5  Wednesday.  Okay?  That's why.
6      Q    First and foremost, what other known
7  violations are there at the Cook County
8  Department of Corrections that had been
9  assessed by an architectural or engineering
10 firm?
11     A    I am not aware of -- I'm trying to
12 think.  I'm not aware of any others other than
13 elements as mentioned previously that have been
14 the subject of a specific assessment of the
15 holding cell areas within the Leighton
16 Courthouse.  I don't know if there had been any
17 other specific assessment of the elements.
18         I do know that in 2015 the Department
19 of Justice issued its barriers report that
20 cited a number of areas, most of which -- I
21 think perhaps all of which had been addressed
22 at this point, but there may be other -- there
23 were other buildings that they didn't cover.
24 So I'm not aware of any other assessments.

Exhibit 2 Page 21

Page 213

1        We're trying to take care of a large
2   problem in a comprehensive and efficient way.
3        Q   Has the Sheriff notified Capital
4   Planning or you that Division 10 is not
5   accessible for mobilely disabled prisoners?
6        A   I know that there are some issues.  I
7   believe it's with the showers in that case.
8   There's some issues there.
9        Again, we're trying to get -- that
10  would be the kind of thing that we would have
11  dealt with in a comprehensive way, just like we
12  are having Globetrotters do for Cermak.
13       Q   In Division 9, there are mobilely
14  disabled prisoners in Division 9 and there are
15  no handrails in the showers?
16       A   I don't recall if it's Division 9 or
17  which one it is.  I would have to look.
18           MR. STILLMAN:  Objection, relevance
19       on that.  Yeah.
20  BY MR. MORRISSEY:
21       Q   Are you aware that there are no
22  benches in Division 9 for mobilely disabled
23  prisoners?
24           MR. STILLMAN:  Objection, relevance.

Page 214

1   BY THE WITNESS:
2        A   There may have been -- you say no.  I
3   mean, I don't know who makes an evaluation like
4   that.  Because your question earlier was about
5   having an architect assess it.  I don't know
6   who made that evaluation or, if so, when that
7   was done.
8   BY MR. MORRISSEY:
9        Q   Do you know if the showers in
10  Division 11 have mounted seats?
11           MR. STILLMAN:  Objection, relevance.
12  BY THE WITNESS:
13       A   I don't recall.  I would have to
14  look.
15  BY MR. MORRISSEY:
16       Q   Assuming that the RTU in the
17  dormitories do not have mounted, fixed seats in
18  the shower, will Cook County do an assessment
19  to determine that?
20       A   We will be assessing the RTU as a
21  part of the comprehensive assessment that the
22  responses were received for today in a
23  solicitation.  The RTU -- the rest of the
24  building will be included in that assess -- in

Page 215

1   the assessment.
2        Q   It's known -- would you agree that
3   Globetrotters has provided detailed reports for
4   Cook County in regards to the east corridor
5   ramp and also Cermak?
6        A   Yes.
7        Q   And both reports reflect that the --
8   both ramps are noncompliant under the ADA code,
9   correct?
10       A   Yes.
11       Q   And the Sheriff and Cook County are
12  aware of the fact that the -- both ramps,
13  Cermak and the RTU east corridor ramp, are used
14  on a daily basis by mobilely disabled prisoners
15  such as wheelchair prisoners, prisoners in
16  walkers and using canes.  And they are going to
17  proceed to wait in regards to one ramp, the
18  east corridor ramp, until there's a full
19  assessment of the entire Cook County Department
20  of Corrections campus before addressing the
21  east corridor ramp.
22           And on the other hand, because the
23  Walker case, there's a motion for a permanent
24  injunction, Cook County is going to proceed to

Page 216

1   remedy the east -- the Cermak corridor ramp
2   within the next two years.
3            Is that fair to say?
4        A   First of all, I don't know if there's
5   been a ruling on the motion that you are
6   referring to.  I can't testify about what the
7   Sheriff does or doesn't know.
8            And as far as whether or not they are
9   aware of the determination to assess the entire
10  campus, yes, they are aware of that, and
11  they're aware that we are accelerating the
12  process by having the assessment occur
13  comprehensively in through design and through
14  construction.  So they're aware of the process
15  overall, yeah.
16           They know that we're attempting to
17  get our arms around the extent of upgrades that
18  are needed in a comprehensive way.  But as far
19  as specifically what they know or don't know or
20  what one person or another or the Sheriff
21  knows, I can't testify to that.
22       Q   For the year -- in the year 2024, to
23  your knowledge, Cook County government has no
24  plans to do design drawings for the east

Exhibit 2 Page 22

ERIC DAVIS
June 5, 2024

Page 217

1 corridor ramp to be renovated to make it in
2 compliance with the ADA 2010 standards; is that
3 correct?
4     A    I think we just went through the fact
5 that we have plans to generate those drawings.
6     Q    My question is specific to the east
7 corridor ramp.
8     A    Yeah.
9     Q    In this year, 2024, are there any
10 plans or intentions to hire an architectural
11 firm to proceed to do design drawings for the
12 east corridor ramp?
13     A    Yes.  As I said --
14     Q    When --
15     A    As I said.
16     Q    When will those --
17     A    Excuse me.  Excuse me.  You want to
18 ask -- as I said, the firms that are being
19 hired under the RFQ for which solicitations
20 were submitted today, those firms will be --
21 whatever firm that is, they will be doing the
22 design drawings for the east tunnel ramp as a
23 part of their scope.
24           We are hiring a firm.  We are

---

ERIC DAVIS
June 5, 2024

Page 218

1 expecting to have their contract this year,
2 yes, for an assignment that includes producing
3 the drawings, the construction drawings, for
4 these -- that will be a part of their
5 assignment.  So yes, we are hiring a firm to do
6 that with the expectations they will be hired
7 in 2024.
8     Q    The question is will there be
9 construction drawings in the year 2024 for the
10 east corridor ramp?
11     A    I would expect probably not, but even
12 if we stopped and made it instead as a task
13 order and did the approval of that, I wouldn't
14 think their drawings would be done by the end
15 of this year anyway.  And, again, we think that
16 would be an inefficient way to go about this.
17     Q    For the Cermak ramp, you, as the
18 deputy director of Capital Planning, have the
19 ability to hire HDR to do construction drawings
20 for the Cermak ramp, correct?
21     A    To be clear, and as I have testified
22 before, they are already hired.  We are just
23 making an assignment under their contract.
24     Q    Let me rephrase the question.  Cook

---

ERIC DAVIS
June 5, 2024

Page 219

1 County can assign a contractor such as HDR this
2 summer to begin doing construction drawings to
3 make -- to design renovations for the east
4 corridor ramp to come into compliance with the
5 2010 ADA standards.
6     A    I'm not hearing a question.  Sorry.
7 I'm hearing a statement, not a question.
8     Q    The question is can Capital Planning
9 or Cook County hire an architectural firm to
10 begin doing construction drawings specifically
11 for the east corridor ramp this year similar to
12 what HDR is undertaking for the Cermak corridor
13 ramp?
14     A    When we give them that assignment, we
15 could give them that assignment, yes.  Then we
16 would have to then remove that scope from the
17 assignment that we just took the solicitations
18 for.
19     Q    Who would make that decision in Cook
20 County's government to -- within the near term
21 under your task program to hire an
22 architectural firm such as HDR to do
23 construction drawings for the east corridor
24 ramp?  Who makes that decision in Cook County?

---

ERIC DAVIS
June 5, 2024

Page 220

1     A    We have a standardized process for
2 all of the project, which are over
3 100 projects, under the task order assignment
4 mechanism whereby the project is scoped out.
5 The firm intended is consulted about what their
6 needs are in order to perform the assignment.
7 That proposal is then reviewed by our
8 consultant team.  They make a recommendation to
9 the portfolio lead, which is me.  That then
10 goes to our department director who then
11 submits it to procurement.
12           So the decision is made by the
13 department in consultation with the procurement
14 department.  Capital Planning -- so it's
15 multiple people.  It's not one person; it's
16 multiple people.
17     Q    And the group that you just described
18 has undertaken a task to perhaps hire or to
19 retain HDR to prepare construction drawings
20 this year for the east -- for the Cermak
21 corridor ramp; is that correct?
22     A    I would say the expectation is that,
23 yes, HDR would be able to complete those
24 drawings this year.

Exhibit 2 Page 23

ERIC DAVIS
June 5, 2024

Page 221

1    Q    How much will it cost HDR to provide
2    construction drawings this year for the Cermak
3    corridor ramp?
4    A    I don't know offhand.
5    Q    Is it within $100,000?
6    A    I don't know offhand.  The contract
7    at HDR as 1 of 16 firms has -- is a total
8    contract of $2 million.  Generally we like to
9    keep the assignments to 150,000 or lower, but
10   if they need to be a little bit more, we are
11   allowed to go above that threshold.  The
12   intent, as the procurement name suggests, is
13   for smaller projects.
14        So is the fee probably in the 1,
15   $200,000 range?  Probably something in that
16   range.  I don't happen to know offhand what the
17   fee is for that project.
18   Q    So as of this date, June 5th, 2024,
19   you, as the deputy director of Capital
20   Planning, does not know the fee that HDR will
21   charge to do design drawings for the Cermak
22   ramp?
23   A    It would -- I would have to look at
24   it.  I may have that.  They may have submitted

ERIC DAVIS
June 5, 2024

Page 222

1    that to me for review previously.  I would have
2    to double-check.
3    Q    In your Declaration in the Walker
4    case on February 24th -- I'm sorry -- at the
5    end of February of 2024, you represented under
6    oath that you were in negotiations with HDR in
7    regards to the fee that they would charge for
8    renovating the Cermak ramp.  Have those
9    negotiations been ongoing?
10   A    Yes.
11   Q    So in March, April, May and June, you
12   have been negotiating with HDR in regards to
13   the amount of money they are going to charge to
14   design the Cermak renovation of the tunnel --
15   the Cermak tunnel -- the Cermak corridor?
16   A    The ramp you mean.
17   Q    Well, let's use the -- let me
18   rephrase it.
19        So for the last three months, you
20   personally have been in negotiation with HDR to
21   determine a price they will charge for design
22   work for the Cermak ramp.
23        Is that fair to say?
24   A    No, the department has been.  When I

ERIC DAVIS
June 5, 2024

Page 223

1    said "we," that's the department.  I can tell
2    you that I have looked it up and, as I said
3    yesterday, in the deposition yesterday, Tom,
4    there was an issue with HDR with one of their
5    subcontractors.
6         So when we spoke about this in March,
7    at that time it was my expectation that we were
8    close to conclusion.  Evidently there was an
9    issue after that that had to get resolved.  My
10   understanding is that has been resolved.
11        And as I'm talking to you here, I was
12   able to determine that the fee for the Cermak
13   ramp has been agreed to.  It's approximately
14   $100,000.  And as soon as we can get the
15   documents that I mentioned earlier today from
16   procurement, in a meeting they will be issued a
17   notice to proceed.  So yes --
18             (Simultaneous speaking.)
19   BY MR. MORRISSEY:
20   Q    Do you consider that fee to be
21   reasonable, $100,000 to design the Cermak ramp
22   by HDR?
23   A    For the architectural and structural
24   and other evaluations that they need to do,

ERIC DAVIS
June 5, 2024

Page 224

1    yes, I would consider that to be a reasonable
2    fee.
3    Q    Would that be a reasonable fee for an
4    architectural firm to design the east corridor
5    ramp?
6    A    I would expect it would be in a
7    similar order of magnitude, yes.
8    Q    How much will it cost to construct
9    the -- let me rephrase the question.
10        What is the projected cost of the
11   entire project to renovate the Cermak ramp?
12   A    As I think I have discussed before, I
13   don't know the specific costs for that.  The
14   only thing -- because this is somewhat singular
15   work, the only example we have to go by in the
16   case of Cermak is the bridge into Leighton.
17   But as you know, the configuration is very
18   different.
19        So we can identify an approximate,
20   but I can't tell you right now what the cost
21   is.  What I can tell you is that -- that part
22   of the assignment for HDR will be to develop a
23   cost estimate that we will review, and as I
24   think I also mentioned, we are intending to

Exhibit 2 Page 24

ERIC DAVIS
June 5, 2024

Page 225

1   deliver the replacement of the Cermak ramp by
2   our job order contracting or project or process
3   which would be relatively straightforward.
4   They will work with HDR during the course of
5   design to finalize the design and start the
6   pricing process for construction.
7       Q    Has the contract -- contractor begun
8   work as far as developing a price for the
9   Cermak ramp yet?
10      A    No, they don't have anything to go
11  by.  HDR has to do some of their work before a
12  contractor can do that.
13      Q    How long will it take for HDR to
14  provide information to a construction firm to
15  provide a cost estimate to Cook County?
16      A    I can't answer that for you at this
17  time.  When we have the kickoff meeting, they
18  will present us with a projected schedule for
19  their work, but I can't answer that for you
20  today.
21      Q    Will your kickoff meeting for HDR be
22  in July of 2024?
23      A    No, hopefully it will be next week.
24      Q    Who will be present during the

ERIC DAVIS
June 5, 2024

Page 226

1   kickoff meeting?
2       A    I would expect, depending on the day
3   and time, one or more representatives from HDR,
4   one or more representatives from their
5   subcontractor, if there is a structural
6   engineer, for example, would be there.  We
7   would have our -- probably Kate from LCM would
8   be there.  My project director should be back
9   from Washington, so he would be there.  I may
10  or may not be at the kickoff.  There would also
11  be somebody from our job order contracting, a
12  manager, the Gordian firm, they would be there
13  as well probably for coordination sake.  So
14  yes, so roughly a half dozen to a dozen people.
15      Q    Wouldn't it be advisable to have
16  Mr. Darr from Globetrotters present?
17      A    Not necessarily.
18      Q    Well, they did the assessment.
19  Apparently the representation by you in March
20  was that you were waiting for that transfer
21  package.  I would think you would want
22  Globetrotters there.
23      A    As we said before, Tom, and I'm not
24  quite sure why you're covering this ground

ERIC DAVIS
June 5, 2024

Page 227

1   multiple times, we are going ahead with the
2   report as presented.  I don't necessarily -- I
3   mean, it may be reasonable to have them there
4   or we may simply provide them with
5   Globetrotters' phone number to say if you have
6   any questions, here is Carl's number, you can
7   call him or the firm and they can answer
8   questions.
9           I don't necessarily know that it
10  would be required for Globetrotters to be there
11  since they had given us their assessment, but I
12  don't know why -- I mean, I don't know why it
13  would be necessarily -- I mean, necessary for
14  them to be at the kickoff for somebody else's
15  work like that, since they provided the
16  assessment.
17      Q    Now, Globetrotters provided the
18  assessment for the east corridor ramp.  Would
19  it be reasonable to hire a firm like HDR to
20  begin the design work for the ramp that is in
21  violation of the 2010 ADA standards?
22      A    I have to express exasperation
23  because this is at least the third time you've
24  asked that question.

ERIC DAVIS
June 5, 2024

Page 228

1       Q    Well, do you have an estimate or a
2   guesstimate in regards to when the east
3   corridor ramp will be constructed to make it in
4   compliance with the 2010 ADA standards?
5       A    Asked and answered.
6       Q    Was that you, Mr. Davis?
7       A    That was me.  Asked and answered.
8           MR. STILLMAN:  Okay.  I will parrot,
9       I guess, yeah.  I mean, you keep asking the
10      same things, Tom.
11  BY MR. MORRISSEY:
12      Q    How long will the east corridor ramp
13  remain not in compliance with the ADA for
14  wheelchair users at the Cook County Department
15  of Corrections?
16      A    I can't give you an answer to that
17  until the firm that we're hiring to assess and
18  design the ADA renovations gives us a schedule.
19  So I can't answer that question right now.
20      Q    If a federal judge ordered you to
21  begin design work for renovating the east
22  corridor ramp, would Cook County comply with
23  the federal judge's order?
24      A    If other cases are any example, I

Exhibit 2 Page 25

ERIC DAVIS
June 5, 2024

Page 229

1    would assume if you made a petition to ask that
2    and at such point as the County has had an
3    opportunity to respond to that petition and if
4    upon reviewing that petition there was a
5    determination made by the judge -- because we
6    have given the reasons not to in the deposition
7    that you have in front of you.  We've given our
8    reasons why we think that's not a good idea.
9    But if the federal judge said, okay, I have
10   read your objections, Cook County,
11   nevertheless, I want you to go ahead and
12   proceed with this, we would follow the law.  We
13   would follow the ruling of a federal judge.
14            However, I believe we have made a
15   cogent case for why that would not be in the
16   best interest of the County or the taxpayers or
17   anybody involved.
18       Q    Do you understand that there is a law
19   passed by the state of Illinois that provides
20   compensation for individuals that are disabled,
21   that they can be compensated $4,000 for a
22   violation of the ADA?  Are you aware of that?
23       A    That's why you have a business model,
24   Tom, yes.

