Transcript of the Testimony of
**ERIC DAVIS**

**Date:** December 19, 2019

**Case:** JASON SHAUGHNESSY v. THOMAS DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

Page 1

```
              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
JASON SHAUGHNESSY,          )
                            )
          Plaintiff,        )
                            )
            vs.             )  No. 18 cv 6803
                            )
THOMAS DART, SHERIFF OF     )
COOK COUNTY, and COOK       )
COUNTY, ILLINOIS,           )
                            )
          Defendants.       )
                   and
JAMES DANIEL JOHNSON,       )
                            )
          Plaintiff,        )
                            )
            vs.             )  No. 16 cv 4074
                            )
THOMAS DART, SHERIFF        )
OF COOK COUNTY, and         )
COOK COUNTY,                )
                            )
          Defendants.       )
                   and
ERICK COLEMAN,              )
                            )
          Plaintiff,        )
                            )
            vs.             )  No. 18 cv 4480
                            )
THOMAS DART, Sheriff of     )
Cook County, Illinois,      )
                            )
          Defendant.        )

                   and
```

TOOMEY REPORTING
312-853-0648

---

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
 3  DEONTRA SPENCE,             )
                                )
 4        Plaintiff,            )
                                )
 5          vs.                 )  No. 18 cv 4258
                                )
 6  THOMAS DART, Sheriff of     )
    Cook County, and            )
 7  COOK COUNTY, ILLINOIS,      )
                                )
 8        Defendants.           )
 9          This is the deposition of ERIC DAVIS,
10  called by the Plaintiff for examination, taken
11  pursuant to the Federal Rules of Civil
12  Procedure for the United States District Courts
13  pertaining to the taking of depositions, taken
14  before PEGGY A. ANDERSON, a Certified Shorthand
15  Reporter of the State of Illinois, at 10150
16  South Western Avenue, Chicago, Illinois, on
17  December 19, 2019, at 11:30 a.m.
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

Page 3

```
 1  A P P E A R A N C E S :
 2
 3          THE LAW OFFICES OF:
            THOMAS G. MORRISSEY, LTD.
 4      BY:  MR. PATRICK W. MORRISSEY
             10150 South Western Avenue
 5             Rear Suite
               Chicago, Illinois  60643
 6             (773) 238-4235
               patrickmorrissey1920@gmail.com
 7
               Appeared on behalf of the
 8             Plaintiff;
 9          THE LAW OFFICES OF:
            JOHNSON & BELL, LTD.
10
11      BY:  MR. MICHAEL R. SHERER
             33 West Monroe Street
12             Suite 2700
               Chicago, Illinois 60603-5404
13             (312) 984-6655
               shererm@jbltd.com
14             Appeared on behalf of the
               Defendants.
15
16
17
18
19
20
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 1

ERIC DAVIS
December 19, 2019

Page 4

```
 1              I N D E X                    PAGE
 2    WITNESS                                PAGE
 3    ERIC DAVIS
 4    DIRECT EXAMINATION BY
      MR. MORRISSEY:                         5-94
 5    CROSS-EXAMINATION BY
      MR. SHERER:                            95-101
 6
 7    REDIRECT EXAMINATION BY
      MR. MORRISSEY:                         102-104
 8
 9              E X H I B I T S
10    MARKED                                 PAGE
11    PLAINTIFF'S EXHIBIT NO. 1              64
12    PLAINTIFF'S EXHIBIT NO. 2              11
13    PLAINTIFF'S EXHIBIT NO. 3              48
14    PLAINTIFF'S EXHIBIT NO. 5              73
15    PLAINTIFF'S EXHIBIT NO. 7              24
16    PLAINTIFF'S EXHIBIT NO. 8              76
17    PLAINTIFF'S EXHIBIT NO. 10             83
18    PLAINTIFF'S EXHIBIT NO. 11             59
19
20                    *******
21
22
23
24
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 5

```
 1         (WHEREUPON, the witness was
 2          first duly sworn.)
 3    MR. MORRISSEY:  This is the
 4    deposition in Shaughnessy versus Dart taken
 5    pursuant to notice and continued to this
 6    date.  We're also going to cover Johnson
 7    versus Dart, Coleman versus Dart and Spence
 8    versus Dart.
 9         MR. SHERER:  Got them all in?
10         MR. MORRISSEY:  I think so.
11    WHEREUPON:
12              ERIC DAVIS,
13    called as a witness herein, having been first
14    duly sworn, was examined and testified as
15    follows:
16         D I R E C T   E X A M I N A T I O N
17              BY MR. MORRISSEY:
18    Q    Can you please state your name?
19    A    Eric Davis.
20    Q    Mr. Davis, what is your title?
21    A    I am the Deputy Director of the Cook
22    County Department of Capital Planning and
23    Policy.
24    Q    Have you worked in that capacity
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 6

```
 1    since April 10th of 2017?
 2    A    I believe that's the date I started,
 3    yes.
 4    Q    In your career, have you taught
 5    building codes?
 6    A    Yes.
 7    Q    And you've taught about the Americans
 8    with Disabilities Act?
 9    A    That's correct.
10    Q    Explain to me where you taught about
11    the ADA.
12    A    I was a lecturer in the Department of
13    Architecture, Interior Architecture and Design
14    Objects at the school of the Art Institute of
15    Chicago.  I taught courses to undergraduates
16    and graduates.  My graduate courses included a
17    course that covered building codes and the
18    Americans with Disabilities Act among other
19    things.
20    Q    When did you teach that graduate-
21    level course about building codes and the ADA?
22    A    I believe I started in either 2013 or
23    2014, and I taught that course multiple times.
24    I believe I taught it three times.
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 7

```
 1    Q    Are you familiar with the
 2    Rehabilitation Act of 1973?
 3    A    Yes.
 4    Q    In your graduate-level course, did
 5    you teach about the Rehabilitation Act?
 6    A    Given the variety of subjects to
 7    cover in that professional practice class, we
 8    focused on the ADA mostly and didn't really get
 9    drilled down to all the connected documents and
10    regulations.  We did some of them, but we
11    didn't, by any means, do all of them.
12    Q    To your knowledge, does the
13    Rehabilitation Act have any standards for
14    toilets and sinks?
15    A    I don't remember.  I would assume so,
16    but I don't remember.
17    Q    Have you ever heard of the term UFAS?
18    A    Yes.  I believe it stands for Uniform
19    Facility Access Standards or Accessibility
20    Standards.
21    Q    To your knowledge, does the
22    Rehabilitation Act cover entities that receive
23    federal financial assistance?
24         MR. SHERER:  I'm just going to object
```

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 2

**ERIC DAVIS**
**December 19, 2019**

Page 8

1      for the record to the extent that this
2      question calls for a legal conclusion, but
3      if you understand.
4 BY THE WITNESS:
5      A   I don't.  I don't know that
6 specifically.
7 BY MR. MORRISSEY:
8      Q   Have you ever studied the regulations
9 pertaining to the Rehabilitation Act and
10 construction of buildings or alteration of
11 buildings after March 7th, 1988?
12      A   Perhaps.  I don't remember
13 specifically that element of the regulations.
14      Q   Do you know whether the UFAS requires
15 an accessible toilet to have grab bars mounted
16 near the toilet?
17      MR. SHERER:  Same objection, but you
18      can answer.
19 BY THE WITNESS:
20      A   I don't know.  It wouldn't surprise
21 me, but I'm more familiar with more recent
22 laws.
23 BY MR. MORRISSEY:
24      Q   Which more recent laws are you

TOOMEY REPORTING
312-853-0648

---

**ERIC DAVIS**
**December 19, 2019**

Page 9

1 familiar with?
2      A   The Americans with Disabilities Act,
3 the Illinois Accessibility Code.  Those are the
4 main ones and the similar elements of local
5 regulations.
6      Q   For a building that's constructed in
7 2012, a public building, does the ADA, to your
8 knowledge, require a grab bar near the toilet
9 for an accessible toilet?
10      MR. SHERER:  Same objection, calls
11      for a legal conclusion.  You can answer.
12 BY THE WITNESS:
13      A   I believe that it does.
14      MR. SHERER:  And I will just put a
15      standing objection on the record in terms
16      of requirements of the ADA.
17 BY MR. MORRISSEY:
18      Q   Michael Gumm was the ADA coordinator
19 for the part of Capital Planning and Policy; is
20 that true?
21      A   He was for a time, yes.
22      Q   Presently, is there anybody who works
23 in that capacity?
24      A   That position has not been filled

TOOMEY REPORTING
312-853-0648

---

**ERIC DAVIS**
**December 19, 2019**

Page 10

1 since he vacated it.  In the interim, I'm the
2 subject matter attorney for the County.
3      Q   What documents did you review prior
4 to coming here today to testify?
5      A   What documents did I review?
6      Q   Correct, to prepare yourself to come
7 here today to testify.
8      A   I don't know if I can give you a full
9 accounting of that.  I think I looked at things
10 that I said in the past, you know.
11      Q   Did you review your deposition
12 transcript from Bennett versus Dart that was
13 taken on March 28th, 2019?
14      A   Briefly.
15      Q   And when you testified on March 28,
16 2019, you were working to fill the position of
17 the ADA coordinator for the DCPP?
18      A   I was serving as the interim subject
19 matter expert.  I was not in that position.
20      Q   Do you have any date when you expect
21 to have an ADA coordinator?
22      A   The search is ongoing.  This is a
23 very competitive job market.  It's difficult to
24 find suitably-qualified people in this job

TOOMEY REPORTING
312-853-0648

---

**ERIC DAVIS**
**December 19, 2019**

Page 11

1 market, but we are continuing to look.
2      Q   Are you directly involved in
3 implementing and developing ADA program
4 policies and procedures and guidelines for Cook
5 County facilities?
6      A   When you say "directly involved,"
7 what do you mean?
8      Q   Well, do you remember in your prior
9 deposition we reviewed your report from the
10 Roberts case?
11      A   Okay.
12      Q   Would you like a copy of it?
13      A   Sure.
14      Q   Showing you what I'm going to mark as
15 Exhibit 2.  It's a report of Eric Davis that we
16 discussed in your prior deposition.
17      (WHEREUPON, Plaintiff's
18      Exhibit No. 2 was marked
19      for identification.)
20 BY MR. MORRISSEY:
21      Q   Do you remember reviewing this
22 document or going over it?
23      A   I believe I did look it over at some
24 point, yes.  Yes, I did look it over at some

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 3

ERIC DAVIS
December 19, 2019

Page 12

point.

Q     The last paragraph of the first page --

A     Okay, yeah.  "Participating in,"
yeah.

Q     What do you mean by you're directly
involved in developing, implementing ADA
program policies, procedures and guidelines for
Cook County facilities?

A     I want to make sure that I speak
clearly.  The annual capital improvement plan
budget includes projects that have an ADA
component to them.

We are involved in continuing the
effort to address a wide variety of ADA
concerns in the county's 19 million square
feet.

To that end, I helped put together
the capital improvement plan that addresses
those; and on a project-by-project basis, I'm
often consulted on ADA questions.

Q     How were you consulted on ADA
questions?

A     All of our projects are managed by
project directors and our projects are for

---

ERIC DAVIS
December 19, 2019

Page 13

individual user agencies.  We undertake a
development of the scope of a project; and as
it's implemented, depending on how it's
implemented, there may be other questions that
come up on a project, depending on the delivery
method.

Q     Is it fair to say that you're not
involved in the operations of the Department of
Corrections?

A     That's correct.  I have nothing to do
with the operations of the Department of
Corrections.

Q     What is your understanding of
"operations"?

MR. SHERER:  Object to the form.

BY THE WITNESS:

A     What do you mean?