ERIC DAVIS
June 5, 2024

Page 230

1       Q    And how did you become aware of the
2    passage of the Restoration Act by the state of
3    Illinois?
4       A    I think I read it in the Sun-Times.
5    I don't know.  I think I read an article about
6    it in the paper.  It may have been something
7    communicated.  It may have been something that
8    Kate brought to my attention.  I remember
9    reading something about it somewhere.
10      Q    So Cook County is aware that for each
11   person that goes up or down the east corridor
12   ramp and is in a wheelchair, walker or cane,
13   potentially Cook County and the Sheriff could
14   be liable for violating the Act and be required
15   to pay damages of $4,000?
16           MR. STILLMAN:  Just objection, calls
17       for a legal opinion.
18           You can answer.
19   BY THE WITNESS:
20       A    Yeah, I'm not a lawyer, Tom.  But my
21   recollection is that some form of harm has to
22   be demonstrated.  But yeah.  I mean, okay.
23   BY MR. MORRISSEY:
24       Q    To your knowledge, does the ADA --

ERIC DAVIS
June 5, 2024

Page 231

1    does the purpose of the ADA state that one of
2    the purposes is to provide equal access to
3    able-bodied and disable-bodied people to public
4    buildings?
5       A    I think it's fair to characterize
6    that that's one of the fundamental motivations
7    of the Americans with Disabilities Act,
8    specifically Title II.
9       Q    And Title II provides that the ADA
10   2010 standards and the 1991 standards are
11   intended to provide the independence to
12   mobilely disabled individuals so that they can
13   have access to public buildings just like
14   able-bodied people or similar to able-bodied
15   people?
16      A    Yes, I think that that premise that
17   you are talking about there, Tom, is enormously
18   important.  It is clearly something -- I mean,
19   the ADA is civil rights law.  It is about
20   fairness.  It is about access.  It is an
21   extremely important part.  To me, it goes to
22   the American character, the need to provide
23   everybody with access to the same benefits of
24   public functions, to access to our justice

ERIC DAVIS
June 5, 2024

Page 232

1    system.
2            It's a very important principle and a
3    very important element of civil rights law.
4    It's something very important to me.  It's
5    something that occupies a large part of my
6    professional work.
7            So, yes, I think -- so I'm aware of
8    it.  It's an extremely important principle.
9       Q    And the 2010 ADA standards and the
10   1991 ADA standards are written to allow
11   mobilely disabled individuals and other
12   disabled individuals to independently access
13   public buildings?
14      A    To access buildings, period.  It's
15   about the ability to interact with -- for
16   individuals to interact on an equal basis with
17   their environment.
18           It's why when I teach about the ADA,
19   one of things that I do in most classes is I
20   ask the young students to raise their hand if
21   they don't plan on getting old.  And I say for
22   those people that didn't raise your hands, the
23   ADA is about you.  It's about everybody.  It's
24   not something that is just about those people

Exhibit 2 Page 26

ERIC DAVIS
June 5, 2024

Page 233

1   or a subsection.  It's something that is for
2   elderly, for people with disabilities, for
3   people that have been in accidents.
4            It is a really important series of
5   laws and one that I'm committed to implementing
6   in as complete a manner as possible, in some
7   cases even beyond what the ADA requires.
8            One of the things that is in the RFQ
9   is the stipulation that if one of our
10  consultants identifies something that they
11  consider that should be done that may be above
12  and beyond the ADA, something that sometimes
13  gets referred to as universal design, the
14  County wants them to bring those elements to
15  our attention so that we can consider the
16  feasibility of elements that may be beyond the
17  letter of the law.  Because this is about
18  fairness.  This is about access.  This is about
19  an equal footing.
20           One of the reasons that we do not
21  want to pull the east tunnel ramp out is that
22  it slows everything else down.  We want to do
23  all of it.  We want to do it in as an efficient
24  way as possible and as comprehensive a way as

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 234

1   possible.
2            I will say again, pulling out the
3   east tunnel ramp as another separate project,
4   there is quickly a point of diminishing returns
5   where it slows everything else down.  We are
6   trying to deal with all of it.  Okay?
7        Q    Let me ask you, the ADA is about
8   independence.
9            Isn't that fair to say?
10       A    That's fair to say, yes.
11       Q    Independence for disabled
12  individuals.
13       A    I think --
14       Q    And the disabled individual, under
15  the ADA, should not have to depend upon another
16  person to push them up or down a ramp that is
17  required under the 2010 or 1991 ADA standards
18  to be compliant with the code.
19           Is that fair to say?
20       A    I think it's fair to say that the ADA
21  and the interpretations of the ADA by the
22  profession and by the Department of Justice
23  realizes that there are situations where having
24  assistance may be a benefit to the individuals.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 235

1   I can only speak to the physical facility
2   elements of it, but I am aware that there --
3   there is a recognition that there are some
4   instances where someone may require physical
5   assistance in addition to what the building or
6   facility provides.
7        Q    Well, the east corridor ramp was
8   required to comply with the 2010 standards.
9            Isn't that fair to say?
10       A    That's fair to say.  And it's also
11  fair to say that the assessment we got
12  indicates that it doesn't.  So we need to find
13  a way to remedy that.
14       Q    And pushing a person up or down the
15  ramp doesn't comply with the 2010 or 1991
16  standards on its own, correct?
17       A    I can't speak to whether or not
18  operationally that makes a difference or
19  provides an exception.  I honestly don't know.
20  I know about the building parts.
21       Q    Well, the building aspect of it is,
22  it's still in violation of the ADA if it
23  doesn't comply with the 2010 or 1991 ADA
24  standards, correct?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 236

1        A    The building either complies or it
2   doesn't.  I think we have established in the
3   case of the east RTU ramp that it doesn't
4   comply.
5        Q    And you are not aware of any
6   exception under the 2010 or 1991 standards that
7   would provide an exception for Cook County or
8   the Sheriff to remedy the violations for the
9   east corridor ramp by simply saying, well,
10  we're just going to push wheelchair detainees
11  up and down the east corridor ramp?
12       A    I'm not aware if there is or if there
13  isn't.  My recollection is that in the course
14  of investigating the circumstances around the
15  Cermak ramp that there was an allowance, in a
16  secure environment, for a law enforcement
17  agency, in this case the Sheriff, to
18  operationally -- and, again, it's up to them --
19  to operationally require that individuals going
20  up and down the ramp be not only pushed up and
21  down but escorted.
22           I don't know whether they do that or
23  not in every instance, I can't speak to that,
24  but my recollection is that there was some

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 27

ERIC DAVIS
June 5, 2024

Page 237

1  provision in some guideline in a secure
2  environment for them to provide or require that
3  kind of escort.
4      Q    LCM was involved in the barriers
5  report?
6      A    I believe they were, yes.
7      Q    And were they involved in the
8  renovation of the bridge ramp?
9          MR. STILLMAN:  Objection, relevance.
10 BY THE WITNESS:
11     A    I don't remember if they were or not,
12 Tom.  I don't recall.
13 BY MR. MORRISSEY:
14     Q    Was LCM involved in the limited
15 Cermak renovations in 2022?
16         MR. STILLMAN:  Objection, relevance.
17 BY MR. MORRISSEY:
18     Q    I'm sorry.  2018?
19         MR. STILLMAN:  Objection, relevance.
20 BY THE WITNESS:
21     A    What are you referring to.
22 BY MR. MORRISSEY:
23     Q    Well, weren't some of the showers in
24 the Cermak building renovated in the year 2018?

---

ERIC DAVIS
June 5, 2024

Page 238

1          MR. STILLMAN:  Objection, relevance.
2  I think the showers just have nothing to do
3  with Westmoreland.
4          Go ahead.
5  BY THE WITNESS:
6      A    I don't think they were involved in
7  any work in the showers at all.  I could tell
8  you that they weren't under contract in their
9  current role at that time.  I don't believe
10 they were -- I don't believe they were.  But I
11 can't -- I can't say whether they were or they
12 weren't.  I don't think they were in anything
13 relative to the showers back in 2018.  I'm not
14 aware of that.
15 BY MR. MORRISSEY:
16     Q    You were provided with the plans for
17 renovation of the Leighton court building,
18 correct, after you became employed by Cook
19 County?
20     A    You mean the renovation of the
21 holding cell areas?  Yes.
22     Q    And those plans were done by an
23 architectural or engineering firm?
24     A    I believe they were done by Primera.

---

ERIC DAVIS
June 5, 2024

Page 239

1      Q    And Primera is an architectural or
2  engineering firm?
3      A    Yes.
4      Q    And approximate cost for those plans
5  was over seven figures?
6      A    You said that the other day.  It
7  happened -- the contract was before I came to
8  the County, but if you looked it up, I'm not
9  prepared to dispute that.
10     Q    And you started with the County when?
11     A    April of 2017.
12     Q    And as of June of 2024 -- let me ask
13 an initial question.
14         Primera identified that there were
15 accessibility issues for wheelchair people in
16 the holding areas at the Leighton Courthouse?
17         MR. STILLMAN:  Objection, relevance.
18         Go ahead.
19 BY THE WITNESS:
20     A    It was the subject of the drawings
21 that they provided, yes.
22 BY MR. MORRISSEY:
23     Q    And at least from -- at least up
24 until today's date, even though the County is

---

ERIC DAVIS
June 5, 2024

Page 240

1  aware that the -- let me rephrase the question.
2          Even though Primera provided
3  construction drawings for the holding cells at
4  Leighton five or six years ago, the holding
5  cells still have not been renovated, correct?
6          MR. STILLMAN:  Objection, relevance.
7  BY THE WITNESS:
8      A    We went through all of this
9  yesterday, Tom.  I answered this question
10 yesterday.
11 BY MR. MORRISSEY:
12     Q    Well, isn't that true, there still
13 hasn't been any renovation to make the holding
14 cells at Leighton accessible by Cook County?
15     A    I would refer you to my remarks
16 yesterday, yes.
17         MR. STILLMAN:  Tom, we're focused
18     back on the affidavit --
19         (Simultaneous speaking.)
20 BY MR. MORRISSEY:
21     Q    Given the fact that Cook County
22 history or practice in the past has been to
23 spend upwards of a million dollars or more to
24 make the Leighton court building accessible for

Exhibit 2 Page 28

ERIC DAVIS
June 5, 2024

Page 241

1  wheelchair detainees --
2          MR. STILLMAN:  Objection, relevance.
3  BY MR. MORRISSEY:
4      Q   -- can you explain why there should
5  be any credence that Cook County is going to
6  proceed in renovating the RTU corridor ramp in
7  the next three years?
8      A   Okay.  Let's unpack that a little
9  bit.
10         MR. STILLMAN:  Object to form.
11  Because I don't really understand what you
12  asked.  That was a long question.
13         MR. MORRISSEY:  I will ask the
14  question distinctly.
15  BY MR. MORRISSEY:
16      Q   Will Cook County prioritize
17  renovating the east corridor ramp within the
18  next two years to make it compliant with the
19  2010 ADA code?
20      A   As I said before, the intent is to
21  develop the assessment, design drawings and
22  construct the upgrades necessary for the
23  Department of Corrections campus in a
24  comprehensive and thorough and holistic way

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 242

1  along the lines of what has been outlined in
2  the RFQ and in the discussions that we have had
3  about this.
4          As I have said, we consider it to be
5  inefficient to pluck out individual elements at
6  this point because of the size of the effort
7  that it also misses potentially other elements
8  that may impact a specific situation, whether
9  it's the mechanical systems as were mentioned
10  in my deposition or whether it is elements of
11  alternate paths of travel or all of the other
12  areas of the campus that need to be addressed.
13  It's a large problem.  We're attempting to be
14  holistic and complete.
15          To speak to your earlier question,
16  and I object to the characterization that there
17  is any lack of motivation to do this work.  I
18  object to any characterization that we are not
19  operating in good faith.  I object to the
20  notion that we somehow don't care or don't
21  intend to follow through.
22          I work in the Department of Capital
23  Planning.  Okay?  Our effort is to spend the
24  money that the taxpayers entrust with us in as

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 243

1  effective and efficient a manner as possible.
2          So any suggestion that we're not
3  going to go forward with this, I can't support
4  that assertion in any way relative to your
5  comment about the work that was done previously
6  to assess the holding cells area.
7          As I said yesterday, it is also
8  inefficient to take a courtroom offline to
9  repair or renovate the back stage areas without
10  also looking at the courtrooms itself.
11          Unfortunately, that decision was made
12  before I got here, before my director got here.
13  It was clearly identified as being in the best
14  interest of the taxpayers to only close the
15  courtroom once and do the courtroom and the
16  holding areas and do it in a comprehensive way.
17          In order to do that, Tom, in the
18  criminal courthouse, in one of the largest
19  jurisdictions in the United States, it is a
20  very careful process of phasing the work.  It
21  doesn't happen overnight.  We are trying to do
22  it once.  We are trying to do it as efficiently
23  and effectively as possible.  But any
24  characterization of that effort that suggests

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 244

1  that somehow we don't care or that it's not
2  important to us, I reject completely.
3      Q   My question is, and you didn't answer
4  it, will the east corridor ramp be completed
5  and renovated within a two-year period of time?
6          MR. STILLMAN:  Objection, asked and
7  answered.  Maybe, maybe not.
8  BY MR. MORRISSEY:
9      Q   And what is the total cost of the
10  renovations for the ADA violations at the Cook
11  County Department of Corrections?
12      A   I have absolutely no idea.  That is
13  why we are hiring firms to assess the
14  situation.  It is likely in the tens of
15  millions of dollars, if not more.
16      Q   And any decision to go forth with
17  correcting the violations, the ADA violations
18  at the Cook County Department of Corrections,
19  will be up to the Cook County Board of
20  Commissioners.
21          Is that fair to say?
22      A   The Cook County Board of
23  Commissioners approves any contracts that we
24  undertake.  They rely on the professional

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 29

ERIC DAVIS
June 5, 2024

Page 245

1  expertise of the department, but ultimately
2  they make a decision about the hiring of both
3  design and construction firms.  They will
4  review and hopefully approve the contracts for
5  the ADA assessment that are the subject of the
6  RFQ.
7       They will also approved the contracts
8  for construction of the work.  One of the
9  things that we will look at once we have the
10 assessment, once we know the landscape of the
11 need across the campus, we may -- and that's
12 why my earlier answer was maybe, Tom, once we
13 have a feel for what the magnitude of the
14 challenge is, we may break out the actual
15 construction of some of the elements on a more
16 localized and expedient basis.
17      I can't answer that question for you
18 right now because I don't know the whole
19 picture.  But that's --
20      Q    So --
21               (Simultaneous speaking.)
22 BY THE WITNESS:
23      A    Excuse me.  That's one of the reasons
24 for doing it this way, to be as efficient -- it

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 246

1  may be better to do one giant construction
2  contract, it may be better to break it up into
3  a series of smaller contracts, it may be better
4  to do a combination of the two, I don't know.
5  That's why we are hiring the firms to help us
6  with this challenge.
7  BY MR. MORRISSEY:
8       Q    To break this down, Mr. Davis, you
9  have issued an RFQ for qualifications of --
10      A    Yes.
11      Q    -- architects and engineers?
12      A    Yes.
13      Q    Any contract to proceed on Package 1,
14 2 or 3 for architectural or engineering
15 services will have to be approved by the Cook
16 County Board?
17      A    That's correct.
18      Q    And does that become part of a
19 Capital Improvement Plan?
20      A    Yes.
21      Q    And that may or may not be approved
22 by the Cook County Board?
23      A    I have been involved in nine budget
24 cycles, Tom.  The next -- I'm answering your

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 247

1  question.  I have been involved in nine budget
2  cycles.  Okay?  At least seven of which have
3  been CIP's that have been submitted to the
4  board of commissioners.  The next time the
5  commissioners strike a project from the Capital
6  Improvement Plan and tell us not to go forward
7  will be the first.  Can I say they won't do it?
8  No, that's their prerogative.  But in seven
9  CIP's submitted to board, I haven't seen it.
10      Q    You said that the renovation of the
11 east corridor ramp may or may not be completed
12 in two or three years.
13      Is that fair to say?
14      A    No.  Your question was two years.
15 But yeah, two or three years it may or may not.
16 I don't know.
17      Q    Could we say that it may or may not
18 be completed in four years?
19      A    It may or may not.  I can't say one
20 way or the other right now.  As I said, we will
21 know sooner than that because we will have the
22 assessments and will understand better of a
23 best way to go forward with implementing the
24 necessary upgrades.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 248

1       Q    So assuming that the east corridor
2  ramp will not be renovated in the next four
3  years, wheelchair detainees on a daily basis
4  will be going up and down the east corridor
5  ramp to go to medical appointments at the
6  Cermak Health facility.
7       Is that your understanding?
8       A    No, that's your assumption about four
9  years.  I said it may or may not be.
10      Q    But during that period of time, until
11 Cook County decides to renovate the east
12 corridor ramp, one of the paths of travel for
13 wheelchair detainees will be the east corridor
14 ramp to go to medical appointments at Cermak.
15      Is that fair to say?
16      A    Yes.  That will be one of the paths
17 of travel, yes.
18      Q    Why is Cermak's corridor ramp
19 renovation more important than the east
20 corridor ramp?
21      A    I think more important is your term.
22 I don't agree with that characterization.
23      Q    Are they equally important,
24 renovating the Cermak corridor ramp and the RTU

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 30

ERIC DAVIS
June 5, 2024

Page 249

```
1   east corridor ramp?
2       A    I don't know how to answer that
3   question.
4       Q    Well, the east corridor ramp, as you
5   have testified today, has multiple ADA
6   violations, correct?
7       A    Yes.
8       Q    And why then --
9            (Reporter clarification.)
10  BY MR. MORRISSEY:
11      Q    And why is Cook County prioritizing
12  the Cermak renovation of the ramp over the east
13  corridor ramp?
14      A    I reject your characterization that
15  we are prioritizing over it.  It's just the one
16  that we are doing first.
17      Q    You would -- for a wheelchair person
18  going up either the east corridor ramp or going
19  up the Cermak ramp, would you agree that both
20  of them provide the same level of difficulty to
21  navigate either ramp?
22      A    I haven't taken either ramp in a
23  wheelchair, Tom.  I'm not in a position to
24  assess whether one or the other is more
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 250

```
1   difficult.
2            MR. MORRISSEY:  We will take a
3       minute, and then we might be wrapping up.
4            (WHEREUPON, a short
5            break was had.)
6   BY MR. MORRISSEY:
7       Q    During your deposition in March of
8   2024 --
9       A    Are we back on?
10      Q    We are back on.
11      A    Okay.  Thank you.
12      Q    In March of 2024, you represented
13  that renovating the Cermak ramp was one of the
14  most important projects that you were
15  supervising at the Cook County Jail.  Is that
16  still your position?
17      A    I don't know if I used the term, but
18  it's definitely an important project.
19      Q    And would you say renovating in the
20  east corridor ramp would have equal importance
21  to you as a director at the Department of
22  Capital Planning?
23      A    All ADA projects are important to me.
24      Q    Well, which ones do you prioritize?
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 251

```
1   Do you prioritize the Cermak ramp over the RTU
2   ramp?
3       A    I don't know how to answer that, Tom.
4            MR. STILLMAN:  Objection, asked and
5       answered.
6   BY THE WITNESS:
7       A    No, I don't know how to answer that
8   because if -- you know, you might ask, well,
9   which is more important, renovating Cermak or
10  renovating the courthouse.  They are both
11  important.  They are all important.
12           MR. MORRISSEY:  I have nothing
13      further.  Have a good evening.
14           MR. STILLMAN:  I have a couple of
15      questions.  Just one or two.  Sorry to --
16      it should not take too long.
17    C R O S S - E X A M I N A T I O N
18           BY MR. STILLMAN:
19      Q    So, Eric, the Declaration, you had
20  said before that you didn't write it.  We had
21  written it kind of in conjunction with you; is
22  that right?
23      A    Yes.
24      Q    But none of the words in there were
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 252