MR. SHERER:  Yeah, if you understand
it, you can answer, but.

BY THE WITNESS:

A     You don't have time for the entire
operations of the jail.  What are you asking me
about?

---

ERIC DAVIS
December 19, 2019

Page 14

BY MR. MORRISSEY:

Q     Well --

A     No, I'm not being flippant.  The jail
is an incredibly complicated endeavor involving
thousands of people.  So what are you asking
about?

Q     Is it fair to say you have never
given any guidance to the Sheriff's Office how
to formulate a policy or procedure to assist
inmates shower?

A     That is correct.  I have nothing to
do with their operational policy.

Q     Is it fair to say you have never
given any guidance to the Sheriff's Office how
to formulate a policy or procedure to assist
inmates use the toilet in Division 10?

A     I don't believe I have given any
guidance in that area at all.

Q     Is there a reason why you haven't?

A     Because the Sheriff is in charge of
operations.

Q     Now, you know that there is a ramp,
two ramps, leading up to the Leighton
courthouse?

---

ERIC DAVIS
December 19, 2019

Page 15

A     Two?  I think you are talking about
the bridge.

Q     The bridge, correct.

A     Yeah, yeah.

Q     Is it fair to say that in your
capacity as the deputy director for Cook County
Department of Capital Planning and Policy, you
have not given any guidance to the Sheriff's
Office to assist inmates move up and down that
ramp?

A     That's correct.  I don't have
anything to do with how they operate that.

Q     Is there a ramp in the tunnels of the
jail leading to the Cermak building?

A     I believe there is.

Q     Is it fair to say as the Deputy
Director of Capital Planning and Policy, you
haven't given any guidance to the Sheriff's
Office to formulate a policy, procedure to help
inmates move up and down that ramp?

A     That's correct.  That's their
operations.

Q     The last page of the report, which is
Exhibit 2, talks about in April of 2014, a

Exhibit 4 Page 4

ERIC DAVIS
December 19, 2019

Page 16

1  policy and procedure was put in place to bring
2  detainees in wheelchairs to public ADA
3  restrooms at the courthouse, if necessary.
4      A    Uh-huh.  It notes that that is
5  information I obtained from the Department of
6  Corrections.
7      Q    After you became the deputy director
8  in 2017, do you have any knowledge whether any
9  wheelchair user was brought to an ADA
10  restroom at the Leighton Courthouse?
11      A    I haven't witnessed that.
12      Q    Has anybody told you that it
13  happened?
14      A    Probably.  I couldn't cite a specific
15  example though.
16      Q    Have you ever given any feedback or
17  comments to the Sheriff's Office regarding that
18  specific policy or procedure?
19      A    I'm sorry.  Regarding which specific
20  policy?
21      Q    The policy and procedure to bring
22  detainees in wheelchairs to ADA restrooms.
23      A    That's operations.  They do that.
24      Q    The question is:  Have you ever given

ERIC DAVIS
December 19, 2019

Page 17

1  any comments or guidance about that specific
2  policy of the Sheriff's Office?
3      A    No, not that I remember.
4      Q    The second page of your report, the
5  first full paragraph on that page --
6      A    Uh-huh.
7      Q    -- talks about reviewing some
8  material that was dated February of 2011
9  relating to ADA compliance and compliance with
10  the Rehabilitation Act; do you see that?
11      A    Uh-huh.
12      Q    That's a yes?
13      A    Yes.
14      Q    What is your understanding of what is
15  required of the CCDOC pertaining to compliance
16  with the Rehabilitation Act of 1973?
17          MR. SHERER:  Object, calls for a
18      legal conclusion.  You can answer, if you
19      understand.
20  BY THE WITNESS:
21      A    It is a very complicated area, and I
22  can't give a point-by-point specific answer to
23  your question.

ERIC DAVIS
December 19, 2019

Page 18

1  BY MR. MORRISSEY:
2      Q    Why do you say it's a complicated
3  area?
4      A    Because the laws change.
5      Q    To your knowledge, how has the law
6  changed pertaining only to the Rehabilitation
7  Act of 1973?
8      A    I haven't reviewed the Rehabilitation
9  Act specifically but, in general, my experience
10  has been that the laws related to the ADA are
11  interdependent.  I can't say specifically which
12  provisions are or are not still in force or may
13  have been superceded by subsequent law.  I am
14  not an attorney.
15      Q    Was the ADA, to your knowledge,
16  passed by Congress in 1990?
17      A    I thought it was '91, but okay.  It
18  may be the date of the document.  Around that
19  time, yeah.  It was either '90 or it might have
20  been signed -- I don't remember the exact
21  dates.  I know that it was around '90, '91.
22      Q    Prior to 1990, to your knowledge, was
23  there any federal requirement for the DOC to
24  provide toilets that met some federal

ERIC DAVIS
December 19, 2019

Page 19

1  structural standard for disabled people?
2          MR. SHERER:  Objection, asked and
3      answered.  Objection, calls for a legal
4      conclusion.  You can answer.
5  BY THE WITNESS:
6      A    I can't say.  I don't know.
7  BY MR. MORRISSEY:
8      Q    Presently, does the County receive
9  federal financial assistance, to your
10  knowledge?
11      A    What do you mean by "financial
12  assistance"?
13      Q    Do they receive money from the
14  federal government?
15      A    Sometimes.
16      Q    How do you know?
17      A    I only know about the funding that
18  directly affects capital projects.  Whether
19  they receive money for other programs, I don't
20  know.
21      Q    How are you made aware that there is,
22  at times, federal funding for capital projects?
23      A    Since I've been there, when we create
24  the capital improvement plan, there have been

Exhibit 4 Page 5

ERIC DAVIS
December 19, 2019

Page 20

1 one or two instances where we have sought or
2 received federal funding for capital projects.
3 Those are generally in the area of security,
4 period.  Almost the entire capital plan is bond
5 funds.  There may one or two projects in a
6 given year that have some federal funding
7 component, but almost the entire rest of it is
8 municipal bond funds.
9      Q    What security projects have you been
10 made aware of that have been funded in part
11 with federal assistance?
12      A    I'm not certain I'm allowed to answer
13 because some of them deal with homeland
14 security.  I'm not 100 percent certain I'm
15 allowed to get into that other than what's been
16 publicly published.
17      Q    What is publicly published relating --
18      A    What's published in the budget book
19 every year.
20      Q    Does it explain which project is
21 funded with federal funds?
22      A    I don't believe so.
23      Q    Does it relate to the DOC?
24      A    Not that I'm aware of, certainly not

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 21

1 to capital projects at the DOC at the jail
2 campus.
3      Q    Do you know when Cermak was
4 constructed?
5      A    I believe it was around '98.
6      Q    How do you know that?
7      A    I have a handwritten graph on my wall
8 that indicates approximate dates.  I don't have
9 any documentation of it.  Someone wrote down
10 dates of when these things were constructed.
11 That's the only reference I have to when these
12 things were constructed.  It's an old Xerox.  I
13 don't know who did it.
14      Q    Does the handwritten graph identify
15 that Division 10 was constructed in 1992?
16      A    That may -- I can't remember if
17 that's the exact date, but I believe it has a
18 date for that building, yeah.
19      Q    Do you know approximately the date?
20      A    That's about right.
21      Q    Now, in your report, you talk about
22 in 2014 Cermak met the requirements for
23 accessible rooms according to the Americans
24 with Disabilities Act for the 1990 version of

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 22

1 the ADA?
2      A    I'm sorry.  Which paragraph are you
3 looking at?
4      Q    The second full paragraph.
5           MR. SHERER:  On Page 2?
6           MR. MORRISSEY:  Yes.
7 BY THE WITNESS:
8      A    I believe I said it appears that it
9 met the requirements.
10 BY MR. MORRISSEY:
11      Q    And you're referring to 2014?
12      A    Correct.
13      Q    Do you have any reason now to comment
14 on whether that is correct?
15      A    I haven't done an analysis of
16 accessibility so I can't really give you any
17 details beyond a general impression.
18      Q    And you're the person in charge of
19 ADA accessibility for all county facilities?
20      A    Uh-huh, 19 million square feet.  To
21 be clear, in charge of the ADA is an
22 overstatement.  I provide insight.
23      Q    When Cermak was constructed in 1998,
24 to your knowledge, was there a requirement for

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 23

1 the shower areas to satisfy any structural
2 standards?
3      A    What do you mean by "structural
4 standards"?
5      Q    Relating to a fixed bench.
6      A    There would have been, yeah.
7      Q    How do you know there would have been
8 no standard for the shower area pertaining to a
9 fixed bench?
10      A    The requirements for an accessible
11 shower are stipulated in the 1990 or '91 ADA
12 and are also covered in the Illinois
13 Accessibility Code, which I believe was the
14 version which was also active at that time.
15      Q    When you became the deputy director
16 in April of 2017, do you know whether there was
17 any fixed bench in any of the shower areas in
18 Cermak?
19      A    No, I don't.
20      Q    Are you aware in the last few years a
21 fixed bench has been installed in some of the
22 shower areas?
23      A    A fixed bench?  I believe so.  I
24 believe so.  I don't remember.  I think so,

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 6

ERIC DAVIS
December 19, 2019

Page 24

1    yes.  I don't know if there actually were or
2    not.  I don't know.  I have not been through
3    them recently.
4        Q    To your knowledge, in the last year,
5    has there been a renovation to a tunnel from
6    Division 10 to Cermak?
7        A    Division 10?
8        Q    Correct.
9        A    I don't remember a project about the
10   tunnel in Division 10 other than work done in
11   that area when, I believe it was, Division 17
12   was taken down.
13       Q    What is your understanding of the
14   work done when Division 17 was taken down?
15       A    That was simply a case of closing
16   things off to provide a secure weather-tight
17   enclosure for the tunnel when the building
18   above it was removed.
19                    (WHEREUPON, Plaintiff's
20                    Exhibit No. 7 was marked
21                    for identification.)
22   BY MR. MORRISSEY:
23       Q    I'm showing you what's been marked as
24   Exhibit 7.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 25

1        MR. SHERER:  Is this the document you
2    sent me?
3        MR. MORRISSEY:  It is.
4        MR. SHERER:  Just for the record, I'm
5    going to make a Rule 26 objection.  I don't
6    believe this has been shared by either
7    party in discovery.
8        MR. MORRISSEY:  It's your client's
9    document though.
10       MR. SHERER:  Well, I mean, you got to
11   include it in a Rule 26 disclosure.  So
12   that's my objection for the record.
13       MR. MORRISSEY:  It wasn't my document
14   to disclose.  It was the County's document.
15   BY MR. MORRISSEY:
16       Q    Mr. Davis, going back to the
17   document, have you seen this document before?
18       A    Yes.
19       Q    What is this document?
20       A    It looks like a copy of an excerpt of
21   a report or scope document, something like
22   that; but I don't know where it comes from and
23   I don't know who created it.
24       Q    What report is this an excerpt of?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 26

1        A    As I said, I don't know where it
2    comes from.
3        Q    Prior to Monday, have you seen this
4    document before?
5        A    I don't -- No, I don't believe I
6    have.
7        Q    Do you recognize what this document
8    is depicting?
9        A    Yes.
10       Q    What is it?
11       A    It is a plan drawing of an area of
12   the tunnel ramp into -- into Cermak Health
13   Services facility.  Yeah, that's what it is.
14       Q    Have you ever walked in that tunnel
15   area?
16       A    I don't believe I have.
17       Q    The top of this document talks about
18   a walk-through from March of 2018?
19       A    Uh-huh.
20       Q    Is that correct?
21       A    That's what it says.
22       Q    Do you know whether there was a
23   walk-through of this area in March of 2018 with
24   anybody that you supervise?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 27

1        A    I believe there was a scope -- what
2    we call a scope walk for a project to do some
3    work in this area.
4        Q    What is a scope walk?
5        A    Before we issue instructions to a
6    design firm in this case -- and I would note
7    that the document says "for A/E via
8    procurement."  When we issue things to a design
9    firm, we want to make sure that our
10   instructions and expectations are clear and so
11   it is helpful to -- for someone from capital to
12   walk, in this case, with the user agency, which
13   would be the Department of Corrections to
14   verify that the scope that's being asked for by
15   the design firm complies with the client's
16   expectations.
17       Q    Have you ever conducted a scope walk?
18       A    I have been part of them.  I
19   generally -- If I go on them, it's with another
20   project director usually.
21       Q    Would a project director work in your
22   office?
23       A    Yes.
24       Q    Who are the project directors that

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 7

Page 28

1    work at the DOC?