```
1   anything that you didn't 100 percent agree with
2   or identify as true, correct?
3       A    I reviewed all of the elements and,
4   as we discussed yesterday, it appears that
5   there was a slight variation in one of the
6   footnotes.  But, yeah, I reviewed all this, and
7   in some cases suggested alternate ways of
8   saying things.
9       Q    And then there was another -- there
10  was a line of questioning Tom was asking you
11  yesterday about whether it would make sense
12  to -- after we were talking about the movements
13  of the doors for the upper landing area, he was
14  asking if it would make sense to implement that
15  Recommendation Number 2 for using a floor
16  surface material to kind of stabilize the
17  surface.
18           Do you remember that, the slope?
19      A    Yes.
20      Q    Would it make any sense to implement
21  that Recommendation Number 2 with the floor
22  surface material to change the slope before
23  going through with any of the rest of the
24  remediation efforts?
```

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 31

ERIC DAVIS
June 5, 2024

Page 253

1    A    I'm not quite understanding your
2  question, Zach.  Would it make sense to do
3  that?  I mean, ultimately we would do all of
4  it.
5    Q    As far as you know, with all of these
6  other efforts where we discussed about the path
7  of -- the path of travel and, you know,
8  holistically considering the rest of the
9  different things needed in remediation, would
10 it make any sense to go out of the way, put on
11 that surface topper for the upper portion of
12 the ramp only, for that east RTU ramp, and then
13 go and do the rest of it, or would it make
14 sense to consider it along with the rest of the
15 project we're talked about doing?
16   A    Yeah, we would want to look at the
17 whole thing.  I do want to point out one thing
18 though, just to update Tom on something.
19        When we did discuss this yesterday
20 and you brought up the notion of moving the
21 doors at the top of the ramp -- or, I'm sorry,
22 at the -- yeah, at the bottom of the ramp
23 rather -- I'm sorry.  You know, excuse me.  At
24 the top of the ramp.  At the east end of the

ERIC DAVIS
June 5, 2024

Page 254

1  ramp, you talked about the notion.
2        I did look into that, Tom, since we
3  spoke yesterday.  It probably isn't feasible to
4  simply move those doors because there is a fire
5  door into a stairway that those doors might
6  block.  So I'm going to have to have an
7  architect look into it.
8        So the ability to just simply direct
9  somebody to move those doors, I did look into
10 it, but it looks likes there might be an
11 obstruction with a fire door and -- a door to a
12 fire exit stair.  So I can't just immediately
13 move on it.  You know, we did look -- I did
14 look into that.
15        MR. STILLMAN:  I have nothing else.
16      R E D I R E C T   E X A M I N A T I O N
17           BY MR. MORRISSEY:
18   Q    In regards to that -- the top landing
19 that is only 9 inches --
20   A    Because the door mullion is in the
21 way, yes.
22   Q    Globetrotters and Mr. Darr testified
23 that it can be easily corrected by relocating
24 the doors to the east.  Assuming that it can be

ERIC DAVIS
June 5, 2024

Page 255

1  done, will Cook County proceed to do that or do
2  we have to wait three or four years until the
3  overall assessment and plan is put out?
4    A    I reject your sarcastic comment, but
5  if you would like to flip to Page 16 of the
6  Globetrotters report that is a part of my
7  testimony, that has the diagram.
8    Q    All right.  I'm on Page 16.
9    A    Do you see the drawing of the ramp?
10   Q    I do.
11   A    Okay.  On the right-hand side where
12 it says top landing and it shows -- and it has
13 a note that says:  Move doors east to create a
14 60-inch-long landing.
15        Do you see that?
16   Q    I do.
17   A    Do you see where the red doors, that
18 would be the relocated doors, where those are
19 in the drawing?
20   Q    I don't.
21   A    Okay.  There's the black line doors
22 of the drawing -- drawing of the doors on the
23 left -- to the left on the top landing, and
24 then to the right there is red lines that

ERIC DAVIS
June 5, 2024

Page 256

1  indicate where the doors would be moved to.
2        Do you see that?
3    Q    I don't.  I don't have a color form
4  here.
5    A    I'm sorry.  So if you don't mind, I
6  will go ahead and share it on my screen.
7        Do you see that right here?  I can
8  make that larger if you want.  Do you see this
9  area right here?
10   Q    There's a screen there, Eric.  I
11 can't -- would you mind putting that back up on
12 the screen there?
13   A    I'm going to reshare.  Hold on a
14 second.  I got -- hand on.  I got to figure out
15 how to do this.  Hold on.  Okay.  Let me do
16 this.  Let me try this again.  Okay.
17        Yes, here we go, Declaration.  Here
18 it is.  This thing.  There's the document.  Can
19 you see this?
20        MR. STILLMAN:  Yeah.
21 BY THE WITNESS:
22   A    Do you see that, Tom?
23 BY MR. MORRISSEY:
24   Q    I'm an attorney.  So you can testify

Exhibit 2 Page 32

ERIC DAVIS
June 5, 2024

Page 257

```
 1   to what you --
 2        A    So this is a drawing of the ramp from
 3   the Globetrotters report.  It says:  Figure 3
 4   Plan of Recommendations.  It indicates the
 5   bottom landing, the lower ramp, the
 6   intermediate landing, the upper and the top
 7   landing.
 8            In the area where it says the top
 9   landing, there are two sets of three doors
10   indicated.  In each case there is a set of
11   double doors and a single door.  The doors on
12   the left are rendered in black lines, and
13   that's the existing doors.  And the set of
14   doors on the right are indicated in red, and
15   that's the proposed -- Globetrotters' proposed
16   new doors of moving those.
17            Do you see where this arrow that
18   says:  Move doors east to create a 60-inch-long
19   landing, and there are two arrows indicating
20   the two sets of doors?
21            Do you see that.
22        Q    Yes, but this isn't my deposition,
23   Mr. Davis.
24        A    No, no.  Okay.  Well, I want to tell
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 258

```
 1   you something.
 2            MR. STILLMAN:  Tom, you asked him to
 3        put it up.
 4   BY THE WITNESS:
 5        A    No, no.  I just want to tell you
 6   something.  What I found out since we spoke
 7   yesterday, this set of doors on the right where
 8   the arrow is pointing to this set of doors, I
 9   have learned that right there is a door, that's
10   a fire stair.
11            So while Globetrotters looked to the
12   end of the ramp here, they didn't continue
13   their investigation into the rest of the tunnel
14   and learned that, in fact, actually there is a
15   door right here that is a fire door into a
16   stair.  So they cannot simply slide the doors
17   to the east to create a 60-inch landing without
18   creating a fire hazard.
19            And if I look at the drawing here and
20   I see a regular wall that's uninterrupted, that
21   looks fine.  Upon investigation, I learned that
22   moving the doors there would create a fire
23   hazard.
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 259