2        A    The project director for most of our

3    capital projects at the DOC is Sheila Atkins.

4    There are project directors who have done --

5    who have been the PD on other capital projects

6    there, but she is the project director for most

7    every one of the projects there at the campus.

8        Q    In order for a scope walk to occur,

9    is there generally a business case by a user to

10   initiate this process?

11       A    Yes.

12       Q    Do you know whether there was a

13   business case pertaining to the Cermak ramp?

14       A    I don't recall if there was one

15   specific to this.  We had multiple projects at

16   different stages involved with the AD and the

17   campus.  So I don't recall if there was one

18   specific to this or whether it was included

19   within a larger project.

20       Q    What do you mean "a larger project"?

21       A    Sometimes we have what are called

22   county-wide projects that include multiple

23   sites because, at the time of the budget

24   formulation, it's not clear which elements for

Page 29

1    whatever reason would move forward or not move

2    forward during that fiscal year.  And so it's

3    making sure that we have the ability to move

4    forward with what we think is going to be able

5    to be achieved in that year.

6        Q    If it was derived from a larger

7    project, does a larger project start with a

8    business case?

9        A    Yes.

10       Q    So would it be your expectation that

11   a business case would address the Cermak ramp

12   to initiate the scope walk?

13       A    I would assume so.  In some cases,

14   business cases are generated years before and

15   carried over.  Sometimes they're new.

16       Q    And when a scope walk occurs, is it

17   just with the user agency and a member of your

18   office?

19       A    Sometimes, depending upon the

20   delivery method, it may have be done with

21   someone from facilities management if DFM is

22   doing a part of the work.  Generally, there's a

23   scope walk with the user beforehand; and then

24   when it's assigned to someone, they do a

Page 30

1    subsequent walk with the designer or the

2    contractor.

3        Q    Wouldn't the designer or contractor

4    be involved in the scope walk?

5        A    They would eventually walk -- I don't

6    know if this is from the walk with the

7    designer.  I would assume not since it says for

8    procurement.  So I would assume this is before

9    a designer was engaged for the project.

10       Q    And then after a scope walk, what are

11   the people that you supervise supposed to do?

12   What is a project director supposed to do after

13   a scope walk?

14       A    The project director in this case

15   works with our public safety consulting team to

16   develop the scope into something that can be --

17   into a document that can be the basis of a

18   procurement either for the services or

19   construction that is provided to our

20   procurement department who advertises for

21   services.

22       Q    Who would be involved in this public

23   safety consulting team?

24       A    We have a large team.

Page 31

1        Q    Do they work for you?

2        A    They work for the department.

3        Q    Do you supervise them?

4        A    I help supervise them.

5        Q    Who else supervises them?

6        A    They are also supervised by the

7    project director in this case.  They are also

8    supervised by the director of capital planning.

9    Some elements of what they do are supervised by

10   the director of financial controls in terms of

11   invoices.  So it's not a single point of --

12   There are multiple points of oversight to their

13   activities, depending on the subject.

14       Q    Are there any members of the public

15   safety consulting team that generally work at

16   the DOC or relating to DOC projects?

17       A    Uh-huh.

18       Q    Who are they?

19       A    I don't know if I'm able to give you

20   a complete list of who they are.  We have

21   multiple project managers from that team that

22   support our project director on various

23   projects.

24       Q    So, generally, after a walk-through,

Exhibit 4 Page 8

ERIC DAVIS
December 19, 2019

Page 32

1  would the project director coordinate with the
2  public safety consulting team to type up a
3  document?
4      A    Uh-huh.
5      Q    Is that correct?
6      A    Yes.
7      Q    Would it tend to look like Exhibit 7,
8  a portion of Exhibit 7?
9      A    It might be.  This might be included
10 or it might be redrawn.  You know, it varies.
11     Q    And then after -- Strike that.  Would
12 you agree generally there's some report that's
13 generated after the scope walk with the project
14 director and the members of the public safety
15 consulting team?
16     A    When you say a report, other than the
17 document for procurement, what are you
18 referring to?
19     Q    Well, is Exhibit 7 part of the
20 document that would go to the procurement team?
21     A    We might have documents like this,
22 yeah.  It says it's for procurement.  So this
23 kind of thing would be substantially what's
24 part of a procurement package.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 33

1      Q    And what does procurement do after
2  they receive a package?
3      A    A great deal.  I don't know if you
4  have time to get into the specifics of all that
5  they do.  I suspect not.  There are a lot of
6  regulations that procurement is required to
7  follow that can be complicated and time
8  consuming to execute.
9      Q    Based on your experience, can it take
10 a long time for the procurement department to
11 finalize the bid documents?
12     A    Yes, a very long time.
13     Q    Based on your knowledge, what is
14 required for a ramp under the ADA?
15     A    Currently?
16     Q    Well, if the ramp was constructed in
17 1998.
18     A    Whatever laws were in place in '98.
19 I don't think I can give a succinct answer
20 because there are a lot of elements.
21     Q    Well, if the ramp was built in 1998
22 at a public building, would it be required to
23 have a handrail?
24     A    The answer, I believe, is it depends.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 34

1  I believe that there are instances -- Well, I
2  should say:  There are instances where a ramp
3  could be built without a handrail.  It would
4  depend upon the specific configuration.  The
5  curb ramp that you go on from the street to the
6  sidewalk every day is not required to have a
7  ramp -- or handrail, but it's a ramp.
8      Q    So which ramps if it was built in
9  1998 would have to have a handrail, based on
10 your understanding?
11     A    Whatever the threshold was in effect
12 in '98 for the minimum rise that would require
13 a handrail.
14     Q    Looking at Exhibit 7, it talks about
15 the "Exiting ramp is 47 feet long without a
16 landing"?
17     A    Correct.
18     Q    "The scope of the ramp is within 1:12
19 maximum slop requirements, however the run
20 exceeds code requirements."
21     A    Uh-huh.
22     Q    Do you have any understanding, why it
23 says "the run exceeds code requirements"?
24     A    I believe what it's asserting is that

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 35

1  a ramp longer than 30 feet, which would provide
2  a rise of 30 inches is required to have an
3  intermediate landing or, I believe, was
4  required to have an intermediate landing.  I
5  don't know in '98 if it was.  I suspect it was.
6  I would have to go back and research it.
7      Q    Did the people within your department
8  have a recommendation relating to the Cermak
9  ramp?
10     A    I'm sorry?
11     Q    Did the people at work within your
12 office have a recommendation pertaining to the
13 Cermak ramp as reflected in this document?
14     A    This appears to be summarizing the
15 scope recommendations for renovations to that
16 ramp.
17     Q    Do you have any knowledge whether
18 this proposal was adopted by procurement?
19     A    Oh, I know that it was not.
20     Q    Why not?
21     A    This, I believe, was a project where
22 it was the County's intent to procure those A/E
23 services through what's called a task order.
24 There were a number of projects where in order

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 9

ERIC DAVIS
December 19, 2019

Page 36

1  to expedite execution of projects, we sought to
2  group projects together to make it easier and
3  faster to procure.  We based a lot of our
4  planning for 2019 around doing it that way.
5          That request was denied by the board
6  of commissioners, and so we have had to try to
7  procure projects like this through alternate
8  means.
9      Q    Do you know why it was denied by the
10 board of commissioners?
11     A    Do I know why it was denied?  There
12 were multiple concerns that one or more
13 commissioners had about procuring these
14 services that way through the board.  So, I
15 mean, more than one commissioner raised
16 concerns about it, and we didn't proceed
17 because of their objections.
18     Q    So what is the procedure to move
19 forward with the work?
20     A    There are multiple other ways to try
21 to get these procured.  What we are doing now
22 is working with procurement to establish a
23 standard that would allow us to go forward.
24 We're still in negotiations with them to

ERIC DAVIS
December 19, 2019

Page 37

1  identify a way to do that that meets their
2  requirements.
3          Once that's complete, we expect to
4  move forward with many projects including
5  projects like this.
6      Q    Why do you intend to move forward
7  with this project?
8      A    That's an interesting question.  Why
9  do I -- I believe this is scope of work that
10 was included in what we intended to procure in
11 2019.  Assuming that that is, in fact, the
12 case, we want to accomplish those projects as
13 expeditiously as possible.
14         So if this was one expected to be
15 done in 2019 and was delayed because of that
16 procurement challenge, we would want to try to
17 execute it as soon as we are able to do so.
18     Q    But why is there a need to do some
19 work on the ramp?
20     A    I would have to go back and look into
21 what generated the specific request.  I assume
22 it was a request from the DOC, but it may have
23 been from -- anecdotal.  I don't know how it --
24 I don't know how it came to be in a business

ERIC DAVIS
December 19, 2019

Page 38

1  case that was the subject of the scope.  I
2  would have to go back and research why.  As you
3  said, I only got this document on Monday, so I
4  don't --
5      Q    Is there a priority level for this
6  project?
7          MR. SHERER:  Object to the form of
8      the question.  You can answer, if you
9      understand it.
10 BY THE WITNESS:
11     A    Yeah, priority from what standpoint?
12 BY MR. MORRISSEY:
13     Q    You mentioned the DOC --
14     A    Yes.
15     Q    -- initiated this project, correct?
16     A    I said I think it may have been one
17 of those generated by them.  I'm not
18 stipulating that I know for certain that they
19 are the ones that generated it.
20     Q    So earlier you mentioned this was a
21 task order?
22     A    It was intended to be included in a --
23 in a task order contract with architects and
24 engineers for various projects.

ERIC DAVIS
December 19, 2019

Page 39

1      Q    What is a task order?
2      A    Governments at multiple levels have
3  contracted with firms to provide multiple
4  projects that aren't necessarily completely
5  defined at the time of contracting; and so, for
6  example, the federal government does indefinite
7  delivery, indefinite quantity work called IDIQ
8  contracts because they know they are going to
9  need services in a certain area.  They don't
10 know what they are specifically.  So they hire
11 someone with certain parameters, and then they
12 assign them projects under that contract.  This
13 was essentially a version of that.  So we were
14 following a procurement method that many
15 agencies use in an attempt to move the project
16 forward.
17     Q    Have you ever used that procurement
18 method before?
19     A    Not with the County.
20     Q    Whose idea was it to attempt to use
21 this --
22     A    It was actually suggested to us by
23 procurement.
24     Q    To your knowledge, did you believe

Exhibit 4 Page 10

ERIC DAVIS
December 19, 2019

Page 40

1 the task order procurement method would cause a

2 project to be expedited?

3     A. Yes.

4     Q. What other projects were included in

5 this task order?

6     A. Several. I can't give you a

7 comprehensive list off the top of my head.