```
 1   BY MR. MORRISSEY:
 2        Q    You have the ability under the task
 3   program to independently hire an architect now
 4   that there's been assessment by Globetrotters
 5   to renovate the east corridor ramp.
 6            Is that fair to say?
 7        A    I have the ability to do so, and as I
 8   have said multiple times, I don't think it's --
 9   we don't think it's wise.  I have talked with
10   the director about this.  We don't think it's
11   wise.  We think it's wise to pursue this as
12   part of the larger assessment in renovation of
13   the campus.
14        Q    And is the current proposal by HDR,
15   $102,000 to design drawings for the Cermak
16   ramp?
17        A    Yes.
18            MR. STILLMAN:  Objection, relevance.
19   BY THE WITNESS:
20        A    It is.
21            MR. MORRISSEY:  I have nothing
22   further.
23            MR. STILLMAN:  All right.
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 260

```
 1            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3
 4   EUGENE WESTMORELAND,         )
                                  )
 5        Plaintiff,              )
                                  )
 6        vs.                     )   No. 23-cv-1851
                                  )
 7   COOK COUNTY Sheriff          )   Day 2
     THOMAS DART, et al.,         )
 8                                )
          Defendants.            )
 9
10            I, ERIC DAVIS, being first duly
11   sworn, on oath, say that I am the deponent in
12   the aforesaid deposition, that I have read the
13   foregoing transcripts of my deposition, Day 1,
14   June 4, 2024; and Day 2, June 5, 2024,
15   consisting of pages 1-260 inclusive, taken at
16   the aforesaid time and place and that the
17   foregoing are a true and correct transcripts of
18   my testimony so given.
19
                        _____
20                            ERIC DAVIS
21   SUBSCRIBED AND SWORN TO
     me before this _____ day
22   of _____, A.D. 2024.
23   _____, Notary Public
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 33

ERIC DAVIS
June 5, 2024

Page 261

1  STATE OF ILLINOIS )
                     )  ss:
2  COUNTY OF C O O K )

3          I, Peggy A. Anderson, a Certified
4  Shorthand Reporter in the State of Illinois do
5  hereby certify:
6          That previous to the commencement of
7  the examination of the witness, the witness was
8  duly sworn to testify the whole truth
9  concerning the matters herein;
10         That the foregoing deposition
11 transcript was reported stenographically by me,
12 was thereafter reduced to typewriting under my
13 personal direction, and constitutes a true
14 record of the testimony given and the
15 proceedings had;
16         That the said deposition was taken
17 before me at the time and place specified;
18         That the said deposition was
19 adjourned as stated herein;
20         That I am not a relative or employee
21 or attorney or counsel, nor a relative or
22 employee of such attorney or counsel for any of
23 the parties hereto, nor interested directly or
24 indirectly in the course of this action.

ERIC DAVIS
June 5, 2024

Page 262

1          IN WITNESS WHEREOF, I do hereunto set
2  my hand this 12th day of June, 2024.

6          _____

7          Peggy A. Anderson
8          Certified Shorthand Reporter
9          License No. 084-003813

ERIC DAVIS
June 5, 2024

Page 1

**A**
A.D 260:22
ability
  159:20
  204:10
  218:19
  232:15
  254:8 259:2
  259:7
able 142:17
  143:16
  160:14
  161:15
  162:17
  196:22
  204:17
  220:23
  223:12
able-bodied
  231:3,14,14
absent
  145:14
absolutely
  244:12
accelerate
  159:18
  200:10
accelerated
  204:11
accelerating
  216:11
acceptance
  156:10
access 143:17
  205:20
  231:2,13,20
  231:23,24
  232:12,14
  233:18
accessibility
  163:15
  177:21
  178:9
  179:22

184:4 192:5
205:19
209:14
239:15
accessible
  138:15,18
  138:22
  139:2 180:1
  180:21
  213:5
  240:14,24
accidents
  233:3
accommod...
  168:8,12
  171:4,12,20
  172:9
  173:14
  175:5
accommod...
  170:23
  172:8,17
  168:3
  172:15
accomplish
  162:15
accomplish...
  168:8
accomplish...
  163:10
achieve
  168:17,22
  183:18
  184:1
  187:15
  156:10
Act 134:18
  134:22
  167:23
  150:11
  230:2,14
  231:7
action 196:18
  261:24
actual 152:8
  215:8 217:2
  219:5
  227:21
  228:4,13,18

134:10,11
134:13,20
135:4,11
136:17
137:3,20
138:7 139:8
140:9,14,17
143:1,6,12
144:7,10
147:17
149:5 156:5
158:24
162:18
163:24
165:12
166:6,9,18
166:19
167:7 169:1
169:4,7
170:23
172:8,17
173:1,16,24
174:10,21
177:4
178:20,24
179:18
180:6,15
182:14
183:3,8,11
183:18
184:9
188:19
188:19
206:14
215:20
adjourned
  261:19
190:11
205:14
206:2,4
207:5
208:12
209:6,21
215:8 217:2
219:5
227:21
228:4,13,18

229:22
230:24
231:1,9,19
232:9,10,18
222:23
233:7,12
234:7,15,17
234:20,21
235:22,23
241:19
244:10,17
245:5 249:5
250:23
addition
  133:10
addition
  134:15
  140:22
  141:7
  164:15
addional
  143:4
address
  145:21
  148:21
  165:15
  210:6
addressed
  212:21
  242:12
addresses
  183:3,8,11
adding
  188:19
  188:19
adjust 160:3
advice 177:3
177:9
advisable
  248:22
advised
  197:18
advisor

174:10
advisors
  148:7
ADX 169:3
advantage
  207:13
affidavit
  181:18
affirmatively
  181:17
aforesaid
  242:17
afternoon
  133:10
197:9,16
agencies
  166:14
agency
  147:22
148:21
171:19
236:17
ago 133:21
150:15
192:20
170:16
220:11
agree 135:21
136:12
158:1 162:5
162:10,11
162:12,19
173:17
204:12
178:4
181:20
183:9
184:23
215:2
248:22
252:1
agreed
  223:13
ahead 185:20

198:20
200:21
201:2 202:8
204:14
207:13
227:1
229:11
238:4
239:18
241:16
AIA 194:13
al 130:7
260:7
allow 161:1
170:24
232:10
allowable
  146:17
172:15
173:10,15
176:2,24
allowance
  236:15
allowed
  138:4,15,19
170:16
220:11
Allowing
  144:16
allows 149:5
160:22
237:7
altered 143:1
alternate
  242:11
242:21
252:7
amendment
  195:24
American
  231:22
Americans
  134:17,22
231:7

ERIC DAVIS
June 5, 2024

Page 2

amount
  196:17
  222:13
analysis
  179:4 183:5
  190:24
  192:1
  193:13,13
analyze
  210:22
And/or
  137:21
Anderson
  130:16
  261:3 262:7
answer
  172:13
  174:2,5
  185:20
  188:6 195:5
  199:7
  207:17,21
  209:15
  225:16,19
  227:7
  228:16,19
  230:18
  243:2
  245:12,17
  249:2 251:3
  251:7
answered
  174:2
  181:16,18
  185:19
  207:9,12,15
  228:5,7
  240:9 244:7
  241:15

anybody
  176:13
  229:17
anyway
  218:15
  194:16
  218:16
apparently
  193:16
Appeared
  131:8,16
appears
  177:12
  148:21
  239:11
applicable
  137:21
applied 146:3
apply 144:18
  169:8
appointment
  165:8
appointme...
  148:7
appproach
  156:20,23
  142:14
  200:8
179:14
205:12
209:21,24
210:21
213:17
203:4,6,17
211:6
approval
  214:5 254:7
arms 216:17
218:13
approve
  156:1 245:4
approved
  159:11
156:21
245:7
246:15,21
approves
  244:23
approximate
  224:19

239:4
approxima...
  152:23
165:6
182:17
222:4
238:23
April 154:9
154:13
155:2
177:12
22:11
203:4,6,17
216:3
210:20,24
214:5 254:7
216:17
218:13
245:9,16
arrow 257:17
248:6
arrows
159:11
257:19
Art 134:24
article 230:5
174:19
176:11,21
185:19
207:11

212:9
219:9,22
223:23
224:6 251:4
239:1
246:1
architectur...
192:23
193:22
224:11
area 137:7
138:18
148:12
157:19
160:20
208:1 228:9
252:10,14
235:21
256:9 257:8
187:3,4
259:18
159:11
162:9
179:21
181:21
184:24
192:24
206:14,18
214:20

227:24
228:5,7
241:12
244:6 251:4
256:8
asking 138:3
138:5
198:20,21
201:19
assess 192:24
assessments
212:24
247:22
assign 219:1
assignment
193:9
199:24
200:20
202:12
216:12
211:20
218:2,5,23
219:14,15
259:12
assignments
221:9

assessment
178:6,9,12
179:17
188:9 191:3
191:23
201:19
198:20,21
203:12
206:20,21
209:5
211:13
212:14,17
212:18,21
215:1,19
235:21
227:11,16
227:18
235:11
241:21
245:5,10
255:3 259:4
259:12
assessed
202:12
216:12
assessing
218:2,5,23
219:14,15
259:12

Exhibit 2 Page 34

## Page 3

| | | | | | |
|---|---|---|---|---|---|
| assistance | available | 240:18 | 166:6,13 | 254:6 | 230:8 |
| 171:22 | 163:11 | 243:9 250:9 | 170:4 173:7 | blueprints | 253:20 |
| 173:5,10 | 193:11 | 250:10 | 174:11 | 149:12 | budget |
| 234:24 | 208:24 | 256:11 | 182:13 | board 196:18 | 246:23 |
| 235:5 | Avenue | balance | 187:12,19 | 211:23 | 247:1 |
| assisting | 131:5 | 202:17 | 190:4,8 | 244:19,22 | building |
| 175:20 | avenues | barriers | 192:18 | 246:16,22 | 138:21 |
| assume 156:6 | 145:18 | 212:19 | 194:12 | 247:4,9 | 144:12 |
| 172:23 | aware 155:13 | 237:4 | 199:9 200:5 | bottom | 145:20 |
| 209:1 229:1 | 170:2 | based 143:8 | 201:4 202:4 | 141:24 | 147:23 |
| assuming | 175:14,16 | 155:6 161:6 | 207:9 | 142:3 143:2 | 152:17 |
| 172:1 | 175:17 | 166:17 | 208:23 | 143:14 | 155:20 |
| 180:22 | 176:1,2,8 | 167:3 209:4 | 213:7 | 144:4,15 | 156:12 |
| 207:2 | 176:10,22 | basically | 229:14 | 145:5 | 157:1 164:4 |
| 214:16 | 176:24 | 160:1 | 237:6 238:9 | 151:13,15 | 167:6,17 |
| 234:14 | 179:3,20,23 | basis 150:6 | 238:10,24 | 157:19 | 169:6,14 |
| 258:21 | 188:8 209:9 | 163:12 | benches | 158:7,11 | 171:10 |
| assumption | 212:11,12 | 170:8 | 213:22 | 180:13 | 172:2,16,19 |
| 248:8 | 212:24 | 186:16 | benefit | 181:1,1 | 185:17 |
| assured | 215:21 | 188:17 | 234:24 | 182:15 | 186:5 190:2 |
| 195:11 | 215:12 | 209:3 | benefits | 183:12 | 190:7,12 |
| 196:16,19 | 216:9,10,11 | 215:14 | 231:23 | 185:1 | 193:11 |
| attached | 216:14 | 232:16 | best 211:10 | 186:19 | 202:19 |
| 154:16 | 229:22 | 245:16 | 229:16 | 188:6 | 203:2 |
| 206:20 | 230:1,10 | 248:3 | 243:13 | 188:8,18,22 | 208:18,22 |
| attachment | 232:7 235:2 | beginning | 247:23 | 189:21 | 214:24 |
| 191:16 | 236:5,12 | 260:4 | best-case | 244:5,8 | 235:5,20,21 |
| attempting | 238:14 | begun 225:7 | 209:12 | 246:2,8 | 236:1 |
| 159:6 | 240:1 | behalf 131:8 | better 141:21 | 250:5 | 237:24 |
| 211:24 | | 131:16 | 162:3 246:1 | 251:9 | 238:17 |
| 216:16 | **B** | believe | 246:2,3 | 253:3 | 240:24 |
| 242:13 | **B** 132:10 | 133:10,20 | 247:22 | bridge | buildings |
| attention | 139:20 | 134:15 | beyond 142:7 | 224:16 | 138:4,9,12 |
| 146:10 | back 157:9 | 143:6 144:1 | 166:8 159:8 | 237:8 | 163:23 |
| 230:8 | 160:12,15 | 148:18 | 158:13 | brief 185:3 | 164:3,8,12 |
| 233:15 | 162:20,21 | 150:16 | 233:7,12,16 | 189:18 | 164:13,24 |
| attorney | 163:2 | 152:22 | bid 192:10 | bring 146:10 | 165:6,12 |
| 256:24 | 165:14 | 153:18 | 194:18 | 165:19 | 166:9,10,15 |
| 261:21,22 | 166:2 | 158:24 | 197:10 | 207:5,6 | 167:6 |
| authority | 167:19 | 221:10 | 207:15 | 231:4 | 169:2 |
| 147:10 | 178:6 185:5 | 241:9 | broader | broke 210:8 | 184:17 |
| 149:10 | 194:15,23 | 160:20 | 192:1 | 211:2 | 201:12 |
| automatica... | 226:8 | 164:16,21 | 257:12 | 249:2 208:8 | 214:13,14 |
| 176:7 | 238:13 | 165:17 | block | broken 189:18 | 232:13,14 |
| | | | | brought | |

## Page 4

| | | | | | |
|---|---|---|---|---|---|
| built 144:12 | 209:22 | 144:18 | 192:5,24 | 170:2 | 134:24 |
| 144:24 | 210:1,15 | 146:4,17,23 | 193:13 | certification | 146:3,24 |
| 163:24 | 211:5,14 | 147:8,9,10 | 195:2 196:9 | 134:10 | 147:9,15 |
| 164:10,12 | 215:20 | 148:18,20 | 197:20 | Certified | 148:23 |
| 165:17 | 216:10 | 155:15 | 199:4,16 | 130:16 | 149:2 |
| 166:9,11,18 | 242:12 | 156:24 | 200:4,11,15 | certify | Chief 197:6 |
| 167:14 | 245:11 | 162:24 | 200:20,23 | 204:15 | 200:10 |
| 169:7,14 | 259:13 | 168:5 | 201:22 | 205:1 | CIP 134:20 |
| 171:11 | certain 142:13 | 173:18 | 203:10,12 | 261:5 | 159:11 |
| 172:3,20 | 142:13,22 | 181:19 | 204:8 | cetera 159:11 | CIP's 247:3,9 |
| 175:22 | 143:16 | 188:22 | 205:7 | 196:18 | circumstance |
| business | 161:15 | 191:6,23 | 206:10,12 | challenge | 147:6 |
| 229:23 | 161:18 | 199:17,21 | 210:21 | 245:14 | circumstan... |
| | 200:20 | 204:7 | 207:4 | 246:6 | 170:13 |
| **C** | 204:17 205:6 | 208:20,21 | change | 236:14 |
| **C** 131:1 | 210:21 | 210:1 | 208:15 | citation |
| 133:8 | 186:7,15 | 215:23 | 246:6 | 179:1 |
| 251:17 | 215:16 | 215:2 | 211:18 | cited 212:20 |
| 254:16 | Capital | 224:16 | 213:12 | city 146:23 |
| 261:2 | 144:23 | 229:16 | changed | 147:9,15 |
| calculated | 163:6 175:8 | 236:3,17 | 143:6 | 149:1 |
| 142:20 | 176:13 | 257:10 | 218:17,20 | 152:4 |
| 153:3 | 177:20 | cases 167:5 | 220:20 | 232:3 |
| call 148:8 | 178:10 | 220:24 | 221:2,21 | clarification |
| 149:20 | 183:7 213:3 | 228:24 | 222:8,14,15 | 198:8 204:4 |
| 150:9 194:3 | 218:18 | 233:7 252:7 | 222:15,22 | 242:10 |
| 194:8 212:2 | 219:8 | caveats | 224:11,16 | 248:22 |
| 227:7 | 220:14 | 223:12,21 | 249:4 | clarify |
| called 130:12 | 221:19 | 225:1,9 | characterize | 141:22 |
| 133:5 | 242:22 | 230:7 | 142:16 | 193:17 |
| 137:10 | 246:19 | cells 240:3,5 | 237:15,24 | 198:21 |
| 138:22 | 247:5 | 240:14 | 177:19 | classes |
| 150:5,8 | 250:22 | 243:6 | 184:20 | 138:10 |
| 161:10,16 | 248:16 | Cermak | 234:8 | clear 138:5 |
| 204:10 | 242:20 | 250:13 | characteriz... | 160:14 |
| calls 230:16 | 244:1 | 251:1,9 | 137:15 | 195:20 |
| campus | career 131:1 | 250:11 | 138:18 | clearing |
| 163:23 | careful | 186:17,21 | Cermak's | 211:24 |
| 164:9,9,18 | 205:16 | 187:5,10 | 248:18 | check 153:11 |
| 165:2,8 | 243:20 | 187:24 | 168:16 | 165:1 166:2 |
| 172:3 189:1 | cases 135:14 | 188:3,13 | 169:1 | 197:13 |
| 189:9,12 | 142:24 | 189:19,22 | 182:18 | 201:12 |
| 193:11 | 143:2 | 191:10 | 208:11 | 206:12 |
| 206:1 | | | | checked | 218:21 |
| | | | | 156:21 | clearly |

## Page 5

| | | | | | |
|---|---|---|---|---|---|
| 164:24 | 183:17 | 156:2 | 177:4 | 168:13 | 261:13 |
| 169:17 | commence... | compliance | components | 224:17 | construct |
| 204:8 | 261:6 | 145:23 | 180:8 | confined | 167:6 |
| 231:18 | comment | 148:3 | comprehen... | 204:13 | 211:23 |
| Clerk 131:19 | 243:5 255:4 | 178:24 | 178:15 | confines | 224:8 |
| close 223:8 | commissio... | 180:5,6,11 | 209:20,23 | 165:7 | 241:22 |
| 243:14 | 153:12 | 180:14 | 210:7 213:2 | confirm | constructed |
| code 137:20 | commissio... | 181:3,5 | 213:11 | 150:13 | 145:10 |
| 140:14,17 | 244:20,23 | 182:3,7 | 214:21 | 191:23 | 146:3,5 |
| 141:10 | 247:4,5 | 183:13,17 | 216:18 | 192:13 | 150:7 |
| 144:11 | committed | 184:1,16 | 233:24 | 193:5 | 151:19 |
| 156:4 161:5 | 233:5 | 206:2 207:5 | 241:24 | Congress | 155:17 |
| 166:8 172:8 | common | 207:8 217:2 | 243:16 | 166:7 | 156:9,12 |
| 173:2,16 | 147:6 | 219:4 228:4 | comprehen... | conjunction | 157:1 165:3 |
| 178:24 | 228:13 | 228:13 | 190:15 | 251:21 | 167:4,6,4 |
| 182:1,3,12 | communica... | compliant | 191:14 | connecting | 169:6 |
| 182:22 | 225:1 230:7 | 137:9,10,17 | 216:13 | 152:11 | 171:18 |
| 183:2,10 | compensated | 137:19 | compromise | 152:11 | 198:19 |
| 207:6,8 | 229:20 | 144:16 | 134:4 | 189:23 | 202:3 |
| 218:8 | complain | 146:16 | 146:16 | 202:3 | 205:21 |
| 234:18 | 211:21 | 169:16 | 261:9 | 204:24 | 228:3 |
| 241:19 | complaining | 170:17 | concerns | 221:10 | construction |
| codes 137:21 | 211:17 | 173:13 | 168:10 | 224:1 | 144:17 |
| 138:7 | complete | 180:19 | 223:8 | 145:1 | 145:1 |
| cogent | 138:10 | 182:10,14 | concrete | 242:4 | 149:16,19 |
| 229:15 | 193:19 | 184:6 | 166:7 | 145:7 | 162:20 |
| Cohen | 200:24 | 204:16 | 151:20 | 150:8,11 | 183:13 |
| 131:19 | 202:24 | 218:10 | considerati... | 205:16 | 157:21 |
| coincide | 203:20 | 234:18 | 205:16 | 150:14 | |
| 153:14 | 206:12 | 241:18 | 137:3,9 | 151:16 | |