8     Q. Can you give me an incomplete list?

9     A. Generally, the intent was to do

10 projects that are smaller that are of a focused

11 nature that involve fewer trades or are within

12 the same area. For example, we might hire a

13 mechanical engineer to do a series of

14 mechanical engineering projects on a task-order

15 basis.

16     Q. Specifically, other than the Cermak

17 ramp, was there anything else that you are

18 aware of that was included in this task order?

19     A. Yes, lots of things.

20     Q. What else?

21     A. I can't give you a comprehensive list

22 off the top of my head. There are many. We

23 have been trying to get these things procured.

24 They have been broken up into different

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 41

1 categories to try to get them done. So I can't

2 honestly remember right off the top of my head

3 this "X" project was definitely on it. I

4 would have to go look it up. I don't know.

5     Q. Was there an expected budget for the

6 task order?

7     A. The task order contracts that were

8 put forward to the board were on the order of a

9 million dollars in fee per year for, I believe

10 it was, six firms to handle a variety of

11 projects.

12     Q. So each firm would have $1 million?

13     A. Up to.

14     Q. Was anything pertaining to Division 10

15 in this task order?

16     A. Possibly. I don't remember. I would

17 have to look.

18     Q. How would you find out?

19     A. To be clear, it was all preliminary

20 documents. They're preliminary until the board

21 approves them. So we can make requests, but

22 they are not official until they are approved.

23     Q. Was there a section of the county

24 board that considered the task order?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 42

1     A. Most of the things that we do go

2 through the asset management committee, and

3 then to the full board.

4     Q. When did the task order -- when was

5 that presented to the asset management

6 committee?

7     A. I can't remember. I would have to go

8 look. I would have to check the board

9 calendar. I don't remember. It was at some

10 point in 2019. I don't remember when.

11     Q. Did the committee approve it?

12     A. I don't usually go to those. The

13 director does. I don't remember if it was at

14 that or -- Honestly, I don't remember whether

15 it was that or the full board level. I believe

16 it was the committee level, but I don't

17 remember.

18     Q. So you believe it was struck down at

19 the committee level?

20     A. It was pulled.

21     Q. Was this an open meeting?

22     A. Yes.

23     Q. Were you told why the committee

24 members -- some of them didn't agree with this?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 43

1     A. The committee members' testimony is a

2 matter of public record. You can look it up.

3 They stated it. I don't know.

4     Q. Do you have any recollection of what

5 they stated?

6     A. I don't want to misattribute remarks

7 to one commissioner or another. You should

8 look it up.

9     Q. How would I look it up?

10     A. You can look things up through the

11 County Website. You can look up agendas. They

12 have videos. They have -- I don't know if they

13 have transcriptions. I believe they do. I've

14 never looked them up individually myself.

15     Q. Was it in the summer of 2019 that you

16 spoke to the committee?

17     A. Sounds right, yeah.

18     Q. Do you remember which month?

19     A. No, I don't, not offhand.

20     Q. Was there anything pertaining to the

21 Leighton Courthouse in this task order that was

22 proposed to the committee?

23     A. I don't remember one at Leighton.

24 No, I don't remember one. Leighton, as I know

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 11

ERIC DAVIS
December 19, 2019

Page 44

1  that you know, is the subject of a larger other
2  project.  So I don't know if there was anything
3  besides that that was on task orders.
4      Q   So what is the present status of the
5  Cermak ramp renovation?
6      A   We are attempting to procure the
7  services.  As I said, it's in line waiting for
8  approval of the alternate form of procurement.
9  Once that form of procurement is approved by
10 the procurement officer, we intend to issue a
11 number of other requests for proposal for
12 services like what's in this document.
13     Q   Do you have an idea of the expected
14 budget for the renovation?
15     A   Not offhand, no.
16     Q   Is it under a million dollars?
17     A   I don't remember.  That's a threshold
18 because of the way that our pre-qualified firms
19 are structured.
20     Q   From looking at Exhibit 7, is it your
21 understanding the recommendations are to comply
22 with some ADA standards?
23         MR. SHERER:  Object to the form,
24     calls for speculation, foundation.  You can

ERIC DAVIS
December 19, 2019

Page 45

1      answer.
2  BY THE WITNESS:
3      A   We always try to do things that are
4  compliant.  So I would assume, you know, yes.
5  Again, I don't know.  This is a copy of
6  something, so I don't know.  It looks like it.
7      Q   Is it fair to say you would have
8  access to a business case that pertains to the
9  Cermak ramp?
10     A   Yes.
11     Q   And would you agree it wouldn't be
12 very difficult to produce it?
13     A   It wouldn't be difficult to produce a
14 business case that might include this.  I can't
15 say for this one specifically, but I would
16 assume I should be able to find it readily,
17 yes.
18     Q   When was the last time you walked
19 through Division 10?
20     A   I don't remember.  It was sometime
21 ago.
22     Q   You mentioned that you sat for a
23 deposition in March of 2019 in the Bennett
24 case?

ERIC DAVIS
December 19, 2019

Page 46

1      A   Uh-huh.
2      Q   After that date, did you tour
3  Division 10?
4      A   I don't remember if it was before or
5  after.
6      Q   What do you remember about your tour
7  in Division 10?
8      A   I believe I have only been through --
9  at the facility twice.  Once was to go up on
10 the roof, but we didn't go through any
11 detention areas; and once was a brief tour of
12 one of the housing units.
13     Q   Which housing unit did you tour?
14     A   I don't remember which one.  I
15 believe it was the one that has the detainees
16 that wear special uniforms.
17     Q   And why did you tour that unit?
18     A   I don't remember what occasion that --
19 I don't believe it was specific to a project,
20 though.  I try to visit the housing units, if I
21 can but time is limited.  There's 5 million
22 square feet.
23     Q   So in your office, you have a
24 blueprint of Division 10?

ERIC DAVIS
December 19, 2019

Page 47

1      A   Yes.
2      Q   And the blueprint identifies the date
3  it was constructed?
4      A   Yeah.  I'm sure we have that
5  documentation, yeah.
6      Q   How hard would it be for you to
7  identify the date it was constructed?
8      A   How hard?
9      Q   Yeah.
10     A   I don't know.  I would have to
11 identify the documentation that's available,
12 and I couldn't say.  I don't know how to say
13 how hard it would be.
14     Q   On the blueprint -- Strike that.  As
15 an architect, you're familiar with how to
16 interpret blueprints?
17     A   Yes.
18     Q   And blueprints generally have to be
19 approved by building committees?
20     A   Yes.
21     Q   And when --
22     A   Authorities having jurisdiction, yes.
23     Q   When the jurisdictions review
24 blueprints, would the jurisdiction be able to

Exhibit 4 Page 12

Page 48

1  identify whether a toilet has a grab bar around
2  it?
3  A    Yes.
4  Q    How would a jurisdiction be able to
5  identify that in a blueprint?
6  A    Typically, the building permit
7  drawings would include plans and elevations of
8  such areas, and it would be reviewed -- in the
9  case of the jail, it would be reviewed by the
10  Mayor's Office of People with Disabilities.  I
11  don't know if the Mayor's Office of People with
12  Disabilities existed in 1998.  I think it did,
13  but I'm not certain.
14                    (WHEREUPON, Plaintiff's
15                    Exhibit No. 3 was marked
16                    for identification.)
17  BY MR. MORRISSEY:
18  Q    I'm going to show you what is going
19  to be marked as Exhibit 3, which is the
20  County's Answers to Plaintiff's First Set of
21  Interrogatories in Johnson.
22       Mr. Davis, why don't you take a
23  moment to look at this.  Have you seen this
24  before?

Page 49

1  A    I don't know if I have seen it
2  specifically.  It appears to reference things
3  that I said or attested to elsewhere.  I don't
4  know if I saw this document or not.  I do note
5  that it includes my affidavit on the back.
6  That one, I probably have seen before, but I
7  don't know if the front document is something
8  that I've seen before.
9  Q    Paragraph 2 talks about the public
10  bathrooms for the men and women in the Division
11  10 lobby; do you see that?
12  A    Number 2, yes.
13  Q    As an architect and the Deputy
14  Director for Capital Planning and Policy, how
15  could you identify whether the public bathrooms
16  were installed with grab bars when the place
17  was built?
18  A    I'm not sure it would be possible to
19  determine simply from visual inspection whether
20  any grab bars were there -- were installed when
21  it was built or whether they were installed
22  subsequently.
23  Q    Are there any documents you could
24  review to obtain that information?

Page 50

1  A    If I needed to find that out, I would
2  simply go -- well, not simply.  I would go
3  through the documentation that I was able to
4  find either electronic or physical.
5  Q    Have you ever looked at the blueprint
6  in your office to see whether the public
7  bathrooms in the Division 10 lobby had grab
8  bars in the original blueprints?
9  A    I think we looked into this at one
10  earlier point, and I honestly don't remember
11  what we looked at at that time.  I don't know
12  what was looked at at that time.  I believe
13  there was some kind of case about the public
14  area, but I don't remember in the case of that
15  whether I consulted the drawings or not.
16  Q    Do you know whether grab bars were
17  installed in the Division 10 public bathrooms
18  when the building was constructed in '92?
19  A    I'm sorry.  I was distracted.  My son
20  texted me something.  Can you repeat the
21  question?
22  Q    You mentioned that you believed
23  Division 10 was constructed around 1992?
24  A    That sounds right, yeah.

Page 51

1  Q    Do you know whether when the building
2  opened whether there were grab bars around the
3  public toilets in the lobby?
4  A    My assumption is that the building
5  would have been designed to comply with the
6  regulations in force at the time.
7  Q    So do you know whether the
8  regulations would have addressed grab bars
9  around the public bathrooms in the lobby?
10       MR. SHERER:  Objection, calls for a
11       legal conclusion.  You can answer.
12  BY THE WITNESS:
13  A    I don't specifically, and it's
14  because of the date of '92.  As I recall,
15  the -- and I don't remember the legal term for
16  it.  Basically, the date when the ADA took
17  effect.  I don't know how that applied to this
18  specific project.  I know that there were
19  projects that were constructed after the law
20  was passed that weren't subject to it.  So I
21  don't -- because, at the time of its design and
22  permitting, I don't know the gap -- I don't
23  know when this project was permitted.  I
24  believe that the law allows entities to design

Exhibit 4 Page 13

ERIC DAVIS
December 19, 2019

Page 52

1  things that are to the laws that are in effect
2  at the time of permit, and they don't require
3  you to go back and change things if something
4  gets passed after you've received a building
5  permit; but I don't know in this specific case.
6      Q    Are you talking about the ADA?
7      A    Yes.
8          MR. MORRISSEY:  Why don't we take a
9      few-minute break.
10         MR. SHERER:  Okay.
11                  (WHEREUPON, a short break
12                  was had.)
13         MR. MORRISSEY:  Back on the record.
14  BY MR. MORRISSEY:
15     Q    Mr. Davis, going back to that Cermak
16  ramp.
17     A    Okay.
18         MR. SHERER:  Are you talking about
19     Exhibit 7?
20         MR. MORRISSEY:  Exhibit 7.
21  BY THE WITNESS:
22     A    Uh-huh.
23  BY MR. MORRISSEY:
24     Q    Do you know whether there are any

ERIC DAVIS
December 19, 2019

Page 53

1  violations of the ADA pertaining to that ramp?
2          MR. SHERER:  Objection, calls for a
3      legal conclusion, calls for speculation,
4      form, foundation.
5  BY THE WITNESS:
6      A    I haven't looked at it myself.
7  BY MR. MORRISSEY:
8      Q    If a ramp is 47 feet long, based on
9  your understanding of the 1990 or 1991 ADA
10  structural standards, is there a requirement
11  for the run?
12         MR. SHERER:  Objection, calls for a
13     legal conclusion, form, incomplete
14     hypothetical.  You can answer.
15  BY THE WITNESS:
16     A    Well, assuming, as this document
17  says, that the ramp in question is a 1:12
18  slope, that would yield a total ramp length of
19  47 feet.
20         I believe the standard in place at
21  the time required there to be a landing if it
22  was more than 30 feet of -- 30 inches of rise,
23  which would mean you couldn't go more than
24  30 feet with a section of ramp without an

ERIC DAVIS
December 19, 2019

Page 54

1  intermediate landing.
2  BY MR. MORRISSEY:
3      Q    Does the document in front of you,
4  Exhibit 7, identify a way to remedy?
5      A    No.
6      Q    Why not?
7      A    Why not?
8      Q    Does it explain how to -- Does it
9  explain a recommendation for the Cermak ramp?
10         MR. SHERER:  Objection, form, calls
11     for speculation, foundation, calls for a
12     legal conclusion.  You can answer.
13  BY THE WITNESS:
14     A    I would note that the document under
15  Item 2 talks about pouring the ramp in two
16  sections with a landing.
17  BY MR. MORRISSEY:
18     Q    Would that address the run?
19         MR. SHERER:  Same objection.
20  BY THE WITNESS:
21     A    That would seem to do that, yes.
22  BY MR. MORRISSEY:
23     Q    Is there any timeline when you expect
24  the Cermak ramp to be renovated?