| colloquially | 179:18 | complex | 170:11 | 152:16 | |
| 150:2,10 | 220:23 | 156:3 176:9 | 139:2 | 156:2,15 | |
| color 256:3 | 233:6 | 206:4 236:1 | 165:2 | 159:11 | |
| combination | 242:14 | comply 169:2 | 205:12 | 156:17 | |
| 246:4 | completed | 156:9 | 200:21 | 210:10,14 | |
| come 164:14 | 155:14 | 171:10 | 242:4 | 211:1,9,13 | |
| 185:5 | 244:4 | 223:8 | 147:12 | 213:3,19 | |
| 188:16 | 247:11,18 | 209:1 | 216:19 | 219:12,10,23 | |
| 219:4 | completely | 223:22 | 157:2 | 220:19 | |
| coming | 209:13 | 238:6,15,23 | consisting | 221:2 225:6 | |
| 159:16 | 244:2 | 236:4 | 260:15 | 225:14 | |
| 175:15 | completion | complying | constitutes | | |

## Page 6

| | | | | | |
|---|---|---|---|---|---|
| 240:3 245:3 | 225:12 | 238:18 | correction | 188:3,13 | 250:20 |
| 245:8,15 | contractors | 240:14,21 | 172:2 | 190:10,17 | 259:5 |
| 246:1 | 145:3,18 | 241:5,16 | corrections | 190:22 | cost 221:1 |
| consult 149:2 | 150:4 163:8 | 244:10,18 | 163:13,23 | 191:6,24 | 224:8,10,20 |
| 174:22 | contracts | 244:19,22 | 189:1,12 | 192:6,24 | 224:23 |
| 175:2 | 244:23 | 246:15,22 | 209:22 | 193:1,1 | 225:15 |
| consultant | 245:4,7 | 249:11 | 223:18 | 194:8 195:2 | 234:19 |
| 172:22 | 246:3 | 249:11 | 228:15 | 196:9 197:20 | cost-effective |
| consultants | contractually | 250:15 | 226:13 | 199:4,16 | 205:22 |
| 175:1 | 196:7 | 255:1 260:6 | 246:24 | 199:9,16 | 210:18 |
| 223:10 | convention | 250:1 | 244:11,18 | 200:4 | 211:11 |
| consultation | 194:13 | coordination | correctly | 201:14 | 212:1 |
| 220:13 | Cook 130:6 | 137:20 | 191:10 | 203:10 | costs 224:13 |
| consulted | 138:24 | 137:20 | 176:4 | 204:1,3 | counsel |
| 220:5 | 145:19 | 164:24 | 199:10 | corridor | 153:13 |
| consulting | 156:1 163:6 | 147:18 | 196:15,19 | 260:22 | 184:12 |
| 174:8,9 | 163:16,22 | 152:21 | 135:13,22 | 262:2 | 150:10 |
| context 191:7 | 165:8 | 153:9 | 138:23 | 207:4,7 | County 130:6 |
| 191:8 192:3 | 166:12 | 159:12 | 159:2 | 208:12,19 | 145:18 |
| 205:18 | 167:13 | 164:1 165:8 | 138:23 | 209:5,12 | 145:1,3 |
| continue | 172:7 175:6 | 168:9 | 209:20 | 214:8,11 | 146:2 156:1 |
| 123:18 | 175:8 | 171:10 | 196:15 | 215:4,13,18 | 163:11 |
| continuing | 176:14 | 167:12 | 150:14 | 216:1,17,1 | 216:22 |
| 134:16 | 177:2 | 183:4,19,23 | 189:1 | 217:7,12 | 163:16,22 |
| continuous | 178:13 | 183:12,23 | 152:18 | 218:10 | 164:3 |
| 134:17 | 183:7,16,23 | 184:9,10 | 160:10 | 218:18 | 167:13 |
| contract | 188:11,24 | 185:2 188:7 | 220:21 | 219:3 | 166:12 |
| 150:9,13 | 189:9,11 | 201:22 | 220:21 | 220:23 | 167:13 |
| 151:7 196:1 | 190:21,24 | 189:11 | 167:13 | 221:4 | 172:2 |
| 196:3,20 | 192:8 208:8 | 169:8 | 172:2 | 224:4 | 172:6 |
| 199:4 201:6 | 207:6 208:9 | 175:10 | 151:22 | 247:11 | 174:16 |
| 201:9 202:6 | 208:11,16 | 177:13 | 177:9,15,17 | 248:1,4,12 | 192:10 |
| 211:18 | 209:3 211:8 | 221:21 | 179:15,17 | 248:14,23 | 207:5 |
| 218:3,23 | 214:18 | 224:2 | 137:1 | 248:18 | 209:2 212:7 |
| 225:7 228:8 | 215:4,11,19 | 235:7 236:9 | 181:23 | 241:6,14,23 | 212:22 |
| 226:11 | 236:17 | 186:24 | 183:3,9,19 | 214:18 | 214:1,1,18 |
| 219:1 225:7 | 236:7 | 254:23 | 186:21 | 249:18 | 215:4,11,19 |
| | | correcting | 244:17 | 187:24 | |

Exhibit 2 Page 35

215:24
216:21
219:1,9,24
225:15
228:14,22
229:2,10,16
230:10,13
233:14
236:7
238:19
239:8,10,24
240:14,21
241:5,16
244:11,18
244:19,22
246:16,22
248:11
249:1
250:15
251:5 260:6
261:2
**County's**
163:6 206:3
219:20
**couple**
176:21
197:2
197:1
251:14
**course**
134:16,19
146:12
205:4 225:4
236:13
**court** 130:1
238:17
257:20
260:1
**courthouse**
212:16
239:16
243:18
251:10

**courthouses**
145:2
**courtroom**
243:8,15,15
**courtrooms**
243:10
**Courts**
130:14
**cover** 154:8
212:23
**covering**
226:24
**create** 159:19
255:13
257:18
258:17,22
**creating**
145:13
258:18
**credence**
241:5
**criminal**
243:18
**CROSS-E...**
132:5
**current** 181:5
260:21
242:7

**D**
**D** 132:1
133:8
139:19
157:11
234:15
**dealt** 213:11
160:12
**decides**
248:11
**decision**
219:19,24
220:12
243:11

**Darr** 160:7
226:16
254:22
**Darr's**
160:24
**DART** 130:7
260:7
**date** 154:5,7
154:9 169:9
169:10,11
192:10
221:18
224:12
**Davis** 130:11
132:2 133:4
133:10
139:16
149:15
228:6 246:8
257:23
260:10,19
**day** 130:6,10
155:2
195:15
226:2 239:6
260:6,13,14
260:21
262:8
**days** 195:12
196:21
197:1
**deal** 184:17
184:18
188:17
234:6
**decided**
208:17
209:3
215:14
248:3
230:15

244:16
245:2
**Declaration**
154:16
162:21,24
188:18,22
205:9 222:3
251:19
256:17
**deemed**
175:3
**Defendants**
130:8
131:17
260:8
**deficiency**
155:14
**define** 135:16
177:15
201:17
**defined** 136:3
162:17
204:8
**defines**
234:15
157:10
**definitely**
226:2
260:21
**deponent**
181:15
260:11
**deposition**
135:24
**degree** 135:3
**delay** 202:15
**delegate**
148:20
149:1
**delineated**
200:8
**deliver** 225:1
**demolition**
204:2
**demonstrat...**
230:22
**department**
141:2 148:6
148:15

149:6
163:13,22
166:3
175:7
176:13
189:12
192:14
215:19
220:10,13
220:24
222:24
223:1
228:14
234:22
241:23
242:22
244:18
245:1
250:21
**depend**
234:15
**depending**
226:2
**deponent**
181:15
260:11
**deposition**
198:2
130:10
174:2
196:15
198:14
200:6
207:21,23
223:3 229:6
242:10
250:7
257:22
260:12,13
261:10,16

261:18
**depositions**
130:15
**deputy**
144:23
174:15
178:10
183:6 197:6
221:18
221:19
**describe**
149:21
**described**
206:3
220:17
**design**
144:22
147:23
195:2
198:18
201:22
205:13,14
210:10,13
210:19
211:8,13
216:13,24
217:11,22
219:1,2,14
221:1
224:1,21
225:5
227:20
228:18,21
233:13
241:21
245:3
259:15
**designated**
138:14
162:9
**designed**
164:22
211:7
**designing**

145:20
146:6
**desire** 176:5
**detailed**
215:3
**detainees**
138:24
149:7
176:16
185:15
186:3
208:18
230:10
241:1 248:3
248:13
**determinat...**
216:9 229:5
**determine**
179:18
189:1
214:19
222:21
223:12
**determined**
210:5
**develop**
224:22
241:21
**developed**
140:22
141:2
**developing**
146:13
225:8
**development**
163:5
196:24
198:23
**DEVORE**
131:11,12
**diagram**
255:7
**difference**
235:18

**different**
143:2
153:20
166:7
167:10,10
177:18
184:4
197:24
224:18
**difficult**
250:1
**difficulty**
179:10
**Digressing**
216:9 229:5
**dimension**
152:3,5
229:20
231:12
232:11,12
234:11,14
**disagree**
178:2,21
**diminishing**
178:21
**direct** 132:3
189:8
193:20
254:8
**directed**
147:21
**direction**
152:22
261:13
**directly**
261:23
**director**
174:16
174:21
218:18
220:10
**disservice**
211:4
**distance**
143:4

259:10
**disabilities**
134:18,22
146:24
162:9
231:3
**disabled**
141:14
146:14
141:24
185:24
213:5,14,22
213:16,22
214:1,14
229:19
231:12
232:11,12
234:11,14
**disagree**
178:2,21
**discuss**
153:17,21
**discussed**
150:1
152:22
150:17
224:12
**discussing**
188:19,24
190:9
**discussions**
242:2
239:9
201:11
253:15
**DOJ** 149:2
258:19

157:18,20
159:7
**distinctly**
241:14
**District** 130:1
130:14
260:1,1
**Division**
130:2
165:17
163:18
167:14,22
189:21,22
213:14,22
213:16,22
229:19
**doing** 179:17
198:19
201:13
154:6
158:8
200:13
201:6
190:19
207:22
**drafted**
207:22
154:2
196:1
**duly** 133:2,6
260:10
**duplicate**

dollars
146:13,22
149:12,16
244:15
**door** 145:14
254:5,11,11
150:5,6
151:6,7,14
151:15,16
152:1,8
156:13
157:2 187:9
195:20
254:24
254:18
255:13,17
197:20
198:6,7,16
199:14,15
199:24
200:15,17
257:16,18
257:11,18
201:18,18
201:18,18
201:20,23
202:16,21
**dormitories**
193:9,24
**dorms** 189:20
204:23
210:23
216:24
217:5,11,22
218:14,19
219:10,23
220:19,24
221:2,21
222:19,24
**drafted**
240:3
241:21
259:15
**draw** 241:21
**drawing**
202:11
244:14,16
196:1
**duly** 133:2,6
260:10
**duplicate**

191:18
**duties** 163:4
199:2

**E**
**E** 131:1,1
132:1,10
133:8,8
251:17
254:16,16
254:16
**earlier**
153:22
154:1,3
214:4
223:15
242:15
245:12
**easily** 254:23
**east** 135:13
135:22,22
136:2
138:23
139:6
149:12,16
150:14
151:4
152:18
155:20
158:1,2,8
160:10
164:16
177:13
178:12,23
179:15,17
179:22
180:2 181:4
181:21
183:19,19
183:24
185:8
186:16,23
187:5
190:10,17

190:22
191:7
192:24
194:8 196:3
206:3,9,14
206:19,21
207:7
208:12,19
209:5,12
210:8
211:12
215:4,13,18
215:21
216:1,24
217:6,12,22
218:10
219:3,11,23
220:20
221:24
227:18
228:2,12,21
242:6,23
243:1
245:24
**efficiently**
204:21
247:8
227:18
228:2,12,21
242:6,23
243:1
245:24
**EASTERN**
130:2 260:2
**education**
134:17
135:2

**effect** 164:1
169:10
**effective**
169:11
212:1 243:1
**effectively**
243:23
**efficient**
205:22
206:11
209:19
211:11
212:1 213:2
233:23
243:1
245:24
**eliminate**
204:21
211:14
152:1,2,16
**else's** 227:14
**emphasize**
170:15
**employed**
238:18
**employee**
261:20,22
**enactment**
169:10
**encompass**
165:7
**ended** 192:16
192:19
**enforced**
146:1
**enforcement**
148:20
156:22
**engage**
147:17
**engaging**
180:19
205:17
207:16
**engineering**
212:9

228:23
239:2
246:14
**engineers**
145:19
246:11
205:11
246:10
201:11
**enormously**
231:17
**ensure** 206:4
**enter** 164:17
**entire** 138:24
193:11
196:2 210:1
**entrust**
194:20
**entry** 164:15
164:15,19
164:20
**environment**
232:17
232:16
232:17
**equal** 231:2
232:16
232:23
250:20

238:23
239:2
246:14
**Eric** 130:11
132:2 133:4
154:14
185:20
251:19
256:10
260:10,19
**escort** 237:3
**escorted**
171:22
176:7
236:21
176:23
**essentially**
189:18
**establish**
147:20
**established**
236:2
**estimate**
224:23
225:15
228:1
**et** 130:7
149:13
189:3
205:22
207:16
209:5
221:16
233:12,20
232:8
**EUGENE**
130:3 260:3
**evaluate**
194:20
**evaluation**
143:8
204:19
214:3,6
**evaluations**
223:24
**evening**
236:16
**every** 232:17
231:23
232:23
**Evidently**

**exactly**
153:24
**examination**
130:12
153:6
261:7
**examined**
133:6
**example**
146:1 147:3
167:20,22
168:6
169:12
224:15
245:22
245:12
**exasperation**
227:22
**exceeded**
172:22
**exceeds** 158:3
170:19
173:22
**exception**
145:18
146:17
147:24
169:24
170:4 173:2
179:22
**excess** 155:22
**excuse**
217:17,17
245:23
253:23
**execute**

201:10
**executed**
201:7
**exemptions**
145:19
**exercised**
169:23
170:9,15
**Exhibit**
132:13,14
142:6
162:21,24
208:8 241:4
162:17
**existing**
146:8
**extended**
152:11
257:13
**exit** 254:12
142:3 143:3
155:15
145:5 147:4
191:14,17
196:23
218:11
204:6
220:22
216:17
218:6
231:5 232:9
231:5 234:9
224:11
246:16
165:10
166:21
170:10

190:21
176:4
**expertise**
172:10
**experts** 141:2
**explain** 142:9
155:24
205:11
231:10
252:3
**extent** 164:17
171:6
196:23
194:19
**extended**
152:11
143:18,19
164:8
146:17
152:1,2,16
155:7
163:17
143:3
**extensive**
177:7,14
182:24
183:4 186:2
186:8 187:1
187:18
197:23
189:3
195:22
216:17
216:3
231:5 234:9
229:3
222:11
234:10,19
**expeditious**
248:15
259:6
**fairly** 147:5

177:8
**facility** 146:3
168:4
185:20
203:12
235:1,6
248:6
**fact** 196:1,13
214:7
215:12
217:4
240:21
258:14
**express**
143:15,19
189:3
**extremely**
216:3
222:24
234:10,19
**feel** 200:17
201:1
187:10
187:10
189:3
218:24
221:21
220:22
218:6
235:19
240:8
248:15
257:3
**figures** 239:3
**filed** 153:17

**fairness**
231:20
233:18
**faith** 242:19
**fall** 135:23
169:23
170:3
**FAQ** 174:24
172:22
140:5
200:18
216:8,18
225:8 253:5
**feasibility**
177:22
178:22
180:4
187:23
**fine** 144:2
228:7
**February**
222:4,5
**fire** 254:4,11
258:10,15
254:12
258:18,22
167:1,3
168:1
228:20,23
229:9,13
193:6,18
194:1,20
203:22
210:12
217:21,21
217:11,21
196:7
219:19
220:5 224:4
226:12
227:7,19
238:23

154:10,13
154:18
156:10
**finalize** 225:5
**finally**
202:12
182:12
**find** 174:4
181:12
191:19
192:9
**findings**
177:22
178:22
180:4
187:23
138:8
187:23
228:7
**finishing**
201:9
254:2,12
258:10,15
258:18,22
167:1,3
168:1
191:22
192:23
193:6,18
194:1,20
203:22
210:12
**first** 154:9
221:14,17
194:1,20
203:22
210:12
217:11,21
196:7
219:19
220:5 224:4
226:12
227:7,19
238:23

Exhibit 2 Page 36

ERIC DAVIS
June 5, 2024

Page 11

| | | | | | |
|---|---|---|---|---|---|
| 239:2 | 252:6 | 137:3 | 185:14 | 186:17 | 205:1 207:4 |
| **firms** 210:22 | **foregoing** | 139:23 | 187:12,24 | 194:23 | 208:19 |
| 217:18,20 | 260:13,17 | 141:22 | 188:2 | 199:15 | 209:15 |
| 221:7 | 261:10 | 142:14 | 190:23 | 200:21 | 215:16,24 |
| 244:13 | **foremost** | 144:19 | 191:20 | 202:8,14 | 222:13 |
| 245:3 246:5 | 221:6 | 166:17 | 196:1,7,20 | 203:7 | 227:1 |
| **first** 133:2,5 | **form** 230:21 | 167:23,24 | 196:24 | 204:13 | 236:10,19 |
| 157:16 | 241:10 | 168:3,15,20 | 197:18 | 207:13 | 241:5 243:3 |
| 174:6 197:3 | 246:16 | 169:13 | 198:15 | 208:20 | 244:8 |
| 204:19 | **forth** 244:16 | 170:16 | 199:3,13,23 | 218:16 | 249:18,18 |
| 212:6 216:4 | **forward** | 178:14 | 201:5,12 | 221:11 | 252:23 |
| 247:7 | 243:3 247:6 | **generally** | 203:11,20 | 224:15 | 254:6 |
| 249:16 | 247:23 | 136:19 | 206:20 | 225:10 | 256:13 |
| 260:10 | **found** 155:6 | 221:8 | 212:13 | 229:11 | **good** 133:10 |
| **five** 209:7 | 180:11,24 | **generate** | 215:3 | 238:4 | 229:8 |
| 240:4 | 181:24 | 217:5 | 226:16,22 | 239:18 | 242:19 |
| **fixed** 214:17 | 182:2,6 | **getting** | 227:10,17 | 243:3 | 251:13 |
| **flight** 143:10 | 183:1 | 195:17 | 254:22 | 244:16 | **Gordian** |
| **flip** 255:5 | 187:13 | 232:21 | 255:6 257:3 | 246:7,23 | 226:12 |
| **floor** 147:3 | 232:23 | **giant** 246:1 | 258:11 | 248:5,14 | **government** |
| 182:10,18 | 194:10 | **give** 135:5 | 259:4 | 253:10,13 | 147:16,17 |
| 193:12 | 258:6 | 160:14 | **Globetrotte...** | 256:6,17 | 147:19,22 |
| 252:15,21 | **four** 165:10 | 172:13 | 142:5 152:4 | **goal** 206:3 | 170:24 |
| **focused** | 247:18 | 209:11,15 | 157:10,24 | 222:6,12,20 | 172:18 |
| 171:9 | 248:2,8 | 219:14,15 | 160:8 | 230:11 | 176:14 |
| 240:17 | 255:2 | 228:16 | 177:12,22 | 231:21 | 216:23 |
| **focusing** 139:19 | **from** 163:1 | **given** 195:20 | 191:3,15,19 | **going** 139:19 | 270:20 |
| **follow** 151:20 | 229:7 | 205:11 | 209:4 227:5 | 142:23 | 279:14 |
| 167:16 | **full** 191:23 | 227:11 | 257:15 | 143:9 147:5 | **graduate** |
| 210:13 | 215:18 | 229:6,7 | **go** 141:16 | 157:4,9 | 134:23 |
| 229:12,13 | **functions** | 240:21 | 142:8 | 159:14 | **great** 185:8 |
| 242:21 | 231:24 | 260:18 | 146:23 | 160:9 | **greater** |
| **followed** | **fundamental** | 261:14 | 147:13 | 172:10 | 158:12,13 |
| 156:7 | 231:6 | **gives** 228:18 | 156:23 | 162:20 | 172:4 |
| **following** | **funding** | **giving** 193:19 | 158:17 | 172:10 | **greatly** 158:2 |
| 136:8 | 167:7,14 | **Globetrotte...** | 159:7 | 173:6 | **green** 195:20 |
| 154:23 | 168:1 | 133:19 | 160:12,15 | 174:20 | **ground** |
| 156:17 | **further** 157:4 | 153:3 155:6 | 162:21 | 185:18 | 140:6,10,18 |
| **follows** 133:7 | 251:13 | 169:18 | 163:21 | 190:21 | 226:24 |
| **Fools'** 155:2 | 259:22 | 178:5,11 | 165:4,14 | 194:3 | **group** 179:9 |
| **foot** 143:5 | | 140:5 | 166:1 | 226:4 | 220:17 |
| **footing** | **G** | 166:11 | 167:19 | 200:13 | **groups** 163:9 |
| 233:19 | **G** 131:3,4 | 180:3,10,23 | 178:6 | 202:13 | **guess** 144:22 |
| **footnotes** | **general** 135:2 | 181:19 | 183:1 | 204:9,19 | 228:9 |
| | | 183:1 | | | |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 12

| | | | | | |
|---|---|---|---|---|---|
| **guesstimate** | 221:16 | **help** 142:16 | 241:24 | 224:19 | 247:6 |
| 228:2 | 243:21 | 149:5 246:5 | **hereto** 261:23 | 226:19 | **inches** 136:10 |
| **guidance** | **happened** | **holistically** | 253:8 | 228:11 | 140:7,7,11 |