ERIC DAVIS
December 19, 2019

Page 55

1          MR. SHERER:  Objection, asked and
2      answered.  You can answer again.
3  BY THE WITNESS:
4      A    We're endeavoring to procure the
5  design services.  Once those have been procured
6  and the design work has been done, we will
7  pursue construction by the delivery method that
8  seems to make the most sense in terms of
9  getting the work done; but as to when that
10  would result in it being finished, I couldn't
11  speculate right now.  It could vary a great
12  deal based on factors that are out of my
13  control.
14     Q    Could it take more than a year?
15     A    Yes.
16     Q    Are there ways for your office to
17  facilitate projects on an emergency basis?
18     A    They are very limited, but yes.
19     Q    Why are they limited?
20     A    In some cases, and we have to take
21  our guidance in this from the procurement
22  department, there are limitations that they
23  will allow in terms of their decision of
24  whether or not something qualifies as an

Exhibit 4 Page 14

ERIC DAVIS
December 19, 2019

Page 56

1  emergency or not.
2          I couldn't give you an exhaustive
3  list of the factors that they would consider in
4  making that determination.  Otherwise, as you
5  could understand, every project would be an
6  emergency.  So, clearly, they need to follow
7  standards that impact whether or not the
8  project is allowed to be moved forward with
9  that method of procurement.
10         Q    What standards have you been told
11  qualify for an emergency?
12         A    Direct threat to safety.  Sometimes
13  they're related to schedule needs of elements
14  that are outside of our control.  That's
15  generally health, safety and welfare.  I can't
16  characterize the language of what they would --
17  how they would phrase it.
18         Q    Have you ever moved forward with a
19  project that you determined was an emergency as
20  approved by procurement?
21         A    Yes.
22         Q    How many?
23         A    Less than five.  I think perhaps
24  three.  They are very limited.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 57

1    .  Q    Did one involve a lift for a judge at
2  the courthouse?
3         A    Yes.
4         Q    Why was that an emergency?
5         A    Well, I should be clear.  I don't
6  believe that one was ultimately procured as an
7  emergency.  It's -- you know, I don't believe
8  that one was -- There was one that, I believe,
9  we investigated the feasibility of it, but I
10  think, in the end, that was not one that was
11  officially deemed an emergency by procurement.
12  I don't believe in the end that that was one
13  that when it went forward was actually executed
14  as an emergency procurement.  I don't -- I'm
15  pretty sure it was not in the end.  I think we
16  looked into it at one point, but I don't
17  believe it was ultimately done that way.
18         Q    You're aware of the Maywood
19  courthouse order about the two privacy screens,
20  correct?
21         A    Yes.  That's where I saw you last.
22         Q    Was that determined an emergency?
23         A    When you say "determined an
24  emergency," by -- in what way?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 58

1    .  Q    By procurement.
2         A    Do you mean direction to move forward
3  with the elements that were a part of the
4  agreement or are you talking about work in that
5  area?  What are you asking about it?
6         Q    Well, you're aware that the Court of
7  Appeals affirmed a lower Court's ruling that
8  the County has to move the two privacy screens,
9  correct?
10         A    Yes.
11         Q    And that occurred about a year --
12  more than a year ago, correct?
13         A    The determination requirement was
14  just a few months ago.  You were there.
15         Q    No, no.  The Seventh Circuit in July
16  of 2018 said the County had to do that work.
17         A    If you say so.  I don't remember that
18  specifically.  I don't remember.
19         Q    Do you know --
20         A    I only remember the more recent
21  discussion.
22         Q    Do you know when that work will be
23  completed?
24         A    No.  We're trying to get that

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 59

1  accomplished now because, as you know, the
2  decision to do that was very recent.  I want to
3  make sure we get it right the first time.
4         Q    Before we took a break, we were
5  talking about Division 10.
6         A    Okay.
7         Q    And requirements of the ADA, I
8  believe.  I'm going to show you a document that
9  I'm going to mark as Exhibit 11, which is an
10  order from Polletta versus Dart, and I have one
11  question about this document.
12              (WHEREUPON, Plaintiff's
13               Exhibit No. 11 was marked
14               for identification.)
15  BY MR. MORRISSEY:
16         Q    This is an order from a district
17  court judge in Polletta versus Dart.  Do you
18  see the top of the page?
19         A    Yeah, okay.
20         Q    I'm going to draw your attention to
21  page 4, the bottom of page 4.
22         A    Okay.
23         Q    Where it says "Regarding grab bars
24  and shower seat requirements, the Court adopts

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 15

ERIC DAVIS
December 19, 2019

Page 60

1   the following instruction: 'Under the
2   Rehabilitation Act, an accessible toilet for
3   individuals with disabilities in a facility
4   built after 1988 must have grab bars near the
5   toilet, and an accessible shower must have a
6   mounted shower seat.'"
7           Is that your understanding of the
8   requirements of the Rehabilitation Act?
9       A    Let me reread this. I'm sorry.
10  Could you ask your question again?
11      Q    Is it your understanding that "under
12  the Rehabilitation Act, an accessible toilet
13  for individuals with disabilities in a facility
14  built after 1988 must have grab bars near the
15  toilet and an accessible shower must have a
16  mounted shower seat" as identified in the order
17  that's in front of you?
18      A    I don't know whether the requirement
19  comes from the Rehab Act or from the ADA
20  itself, but I believe that that's the standard,
21  yes.
22      Q    For a facility built after 1988?
23      A    Then that must -- the ADA suggests
24  that it was simply the Rehab Act.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 61

1   .   Q    Well, is your understanding of the
2   Rehabilitation Act pertaining to an accessible --
3   pertaining to a building built after 1998 (sic)
4   that it must have grab bars near the toilet and
5   an accessible shower must have a mounted shower
6   seat; is that your understanding?
7       A    I'm sorry. You said '98. This is
8   '88.
9           MR. SHERER: Yeah, sorry. I'm going
10          to object to this whole line of question.
11          It calls for a legal conclusion. Go ahead.
12          You can answer.
13  BY MR. MORRISSEY:
14      Q    Mr. Davis, I'm just asking you
15  whether your understanding is --
16      A    No, I'm attempting to answer you.
17  Just you asked about '98, and the part that you
18  mentioned here says '88, so.
19      Q    Going to Exhibit 11, page 4.
20      A    Yes.
21      Q    It says, "The Court adopts the
22  following instruction: 'Under the
23  Rehabilitation Act, an accessible toilet for
24  individuals with disabilities in a facility

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 62

1   built after 1988 must have grab bars near the
2   toilet, and an accessible shower must have a
3   mounted shower seat;'" is that your
4   understanding?
5           MR. SHERER: Objection, calls for a
6           legal conclusion, speculation. You can
7           answer.
8   BY THE WITNESS:
9       A    I'm not clear about the language
10  where it says "in a facility built after 1988"
11  because I don't know -- I don't remember when
12  the Rehab Act itself was in force.
13          Assuming that the Rehab Act was in
14  force at that time, I would expect that these
15  requirements are, in fact, as noted here.
16  BY MR. MORRISSEY:
17      Q    But in your report that we talked
18  about when this deposition started --
19          MR. SHERER: Exhibit 2.
20          MR. MORRISSEY: Thanks.
21  BY MR. MORRISSEY:
22      Q    You mentioned that the Rehabilitation
23  Act --
24      A    I'm sorry. Which exhibit are you

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 63

1   looking at again?
2       Q    We're looking at Exhibit 2. In your
3   report that we talked about, the second page --
4       A    Okay.
5       Q    -- the first full paragraph, you
6   mentioned about compliance of the
7   Rehabilitation Act of 1973, correct?
8       A    There we go, yes. Uh-huh.
9       Q    So it's your understanding that the
10  Rehabilitation Act --
11      A    In effect at that time, yeah.
12      Q    In 1973, correct?
13      A    Correct, yes.
14      Q    And then for a building built after
15  1988, it's your understanding that the
16  Rehabilitation Act requires grab bars near the
17  toilet, and an accessible shower must have a
18  mounted shower seat?
19      A    That's sounds right.
20          MR. SHERER: Same objection.
21  BY THE WITNESS:
22      A    That sounds right, though, yeah.
23  BY MR. MORRISSEY:
24      Q    Going back to the interrogatories

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 16

ERIC DAVIS
December 19, 2019

Page 64

1  from the Johnson case, Exhibit 3.
2      A    Okay.
3      Q    Paragraph 9 talks about a business
4  case marked 394 to 400.
5      A    Okay.
6      Q    Do you see that?
7      A    Yes.
8      Q    And I will give you a copy of that
9  business case.  It's going to be marked as
10 Exhibit 1.
11                 (WHEREUPON, Plaintiff's
12                 Exhibit No. 1 was marked
13                 for identification.)
14 BY MR. MORRISSEY:
15     Q    The County's Answer to Interrogatory
16 Number 9 says, "The project identified above is
17 currently in the procurement phase"?
18     A    Uh-huh.
19     Q    Correct?
20     A    What's the date of this document, by
21 the way, Exhibit 3?
22     Q    You signed the affidavit on August 5th.
23     A    That's not what I'm asking.  I'm
24 asking about the part that wasn't my affidavit,

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 65

1  this part, the front part, when was this?
2          MR. SHERER:  Do you have the
3      certificate of service?
4          MR. MORRISSEY:  I don't because it
5      wasn't attached.  I think it was a separate
6      document.
7          MR. SHERER:  Okay.  That would tell
8      us when, but.
9  BY THE WITNESS:
10     A    I'm sorry.  Go ahead.
11 BY MR. MORRISSEY:
12     Q    Do you know what the status of the
13 FY19 Business Case that's in front of you as
14 Exhibit 1, what the status is presently?
15     A    Yes.
16     Q    What is it?
17     A    It's in procurement.  It is one of
18 those projects that was intended to be procured
19 through the task order methodology.  It was
20 intended to be procured during fiscal year '19
21 and was inhibited from being procured by the
22 board's decision not to allow the task order
23 methodology, and so we are attempting to move
24 forward with frankly slower and more

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 66

1  traditional procurement methods.  So it's in
2  procurement.
3      Q    What stage of procurement is it?
4      A    As I mentioned to you previously,
5  it's among those that we are negotiating with
6  procurement to -- as to the form of the
7  documentation that we provide to them; and then
8  once they've approved and agreed to that, there
9  are several that we're expecting to go forward
10 with, which would include one or more that
11 might include things under this particular
12 business case.
13     Q    To your knowledge, has the county
14 board already set aside 750,000 for this
15 business case?
16     A    I would have to consult the capital
17 improvement plan and see what's in effect in
18 fiscal year '20.  I suspect something on that
19 order is in there.  I can't recall that
20 specific one.  We have over 300 projects, so I
21 can't remember off the top of my head the
22 amount for this particular one.
23     Q    And this business case is just to
24 hire a consultant to study certain divisions at

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 67

1  the jail?
2      A    It is -- Well, yes, as you say, it is
3  to hire a consultant to do the assessment to
4  identify the scope of work that we need to be
5  doing on a project-by-project basis.
6      Q    Do you know whether there was a
7  scoping meeting that occurred pertaining to
8  this business case?
9      A    There may have been a meeting
10 preparatory to -- including this among the
11 requests for task orders or perhaps not.  The
12 scope that would be required at that point is
13 much simpler and shorter than what it would be
14 if it was simply put out on the street in an
15 RFP.  It's one of the advantages of the task
16 order approach.
17     Q    But based on your knowledge, the task
18 order approach has never been used by the
19 County?
20     A    No, that's not true.  Other divisions
21 and departments have done it.  They just didn't
22 want us to do it.
23     Q    Do you have any expectation when the
24 RFP will be put out?