| 149:6 | 197:15 | 253:6 | **honestly** | 230:17 | 140:11,19 |
| 166:14 | 239:7 | 262:1 | 235:19 | 131:6,14 | 142:2 143:5 |
| 183:16 | **happens** | **hesitate** | **hope** 204:6 | 133:14 | 144:6 143:17 |
| **guidances** | 145:8 | 180:16 | **hopeful** | 143:14 | 144:6,14,20 |
| 174:22 | **harm** 230:21 | **hey** 146:13 | 229:19 | 144:16 151:8 | 145:6,15 |
| **guideline** | **hazard** | 147:3 148:9 | 230:3 260:1 | **imagine** | 146:13,15 |
| 237:1 | 258:18,23 | 184:15 | 240:7 | 152:6 | 147:5 151:18 |
| **H** | 159:19 | **holistically** | **hopefully** | **immediately** | 152:10 |
| **H** 132:10 | **HDR** 195:1 | 210:22 | 245:4 | 192:12 | 152:7,21 |
| **half** 236:11 | 195:19 | 217:10 | 142:1 | 197:10,10 | 158:20 |
| **hand** 215:22 | 197:4 | 218:19 | **host** 162:8 | 158:20 | 162:3 |
| 232:20 | 200:16,19 | 219:9,21 | 165:19 | 159:12 | 163:2 |
| 256:14 | 203:6 | 220:18 | 209:7 | 162:11,22 | 170:19,23 |
| 262:2 | 204:10,18 | 221:19 | **hour** 205:3,5 | **impact** 242:8 | 171:2,3,7 |
| **handled** | 211:17 | 259:3 | 242:9 | **impacted** | 172:3,3,20 |
| 149:9 | 218:16 | **hired** 217:19 | **housed** | 186:14 | 172:4,7,23 |
| **handrail** | 219:1,12,22 | 218:6,22 | 149:16 | **implement** | 173:3,20,22 |
| 140:6,10,18 | 220:19,23 | 185:15 | 186:1,11 | 252:14,20 | 171:14,19 |
| 142:10 | 221:1,7,20 | 228:17 | 218:5 | 165:3 | 172:4,7,23 |
| 144:3,13 | 222:6,12,20 | 244:13 | **housing** | 202:15 | 173:3,20,22 |
| 145:4,5 | 223:4,22 | 245:2 246:5 | 165:23 | **implementi...** | 175:11,13 |
| 146:7 147:4 | 224:22 | **historic** | 169:3 | 175:11,13 | 176:19 |
| 181:2 | 225:4,14,13 | 168:9 170:3 | 225:21 | **implementi...** | 178:1 181:3 |
| 182:22 | 225:21 | **historical** | **hypothetic...** | 175:11,13 | 182:9,18,20 |
| **handrails** | 226:3 | 169:24 | 180:10,22 | 176:19 | 182:23 |
| 139:23 | 269:10 | **history** | **I** | **importance** | 250:17 |
| 140:4 142:1 | 259:14 | 140:24 | **idea** 142:17 | 195:17 | 187:17 |
| 143:13 | 260:4 | 152:17 | 190:13 | **important** | 194:7 |
| 162:20 | 196:7 | 190:13 | 232:2,3,4,8 | 194:7 | 254:19 |
| 180:13 | 208:6 | 232:22 | 233:4 244:2 | 231:18,21 | 153:14 |
| 182:14,15 | **hear** 139:12 | **hold** 206:14 | 248:19,21 | 232:2,3,4,8 | 153:14 |
| 213:15 | 139:16 | 256:13,15 | 248:23 | 233:4 244:2 | 164:3 191:2 |
| **hands** 232:13 | 183:21 | **holding** | 163:4,4 | 248:19,21 | 250:23 |
| **Hannah** | 207:15 | 231:16 | 259:11 | **improve** | 251:9,11,11 |
| 195:16 | **hearing** | 239:16 | **identifies** | 163:6 | 199:17 199:6 |
| 212:4 | 246:3 | 240:3,4,13 | 233:10 | 246:19 | 201:2,18,23 |
| **happen** | **heights** 140:5 | 243:6,16 | **identify** | **Improveme...** | 211:12 |
| 195:16 | **held** 206:18 | **holistic** | 165:5 179:9 | 163:6 | **included** |
| 212:4 | 206:22 | 205:12 | 179:9 | 246:19 | 142:5 |
| | | 210:1 | | | 189:12,24 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 13

| | | | | | |
|---|---|---|---|---|---|
| 190:3 | 159:9 | 156:17 | 150:18 | 164:9 165:8 | 225:17,21 |
| 214:24 | 161:14 | 157:3 191:6 | 172:12 | 226:1,10 | 226:1,10 |
| **includes** | 186:10,16 | 191:13 | **investigating** | **Jason** 131:12 | 227:14 |
| 145:21 | 229:20 | 201:4 | 162:67 | 150:21 | 146:10 |
| 206:9 | 231:22 | 212:11,12 | 167:12 | **jdevore@d...** | 167:20 |
| 207:24 | 232:16 | 241:20 | 236:14 | 131:15 | 171:23 |
| 218:2 | 234:12,24 | **intentions** | **investigation** | **job** 181:20 | 176:10 |
| **including** | 236:19 | 217:10 | 217:10 | 225:2 | 184:7 |
| 156:4 180:2 | **inefficient** | **interact** | 168:23 | 226:11 | 191:16 |
| 190:17 | 218:16 | 232:15,16 | 258:13,21 | **judge** 228:20 | 193:6 |
| 205:14 | **interest** | **involve** 192:4 | 229:5,9,13 | 213:10 | 248:8 |
| **inclusive** | 242:5 243:8 | **involved** | | 237:3 | 251:23 |
| 260:15 | **infirmary** | 229:6 | 237:17,4,7,14 | 251:21 | 252:16 |
| **incorporate** | 186:17 | 243:14 | 238:6 | **judgment** | kinds 167:10 |
| 191:24 | 206:9 | **interested** | 242:12 | 212:2 | know 144:17 |
| **independe...** | **information** | 263:23 | **July** 225:22 | 251:23 | 146:10 |
| 231:11 | 184:7 191:2 | **intermediate** | **June** 130:17 | 146:10 | 149:19 |
| 234:8,11 | 191:3,24 | 157:5 | 221:18 | 149:19 | 151:9 |
| **independe...** | 193:15,24 | 158:14 | 222:11 | 151:9 | 152:13,16 |
| 232:12 | 225:14 | 158:19 | 239:12 | 152:13,16 | 152:24 |
| 259:3 | **inhibit** | 159:1,4 | 260:14,14 | 152:24 | 153:8 |
| **indicate** | 158:18 | 166:11,13 | 223:4,9 | 153:8 | 155:13 |
| 256:1 | **initial** 239:13 | 161:4,8,11 | **jurisdiction** | 154:3 | 155:18 |
| **indicated** | **initially** | 162:14 | 147:11 | 155:18 | 156:17 |
| 194:19 | 153:17 | 170:20 | 148:22 | 156:17 | 165:15,19 |
| 257:10,14 | **injunction** | 171:1,7,13 | **jurisdictions** | 165:15,19 | 167:5,8 |
| **indicates** | 215:24 | 231:4 | 167:5,8 | 167:5,8 | 168:5 |
| 235:12 | **inquiry** 176:9 | 172:5,6,22 | 148:6,15 | 168:5 | 170:8 173:9 |
| 257:4 | **install** 145:3 | 231:8 | 149:7 | 170:8 173:9 | 173:13,15 |
| **indicating** | **instance** | 173:19,20 | 159:10 | 173:16,22 | 173:16,22 |
| 146:7 | 141:16 | 175:10,12 | 166:13 | 174:3,24 | 174:3,24 |
| 193:22 | 236:23 | 175:24 | 231:24 | 176:7 | 176:7 |
| 257:19 | **instances** | 213:8 | 212:19 | 177:15,19 | 177:15,19 |
| **indirectly** | 235:4 | 187:15,16 | **issuing** | 179:13 | 179:13 |
| 261:24 | **Institute** | 187:21 | 221:12 | 184:9,10,11 | 184:9,10,11 |
| **individual** | 182:17 | 191:10 | 189:19 | 184:12,16 | 184:12,16 |
| 159:6 170:8 | **intend** | **interpretat...** | **item** 141:1 | **K** | |
| 176:6 210:4 | 242:21 | 148:9,13 | 196:13 | **K** 261:2 | 184:20 |
| 211:20 | **intended** | **interpretat...** | 207:17 | **Kate** 174:12 | 186:18 |
| 234:14 | 160:7 | 234:21 | | 194:9,11 | 187:7 |
| 242:5 | 235:13 245 | **interpreting** | **J** | 225:7 230:8 | 188:17 |
| **individually** | 231:11 | 134:20 | **jail** 139:1 | **keep** 205:7 | 201:8 209:1 |
| 211:2,6,7 | **intending** | 148:14 | 145:1 | 221:9 228:9 | 209:4 211:8 |
| **individuals** | **intent** 156:13 | **interruption** | 163:16 | **kickoff** | 213:6 214:3 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 14

| | | | | | |
|---|---|---|---|---|---|
| 214:5,9 | 155:8,9,10 | 159:12 | 175:11,24 | 252:10 | 204:24 |
| 216:4,7,16 | 157:5 | 229:12,18 | 176:24 | 255:21 | 255:21 |
| 216:19,19 | 158:11,12 | 231:19 | 177:24 | **lines** 184:22 | 241:23 |
| 221:4,6,16 | 158:14,17 | 232:3 | 181:1 182:8 | 242:1 | 252:3 |
| 221:20 | 158:19 18:4 | 233:17 | 187:4,16 | 251:22 | 154:23 |
| 224:13,17 | 159:2,4 | 236:16 | 194:7 | 257:12 | 154:3 |
| 227:9,12,12 | 160:11,13 | **laws** 147:13 | **let's** 144:4,5 | **list** 193:20 | 165:14 |
| 230:5 | 161:22 | 147:18 | 159:16 | 165:8 | 174:4,17 |
| 235:19,20 | 161:22 | 148:23 | 160:2 | **listed** 180:8 | 179:10,10 |
| 236:22 | 162:7,14 | 159:16 | 167:15 | **listing** | 179:11,11 |
| 245:10,18 | 170:20 | 160:2 | 181:13 | 153:23 | 179:12 |
| 246:4 | 171:1,7,13 | **lawyer** | 169:15 | 181:1 | 180:18,23 |
| 247:16,21 | **leach** | 168:4 | 181:19 | 184:10 | 191:6,6,13 |
| 249:2 | 171:2,8 | 169:15 | 230:20 | 181:13 | 194:9 |
| 251:17 | 172:5,6,22 | **Leighton** | 222:7 237:1 | 212:13 | 199:4 |
| 251:3,7,8 | 175:10,12 | 212:15 | 241:8 | 213:6 214:3 | 199:17,21 |
| 253:5,7,23 | 175:10,24 | 234:10,12 | 221:10 | 211:16 | 211:7 |
| 254:13 | 179:24 | 135:2 | **local** 148:21 | 214:14 | |
| **knowledge** | 177:23,24 | **landscape** | **level** 160:4 | 149:10 | |
| 164:13 | 179:11,12 | 235:20 | 249:20 | 221:23 | |
| 169:22 | 181:24 | 184:6,18,20 | **liable** 230:14 | 224:9 | |
| 178:2 | 182:7 | **large** 213:1 | **license** | 245:9 | |
| 175:19 | 187:21 | 232:5 | 133:12 | **location** | |
| 176:12,14 | 194:5,5,7 | **largest** 256:8 | 133:14,15 | 254:2,7,9 | |
| 183:22 | 252:12 | 259:12 | 262:9 | 254:13,14 | |
| 226:3 | **legal** 175:19 | 159:1 161:4 | **licensed** | 258:19 | |
| 230:24 | 168:6 179:18 | **law** 131:1 | 133:17 | **looked** | |
| 242:5 | 135:21 | **laundry** | 133:14,15 | 152:14 | |
| **knows** 208:9 | **legally** | 170:22 | 145:24 | 252:20 | |
| 208:11 | 148:19 | 193:20 | 185:24 | 239:8 | |
| 212:6 215:2 | **licensure** | 171:2,14 | 168:13 | 258:11 | |
| 216:21 | **landscape** | 172:7,22 | 180:18,23 | **logical** | |
| **L** | 235:20 | 173:4,20 | 191:6,6,13 | 166:16 | |
| **lack** 242:17 | **large** 213:1 | **line** 149:5 | 194:9 | 153:3 | |
| **landing** | 232:5 | 161:19 | 199:4 | 187:3 | |
| 142:2 | **largest** 256:8 | 189:19 | 199:17,21 | 211:17,22 | |
| 150:17 | 259:12 | 199:17,21 | 211:7 | 193:5,8,14 | |
| 151:2,7 | **length** 153:7 | | | 195:18 | |
| 152:18,20 | **light** 195:20 | | | **loose** 254:10 | |
| 152:21 | 234:14,15 | | | 258:21 | |
| 153:6,9 | 189:19 | | | **loss** 175:1 | |
| | | | | | 167 211:7 |

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 37

lower 158:6
182:9,11,16
221:9 257:5

**M**

M 133:8
251:17
254:16
magnitude
150:20
224:7
245:13
maintain
176:5
making
199:1
218:23
manage
210:16
manager
226:12
maneuver
160:23
manner
143:24
205:23
210:1 233:6
243:1
March 154:6
154:12
198:1,13
199:12
222:11
223:6
226:19
250:7,12
MARKED
132:12
material
252:16,22
matters
171:6 261:9
maximum

140:7
157:14
mayor's
146:23
mean 136:4
136:16
142:13
153:18
158:4,5,7
166:23
178:16
179:6
199:20
201:17,19
214:3
222:16
227:3,12,13
228:9
230:22
231:18
238:20
253:3
means 137:19
136:16
meant 169:4
measured
157:18
mechanical
242:9
mechanism
148:5 149:4
220:4
medical
208:20
248:5,14
meet 182:22
meeting
192:12,13
195:8
197:11,14
223:16
225:17,21
226:1
members

171:4
motion
160:7
mentioned
160:8
165:11
174:11
195:8
196:14
212:13
223:15
224:24
242:9
methods
156:16
microphone
198:10
middle 160:6
million
155:22
221:8
240:23
millions
244:15
mind 164:14
185:22 256:5
model 229:23
modification
196:20
201:7
moment
135:6
162:22
194:2
202:10
207:3
money
190:22
222:13
242:24
Monroe
131:13
months
170:22

171:2 173:3
175:24
morning
176:19
181:3 182:7
182:23
MORRISS...
131:3,4,5
132:4,7
133:9 135:9
139:10,15
151:1 155:5
185:12,23
188:10
195:13
198:9,12
199:11,22
200:3
201:21
203:5,23
205:2,8
207:1,19
208:5,7
213:20
214:8,15
223:19
228:11
230:23
237:13,17
237:22
238:15
239:22
240:11,20
241:3,13,15
244:8 246:7
247:16 249:6
251:12
256:1
259:1,21
motion
216:5
motivation
242:17

motivations
231:6
mounted
214:10,17
move 210:9
254:4,9,13
255:13
257:18
moved 194:6
256:1
movements
252:12
moving 201:2
203:3
208:18
253:20
257:16
258:22
mullion
254:20
multiple
220:15,16
227:1 249:5
259:8
mute 150:21

**N**

N 131:1
132:1 133:8
133:8
251:17,17
254:16,16
name 221:12
nature 119:5
navigate
161:15
162:17
249:21
near 192:24
necessarily
168:17
186:11
226:17
227:2,9,13

necessary
159:6
199:1
201:1
211:14
227:13
241:22
247:24
necessitate
158:14
need 168:24
142:9,15,16
143:9
145:11
150:21
153:11
159:23,24
162:4,11
166:1
172:17
169:23
198:20
203:2
204:18,21
205:1,20
221:10
223:22
235:12
243:18
245:1
needed
152:12
159:13
216:18
253:9
needs 140:23
141:8,15
145:16
160:3 162:2
163:10
170:13
220:6
negotiate

159:6
negotiating
222:12
negotiation
222:20
negotiations
222:6,9
nevertheless
229:11
new 168:24
169:14
257:16
newly 169:1
nine 261:3
247:1
noncompli...
215:8
normal 149:9
155:24
north 189:20
189:21
191:11
193:1
NORTHE...
130:1 260:1
221:10
Notary
223:22
note 142:24
197:13
204:7
255:13
noted 203:11
notes 135:18
notice 195:1
196:24
197:4 203:7
223:17
223:24
228:17
237:9,16,19
notion
220:20
254:1

number
229:10
222:12
205:10,24
212:20
227:5,6
252:15,21
numbers
151:13

**O**

O 133:8
251:17,17
254:16
261:2,2
o'clock
192:16,19
197:16
226:12
260:11
object 185:18
241:10
242:16,18
243:3
245:17
offhand
165:15,21
217:3
189:8
191:11
241:10
242:16,18
243:3
offence 166:6
office 146:24
163:15
176:15
objection
188:5 195:4
195:1,8
200:2
221:1
230:16
237:9,16,19
OFFICES
131:3,10
176:23
offline 243:8
offset 152:9
202:7
203:14
204:4
206:11
207:11
213:18,24
214:11
155:1,2,2
230:16
237:9,16,19
195:14
197:12
199:2
210:15
220:6
254:1

objections
229:10
229:9
observed
186:19
obstruction
145:8,13
148:2
155:11,21
256:15,16
obstructions
145:22
occupies
232:5
occur 156:15
216:12
occurred
150:20
175:16
offhand
149:24
173:23
163:12
204:5
198:23
221:4,6,16
241:1
office 146:24
163:15
154:18
236:18,19
207:11
213:18,24
214:11
230:16
237:9,18,22
196:21
180:16
195:14
197:12
199:2
210:15

229:9
230:22
234:6 241:8
242:23
250:11
255:11,21
256:15,16
256:21
old 232:21
once 193:7
243:15,22
245:9,10,12
159:20
200:14
179:20
230:20
241:16
250:18
197:6
177:10
198:1
184:18
199:14
197:12
199:2
180:24
220:6
250:18
200:9
226:12
165:3
204:9
210:15
228:22

143:15
149:11
161:13
162:15
229:3
optimal
141:7,21
152:5
161:8,24
162:1
optimally
161:19
options 204:9
order 203:17
218:13
220:3,6
224:7 225:2
226:11
228:23
243:17
ordered
228:20
ought 160:13
outcome
261:24
outlined
191:5 242:1
overall 158:4
182:11
216:15
255:3
overseeing
243:21
overseen
164:3
163:5
oversight
144:24
146:19
183:8
owner 146:11
146:18

156:24

**P**

P 131:1,1
p.m 130:18
package
189:17
190:1,2,16
191:5 192:4
192:22
193:9 196:6
196:23
197:19
198:5,15,16
198:22,24
200:14,23
201:11,20
201:22
202:13,19
202:21
203:1,20
210:20
226:21
246:13
packages
189:15
194:18,22
Page 132:1
152:12
153:2 157:9
158:17
180:24
255:5,8
pages 260:15
paid 201:13
paper 230:6
229:19
Paragraph
163:3
paraphrasi...
145:13
Pardon
190:19
parrot 228:8
part 135:14

142:16
152:17
157:21,22
162:23
163:3,19
189:5
190:16
200:24
214:21
217:23
218:4
224:21
231:21
232:5
246:18
255:6
259:12
particular
140:24
145:24
218:20
210:20
226:21
168:11
parties
261:23
parts 189:8
189:11
235:20
passage
166:19
230:2
passageway
145:23
193:1
passed 166:6
229:19
period
192:15,18
path 138:16
138:24
139:3,4
222:14
244:5
248:10
permanent
215:23
permissible

paths 192:1
242:11
248:12,16
PATRICK
163:3,19
131:3
pay 230:15
Peggy 130:16
139:11
178:17
182:12
permitting
147:1
149:10
204:14
person 160:2
142:16
166:13
186:6,12,13
190:14
194:17
172:10
173:6
175:21
177:2
178:19
216:20
220:15
231:4
235:14
249:17
personal
261:13
personally
222:20
pertaining
130:15
petition
229:1,3,4
phase 147:23
189:5,13,14
189:15
phasing
243:20
physical
145:9,22

172:7 175:4
175:22
permit 173:2
199:16
203:24
204:12,21
permitted
149:21
182:12
permitting
147:1
piece 146:21
141:9 142:9
160:1
164:17
160:16
261:17
pieces 207:16
Plaintiff
130:4,12
173:6
130:9 260:4
PLAINTIFF...
132:13,14
plan 147:3,7
163:6
222:21
235:16
247:6 255:3
257:4
planning
144:23
175:8
176:13
177:20
178:10
183:7
218:18
165:8
plans 151:24

148:2
170:11
235:1,4
physically
150:7
pick 181:14
picture
245:19
146:21
161:1
218:11
160:1
164:17
164:16
253:17
pointing
258:8
police 148:23
portfolio
220:9
portion 182:9
200:10,22
162:12
253:11
position
146:12
165:13
249:23
250:16
post 164:15
164:15,16
164:20,24
165:18
post-ADA
164:15
posts 164:15
166:1
potentially
230:13

193:12
216:24
217:5,10
238:16,22
239:4
platform
160:5
phack 242:5
PO 195:11
point 165:3
212:22
229:2 234:4
242:6
253:17

242:7
practice
144:22
148:10
195:22
practicing
148:7
pre-166:15
pre-passage
165:12
preclude
145:22
precludes
148:3
precluding
146:9
prefer 150:9
preliminary
212:13
166:4 196:2
196:8
197:20
199:14
201:13,17
201:18,24
203:9,10
206:10
219:19
premise
219:10
prepare
142:15
201:10
prepared
239:9
prerogative
247:8
present
131:18
225:18,24
231:24
presented
227:2
presenting
146:13

presently
190:7
preservation
168:9
170:3
pretty 178:15
178:17