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 17

ERIC DAVIS
December 19, 2019

Page 68

1    A    I believe we're going to try and get
2  it out the first quarter this fiscal year,
3  which started December 1st and I believe ends
4  February 28th.  Whether we are able to get it
5  out by then or not is subject to things outside
6  of our control because it's procurement.
7    Q    Based on your experience, there is
8  nothing more your office can do to expedite
9  this project?
10   A    I think we have gone through the
11  different avenues that are open to us and this
12  is the most expeditious way for us to get the
13  work done.
14   Q    If you look at Exhibit 1, the FY19
15  Business Case, Page 3, half way down, it talks
16  about "If you're requesting more than one
17  allocation, what is the priority project?"  Do
18  you see that?
19   A    Yes.
20   Q    What does that question generally
21  mean to your office?
22   A    For some of our users, they have many
23  different requests, and so it's an attempt to
24  help us to understand how a particular request

ERIC DAVIS
December 19, 2019

Page 69

1  fits in with the full spectrum of elements that
2  are being requested from a given user.
3    Q    So does your office request the user
4  to prioritize the projects?
5    A    We want to get an understanding of
6  how the project aligns with their needs and
7  goals.
8    Q    So in response to that question,
9  Sheriff's Office writes, "DOC Bridge, CCB and
10  RTU corrections"?
11   A    Yes.
12   Q    How does your office interpret that
13  response by the user?
14   A    As you know, the DOC bridge, the
15  bridge from the tunnel into the Leighton
16  Courthouse, is an important project and I
17  believe that that's the user communicating to
18  us that they wouldn't want us to do anything to
19  delay that project.  Similarly with the CCB and
20  the RTU projects that, in other words, they're
21  saying, yes, we want to do this, but we don't
22  want to do things that are going to slow these
23  other projects down.
24   Q    So the DOC bridge was identified by

ERIC DAVIS
December 19, 2019

Page 70

1  the user as the priority project?
2    A    As a priority.  As you note, there
3  are three that they identify.
4    Q    So how is the DOC bridge project
5  coming along?
6    A    I believe we're in implementation
7  phase of that project.  I don't honestly
8  remember where that one is right now.  I
9  believe it's under contract for construction.
10   Q    Do you have any expectation when that
11  DOC bridge project will be completed?
12   A    I would have to consult the project
13  director and the program management team.  They
14  provide a schedule.
15   Q    Do you have an expectation it will be
16  done in the year 2020?
17   A    I think it is supposed to be done
18  this year.  I believe that it is.
19   Q    You mean 2020?
20   A    Yes.  When I say "this year," sitting
21  here now, we're in fiscal year 2020.  So I
22  think in terms of fiscal years.
23   Q    What is the status of the CCB
24  project?

ERIC DAVIS
December 19, 2019

Page 71

1    A    As you know, they are related.  The
2  bridge project has to be completed first before
3  the -- any other work in the courthouse goes
4  forward because it is a narrowing of the travel
5  of staff and detainees.  It's an enabling
6  project for the larger project.
7    Q    Has the county board already set
8  aside money for the DOC bridge?
9    A    Yes.
10   Q    How much is that?
11   A    I don't recall what the number is.
12  It is technically part of the larger project,
13  except, I think in '20, we might have broken it
14  out.  I don't remember.  I don't remember if in
15  '20 we broke out the bridge as a separate
16  project or if it's still contained within the
17  larger Leighton project.
18   Q    What is the status of the CCB
19  project?
20   A    It is a large and very complicated
21  project because of phasing because of a
22  requirement by the chief judge that we keep all
23  the courtrooms open, and that complicates the
24  phasing.  So we are working to resolve the

Exhibit 4 Page 18

ERIC DAVIS
December 19, 2019

Page 72

1  phasing questions because it's very
2  challenging, which is why we broke out the
3  bridge because that's important, and we can get
4  that done right now.
5      Q   So after phasing, what's the next
6  step with the project?
7      A   We would have to finalize the
8  documentations for bid and go out to bid and
9  then contract and start that work.
10     Q   Do you expect the CCB project to be
11 complete in 2020?
12     A   No.
13     Q   How about 2021?
14     A   No.
15     Q   2022?
16     A   No.
17     Q   2023?
18     A   Perhaps.  As I said, it is a very
19 complicated project.  It involves moving lots
20 of staff and judges and their support
21 operations, and the Court has to continue
22 operation.  And so we're very limited in terms
23 of the hours when we can work in the
24 courthouse.  So this project is going to take a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 73

1  long time.
2      Q   Is it one of the more complicated
3  projects you have worked on as a county
4  employee?
5      A   Yes.
6      Q   I'm going to show you some documents
7  that have been produced by the County in this
8  case.  I'm going to mark them Exhibit 5.
9          (WHEREUPON, Plaintiff's
10              Exhibit No. 5 was marked
11              for identification.)
12 BY MR. MORRISSEY:
13     Q   Take a moment to look at them.
14         MR. MORRISSEY:  I'm going to use the
15     bathroom.
16             (WHEREUPON, a short break
17                 was had.)
18 BY MR. MORRISSEY:
19     Q   Mr. Davis, I'm showing you Exhibit 5,
20 which is a group of documents that's been
21 produced by the County's lawyers in this case.
22 Have you seen these documents before?
23     A   No.
24     Q   Have you had a chance to look at the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 74

1  documents?
2      A   Only briefly when you gave it to me a
3  few minutes ago.
4      Q   Do you have any idea what these are?
5      A   It looks like some of the documents
6  are from a close-out report on a project that
7  was completed in 2009.
8      Q   Do you have any information about
9  that 2009 project?
10     A   Not other than what I have here.  No,
11 not that I'm -- I don't have anything.  County
12 may have documentation back at the office, but
13 I don't have any other information about this
14 one.
15     Q   Do you see in the group exhibit
16 there's a Certificate of Occupancy?
17     A   Correct.
18     Q   Do you know what the scope of work
19 that was completed in Division 10 was that
20 related to this certificate?
21     A   No.  This refers to per plans, and
22 the plans aren't here.  So I don't know that.
23     Q   From looking at any documents, do you
24 know whether there are any toilets in Division 10

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 75

1  that are ADA compliant for detainees?
2      A   You mean from looking at these
3  documents?
4      Q   Just in general.
5          MR. SHERER:  I'm going to object,
6      calls for a legal conclusion but you can
7      answer.
8  BY THE WITNESS:
9      A   Can you re-ask your question because
10 I'm not clear on what you're asking.
11 BY MR. MORRISSEY:
12     Q   Sure.  Do you know whether there are
13 any toilets in any of the Division 10 living
14 units that have grab bars near them?
15     A   I would expect that there are.  I
16 believe so.  I don't remember.  The only time
17 I've been there, I don't remember going in a
18 bathroom, so I don't know.
19     Q   Do you know whether any of the shower
20 areas for inmates in Division 10 have a fixed
21 bench?
22     A   I don't remember, no.  I don't
23 remember.  Maybe, I don't know.  I would expect
24 that they would be somewhere, but I don't know.

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 19

ERIC DAVIS
December 19, 2019

Page 76

1    I don't know what the requirements are
2    applicable to that specific situation.
3        Q    Have you ever toured Division 6?
4        A    No.
5        Q    Is it fair to say you have never been
6    in Division 6?
7        A    I don't believe I have.
8        Q    Are you familiar with the program
9    called WestCare?
10       A    WestCare, no.
11       Q    Prior to coming here today to
12   testify, did you review any documents relating
13   to upgrades of any bathroom facility in
14   Division 10 -- Strike that -- Division 6?
15       A    I think I might have looked at a copy
16   of what you have there.
17       Q    I'm showing you what has been
18   produced by the County.  I'm going to mark it
19   as Exhibit 8.  It's a three-page document.
20                   (WHEREUPON, Plaintiff's
21                   Exhibit No. 8 was marked
22                   for identification.)
23   BY MR. MORRISSEY:
24       Q    I'm going to direct your attention to

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 77

1    the last page.
2        A    Sure.
3        Q    Have you seen this document before,
4    Mr. Davis, that's --
5        A    This looks like a document that I
6    have reviewed in the last few days, but I only
7    saw it recently.
8        Q    The top right of the document says
9    Job Order Contract?
10       A    Yes.
11       Q    What is a Job Order Contract?
12       A    The County uses the job order
13   contract or JOC procurement method for
14   projects.  It is a method used by government
15   agencies to accelerate procurement of generally
16   construction projects because it is based upon
17   a pre-agreed upon cost structure, and so it
18   speeds up the estimating process because
19   contractors in the program agree to a cost book
20   that documents how much things cost.
21       Q    Presently, what is the amount of
22   money that the Job Order Contract can
23   encompass?
24       A    When you say "presently," do you mean

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 78

1    under contracts currently available or what
2    we're doing this year?
3        Q    In the last year, is there a limit?
4        A    Well, the limit is established by the
5    contracts with the individual job -- JOC
6    contractors.  So we went for renewal recently.
7    I don't remember off the top of my head what
8    the breakdown is for those.
9        Q    Do you have an estimate about how
10   much it is?
11       A    Again, are you asking about the
12   program in general or about that which a
13   specific contractor can do?  Because it's a
14   series of contracts with individual
15   contractors.
16       Q    Well, we talked about the Cermak
17   ramp, right?
18       A    Yes.
19       Q    Based upon your knowledge, can your
20   department use a JOC to move forward with that
21   project?
22       A    That is one of the delivery methods
23   open to us once the project has been designed.
24   JOC is focused on construction, not on

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 79

1    procuring design services.  The holdup on the
2    Cermak ramp is getting an architect hired to do
3    the construction drawings.
4        Once that's done, we'll look at the
5    different methodologies for achieving it and
6    decide which is the most expeditious, but the
7    bottleneck right now is getting the bloody
8    things designed.
9        Q    So the Job Order Contract is dated
10   February 26, 2014?
11       A    That's what it says.
12       Q    And does this relate to the shower in
13   Division 6?
14       A    I believe that's what the scope of
15   this is about, yeah.  Just to be clear, there's
16   an element in this page at the top that is
17   black that is an area where it says what this
18   document is.  There are different documents
19   during the job order process, and so it's not
20   clear to me which one this is.  I can't read it
21   from the copy I have here.
22       MR. MORRISSEY:  I think that's the
23   way it was produced to me, right?
24       MR. SHERER:  I mean --