prevented
145:9
previous
155:23
261:6
previously
133:18
182:21
206:6
221:1 243:5
225:8
225:6
prices 181:12
228:8
price 222:17
225:8
pricing 225:6
Primera
238:24
239:1,14
153:4,6,7
155:8
168:18
189:21
261:15
primarily
166:8
167:7,15
168:1
prioritize
241:16
prioritizing
249:11,15
prisoners
213:14,23
215:14,15
215:15
private

133:23
134:2
144:22
148:10
probably
203:14
204:12,14
216:12,14
221:1 225:2
225:6
218:11
221:11
226:7,13
159:9
164:16
213:2
170:16
220:11,13
181:12
221:12
225:8
procedure
130:14
173:5
210:4
produce
150:4
222:13
250:14,23
218:2
production
202:20
201:10
profession
147:6 150:2
profess
166:10
professional
135:1
223:17
215:17,24
217:11
223:17
181:20
213:14
223:17
181:22
246:13
255:1
proceeding
244:24
proceedings
150:19
261:15
process 147:1

156:1,6,10
168:19
188:12
193:2
200:14
255:19
226:12 220:2
225:6
242:19
243:20
185:10
192:14
250:18
195:9,10
226:7,13
198:3
192:4
197:6,22
213:2
198:20
212:11
221:12
225:8
210:4 238:2
223:13
242:14
250:14,23
219:12
220:7
259:14
221:18
259:2
162:7 161:7
162:7 166:7
166:20
171:12,20

155:14,19
156:2
194:12
205:12,13
205:15,15
185:19
193:14,21
225:14,15
225:23,24
231:11,22
236:7 237:2
231:13,20
237:2
143:16,20
161:12
193:4
250:18
257:15,17
228:19
231:9 235:6
237:2
projected
224:10
projection
199:11,13
prospect
148:11
225:15
project
208:18
proposal
222:7
proposed
174:23
177:8
229:19
231:9 235:6
provide
231:9 235:6
163:5
providing
162:7
provision
170:17
173:23
144:12

ERIC DAVIS
June 5, 2024

Page 19

| | | | | |
|---|---|---|---|---|
| 145:20 | qualificatio... | 247:1,14 | 149:13,17 | 194:8 195:2 | 244:4 |
| 164:17 | 134:6,11 | 249:3 253:2 | 196:9 199:4 | 247:11 |
| 166:11,19 | 168:23 | questioning | 154:14 | 199:16 | 248:2,5,12 |
| 166:21 | 189:7 193:5 | 252:10 | 152:12,19 | 200:4,9,15 | 248:14,18 |
| 167:12,24 | 193:6 246:9 | questions | 155:8,21 | 200:21,24 | 248:20,24 |
| 168:1,3,4,8 | qualified | 205:5 208:9 | 157:6,11,12 | 201:14 | 249:1,4,12 |
| 169:1,6 | 134:5 193:8 | 209:17 | 157:17,19 | 202:12,21 | 249:13,18 |
| 171:5,11,19 | 193:18 | 227:6,8 | 157:21,22 | 203:10,16 | 249:19,21 |
| 172:8 173:2 | 194:1 | 251:15 | 158:1,2,4,5 | 203:18 | 249:22 |
| 173:4,17 | question | quicker | 158:8,8,11 | 204:1,3,9 | 250:13,20 |
| 231:3,13,24 | 134:5 136:6 | 209:20 | 158:12,18 | 206:3,9,10 | 251:1,2 |
| 232:13 | 138:5 147:2 | 210:17 | 159:7,17,18 | 206:13,15 | 253:12,12 |
| 260:23 | 147:7,14,21 | quickly 234:4 | 160:6,10,16 | 206:19,22 | 253:21,22 |
| publicly | 155:4 157:8 | quite 181:21 | 161:16 | 207:4,7 | 253:24 |
| 155:21 | 161:9 | 226:24 | 161:18 | 208:12,19 | 254:1 255:9 |
| pull 233:21 | 163:12 | 253:1 | 162:18 | 208:20 | 257:2,6 |
| pulled 154:21 | 166:4 171:9 | | 170:18 | 209:5,13 | 258:12 |
| pulling 234:2 | 171:17 | **R** | 171:5,13 | 210:8 | 259:5,16 |
| purpose | 172:1 173:1 | R 131:1 | 172:3,11 | 211:12,18 | ramp's 136:9 |
| 159:4 231:1 | 174:9 | 133:8 | 173:6 | 214:6,11 | 140:13,20 |
| purposes | 176:10,20 | 251:17 | 176:10,13 | 215:5,13,17 | ramps 136:7 |
| 231:2 | 176:22 | 254:16,16 | 175:21,22 | 215:18,21 | 138:6 |
| pursuant | 177:18 | RADUNSKY | 176:17,18 | 216:1 217:1 | 141:24 |
| 130:13 | 180:19 | 131:11 | 178:13,23 | 217:7,12,22 | 142:3 |
| pursue | 181:16 | raise 232:20 | 179:11,15 | 218:10,17 | 144:15 |
| 259:11 | 184:4 | 232:22 | 179:17,22 | 218:20 | 159:24 |
| push 234:16 | 185:1 | ramp 135:13 | 180:3,5,13 | 219:4,11,13 | 206:5 215:8 |
| 236:10 | 187:19,22 | 135:16,18 | 180:14,20 | 219:24 | 215:11,16 |
| pushed | 188:1,21 | 135:22,24 | 181:4,21 | 220:21 | range 221:15 |
| 236:20 | 196:5,17 | 136:3,5,17 | 182:3,12 | 221:16 | 221:16 |
| pushing | 206:23 | 136:22,24 | 183:3,9,19 | 222:8,16,22 | rate 135:10 |
| 171:4 | 207:2,18 | 137:3,4,10 | 183:24 | 223:13,21 | 136:1 138:3 |
| 176:16 | 214:4 217:6 | 138:2,2 | 184:5 | 224:5,11 | 229:10 |
| 234:14 | 218:8,24 | 139:4,5,23 | 184:11 | 225:1,9 | 230:4,5 |
| 234:17 | 219:6,7,8 | 140:8,12 | 186:7,23 | 225:19 | 260:12 |
| put 196:14 | 224:9 | 141:11,16 | 187:5,6,14 | 227:18,20 | reading |
| 253:10 | 227:24 | 142:1,3,9 | 187:16,17 | 228:3,12,22 | 199:9 230:9 |
| 255:3 258:3 | 228:19 | 142:12,14 | 187:21 | 230:1 | realistically |
| putting | 239:13 | 142:18,23 | 188:1,3,13 | 231:6 234:14 | 174:15 |
| 190:14 | 240:1,9 | 143:10,14 | 190:11,17 | 235:7,15 | reality 150:4 |
| 256:11 | 241:12,14 | 143:17 | 192:5 | 236:3,9,11 | 216:9 |
| pwm@mor... | 242:15 | 144:4 145:6 | 191:7,10 | 236:15,20 | realize |
| 131:7 | 244:3 | 145:21,23 | 192:6,24 | 237:8 241:6 | 194:18 |
| | 245:17 | 146:7 148:1 | 241:17 | 241:17 | realized |
| **Q** | | | | | 194:9 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 20

| | | | | |
|---|---|---|---|---|
| realizes | recognition | 216:6 | reject 244:2 | 202:22 | 222:14 |
| 234:23 | 235:3 | 237:23 | 244:14 | 228:13 | 237:8 |
| really 146:20 | recollection | related | 254:4 | 235:4 | 238:17,20 |
| 147:21 | 151:11,22 | 140:22 | related | 191:5 | 240:13 |
| 159:19 | 230:21 | reflect 215:7 | 159:15 | 240:15 | 247:10 |
| 168:12 | 236:13,24 | regarding | 160:18 | remediation | 248:19 |
| 233:4 | recommend | 177:8 | relating | 252:24 | 249:12 |
| 241:11 | 202:18 | 196:17 | 234:7 | 253:9 | 259:12 |
| reason | recommen... | regardless | relation | remedy 216:1 | renovations |
| 141:11 | 178:5 220:8 | 167:1 | 157:17 | 236:8 | 211:1 219:3 |
| 143:11 | 252:15,21 | regards | relative 141:7 | remember | 228:18 |
| 161:5,10 | recommen... | 134:7 | 170:9 200:9 | 176:4 | 237:15 |
| 188:15 | 187:23 | 135:13,21 | 238:13 | 184:19 | 244:19 |
| 210:2,3 | 257:4 | 170:20 | 243:4 | 230:8 | repair 243:9 |
| reasonable | record 135:7 | 137:13,13 | 261:20,21 | 237:11 | rephrase |
| 148:17 | 146:20 | 158:16 | relatively | 244:13 | 134:5 139:5 |
| 166:20,24 | 147:24 | 163:13 | 160:22 | remove | 157:7 161:9 |
| 168:2 171:3 | 155:13 | 167:17 | remediate | 236:18 | 182:16 |
| 171:15 | 156:8,11,20 | 169:17 | 200:7 204:8 | 219:16 | 185:1 |
| 172:9 | 156:23 | 170:22 | 219:18 | rendered | 188:20 |
| 223:21 | 200:12,20 | 175:20 | 224:3 | 257:12 | 189:6 196:4 |
| 224:1,3 | 203:4,6,17 | 177:4,11,13 | relevance | 188:9 196:4 | 197:2 |
| 227:3,19 | 203:21 | 177:20 | 188:5 195:4 | renovate | 201:16 |
| reasons | 177:20 | 178:22,22 | 196:6,18 | 207:4,7 | 222:18 |
| 141:13 | 261:14 | 196:19,18 | 200:2 | 222:24 | 224:9 240:1 |
| 209:7 229:6 | records 165:4 | 183:24 | 201:15 | 243:9 | replacement |
| 229:8 | 166:2 | 187:24 | 202:7 | 248:11 | 225:1 |
| 233:20 | 187:7 197:4 | 190:7 197:4 | 203:14 | renovated | report 142:5 |
| 245:23 | 257:14 | 198:5,14 | 204:4 | 209:13 | 152:4 153:3 |
| recall 152:3 | REDIRECT | 199:2 215:4 | 206:16 | 217:24 | 157:10,24 |
| 165:21 | 132:6 | 216:18 | 211:3,18 | 227:24 | 158:3 |
| 169:9 | reduced | 217:7,12 | 214:11 | 240:5 244:5 | 180:9 |
| 184:24 | 261:12 | 228:2 | 237:9,16,19 | 248:2 | 182:8,15 |
| 199:1 | refer 240:15 | 237:6 | 238:1 | renovating | 185:14 |
| 213:16 | reference | regular | 239:17 | 188:12 | 191:15 |
| 214:13 | 191:17 | 154:22 | 240:6 241:2 | 192:8 | 192:8 |
| 237:12 | referred | 197:14 | 259:18 | 228:2 | 197:20 |
| receive 167:7 | 150:3,11 | 203:19 | relief 159:5 | 241:6,17 | 206:19 |
| 203:7 | 233:13 | 258:20 | relocated | 244:24 | 207:17 |
| received | referring | Rehab | 248:24 | 245:10,19 | 212:19 |
| 154:1 | 145:13 | 162:5 | 250:13,19 | renovation | 227:2 237:5 |
| 167:13,24 | 162:20 | 171:11 | 254:23 | 196:8 | 256:6 257:3 |
| 192:17 | 168:7 | reinforced | rely 244:24 | 197:21 | reported |
| 214:22 | 189:17 | 151:19 | remain | | 169:18 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 21

| | | | | |
|---|---|---|---|---|
| 261:11 | 173:21 | 192:11 | 150:12 | 157:12,17 | 236:3 241:6 |
| Reporter | 175:12 | response | 177:12,16 | 158:2,9,10 | 248:24 |
| 130:17 | 182:19 | 139:10 | 177:17 | 158:13 | 251:1 |
| 135:5 | 196:7 202:5 | 141:3 | 179:16 | 170:19 | 253:12 |
| 139:12 | 227:10 | 181:15 | 200:7 | 172:4,22 | 255:12 |
| 198:8 208:4 | 230:14 | 192:19 | 252:6 | 173:21 | ruling 147:11 |
| 249:9 261:4 | 234:17 | 193:24 | reviewer | 175:13 | 216:5 |
| 261:20 | 235:8 | responses | 147:7 | 177:7 | 229:13 |
| reports 215:3 | requirement | 214:22 | reviewing | 180:24 | run 136:9,13 |
| 215:7 | 143:3 161:5 | responsibil... | 151:11 | 197:17 | 137:4 138:2 |
| representat... | 173:3 | 162:23 | 157:24 | 197:19 | 139:4,6 |
| 171:16 | 176:18 | 163:4,14,19 | 191:20 | 199:10 | 140:13,14 |
| representat... | 182:8,23 | 183:8 199:3 | 192:5 229:4 | 198:22 | 140:16,17 |
| 148:16 | requireme... | responsibil... | rolling | 141:15 | 141:16 |
| 177:20 | 136:8 141:4 | 144:23 | 169:10 | 145:12 | 152:17 |
| 226:3,4 | 141:10 | 144:14 | roof | 154:18 | 158:9 182:4 |
| represented | 148:1 156:4 | 146:19 | 170:20 | 155:6 | 182:11 |
| 222:5 | 156:4 | 148:21 | 193:7 | 157:20 | running |
| 250:12 | 166:8,8,24 | 204:21,22 | 194:17 | 160:5 | 136:10 |
| request | 167:2,9,10 | 211:5 | 231:20 | 172:20 | runs 142:3 |
| 175:14 | 168:16 | 214:23 | roughly | 173:3,4 | 189:19 |
| 176:8 189:7 | 170:6,7 | 252:23 | 142:1 | 195:17 | |
| 193:4 | 177:5 | 253:8,13,14 | 194:14 | 200:21 | **S** |
| requested | 205:19 | 258:13 | 192:4,9,21 | 226:14 | S 131:1 |
| 135:8 175:7 | 243:6 | Restoration | 193:7 | route 138:15 | 132:10 |
| 176:15 | 249:16 | 154:23 | 194:17 | 138:22 | 251:17,17 |
| requests | 158:18 | 164:4 | 195:15 | 149:1 | Sacramento |
| 175:17 | 199:19 | 230:2 | 195:21 | 172:12 | 164:20 |
| require | 205:16 | restroom | 196:17,18 | | safe 205:22 |
| 143:13 | 233:7 | 147:18 | 184:5,24 | | safely 170:14 |
| 158:24 | research | 224:20 | 185:16 | | sale 226:13 |
| 202:14 | 167:10 | 228:19 | 186:1,6,20 | | sarcastic |
| 206:1 235:4 | 172:17 | revealed | saves 209:16 | | 255:4 |
| 236:19 | reshare | 152:3 | saying | | save 209:16 |
| 237:2 | 256:13 | review 147:1 | 138:11 | | sarcastic |
| required | resolved | 149:12 | 153:19 | | 255:4 |
| 136:21 | 223:9,10 | 156:9 | 161:5 | | saves 209:16 |
| 139:22 | resources | 168:19 | 162:19 | | saying |
| 152:19,20 | 163:10 | 175:8 | 167:18 | | 138:11 |
| 153:7,8 | respite 160:2 | 191:15,19 | 197:22 | | 153:19 |
| 155:9,10 | respond | 222:1 | 202:23 | | 162:19 |
| 169:2,19 | 234:20 | 224:23 | 211:4,21 | | 167:18 |
| 172:5,20 | responding | 245:4 | 214:16,20 | | 197:22 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 22

| | | | | |
|---|---|---|---|---|
| 141:24 | 175:2 185:8 | 256:6 | 151:24 | 149:9 | someplace |
| 184:15 | 194:4 255:9 | shared | 152:2 | 152:10 | 210:9 |
| 205:24 | 255:15,17 | 184:11,12 | shows 255:12 | 212:3 242:8 | somewhat |
| 255:12,13 | 256:2,7,8 | sheets 174:24 | sic 169:3 | 244:14 | 224:14 |
| 257:3,8,18 | 256:19,22 | sheriff 130:6 | 209:6 | situations | soon 223:14 |
| schedule | 257:17,21 | 173:18,24 | side 164:16 | 138:12 | sooner |
| 225:18 | 258:10 | 164:20,20 | 164:20,20 | 139:24 | 247:21 |
| 228:18 | seek 145:19 | 177:4,10 | sign 156:11 | six 180:2,8,23 | sorry 136:5 |
| School | 147:24 | 183:16,23 | 156:18 | 209:7 240:4 | 139:17,20 |
| 134:23 | seen 161:23 | 255:11 | 156:18 | size 205:11 | 150:23 |
| scope 200:10 | 247:9 | 190:24 | significant | 150:6 | 154:2,19 |
| 202:1 | 209:4 213:3 | 208:17 | 137:12,16 | 242:6 | 155:3 157:7 |
| 204:8,13 | self-certific... | 216:7,20 | similar | slide 258:16 | 161:9 178:7 |
| 205:11 | 204:11,20 | 260:6 | 159:24 | slight 252:5 | 183:21 |
| 211:23 | sense 194:21 | Sheriff's | 164:19 | slope 135:19 | 187:22 |
| 219:16 | 252:11,14 | 153:6 | 211:19 | 136:4,9,10 | 208:16 |
| scoped 220:1 | 254:11,20 | 224:7 | sheriff | 136:13,18 | 219:6 222:4 |
| screen 135:17 | 252:17 | 231:14 | 154:8 | 137:2,14 | 246:15 |
| 213:13 | separate | 176:5 | 176:5 | | 249:4 |
| 215:10 | 134:9 234:3 | shop 150:5,16 | safely | 145:12 | sort 142:14 |
| 196:14 | seat 154:16 | 156:6 | 196:16 | 182:5,13 | slows 233:22 |
| 256:6,10,12 | sequence | short 152:19 | simplify | 252:18,22 | 234:5 |
| seamlessly | 134:9 234:3 | 199:6 | 171:6 | 253:21,23 | 166:1 |
| 205:20 | seats 214:10 | 155:8 | simply | 237:18 | space 160:14 |
| 214:17 | series 174:22 | 155:8 | 155:17 | 182:5,13 | speak 167:21 |
| second | 179:8 | 176:20 | 191:24 | smaller | 170:7 235:15 |
| 190:23 | 233:4 246:3 | 169:22 | 200:8 | 237:18 | 235:17 |
| 191:23 | Service 164:6 | 250:4 | 191:24 | solicitation | species |
| 208:21 | 208:21 | Shorthand | single 193:20 | 175:19 | 234:8 |
| section 136:7 | services | 130:16 | 161:1 | sounds 153:1 | sought |
| 136:20 | 134:20 | 201:6 227:4 | sir 190:20 | source | 175:19 |
| 139:20 | 133:23 | 261:4 259:24 | 236:2 254:9 | 194:24 | south 131:5 |
| 141:22 | 172:17 | shortly | sit 147:19 | speak 167:21 | 139:19,20 |
| 159:14 | 203:18 | 254:8 | 214:18 | 170:7 235:15 | 235:17 |
| sections | 211:8,9 | showed | 245:21 | | |
| 138:9 158:5 | 246:15 | 214:8 | situation | | |
| sector 133:23 | 257:10,13 | shower | 245:21 | | |
| 134:2 | 258:7,8 | 214:18 | situation | | |
| secure 236:16 | 262:1 | 213:7,15 | 176:22 | | |
| 237:1 | 262:1 | single | sit 190:20 | | |
| security | 257:9,20 | 233:23 | 236:2 254:9 | | |
| 170:6,6,14 | seven 239:5 | 238:2,7,13 | six | | |
| 236:17 | 247:2,8 | showing | 181:13 | | |
| see 153:5 | share 193:9 | 147:4 | 254:9 | | |

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 39

ERIC DAVIS
June 5, 2024

Page 23

| | | | | | |
|---|---|---|---|---|---|
| 223:18 | speculating 141:14 | 143:23 | 185:18 | 218:12 |
| 240:10 | 156:22 | 143:12 | 229:19 | 188:5 195:4 | stops 157:22 |
| 245:21 | spend 240:23 | 144:7 | 230:2 231:1 | 199:5,18 | straightfor... |
| specific | 242:23 | 145:23 | 261:1,4 | 200:2 | 200:8 225:3 |
| 134:10,21 | spoke 195:9 | 147:18,20 | stated 155:21 | 201:15 | Street 131:13 |
| 135:2 | 196:12 | 148:4 156:5 | 261:19 | 202:7 | stressed |
| 140:24 | 223:6 254:3 | 163:24 | statement | 203:14 | 195:16 |
| 141:3 168:5 | 258:6 | 166:9 | 160:24 | 204:4,24 | strict 145:22 |
| 168:12 | spoken 197:3 | 167:17 | 198:4,14 | 205:4 | 148:3 |
| 169:9 170:5 | ss 261:1 | 168:21 | 199:2 | 206:16 | strike 247:5 |
| 172:12,14 | stabilize | 169:3,7,11 | 205:10 | 207:11 | strong |
| 173:17 | 252:16 | 169:16,20 | 210:15 | 213:18,24 | 135:11 |
| 194:18 | stable 160:4 | 170:1,24 | 219:7 | 214:11 | structural |
| 196:13 | staff 164:17 | 172:21 | States 130:1 | 228:8 | 151:16 |
| 200:24 | stage 193:17 | 174:1 177:6 | 130:14 | 230:16 | 152:1 |
| 212:14,17 | 243:9 | 179:19 | 243:19 | 237:9,16,19 | 168:10 |
| 217:6 | stair 143:1,2 | 180:15 | 260:1 | 238:17 | 223:23 |
| 224:13 | 143:4 | 181:6 | steady | 239:17 | 226:5 |
| 242:8 | 254:12 | 182:15 | 142:16,17 | 240:6,17 | structure |
| specifically | 258:10,16 | 182:2,10,18 | 142:22 | 241:2,10 | 151:20 |
| 134:17 | stairs 143:10 | 182:12 | 143:9 | 244:6 251:4 | 162:2 |
| 174:12,20 | 159:23 | 187:15 | steep 136:3,5 | 251:14,18 | 165:2 |
| 184:15,19 | stairway | 188:4 206:5 | 254:15 | 254:15 | Stuart 197:7 |
| 192:21 | 254:5 | 191:9 | 135:19,24 | 256:20 | 197:17 |
| 193:3 195:9 | stalls 160:21 | 209:6,8,14 | 136:10,23 | 258:2 | students |
| 208:2 | standard | 217:2 219:5 | 137:5,8 | 259:18,23 | 134:23 |
| 216:19 | 136:12 | 221:21 | 138:13,16 | stipulate | 232:20 |
| 219:10 | 141:1 | 228:4 | 138:18,21 | 157:7 | study 184:15 |
| 231:8 | 145:16 | 231:10,10 | 139:7 | 178:16 | subcontrac... |
| specificatio... | 158:23,24 | 232:9,10 | 182:12 | 193:5 | 226:5 |
| 198:6,7,16 | 162:6,12 | 234:17 | 184:9 | 195:15 | subcontrac... |