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 20

Page 80

```
1   BY THE WITNESS:
2       A    We have scope of work documents and
3   then we have --
4           MR. SHERER:  Yours is a little worse.
5       I think it says Detailed Scope of Work.
6   BY MR. MORRISSEY:
7       A    Oh, it's a DSOW, okay, yeah.  All
8   right.  Go ahead.  So this is a DSOW, not a --
9   okay.
10          THE REPORTER:  DS what?
11          THE WITNESS:  DSOW, detailed scope of
12      work.
13  BY MR. MORRISSEY:
14      Q    To your knowledge, what were the ADA
15  accessibility requirements for a shower that
16  was constructed in February of 2014?
17          MR. SHERER:  Objection, calls for a
18      legal conclusion.  You can answer.
19  BY THE WITNESS:
20      A    To be clear, this is the scoping.
21  This is not the contract for construction.
22  This is a document that is used to ask the
23  contractor to assemble the bid.  So I don't
24  know what the time delay was between this scope
```

Page 81

```
1   of work and when the final package was approved
2   for construction.  That said, showers needed to
3   be -- As it says it here, must meet -- one
4   shower location must meet ADA accessibility
5   requirements, so.  I don't know also whether or
6   not this is -- was accompanied by an
7   architect's drawings or not.  Given a brief
8   review of the document here, it's not clear to
9   me whether this scope can be achieved without a
10  permit.  If it needed a permit, it needed to
11  have an architect.  So I don't know what the
12  status of that is relative to contracting for
13  this work.
14      Q    Would you expect there to be
15  additional documents relating to this proposed
16  project?
17      A    Yeah, there would be.  Yes.
18      Q    And you would expect there might be
19  an architect's drawings?
20      A    As I said, it's not clear to me from
21  looking at this whether or not this scope is
22  sufficient to trigger the requirement or
23  whether this could be done simply as replacing
24  in kind, which sometimes the city allows you to
```

Page 82

```
1   do without a permit.
2       Q    Based on your understanding as being
3   an architect, if a public entity alters a
4   facility, is it generally required to bring
5   them into compliance with the latest
6   accessibility standards?
7       A    Yes.
8       Q    How do you know that?
9       A    How do I know that?
10      Q    Yeah.
11      A    Tied to the ADA.
12      Q    And is it your understanding that if
13  an alteration occurred after March of 2012, the
14  public entity must comply with the latest
15  accessibility standards and the 2010 ADA
16  standards for accessible design?
17      A    Yes, I believe so.
18      Q    Is it your understanding that the
19  2010 ADA standards for accessible design
20  require a shower area to have a fixed bench?
21      A    I don't recall whether or not a
22  movable bench is allowed or not.  I don't know
23  whether that is -- I would have to go check and
24  see if that was allowed or not or whether that
```

Page 83

```
1   was an exception the city made.  I don't know
2   the specifics of whether it's fixed or movable.
3           MR. SHERER:  I'm just going to object
4       to the last line of questions.  It calls
5       for a legal conclusion.
6   BY MR. MORRISSEY:
7       Q    I'm going to show you a series of
8   pictures I'm going to mark as Exhibit 10.  They
9   were taken during an inspection.
10          (WHEREUPON, Plaintiff's
11           Exhibit No. 10 was marked
12           for identification.)
13  BY MR. MORRISSEY:
14      Q    Mr. Davis, I'm showing you what is
15  marked as Exhibit 10.  Can you look at the
16  third page?
17      A    Sure.
18      Q    There's a photograph of a shower
19  area.
20      A    Uh-huh.
21      Q    And this was in Division 6 that
22  counsel and I inspected.
23      A    Uh-huh.
24      Q    From looking at this photograph --
```

Exhibit 4 Page 21

Page 84

1      .       MR. SHERER:  Hang on, Pat.  I'm just
2    going to object to your characterization of
3    this photograph as the photograph of the
4    shower area.
5           MR. MORRISSEY:  Well, it is.
6  BY THE WITNESS:
7      **A    But I have no way of knowing where**
8  **this is.**
9  BY MR. MORRISSEY:
10     **A    I'm representing to you that I was**
11 **there, along with your attorney, and the**
12 **Sheriff let us inspect Division 6, Tier 2-A.**
13 **This was a photograph that was taken by an**
14 **expert.  Based on your review --**
15          MR. SHERER:  We're on which page?
16          MR. MORRISSEY:  We are on the third
17    page.
18          MR. SHERER:  Oh, okay.  Sorry.  I
19    thought you were talking about the first
20    page.  All right.
21          THE WITNESS:  Okay.
22 BY MR. MORRISSEY:
23     Q    Based on your review of this
24 photograph, Mr. Davis, does that photograph

Page 85

1  depict a shower area that complies with the
2  2010 ADA standards?
3           MR. SHERER:  Objection, calls for a
4    legal conclusion.  You can answer.
5  BY THE WITNESS:
6      **A    It doesn't appear to.**
7  BY MR. MORRISSEY:
8      Q    Why not?
9      **A    Realizing that the ADA standards**
10 **treat multiple -- locations where there are**
11 **multiple showers differently from individual**
12 **showers, in other words, if there are three or**
13 **four in a row, it may be that one needs to be**
14 **accessible and the rest do not.**
15     **I don't know from this photograph**
16 **whether if I turned to the right I would see**
17 **one that is fully accessible or not.  That**
18 **said, if this turns out to be the one that is**
19 **supposed to be accessible, no, there is no**
20 **shower seat here of any kind.**
21     Q    Looking at the next page, the last
22 page of Group Exhibit 10, do you see -- and
23 this was a photograph taken of the Division 10
24 officers' locker room?

Page 86

1      **A    I'm sorry.  Division 10 what?**
2      Q    The officers' locker room.
3      **A    Officers' locker room.  This is not**
4  **in the detention area.**
5      Q    No, this is the officers' locker
6  room.
7      **A    All right.**
8      Q    From looking at this photograph, do
9  you see a fixed bench?
10     **A    I see something that looks like one**
11 **in the back of the photograph, but I can't tell**
12 **because of what appears to be a box of rocks.**
13     Q    From looking at the photograph, does
14 it appear to have grab bars?
15     **A    It does have two grab bars.**
16     Q    What structural elements do you see
17 in this photograph that would make it
18 accessible?
19          MR. SHERER:  Objection, calls for a
20    legal conclusion.  You can answer.
21 BY THE WITNESS:
22     **A    Well, grab bars are a part of the**
23 **equation.  If that is, in fact, a seat, it's**
24 **not clear to me what its dimensions are.  So I**

Page 87

1  **can't tell if that's a compliant seat or not.**
2      **The temperature control appears to be**
3  **an accessible fixture.  It looks to me like the**
4  **soap dish is too high.  I don't know.**
5  BY MR. MORRISSEY:
6      Q    Does it appear to have a nozzle
7  that's movable?
8      **A    Yes.**
9      Q    Do you have any personal knowledge
10 whether Division 4 had any inmate toilets with
11 grab bars near the toilet?
12     **A    I don't remember if they have or not.**
13 **I don't think I have been through the housing**
14 **block portion of Division 4.**
15          MR. MORRISSEY:  Do you want to take
16    about a ten-minute break?  We're almost
17    finished.
18          MR. SHERER:  Sure, yeah.
19             (WHEREUPON, a short break
20                was had.)
21 BY MR. MORRISSEY:
22     Q    At the start of the deposition today,
23 we talked about your teaching, correct?
24     **A    Yes.**

Exhibit 4 Page 22

ERIC DAVIS
December 19, 2019

Page 88

1    . Q    When you teach undergraduate- or
2  graduate-level courses, do you ever teach your
3  students about what "disability" means?
4       A    Yes.
5       Q    What do you teach your students?
6       A    I try to lay out a broader
7  understanding of disability so that the
8  students understand the context of the ADA.
9  Typically, what I'll do is I'll ask them which
10 of them doesn't plan on getting old.  So, in
11 other words, nobody will raise their hand, and
12 then I say, well, then the ADA is going to
13 apply to you in the course of your life, that
14 the ADA is not something that is peripheral or
15 for a subset for "those people," quote,
16 unquote, "those people" but something that is
17 intended to make life easier for a broad range
18 of people, which at some point, if they are
19 older and have limited mobility will include
20 them.
21       It is an attempt to have them
22 understand that it is a fundamental aspect of
23 the responsibilities of architects and not an
24 inconvenience.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 89

1    . Q    When you mentioned these people, what
2  are you referring to?
3       A    Sometimes designers, particularly
4  younger designers, think in rarified air.  If
5  you are younger and inexperienced, they don't
6  understand the challenges of people with
7  disabilities because they don't have a
8  disability or maybe they don't have someone in
9  their family that does.  So it doesn't occur to
10 them.  So they tend to think that sometimes --
11 sometimes they tend to think that those things
12 are for -- are not -- are for a subset of the
13 population that they may or may not need to
14 deal with and that that's particularly true in
15 the case of public buildings.
16       Q    Do you have to be in a wheelchair to
17 be disabled?
18       A    No.
19       Q    Why not?
20       A    Disability comes in many forms.
21 There are visual disabilities, for example,
22 that perfectly ambulatory individuals may have
23 and the ADA addresses issues that someone that
24 has limited vision might have.  So there are

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 90

1  any number of things.  There are people that
2  can walk but need to walk with a cane.  So they
3  can't navigate regular flat surfaces -- or, I'm
4  sorry, stairs and such.  So they need
5  assistance climbing stairs or doing that sort
6  of thing, and they're not in a wheelchair but
7  they're of more limited mobility.  So it's not
8  a requirement that they're in a wheelchair.
9       MR. SHERER:  And, again, I will just
10      object for the record, calls for a legal
11      conclusion as to the definition of
12      disability.  Go ahead.
13 BY THE WITNESS:
14      A    And I'm speaking generally.
15 BY MR. MORRISSEY:
16      Q    When you teach your students, do you
17 teach them how to identify people with
18 disabilities?
19      A    No, not really.  No.  It's not -- No.
20      Q    In your undergraduate- or graduate-
21 level courses --
22      A    To be clear, I'm not teaching
23 anymore.  I ended teaching in 2017.
24      Q    When you did teach --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 91

1       A    Yes.
2       Q    -- did you ever teach any provision
3  of the ADA regarding reasonable modifications?
4       A    I don't recall if we got into that
5  much detail.
6       Q    Are you familiar with the reasonable
7  modification provision of the ADA?
8       A    (Indicating.)
9       Q    What is your understanding of that
10 provision?
11      A    There are elements that are
12 discretionary that allow for less than
13 100 percent compliance in all locations with
14 every provision.  Sometimes it's because of a
15 subset of the population, and there's not a
16 need to do everything everywhere.  Sometimes
17 there are issues of cost or structural
18 feasibility, right?
19       So there are elements that make it
20 objectively excessively difficult to comply in
21 a particular instance.
22      Q    Do you provide any professional
23 services to the Sheriff about the reasonable
24 modification provision of the ADA?  I'm talking

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 23

ERIC DAVIS
December 19, 2019

Page 92

1  about the Sheriff's Office.
2      A    When you say do I provide
3  professional services, I'm not clear what
4  you're asking.
5      Q    In your capacity as director --
6      A    Yeah.
7      Q    -- do you consult with the Sheriff's
8  Office regarding any reasonable modifications
9  provision of the ADA?
10     A    I don't recall if I have discussed
11 with them or provided an opinion about whether
12 or not a specific element does or doesn't
13 constitute a reasonable modification.
14         I tend to speak with them more
15 broadly.  So I don't remember an instance of
16 saying, in this particular location, you should
17 do "X."
18     Q    Are you aware of any accommodation or
19 modification the Sheriff's Office has for
20 disabled people to move up or down the Leighton
21 ramps?
22     A    Accommodations is operational.  So
23 that's on them.  That's not a capital issue.
24 Modifications at the facility would be either