| 198:17 | 162:6,8 | 236:6 | steepness | 198:18 | 223:5 |
| 200:1 | 180:20 | start 174:7,9 | 137:11,12 | 202:2 | subject |
| 201:11,24 | standardized | 174:20 | 138:1 | stipulated | 212:14 |
| 202:1,1,11 | 174:20 | 198:21 | step 163:21 | 189:18 | 239:20 |
| 202:17 | 220:1 | 225:5 | 178:6 | 239:19 | 245:5 |
| specifies | standards | started | 194:24 | stipulation | subjective |
| 167:21 | 134:8 | 198:23 | 212:14 | 233:9 | 164:8 |
| specified | 135:16 | 239:10 | stick 210:24 | stop 159:21 | subjects |
| 152:5 | 136:16 | starting | 211:9,10 | 193:23 | 168:5 |
| 261:17 | 155:19,22,18 | 158:7 | 211:16 | submit | 197:9 |
| specs 202:21 | 137:24 | starts 157:21 | stopped | 210:4,10 | submits |
| speculate | 139:8 | state 130:17 | 210:8 | 211:16 | 220:11 |
| 152:8 | 140:21 | | | | submittals |
| | | | | | 192:15,17 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 24

| | | | | |
|---|---|---|---|---|
| submitted | 155:6 156:3 | 210:6 211:7 | 174:10 | testimony 183:4 184:6 |
| 217:20 | 163:9 | 213:19 | technical | 209:19 | 194:21 |
| 221:24 | 171:16 | 225:13 | 148:7,16 | 255:7 | 205:1,5 |
| 247:3,9 | 183:22 | 243:8 250:2 | 175:1 | 260:18 | 207:15,17 |
| SUBSCRI... | 185:5,7 | 251:16 | technically | 261:14 | 212:12,21 |
| 260:20 | 226:24 | taken 130:11 | 148:10 | tgm@morr... | 217:4 |
| subsection | 231:1 | 130:12,15 | tell 133:11 | 131:7 | 218:14,15 |
| 233:1 | surface | 134:15 | 135:9 | Thank | 224:12 |
| successful | 159:13 | 249:22 | 152:8 | 150:22 | 226:21 |
| 191:4 | 137:1 140:6 | 260:15 | 157:16 | 250:11 | 229:8 230:4 |
| suddenly | 140:8,10,13 | 261:16 | 170:10 | Thanks | 230:5 231:5 |
| 197:2 | 140:18,20 | takes 211:17 | 196:11 | 185:9 | 231:16 |
| sufficient | 182:10 | 211:20 | 198:22 | themself | 232:12 |
| 142:20 | 252:16,17 | 212:20 | 200:21 | 204:15 | 234:13,20 |
| 200:19 | 252:22 | talk 194:14 | 220:3 | thing 154:24 | 236:2 238:2 |
| suggest | 253:21 | talked 184:3 | 223:1 | 184:8 | 258:6,12 |
| 193:24 | surrounding | 195:7 | 224:20,21 | 171:23 | 248:21 |
| suggested | 192:3 | 254:1 259:9 | 246:24 | 180:18 | 249:3 |
| 252:7 | 205:18 | talking 161:3 | 248:7 247:6 | 179:8,10 | 259:8,9,10 |
| suggestion | surroundin... | 173:3 | 257:24 | 188:18 | third 227:23 |
| 243:2 | 191:8 | 197:23,24 | tens 244:14 | 253:17,17 | THOMAS |
| suggests | Susmilch | 198:10 | term 137:16 | 256:18 | 130:7 131:13 |
| 189:11 | 174:13 | 211:3,15 | 141:20 | things 138:4 | 131:4 260:7 |
| 221:12 | suspect 141:6 | 221:11 | 179:6 | 145:14 | thorough |
| 242:16,24 | 142:19 | 231:17 | 209:23 | 164:7 | 178:11,17 |
| suing 212:4 | 156:19 | 252:12 | 219:20 | 167:9 | 190:24 |
| summarize | sworn 133:2 | 219:20 | 219:2 | 242:24 | 261:24 |
| 183:4 | 133:6 | 219:10 | term 153:5 | 252:11 | thoroughly |
| summer | 260:11,20 | task 203:17 | 157:11 | 179:5,8 | 177:11,16 |
| 231:2 | system 232:1 | 218:12 | 160:20 | 193:12 | 177:18 |
| Sun-Times | systems | 219:21 | 197:24 | 197:24 | thought |
| 230:4 | 142:19 | 203:3,18 | 174:3 | 232:19 | 152:10 |
| supervising | | 259:2 | 179:4,21,24 | 233:8 245:9 | three 182:6 |
| 250:15 | T | target | 133:6 | think 137:16 | 222:19 |
| support | T 132:10 | 134:21 | testified | 141:21 | 231:21 |
| 243:3 | 133:8,8 | taxpayers | 187:13 | 147:16 | 247:12,15 |
| supposed | 251:17 | 229:16 | 141:21 | 148:13,16 | 255:2 257:9 |
| 144:19 | 254:16,16 | 242:24 | 218:21 | 151:16 | threshold |
| 146:14 | take 174:16 | 243:14 | 151:6 | 152:5 153:3 | 136:19 |
| 168:2 | 179:4 185:3 | teach 232:18 | 254:22 | 154:6 157:5 | 255:2 257:9 |
| 170:16 | 191:24 | team 193:8 | 252:21 | 215:16 | time 135:4 |
| 171:20 | 202:14 | 194:20 | 216:21 | 216:21 | 162:4 |
| sure 141:19 | 209:20 | 201:5 220:8 | 162:4,5 | 169:4 174:2 | 165:21 |
| | | team's | 176:3,20 | 176:3,20 | 168:13 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 25

| | | | | | |
|---|---|---|---|---|---|
| 174:16 | 160:19 | 181:2,24 | trouble | 241:18 | 135:3,10,15 |
| 190:23 | 162:1 | 182:4 187:4 | 209:16 | 246:4 | 141:9 |
| 191:23 | 172:13 | 187:5 194:4 | true 160:18 | 247:12,14 | 143:12 |
| 198:20 | 185:2 | 194:5,7 | 240:12 | 247:15 | 144:10 |
| 207:6 | 190:13 | 196:13 | 252:2 | 244:10 | 155:22 |
| 211:20 | 192:13 | 253:21,24 | 260:17 | 249:15 | 159:3 161:7 |
| 223:7 | 196:11 | 254:18 | 261:13 | two-year | 166:17 |
| 225:17 | 200:5 | 255:12,23 | truth 261:8 | 244:5 | 166:6,9,19 |
| 226:3 | 204:24 | 257:6,8 | try 160:5 | typewriting | 188:2 |
| 227:23 | 209:16 | topper | 168:16,22 | 261:20 | 199:21 |
| 238:9 244:5 | 211:16 | 253:11 | 174:4 | typical 149:7 | 223:10 |
| 248:14 | 223:8 | total 221:7 | 182:19 | 153:6 | 248:7 253:1 |
| 253:8 | 226:23 | 244:9 | 204:19 | typically | 257:7 |
| 260:16 | 228:10 | transcript | 256:16 | 142:12 | undertake |
| 261:11 | 230:20 | 199:10 | trying 211:10 | 151:18 | 244:24 |
| timeline | 231:17 | 260:13,17 | 212:11 | 156:11,18 | undertaken |
| 146:4 | 237:12 | transcripts | 213:1,9 | 156:22 | 220:18 |
| times 150:1 | 240:9,17 | 260:13,17 | 234:6 | | undertaking |
| 176:21 | 243:17 | transfer | 243:21,22 | U | 219:12 |
| 227:1 259:8 | 197:19 | 196:6,23 | tunnel 178:8 | UFAS 167:8 | Unfortunat... |
| timetable | 245:12 | 198:22,24 | 179:22 | 167:16 | 243:11 |
| 188:19 | 198:5,15,15 | 244:23 | 185:13,14 | Uh-huh | uninterrup... |
| Title 231:8,9 | 198:22,24 | 244:23 | 186:3 | 142:7 | 258:20 |
| titled 178:8 | 251:3 | 201:10,19 | 187:4 | ultimately | unit 160:13 |
| today 192:11 | 252:10 | 201:22 | 208:20 | 245:1 253:3 | United 130:1 |
| 192:12 | 252:18 | 202:13,18,18 | 211:12 | uncompliant | 130:14 |
| 194:12,16 | 254:2 | 202:20 | 217:22 | 210:6 | 243:19 |
| 195:8,19 | 256:22 | 203:1,20 | 222:14,15 | uncomplied | 260:1 |
| 196:12 | 263:2 | 203:4,9 | 233:21 | 209:10 | units 165:24 |
| 197:17 | 210:20 | 210:20 | 234:3 | universal | 249:4 |
| 214:22 | 221:4 | 234:3 | 258:13 | 141:14,20 | 167:24 |
| 217:20 | 241:21 | 234:3 | 258:13 | 233:13 | 243:8 |
| 223:15 | 142:3,8 | 137:14 | underscore | unpack 241:8 | 241:11 |
| 225:20 | 144:15 | 218:24 | 196:15 | unusual | 216:17 |
| 249:5 | 150:17 | 139:3,4 | understand | 149:8 | 247:22 |
| today's | 151:2,7,12 | 185:15,22 | 146:14 | update | 247:24 |
| 239:24 | 151:14 | 186:3 192:3 | 148:12 | 253:18 | |
| toilet 160:21 | 152:12,18 | 206:1,7 | 155:16 | upgrades | |
| told 184:5 | 153:6,9 | 242:11 | 176:23 | 200:11 | |
| tolerances | 242:11 | 248:12,17 | 220:16 | 202:18 | |
| 144:17 | 157:18 | 253:7 | 221:11 | 209:21 | |
| Tom 135:5 | 158:8,12 | treated | 209:6 | 241:11 | |
| 155:3 | 177:23 | 136:24 | 233:10 | 216:17 | |
| | 180:13 | tried 202:10 | 186:7,15 | 247:22 | |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
June 5, 2024

Page 26

| | | | | | |
|---|---|---|---|---|---|
| upper 155:8 | 141:15 | 230:14 | walking | 233:24,24 | 260:3 |
| 158:6 182:2 | variety | violation | 135:19 | 233:19 | wheel 142:13 |
| 252:13 | 140:22 | 140:13 | 137:1 | 241:24 | wheelchair |
| 253:11 | 141:8 | 144:6 | walkway | 243:4,16 | 142:12,21 |
| 256:8 | 143:15 | 163:20 | 136:21 | 242:24 | 143:16 |
| upwards | 161:13 | 182:1 | 137:8 | 247:20,23 | wall 145:8 |
| 240:23 | 175:2 | 227:21 | walkways | 253:10 | 160:3 |
| urgency | various 192:1 | 229:22 | 138:9,13 | 160:3 | 161:14 |
| 196:15 | 192:2 | 235:22 | wall 145:12 | ways 252:7 | 171:4,21 |
| 197:2 | vast 206:2 | violations | 258:20 | we'll 185:8 | 172:10 |
| use 142:16 | vendor 191:4 | 183:1,2 | wall 138:10 | 172:10 | 173:6 |
| 145:24 | verify 156:24 | 184:19 | 184:9 | 173:6 | 176:16 |
| 155:7 | versed | 189:2 190:6 | 185:5 | 182:6 | 184:23 |
| 161:18 | 178:19 | 190:11 | 209:23 | 210:21 | 185:16,24 |
| 171:19 | version | 203:21 | 210:6 | 228:17 | 186:5 |
| 180:16 | 153:11,13 | 209:8,22 | 211:12 | 236:10 | 206:7 |
| 185:3 186:7 | 153:19,22 | 236:8 | 217:17 | 236:10 | 218:17 |
| 186:16 | 154:1,3,15 | 244:17 | 236:6 | 228:24 | 219:4 |
| 208:24 | 154:21 | 254:20 | 241:24 | 242:13 | 222:18 |
| 209:23 | 172:16 | 249:6 | 233:21,22 | 243:3 | 235:12 |
| 222:17 | vertical | vs 130:5 | 233:23 | 244:24 | 236:13 |
| user 163:9 | 157:18 | 260:5 | 253:16,17 | 237:3 | 239:15 |
| 184:24 | vertically | | 236:8 | 249:6 | |
| users 143:16 | 140:8,12,19 | W | 256:8 | we've 184:6 | |
| 167:16 | 131:1 | wait 200:14 | 258:5 | 239:7 | 241:1 248:3 |
| 143:13 | 142:9 | 215:17 | wants 233:14 | Website | 244:9 |
| usually 148:9 | 164:21 | 255:2 | 249:17 | 248:13 | 249:17,23 |
| 149:8 | 165:15,16 | waiting | warning | 254:1 | 264:20 |
| utilize 141:16 | 165:19 | 184:20 | 184:20 | week 225:23 | wheelchairs |
| | 167:1 | 201:6 | 212:5 | weeks 197:15 | 160:9 186:7 |
| V | 172:16 | 226:20 | Washington | 141:4 | 164:14 |
| variance | wafer | 269:10 | 194:13 | went 217:4 | 160:23 |
| 146:9 | 142:22 | 201:6 | 226:9 | 240:8 | weren't |
| 151:12,17 | 161:15 | 226:20 | watch | way 141:22 | 237:23 |
| 151:23 | 180:17 | walkers | 145:10,12 | 145:10,12 | 238:8,12 |
| 152:15 | 198:2 | 181:20 | 222:3 | 238:8,12 | west 131:13 |
| variation | 137:20 | 143:16 | 231:3 | Western | 144:17 |
| 145:7 | 177:23 | 162:16 | 209:1 | 131:5 | 259:9,11 |
| 252:5 | 183:10 | 186:7,15 | 213:11 | Westmorel... | witness 132:1 |
| variations | 208:12 | 141:5 | 213:14 | 131:13,5 | 133:1,5 |
| 144:16 | 209:6 | 143:16 | 186:18,20 | 133:14 | 150:21 |
| 156:14 | violating | 162:16 | 216:17 | 193:11 | 205:8 238:3 |
| varieties | 137:5 | 218:16 | 218:16 | 205:6 238:3 | 185:21 |

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 40

ERIC DAVIS
June 5, 2024

Page 27

| | | | | | |
|---|---|---|---|---|---|
| 188:7 195:6 | 242:17,22 | 169:6 | 240:9,10,16 | 246:13 | **12th** 198:1,13 |
| 199:8,19 | 243:5,20 | 178:15 | 243:7 252:4 | 260:13 | 262:2 |
| 201:16 | 245:8 | 187:11 | 252:11 | **1-260** 260:15 | **133** 132:4 |
| 202:9 | **worked** | 188:8 | 253:19 | 1/2 182:11 | **142** 132:13 |
| 203:15 | 159:9 | 189:21 | 254:3 258:7 | **1:00** 197:16 | **150,000** |
| 204:5 | **working** | 192:8 198:3 | **yesterday's** | **10** 137:11 | 221:9 |
| 206:17 | 146:2 163:8 | 194:22 | 206:6 | 153:2 | **16** 136:21 |
| 207:14 | 163:14 | 207:15 | **young** 232:20 | 158:17 | 221:7 255:5 |
| 214:1,12 | **wouldn't** | 213:19 | | 165:20 | 255:8 |
| 230:19 | 155:12,12 | 216:15 | **Z** | 167:14,22 | **162** 132:14 |
| 237:10,20 | 161:18 | 217:8 228:9 | **Zach** 253:2 | 180:24 | **19** 166:6 |
| 238:5 | 170:3 | 230:20,22 | **ZACHARY** | 207:17 | **1980** 172:3 |
| 239:19 | 174:16 | 247:15 | 131:12 | 213:4 | **1988** 167:15 |
| 240:7 | 218:13 | 252:6 | **Zoom** 130:11 | **100** 168:18 | **1989** 133:17 |
| 245:22 | 226:15 | 253:16,22 | 181:14 | 220:3 252:1 | **1990** 166:7 |
| 251:6 | **wraparound** | 256:20 | 231:15 | **100,000** | **1991** 134:7 |
| 256:21 | 209:24 | **year** 207:3 | | 221:5 | 137:24 |
| 258:4 | 210:18 | 216:22,22 | **0** | 223:14,21 | 139:8 |
| 259:19 | **wrapping** | 217:9 218:11 | **084-003813** | **102,000** | 158:24 |
| 261:7,7 | 250:3 | 218:9,15 | 262:9 | **10257** 131:5 | 163:24 |
| 262:1 | **write** 251:20 | 219:11 | | **11** 143:5 | 164:10,13 |
| **woman** | **written** | 220:20,24 | **1** | 144:6 | 164:24 |
| 194:10,11 | 232:10 | 221:2 | **1** 132:13 | 165:17 | 166:5,8,10 |
| **word** 157:13 | 251:21 | 237:24 | 135:20 | 180:24 | 166:11 |
| 161:18 | **wrong** 140:1 | **years** 133:21 | 136:1,5,10 | 182:5 | 167:15,16 |
| 162:1 | 154:12 | 155:23 | 136:18,19 | 214:10 | 168:1,24 |
| **words** 136:20 | 155:3 | 181:13 | 136:19,21 | **11.7** 182:12 | 169:2,4 |
| 138:20 | | 186:13 | 136:23,24 | **12** 136:5,10 | 171:11 |
| 161:21 | **X** | 210:6 216:2 | 137:2,2,5,8 | 136:18,19 | 172:8 177:5 |
| 251:24 | **X** 132:1,10 | 240:4 241:7 | 137:11 | 187:15 | 187:15 |
| **work** 133:18 | 133:8 | 241:18 | 138:1,13 | 136:23 | 188:3 207:5 |
| 145:1 163:8 | 251:17 | 247:12,14 | 138:13 | 137:2,5,8 | 231:10 |
| 195:2 201:9 | 254:16 | 247:15,18 | 139:7 142:6 | 138:1,14 | 232:10 |
| 202:22 | | 248:3,9 | 143:5 178:8 | 139:7 142:2 | 234:17 |
| 204:16,22 | **Y** | 255:2 | 178:21 | 147:3 144:5 | 235:15,23 |
| 205:15,21 | **yeah** 133:21 | **yesterday** | 182:5,13 | 144:14,20 | 236:6 |
| 210:14 | 137:22 | 152:23 | 185:13 | 145:17 | **1998** 133:20 |
| 222:22 | 139:14 | 160:19 | 189:17 | 146:8,15 | **1st** 154:9 |
| 224:15 | 150:10,16 | 174:11 | 190:1,2,16 | 147:5 181:3 | 177:12 |
| 225:4,8,11 | 152:23 | 187:13 | 191:6 | 182:23 | |
| 225:19 | 154:11,20 | 188:11 | 191:5 192:4 | **12-inch** 142:9 | **2** |
| 227:15,20 | 155:1,16 | 194:2 195:7 | 192:22 | 143:13 | **2** 130:6,10 |
| 228:21 | 162:4,12 | 196:15 | 193:9 221:7 | 145:5 | 163:3 221:8 |
| 232:6 238:7 | 168:20 | 223:3,3 | 221:14 | 180:12 | 246:14 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
June 5, 2024

Page 28

| | | | | | |
|---|---|---|---|---|---|
| 252:15,21 | 232:9 | **3** 182:11 | **505**-10.1 | **8** 132:14 | |
| 260:6,14 | 234:17 | 246:14 | 141:23 | 162:21,24 | |
| **20** 133:20 | 235:8,15,23 | 257:3 | **505.4** 140:4 | 165:5 178:7 | |
| 20 133:20 | 236:6 | **3:00** 192:16 | 57 171:7,2,8,19 | 188:18,23 | |
| 135:20 | 241:19 | 192:19 | 172:7,24 | 205:10,24 | |
| 136:1,19,24 | **2011** 169:12 | 192:19 | 175:20 | **8.5** 182:13 | |
| 137:2 | 175:23 | **30** 157:13 | **5th** 221:18 | **84** 155:22 | |
| **200,000** | **2012** 172:20 | 158:3,9,12 | | **85** 152:19,24 | |
| 221:15 | **2013** 169:15 | 170:19 | **6** | 153:4,6,7 | |
| **2000** 164:10 | **2015** 212:18 | 172:4,23 | **6** 157:9 | 155:8 | |
| 187:14 | **2017** 239:11 | 173:22 | 159:21 | | |
| 209:6 | **2018** 237:18 | 175:13 | **60** 152:21 | **9** | |
| **2010** 134:8 | 237:24 | 199:15 | 158:20 | **9** 151:8,10 | |
| 134:20 | 238:13 | **300-4479** | 161:3,20,22 | 152:7 | |
| 135:15 | **2022** 237:15 | 131:14 | 162:3 165:6 | 165:20 | |
| 136:16 | **2024** 130:18 | 131:14 | 170:23 | 213:13,14 | |
| 137:6,13,20 | 154:13 | 181:12 | 171:3,7,8 | 213:16,22 | |
| 137:23 | 177:12 | **34** 140:7,11 | 171:14 | 254:19 | |
| 139:8 | 198:1,13 | 140:11,19 | 173:3,20 | **9-inch** 152:3 | |
| 140:14,17 | 204:2 | 182:20 | 176:19 | **91** 143:1 | |
| 143:6,12 | 216:22 | **38** 140:7 | 178:1 | 165:17,18 | |
| 144:7,10,13 | 217:9 218:7 | | 187:10,17 | 165:22 | |
| 145:23 | 218:9 | **4** | 194:7 | 172:16 | |
| 148:3 156:5 | 221:18 | **4** 260:14 | | | |
| 158:23 | 222:5 | **4,000** 229:21 | **60-inch** 159:1 | | |
| 161:6 169:7 | 225:22 | 230:15 | 160:20 | | |
| 169:7,11,16 | 239:12 | **4.27** 182:3 | 161:11 | | |
| 169:19 | 250:8,12 | **4.56** 182:4 | 162:6,13 | | |
| 170:1,23 | 260:14,14 | **405** 136:7 | 175:23 | | |
| 172:21 | 260:22 | 139:20 | 182:8 | | |
| 173:1,16,24 | 262:2 | **405.2** 136:9 | 258:17 | | |
| 177:5,23 | **23-cv-1851** | **405.3** 139:21 | **60-inch-long** | | |
| 178:24 | 130:5 260:5 | **405.6** 157:12 | 255:14 | | |
| 180:15 | **230** 131:13 | **45** 181:13 | 255:18 | | |
| 181:6 | 131:13 | 192:20 | **6060** 6 131:14 | | |
| 182:14 | **233-7901** | | **60643** 131:6 | | |
| 183:2,10,18 | 131:6 | **5** | **6th** 154:13 | | |
| 184:1 207:8 | **24th** 222:4 | **5** 130:17 | | | |
| 208:12 | **251** 132:5 | 164:16 | **7** | | |
| 209:8,14 | **254** 132:7 | 179:24 | **7** 205:10 | | |
| 217:2 219:5 | **25th** 154:12 | 199:22,24 | **72** 161:23 | | |
| 227:21 | **26** 133:21 | 191:12 | **773** 131:6 | | |
| 228:4 | | 260:14 | | | |
| 231:10 | **3** | **50** 210:6 | **8** | | |
| | | **505** 140:20 | | | |

TOOMEY REPORTING
312-853-0648

Exhibit 2 Page 41