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 93

1  on us or DFM, Department of Facilities
2  Management.
3      Q    Do you know how disabled people move
4  up and down the Leighton ramp now?
5      A    I have been told that they use a
6  chair, a wheeled chair, that is operated by the
7  sheriffs.  I have never seen that, but that's
8  what I have been told.
9      Q    Have you ever given any advice about
10 that procedure?
11     A    No, not that I -- I don't remember.
12 No.
13     Q    Do you know what accommodations are
14 provided by the Sheriff's Office for people
15 that use a wheelchair at all times to move up
16 or down the Leighton ramps?
17     A    Only other than what they tell me
18 anecdotally.
19     Q    Do you have any first-hand testimony
20 about what they do?
21     A    As I said, I don't believe I have
22 ever seen them do it.
23     Q    Earlier, we talked about a procedure
24 for people who are in wheelchairs and use a

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 94

1  public ADA bathroom upon request at Leighton?
2      A    That sounds familiar.
3      Q    Do you have any opinion whether
4  that's a reasonable modification?
5      A    That wouldn't be a modification.
6  That would be an accommodation, and an
7  accommodation is operational.
8      Q    So you have no opinion whether that
9  accommodation is reasonable under the ADA?
10     A    Correct.
11     Q    Is it fair to say you have no opinion
12 about the accommodations provided by the
13 Sheriff's Office to disabled people at the Cook
14 County Jail?
15     A    That's correct.  I don't know the
16 extent of their accommodations, so I'm not in a
17 position to have an opinion one way or the
18 other.
19         MR. MORRISSEY:  I have nothing
20     further.  Thanks for your time.
21         MR. SHERER:  I just have a couple of
22     quick questions here.
23         THE WITNESS:  Okay.  Do you want
24     these back?  I don't need them.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
December 19, 2019

Page 95

1          MR. SHERER:  Yeah, we're going to go
2      through just a couple of them.
3          THE WITNESS:  Okay.
4        C R O S S - E X A M I N A T I O N
5          BY MR. SHERER:
6      Q    So first, I want to just turn your
7  attention to Exhibit 8.
8      A    Okay.
9      Q    We talked a little bit about this,
10 and Mr. Morrissey asked you some questions
11 about it.
12     A    Okay.
13     Q    And I believe you testified that it
14 was a DSOW or a Job Order Contract that was
15 authored by the Cook County Office of Planning
16 and Policy; is that right?
17     A    Yes.
18     Q    And did you have a chance to review
19 the -- this scope of work narrative that's
20 contained in the document?
21     A    Yes.
22     Q    Was there anything within that scope
23 of work narrative that referenced any
24 modifications or alterations to toilets?

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 24

ERIC DAVIS
December 19, 2019

Page 96

1    .    **A    I didn't see any.**

2        Q    Was there anything that you can tell

3    from this document as a whole that referenced

4    any modifications or alterations to toilets?

5        **A    There doesn't appear to be any in the**

6    **document here.  By the way, I would note that**

7    **this isn't signed, so I don't even know if this**

8    **was ever actually adopted as presented here.**

9        Q    So based on your understanding and on

10   your education, training and experience as an

11   architect and someone who has taught classes on

12   ADA, would performing alterations or

13   modifications to showers trigger any

14   requirement to also make toilets that are in a

15   separate room ADA compliant?

16       **A    I would need to research it in detail**

17   **but, generally, no, that wouldn't necessarily**

18   **trigger a requirement for the -- for toilet**

19   **rooms in another -- for toilets in another**

20   **room.**

21       Q    Okay.  And then if we could go to

22   Exhibit 7, which I think we talked about right

23   at the beginning.  Counsel asked you some

24   questions about it.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 97

1    .    **A    Okay.**

2        Q    Prior to Monday, had you ever seen

3    this document before?

4        **A    I don't remember seeing it, no.**

5        Q    Do you know who authored this

6    document?

7        **A    I don't know for certain who did, no.**

8        Q    And so when you testified on what the

9    document purports to show, that's based upon

10   your understanding of what it indicates,

11   correct?

12       **A    Just looking at the piece of paper.**

13       Q    Okay.  And have you ever been down to

14   the ramp leading up to Cermak Hospital that we

15   have discussed at length here in this

16   deposition today?

17       **A    I don't believe I ever have been down**

18   **there.  The times that I have been to Cermak, I**

19   **entered on the ground floor and went through**

20   **the security checkpoint accessible from grade.**

21   **So I don't think I have been into the -- I may**

22   **have been, but I don't remember being in --**

23   **entering the building or leaving it this way.**

24       Q    Okay.  Have you ever -- Do you have

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 98

1    any memory of ever performing any measurements

2    or determination of specifications in terms of

3    the ramp structurally that we have talked about

4    here today?

5        **A    No.**

6        Q    So everything that you testified here

7    to today regarding what is purportedly the ramp

8    is based upon the information that you're

9    reading from this document; is that correct?

10       **A    Yeah, that's correct.  Yeah, yeah,**

11   **yeah.**

12           MR. MORRISSEY:  Well, I object to the

13   extent it mischaracterizes testimony about

14   the county board process.

15           MR. SHERER:  Okay.  You can object to

16   that, sure.

17           THE WITNESS:  Okay.

18   BY MR. SHERER:

19       Q    And you said this document that's

20   Exhibit 7 -- You testified that it may be a

21   piece of a document that was included in a task

22   order?

23       **A    I think that this includes**

24   **information about a scope of work that is or**

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 99

1    **would have been included in a task order, one**

2    **of the task order projects that we had intended**

3    **to go forward with.**

4        Q    But as you as you sit here today, you

5    can't be 100 percent sure?

6        **A    Correct.**

7        Q    And then there was a lot of testimony

8    about the date a certain building, I believe it

9    was Division 10, was constructed.  A lot of

10   times we use the term colloquially that it was

11   constructed sometime around 1992; do you

12   remember that?

13       **A    Yes.**

14       Q    So when we use the term

15   "constructed," what does that mean to you?

16       **A    Well, constructed could mean when you**

17   **start a construction.  It could mean when you**

18   **end a construction.  It could mean when the**

19   **building was completed and occupied.  It could**

20   **mean when the contract was signed, but they**

21   **didn't start work right away.  So it could**

22   **encompass a lot of different points in the**

23   **process.**

24       Q    And if a building -- Strike that.  So

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 25

ERIC DAVIS
December 19, 2019

Page 100

1  when you say that the building was constructed
2  in approximately 1992, it could encompass a
3  number of different things; is that fair to
4  say?
5      A    That could be indicative of a number
6  of different points in the process.
7      Q    Okay.
8      A    I would suspect that a building of
9  that size would take more than a calendar year
10 to construct.  So I don't know if that
11 indicates when construction started or when
12 construction was completed.
13     Q    Okay.  And if construction started
14 before 1992, are you aware if that building
15 would have to comply with the structural
16 requirements of the Americans with Disabilities
17 Act?
18     A    As I explained to our friend here, it
19 depends -- I believe the standard is when the
20 project is permitted for construction.  I think
21 that's the standard of when the compliance is
22 required to be -- to -- when that takes effect.
23         So, in other words, if it was
24 permitted for construction in 1990 before the

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 101

1  ADA was adopted but construction started in '91
2  and completed in '92, it might be that it was
3  permitted before -- I don't know.  I haven't
4  checked with the city -- It might have been it
5  was permitted before the act was in effect.  I
6  have no idea.
7      Q    And if we could turn to what's been
8  marked as Exhibit 11, it's the Order from the
9  Nicholas Polletta case.  Do you remember when
10 counsel asked you some questions about that?
11     A    Yes.
12     Q    And I believe he asked you questions
13 about the last bullet point on page 4 leading
14 into page 5?
15     A    Right.
16     Q    You didn't author that statement,
17 correct?
18     A    No.
19         MR. SHERER:  I think that's all I
20     have, Pat.  Do you have anything else?
21         MR. MORRISSEY:  I have a few
22     follow-ups.
23
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 102

1    R E D I R E C T  E X A M I N A T I O N
2             BY MR. MORRISSEY:
3      Q    Mr. Davis, do you know how far
4  Division 6 is from the RTU?
5      A    I can't give you a distance, no, not
6  offhand.
7      Q    Do you agree they're separate
8  buildings?
9      A    Yes.
10     Q    If a wheelchair user is brought to
11 Division 6 for a drug treatment program for
12 several hours and needs to use the bathroom, do
13 you think it's a reasonable accommodation that
14 the Sheriff has a policy to bring the person
15 from Division 6 to his cell in the RTU to use
16 the toilet?
17         MR. SHERER:  Objection, incomplete
18     hypothetical, calls for a legal conclusion.
19 BY THE WITNESS:
20     A    I can't speculate on the Sheriff's
21 operations or on reasonable accommodations or
22 not.
23 BY MR. MORRISSEY:
24     Q    And why can't you comment about

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 103

1  whether an accommodation is a reasonable
2  accommodation?
3      A    Because it's not my area of
4  expertise.  I deal with the building.
5      Q    When you taught, did you discuss
6  reasonable accommodations to your students?
7      A    I don't remember using that term.
8      Q    Did you use a similar term to discuss
9  the general concept?
10     A    I don't think we really talked about
11 operational.  We talked about sticks and
12 bricks, the physical structures.
13     Q    When counsel mentioned -- referred to
14 Exhibit 7, you said there should be some
15 additional documents that pertain to the Cermak
16 ramp project?
17     A    Is that a question?
18     Q    Is that fair to say?
19     A    Well, it looks like it's an excerpt
20 from a larger document.  It does say "copy
21 paste," so I would assume that this is a page
22 of a larger document.
23     Q    Is it fair to say you have personal
24 knowledge that this Cermak ramp project was

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 26

ERIC DAVIS
December 19, 2019

Page 104

1  part of the task order that went before a
2  committee of the county board?
3      **A    I believe that this was among the**
4  **projects that was intended to be -- have the**
5  **design services procured that way.**
6          MR. MORRISSEY:  I have nothing
7      further.  I appreciate it.
8          MR. SHERER:  All right.  We'll waive.
9
10          FURTHER DEPONENT SAITH NOT....
11
12
13
14
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 105

1  STATE OF ILLINOIS )
2                    )  ss:
3  COUNTY OF C O O K )
4          I, Peggy A. Anderson, a Certified
5  Shorthand Reporter in the State of Illinois do
6  hereby certify:
7          That previous to the commencement of
8  the examination of the witness, the witness was
9  duly sworn to testify the whole truth
10  concerning the matters herein;
11          That the foregoing deposition
12  transcript was reported stenographically by me,
13  was thereafter reduced to typewriting under my
14  personal direction, and constitutes a true
15  record of the testimony given and the
16  proceedings had;
17          That the said deposition was taken
18  before me at the time and place specified;
19          That the said deposition was
20  adjourned as stated herein;
21          That I am not a relative or employee
22  or attorney or counsel, nor a relative or
23  employee of such attorney or counsel for any of
24  the parties hereto, nor interested directly or
25  indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
December 19, 2019

Page 106

1          IN WITNESS WHEREOF, I do hereunto set
2  my hand this 30th day of December, 2019.
3
4
5
6  _____
7  Peggy A. Anderson
8  Certified Shorthand Reporter
9  License No. 084-003813
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 4 Page 27