Transcript of the Testimony of
**ERIC DAVIS**

**Date:** March 12, 2024

**Case:** WALKER VS. DART

**TOOMEY REPORTING**
312-853-0648
toomeyrep@sbcglobal.net
www.toomeyreporting.com

---

ERIC DAVIS
March 12, 2024

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CORNELIUS WALKER,       )
                        )
        Plaintiff,      )
                        )
        vs.             )   No. 20-cv-00261
                        )
THOMAS DART, SHERIFF OF )
COOK COUNTY and COOK    )
COUNTY, ILLINOIS,       )
                        )
        Defendants.     )

    This is the deposition of ERIC DAVIS, taken via Zoom videoconferencing, called by the Plaintiff for examination, taken pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before PEGGY A. ANDERSON, a Certified Shorthand Reporter of the State of Illinois, on March 12th, 2024, at 1:00 o'clock p.m.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 2

1  A P P E A R A N C E S :
2
3       THE LAW OFFICES OF:
        THOMAS G. MORRISSEY, LTD.
4       BY:  MR. THOMAS MORRISSEY
             10257 South Western Avenue
5            Chicago, Illinois  60643
             (773) 238-4235
6            tgm@morrisseylawchicago.com
7            Appeared on behalf of the
             Plaintiff;
8
        THE LAW OFFICES OF:
9       JOHNSON & BELL, LTD.
10      BY:  MR. SAMUEL BRANUM
             33 West Monroe Street
11           Suite 2700
             Chicago, Illinois 60603-5404
12           (312) 372-0770
             branums@jbltd.com
13
             Appeared on behalf of the
14           Defendants.
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 3

1              I N D E X
2  WITNESS                               PAGE
3  ERIC DAVIS
4  DIRECT EXAMINATION BY
   MR. MORRISSEY:                          4
5
   CROSS-EXAMINATION BY
6  MR. BRANUM:                           228
7  REDIRECT EXAMINATION BY
   MR. MORRISSEY:                        246
8
9
10
11           E X H I B I T S
12 MARKED                                 PAGE
   PLAINTIFF'S EXHIBIT NO. 1               7
   PLAINTIFF'S EXHIBIT NO. 3              55
13 PLAINTIFF'S EXHIBIT NO. 4             145
   PLAINTIFF'S EXHIBIT NO. 7              49
14 PLAINTIFF'S EXHIBIT NO. 103           214
15
16      C E R T I F I E D   Q U E S T I O N S
17 LINE                                  PAGE
18 11                                      22
   5                                       26
19 3                                       27
   17                                      82
20
21              *******
22
23
24

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 1

ERIC DAVIS
March 12, 2024

Page 4

1         (WHEREUPON, the witness
2        was first duly sworn.)
3      MR. MORRISSEY:  This is the deposition
4   of Eric Davis taken pursuant to the Court's
5   order and set for today's date.
6  WHEREUPON:
7          ERIC DAVIS,
8  called as a witness herein, having been first
9  duly sworn, was examined and testified as
10  follows:
11     D I R E C T   E X A M I N A T I O N
12        BY MR. MORRISSEY:
13    Q   Mr. Davis, I'm going to ask you a
14  series of questions in regards to the Walker
15  case in which you provided a Declaration in
16  response to a motion for a permanent
17  injunction.
18        Have you looked at -- you were
19  previously deposed on two days in the Walker
20  case, correct?
21    **A   I don't recall specifics, but if you**
22  **say so.**
23    Q   On January 19th, 2022, do you recall
24  being deposed?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 5

1    **A   I would have to check my calendar,**
2  **but I assume the date you are talking about is**
3  **correct.**
4    Q   And you were also deposed on
5  January 24th, 2022 in the Walker case?
6    **A   I don't know if it was in the same**
7  **case, but okay.**
8    Q   Did you have an opportunity since
9  those dates to review your deposition
10  transcript?
11    **A   I think so.  Honestly, I looked at a**
12  **lot of things in connection with a lot of**
13  **cases.  So I'm not -- I would assume so, but I**
14  **can't recall specifically.**
15    Q   Is there anything in the depositions
16  in January of 2022 that were incorrect or
17  inaccurate which you would like to change
18  today?
19       MR. BRANUM:  Objection to the form of
20   the question.
21       THE WITNESS:  Am I supposed to
22   answer, Sam?
23       MR. BRANUM:  I mean, I guess the
24   answer to that is it depends.  I objected

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 6

1  to the form of the question.
2       If you are -- if you can answer
3   it, then answer it but I thought it was a
4   poor question.
5  BY THE WITNESS:
6    **A   I don't recall from a review any item**
7  **that may or may not have been accurate.  I**
8  **think I'm usually pretty good at those things,**
9  **but I don't recall any specifics.**
10      MR. BRANUM:  And just for the record,
11   Tom, you're not talking about any
12   inaccurate statements that you make in
13   these depositions because I think the
14   witness would say that he -- I don't think
15   the witness is subscribing to any of your
16   statements made during the deposition.
17      So my objection to the form of
18   the question was you didn't distinguish
19   between his testimony or your statements or
20   what in the deposition that you think he
21   found inaccurate, if anything.
22      But go ahead and ask your next
23   question.  That's my objection.
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 7

1  BY MR. MORRISSEY:
2    Q   Can you turn to -- let me see.  Turn
3  to Exhibit 1.
4       MR. BRANUM:  You are going to have to
5   share your screen.
6  BY MR. MORRISSEY:
7    Q   What documents prior to today's
8  deposition have you reviewed in order to
9  testify today?
10    **A   I think primarily -- well, I know if**
11  **this is the right one -- it looks like it is.**
12  **I did review this Declaration that you're**
13  **showing on the screen now.**
14    Q   When did you review the Declaration?
15    **A   Within the past few days.**
16    Q   Did you review any other documents in
17  preparation for today's deposition?
18    **A   Not that I recall.  I mean, I -- as**
19  **the Declaration states, there's work ongoing**
20  **that involves the area in question in this**
21  **case.  So I may have looked at documents**
22  **relative to that ongoing project or projects**
23  **that relate to what's in here.  I can't say**
24  **specifically -- it's not clear what you're, you**

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 2

ERIC DAVIS
March 12, 2024

Page 8

```
1   know, asking for.
2        Q    What documents did you review in
3   regards to what you call an ongoing project
4   involving the Cermak ramp?
5        A    I mean, I would have to go back and
6   check because it's -- as I said, it's an active
7   project.  There's work going on to, as it's
8   stated in the Declaration, to bring an
9   architect on board and bring a contractor on
10  board.  So I wouldn't be able to give you a
11  complete answer to that question without
12  looking into it.
13       Q    Since the date of your Declaration,
14  which was executed on February 22nd, 2024, are
15  there any documents that have been executed by
16  the defendants either the Sheriff or Cook
17  County in regards to -- that would be relevant
18  to your Declaration?
19            MR. BRANUM:  Objection to form.
20  BY THE WITNESS:
21       A    I can't speak to anything that the
22  Sheriff would or would not have executed.  I
23  have no way to know that, and it's not clear to
24  me, Tom, what constitutes executed.  I don't
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 9

```
1   know what that means in this context.  I mean,
2   a contract is executed but, I mean, I don't
3   know you're referring to when you say
4   documents that were executed in the period.
5   It's not clear to me what you're asking.
6   BY MR. MORRISSEY:
7        Q    What contract are you referring to?
8        A    Well, as it's noted in this
9   Declaration and -- let's see.  I'm not finding
10  it offhand.  Give me just a moment.  Yeah, it's
11  noted in the Declaration we have assigned one
12  of our task order architects to design the
13  replacement of the ramp.  So, you know, they
14  have a master agreement, and this is an
15  assignment under that agreement.
16       Q    What documents were executed to
17  assign this design --
18       A    Again, I don't --
19       Q    -- ramp to an architectural firm?
20       A    So, again, it's not clear to me what
21  you mean by executed.  The process of executing
22  the assignment for an architect for this
23  involves a development as it says I think in
24  Item 16 in this document of a task order, and
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 10

```
1   the development of a task order is a multistep
2   process.  That process is under way, but it's
3   not completed yet.  So we don't have anything
4   executed.  We're working out the specific terms
5   of the assignment with the vendor.
6        Q    What is the name of the vendor?
7        A    As it says in Item 16, it's HDR
8   Architecture.
9        Q    Looking at Paragraph Number 7 of your
10  Declaration.
11       A    Okay.
12       Q    Let me pull it up on the screen.  Do
13  you have your Declaration in front of you?
14       A    I do.
15       Q    Okay.
16       A    Yes, I do.
17       Q    Were you involved in hiring the firm
18  of Globetrotter [sic] Engineering?
19       A    Yes.
20       Q    Tell me what your involvement -- let
21  me ask a first question.
22            When did you first become involved in
23  retaining a third-party architectural
24  engineering firm to assess the ADA compliance
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 11

```
1   of the Cermak Health Service facility?
2            MR. BRANUM:  Objection to the form of
3       the question.
4            Go ahead.
5   BY THE WITNESS:
6        A    I would have to look back at my
7   records.  As it says in here somewhere -- well,
8   anyway, so the County is -- has retained or is
9   in the process of retaining firms to assess, as
10  it says in Number 7, the entire public safety
11  portfolio.  It's seven contracts, I believe
12  five of which have been executed as of today.
13  And the process of developing those requests
14  for qualification is a lengthy one.  So I would
15  say the process that led to hiring
16  Globetrotters is well over a year ago.  I would
17  have to look up the specific date.  I expect
18  the process was sometime in 2022.
19       Q    When did you personally become
20  involved in trying on behalf of the Capital
21  Planning Department to hire a firm to assess
22  the ADA compliance involving the Cermak ramp?
23            MR. BRANUM:  Objection to form.
24
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 3

ERIC DAVIS
March 12, 2024

Page 12

1   BY THE WITNESS:
2        A    I can look.  It's been a long process
3   to get that -- to get that procurement
4   completed.  I think it probably -- I'm pretty
5   sure it started sometime in 2022 or earlier
6   than that.
7   BY MR. MORRISSEY:
8        Q    Would it be fair to say that it began
9   after Ellen Stoner issued her report for STV in
10  regards to the noncompliance of the ADA ramp?
11       MR. BRANUM:  Objection to the form of
12  the question.  Misstates the record.
13  BY THE WITNESS:
14       A    I don't recall offhand, Tom, the date
15  of that document.  So I can't really speak one
16  way or the other.  I don't know.
17  BY MR. MORRISSEY:
18       Q    Do you recall Ellen Stoner's firm
19  doing an assessment of the Cermak ramp?
20       A    I recall her issuing an opinion that
21  included an illustration, yes.
22       Q    And the firm that she works for or is
23  a subcontractor for was STV Henry [sic]?
24       A    Heery.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 13

1        Q    Heery.  Is that correct?
2        A    STV Heery.  Heery is spelled
3   H-e-e-r-y, STV Heery.  Yes, she was --
4        MR. BRANUM:  And, Counsel, these
5   questions have already been asked in
6   previous depositions.  So you need to stick
7   with the Declaration per the Court's order.
8   BY MR. MORRISSEY:
9        Q    And her report, her assessment of the
10  Cermak ramp, was in March of 2018, correct?
11       A    I can't confirm or deny that.  I
12  would have to look it up, but I don't know
13  which item in the Declaration is that related
14  to?  I'm not following.
15       Q    After the issuance of Ellen Stoner's
16  report on the Cermak ramp in 2018, did you
17  personally take any steps to hire an
18  architectural firm to assess whether the ramp
19  was accessible?
20       MR. BRANUM:  You mean outside of what
21  he just testified to?  I think we're --
22  this has been asked and answered.  So
23  you're going around in circles.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 14

1   BY THE WITNESS:
2        A    I think what he may be referring
3   to -- and, Tom, again, I would have to qualify
4   saying I would have to check my notes and
5   records.  But as I know that you know from
6   other litigation or maybe it's this case and
7   some other part of this case.  I don't know.
8   The County attempted to hire the first time a
9   batch of firms to do work on a task order
10  basis.  The approach to Cermak would have been
11  probably -- the Cermak ramp would have probably
12  been handled under that.
13       But, as you know, in approximately
14  2019, the Board of Commissioners declined that
15  request to execute those contracts; and so we
16  tried again and reshaped and reissued a
17  solicitation, and that's what ended up with
18  Globetrotters.  But, as you know, we tried to
19  obtain task order engineering services
20  initially in around 2019.
21       So, again, assuming that the date
22  you're saying for Ellen's report is accurate, I
23  would expect that the information would confirm
24  that it was expected.  We would address the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 15

1   ramp with an architect through that vehicle
2   which, as I said, we weren't able to do.
3        Q    The first step in the actual
4   retention of Globetrotter Engineering was in
5   the year 2020, in February of 2020, when a
6   request for qualifications was being drafted by
7   either your department or procurement?
8        A    That may be right, yeah.  We
9   generally draft them, yeah.  That may be
10  correct.  I don't know.  I would have to go
11  check my records.
12       Q    And when did you finally get approval
13  to issue a request for qualifications?
14       A    It's a multistep process.  I would
15  have to go check.
16       Q    Was it more than two or three years
17  ago?
18       MR. BRANUM:  Asked and answered.
19  BY THE WITNESS:
20       A    I would have to go check.  I can't
21  answer one way or the other.  It took awhile.
22  Let's put it that way.
23  BY MR. MORRISSEY:
24       Q    Did that require the procurement

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 4

ERIC DAVIS
March 12, 2024

Page 16

```
 1   office to approve the request --
 2        A    Yes.
 3        Q    -- for qualifications?  Did it also
 4   require the procurement office eventually to
 5   approve a request for a proposal from an
 6   architectural firm?
 7             MR. BRANUM:  Objection to form,
 8        foundation.
 9   BY THE WITNESS:
10        A    In this case, we did not -- the
11   County did not issue a request for proposal.
12   It issued a request for qualifications.  It's a
13   slightly different process.  The intent is to
14   identify the most qualified firm and then to
15   negotiate with that firm in terms of their fee.
16   It's a standard practice in what's called
17   qualifications-based solicitation, and the
18   reason that we went to a request for
19   qualifications in this case rather than a
20   request for proposal that includes a price up
21   front was because some or -- we expect that
22   some or all of the work either on this project
23   or other projects in terms of ADA work may
24   receive federal funding.  In fact, we had one
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 17

```
 1   that did receive federal funding.
 2             And so by going to a
 3   qualifications-based procurement, it is
 4   compliant with the what's called the Brooks
 5   Act, which is a federal requirement for
 6   qualifications-based contracting of professional
 7   services in projects that receive federal
 8   funding.
 9             So it was done as an RFQ instead of
10   an RFP in order to allow at some point in the
11   future if there was federal funding to support
12   the eventual work, and that process took a
13   while.
14        Q    In order to put through a request for
15   qualifications, did that have to be included in
16   the Capital Improvement Plan for the County
17   Board?
18        A    The line item for a project for ADA
19   upgrades, yes, is included in the capital plan,
20   and I think that item number is in -- yeah,
21   Item 8 in this Declaration.
22        Q    So before you can hire Globetrotter,
23   you had to get approval from the County Board
24   to have the funds included in the Capital
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 18

```
 1   Improvement Plan for fiscal year 2023; is that
 2   fair to say?
 3        A    We tried to be as efficient as
 4   possible.  Since the encumbrance of a contract
 5   is not something that one does until the end of
 6   a process, again, I would have to check my
 7   records, but sometimes we will go ahead and put
 8   in the request for a project at the beginning
 9   of the year, and then go ahead and develop the
10   solicitation with the expectation that the
11   project would be approved later in the year,
12   and that would allow us to sign the contract
13   sooner relative to the date that the project
14   was approved in the capital plan.  But I would
15   have to refer to the notes and records to be
16   able to identify the timing both of the
17   contract for Globetrotters and the timing of
18   the development of the project that was
19   included in the capital plan.
20        Q    Did you participate at all with
21   reviewing the contract for -- with
22   Globetrotters to assess whether or not the
23   Cermak ramp complied with the ADA?
24        A    Yes.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 19

```
 1             MR. BRANUM:  Objection, form,
 2        compound question.
 3   BY THE WITNESS:
 4        A    I participated, yes.
 5   BY MR. MORRISSEY:
 6        Q    When did you first have contact with
 7   Globetrotter in regards to assessing the Cermak
 8   ramp?
 9             MR. BRANUM:  Objection to form.
10   BY THE WITNESS:
11        A    I don't -- you know, I couldn't say
12   offhand.
13   BY MR. MORRISSEY:
14        Q    Is it more than two years ago?
15        A    Again, I would have to check.
16        Q    Was it less than two years ago?
17        A    I would have to check.
18             MR. BRANUM:  Objection.
19   BY THE WITNESS:
20        A    We have -- as I said, we have five of
21   these contracts already executed and two more
22   in process.  So I would have to go back and
23   look at the specifics because we're working on
24   several of these all at the same time.
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 5

Page 20

```
 1   BY MR. MORRISSEY:
 2        Q    Who was your contact person when you
 3   were negotiating the contract with Globetrotter
 4   to assess the Cermak ramp?
 5        A    Do you mean the contract from -- the
 6   contact from Globetrotters or the contact from
 7   our procurement office?
 8        Q    Globetrotters.
 9        A    I don't -- I couldn't say
10   definitively.  It would be one of two -- three
11   or four people.  I can't remember who it was
12   specifically because we talked to some people
13   during the contract negotiations initially, so
14   it would have been one of several different
15   people.
16        Q    Did you personally have contact with
17   Globetrotter in negotiating the contract to
18   assess the Cermak ramp?
19        A    I participated in meetings discussing
20   with Globetrotters and with the office of the
21   chief procurement officer.
22        Q    Who from the office of chief
23   procurement office was involved in the
24   negotiations with Globetrotters?
```

Page 21

```
 1        A    I can't say definitively.  It would
 2   have been one of two, possibly three people.
 3        Q    Who were those individuals?
 4        A    It could have been Michael Sheevy who
 5   is no longer with the procurement office.  It
 6   could have been Robert Stewart who's a deputy
 7   CPO.  It could have been Adriaan Jelks-Brown
 8   who also is involved in the project as well,
 9   but I don't know which meeting you're talking
10   about because there were several meetings in
11   the course of negotiations on this.
12        Q    Were there meetings with the
13   Sheriff's Office in negotiating the contract
14   with Globetrotter?
15        A    I don't recall.  I don't think they
16   were involved in the specific scope
17   negotiations -- or I'm sorry -- fee
18   negotiations.  I don't -- they may or may not
19   have been in those meetings.  I don't recall if
20   they were or they weren't.  I don't think we
21   met with them separately, but I don't know if
22   they were in the conversations with
23   Globetrotters and the CPO's office or not.
24        Q    When you were negotiating with
```

Page 22

```
 1   Globetrotters, I would assume it was in 2022 or
 2   2023, correct?
 3        A    I would assume it's somewhere in that
 4   range, yes.
 5        Q    Did you discuss the scope of the work
 6   that you were asking Globetrotters to
 7   complete --
 8        A    Yes.
 9        Q    -- per the contract?
10        A    Yes.
11        Q    **** Did the scope of the work with
12   Globetrotters when you talked to them in 2022
13   or 2023 include any other assessments at the
14   Cook County Jail other than specifically the
15   Cermak ramp?
16             MR. BRANUM:  So don't answer that
17   question.
18             THE WITNESS:  Okay.
19             MR. BRANUM:  The Court's order is
20   limited to asking him questions about his
21   Declaration, and his Declaration doesn't go
22   outside of Globetrotters' involvement with
23   Cermak Health Services.
24             So in order to enforce a court
```

Page 23

```
 1   order, I'm directing the witness not to
 2   answer the question.
 3             MR. MORRISSEY:  We'll certify that
 4   question.
 5   BY MR. MORRISSEY:
 6        Q    You mentioned that at some point in
 7   time, Globetrotters was hired, correct?
 8        A    Yes.
 9        Q    In what year was Globetrotters hired?
10        A    I believe that the contract was
11   executed by the Board sometime in 2023.
12        Q    By "the Board," you mean the Cook
13   County Board?
14        A    That's correct.
15        Q    Why did Cook County Board have to
16   execute a contract for Globetrotters to assess
17   the Cermak ramp for compliance under the ADA?
18        A    Actually, I want to clarify.
19   Initially, they were hired under the direct
20   authority of the chief procurement officer.
21   There was a clerical error that caused -- and
22   so, actually, it was supposed to go to the
23   Board.  So it has subsequently gone to Board.
24             The initial engagement I'm pretty
```

Exhibit 5 Page 6

ERIC DAVIS
March 12, 2024

Page 24

1  sure was done just on -- because there's a
2  threshold fee, and the initial executed
3  contract was a portion of the scope that was
4  below that threshold.  So the chief procurement
5  officer approved it himself, and then it was
6  discovered that there was an error requiring it
7  to go to the Board.
8         So it was approved by the Board,
9  again, I believe, in 2023, but they were
10 initially engaged, you know, earlier in the
11 year.
12    Q   When you say there was a threshold
13 for payment for design services, is the
14 threshold $150,000 or more?
15    A   Yes.
16    Q   So the fee that was paid to
17 Globetrotters to assess the Cermak ramp
18 exceeded $150,000?
19         MR. BRANUM:  Objection to the extent
20    you're mischaracterizing the testimony, but
21    you can answer.
22 BY THE WITNESS:
23    A   No, because you say the amount paid.
24 Globetrotters bills as the project goes on.  I

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 25

1  couldn't tell you offhand whether or not as of
2  the day that we're talking if they billed more
3  or less than $150,000 yet.  They have a
4  contract for that value over 150,000, but I
5  can't tell you whether or not they have been
6  paid, which was the word you used, more than
7  150,000 or not as of March 13.
8     Q   What was the scope?  You say that
9  Globetrotters was hired under a contract
10 approved by the Cook County Board?
11    A   Yes.
12    Q   What was the scope of that contract?
13    A   To assess the entire Cermak Health
14 Services facility including the ramp and to
15 provide a preliminary design, what's called a
16 transfer package of the intended -- of the
17 resulting approved modifications such that then
18 they could be approved by an architect of
19 record to pull permit for construction.
20    Q   So the contract for -- were there
21 more than one contracts issued to Globetrotters
22 in 2022 or 2023?
23         MR. BRANUM:  Objection to form.
24

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 26

1  BY THE WITNESS:
2     A   This contract was just a single
3  contract.
4  BY MR. MORRISSEY:
5     Q   **** My question was did
6  Globetrotters receive, to your knowledge,
7  receive more than one contract in 2022 or 2023?
8         MR. BRANUM:  Again, same objection
9     and direction not to answer.
10         To the extent -- I don't know
11    exactly what you're asking, Tom, but if
12    you're asking for contracts outside of
13    Cermak Health Services, then I would direct
14    the witness not to answer the question to
15    enforce the Court's order.
16         To the extent you're asking about
17    other contracts related to Cermak Health
18    Services, he can answer that question.
19         MR. MORRISSEY:  I will certify the
20    question if you don't want to allow him to
21    answer, Mr. Branum, because it's relevant
22    to the permanent injection.
23         MR. BRANUM:  Well, if you want to
24    clarify your question first, I could

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 27

1  reassess because your question was unclear.
2  BY MR. MORRISSEY:
3     Q   **** Has Globetrotters provided any
4     other assessments of buildings at the Cook
5     County Jail since 2022 as far as compliance
6     under the ADA?
7         MR. BRANUM:  And with that
8     clarification, I'm directing the witness
9     not to answer to enforce a court order.
10        His Declaration does not go into
11    details about any other building or
12    facility at the jail outside of Cermak
13    Health Services facility.
14        The Court ordered that your
15    questioning in this deposition be limited
16    to his Declaration.  And so because other
17    facilities are not in his Declaration, your
18    question falls outside of the scope of the
19    Court's order.
20 BY MR. MORRISSEY:
21    Q   Under Paragraph Number 8, you say the
22 ADA renovations for Cermak Health Service
23 facilities was included in the fiscal year 2023
24 capital plan, Project Number 23280.  The

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 7

ERIC DAVIS
March 12, 2024

Page 28

1  Globetrotters' contract and subsequent
2  construction is funded under that item in the
3  County budget, Project 23280 and carried over
4  and is in the fiscal year 2024 CIP as well.
5        So my question is what was included
6  in Project Number 23280?
7     A    For the engagement of Globetrotters
8  and is only the Globetrotters' work, there is a
9  difference between a project and a contract.
10 It is not uncommon for us to have a project
11 that includes contracts both for design and
12 construction.
13        At this time, because we're in design
14 phase, the funding in the budget is only for
15 design.  It is expected that when we get to
16 construction documents and need to get to
17 construction itself, that we will need to
18 increase the funding on Project 23280 to
19 include the funds necessary as estimated for
20 the construction.  But since we don't know what
21 that number is at this time, the only element
22 in the budget for 23280 is the funding for the
23 design fees.
24     Q    When you say "design fees," what do

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 29

1  you mean by design fees?
2     A    Architectural engineering work.
3     Q    In 23280, did that include any funds
4  for design fees or architectural engineering
5  work other than the Cermak ramp?
6     A    No.
7        MR. BRANUM:  Objection to the form of
8     the question.
9  BY THE WITNESS:
10    A    My answer was no, not at this time.
11 BY MR. MORRISSEY:
12    Q    And you say that -- you draw a
13 distinction between design work and
14 construction drawings, is that correct, under
15 23280?
16    A    In this case, the assignment for --
17 and I think it says this.  The assignment for
18 Globetrotters is to assess the facility and to
19 develop preliminary design work to indicate the
20 recommendations.  The intent -- and that's
21 what's called a transfer package.  They will be
22 generating a transfer package which articulates
23 the scope in detail that is necessary to
24 achieve the approved modifications to the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 30

1  building.
2        The County will then hire a second
3  firm to -- what's called the architect of
4  record that will execute those -- the transfer
5  package as drawings for permit.  It's a fairly
6  common arrangement.  Chicago Public Schools
7  does it all the time, and it allows us to
8  budget more accurately.  We can budget for the
9  subsequent fees based on a transfer package and
10 not just recommendations.  So it's something
11 that we do sometimes to -- both to ensure full
12 information, but also it helps with making sure
13 that we're doing a good job in terms of
14 estimating the project.
15    Q    Under the Globetrotter contract, has
16 the transfer package been provided by
17 Globetrotter under Project Number 23280?
18    A    They are not done with it yet, no.
19    Q    What does the transfer package
20 include?
21    A    Generally, it's a set of drawings and
22 a set of specifications.
23    Q    When did -- to your knowledge, did
24 you supervise or were you -- let me strike

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 31

1  that.
2        Tell me your involvement after
3  negotiating a contract with Globetrotters to
4  assess the Cermak ramp.  What additional
5  involvement have you had with Globetrotters?
6        MR. BRANUM:  Objection to form.
7  BY THE WITNESS:
8     A    Well, I have been in most of the
9  meetings.  I can't say categorically all, but I
10 have been in most of the meetings with
11 Globetrotters' staff as a part of their
12 assessment of the facility and reviews of their
13 draft assessments as they were developed.
14        So I have been in several meetings
15 with them along with our project director and
16 project manager and ADA expert, et cetera, and
17 I should say members of the Sheriff's Office
18 have also been participating in the reviews of
19 the draft assessment as that's been developed.
20    Q    In the year 2023, tell me
21 specifically what involvement you've had with
22 Globetrotters in relation to the Cermak ramp?
23        MR. BRANUM:  Objection, asked and
24    answered.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 8

ERIC DAVIS
March 12, 2024

Page 32

```
1    BY THE WITNESS:
2         A    Yeah, that's what I just said.
3    BY MR. MORRISSEY:
4         Q    Well, your report, I believe,
5    mentions -- let me see here.  On Number 9:  The
6    Globetrotter team conducted the site visit on
7    August 18th, 2023 and September 1st, 2023 to
8    verify existing conditions relating to the
9    Cermak ramp.
10             Prior to August 18th, 2023, did you
11   have any conversations or meetings with
12   Globetrotter in regards to the Cermak ramp?
13        A    Globally, I can't tell you what date
14   they were on offhand without checking the
15   records, but I believe we had one or more
16   conversations with their team prior to them
17   going to the site.
18        Q    When you say "we," who do you
19   include?
20        A    Myself, my project director, the
21   consulting construction manager.  As I
22   mentioned, usually someone from the Sheriff's
23   Office is there.
24             In the initial meeting when we first
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 33

```
1    contacted them after the contract is signed,
2    usually someone is there from the Office of the
3    Chief Procurement Officer, so it's multiple
4    folks from the County.
5         Q    You mentioned a construction manager?
6         A    Yes.
7         Q    Prior to April -- August 18th, 2023,
8    there was a meeting which you participated with
9    Globetrotter where there was also a
10   construction manager present.  Who was that
11   person?
12        A    I would have to check my records.  I
13   don't recall who was there.
14        Q    Is that a County person, someone who
15   works for the County?
16        A    That's a consultant.
17        Q    And would this consultant be STV
18   Henry?
19        A    No.
20        Q    Who was the consultant?
21        A    In 2022 -- I believe it was 2022 --
22   the prior contract with STV Heery expired, and
23   the County contracted with a different team,
24   which is called Ardmore Roderick Arcadis, which
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 34

```
1    is the construction management firm overseeing
2    the public safety portfolio, which includes
3    this facility.
4              So if there was a meeting between the
5    time that the contract was executed on
6    August 18th, which I believe there was one or
7    more, it would have been someone from that
8    consulting team because they took over the
9    portfolio for STV Heery who then was no longer
10   the construction manager for this portfolio.
11        Q    So would Ardmore be the construction
12   firm that would be retained by Cook County to
13   renovate the Cermak ramp?
14        A    No.
15        Q    What would their involvement be in
16   renovating the Cermak ramp?
17        A    So I would refer you to -- let's see.
18   Where is it?  I know it's here somewhere.
19             So as mentioned in Item 17 in the
20   Declaration, the actual construction in the
21   ramp will be done -- will be constructed by one
22   of our job order contracting companies.  Okay?
23   These are the people actually doing the
24   construction.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 35

```
1              As I mentioned, the Ardmore Roderick
2    Arcadis team is a construction management firm.
3    They help the County manage the construction.
4    They will not be doing the construction.  They
5    help us manage the construction.
6         Q    By "manage," do you mean that they
7    oversee the construction by their outside
8    contractor to make sure that it is done
9    correctly?
10        A    Generally -- and you're getting into
11   an area of law that gives architects
12   nightmares.  Generally, what they do is they
13   observe the construction; and if there are
14   elements that appear to be incorrect, they will
15   work with the County and with the architect.
16   They'll say, hey, it looks like the contractor
17   is constructing this part of it incorrectly,
18   and they may ask the architect of record to go
19   to the site and observe.  And if the architect
20   of record says, oh, yes, they're building that
21   wrong, then the Ardmore team would help us
22   issue direction to the contractor to make
23   corrections.
24             So in other words, they are not
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 9

ERIC DAVIS
March 12, 2024

Page 36

1  directing trades in the field, but they are
2  observing and helping us identify issues that
3  may appear to be not in compliance with the
4  design.
5      Q   So let's go to Number 5 of your
6  Declaration.  Can you pull that up?
7      A   Yes.  It's on the screen.
8      Q   You say in the first paragraph:  Per
9  the original design plans for the Cermak ramp
10 from 1996, the drawing showed the rise of the
11 Cermak ramp was intended to be 30 inches.
12     A   Correct.
13     Q   What you're referring to there are
14 the initial architect's design drawings,
15 correct?
16     A   That's correct.
17     Q   And Cook County, after it was
18 constructed, it would have been a construction
19 manager either for Cook County or their outside
20 consultant that would have measured the ramp to
21 ensure that it was done per the design plans by
22 the architect, correct?
23         MR. BRANUM:  Objection, foundation,
24     calls for speculation.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 37

1  BY THE WITNESS:
2      A   Yeah, I couldn't say one way or the
3  other.  I didn't work at the County.  I can't
4  stipulate as to what processes the County did
5  or did not use at the time.
6  BY MR. MORRISSEY:
7      Q   What is the relevance then of Number 5?
8  Isn't it true that the architect's initial design
9  drawings may be quite different from the finished
10 product?
11         Would you agree with that?
12         MR. BRANUM:  Objection, incomplete
13     hypothetical.
14 BY THE WITNESS:
15     A   Yeah, I don't -- generally owners
16 want to make sure that they're getting what's
17 been specified.  I don't know if that's
18 answering your question or not.
19 BY MR. MORRISSEY:
20     Q   So to your knowledge, after the
21 Cermak was built sometime after the design
22 drawings were done in 1996, to your knowledge,
23 did anybody from Cook County inspect it after
24 construction to see if it was in conformance

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 38

1  with the design drawings that showed the --
2         MR. BRANUM:  Objection, foundation.
3  BY MR. MORRISSEY:
4      Q   -- rise of less than 30 inches?
5         MR. BRANUM:  Objection, foundation.
6  BY THE WITNESS:
7      A   So I couldn't say whether they
8  inspected it immediately after construction or
9  three years after construction or ten years
10 after construction.  I don't know what you're
11 asking.
12 BY MR. MORRISSEY:
13     Q   Well, my question is did -- to your
14 knowledge, did anybody verify after the ramp
15 was constructed that the rise of the Cermak
16 ramp was less than 30 inches?
17         MR. BRANUM:  Objection, foundation.
18 BY THE WITNESS:
19     A   If what you're asking is relatively --
20 is whether relatively soon after construction
21 was completed someone from the County verified
22 the rise of the ramp, I couldn't say one way or
23 the other.  I don't know.  What someone may
24 have done in 1998, 1999, I couldn't say.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 39

1  BY MR. MORRISSEY:
2      Q   Assuming there is a renovation of the
3  Cermak ramp, would this firm -- would your
4  construction manager now, Ardmore, be charged
5  with the job of making sure that the renovated
6  Cermak ramp complied with the 2010 ADA
7  standards?
8      A   Well, given how much fun we've had
9  talking with you about this, we will probably
10 employ some form of verification of the final
11 construction after the modifications are made.
12 I can't say if that would be another LIDAR scan
13 or a survey or whatever, but it would seem
14 prudent for us to make sure that that is --
15 that compliance with the -- the design for the
16 modifications was, in fact, achieved.
17         I can tell you that on another
18 instance, there was a ramp that was to be
19 constructed elsewhere in the County complex
20 that was constructed wrongly and had to be
21 chopped out and reconstructed.
22         So we will make sure that what is
23 built -- we will have an independent
24 verification one way or the other that what

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 10

Page 40

1  gets built is compliant with the design plans
2  that would be compliant with the applicable
3  portions of the 2010 ADA and all other
4  applicable regulations.
5          Q    The intent by the architect for the
6  Cermak ramp in 1996 was to make it -- make the
7  rise less than 30 inches for the Cermak ramp.
8              Would you agree with that?
9              MR. BRANUM:  Objection --
10 BY THE WITNESS:
11         A    I would say that the design plan
12 showed that the intent was that it would be
13 exactly 30 inches.
14 BY MR. MORRISSEY:
15         Q    And you just used a word that you
16 would "probably" hire a firm now if the Cermak
17 ramp is renovated to make sure that it complies
18 with the 2010 ADA standards.
19             Was that correct?  Did I hear that
20 correct?
21             MR. BRANUM:  Just object to the
22         extent you're mischaracterizing his
23         previous testimony, but go ahead.  You can
24         answer.

Page 41

1  BY THE WITNESS:
2          A    Yeah, I would -- I would say that it
3  would be generally the department's intent to
4  hire someone to verify that.
5              As I mentioned, this department
6  doesn't have sole discretion over who does or
7  doesn't get hired for such things.  The Office
8  of the Chief Procurement Officer has to approve
9  it and, in some cases, the County Board has to
10 approve it.  I don't know how we're going to
11 achieve it.  I think it would be our intent to
12 do so, and that's why I used the term
13 "probably."  But I can't give you a guarantee
14 because that's an act in the future to be done
15 by people that -- outside the department.
16         Q    Would you as the deputy in Capital
17 Planning be responsible, assuming the Cermak
18 ramp is renovated, to ensure that it complies
19 with the 2010 standards?
20             MR. BRANUM:  Objection to form.
21 BY THE WITNESS:
22         A    I don't know what you mean by "to
23 ensure."  The architects that we hire as
24 architect of record are contracted to design a

Page 42

1  ramp that would be compliant with applicable
2  code.  They have a responsibility for that.
3  The contractor who constructs the replacement
4  of the ramp has a responsibility to execute the
5  drawings.
6              So I don't know how -- you know, they
7  have responsibilities, and so I don't know how
8  to completely answer your question.
9          Q    Who within Cook County's government
10 would be responsible to ensure that the Cermak
11 ramp, if it's renovated, will comply with the
12 2010 standards?
13             MR. BRANUM:  Objection to the form of
14         the question.  Your question has a false
15         premise or it's based on an assumption that
16         hasn't been established.  So it's a
17         question that can't be answered.
18 BY THE WITNESS:
19         A    I don't know what you mean by
20 "ensure."
21 BY MR. MORRISSEY:
22         Q    By ensure, I mean that if the County
23 goes forward with the renovation of the Cermak
24 ramp, how will the Court know that the ramp

Page 43

1  complies with the 2010 ADA standards?
2          A    Well, again, as you know, first of
3  all, the 2010-ADA is not the sum total of
4  applicable regulations.  So let's first note
5  that there are other requirements that may be
6  involved, you know, like accessibility code or
7  city of Chicago code may have additional
8  elements.
9              That said, as I mentioned, it is our
10 intent to obtain objective documentation of the
11 physical form of the final reconstructed ramp
12 that would reflect that it was compliant with
13 the design, that the architect of record has a
14 responsibility for it to be compliant with the
15 applicable laws and codes.
16         Q    When you say "intent," what
17 verification will be provided by your office or
18 Cook County that the Cermak ramp after it's
19 renovated will comply with the federal ADA
20 standards?
21             MR. BRANUM:  Yeah, I believe he's
22         asked that question a couple of times, but
23         maybe it's because I don't understand your
24         question but --

Exhibit 5 Page 11

Page 44

1  BY THE WITNESS:
2      A    Yeah, I don't know how it's different
3  from things I've already said.
4  BY MR. MORRISSEY:
5      Q    Can you respond to it?
6      A    If I'm understanding your question
7  correctly, our intent is to provide objective
8  documentation of the physical form of the final
9  reconstructed ramp and to compare that
10 documentation with design drawings.
11     Q    You're aware that there was -- let
12 me -- I'm going to refer to Exhibit 7.
13     A    I don't know if I have Exhibit 7.  I
14 only have 1 and 2.
15          MR. BRANUM:  Well, he's referencing
16     exhibits that he's using.  You don't have
17     those.
18          THE WITNESS:  Okay.
19          MR. BRANUM:  And he will share it on
20     the screen.
21          THE WITNESS:  Okay.
22 BY MR. MORRISSEY:
23     Q    Showing you Exhibit Number 7.  Do you
24 have Number 7 on your screen?

Page 45

1      A    I see an Order on the screen.
2      Q    And it's an order by Judge Rowland
3  issued on July 27, 2022.
4      A    Okay.
5      Q    Are you familiar with this order?
6      A    Generally, yes.
7      Q    When did you first become aware that
8  there was an order entered regarding the Cermak
9  ramp?
10     A    I would have to check my records
11 about when I received a copy of this.
12     Q    The first line is:  Upon the parties'
13 agreement, defendant Cook County will install
14 handrails --
15     A    Hand-railings.
16     Q    -- on the Cermak ramp on or before
17 December 31st, 2022.
18     A    Yeah.
19     Q    Railings must comply with the
20 Americans with Disability [sic] Act (ADA)?
21     A    Okay.
22     Q    What was your participation in -- let
23 me go back a step.
24          When did you first become aware that

Page 46

1  the County entered into an agreement to install
2  handrails on the Cermak ramp?
3      A    So I'm not clear on which item of the
4  Declaration this is in reference to.
5      Q    That's not --
6          MR. BRANUM:  Yeah, Tom, if you could
7     tell us what paragraph of the Declaration
8     your questions are directed to.
9  BY MR. MORRISSEY:
10     Q    That's not the question, sir.
11          MR. BRANUM:  Then we'll stop the
12     deposition.  We'll get the Court involved
13     if you don't want to cooperate.  There is
14     no reason for you to not provide that
15     information.  It's information that we need
16     to assess whether the scope of your
17     deposition is within the Court's order, and
18     the Court's order stated that the
19     deposition is limited to Eric Davis'
20     Declaration.
21          So all we're asking is that you
22     explain what part of the Declaration these
23     questions are directed at.
24

Page 47

1  BY MR. MORRISSEY:
2      Q    Well, Declaration Number 12
3  specifically refers to the handrails.
4      A    Okay.  All right.  Thank you.
5          MR. BRANUM:  And, Eric, if you need
6     time to review that paragraph.
7          THE WITNESS:  Yeah, that's what I'm
8     looking at now.
9  BY THE WITNESS:
10     A    Okay.  Yada, yada.  Okay.  Yeah, I
11 think it also impacts Number 13.
12          But go ahead.
13          MR. MORRISSEY:  Peggy, can you read
14     back the question?
15               (WHEREUPON, the record
16               was read as requested.)
17 BY THE WITNESS:
18     A    Okay.  So the handrails of the Cermak
19 ramp, as I believe counsel knows from prior
20 action, were actually installed by the County's
21 Department of Facilities Management.
22          So as far as a contract to install
23 them, they were actually done by -- installed
24 by County forces.

Exhibit 5 Page 12

ERIC DAVIS
March 12, 2024

Page 48

1  Q    My question was directed to your
2  knowledge that the County was going to go forth
3  with handrails.
4  A    Yeah.
5  MR. BRANUM:  Well, I'll object to the
6  form of the question.  It's confusing.
7  BY THE WITNESS:
8  A    So you're asking when I knew we were
9  going to do handrails?
10 BY MR. MORRISSEY:
11 Q    Correct.
12 A    I would have to check.  I can't tell
13 you offhand.
14 Q    Was that sometime in August of 2022?
15 A    Perhaps.  That may be.  I know --
16 Tom, I know you and I have talked about this
17 several times.  That sounds right, but I
18 couldn't stipulate, you know, yes or no.  That
19 may be the case.
20 Q    When you became aware that the County
21 was going to install handrails pursuant to the
22 Court's order, what did you do as the capital
23 planning deputy director?
24 MR. BRANUM:  So, first, I will object

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 49

1  that you're misstating the Court's order.
2  It states:  Upon the parties' agreement.
3  So the premise of your question -- or
4  strike that.
5  Your question has a false
6  premise, so it's an unanswerable question.
7  BY MR. MORRISSEY:
8  Q    You can answer, Mr. Davis.
9  MR. BRANUM:  It's an unanswerable
10 question, so -- because the premise of your
11 question is false.
12 So if you want to ask a clean
13 question without inserting your spin on
14 what the order that you have marked Exhibit 7
15 shows, he can answer a clean question, but
16 he's not going to answer a question with
17 your interpretation of the Court's order in
18 it.
19 MR. MORRISSEY:  Peggy, will you
20 repeat the question?
21 MR. BRANUM:  She can repeat it, but
22 it's going to be the same objection.  I
23 think it would be easier if you just ask a
24 clean question.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 50

1  THE WITNESS:  I'm okay if Peggy
2  rereads it.
3  (WHEREUPON, the record
4  was read as requested.)
5  MR. BRANUM:  So don't answer that
6  first part that has plaintiff's counsel's
7  incorrect characterization included in the
8  question, but you can answer the second
9  part, which what he's asking is what did
10 you do?
11 So just answer what did you do,
12 but you're not adopting plaintiff's
13 characterization.
14 BY THE WITNESS:
15 A    So first of all, these things are --
16 you know, it's a process.  It's multiple steps.
17 I know that we -- I don't know.  I believe we
18 were involved in the effort to put in handrails
19 in the ramp before this order.
20 As far as when the specific direction
21 got made, if I remember correctly, it took us
22 quite awhile to obtain the handrails because
23 it's a relatively specialized piece that had to
24 be ordered.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 51

1  So the process of starting to say,
2  hey, we need to replace the handrails on the
3  ramp, I'm pretty sure happened before this
4  order.
5  As far as when the specifics of when
6  it was going to be constructed, as I recall,
7  let's see, would it have been October?  I'm
8  not -- I don't -- something like that.  A year
9  and a half ago when the construction started,
10 and I remember that we had difficulty, as I
11 think it says in the Declaration, had
12 difficulty acquiring the end pieces that would
13 have resolved the installation.  But I believe
14 the main handrails went in sometime between --
15 I want to say it was around October, December,
16 in that area.  I would have to go back and
17 check.
18 BY MR. MORRISSEY:
19 Q    When you say "we," who are you
20 including in the Cook County government?
21 A    Well, as I said earlier, the people
22 installing it was the County's Department of
23 Facilities Management.  I'm in Capital
24 Planning, which is a part of the Bureau of

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 13

Page 52

1   Asset Management, and Facilities Management is
2   also part of the bureau.  So those folks are in
3   the same bureau with me.
4       Q    Would it be fair to say as far as
5   Cook County's government is concerned, you were
6   the -- you have been the lead person in regards
7   to the Cermak ramp since at least the issuance
8   by Ellen Stoner's report in March of 2018?
9           MR. BRANUM:  Objection to the form of
10      the question.
11  BY THE WITNESS:
12      A    I have served as the primary contact
13  for the County on the facilities aspect of
14  accessibility and the ADA for quite sometime,
15  including the period when Ellen Stoner issued
16  her opinion.
17  BY MR. MORRISSEY:
18      Q    And when you say "the primary
19  contact," you have been the primary contact for
20  Cook County's government in regards to the
21  Cermak ramp.
22           Is that fair to say?
23           MR. BRANUM:  Objection to form.
24

Page 53

1   BY THE WITNESS:
2       A    To the facilities aspects of it.  I
3   have nothing to do with the operations of the
4   ramp.
5   BY MR. MORRISSEY:
6       Q    Well, what do you mean by "the
7   facilities" as opposed to the operations of the
8   ramp?
9       A    To oversimplify, the difference
10  between the floor and the person who walks on
11  it.  We work with the floor, not the people
12  that walk on it.
13      Q    So for Cook County, you have been the
14  person, the lead person, in regards to this
15  effort to renovate the Cermak ramp?
16      A    I think that's fair to say, yes.
17      Q    So you are aware that the County had
18  agreed to install handrails that complied with
19  the Americans for [sic] Disabilities Act,
20  correct?
21      A    As of July 27th, that was our intent
22  to do so, yes.
23      Q    When did you become aware for the
24  first time that the handrails did not comply

Page 54

1   with the ADA?
2       A    I couldn't tell you offhand.  I
3   believe it was during the course of arranging
4   for the Department of Facilities Management to
5   purchase the handrails and materials, but I
6   don't -- I couldn't tell you offhand when that
7   happened just that I remember that getting the
8   end pieces became a challenge.
9           We looked at -- I should also say we
10  looked into a lot of different options to try
11  to achieve handrails in the way that, as it
12  notes here, GEC has observed including things
13  like exploring the feasibility of cutting and
14  beveling sections of the handrail.  There were
15  some geometric reasons why that wouldn't work.
16  The ability to simply bend them, the material
17  would not allow us to do that.
18          So we looked at different ways to
19  possibly try to achieve the ends of the
20  handrails adequately, but we weren't able to
21  figure out a way to make that happen.
22      Q    And as the Cook County's
23  representative, you are aware that the
24  handrails -- well, let me ask a preliminary

Page 55

1   question.
2           Let's turn to Globetrotters' report.
3           MR. BRANUM:  You are going to have to
4       show the exhibit on the screen.
5   BY MR. MORRISSEY:
6       Q    Do you have a copy of Globetrotters'
7   report?
8           MR. BRANUM:  What Exhibit Number is
9       it?
10          MR. MORRISSEY:  It's Exhibit Number
11      3.
12          MR. BRANUM:  And that's what you're
13      showing on the screen?
14          MR. MORRISSEY:  That's correct.
15  BY THE WITNESS:
16      A    Okay.  I don't know if this is a
17  draft or the final.  I would have to check.
18  But go ahead.
19  BY MR. MORRISSEY:
20      Q    How many -- when did you first
21  receive a draft of Globetrotters' Corridor Ramp
22  Accessibility Assessment?
23      A    I don't know offhand.  I would have
24  to check.

Exhibit 5 Page 14

ERIC DAVIS
March 12, 2024

Page 56

```
 1        Q    Would that have been shortly after
 2   the inspection in August or September of 2023?
 3        A    Shortly?  I don't know what that
 4   means.
 5        Q    Well, is it within one month of their
 6   doing the inspection were you told that the
 7   Cermak ramp -- the rise of the Cermak ramp
 8   exceeded 30 inches?
 9        MR. BRANUM:  Objection to form.
10   BY THE WITNESS:
11        A    I don't know when I was notified of
12   that.  I would have to check.  I don't know.
13   BY MR. MORRISSEY:
14        Q    Were you aware that Globetrotters was
15   coming out in August of 2023 to inspect the
16   Cermak ramp?
17        A    I attended one or the other of the --
18   I believe one or the other of those
19   walkthroughs that you referred to earlier in
20   August or September.  I can't remember offhand
21   which one of them.  I did walk the building at
22   least once with them.
23        Q    And when you walked the building,
24   were they conducting measurements of the Cermak
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 57

```
 1   ramp?
 2        A    Not on the one that I went on, no.
 3        Q    Did you attend any meetings in August
 4   or September with Globetrotters' representatives
 5   in regards to the Cermak ramp?
 6        A    I'm pretty sure that I did.  I
 7   couldn't tell you the exact dates, but I'm
 8   pretty sure that I did.  They might well have
 9   been Zoom meetings, but yeah.
10        Q    Who was present during the meetings?
11        A    I couldn't tell you without checking.
12   I have given a partial answer to that question
13   before, Tom.
14        Q    And after they inspected the ramp in
15   August or early September, you had at least one
16   meeting with Globetrotters?
17        A    Yes.
18        Q    Did you have multiple meetings with
19   Globetrotters after they inspect the -- after
20   they conducted the two inspections?
21        A    I believe so, yes.
22        Q    Between September -- let me get the
23   exact date.  Let me get the exact date.  All
24   right.  Here it is.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 58

```
 1        After -- the Cermak ramp, according
 2   to the ramp on Page 6, and I'll pull it up.  Do
 3   you see on Globetrotters' report they say that
 4   they did site inspections on August 18th and
 5   September 1st of 2023?
 6        A    Okay.
 7        Q    You were present during one of those
 8   site inspections, correct?
 9        A    I think I was present on one or the
10   other, but it may have been another meeting.  I
11   know they have been to the site several times.
12   I know I have walked the building at least once
13   with them.  I don't know if it's the specific
14   ones they are referring to here, but it would
15   have been around the same time.
16        Q    After September 1st, 2023 up until
17   today's date, how many meetings have you had
18   with Globetrotter?
19        A    I couldn't tell you offhand.
20        Q    More than five?
21        A    I couldn't tell you offhand.
22        Q    More than two?
23        A    Probably, yes.
24        Q    Do you have e-mails that would
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 59

```
 1   indicate how many meetings you had with
 2   Globetrotters?
 3        A    I don't know if I would have e-mails.
 4   I might have calendar appointments, although
 5   unfortunately our system sometimes removes
 6   things after meetings have happened, so I'd
 7   have to -- I can go check and try and find out,
 8   but I know we have been in multiple meetings
 9   with them.
10        Q    In September of 2023, were you aware
11   that the -- Cermak had a concern about the
12   handrails not being compliant with the 2010
13   standards?
14        MR. BRANUM:  Objection to form.
15   BY THE WITNESS:
16        A    I couldn't say when they informed us
17   of their opinion of that or not.  I can't tell
18   you when that specific, you know, notice might
19   have been.
20   BY MR. MORRISSEY:
21        Q    In September of 2023, were you made
22   aware of the fact that the rise of the Cermak
23   ramp exceeded 30 inches?
24        A    I don't know offhand when they
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 15

ERIC DAVIS
March 12, 2024

Page 60

1   provided that information to us.
2       Q   Did they provide a draft of their
3   assessment report prior to December 6th, 2023
4   to you?
5       A   I would say probably.  I couldn't
6   tell you the date offhand.
7       Q   When did -- to the best of your
8   recollection, in the fall of 2023 after
9   Globetrotter did their inspection on
10  August 18th and September 1st, when did you
11  become aware that Globetrotters had determined
12  that the rise was over 30 inches?
13      MR. BRANUM:  Didn't you just ask that
14      question?
15  BY THE WITNESS:
16      A   Yeah, I think I just answered that.
17  BY MR. MORRISSEY:
18      Q   Was it prior to November of 2023?
19      MR. BRANUM:  Objection, asked and
20      answered.
21  BY MR. MORRISSEY:
22      A   Again, I would have to check, Tom.
23  You know, somewhere in that -- somewhere in the
24  fall, but I couldn't tell you specifically

ERIC DAVIS
March 12, 2024

Page 61

1   when.
2   BY MR. MORRISSEY:
3       Q   And did you -- turning to Page 9 of
4   Globetrotters' report, looking at the Summary
5   of Findings Per Current Applicable Code and
6   Guidelines.  Calling your attention to the
7   second paragraph, it states, in part:  The
8   existing ramp handrails on both sides are not
9   continuous with the 12-inch extension.
10  Therefore, they are not compliant with section
11  505.10.1 of the 2010 ADAAG, the 2009 ANSI 117.1
12  Accessibility Standards, nor the 2018 IAC.
13      Do you see that in your report?
14      A   Yes.
15      Q   In your report, in your Declaration --
16  give me a moment.  On Page 15 of your
17  Declaration -- can you turn to your Declaration,
18  Page 15?
19      A   Item 15?
20      Q   Yes.
21      A   Yes.
22      Q   You say:  The County has accepted
23  GES's [sic] recommendations to remove the
24  existing concrete ramp and re-pour it with a

ERIC DAVIS
March 12, 2024

Page 62

1   slope of 1 to 20 or shallower, therefore making
2   that area by code no longer a ramp but rather a
3   walking surface, which does not require a
4   landing, handrails, et cetera to transverse.
5       A   Yeah.
6       Q   When you use the term "the County has
7   accepted GEC's recommendation," who do you mean
8   by "the County"?
9       A   The Department of Capital Planning
10  and specifically yours truly as the primary
11  representative on this project.
12      Q   Do you mean Cook County government?
13      MR. BRANUM:  Objection to the form of
14      the question.  I don't know what you're
15      asking.
16      MR. MORRISSEY:  Well, let me rephrase
17      it.
18  BY MR. MORRISSEY:
19      Q   Do you mean the Cook County Board has
20  agreed with Globetrotters' recommendations in
21  the report dated December 6th, 2023?
22      MR. BRANUM:  Objection to form.
23  BY THE WITNESS:
24      A   No.  The County Board doesn't -- this

ERIC DAVIS
March 12, 2024

Page 63

1   is the Department of Capital Planning, which
2   has been -- is the agency that is charged with
3   dealing directly with the facilities, so --
4   but meaning -- is the County in this case means
5   the Department of Capital Planning.
6       Q   Does the Department of Capital
7   Planning have the legal authority to bind Cook
8   County in regards to committing the County to
9   renovating the Cermak ramp?
10      MR. BRANUM:  Objection, calls for a
11      legal conclusion, incomplete hypothetical,
12      calls for speculation.
13  BY THE WITNESS:
14      A   Yeah, I don't know how to answer your
15  question, Tom.
16  BY MR. MORRISSEY:
17      Q   Well, in your Declaration --
18  throughout your Declaration, you use the words
19  "we intend" to renovate the ramp.  "We intend"
20  to hire design architects.  "We intend" to hire
21  a construction firm.  "We intend" to complete
22  it within two years.
23      MR. BRANUM:  Well, now --
24

Exhibit 5 Page 16

ERIC DAVIS
March 12, 2024

Page 64

```
1   BY MR. MORRISSEY:
2        Q    When you use these terms, who do you
3   mean "intend"?  Is it the Cook County
4   government or is it Eric Davis who intended in
5   the year 2018 to do it a different way?
6        MR. BRANUM:  Counsel, if you're going
7        to make representations like that, you have
8        to have a sufficient factual basis to make
9        those representations under Rule 11.
10            So I'd ask maybe you might want
11       to rethink the question you just asked and
12       ask it based on factual information and not
13       imaginary information.
14  BY MR. MORRISSEY:
15       Q    Well, by your Declaration, do you
16  intend to bind Cook County to construct the
17  ramp within two years, to renovate it within
18  two years in compliance with the
19  recommendations by Globetrotters?
20       MR. BRANUM:  Objection to the extent
21       it calls for a legal conclusion.
22            You can answer the question
23       factually.
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 65

```
1   BY THE WITNESS:
2        A    So as the designated representative
3   of the County on this project for the design
4   and construction portion, yes, it is the intent
5   of the County to accept the recommendation of
6   the consultant, GEC, and to proceed with the
7   design and construction of the replacement of
8   the ramp.
9        As I mentioned before in a previous
10  answer, contracts are approved by either the
11  Board of Commissioners or the chief procurement
12  officer or both depending on the size of the
13  contracts.
14       We have vendors under contract right
15  now to deliver the architectural engineering
16  scope.  We are in the process of working out
17  that specific item.  We have a construction
18  company under contract right now that is able
19  to be tasked once the design is to a sufficient
20  point to begin pricing and then construction of
21  the project.
22       The specific assignment for the
23  contract or construction, once the contractor
24  has identified the price still has to be
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 66

```
1   reviewed by the Office of the Chief Procurement
2   Officer.  Okay?  So they will have to approve
3   the specific proposal, but it is our intent to
4   use the contracts that we have to deliver the
5   replacement of the Cermak ramp.
6        Q    Who is in charge of the procurement
7   department?
8        A    Raffi Sarafian.
9        Q    Can you spell that person's name?
10       A    His first name is R-a-f-f-i.  His
11  last name is Sarafian.  I believe it's
12  S-a-r-a-f-i-a-n.  In fact, I believe he's in a
13  meeting with others from my office as I'm
14  talking with you right now.
15       Q    What is his position with Cook County
16  government?
17       A    Chief procurement officer.
18       Q    So is one of the steps before
19  proceeding with the construction or design of a
20  renovation of the Cermak ramp require the
21  approval of the chief procurement officer for
22  Cook County?
23       MR. BRANUM:  Objection --
24
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 67

```
1   BY THE WITNESS:
2        A    Yes.
3        MR. BRANUM:  -- to form.
4   BY THE WITNESS:
5        A    His job is to approve the specifics
6   of all of the proposals under the
7   job-order-contracting process because there are
8   other elements of compliance that are required
9   to be verified before an assignment like that
10  can be approved.
11  BY MR. MORRISSEY:
12       Q    What are the requirements before it
13  can go to the procurement officer?
14       A    How much time do you have?
15       Q    We have at least seven hours.  Can
16  you please tell me the time period that it will
17  take for you just to get the project to the
18  chief procurement officer?
19       A    The project construction, or I should
20  say the project delivery method, as I
21  mentioned, is the job-order-contracting method.
22  That is a construction procurement mechanism.
23  On average, when we have a complete package
24  from the contractor and have the pricing and
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 17

ERIC DAVIS
March 12, 2024

Page 68

1  all of that, it takes approximately 90 days for
2  the chief procurement officer to issue what's
3  called a Notice of Proposal Acceptance or a
4  NOPA that allows us to issue the Notice to
5  Proceed to the contractor to proceed with the
6  construction.
7      Q    Before that, there is a step --
8  there's many steps before that, correct,
9  Mr. Davis?
10     A    There are many steps before that,
11 yes.  It's a process we use quite often, and
12 the process of procuring the construction is
13 included in the estimate of the duration to
14 achieve the project that is included in this
15 Declaration.
16     Q    When -- after doing their site visit
17 on September 1st of 2023, when did Globetrotters
18 begin the process of -- you said that they had
19 to do a transfer package, correct?
20     A    Yeah.
21     Q    When was Globetrotters given
22 permission to prepare a transfer package by
23 Capital Planning or Cook County?
24     A    I would have to look it up and find

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 69

1  out.  The transfer package is the drawings and
2  specifications -- or preliminary drawings and
3  specifications to stipulate the elements of the
4  design that are to be constructed.  Because we
5  are doing an assessment ahead of time, we
6  needed to have clarity on the assessment before
7  we started the transfer package.
8          So I couldn't tell you when --
9  offhand when they started the development of
10 the transfer package.
11     Q    It was known to Cook County's
12 contractor, Globetrotter, on September 1st,
13 2023 that the ramp was not in compliance for
14 two reasons:  One, the rise was too steep, was
15 too high.  It was over 30 inches.  And two, the
16 handrails didn't include the extension,
17 correct?
18         MR. BRANUM:  Objection to your
19     characterization of the report.
20 BY THE WITNESS:
21     A    I don't think so, Tom, because I
22 think their -- the document that you're showing
23 indicates that they had done site visits.  I
24 don't know whether or not they had internally

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 70

1  made the conclusion about the compliance or not
2  at that time or if they made them a week later,
3  two weeks later or whatever.  All we know is
4  that the document that you have in front of us
5  which, I believe, is dated in December of 2023;
6  and as I said, I don't know if what we're
7  looking at is the final report or not.  I would
8  have to check and see if that is.
9          As to when they decided that they
10 felt it was out of compliance, I couldn't tell
11 you.
12     Q    When was the County notified that it
13 was out of compliance by Globetrotter?
14         MR. BRANUM:  Asked and answered.
15 BY THE WITNESS:
16     A    Asked and answered.
17         MR. BRANUM:  It's in the transcript.
18         MR. MORRISSEY:  Well, it is not.
19 BY MR. MORRISSEY:
20     Q    It was sometime after September 1st,
21 2023, correct?
22         MR. BRANUM:  You've already been over
23     this line of questioning.
24

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 71

1  BY THE WITNESS:
2      A    It's, I believe, sometime in the
3  fall.  I couldn't tell you specifically when.
4  BY MR. MORRISSEY:
5      Q    To your knowledge, was there any
6  delay in Globetrotters' beginning the process
7  of doing the transfer package?
8      A    As I just said, the transfer package
9  is dependent -- is a series of drawings that
10 stipulate the specific modifications to be
11 made.  Until we've had a chance to go over
12 their assessment and understand all of the
13 things and in some cases they may have made a
14 recommendation.  As it says at the bottom of
15 the page, they recommended that the ramp -- in
16 December, they recommended that the ramp be
17 reconstructed.  So they would not have started
18 the drawings of a reconstruction until they had
19 approval for that to be in the scope.
20     Q    Now, you mentioned this project
21 delivery method?
22     A    Yes.  That's construction I'm
23 referring to.
24     Q    You are aware that -- your report,

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 18

---

ERIC DAVIS
March 12, 2024

Page 72

```
1    your Declaration, talks about a survey,
2    correct?
3         A    Yeah.
4         Q    Well, isn't that correct?  In your
5    Declaration, you talk about a survey?
6         MR. BRANUM:  What paragraph?
7    BY THE WITNESS:
8         A    That's up in --
9    BY MR. MORRISSEY:
10        Q    It's Paragraph 6, correct?
11        A    Yeah, and I think it's actually in 5.
12        Q    When did you become aware that a
13   surveyor was employed by Cook County to measure
14   the Cermak ramp?
15        A    We contracted the surveyor, the
16   department did.
17        Q    When you say "we," does that mean
18   you?
19        A    The Department of Capital Planning
20   contracted for a survey.
21        Q    Were you involved in contracting the
22   surveyor?
23        A    Yes.
24        Q    What was your involvement?
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 73

```
1         A    I would have to go back and check
2    specifically, but this may have been -- I don't
3    remember if this was with STV or if Ardmore had
4    taken it over at that point.
5         I would have to go back and check the
6    specific contract vehicle, but a surveyor was
7    arranged for or contracted by the department.
8         Q    And that was sometime in 2022,
9    correct?
10        A    I believe so, yes.
11        Q    And the surveyor's report came back
12   that the rise on the right and left side of the
13   ramp exceeded 30 inches, correct?
14        MR. BRANUM:  Objection to form.
15   BY THE WITNESS:
16        A    The survey indicated what you say.
17   The survey also indicated that the rise down
18   the middle of the ramp was exactly the 30 inches
19   in the design drawings.
20   BY MR. MORRISSEY:
21        Q    And as a professional architect,
22   you're aware that if the rise on either the
23   right or left side of the ramp exceeded
24   30 inches, then the ramp did not comply with
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 74

```
1    the ADA?
2         MR. BRANUM:  Objection, calls for a
3         legal conclusion.
4    BY THE WITNESS:
5         A    As, I believe I have said in a prior
6    deposition, either on this case or others, it
7    was our understanding that the variances under
8    what's called a cross-slope allows some
9    variation with the 30-inch standard.
10   BY MR. MORRISSEY:
11        Q    Do you recall in your deposition in
12   January of 2022 being asked questions in
13   regards to the rise of the ramp being --
14   exceeding 30 inches on the right or left side
15   of the ramp?
16        A    I can't stipulate whether it was
17   January 2022; but, yes, I recall you asking
18   multiple questions about that whole
19   circumstance.
20        Q    And do you need me to point it out to
21   you where you said that if the rise on either
22   side of the ramp exceed 30 inches, then the
23   ramp did not comply with the ADA?
24        A    I don't believe I said that.
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 75

```
1         MR. BRANUM:  Objection to the extent
2         it mischaracterizes previous testimony.
3         MR. MORRISSEY:  We will take a
4         five-minute break -- or ten.  We will take
5         a ten-minute break, okay?
6         MR. BRANUM:  Eric, will ten minutes
7         be enough for you?
8         THE WITNESS:  Yes, that's fine.  I
9         was going to ask for a break anyway.
10        MR. BRANUM:  Okay.  We will be back
11        in ten.
12             (WHEREUPON, a short
13             break was had.)
14   BY MR. MORRISSEY:
15        Q    You mentioned in your Declaration
16   that you hired a surveyor in November of 2022,
17   correct?
18        A    Sounds right.
19        Q    And what was the name of the
20   surveyor?
21        A    I don't recall.  I would have to
22   check.  I think you probably have it in a prior
23   deposition.
24        Q    Well, if I had it in a prior
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 19

Page 76

1  deposition, I wouldn't ask you.
2      A   I would have to look it up.
3      Q   Do you have a record of who the
4  surveyor was?
5      A   I'm sure we do.
6      Q   Was he a licensed surveyor?
7      A   Yes.
8      Q   Were you present when they did the
9  survey?
10     A   No.
11     Q   Did you talk to the surveyor after it
12  was done?
13     A   I may have spoken to the surveyor or
14  it may have been by e-mail.  I don't recall.
15     Q   Why did you contract with a surveyor?
16     A   Because, as you recall from prior
17  action, there was a question of whether or not
18  the rise of the ramp was 30 inches or not.  And
19  so after consulting with the drawings that you
20  have as a part of this Declaration -- I think
21  it was after the drawings -- we decided that
22  there was a need to verify.
23         You may recall from a prior
24  deposition that the County used a laser level

Page 77

1  which indicated that the rise was 30 inches,
2  but we -- in order to be certain because, among
3  other things, you all felt that that
4  insufficient.  We commissioned a surveyor to go
5  and provide a survey of that vertical rise from
6  the middle of the ramp as indicated in the
7  design drawing.
8      Q   Well, the surveyor didn't just do
9  from the middle of the ramp, correct?
10     A   Correct.
11     Q   He did the right side and the left
12  side, correct?
13     A   Yes.
14     Q   And what was the rise on the right
15  side of the ramp?
16     A   Let's see.  You say the right side.
17  If you're standing at the bottom of the ramp
18  looking up, do you want to say the right side
19  or if you're standing on the ramp --
20     Q   Yes, if you're at the bottom of ramp.
21     A   At the bottom of the ramp looking up,
22  the rise is indicated to be 2.52 feet.
23     Q   How many inches was the rise on the
24  right side?

Page 78

1      A   That would be 30 inches plus a
2  fraction.  I don't know the fraction offhand.
3      Q   It would exceed 30 inches, correct?
4      A   Yes.
5      Q   And on the left side of the ramp,
6  based upon the surveyor's measurement, what was
7  the left side of the ramp?
8      A   It would be 2.58 feet.  So a little
9  less than -- probably a little less than
10  31 inches.
11     Q   So it exceeded 30 inches, correct?
12     A   Yes.
13     Q   And for a ramp between 30 and 50
14  feet, if the rise is greater -- exceeds 30
15  inches, there is a requirement for a landing,
16  correct, an intermediate landing?
17     A   I don't believe that the length of
18  the ramp is a requirement in that stipulation.
19  I think it's the notion of a ramp rising more
20  than 30 inches requiring an intermediate
21  landing.
22     Q   And the Cermak corridor is a ramp,
23  correct?
24     A   Yes.

Page 79

1      Q   And when you talked to Globetrotters
2  before they went out to do the inspection, you
3  knew that the surveyor, it used a laser to
4  indicate the right and the left side exceeded
5  30 inches, the rise exceeded 30 inches?
6      A   Yes.
7      Q   Did you provide that information to
8  Globetrotters?
9      A   I'm pretty sure we did.
10     Q   Why did you provide it to
11  Globetrotters?
12     A   Because we wanted them to have
13  complete information.
14     Q   And did you say that it was your
15  professional opinion as an architect that there
16  was some variance in the ramp that allowed Cook
17  County to exceed 30 inches on the right and
18  left side of the ramp?
19         MR. BRANUM:  Objection to form.
20  BY THE WITNESS:
21     A   I probably communicated to them that
22  it's my understanding that things like
23  construction tolerances and cross-slope may
24  allow a rise greater than 30 inches but that

Exhibit 5 Page 20

ERIC DAVIS
March 12, 2024

Page 80

1   part of the reason for bringing them on is to
2   get a third-party evaluation of that.
3       Q    But you were aware at least in 2022
4   that there was a clear possibility that the
5   ramp did not comply with the ADA standards,
6   correct?
7           MR. BRANUM:  Objection, misstates
8       testimony.
9   BY THE WITNESS:
10      A    What do you mean by "clear
11  possibility"?
12  BY MR. MORRISSEY:
13      Q    Well, let me rephrase the question.
14  After receiving the surveyor's survey in
15  November of 2022, what did you do to determine
16  whether or not the rise, that there was some
17  exemption as far as the Cermak ramp from the
18  ADA requirement that an intermediate landing
19  was required?
20      A    Somewhere in the range of that time
21  is probably when we started the development of
22  the RFQ for an architect to come in and do an
23  independent assessment which led eventually to
24  the hiring of Globetrotters.

ERIC DAVIS
March 12, 2024

Page 81

1           I don't know if we started the
2   writing of that RFQ before November of '22 or
3   after November of '22.  I would have to check.
4   But I believe that around that time, we made
5   that -- we moved forward with that.
6           We were going to do the building
7   anyway as a part of the program that I
8   mentioned, but I believe that's when we started
9   the Cermak one, was somewhere around the end of
10  '22, beginning of '23 to begin to obtain that
11  independent evaluation.  And as I mentioned,
12  the Globetrotters' contract was signed sometime
13  in '23.
14      Q    In your Declaration on page --
15  Paragraph 5 and 6, did you put into the
16  Declaration that in November of 2022 that the
17  survey you received indicated that on the right
18  and left side of the ramp, that it exceeded
19  30 inches?
20      A    I'm not denying that that's the case.
21      Q    No, my question is why wasn't that
22  included in your Declaration?
23      A    In part because the ADA is silent on
24  where the measurements are taken.  There are

ERIC DAVIS
March 12, 2024

Page 82

1   elements that aren't specified; and, as I said,
2   the drawings all indicate and the standards all
3   talk about the slope with an arrow down the
4   middle of the ramp.  Down the middle of the
5   ramp, it was 30 inches.
6       Q    You knew that the architect's design
7   drawings were not verified after construction,
8   correct, when you did --
9           MR. BRANUM:  Objection.  That
10      mischaracterizes his testimony.
11  BY THE WITNESS:
12      A    No, we already went through this.  I
13  don't know what they did or did not do in terms
14  of verification shortly after the work was
15  completed.
16  BY MR. MORRISSEY:
17      Q    **** But you didn't think it was
18  necessary in doing this Declaration for full
19  disclosure to include in there that the survey
20  indicated that the ramp, at least some portions
21  of the ramp, exceeded the 30-inch rise; is that
22  fair to say?
23          MR. BRANUM:  Wait.  Wait.  Before you
24      answer that question, I'm going to assert a

ERIC DAVIS
March 12, 2024

Page 83

1   privilege.  It's the work product doctrine.
2           So your mental impressions in
3   preparation for litigation purposes such as
4   in drafting this Declaration is protected.
5   So if you want to re-ask your question that
6   gets away from the work product.
7           MR. MORRISSEY:  We'll certify the
8       question because it isn't work product.
9       This is his Declaration.
10          MR. BRANUM:  You can ask him about
11      his Declaration, but if you're getting into
12      his mental processes for preparing this
13      Declaration, it's privileged.
14          So just to be clear, I'm not
15      saying you can't ask questions about this.
16      You just can't ask questions about his
17      mental impressions as he was preparing the
18      Declaration and communications with
19      counsel.
20  BY MR. MORRISSEY:
21      Q    Why didn't you just direct
22  Globetrotters to measure it down the middle if
23  you were convinced when you did this
24  Declaration that the only measurement was down

Exhibit 5 Page 21

ERIC DAVIS
March 12, 2024

Page 84

1   the middle for the surveyor to --
2       A   I didn't want to constrain their
3   work.  I wanted their third-party opinion, Tom.
4   And in Item 5, at the end of Item 5, after the
5   statement of being 30 inches down the middle of
6   the ramp, it refers to the ramp survey, which
7   indicates the other measurements on the side
8   that you're referring to.
9       So I have to say I object to any
10  assertion that there was any intent to do
11  anything but get to the heart of the matter
12  objectively and to remedy any situation that
13  needed to be remedied.
14      Your questions suggest that there was
15  some kind of intent to hide or shield
16  information when that clearly is not the case
17  because immediately after that statement is the
18  ramp survey that include the data that you've
19  just been quizzing me on.
20      I have to say I'm very -- I take
21  great exception to any suggestion that the
22  County is anything but committed to providing
23  the accessibility or going beyond it because of
24  the various measures that we've talked about,

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 85

1   the program of assessment, hiring architects,
2   developing scopes.  We are doing the best that
3   we can to try to remediate this situation, and
4   there's no -- I mean, you're implying that
5   there's some kind of shielding when the
6   information is right there in the sentence and
7   in the document right after it.
8       Q   In 2019 or 2020, you attempted to
9   hire a design firm to design a renovation of
10  the Cermak ramp; isn't that fair to say?
11      A   I believe that the effort was in 2019
12  with the Task Order A/Es is what you're
13  referring to, and that would have been, I just
14  said, back in 2019.
15      Q   And it was not accepted by the
16  procurement office.  They wouldn't allow it
17  back in 2019?
18      A   I believe it was the Board of
19  Commissioners that didn't allow that contract.
20  It may have been that procurement pulled it.  I
21  can't remember if they pulled it or -- honestly
22  I don't remember if they did.  Regardless, it
23  didn't -- those contracts didn't get approved.
24      Q   And do you recall in your deposition

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 86

1   from before, you said that the procurement
2   office pulled it back in 2019?
3       A   Honestly, I don't remember if they --
4   it was a very -- I don't remember if they
5   pulled it at the last minute or there was a
6   vote of the Board.  It didn't make it to a
7   Board vote.  It didn't get approved by the
8   Board either way.  Honestly, I don't remember
9   if it was procurement pulling it or if it was
10  that they -- I don't remember.
11      Q   In order for the renovation of the
12  Cermak ramp to proceed, again, under your
13  current -- let me rephrase the question.
14      Under the plan proposed in your
15  Declaration dated February of 2024, you
16  intended to do it through the project delivery
17  method, correct?
18      A   We intend to construct the ramp
19  replacement through the job order contracting
20  delivery method.  That's the construction
21  portion, yes.
22      Q   And it's called the job order
23  methodology, correct?
24      A   Job order contracting or JOC, J-O-C.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 87

1   It's at the beginning of Item 17.
2       Q   And before a contract to construct
3   the ramp is issued, it has to go to the
4   procurement office, correct?
5       A   To be clear, the contractors all
6   already have a contract.  There's a difference
7   between contracting and funding.  The funding
8   is under the project I mentioned before, 23280.
9   The contractor submits a price, and that
10  package is submitted to procurement to make
11  sure that it is compliant with the applicable
12  rules and regulations for County purchasing.
13  That's their job.
14      Q   And you mentioned the name of the
15  director of that department, Mr. Raffi
16  Sarvan [sic].
17      A   Sarafian, yes.
18      Q   The chief procurement officer --
19      A   Yes.
20      Q   -- he has to approve of all contracts
21  under the job order or JOC?
22      A   He issues what's called a Notice of
23  Proposal of Acceptance, NOPA.
24      Q   And that has not been issued yet?

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 22

Page 88

1    A    Correct.  Because the design isn't
2  done.
3    Q    And before, it was the chief of
4  procurement that vetoed the plan back in 2019
5  for the design work, correct?
6        MR. BRANUM:  Objection to form.
7  BY THE WITNESS:
8    A    As I said, I can't recall if it
9  was, at the last minute, if it was procurement
10  deciding to pull the item or if it was
11  something that the Board decided not to vote on
12  or pass.  I don't remember the specifics.
13  Either way, it ended up -- the contracts ended
14  up not getting approved.  It had to do with the
15  language in the specific presentation.  And if
16  memory serves, the term task order was not
17  included in the document and, because of that,
18  it was seen as being outside of the contract,
19  and so they didn't approve it.  And it is
20  included in the contract for HDR.
21    Q    Who was the -- I might have asked
22  this before.  Who is your superior?
23    A    His name is Earl Manning.  He's the
24  director of Capital Planning and Policy.

Page 89

1    Q    Do you serve at his will?  Can he
2  replace you?
3    A    I am an appointee of the president of
4  the Board of Commissioners.  I serve at the
5  pleasure of the president.
6    Q    Can the president of the County Board
7  terminate you?
8    A    Toni Preckwinkle.
9    Q    My question is can you be terminated
10  by the president of the County Board?
11    A    President of the County Board, yes.
12    Q    Can Earl Manning terminate you?
13    A    I don't know the specifics.  I
14  believe he can either do -- I believe he can
15  recommend it.  I don't know.  It's a multistep
16  process, so I don't know the specifics.  Well,
17  actually I do know.  It is a multistep
18  processes, but I don't know the specifics for
19  my position.
20    Q    To your knowledge, has Earl Manning
21  agreed with the recommendation of Globetrotter?
22    A    I believe that I have outlined the
23  general direction relative to the need to
24  replace the ramp, and there has been no

Page 90

1  objection on his part at all.
2    Q    So can you say that Mr. Manning as
3  the director of Capital Planning has accepted
4  Globetrotters' recommendations?
5    A    In that he has designated me to
6  manage this project, yes.
7    Q    Do you know if the County Board has
8  received Globetrotters' recommendations?
9    A    I don't believe they have, no.
10    Q    Has the County Board accepted
11  Globetrotters' recommendations?
12    A    I don't believe it's been provided to
13  them.
14    Q    Has the president of the County Board
15  accepted Globetrotters' recommendations?
16    A    I don't believe it's been provided to
17  her.  I should note that we do an annual report
18  on ADA matters to the Board of Commissioners
19  and things like this since -- it's about that
20  time of year we would be summarizing the status
21  of this in our report to the Board.
22    Q    Can the County Board change the job
23  order or JOC program?
24        MR. BRANUM:  Objection to form.

Page 91

1  BY THE WITNESS:
2    A    I don't know what you mean by
3  changing the program.
4  BY MR. MORRISSEY:
5    Q    Well, could the County Board
6  terminate the JOC program?
7        MR. BRANUM:  Objection to form.
8  BY THE WITNESS:
9    A    They can vote to cancel a contract,
10  yes.
11  BY MR. MORRISSEY:
12    Q    Can the County Board require any
13  renovation of the Cermak ramp to be part of the
14  Capital Improvement Plan?
15        MR. BRANUM:  Objection to form.
16  BY THE WITNESS:
17    A    The County Board reviews and approves
18  the Capital Improvement Plan on an annual basis
19  which includes, as mentioned, Project 23280,
20  which are the ADA renovations of the Cermak
21  Health Services facility.  They are reviewed
22  every year.
23    Q    Just because the County Board
24  approved -- just because the County Board

Exhibit 5 Page 23

ERIC DAVIS
March 12, 2024

Page 92

1  approved the capital plan which you say is
2  23280, to your knowledge, can the County Board
3  terminate that project number?
4         MR. BRANUM:  Objection to form.
5  BY THE WITNESS:
6      A    To my knowledge, the County Board
7  can -- has the ability to rescind a project or
8  a contract subject to the terms of that project
9  or contract.
10 BY MR. MORRISSEY:
11     Q    And can the -- when a project is made
12 part of a Capital Improvement Plan, that
13 doesn't necessarily mean the project is going
14 to be completed in the year 2023 such as
15 Project Number 23280, which was part of the
16 Capital Improvement Plan in 2023?
17        MR. BRANUM:  Objection to form,
18     incomplete hypothetical, compound question.
19 BY THE WITNESS:
20     A    I'm not clear on what you're asking,
21 Tom.
22 BY MR. MORRISSEY:
23     Q    Sure.  Was Project Number 23280
24 completed in fiscal year 2023?

ERIC DAVIS
March 12, 2024

Page 93

1      A    No.
2      Q    In order for it to be carried over to
3  the following year, does the County Board have
4  to vote on it?
5      A    Yes.  Well, they vote on the Capital
6  Improvement Plan.  They are at liberty to add
7  or subtract an item from the submitted Capital
8  Improvement Plan at their discretion.
9          This is the ninth Capital Improvement
10 Plan year that I've been involved in.  I'm not
11 aware of them cancelling any project specific
12 to the CIP in my time here.
13     Q    But for fiscal year 2025, which is
14 coming up in November, the County Board has the
15 ability to cancel Project Number 23280 and not
16 carry it over to fiscal year 2025?
17        MR. BRANUM:  Counsel, he just
18     answered that question.
19 BY THE WITNESS:
20     A    I just answered it.  If they chose
21 to, they could do so, yes.
22 BY MR. MORRISSEY:
23     Q    And prior to the expenditure of money
24 under Project Number 23280, can the -- does the

ERIC DAVIS
March 12, 2024

Page 94

1  County Board have to approve an implementation
2  plan?
3      A    I'm sorry.  I didn't hear the end of
4  your question.
5      Q    An implementation plan, do they have
6  to vote on the expenditure of the money?
7         MR. BRANUM:  Objection to form,
8      incomplete hypothetical.
9  BY THE WITNESS:
10     A    So they approve a plan that includes
11 a budget level estimate of the project.  That
12 is what's in the budget.  As I mentioned
13 before, at the current time and the current
14 plan, we're expecting to be doing design work
15 in '23 and '24.  That's why the funds that are
16 allocated in the CIP for this year only reflect
17 design expenditures.
18        As I mentioned before, when we get to
19 construction, when CREA Construction submits
20 their proposal and we're going to actually be
21 moving to construction and actually expending
22 funds, we will expand the allocation in that
23 budget year, which I expect to be in fiscal
24 year 2025 which starts at the end of November.

ERIC DAVIS
March 12, 2024

Page 95

1  Then we will increase the expenditure in order
2  to fund the construction of the ramp in 2025.
3  That will be what's in the submittal for the
4  fiscal year 2025 CIP.
5  BY MR. MORRISSEY:
6      Q    So in the current fund of 23280,
7  which was carried over from fiscal year 2023,
8  there is no money set aside in that fund for
9  construction of any renovation of the Cermak
10 ramp?
11     A    That's correct.
12        MR. BRANUM:  Objection to form.
13 BY THE WITNESS:
14     A    Well, but that's correct.  And to do
15 otherwise would be irresponsible.
16 BY MR. MORRISSEY:
17     Q    And assuming capital planning -- let
18 me go back a step.
19        Normally, would the Sheriff's Office
20 put in a business case to Capital Planning to
21 fund the construction of the renovation of the
22 Cermak ramp?
23     A    They put in --
24        MR. BRANUM:  Objection to form.

Exhibit 5 Page 24

ERIC DAVIS
March 12, 2024

Page 96

1          THE REPORTER:  I'm sorry, Eric.  Can
2     you start that over?
3          MR. BRANUM:  Objection to form.
4          THE REPORTER:  No, Eric's answer.
5     Thank you.
6     BY THE WITNESS:
7          A    The users, in this case, the Sheriff
8     submit business cases to the department for
9     projects that they wish to see occur.  It is up
10    to us to figure out the specifics of what that
11    would involve.  Sometimes there are projects
12    that they would want to do that involve simply
13    furniture.  Maybe the County has salvaged
14    furniture, and we go ahead and have that, and
15    we go ahead and install it.  Sometimes it may
16    involve new construction.  Sometimes it may
17    involve renovation.  It's up to us.  But they
18    don't specifically -- in other words, after
19    they've requested the project and if the
20    project has been approved, then we execute the
21    project and we don't need a further business
22    case from the Sheriff.  They don't have to come
23    back to us and say, okay, now we would like you
24    to put in the funding to construct it.  They

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 97

1     don't have to do that.  We take care of that.
2          Q    For fiscal year 2025, has the Sheriff
3     put in a business case to construct --
4          A    They don't need to --
5          Q    Let me finish my question.  Have they
6     put in a business case to construct the
7     renovation of the Cermak ramp?
8          MR. BRANUM:  Counsel, he answered
9          that question.
10    BY MR. MORRISSEY:
11         Q    You can answer it now.
12         MR. BRANUM:  Well, he already
13         answered it, and the form of your
14         question -- the premise is incorrect
15         because it relies on a false assumption.
16    BY MR. MORRISSEY:
17         Q    Can you answer the question, please?
18         MR. BRANUM:  He can provide his
19         response.
20         THE WITNESS:  Maybe, Peggy, can you
21         re-ask the question he just asked?
22              (WHEREUPON, the record
23              was read as requested.)
24

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 98

1     BY THE WITNESS:
2          A    The answer is they've already put in
3     a business case to, I believe -- I believe
4     their business case was for the ADA upgrades in
5     the facility generally, although I'd have to go
6     back and check because, as you know, this was
7     sometime ago; but I believe their request was
8     for the whole facility, not just the ramp.  But
9     regardless, since we have adopted this as a
10    project, there isn't a need for them to
11    re-request the construction.  And, in fact,
12    actually we meet with the Sheriff's Office on a
13    monthly basis to review well over 100 individual
14    projects that are going on at any given time
15    that they are involved with one way or another.
16         So there is no need for them to issue
17    or submit another business case because they
18    already know that the project is underway.
19         Q    For fiscal year 2025, when does
20    Capital Planning put in their recommendation to
21    the president's office?
22         A    The development of the Capital
23    Improvement Plan is a very lengthy process that
24    takes the majority of our fiscal year.  The

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 99

1     process starts early in the fiscal year and, in
2     fact, has already started with the conducting
3     of a series of meetings with our various user
4     agencies, over 30 different agencies, that have
5     projects and -- in the Capital Improvement
6     Plan, and we meet with them and we tell --
7     update them up on the progress of projects for
8     them that are underway.  And we also start the
9     conversation about the coming fiscal year.
10         We've already done a couple of those
11    for some of our agencies this year.  I think I
12    have three or four of them next week and about
13    eight of them the week after that.  Generally,
14    in the month of April, we intake requests for
15    new projects and projects involving furniture
16    and real estate acquisition and the
17    re-allocation of space.  It's a multipart
18    process.
19         Once we've achieved those -- received
20    those recommendations, we spend roughly from
21    the beginning of the month of May through the
22    middle of the month of August digesting,
23    categorizing, reviewing, pricing, arranging the
24    projects to get to a draft budget that is

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 25

ERIC DAVIS
March 12, 2024

Page 100

1  submitted to the budget department in the
2  middle of August.
3          Between the middle of August and
4  sometime in the next couple of months, it is
5  submitted formally to the president's office.
6  The president makes her recommendation
7  generally to the Board of Commissioners in the
8  month of October.  That is to acquaint them
9  with the general intent of the budget.  The
10  Capital Improvement Plan is part of the budget.
11          During the month generally the rest
12  of October and the beginning of November, there
13  are various consultations with the Board of
14  Commissioners and it goes to the County Board
15  which does or does not approve the County
16  budget generally in their meeting in the month
17  of November.
18          So you have a process that starts in
19  roughly February and isn't finalized until
20  November and then is the annual cycle of ending
21  the prior year's books and opening the budget
22  for the new year.  So it's a lengthy process.
23          Generally, we submit the
24  recommendation in draft form to the president

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 101

1  in the middle of August, and it goes in her
2  recommendation to the Board for the October
3  board meeting.
4      Q    Is one of the projects that you are
5  discussing with the Sheriff the construction
6  and renovation of the Cermak ramp?
7      A    Yes.
8      Q    How many other projects are you
9  discussing with the Sheriff's Office in regards
10  to fiscal year 2023's CIP, Capital Improvement
11  Project?
12      A    We're in fiscal year '24.  Is that
13  what you're asking about?
14      Q    Well, I'm asking you in regards to
15  fiscal year 2025 in regards to the proposal to
16  be submitted to the president's office.
17      A    Okay.  So the public safety portfolio
18  overall, which includes projects for all of our
19  public safety stakeholders is approximately 300
20  projects in fiscal year 2024.
21          Those include projects at the jail,
22  at our courthouses and at various other public
23  safety facilities:  The Rockwell warehouse, for
24  example, where the Sheriff maintains their

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 102

1  vehicles.
2          Of those 300 projects, more than half
3  of those are either requested by the Sheriff or
4  the Sheriff is directly involved, so I want to
5  say in the range of 150 projects at various
6  stages at any given time.  We issue to them an
7  implementation plan.  We indicate which
8  projects are going to be starting at the
9  beginning of fiscal year, which ones are going
10  to start in the second quarter, third quarter
11  or fourth quarter, and we usually meet with
12  them again after -- their submittal is in
13  April -- in the period around July sort of,
14  June, July to make sure that we understand
15  their request properly and to give them an
16  indication of where we're going with the draft
17  fiscal year.
18      Q    For the fiscal year 2024, it's going
19  to end, what, in November of '24?
20      A    November 30th, 2024, yes.
21      Q    Have you met with the Sheriff in
22  regards to implementing the construction of the
23  renovation of the Cermak ramp in fiscal year
24  2024?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 103

1      A    I know that we -- I know that the
2  Cermak ramp has been one of the efforts
3  discussed in our regular monthly meetings for
4  the past, gosh, several months, if not years.
5  It's one that we have talked about with them
6  for quite sometime.
7      Q    But for implementation, meaning
8  expenditure of money in 2024 for the
9  construction of the renovation of the Cermak
10  ramp, have you discussed that with the Sheriff
11  as far as moving forward and implementing
12  construction in the fiscal year 2024?
13      A    To be clear, you confused two
14  different things.  For the spending of money,
15  which includes the spending of money on
16  architects, which is an activity that's
17  currently underway, yes, we have discussed that
18  with them.
19          In the course of meetings with the
20  project team for the assessment of Cermak, I
21  believe we've discussed specifically the intent
22  to construct the -- to construct the replacement
23  ramp through our job order contracting process.
24      Q    Who is on the assessment team with

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 26

Page 104

1 the Sheriff?
2    A    I believe the primary person is
3 Sabrina Canchola-Rivero [sic].
4    Q    You mentioned that for construction
5 of the renovation of the Cermak ramp, that's
6 going to be put into the Capital Improvement
7 Plan for 2025; is that correct?
8    A    That will be put into the draft
9 budget that's submitted to the president's
10 office in August.
11    Q    In the 2023 Capital Improvement Plan,
12 was there an approval of funds for the
13 construction of the renovation of the Cermak
14 ramp?
15         MR. BRANUM:  Objection to form.
16         MR. MORRISSEY:  Let me rephrase the
17    question.
18 BY MR. MORRISSEY:
19    Q    In the fiscal year 2023 Capital
20 Improvement Plan, were there funds approved by
21 the Cook County Board for the actual
22 construction of the renovation of the Cermak
23 ramp?
24    A    No.  And to do so would have been

Page 105

1 irresponsible.
2    Q    In the fiscal year 2024, was there
3 a -- was the Capital Improvement Plan that was
4 passed by the Cook County Board in 2024, did it
5 include money or funds for the construction of
6 the renovation of the Cermak ramp?
7    A    Our expectation is that the design
8 activities for the renovation of the ramp and
9 implementation of other renovations at the
10 Cermak facility that the design will take the
11 bulk of the year of fiscal year 2024 and that
12 the construction, the NOPA that I mentioned
13 before, would not be issued until fiscal year
14 2025.
15    Q    So my question is specifically in the
16 2024 fiscal CPI, and that was -- in regards to
17 the Cermak ramp, that was a carryover from the
18 CPI from 2023; is that correct?
19         MR. BRANUM:  Objection to form.
20 BY THE WITNESS:
21    A    The renovation of Cermak, which
22 includes the ramp, was part of the, I
23 believe -- I can't remember the exact wording
24 but I note the project, bringing the facility

Page 106

1 up to compliance, was included in the 2024 CIP
2 and, yes, that was a carryover from the 2023
3 CIP?
4 BY MR. MORRISSEY:
5    Q    So we're looking at Paragraph 8 of
6 your Declaration.
7    A    Okay.
8    Q    It's Project Number 23280 in fiscal
9 year 2023, correct?
10    A    Yes.
11    Q    And then for fiscal year 2024 when
12 the funds weren't expended in 2023, they
13 carried it over to fiscal year 2024 under the
14 CIP; is that correct?
15    A    That's correct.
16    Q    And that was for basically design
17 services of Globetrotters to do the assessment?
18    A    Yes.
19    Q    Now, in order to construct, go
20 forward on the construction of the renovation
21 on the Cermak ramp, your office is going to
22 have to include in your proposal for the CIP
23 that funds be earmarked for the construction
24 and renovation of the Cermak ramp?

Page 107

1         MR. BRANUM:  Objection to form.
2 BY THE WITNESS:
3    A    But it's correct.  Yes.
4 BY MR. MORRISSEY:
5    Q    And your office, the Capital Planning
6 office, is going to have to submit that first
7 to the budget office, correct?
8    A    Correct.
9    Q    And the budget office has a say
10 whether or not it's included in the CIP for
11 fiscal year 2025, correct?
12    A    Yes.
13    Q    Who is --
14    A    I should note that in my time here,
15 other than very large purchases of property, I
16 can't recall any project in the draft CIP that
17 the budget office has taken exception to for
18 capital construction.  But go ahead.
19    Q    Who is in charge of the budget
20 office?
21    A    Budget office is under the Bureau of
22 Finance, and the Bureau of Finance is under our
23 chief financial officer.
24    Q    And that person's name is?

Exhibit 5 Page 27

ERIC DAVIS
March 12, 2024

Page 108

```
 1      A    Tanya.
 2      Q    I'm sorry.  Can I have the full name?
 3      A    Honestly, I can't remember her last
 4 name right now.  I just refer to her as Tanya,
 5 but she's the CFO.
 6      Q    Can you spell that?
 7      A    T-a-n-y-a.
 8      Q    So assuming --
 9      A    Excuse me.  Tanya Anthony.
10      Q    Assuming -- and Mr. Manning is
11 responsible as the commissioner of Capital
12 Planning for sending over the recommendations
13 by his office in regards to items to be entered
14 into the CIP for fiscal year 2025, correct?
15      A    He's the director.  To be clear, he's
16 the director of Capital Planning, not the
17 commissioner.
18      Q    Well, as the director of Capital
19 Planning, it's up to his discretion,
20 Mr. Manning's discretion, to include the
21 construction of the renovation -- strike that.
22           It's up to Mr. Manning's discretion
23 as the director of Capital Planning to include
24 funding in fiscal year 2025 in the year
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 109

```
 1 proposed CIP; is that correct?
 2      A    That's correct.
 3           MR. BRANUM:  Objection to form.
 4 BY THE WITNESS:
 5      A    No, that's true.  He approves -- by
 6 ordinance, he is in charge of that -- those
 7 expenditures, of authorizing --
 8 BY MR. MORRISSEY:
 9      Q    By ordinance --
10           THE REPORTER:  Mr. Davis, I didn't
11      hear the last part.
12 BY THE WITNESS:
13      A    Of authorizing those expenditures.
14 The actual expenditures are approved by the
15 Board, but he is the specific person delegated
16 for that, yes.
17 BY MR. MORRISSEY:
18      Q    And Ms. Anthony, as the director of
19 finance, has a say in whether or not funding
20 for the alteration or renovation of the Cermak
21 ramp will be sent to the president's office as
22 a package for the CIP for fiscal year 2025?
23      A    Honestly, I don't know whether -- I
24 don't know about the specifics of her
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 110

```
 1 responsibility in this regard.  And I say that
 2 because I believe that the ordinance says that
 3 the director of Capital Planning is the
 4 responsible party for submitting the capital
 5 plans.
 6           So I don't know -- she may be able to
 7 decide about specifics of funding levels, but I
 8 believe the authority, as far as what goes in
 9 the plan or not, I believe that actually is the
10 director -- I could be mistaken, but I believe
11 it's actually the director of Capital Planning.
12 That said, I don't recall Tanya having taken
13 exception to an item, again, other than some
14 very large purchases like the helicopter and
15 purchase of land and things like that.  I don't
16 recall her weighing in against any project in
17 my years here.
18      Q    The director of Capital Planning,
19 Mr. Manning, after sending it to the budget
20 office then has to submit it to the president
21 of the County Board as far as any funding for
22 construction of the Cermak ramp to be included
23 in the CIP for fiscal year 2025, correct?
24      A    I believe that it is the CFO that
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 111

```
 1 transmits the CIP to the president's office.
 2      Q    CFO stands for, what, chief financial
 3 officer?
 4      A    Chief Financial Officer Tanya
 5 Anthony.
 6      Q    So that's Ms. Anthony.  That's her
 7 position?
 8      A    Yes.
 9      Q    And the president of the Cook County
10 Board, once she receives from Ms. Anthony the
11 Capital Planning's CIP proposals for 2025, then
12 it's up to the discretion of the president of
13 the County Board to make her recommendations
14 for fiscal year 2025 to the elected County
15 Board members, correct?
16           MR. BRANUM:  Objection to the form of
17      the question.  It's a compound question.
18 BY THE WITNESS:
19      A    I'm not quite clear what you're
20 asking.
21 BY MR. MORRISSEY:
22      Q    Okay.  The proposal that -- for
23 2025 -- let me rephrase it.
24           Any proposal for altering the Cermak
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 28

ERIC DAVIS
March 12, 2024

Page 112

1  ramp as far as construction has to go to the
2  president of the County Board to be included in
3  the package for CIP fiscal year 2025 to be
4  approved by the County Board?
5      A    It's a line item in the budget that
6  is approved by the Board.
7      Q    And there has to be a recommendation
8  prior to approval by the County Board from the
9  president to the County Board?
10      A    The president makes that
11  recommendation, yes.
12      Q    So the president of the County Board
13  in November of 2025 -- strike that.
14          The president of the County Board in
15  November of 2024 has the discretion either to
16  recommend funding in the CPI -- CIP for fiscal
17  year 2025 to include construction of the
18  renovation of the Cermak ramp or to exclude it,
19  correct?
20          MR. BRANUM:  Objection to form.
21  BY THE WITNESS:
22      A    And I think I've already answered it.
23  She makes the recommendation, technically.  She
24  makes the recommendation based upon

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 113

1  consultations with the CFO and with anybody
2  else that she questions on.
3      Q    And then the full County Board in
4  November of 2024 would have to vote on in their
5  CIP bill whether to include construction money
6  for the alteration of the Cermak ramp.
7          Is that fair to say?
8      A    They would include the -- yeah, they
9  would include the CIP as a part of their
10  budget.  It's generally in what's called
11  Volume 1 of the budget.
12      Q    My question is that any funding for
13  construction of the Cermak ramp in the year --
14  fiscal year 2025 would have to be included in
15  and voted on and approved by the County Board?
16      A    The projects are approved.  The chief
17  financial officer has the discretion to make
18  re-allocations within the budget along certain
19  guidelines.
20          So you used the term "any."  She has
21  discretion to make adjustments if they are, in
22  her mind, properly justified during the course
23  of the fiscal year.
24          So when you use the term "any," there

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 114

1  are alterations that the Board allows -- you
2  know, the Board allows the chief financial
3  officer to make, again, following rather
4  stringent guidelines.
5      Q    I think we're not -- you don't
6  understand my question.
7          MR. BRANUM:  Well, I understood his
8      answer.
9  BY THE WITNESS:
10      A    Why don't you ask me what you want to
11  ask me, Tom?
12  BY MR. MORRISSEY:
13      Q    Yeah.  For construction of the Cermak
14  ramp, for funds to construct the Cermak ramp,
15  it has to be included in the fiscal year 2025
16  CIP?
17      A    No, no.  There is a mechanism for --
18  you're making absolute questions.
19      Q    All right.  Let me rephrase it.  Let
20  me rephrase the question, okay?
21          Your intention is to include in your
22  proposed Capital Improvement package for fiscal
23  year 2025 funding for the construction of the
24  Cermak ramp?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 115

1      A    Yes.  That is the department's
2  intent, yes.
3      Q    And the County Board ultimately has
4  to vote on the CIP for fiscal year 2025?
5      A    That's correct.  And they have
6  communicated several times both as a group and
7  individually that accessibility and ADA
8  compliance is a priority for them.
9      Q    When did they first communicate to
10  your knowledge that accessibility is a
11  priority?
12      A    Oh, it could easily be before I
13  worked at the County.
14      Q    Did they provide you with that
15  information back in 2019 when you asked for
16  money to -- design money for the Cermak ramp
17  that it was a priority to do this project?
18      A    As I said, the 2019 task order
19  contracts, I don't recall whether or not we
20  stipulated this project in the list.  There was
21  some, I want to say, 80 projects, something
22  like that, that were intended to go forward.  I
23  don't recall if this one was in there or not.
24  I expect that it was, but I don't know

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 29

ERIC DAVIS
March 12, 2024

Page 116

1  specifically that it was or not.  But it has
2  been something that has been important for some
3  time, which is why for the last few years we've
4  issued an annual report to the Board of
5  Commissioners about the status of our efforts
6  for ADA.
7      Q   Now, you say after -- if the County
8  Board approves a CIP for fiscal year 2025, it's
9  always up to the discretion of the chief
10 financial officer whether or not to expend
11 funding for the projects that are included in
12 the CIP.
13          MR. BRANUM:  All right.  Tom, we're
14      going around in circles.  You're just
15      re-looping back to the top of your list of
16      questions.  You're asking these same
17      questions over and over again.
18          So I've allowed you a lot of
19      leeway to get the questions you want in,
20      but now you're just repeating yourself and
21      now we're getting to the point where you
22      are harassing the witness.
23 BY MR. MORRISSEY:
24      Q   You can answer the question.

ERIC DAVIS
March 12, 2024

Page 117

1          MR. BRANUM:  No, he can't.
2          MR. MORRISSEY:  You are not going to
3      allow him to answer the question after the
4      County Board -- assuming the County Board
5      includes the construction -- let me
6      rephrase the question.
7  BY MR. MORRISSEY:
8      Q   Assuming the County passes a CIP for
9  fiscal year 2025, which includes funding for
10 construction of the renovation for the Cermak
11 ramp, can the CFO for Cook County, Ms. Anthony,
12 still stop the funding for --
13          MR. BRANUM:  Objection to form.
14 BY MR. MORRISSEY:
15      Q   -- for the Cermak ramp?
16      A   Honestly, I don't know if she has the
17 authority to do that or not.  If she did, I
18 know she would have to stipulate a pretty good
19 reason for it, but I don't know whether or not
20 she has -- I don't know the specifics of
21 whether she has the ability.
22          Once it's been approved in the CIP,
23 unless there's some violation of the law or
24 something really untoward, I don't know under

ERIC DAVIS
March 12, 2024

Page 118

1  what circumstances she would even do that or be
2  able to justify doing that.  I don't understand
3  how that would happen.
4      Q   Just because a project is included in
5  a CIP for a fiscal year, let's say, 2025, does
6  that necessarily mean that the County will
7  proceed and expend the money for that project
8  in fiscal year 2025?
9      A   There are any number of things that
10 might happen between the passage of a budget
11 and the completion of a funded project.
12          You may recall that we had a
13 pandemic.  That disrupted design and
14 construction activities to an extreme degree.
15 There are any number of things that could come
16 along to -- between the approval of a budgeted
17 item and its execution or completion that might
18 alter that happening.  I can't predict and
19 neither can you.
20      Q   To your knowledge, were there -- for
21 the Capital Improvement Projects that were
22 included and passed for the 2024 fiscal year,
23 approximately what percentage of those projects
24 will move forward in the year 2024?

ERIC DAVIS
March 12, 2024

Page 119

1      A   I'm sorry.  I missed the end.  Will
2  move forward in '25?  You mean be carried over?
3      Q   No, I'm referring to the current 2024
4  CIP.
5      A   So are you asking --
6      Q   There are projects that were approved
7  by the County Board for Capital Improvement
8  Projects for fiscal year 2024, correct?
9          MR. BRANUM:  Objection to form.
10 BY THE WITNESS:
11      A   So are you asking whether projects
12 would carry over or not or are you asking --
13 I'm not clear on what you're asking.
14          MR. BRANUM:  Yeah, Tom, the witness
15      is seeking clarification.
16          MR. MORRISSEY:  Sure.
17 BY MR. MORRISSEY:
18      Q   There were programs and projects that
19 were included in the fiscal year 2024 Capital
20 Improvement Projects, correct?
21      A   There are Capital Improvement
22 Projects in the Capital Improvement Plan for
23 fiscal year 2024, yes.
24      Q   My question is in this fiscal year

Exhibit 5 Page 30

ERIC DAVIS
March 12, 2024

Page 120

1  between November of 2023 and November of 2024,
2  what percentage of those projects will be
3  completed in the year 2024?
4       A    That's a good question with a very
5  complicated answer because, as I mentioned and
6  in the case of the improvements to Cermak,
7  which are under a project number, we're
8  expecting the design work for that project to
9  be completed in 2024.
10           We're expecting construction work to
11 be executed and contracts underway and
12 constructed in 2025, maybe in the beginning of
13 2026.
14           If the architects that are contracted
15 under '24 complete their work in '24 but the
16 project continues because now it has
17 construction funding, does that mean that the
18 project ended in '24 or the project carries
19 over in terms of your question?  What are you
20 asking?
21      Q    All right.  You're familiar that
22 there was funding for renovation of the
23 Leighton court building many years ago,
24 correct?

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 121

1       A    There was a project for renovations
2  to the holding cell areas in the Leighton
3  courthouse years ago, yes.
4       Q    And that project has been carried
5  over for many years, correct, under the CIPs?
6       A    I'm sorry.  Did I refer to that in
7  the -- I might have missed it.  Did I refer to
8  that in the Declaration?  Did we talk about
9  Leighton in the Declaration?  I'm not sure.
10           MR. BRANUM:  Yeah, Tom, why don't you
11      keep your questions within the scope of the
12      Court's order.
13           MR. MORRISSEY:  Well, it is.  It's in
14      regards to whether or not a project --
15 BY MR. MORRISSEY:
16      Q    Just because a project is approved in
17 the CIP for a fiscal year doesn't necessarily
18 mean that funds will be expended in that fiscal
19 year.
20           Is that a fair statement?
21           MR. BRANUM:  Objection, incomplete
22      hypothetical.
23 BY THE WITNESS:
24      A    But there are circumstances where --

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 122

1  but there are definitely circumstances that
2  arise where a project that is budgeted and
3  projected to have funds expended on it in a
4  given fiscal year for any number of different
5  reasons may not go forward in that fiscal year.
6  As I mentioned, you know, the pandemic but
7  there are other circumstances that may come up.
8           If your real question is does the
9  County intend to construct the replacement of
10 the ramp from the standpoint of the Department
11 of Capital Planning and Policy and, as I
12 mentioned that I outlined to our director, the
13 answer to that is yes.  It is our intent to
14 construct it using design and construction
15 firms that are already under contract.
16           It is our intent to submit the
17 construction funding for fiscal year 2025
18 because that's when we expect the proposal for
19 construction to be executed by the chief
20 procurement officer.  It is our definite intent
21 to accomplish this project.
22           Further, if you consult the County's
23 budget, and I will refer you to the published
24 public budget, Page 175 in the development of

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 123

1  the capital plan, even though in fiscal '24
2  there were projects we are not able to go
3  forward with, ADA projects are specifically
4  identified as a priority in the capital plan.
5           So if you want to ask me could
6  something occur to make it not constructed,
7  yeah, I suppose hypothetically it could occur,
8  but it is our intent to carry through per this
9  Declaration to get the replacement of the ramp
10 designed because that's the recommendation of
11 our consultant and to have it constructed by
12 people that are already contracted.  That's
13 what we intend to do.
14           Could there be extenuating
15 circumstances?  Certainly.  But at this point
16 in time, that's our intent, and it's an
17 established process.  We execute dozens if not
18 hundreds of projects every year that way.
19      Q    Is it your opinion that because the
20 rise of the ramp is only, I think, 2.4 --
21 exceeds 30 by 2.4 inches that that's a slight
22 variance and this project -- let me rephrase
23 the question.
24           To your knowledge, does Cook County

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 31

ERIC DAVIS
March 12, 2024

Page 124

```
1    dispute that the rise of the ramp doesn't
2    comply with the ADA?
3         MR. BRANUM:  So don't -- wait.  If
4    you're asking his mental impressions of
5    this case and litigation, that's protected
6    by the work product.
7         So if you want to rephrase your
8    question to not ask it in that way, it
9    might be better.
10   BY THE WITNESS:
11        A   I'm sorry, Tom, did you -- I think --
12   I was waiting for you to rephrase the question.
13   BY MR. MORRISSEY:
14        Q   Well, let's go back for a moment to
15   Globetrotters' report.  Give me one moment.
16        Going back to Globetrotters'
17   recommendations on Page 9, in particular about
18   the existing ramp handrails.
19        A   Uh-huh.
20        Q   When you participated in the
21   installation of the handrails, you are aware
22   that the handrails that were installed by the
23   Department of Facilities Management did not
24   comply with the requirements for the ADA,
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 125

```
1    correct?
2         MR. BRANUM:  Objection to form.
3    BY THE WITNESS:
4         A   If you are asking did I know during
5    the course of their installation that the
6    finished product was not complete and
7    completely compliant, yes, I was aware of that
8    because we were not able to obtain the pieces
9    to accomplish the ends, as I think I mentioned
10   previously in this deposition.
11   BY MR. MORRISSEY:
12        Q   You are aware that there had been a
13   court order in July of 2022 --
14        A   Yes.
15        Q   -- that the ramp was supposed to
16   comply with the ADA?
17        MR. BRANUM:  And I just object to
18   your characterization of the order.
19   BY MR. MORRISSEY:
20        Q   Is that fair to say?  You are aware
21   that the handrails are required to be installed
22   in compliance with the ADA?
23        A   Yeah.  As mentioned in the
24   deposition, there were doors that made it
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 126

```
1    impossible to simply extend the handrail, and
2    so the handrails themselves were not able to be
3    completed with the layout of that area as it
4    currently exits.
5         Q   My question was more focused.  You
6    were aware that it did not comply strictly with
7    the requirements that both sides of the
8    handrails had to be continuous with 12-inch
9    extensions?
10        A   Yes.
11        MR. BRANUM:  I will just object to
12   the extent you're picking out isolated
13   parts of the ADA and not reading the ADA as
14   a whole.  So that's my objection.
15        And we reserve all rights to make
16   those arguments to provide the additional
17   context that you're leaving out.
18   BY THE WITNESS:
19        A   Yes.  I was aware that we were not
20   able to finish the work.  The bulk of it was,
21   but we were not able to finish the ends.  Yes,
22   I was aware of that.
23   BY MR. MORRISSEY:
24        Q   And so the County didn't comply with
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 127

```
1    the Court's order of July of 2022, correct?
2         MR. BRANUM:  Stop.  Don't answer.  So
3    that's a legal conclusion and his mental
4    impressions and conclusions about this
5    litigation is protected by the work product
6    doctrine.
7         So I'm directing the witness not
8    to answer on the basis of privilege.
9    BY MR. MORRISSEY:
10        Q   I'm asking you as an architect --
11        MR. BRANUM:  I don't care how you're
12   asking him.  It's still privileged.
13        MR. MORRISSEY:  How can that be
14   privileged?  I'm asking did Cook County --
15   was Cook County aware that the installation
16   of the handrails in 2022 and in January of
17   '23 did not comply with the ADA standards.
18        MR. BRANUM:  So, one, I don't know
19   what you mean did Cook County know.  If you
20   want to ask him if he knows specific facts,
21   you can ask him that.  But if you're asking
22   for his conclusions and legal theories
23   about this litigation, that's what's
24   protected by the work product.  So, I mean,
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 32

ERIC DAVIS
March 12, 2024

Page 128

```
 1     it's not a categorical direction not to
 2     answer the questions, but your questions
 3     aren't fact based, so.
 4  BY MR. MORRISSEY:
 5     Q    Well, it's a fact that the handrails
 6  that were installed in 2022 by the Department
 7  of Facilities Management were not continuous
 8  for 12 inches at the end and the top of the
 9  ramps, correct?
10     MR. BRANUM:  Objection to form, but
11  you can answer that question.
12  BY THE WITNESS:
13     A    You had an order up earlier that had
14  a date.  I think it was end of '22 that it was
15  supposed to be completed by.  Is that the -- do
16  you still have that?
17  BY MR. MORRISSEY:
18     Q    Sure.  Do you want me to put that up
19  for you?
20     A    Sure.  Would you put that up?
21     Q    Sure.  I think it's Number 7.  Do you
22  see there was a court order dated July 27th,
23  2022?
24
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 129

```
 1     A    Yes, okay.  Thank you.
 2        MR. BRANUM:  And just for the record,
 3  it states:  Upon the parties' agreement.
 4        MR. MORRISSEY:  So, Peggy, can you
 5  repeat the question, please?  Is there a
 6  question pending?
 7        MR. BRANUM:  Well, I think the
 8  witness asked you to share the exhibit.
 9        MR. MORRISSEY:  Okay.
10  BY MR. MORRISSEY:
11     Q    So you see the exhibit now which is
12  the court order from July 27th, 2022, correct,
13  which is Exhibit Number 7?
14     A    So to answer your earlier question,
15  Tom, around this time, and I can't say without
16  checking whether it was before December 31st or
17  after, as you noted, we, we being the Bureau of
18  the Department of Facilities Management,
19  installed the handrails on the ramp, and we
20  were not able to obtain what we needed to
21  finish the ends of the handrails.
22        Around that time, as you noted also
23  in this discussion this afternoon, that was
24  around the time that we initiated the project
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 130

```
 1  to -- or the RFQ rather to hire what became
 2  Globetrotters to look at the whole facility.  I
 3  can't characterize specifics, but I think it's
 4  fair to say that a part of the motivation to
 5  make sure we were going forward with the
 6  assessment of the whole facility by a third
 7  party included a recognition that we were not
 8  finding a way to resolve everything that needed
 9  to be resolved the way we were doing it.  So
10  that's why we brought somebody else in to,
11  first of all, look objectively at the questions
12  that you've asked about the ramp and the rise
13  of the ramp and to give us their objective
14  evaluation of that, but then further to
15  identify what measures would make the area
16  accessible, right?  If we were not able to
17  provide accessibility because we were thwarted
18  in our ability to get the handrails finished,
19  we had to find another way.  And that way that
20  we pursued was to get this third party
21  contracted to look at the facility as a whole
22  and to make their recommendations for how to
23  bring the facility into compliance.
24        That's what we've done.  We've done
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 131

```
 1  it in a fairly efficient way.  We are moving
 2  forward vigilantly and consistently do that.
 3  And if you're saying, you know, did we
 4  recognize that we haven't pulled it off, at
 5  some point along the line, yeah, I think it was
 6  pretty clear that we weren't able to complete
 7  it.  We've done most of it but hadn't been able
 8  to complete all of it, and so we had to find
 9  another way.  And that's what led to the
10  assessment, and that's what's leading to the
11  removal of the ramp.
12        And as you note, and as we note in
13  here, the removal of the handrails.  We are
14  trying to get -- we're trying to make this
15  facility as accessible as it needs to be.  We
16  tried one way.  That didn't work.  We're trying
17  another way.
18     Q    Well, in your Declaration and in
19  Mr. Branum's response to the permanent
20  injunction, you talk about a slight -- the rise
21  of the ramp is slightly off by 2.4 inches,
22  correct?
23        MR. BRANUM:  What paragraph are you
24  referring to?
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 33

Page 132

1    MR. MORRISSEY:  Well, you can look at
2  Paragraph 11.
3  BY MR. MORRISSEY:
4    Q    You say:  Slightly over
5  two-and-a-half feet.  You used the word slight.
6    MR. BRANUM:  And your slightly is
7  under Paragraph 11.  All I'm asking is the
8  paragraph number.  So go ahead.
9  BY MR. MORRISSEY:
10    Q    You used the term slightly over
11  two-and-a-half inches [sic].
12    MR. BRANUM:  Well, that misstates the
13  Declaration.
14    MR. MORRISSEY:  Well, that's what it
15  says.
16    MR. BRANUM:  No.  You misread it.
17    MR. MORRISSEY:  The word is slightly
18  over two and a half --
19  BY THE WITNESS:
20    **A    It does say slightly over**
21  **two-and-a-half feet.**
22    MR. BRANUM:  Yeah, you said
23  "two-and-a-half inches."
24    MR. MORRISSEY:  I'm sorry.

Page 133

1  BY MR. MORRISSEY:
2    Q    It's slightly over two-and-a-half
3  feet which is 32.4 inches, correct?
4    **A    The rise as indicated by the LIDAR**
5  **from GEC indicates that it has a vertical rise**
6  **of 32.4 inches, which is slightly over**
7  **two-and-a-half feet.**
8    Q    So by using the term "slightly," is
9  it your -- in your Declaration, do you consider
10  that to be de minimus that it really doesn't
11  matter that it's only 2 inches -- 2.4 inches
12  exceeding the rise that's required under the
13  ADA?
14    MR. BRANUM:  So don't answer that.
15  Again, this is protected by work product.
16  It's a legal conclusion.  The term
17  de minimus is a legal conclusion.
18    So if you want to ask him factual
19  questions, you can ask him that.  Our
20  arguments in a brief making legal arguments
21  is not something that you can question the
22  witness on.
23  BY MR. MORRISSEY:
24    Q    Well, I'm asking you about your

Page 134

1  Declaration.  And your Declaration uses the
2  term when referring to the ramp and the rise,
3  you used the term slightly over two-and-a-half
4  feet.
5    **A    Yeah.**
6    Q    The vertical rise is 32.4 inches.
7    **A    Yeah.**
8    Q    Mr. Davis, what is required in
9  regards to the Cermak ramp as far as the rise?
10    **A    As discussed before in this**
11  **deposition and other actions, it is supposed to**
12  **be 30 inches before you introduce an**
13  **intermediate landing.  There are qualifications**
14  **to that that I have mentioned before in terms**
15  **of the construction tolerances, the material**
16  **and the allowances for a cross-slope.**
17    **So there are, to our understanding,**
18  **minor variations from that 30-inch standard**
19  **that are allowable.  That said, we wanted a**
20  **third-party view of this.  And the third party**
21  **said you need to change the ramp, and so that's**
22  **what we're doing.**
23    Q    Based upon what you just said, what --
24  in regards to the Cermak ramp, tell me

Page 135

1  specifically why it was permissible for Cook
2  County and the Sheriff to exceed a rise of
3  30 inches for the Cermak ramp?
4    MR. BRANUM:  Again, Counsel, you're
5  getting into legal conclusions.  You can
6  ask him facts, and he's already answered
7  your questions factually, but you're asking
8  for a legal conclusion.
9  BY MR. MORRISSEY:
10    Q    As a factual matter, does the fact
11  that the rise is 2.2 inches and 4 -- let me
12  rephrase it.
13    As a factual matter, does it matter
14  that the rise of the Cermak ramp is 32.4 inches
15  in regards to complying with the ADA
16  requirements for the Cermak ramp?
17    MR. BRANUM:  So just pause.  So just
18  by putting in the beginning of your
19  sentence "factual matter" but then you end
20  with "complying with the ADA," you can't
21  change a question asking for a legal
22  conclusion just by throwing the word
23  factual in a sentence.  So it doesn't work
24  that way.

Exhibit 5 Page 34

ERIC DAVIS
March 12, 2024

Page 136

```
 1          So re-ask a question where you
 2   are not asking a legal conclusion that's
 3   protected by the work product doctrine.
 4   BY MR. MORRISSEY:
 5      Q    **** Did the cross-slope apply to the
 6   Cermak ramp which gave permission in your
 7   opinion for the rise to exceed 30 inches?
 8          MR. BRANUM:  So, Counsel, you're
 9   asking legal conclusions, legal opinions
10   related to this litigation that goes to the
11   heart of this litigation, which is whether
12   the ramp complies with the ADA.  His mental
13   impressions, his conclusions, his legal
14   theories on whether the ramp complies with
15   the ADA are all protected by the work
16   product doctrine.
17          So I'd ask you to not ask those
18   questions because they are privileged.  If
19   you continue to ask those questions, I will
20   object and direct the witness not to answer
21   based on the work product doctrine.
22          MR. MORRISSEY:  Mr. Branum, you're
23   totally off base.  I'm going to certify the
24   question.
```

ERIC DAVIS
March 12, 2024

Page 137

```
 1          MR. BRANUM:  And you don't have to
 2   make personal comments.  Let's keep this
 3   professional.  Let's keep it on the merits
 4   and not make -- throw personal barbs at
 5   each other.
 6   BY MR. MORRISSEY:
 7      Q    Mr. Davis --
 8      A    If I understand your question --
 9          MR. BRANUM:  Well, no, there's no
10   question pending.
11   BY MR. MORRISSEY:
12      Q    **** I have a question, Mr. Davis.
13   In your Declaration, were you uncertain after
14   Helen Stoner issued her assessment in March of
15   2018 up until December of 2024 whether or not
16   the Cermak ramp complied with the ADA
17   standards?
18          MR. BRANUM:  Objection to form and,
19   again, his uncertainty, his conclusions and
20   mental impressions on whether this ramp
21   complied with the law goes to the heart of
22   this litigation and is protected by the
23   work product doctrine.  So --
24          MR. MORRISSEY:  We'll certify the
```

ERIC DAVIS
March 12, 2024

Page 138

```
 1   question if you're not going to allow him
 2   to answer, Mr. Branum.
 3          MR. BRANUM:  Yes, certify it.  But
 4   we're asserting a privilege.
 5   BY MR. MORRISSEY:
 6      Q    Well, in Paragraph 5, you make
 7   various statements, Mr. Davis.  In Paragraph 5
 8   you say that the intent was to have it -- the
 9   rise be 30 inches or less, correct?
10      A    What I say was that the design
11   drawing showed the intent of 30 inches, yes.
12      Q    And then you say the surveyor showed
13   that at least one part of the ramp was exactly
14   30 inches, correct?
15      A    Yes.
16      Q    And why did you put those in the
17   Declaration when you knew, for instance, that
18   the surveyor also said that the right and left
19   side of the ramp were -- exceeded 30 inches?
20          MR. BRANUM:  So, again, don't answer
21   that question.  That's protected by the
22   work product doctrine.  His mental
23   impressions related to this litigation is
24   not discoverable.
```

ERIC DAVIS
March 12, 2024

Page 139

```
 1          So his mental impressions on why
 2   he included something in a court document
 3   in a Declaration is his mental impression
 4   and it's protected.
 5   BY MR. MORRISSEY:
 6      Q    In 2018, as the person in charge of
 7   reviewing Ellen Stoner's report, did you intend
 8   that the Cermak ramp should be renovated?
 9      A    On reading the element that you're
10   referring to, it was not clear to me that her
11   conclusion was taking into account all of the
12   facts because she was making assumptions about
13   the slope of the ramp that were incorrect.  She
14   was making assumptions based upon it being a
15   1 in 12 slope, and it clearly was not.  She was
16   making assumptions about the offset and how
17   high that was, but it was based upon the block
18   coursing, which is an inexact way of
19   determining that offset.
20          So I felt that in reviewing her
21   documents that she didn't have all of the
22   information.
23      Q    And in 2000 -- between 2020 and
24   November of 2022, you still aren't convinced
```

Exhibit 5 Page 35

---

ERIC DAVIS
March 12, 2024

Page 140

1  that the ramp was not in compliance with the
2  ADA, correct?
3       MR. BRANUM:  Objection to the form of
4    the question.
5  BY THE WITNESS:
6    A    Well, in 2022, that's why we wanted
7  to have a surveyor verify it.  That's why we
8  asked him to do a survey because we had had a
9  laser level done.  You questioned that.  We
10 thought fine.  Let's have a surveyor come in
11 and do that and take a look at it but, yeah, it
12 was our impression that the ramp was compliant.
13       Now, as we also note in here, we
14 hadn't done a LIDAR evaluation which GEC did,
15 which revealed more information than we knew at
16 the time.  But, yeah, it was our impression and
17 our -- and I should say my evaluation that the
18 ramp was compliant based upon construction
19 tolerances and cross-slope and what we were
20 seeing at the time.
21       We got more information.  The greater
22 information provided the 2.4 inches that you
23 referenced earlier, and that was enough to be
24 convincing to say we need to look at this

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 141

1  again.  We need to address the situation.
2    Q    And with the handrails that were
3  installed by Cook County in 2022 and early '23,
4  were you unconvinced that the handrails didn't
5  comply with the ADA?
6       MR. BRANUM:  Objection to the form of
7    the question.
8       MR. MORRISSEY:  Let me rephrase it.
9  BY MR. MORRISSEY:
10   Q    When the handrails were put in in
11 December and January of 2022, was it the
12 County's position that they were in compliance
13 with the ADA?
14       MR. BRANUM:  Don't answer that
15    question.  It's a legal conclusion
16    protected by the work product doctrine.
17 BY MR. MORRISSEY:
18   Q    If the Court -- if the Court wasn't
19 alerted to the fact that the handrails were not
20 in compliance with the ADA, was it your
21 position to remedy that, the handrails?
22       MR. BRANUM:  Objection, incomplete
23    hypothetical.  It calls for speculation.
24    It's counterfactual.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 142

1       MR. MORRISSEY:  Well, let me rephrase
2    it.
3  BY MR. MORRISSEY:
4    Q    You were aware when the handrails
5  were put in that they weren't compliant,
6  correct?
7       MR. BRANUM:  Don't answer the
8    question.
9  BY MR. MORRISSEY:
10   Q    (Inaudible) 20 inches -- 12 inches --
11       MR. BRANUM:  Don't --
12 BY MR. MORRISSEY:
13   Q    -- on the end?
14            (Simultaneous speaking.)
15       MR. BRANUM:  If you want to ask him
16    if --
17       THE REPORTER:  I'm sorry, Tom.  I
18    couldn't hear the question.  It was --
19       MR. MORRISSEY:  All right, because
20    Sam was interjecting himself.
21       MR. BRANUM:  Well, you paused, so I
22    put what was starting my objection and then
23    you started your question back up, but I
24    will let you get your question out again.

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 143

1       MR. MORRISSEY:  I would appreciate
2    that, and I would appreciate some
3    cooperation here.
4  BY MR. MORRISSEY:
5    Q    In 2022 and 2023, what did you do as
6  the responsible person for Cook County to
7  ensure that the handrails were properly
8  installed pursuant to the ADA?
9    A    So if I'm understanding your question
10 correctly, the installation of the handrails
11 that were put in was incomplete.
12       And as I said around the time that we
13 determined that we weren't going to be able to
14 achieve complete compliance that way was around
15 the time that we initiated the process to
16 retain the firm which became Globetrotters to
17 get a dispassionate third-party view of the
18 circumstance and make a recommendation.
19   Q    If we look at Paragraph 13, it talks
20 about the handrails, and it talks about
21 anti-ligature handrails, correct?
22   A    Yes.
23   Q    I'm going to show you -- to your
24 knowledge, since 2010 to the present, has Cook

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 36

ERIC DAVIS
March 12, 2024

Page 144

1 County or the Sheriff installed handrails for
2 ramps that do not have anti-ligature handrails?
3     MR. BRANUM: Objection to form,
4     foundation. You can answer it to the
5     extent of your knowledge.
6     MR. MORRISSEY: Let me rephrase it.
7 BY MR. MORRISSEY:
8     Q    To your knowledge, are there other
9 areas of the Cook County Jail that have
10 handrails that are not anti-ligature?
11     MR. BRANUM: Objection, foundation.
12 BY THE WITNESS:
13     **A    I don't know. I can't give you a**
14 **definitive answer.**
15 BY MR. MORRISSEY:
16     Q    Do you know if the RTU handrails are
17 anti-ligature?
18     **A    Not offhand, no.**
19     Q    Do you know if the -- in Division 4
20 whether the handrails are anti-ligature?
21     **A    No, I don't.**
22     Q    Is there a requirement under the ADA
23 that the handrails be anti-ligature to your
24 knowledge?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 145

1     **A    My understanding of the applicable**
2 **standards is that because it is a custody**
3 **environment, the -- and I believe it's -- I**
4 **don't think it's in ADA. I think it's in**
5 **ADAAG. I'm not sure. I have to look it up**
6 **that a sheriff is able to make -- or law**
7 **enforcement is able to make adjustments for**
8 **safety which is what the anti-ligature**
9 **handrails are for because it's a custody**
10 **environment.**
11     **I can't speak to anything that was**
12 **done before 2017 because I didn't work for the**
13 **County before 2017, and I didn't work on the**
14 **RTU.**
15     Q    Showing you the picture in Group
16 Exhibit 4, it's a picture that's been Bates
17 Stamped IMG_3765.JPG.
18     Looking at that photograph, which
19 is -- I will tell you it's the RTU ramp. Is
20 that an anti-ligature handrail?
21     **A    I can't tell from this angle.**
22     Q    What would you need to look at to see
23 the angle of the handrail?
24     **A    I would need to look at the end, look**

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 146

1 **at it from the end.**
2     Q    Showing you Group Exhibit 4
3 Photograph 3765 -- I'm sorry. It's 3807.
4     By looking at that photograph, do you
5 recognize that as the handrail installed in the
6 RTU ramp? And I think if we look further, I
7 think you'll see Mr. Branum in the picture.
8     MR. MORRISSEY: Is that right,
9     Mr. Branum?
10     MR. BRANUM: Just ask your question
11     to the witness.
12     MR. MORRISSEY: Are you with us,
13     Mr. Branum?
14     MR. BRANUM: Just ask your question.
15     There's no -- so we've already been going
16     for three hours on what should have been a
17     two-hour-or-less deposition. I've allowed
18     you a lot of leeway to explore a lot of
19     topics outside his Declaration, but we need
20     to wrap this up.
21 BY MR. MORRISSEY:
22     Q    Looking at the photograph, the end of
23 the -- do you recognize that as the Cermak ramp
24 area?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 147

1     **A    No, because --**
2     Q    I'm sorry. The RTU ramp area.
3     **A    No, I don't but if you stipulate that**
4 **it is, okay. I can't say one way or the other.**
5 **The tunnel has lots of doors and it's an**
6 **extensive system.**
7     Q    We will stipulate for the moment it's
8 the RTU handrail for the ramp that leads from
9 the RTU to Cermak.
10     **A    Yeah.**
11     Q    Looking at that handrail, do you
12 consider that to be anti-ligature?
13     **A    From the shadow line underneath it,**
14 **it doesn't appear that it is.**
15     Q    Do you know if there are any
16 handrails at the Cook County Department of
17 Corrections that are anti-ligature?
18     **A    Yes.**
19     Q    Which handrails?
20     **A    I don't recall offhand, but I know**
21 **I've seen some recently that are. I could**
22 **probably -- I remember seeing some recently**
23 **that are. I don't remember specifically where**
24 **they are. They may be in -- they may be in**

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 37

Page 148

```
1   Cermak itself or -- I did see some recently on
2   the campus.  I think it was in the holding
3   cells perhaps.  I don't remember.  Somewhere.
4   I do remember seeing some recently.
5        Q    For any ramp at the Cook County Jail,
6   do you know if any ramp at the Cook County Jail
7   currently has anti-ligature?
8        A    I would have to go through and look.
9   I don't know offhand, no, one way or the other.
10       Q    When the -- when you oversaw the
11  installation of the handrails in the fall of
12  2022, what steps did you take to secure an
13  extension, the 12-inch extension having been
14  fabricated so you could have a 12-inch
15  extension for the handrail?
16       A    I talked to the manufacturer that we
17  ended up ordering them from.  And we looked at
18  a couple of different ways to possibly do it.
19  We looked at potentially taking a straight
20  section and then miter cutting them on an angle
21  because it had to navigate that 45-degree turn
22  at the corner.  And the problem there was the
23  geometries of the handrail itself and the
24  section that connects back to the wall, it
```

Page 149

```
1   wouldn't align properly and would create an
2   area that you bumped your hand.  So that wasn't
3   going to work.
4        We also looked at the possibility of
5   scoring and mending the straight section to
6   make that turn, and that wouldn't work.  So we
7   looked at -- and the only other way to do it
8   would be to create a custom-cast piece for the
9   area for that specific geometric situation
10  which would be a very time-consuming
11  undertaking.  It might be something that's
12  doable, but it's very time consuming.
13       And as I said, that's around the time
14  that we said, you know what, let's look at the
15  whole thing.  Let's bring somebody in here.
16  Let's look at how to address the situation as a
17  whole.
18       Q    So whether it's costly or not, it's
19  feasible to custom extend the railing that was
20  put in Cermak and extend each side 12 inches?
21       A    For some of those areas, yes.  In
22  others not.  As noted there, as you see in your
23  photographs, there's a door at the bottom of
24  the ramp on one side so that if you extended
```

Page 150

```
1   the handrail and turned the corner 12 inches,
2   you would be blocking the door.  There would
3   also be no way to attach the end of the
4   handrail because the door is there.  So that
5   would be not feasible.
6        Q    For portions of the handrail for the
7   Cermak ramp, it was feasible to extend it
8   12 inches if the piece was individually
9   fabricated, correct?
10       A    My recollection is that I think it's
11  two out of four of the ends of the two
12  handrails.  You could do it with a custom
13  extension, and I think there was an obstruction
14  in the other two cases but I would have to
15  review it.
16       Q    So the County made a decision based
17  upon cost for two of the handrails not to
18  extend it, correct?
19       A    No, no.  The County did not make the
20  decision based on cost.  The County made the
21  decision to make the best possible
22  accommodation.  The decision was not based on
23  cost.  The decision was based on making the
24  best possible accommodation, and that's why we
```

Page 151

```
1   needed to go get somebody to take a look at the
2   whole thing.
3        Q    For two of the handrails, ends of the
4   handrails, it was feasible to fabricate an
5   extension of 12 inches.
6        Is that fair to say?
7        A    Possibly.  That would require further
8   investigation and working directly with the
9   vendor over the period of months, if not, you
10  know, a better part of a year.
11       Q    And that wasn't done.  I'm going to
12  ask you now some questions.
13       MR. MORRISSEY:  We could take a
14       five-minute break.  I need to use the
15       washroom.
16            (WHEREUPON, a short
17            break was had.)
18  BY MR. MORRISSEY:
19       Q    Looking at your Declaration -- can
20  you pull your Declaration up for a second?
21       A    Yep.  I got it.
22       Q    On Number 6, you say:  Based upon the
23  original design plans from 1996 and survey that
24  the County commissioned, the County's belief
```

Exhibit 5 Page 38

Page 152

1 and understanding was that the vertical rise in
2 the Cermak ramp was compliant with applicable
3 accessibility laws, codes and requirements.
4    A   Yes.
5    Q   Is it your position up till September
6 of 2024 that the ramp was compliant, fully
7 compliant; that was your belief?
8    A   September of 2024 is six months from
9 now.  What do you mean?
10    Q   I'm sorry.  As of September -- from
11 2018, March of 2018 --
12    A   What you're asking is when we got the
13 LIDAR from the GEC; is that what you're saying?
14    Q   No.  My question is from March of
15 2018 when you received Ellen Stoner's
16 assessment up through September of 2023, was it
17 your belief that the Cermak ramp was fully
18 compliant with the ADA?
19    A   Number 6, it speaks specifically to
20 the vertical rise.  Assuming your question is
21 about that part of it, then I would say, yes,
22 it was my impression that the ramp was
23 compliant within applicable laws, codes and
24 requirements including the tolerances for

Page 153

1 things like construction variability and
2 cross-slope, which I mentioned previously.
3    Q   Well, tell me what caused you to
4 believe that up until September of 2023, the
5 tolerance under the ADA would provide some kind
6 of excuse for Cook County to have a rise of
7 over 30 inches for the ramp?
8        MR. BRANUM:  So he's already answered
9    this question.  It's been asked and
10    answered.  He already talked about
11    cross-slopes earlier in the deposition.
12        MR. MORRISSEY:  He has not.
13 BY MR. MORRISSEY:
14    Q   Can you answer the question?
15        MR. BRANUM:  Well, he has.  I mean,
16    he can answer it again, but then we need to
17    move on so we're not repeating questions.
18 BY THE WITNESS:
19    A   The information that we had indicated
20 that it was 30 inches right down the middle of
21 the ramp, right like the drawing says and that
22 the variances, if I'm using your legal term
23 correctly, were de minimus.
24

Page 154

1 BY MR. MORRISSEY:
2    Q   Do you think that having a rise
3 that's 32 inches .4 is de minimus as far as --
4    A   No.
5    Q   -- for an intermediate landing?
6    A   No, but that's information we had
7 after that.
8    Q   Is it de minimus if the rise was
9 30 inches and a quarter?
10        MR. BRANUM:  Again, I'm going to stop
11    you.
12 BY MR. MORRISSEY:
13    Q   In regards to --
14        MR. BRANUM:  Your use of the term
15    de minimus is a legal conclusion.
16        MR. MORRISSEY:  The witness used the
17    word de minimus.
18 BY THE WITNESS:
19    A   You need to say acceptable.  I think
20 that's what you're getting at; is that right,
21 Tom?
22 BY MR. MORRISSEY:
23    Q   No.  I'm saying as an architect, is
24 it de minimus --

Page 155

1    A   Are you --
2    Q   -- that the rise --
3        (Simultaneous speaking.)
4        THE REPORTER:  I'm sorry.  I need you
5    to speak one at a time.  Tom, can you start
6    over?
7 BY MR. MORRISSEY:
8    Q   **** Mr. Davis, as an architect, if
9 the rise of the ramp was 30 inches and a
10 quarter, is that de minimus in regards to the
11 requirement to have an intermediate landing?
12        MR. BRANUM:  Again, don't answer that
13    question.  It's a legal conclusion.
14        MR. MORRISSEY:  He used the word "de
15    minimus," Mr. Branum.  I'm asking the
16    question.  I expect him to answer it.
17        MR. BRANUM:  No.  You're asking him a
18    legal conclusion that's protected under the
19    work product doctrine.
20        MR. MORRISSEY:  We will certify the
21    question, Mr. Branum, because it isn't.
22 BY THE WITNESS:
23    A   Tom, I'm going to substitute the word
24 acceptable --

Exhibit 5 Page 39

ERIC DAVIS
March 12, 2024

Page 156

1     MR. BRANUM: Well, no. There's no
2 question pending.
3 BY MR. MORRISSEY:
4     Q All right. We'll use your term then.
5 As an architect, if the rise of the Cermak ramp
6 was 30 inches and a quarter, is that acceptable
7 as an architect?
8     **A As I said before, it's my -- it was**
9 **my --**
10     MR. BRANUM: No. Just stop. Again,
11 these are getting to the witness' mental
12 impressions, conclusions related to this
13 litigation, and it's protected by the work
14 product doctrine.
15 BY MR. MORRISSEY:
16     Q Is it acceptable that the ramp, the
17 Cermak ramp will remain unrenovated in the year
18 2024?
19     MR. BRANUM: Again, you're asking for
20 his mental impressions, his conclusions and
21 opinions related to this litigation and
22 that's protected by the work product
23 doctrine.
24     MR. MORRISSEY: Work product involves

ERIC DAVIS
March 12, 2024

Page 157

1 an attorney's mental thoughts and
2 impressions, not a person that's a witness
3 in a case, Mr. Branum.
4     MR. BRANUM: Well, I'm not going to
5 debate the law with you.
6     MR. MORRISSEY: I would appreciate
7 you not providing these spurious
8 objections.
9     MR. BRANUM: I'm not going to --
10     MR. MORRISSEY: If you won't allow
11 him to answer the question, we'll bring it
12 to the Court.
13     MR. BRANUM: I'm not going to debate
14 the law with you, but you're incorrect that
15 the work product doctrine only applies to
16 attorneys, and that's the privilege we're
17 asserting.
18 BY MR. MORRISSEY:
19     Q Going to Paragraph 16 now, you
20 referred to the Cermak ramp renovation as a
21 small project, correct?
22     MR. BRANUM: Objection to form. Are
23 you referencing a specific paragraph in the
24 Declaration?

ERIC DAVIS
March 12, 2024

Page 158

1     THE WITNESS: He said Number 16.
2 BY THE WITNESS:
3     **A Smaller project, yes, in the scheme**
4 **of things and the projects that we do, the**
5 **removal and replacement of a single ramp,**
6 **concrete ramp, is a smaller project, yes.**
7 BY MR. MORRISSEY:
8     Q As an architect -- how long have you
9 been an architect, sir?
10     **A I first got my license in the state**
11 **of Illinois in 1989. So if my math is correct,**
12 **that makes it 35 years.**
13     Q As an architect, have you been
14 involved with the installation of any ramps in
15 any buildings that you've designed?
16     **A Yes.**
17     Q Approximately how many ramps have you
18 overseen as an architect in 35 years?
19     **A I can't answer that because a ramp is**
20 **something that comes up fairly often. I have**
21 **been involved in the replacement of ramps in**
22 **connection with schools. I have been involved**
23 **in the replacement of ramps in connection with**
24 **park facilities. I have been involved with the**

ERIC DAVIS
March 12, 2024

Page 159

1 **replacement of a ramp in a courthouse. I have**
2 **been involved in several over the years.**
3     Q For a small project, the Cermak
4 renovation as you described as a small project,
5 how long would it take to demolish the ramp, to
6 break it up?
7     MR. BRANUM: Objection to the form of
8 the question. Are you talking about this
9 ramp? Are you talking about -- what ramp
10 are you talking about?
11 BY MR. MORRISSEY:
12     Q I'm talking about the Cermak ramp.
13 If you were to hire a construction firm
14 tomorrow to demolish the exiting Cermak ramp,
15 how long would that take?
16     **A So I believe that's answered in terms**
17 **of the total projected duration of the project.**
18 **The issue in the case of the Cermak ramp is**
19 **that the ramp, which is approximately 10 feet**
20 **wide, has to at least continue to allow access**
21 **to and from the Cermak facility during the**
22 **course of construction.**
23     As that is the case, it's going to
24 have to be a two-stage project. We're going to

Exhibit 5 Page 40

ERIC DAVIS
March 12, 2024

Page 160

```
 1   have to cut out half of it and rebuild half of
 2   it, put up a temporary partition while the
 3   other half remains as is.  And then once the
 4   first half is complete, we're going to have to
 5   open that side and then take out the other
 6   side.  So we will not be replacing the ramp all
 7   at once.
 8            And I want to clarify something
 9   earlier.  In Item 16, the architectural
10   engineering firm on the smaller projects,
11   that's in terms of the budget of the
12   architectural fees, not the cost of
13   construction.
14        Q    Is the cost of construction in excess
15   of $2 million that you previously testified to?
16        A    I could see that that's around what
17   it ends up being, yeah, something like that.  I
18   could see that being the case, 1 to 2.  I
19   really don't know.
20            The problem is we don't know what
21   we're going to find when we take the ramp out.
22        Q    So assuming that this is a ramp not
23   being used by -- at Cook County Jail, how long
24   would it take physically for a construction
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 161

```
 1   firm, based upon your background and
 2   experience, to tear up that ramp?
 3        A    If it was a single ramp and there was
 4   no -- and there were no unforeseen subsoil
 5   conditions, I would think they could take it
 6   out and replace it.
 7            Now, if you mean just in terms of the
 8   concrete work, it would have to be done at a
 9   certain time of year because we live in Chicago
10   and you can't pour concrete in December, but
11   let's assume you're talking the summertime.  I
12   would expect it would take place -- the
13   concrete work could take place -- the
14   demolition concrete work in a matter of months.
15   On the range of, let's say, three to six
16   months.
17        Q    So for just demolition, if you were
18   the general contractor on the project and you
19   had -- you hired a subcontractor to demolish
20   the ramp, tear up the concrete, would that take
21   more than a month to physically take
22   jackhammers and break up the concrete?
23        A    Are you asking about a speculative
24   ramp out in the open or are you asking about
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 162

```
 1   this ramp?
 2        Q    Well, I'm asking about this ramp.  If
 3   you --
 4        A    Okay.  This ramp --
 5        Q    -- hired a bunch of -- a
 6   subcontractor -- a contractor -- well, let me
 7   rephrase it.
 8            If you hired a concrete contractor
 9   and you said to the concrete contractor I'm
10   going to task you with the job of just breaking
11   up the concrete on that ramp, how long would
12   you expect it to take just to remove the
13   concrete?
14        A    With the understanding that I'm
15   speculating with somewhat incomplete
16   information, I would note that in the case of
17   this ramp, you are going to have to saw cut the
18   ramp out rather than simply busting it out with
19   jackhammers.
20            The reason we have to do that is, as
21   I mentioned, on the one side, you're going to
22   have to have a nice clean edge that you can
23   build a wall with to wall off the remaining
24   ramp.  And on the other side, you're going to
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 163

```
 1   have the existing concrete wall and you don't
 2   want to destroy the wall.
 3            So you're going to have to saw cut
 4   that.  And you can imagine taking a saw up
 5   against an existing concrete wall like that,
 6   it's going to take awhile.  You know, you can't
 7   get the blade flat parallel to the wall, right?
 8   There's no saw that I know of -- you're going
 9   to put the saw right up against the -- so
10   you're going to have to cut it out, and you're
11   probably going to have to hand cut the rest of
12   it.
13            So, yeah, the demolition in this case
14   is going to take awhile because it has to be
15   relatively precise.  It's not just two guys
16   with a jackhammer.  It's going to be much more
17   involved.
18        Q    But concrete companies do this all
19   the time, correct?  There are concrete
20   companies that saw cut existing ramps.
21            Is that fair to say?
22        A    There are companies that cut out
23   ramps all the time.  I don't know how many of
24   them do it in a jail environment where their
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 41

Page 164

1  operations are limited.  They can't -- one of
2  the problems that you have in working in the
3  jail, every contractor that comes in has to
4  provide what's called a tool list.  They have
5  to list every single day for every single
6  person anything that's being brought into and
7  out of the jail, and that gets down to a level
8  of screws and fasteners.  It is a very
9  time-consuming effort to get people and
10 material and demolished material in and out of
11 a jail.  It's not like a regular construction
12 site.
13        So are there companies that can do
14 the demolition?  Absolutely.  Is it going to
15 take longer doing it in the jail?  Absolutely.
16     Q    Assuming it wasn't in a jail and you
17 hired --
18        MR. BRANUM:  Well, no.  That's not
19     relevant.
20        MR. MORRISSEY:  Well, let me ask the
21     question.
22 BY MR. MORRISSEY:
23     Q    Assuming the ramp was not in a jail
24 facility, how long would you expect to -- for a

Page 165

1  general -- for a concrete subcontractor to
2  demolish the ramp, the existing ramp at Cermak?
3        MR. BRANUM:  Calls for speculation.
4     It's an incomplete hypothetical.  How long
5     is the ramp?  How high is the ramp?  How
6     wide is the ramp?  What is the ramp made
7     out of?  Where is the ramp located?  Is it
8     the winter?  Is it the summer?
9        MR. MORRISSEY:  Mr. Branum --
10        MR. BRANUM:  How do you expect the
11     witness to answer a question like this?
12        MR. MORRISSEY:  Mr. Branum, the
13     witness, if he doesn't understand the
14     question, I will rephrase it.
15 BY THE WITNESS:
16     A    For the record, I was just about to
17 ask all of the questions he just asked:  How
18 big?  How wide?  Where?  What's the substrate?
19 What time of year?  I was going to ask all of
20 those questions.
21 BY MR. MORRISSEY:
22     Q    All right.  Assuming it's a ramp
23 that's 43 feet long and has a rise now of
24 32 inches .4, and it's similar to the Cermak

Page 166

1  ramp, give me your best estimate how long it
2  would take a subcontractor to remove the
3  concrete, the existing ramp?
4        MR. BRANUM:  Asked and answered.
5  BY THE WITNESS:
6     A    Again, is it outside or is it inside
7  a building?  If it's in a park and it's 43 feet
8  long, it's going to be easy.  If it's inside
9  any other building, it's still going to take
10 awhile.
11 BY MR. MORRISSEY:
12     Q    You mentioned that it would -- you
13 guesstimate that it would take three to six
14 months for a contractor to remove the concrete
15 and pour the new ramp, correct?
16     A    I think I was answering on the
17 shorter -- I think I was answering the question
18 with the three to six months was if it was an
19 open and unencumbered ramp and we didn't have
20 to cut it in half like we do with this one.  I
21 think that was the figure, if it was a ramp in
22 a building, not in a jail and you could take it
23 all out at once and replace it.
24     Q    Assuming you had the funds today --

Page 167

1     A    Yeah.
2     Q    -- how long would it take for a
3  contractor at the jail to remove the concrete
4  and pour new concrete pursuant to a
5  recommendation by Globetrotter?
6     A    I think that's included in the
7  roughly two-year time frame.
8     Q    Well, we're going to get to the
9  two-year time frame that you have here,
10 Mr. Davis.
11        I'm asking you how long for a small
12 project like this would you expect that it
13 would take the contractor to do the work?
14        MR. BRANUM:  Objection to form.
15 BY THE WITNESS:
16     A    I think it's going to take -- well,
17 it's certainly going to take longer to demolish
18 it there than in a building that's not a jail.
19 It's going to take longer to demolish a ramp
20 inside a building than one that's not inside a
21 building.  I mean, that's why I'm giving you
22 those types of figures.  It's a more
23 complicated endeavor.
24

Exhibit 5 Page 42

Page 168

BY MR. MORRISSEY:

1  Q   I'm asking for your guesstimate.

2  A   So are you asking just the demolition
portion or demolition and pouring?

3  Q   Assuming Cook County -- the Cook
County Board approves in fiscal year 2025 --

4  A   Yeah.

5  Q   -- demolition and construction of the
Cermak ramp, how long will the demolition take
and how long will the construction take?

6  A   So I think I said before assuming
that we complete the design work sometime in
the course of fiscal year '24 and get the
pricing underway and we get the Notice of
Proposal of Acceptance around the beginning of
'25, I would expect that the demolition and
construction, the phased demolition and
construction of the ramp and the conversion to
a walking surface would be accomplished during
the course of fiscal year '25 and may extend
into the beginning of '26.  So on the order of
maybe 12 to 15 months overall but, again, that
has to do with -- that's making assumptions
about what we do or don't find underneath it.

Page 169

1  That's making assumptions upon the availability
of the space and how long it's going to take in
the custody environment.

2  Q   Now, your Declaration is silent about
this transfer package by Globetrotter, correct?
Is there anything in your Declaration where you
talk about this transfer package?

3  A   I don't know.  I don't think I
mentioned the transfer package in this.  Yeah,
actually, in the case of -- okay.  So in the
case of the ramp, HDR is going to serve as the
architect of record.  They already have the
report that you have about the ramp.  They
already know what the scope of that is going to
be and what the responsibility -- in fact, we
are negotiating the pricing of that right now,
about what their proposal is going to be for
the design services to serve as architect of
record.  So they already have a jump on it.

4  Q   You didn't answer my question.

5  A   Okay.

6      MR. BRANUM:  Yes, he did.  He just
answered it.

Page 170

BY MR. MORRISSEY:

1  Q   I asked you about Globetrotter and
the transfer package.

2  A   Right.

3  Q   When did they begin the transfer
package?

4  A   I would have to check.

5  Q   I asked you in the Declaration, is
there anything in your Declaration -- well, let
me ask you a preliminary question.

6      Did you include all the steps that
Cook County is going to need to take in your
Declaration statement?

7  A   No.  A lot of the process we
described have lots and lots of different
steps.

8  Q   You didn't include in your
Declaration statement the need for the County
Board to include in fiscal year 2025 funds for
the construction?

9      MR. BRANUM:  Objection to form.
BY THE WITNESS:

10  A   I'm looking up -- I'm looking at my
statement here because I believe that -- yeah,

Page 171

1  we indicated that the subsequent construction
will be funded under the same line item, and it
will be funded in the same line item in the
future CIP, but we're talking about the design
right now.

2  BY MR. MORRISSEY:

3  Q   So there is nothing in your
Declaration in regards to the construction
being included in the CIP for 2025 or 2026,
correct?

4  A   I don't know that that was a
requirement of what you were asking.  I don't
know if it was necessary or not.

5  Q   Okay.

6  A   It was an attempt to communicate
what's going on.

7  Q   In your Declaration, there's no
indication that a transfer package needed to be
completed by Globetrotters before it would go
to HDR, correct?

8  A   No, that's not true.  They are not
going to need it in this case.  That's why we
brought them on now.

9  Q   You mentioned that Globetrotters has

Exhibit 5 Page 43

ERIC DAVIS
March 12, 2024

Page 172

```
1   not completed the transfer package.
2       A    Because they're doing the whole
3   facility.  They're assessing the entire Cermak
4   facility, not just the ramp.  But they don't
5   need -- we have their detailed report.  We have
6   the drawings.  We're bringing on HDR because in
7   the case of the ramp, we don't think that it's
8   necessary and just go ahead and do it.  We have
9   the recommendation to replace it.  That's
10  already there, but they're going to need to --
11  Globetrotters is going to have to do a transfer
12  package for the rest of the building.  They're
13  hired for the whole facility.
14      Q    Okay.
15      A    The whole facility.
16      Q    So part of the holdup is Globetrotter
17  providing a transfer package?
18      A    No, that is not a holdup.  That is
19  not correct.  That is not a holdup.
20      Q    So as of September 1st, 2024, Cook
21  County knew or shortly after --
22      A    You mean '23?
23      Q    I'm sorry.  I keep confusing years
24  because it's been six years for this project,
```

ERIC DAVIS
March 12, 2024

Page 173

```
1   correct?
2           Would that be fair to say?
3           MR. BRANUM:  We don't need your
4       commentary, Tom.
5   BY MR. MORRISSEY:
6       Q    Well, you have been working on the
7   Cermak ramp for six years; is that correct?
8           MR. BRANUM:  Objection to the form of
9       the question.
10  BY MR. MORRISSEY:
11      Q    You can answer it.
12          MR. BRANUM:  Well, the -- if you can.
13      I mean, working on the Cermak ramp, what
14      does that mean?
15          MR. MORRISSEY:  Let me rephrase the
16      question.
17  BY MR. MORRISSEY:
18      Q    Since March of 2018 to the present,
19  whether or not the Cermak ramp was accessible
20  or not has been on your radar.
21          Is that fair to say?
22          MR. BRANUM:  Objection to the form of
23      the question.
24
```

ERIC DAVIS
March 12, 2024

Page 174

```
1   BY THE WITNESS:
2       A    We have been proceeding based on the
3   information that we had at each step of the
4   way.
5   BY MR. MORRISSEY:
6       Q    So we're into year six.
7       A    As to the Ellen Stoner report, which
8   you insist on going back to, which is her
9   opinion, based on reading her opinion, we knew
10  she didn't have the full information, and it
11  was -- it seemed at the time that we could
12  remedy the situation by fixing the handrails.
13          MR. BRANUM:  And just for the record,
14      counsel is laughing.
15          MR. MORRISSEY:  That's not true,
16      Mr. Branum.
17  BY THE WITNESS:
18      A    And that we could fix -- we could
19  bring this ramp into compliance by fixing the
20  handrails, so we did that.  Well, that turned
21  out not to work.
22          We got more information in each step
23  like getting the LIDAR from Globetrotters.
24  That revealed information that we didn't have.
```

ERIC DAVIS
March 12, 2024

Page 175

```
1   So we've had to change course.
2           It is a complicated circumstance,
3   Counselor.  And so by saying you've been
4   working on it for six years, it implies we've
5   been sitting on our hands, and we have not.
6           MR. BRANUM:  I'd ask if you ask a
7       question that you respect the witness and
8       the witness' answer and not put your
9       microphone on mute so you can laugh.
10  BY MR. MORRISSEY:
11      Q    Is it true that on an emergency
12  basis, certain projects go forth quicker at the
13  Cook County?
14      A    Yes.
15      Q    And that's for safety.  When safety
16  is involved, correct, that Capital Planning
17  proceeds on programs that impact safety of
18  citizens, correct?
19      A    The definition of what does or does
20  not constitute an emergency procurement is at
21  the discretion of the chief procurement
22  officer.
23      Q    So it's feasible that Cook County, if
24  they were directed by a judge to proceed on an
```

Exhibit 5 Page 44

ERIC DAVIS
March 12, 2024

Page 176

```
1   emergency basis to renovate the Cook County
2   Cermak ramp, there would be a different
3   timetable for the project.
4              Is that fair to say?
5        A    No, at this point.  No.  As of today?
6   No.  We're proceeding the most expeditious way
7   possible.  We already have an architect
8   engaged.  We already have a contractor engaged.
9   We have a facility that needs to remain open
10  24/7 365, and we still, even in an emergency
11  procurement, have to do work that is compliant,
12  that is approved for a building permit.
13       Q    Since September of 2023 when the site
14  inspection was done by Globetrotter, tell me
15  when the first time that Cook County contracted
16  HDR to proceed with design drawings.  When was
17  HDR initially contacted in regards to the
18  Cermak ramp?
19            MR. BRANUM:  Tom, you might be
20       misconstruing the facts.  So I will object
21       to the form of your question.
22  BY THE WITNESS:
23       A    I don't know offhand, Tom.
24
```

ERIC DAVIS
March 12, 2024

Page 177

```
1   BY MR. MORRISSEY:
2        Q    So in Number 16, you say that HDR has
3   been approached to do design documents for the
4   Cermak ramp?
5        A    Correct.
6        Q    Was that last month?  Was it in 2023?
7        A    I don't know when they were identified
8   as the firm we wanted to use.  The task order
9   process is still fairly new and so I can't
10  say -- I can't tell you offhand when specifically
11  they were -- they were identified -- well,
12  obviously they were identified by whenever this
13  was, February 22nd.  But as far as when before
14  that we identified that they would be the one
15  that we would use, I can't tell you when that
16  happened before that day.
17       Q    When you say that the task process is
18  relatively new, what do you mean?  Was it
19  within the last year?
20       A    Yes.
21       Q    In the last -- the last year --
22       A    Within the last -- the task order
23  contracts were approved last year.  Because of
24  the budget turnover period, the County
```

ERIC DAVIS
March 12, 2024

Page 178

```
1   basically goes dark in terms of procurements
2   for a month every year in around mid December
3   to January in order to clean out the year's
4   books and to get into the new books.
5              But as far as the process of
6   assigning a firm, confirming the scope, getting
7   their proposal, getting their proposal
8   approved, et cetera, that takes awhile.  We've
9   only just recently started getting -- in fact,
10  I just had one today, one of the very first
11  ones today that was actually finally approved
12  by procurement.  We've identified this one as a
13  priority.  The HDR knows it's a priority.  As I
14  said, we're not going to wait for a transfer
15  package for -- from Globetrotters to get HDR
16  going on the architect of record because they
17  understand the assignment.  We're going about
18  as quickly as we can, Tom.
19       Q    You said that the first project under
20  the task process has just been completed,
21  correct?
22       A    One of the -- the first ones have
23  only been -- as far as approving the actual
24  projects, once we identify it, define the
```

ERIC DAVIS
March 12, 2024

Page 179

```
1   scope, get the architect's proposal, get that
2   proposal approved and issue the Notice to
3   Proceed, yeah, we've only recently gotten the
4   first of those here in the last month or so.
5        Q    What was that project for?
6        A    I don't know offhand.
7        Q    And how long did it take?
8        A    The first one took longer because we
9   had more steps.  We've cut out a lot of steps
10  to make the process go more quickly.  So I want
11  to say the second, third and fourth ones are
12  faster, and we've got about ten more coming,
13  including this one, that are going to be faster
14  than that.  So it's much quicker than going out
15  to the street for an RFQ, much quicker.
16       Q    To the best of your recollection,
17  you've had one project that's gone through the
18  task process for design work, correct, and been
19  approved by procurement, correct?
20       A    No.  No, there's -- I believe
21  there's -- in fact, I had to miss our
22  every-other-week meeting with procurement for
23  this deposition.  So I don't know the latest.
24  I know that there were ten or so in process.  I
```

Exhibit 5 Page 45

ERIC DAVIS
March 12, 2024

Page 180

1  don't know where they are.  If I wasn't in this
2  deposition, I would have a better answer for
3  you because we literally met with them for an
4  update this afternoon.
5      Q   So the task process has only been
6  implemented by Cook County in the last year,
7  correct?
8      A   I'm sorry.  I didn't hear the end.
9  Implemented what?
10     Q   The task process that you're going to
11 attempt to proceed on the Cermak ramp
12 renovation has only been in place for less than
13 a year.
14         Is that fair to say?
15     A   Yes.
16     Q   And there's only been one project
17 that you're aware of that's gone through this
18 task process?
19     A   No.  I just said, I believe it's
20 approximately four so far, and there may be
21 more depending on the result of the meeting
22 today.
23     Q   So --
24     A   This project is in the batch that's

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 181

1  currently -- that we're working on.  We are
2  going to be bringing them.
3      Q   So can you tell me exactly when HDR
4  was contracted to do design work for the Cermak
5  ramp?
6          MR. BRANUM:  Asked and answered.
7  BY THE WITNESS:
8      A   A Mischaracterization of the
9  relationship.  They have a contract right now.
10 They've had a -- it's an assignment under a
11 contract.
12 BY MR. MORRISSEY:
13     Q   When was HDR first given the
14 assignment to do design work for the Cermak
15 ramp?
16     A   I would have to check.  I don't know
17 when my first contact with them was.
18     Q   Was it in September of last year or
19 was it just at the time this Declaration was
20 drafted?
21     A   No, we've identified them beforehand.
22 I -- I had an initial conversation with them
23 about it and, honestly, I can't remember when
24 it was, sometime in the -- I want to say

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 182

1  sometime around the 1st of the year, but I
2  can't remember exactly.
3          The lead architect is someone that we
4  used to work with on one of our construction
5  management teams, So he's someone that I know
6  and trust.  He's one of the top justice
7  architects in the country, and that's why I
8  wanted them on this project because of the
9  sensitive nature of it, but I can't remember
10 when I talked to him first.
11     Q   Has HDR given a proposal as far as
12 the architectural fees?
13     A   We are negotiating that right now.
14 We are working with them on that right now.
15     Q   When did you first contact HDR to
16 find out what their price would be for this
17 project?
18         MR. BRANUM:  Tom, you're asking the
19 same question over and over again.
20 BY THE WITNESS:
21     A   I've already answered that.
22 BY MR. MORRISSEY:
23     Q   Well, your Declaration was on
24 February 22nd, 2024, and you said you were

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 183

1  negotiating HDR's architectural fees?
2      A   Yeah.  It takes awhile.
3      Q   How long is it going to take just to
4  negotiate the start point for HDR to start
5  designing?
6      A   They have to get their arms around --
7  I expect it will be consummated here pretty
8  soon.  They have to get their arms around the
9  specifics of the requirements.  I don't think
10 they have been to the site yet.  Matt has been
11 there before, but I can't remember -- I don't
12 think they have done their site walk yet.  What
13 we want to do is rather than doing it in a
14 two-step process, Tom, we want to take the
15 contractor, as I mentioned here, and have them
16 go ahead and walk it with the architects so the
17 contractor can start getting familiar with it
18 so they can start understanding it from the
19 standpoint of pricing.  So rather than doing
20 things sequentially, we are trying to
21 accomplish things simultaneously.  I don't
22 think they've done their site walk yet with the
23 contractor.
24     Q   So you've known since September of

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 46

ERIC DAVIS
March 12, 2024

Page 184

```
1   2023 definitively --
2        A    No, no, no.  September -- no, no, no,
3   no.  That's not true.  What you said -- you're
4   referring to when GEC went to the site, okay,
5   by your own discussion earlier and you put up
6   the two dates that GEC went and walked the
7   site.
8            It was only after that that we made a
9   determination that we needed to do this.  So
10  September is your characterization.  I don't
11  know when we got the LIDAR back.  I would have
12  to make.  I don't know when we made a
13  determination, yeah, okay, we're going to have
14  to take it out.  We're going to have to get
15  somebody.  That's your characterization.
16       Q   Well, let's just put it this way:
17  Six months after the final site check by
18  Globetrotter, the firm that you hoped to
19  negotiate a fee with, HDR, still has not gone
20  out to the site to see the Cermak ramp.
21           Is that fair to say?
22       A   We didn't know they were going to
23  need to necessarily in September.
24       Q   But is it fair to say that since the
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 185

```
1   final site inspection by Globetrotter on
2   September 1st, 2023 up until today, the
3   architectural firm that you intend to negotiate
4   a fee with still has not been out to the site?
5            MR. BRANUM:  Tom, you're asking a
6        loaded question and you're baking an
7        assumption into your question that you're
8        asking the witness to adopt, and the
9        witness has already told you he doesn't
10       adopt your assumption.  And he's clarified
11       exactly what's wrong with your question, so
12       he's provided a response to it.
13           MR. MORRISSEY:  Mr. Branum, that's a
14       speaking objection.
15  BY MR. MORRISSEY:
16       Q   Do you understand --
17           MR. BRANUM:  No, it's not about --
18       yes, he understands your question and he
19       understands that your question contains a
20       false premise.  He has already explained
21       the false premise that you baked into your
22       question.  So he's telling you he's not
23       adopting the way you're characterizing it.
24           MR. MORRISSEY:  Okay.  Let me
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 186

```
1        rephrase the question.
2   BY MR. MORRISSEY:
3        Q   Is there any doubt in your mind,
4   Mr. Davis, that the final site inspection by
5   Globetrotters was on September 1st, 2023, which
6   is in their report?
7        A   You say final?  I don't know if they
8   did or didn't go out to the site after that.
9   They may have.
10       Q   As of March 13th, 2024, you're not
11  aware of HDR going out to the jail to inspect
12  the Cermak ramp?
13       A   That's correct.
14       Q   And prior to bidding on a price for
15  doing the design work for the renovation of the
16  Cermak ramp, HDR is going to have to do a site
17  visit?
18       A   Yes.
19       Q   To your knowledge, has a date been
20  set with members from HDR to go out and do a
21  site inspection?
22       A   I've directed our project director to
23  set that up.  I don't know if it's been set up
24  yet.
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 187

```
1        Q   Do you anticipate in the next week
2   that there will be a site inspection by HDR?
3        A   Yes.
4        Q   What has been the holdup for HDR to
5   do a site inspection?
6            MR. BRANUM:  Objection to your
7        characterization.
8   BY THE WITNESS:
9        A   Holdup?  I don't know -- I don't
10  accept holdup.
11  BY MR. MORRISSEY:
12       Q   All right.  So did you contact HDR in
13  January of 2024 about this Cermak ramp?
14       A   I don't remember when I contacted
15  them first.
16       Q   Pardon?
17       A   I don't remember when I spoke to them
18  first about it.  I honestly don't.  I don't
19  remember when I talked to them first about it,
20  but it wouldn't make any sense.  They're
21  reviewing the documents, the report that you
22  have, which was from December, right?  The
23  report was -- the conclusion wasn't until
24  December.  So they're reviewing that document.
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 47

ERIC DAVIS
March 12, 2024

Page 188

1  They're reviewing the information like the
2  original design plans.  In fact, one of the
3  things they are doing now is arranging to get
4  ahold of the original design plans for the
5  building.  They want to have those plans in
6  hand before they go out to the site, right?  I
7  mean, they would want to have the original
8  drawings before you go out and look at it.
9        So they're already making
10  arrangements to get the drawings from the
11  Department of Facilities Management so that
12  they have the information before they go out to
13  the site, and I totally expect them to be out
14  there within the course of approximately a
15  week, yes.
16        You don't want to -- you know, if the
17  starting gun was December, and let's just
18  assume that it.  As I said, I don't know if
19  that's the final report that we're looking at.
20  But if the starting gun was December, they need
21  to get the information.  They need to review
22  it.  We need to figure out -- you know, it's --
23  we're moving as quickly as we can.
24     Q    So who is responsible for Cook County

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 189

1  to negotiate a fee agreement with HDR?
2     A    Our department reviews the fee
3  proposals, and then submits them to the chief
4  procurement officer for their review.
5     Q    My question is who from Capital
6  Planning would receive the fee request from
7  HDR?
8        MR. BRANUM:  Well, you said my
9        question was, and then you completely
10        changed your question.  So it's a new
11        question.
12             But go ahead.
13  BY THE WITNESS:
14     A    So the initial proposal will probably
15  come to me and to our project director and to
16  our -- the project manager from our construction
17  manager at the same time.
18        I would expect that our construction
19  manager will first review it based upon their
20  understanding of the level of effort required,
21  and the project director will then make a
22  recommendation to me to say, hey, I'm the head
23  of the portfolio.  You know, hey, this looks
24  like this is good.  Can we finalize this and

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 190

1  send this to procurement?  Okay.  It goes over.
2        If everything checks out and they are
3  following the applicable requirements, they
4  issue the Notice to Proceed to the vendor.  I'm
5  sorry.  They issue the proposal approval to the
6  vendor.  We issue the Notice to Proceed.
7  BY MR. MORRISSEY:
8     Q    Who is the construction manager for
9  Cook County?
10        MR. BRANUM:  Asked and answered.
11  BY THE WITNESS:
12     A    The Department of Capital Planning
13  and Policy.
14  BY MR. MORRISSEY:
15     Q    Right.  You mentioned that somebody
16  under you would review the request by HDR --
17     A    Yes.
18     Q    -- for their fees?
19     A    It will probably be the design
20  manager for our construction management team
21  which are consultants.
22     Q    And who is that person?
23     A    His name is Michael Goss.  He's a
24  licensed architect.  He's going to look at it

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 191

1  and then Brad DeRoo who is our Cook County
2  Department of Capital Planning project director
3  who is also a licensed architect is going to
4  look at it.  They are going to make a
5  recommendation to me, and then we are going to
6  advance it from there.
7     Q    When do you reasonably expect that
8  HDR will provide you with a fee request for
9  doing the design work for the Cermak ramp?
10     A    Fairly quickly.
11     Q    Well, by "fairly quickly," do you
12  mean two months?
13     A    Oh, no.  No.  Less than a month.
14     Q    That's after they do the site visit,
15  correct?
16     A    Yeah, less than a month.
17     Q    Have they told you --
18     A    Probably on the order of two weeks.
19     Q    Have you gotten a representation from
20  anybody from HDR that they will give you their
21  price for doing the work prior to April 1st,
22  2024?
23     A    I don't think they made a
24  representation one way or the other, but that

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 48

ERIC DAVIS
March 12, 2024

Page 192

```
 1   sounds about right.  Let's assume that they go
 2   in the next week or so, so that would be about
 3   the 20th.  Early April, yeah, I think that's
 4   probably reasonable.
 5          Q    Has HDR told you that they are
 6   willing to do this project --
 7          A    Yes.
 8          Q    -- for Cook County?
 9          A    Yes.
10          Q    They haven't provided a fee to Cook
11   County for doing their design work, correct?
12          A    They already have a contract.  Their
13   contract is for $2 million in fee.  This
14   project fee is less than $150,000.  They are
15   perfectly comfortable doing the work.
16          Q    How do you know that when HDR gives
17   you their -- you say you're negotiating.
18   Suppose HDR says it's going to cost $160,000 to
19   design this project.  Does that get accepted by
20   you or do you negotiate?
21          A    I don't think it's going to take that
22   much.
23          Q    Well, suppose that it does.  Suppose
24   that it's 160,000.
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 193

```
 1          MR. BRANUM:  Well, Counsel, if you're
 2   just making up facts now.
 3          He's answered the question.  He
 4   said it's not going to be 160,000, so
 5   that's your answer.
 6   BY MR. MORRISSEY:
 7          Q    You say that -- in your Declaration,
 8   you make the affirmative statement that you're
 9   currently negotiating with HDR (inaudible) --
10          A    Yeah.
11                  (Simultaneous speaking.)
12          THE REPORTER:  I'm sorry, Tom.  I
13   didn't hear the last part.
14   BY MR. MORRISSEY:
15          Q    You say in your Declaration that the
16   County is currently negotiating with HDR
17   architectural (inaudible) --
18          A    Yeah.
19          THE REPORTER:  Tom, I'm sorry.  I
20   didn't hear it again.  Mr. Davis, if you
21   can just hold back your --
22   BY MR. MORRISSEY:
23          Q    Sure.  Your statement says under
24   Paragraph 16:  The County is currently
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 194

```
 1   negotiating with HDR Architects --
 2   Architecture's fees.
 3          You have not received any requests
 4   from HDR as far as moving forward with the
 5   design work?
 6          Is that fair to say?
 7          MR. BRANUM:  Objection to form.
 8   Mischaracterizes previous testimony.
 9   BY THE WITNESS:
10          A    You have to have the information in
11   order to submit a fee.
12   BY MR. MORRISSEY:
13          Q    They have not submitted a fee to you,
14   correct?
15          A    Correct.  They have not submitted a
16   fee.
17          Q    So there hasn't been -- at this stage
18   in your relationship with HDR, there has not
19   been any negotiations as of yet in regards to
20   their fee for this project?
21          MR. BRANUM:  Objection,
22   mischaracterizes --
23                  (Simultaneous speaking.)
24
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 195

```
 1   BY THE WITNESS:
 2          A    It is the gathering of information to
 3   be part of negotiating the fee.
 4          THE REPORTER:  I'm sorry.  Can you
 5   say it one more time, Mr. Davis?
 6   BY THE WITNESS:
 7          A    I consider their gathering
 8   information to be part of the fee negotiation.
 9   We've identified an assignment for them.  They
10   are evaluating what they are going to need.
11   They're gathering information so they can
12   present a fee.
13          I think what you are getting at here
14   is to undermine that -- the characterization of
15   the overall timeline for the project.  I think
16   that's incorrect.  We stand by our estimate of
17   how long this project overall is going to take.
18   BY MR. MORRISSEY:
19          Q    You say it's under the task order
20   basis, correct?
21          A    Yes.
22          Q    Is HDR, for whatever reason, free to
23   say, Mr. Davis, we're swamped with work and we
24   prefer not to bid on this job?  Under the task,
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 49

ERIC DAVIS
March 12, 2024

Page 196

```
1   can they -- can they decline to bid on it?
2         MR. BRANUM:  Objection to form.
3   BY MR. MORRISSEY:
4         Q    Yes or no?
5         A    Do they have the ability to decline
6   the project?  Yes, they do.  Does the person
7   involved, the principal in charge, understand
8   the importance of this assignment?  Yes, he
9   does.  Does that person have my trust?
10  Absolutely.
11        Q    And then it says under that same
12  sentence:  The County is currently negotiating
13  with HDR architect fees and will issue a Notice
14  to Proceed with design after negotiations are
15  complete.
16             What is a Notice to Proceed?
17        A    When a proposal has been reviewed by
18  procurement, they notify us that it's the
19  Notice of Proposal of Acceptance, NOPA, which I
20  mentioned before.  They issue that to the
21  department, us.  They say the proposal is
22  acceptable.  There are a couple of things that
23  are minor, specific, replacing a line on an
24  insurance form, a couple of things like that
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 197

```
1   that have to happen and then you -- because the
2   final amount has to be in there.  And then you
3   issue -- the department issues the Notice to
4   Proceed and says you can start work.
5             Now, in this case, because they
6   understand, they will probably be digging in a
7   little more already anyway because, as I said,
8   they're already under contract.  So I don't
9   expect that to be a lengthy period but the
10  department issues the Notice to Proceed.
11        Q    So in order -- before HDR can put pen
12  to paper or use a computer nowadays to design
13  the ramp, the procurement office has to issue a
14  Notice to Proceed?
15        A    No.  The procurement office issues
16  the Notice of Proposal Acceptance.  The
17  Department of Capital Planning issues the
18  Notice to Proceed.
19        Q    You said Notice of...
20        A    Proposal acceptance, NOPA.
21        Q    So before HDR can begin designing the
22  renovation of the ramp, there has to be a
23  Notice of -- is it Proposal?
24             MR. BRANUM:  Counsel, he just
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 198

```
1        answered that.  If you can't understand his
2        answer, that's not the purpose of the
3        deposition.  He just told you what it was.
4        So you can't just repeat it over and over
5        again just because you don't understand it.
6        He's answered the question.
7   BY MR. MORRISSEY:
8        Q    My question is in order for HDR to
9   begin work, the procurement office has to
10  approve it, correct?
11             MR. BRANUM:  Counsel, you just
12        misstated what his testimony was, and he's
13        already told you the requirements.
14  BY MR. MORRISSEY:
15        Q    You can answer the question.
16             MR. BRANUM:  Well, it's been asked
17        and answered.  You can answer it again, but
18        then we need to move on.
19  BY THE WITNESS:
20        A    The reality of the circumstance, Tom,
21  is that in the course of reviewing the scope of
22  the project, we've already talked through with
23  them the possible scenarios for implementing
24  what Globetrotters has recommended in terms of
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 199

```
1   extending the ramp.  We've talked about the
2   specific configurations with them.  We've
3   talked about whether or not we should be -- the
4   geometry of -- there's a turn involved at the
5   bottom of the ramp when it becomes a corridor.
6   We've talked to them about the need to raise
7   the door that is inhibiting us from doing the
8   handrail extensions.
9             So we've already talked to them about
10  significant elements of the design work that
11  needs to happen.
12             So if you want to say they're not
13  going to start work until they start doing
14  stuff in the computer, okay.  But the reality
15  is they've already started thinking about it,
16  and they have to do that in order to give an
17  adequate extension of the fee because they have
18  to understand what they're going to have to do.
19             We've already talked about the
20  salient issues in this project with them.  They
21  understand that already.  They're already
22  working on a solution even though they don't
23  have that to figure out how to -- the specifics
24  of the assignment.
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 50

## Page 200

```
1   BY MR. MORRISSEY:
2       Q    My question, from a County procedure,
3   it has to go through the procurement office?
4       A    Correct.
5       Q    And that hasn't been done yet,
6   correct?
7       A    Correct.  But that doesn't mean they
8   haven't started looking at it.
9       Q    How long after -- how long again do
10  you anticipate negotiating with HDR in order --
11      A    As I said, I expect that to be done
12  within a month.
13      Q    So we're into May now, May 2024.
14      A    No.
15           MR. BRANUM:  Well, you're
16      mischaracterizing his testimony.
17  BY THE WITNESS:
18      A    No, no.  The negotiations are before
19  the proposal approval.  The negotiations are
20  now.
21  BY MR. MORRISSEY:
22      Q    You haven't received one iota from
23  HDR in terms of how much they are going to
24  charge as far as a fee for this project?
```

## Page 201

```
1           MR. BRANUM:  Can you define "iota"?
2   BY THE WITNESS:
3       A    Have we received their initial
4   proposal for the time it's going to take them?
5   No, we have not.  Have they started work
6   figuring that out?  Yes.
7   BY MR. MORRISSEY:
8       Q    How do you know that?
9       A    What?  Because I've had conversations
10  with them about it.  They ask questions.
11      Q    Now, in Number 17, you state:  To
12  expedite construction.  Is there any other --
13  you consider this the most efficient way to
14  move this project forward, through the JOC
15  program.
16           Is that fair to say?
17      A    Absolutely.  That's why you do job
18  order contracting.  It's whole sales premise is
19  that it's a faster way for government to
20  acquire construction.  That's why they're in
21  business.
22      Q    So CREA is a construction firm,
23  correct?
24      A    That's correct.  That's one of our
```

## Page 202

```
1   contractors.
2       Q    And they have not done a site
3   inspection?
4       A    They have not.  As I said, I'm trying
5   to get that set up too.
6       Q    They haven't provided any pricing to
7   Cook County in regards to renovating the ramp,
8   correct?
9       A    No, they have not yet.  That's a part
10  of the process.  That's in the timeline,
11  included in the timetable.
12      Q    CREA Construction is free to bid on
13  it or not bid on it, correct?
14           MR. BRANUM:  Objection to form.
15  BY MR. MORRISSEY:
16      Q    Under the JOC program, they don't
17  have to bid on doing the ramp at the Cook
18  County Jail, correct?
19      A    First of all, it's not a bid.  It's a
20  slightly different way of approaching
21  construction procurement.
22           So when you use the word "bid," Have
23  they bid yet?  It's not a bid.  They're not
24  competing on a price basis against somebody
```

## Page 203

```
1   else.  So that's one thing.
2           Can they say, yeah, we don't want to
3   build the ramp?  They could.  I would be very
4   surprised if they did, but they could.  It
5   would be highly unusual if they did.
6       Q    Now, under the JOC program, you
7   mentioned that this project could exceed
8   1 million or $2 million to renovate the Cermak
9   ramp.  You just don't know, correct?
10      A    Correct.
11      Q    And part of -- the funding for this
12  would come from the CIP for 2025 or 2026, the
13  million dollars that it will cost?
14      A    It will be included in the 2025 CIP
15  recommendation that we forwarded to the
16  president.
17      Q    At present, you don't know how much,
18  whether it's a million dollars or $2 million
19  for this project?
20      A    Correct.
21      Q    It could be $3 million, correct?
22      A    I would be very surprised if it was
23  that much.
24      Q    Now, since September of 2023, have
```

Exhibit 5 Page 51

ERIC DAVIS
March 12, 2024

Page 204

1  you sat down with the Sheriff's Office in
2  regards to this project?
3       A    What do you mean have I sat down with
4  the Sheriff?
5       Q    Well, since September of 2023 after
6  the site inspections were done by Globetrotter,
7  have you or anybody under you sat down with
8  representatives from the Office of the Sheriff?
9       A    We have -- as I said before, we have
10 had meetings with them on an ongoing basis as a
11 part of the Globetrotters' work.  They are in
12 most, if not all, of the calls with them
13 between, as you say, September and the report
14 that was issued in December.
15      So have we been -- have we -- does
16 that constitute sitting down with them as
17 you're referring to?  Are you talking about a
18 separate meeting away from Globetrotters?
19 Because they have been involved in multiple
20 meetings in this assessment during that period.
21      We also include mention of it in our
22 monthly meeting with the Sheriff's Office.  So
23 the Sheriff's Office has been contacted
24 multiple times in that period about this

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 205

1  project.
2       Q    During the monthly meeting with --
3  what do you call the monthly meeting with the
4  Sheriff in regards to Capital Improvement
5  Projects?
6       A    We call it the monthly meeting with
7  the Sheriff on capital projects.
8       Q    Is the Cermak Health facility
9  included in those meetings?
10      A    Yes.
11      Q    Is the Department of Facilities
12 Management included?
13      A    They're in those meetings too, yes.
14      Q    Who else is included in the monthly
15 meetings?
16      A    We oftentimes also cover projects for
17 the Office of the Chief Judge in that same
18 meeting.  So sometimes we'll do the OCJ stuff
19 at the beginning of the meeting, and then we'll
20 talk with the Sheriff for the balance of the
21 time.  But it's Capital Planning.  It is --
22 it's Capital Planning.  It's Facilities
23 Management.  It's the Sheriff.  Sometimes it's
24 real estate if there's a project involving a

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 206

1  purchaser or lease of real estate for them, you
2  know, or if it's modifications of office space,
3  that kind of thing, real estate will be in
4  that.  So it's multiple departments.
5       Q    Now --
6       A    And the reason that I know that you
7  know about these is that you put a page from
8  the minutes of one of those meetings in front
9  of me in a prior deposition.  So I know that
10 you know about those meetings, Tom.  Let's not
11 kid ourselves.
12      Q    So from 2018 to the present, in the
13 monthly meetings with the Sheriff and Cermak
14 and Facilities Management, have you been
15 discussing the renovation of the Cermak ramp?
16      A    Yes.
17      Q    And in regards to -- you've testified
18 that you have no input in regards to the
19 operations at Cermak nor at the jail.  You are
20 not in charge of operations there?
21      A    That's correct.
22      Q    Have you discussed with the Sheriff
23 or Cermak personnel using other -- some other
24 entrance to the Cermak building other than this

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 207

1  ramp during the course of construction?
2       A    That would be highly impractical.  It
3  would require taking detainees outside in the
4  rain or snow.  I couldn't imagine advocating
5  that they do that.
6       Q    My question is have you discussed
7  with the Sheriff's Office the possibility of
8  during the renovation of the ramp using other
9  entrances to Cermak?
10      MR. BRANUM:  Asked and answered.  You
11   can answer again.
12 BY THE WITNESS:
13      A    Other than -- I don't think we've,
14 for example, have said to them, hey, would it
15 be okay if we just had you bring everybody in
16 the front door.  That seems so wildly
17 impractical.  I can't understand why we would
18 ask them that.  Might it have come up in a
19 conversation?  Possibly.  But I couldn't see us
20 recommending that because of the weather.
21      Q    Well, are you aware that Cermak has
22 loading docks where prisoners are brought in
23 and out of Cermak all the time?
24      A    Yes.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 52

ERIC DAVIS
March 12, 2024

Page 208

1  Q   That happens on a daily basis?
2  A   Yes.
3  Q   Inmates come in and out of the Cermak
4  building through the lower loading dock area or
5  the sally ports?
6  A   You mean the ground floor loading
7  area?
8  Q   Right.
9  A   Yeah.  So they come from other
10  jurisdictions.  They come from Division 11
11  because they have to get driven there across
12  the street.  But they are not driven there from
13  Division 5, and they are not driven there from
14  Division 4, and they're not driven there from
15  the RTU.  So I'm not sure what you're asking.
16  Q   Well, they do come from Division 11,
17  correct?
18  A   That's across the street.
19  Q   Right.  So do you know if it's --
20  have you explored with the Sheriff whether it's
21  feasible to bring -- for inmates that need to
22  go to Cermak Health Service that they can be
23  brought in from either -- some other entrance
24  to the building?

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 209

1  A   It seems wildly impractical on the
2  face of it, but I can't recall having a
3  conversation about that option.
4  Q   Have you discussed with HDR whether
5  it's feasible to construct the alteration of
6  the Cermak ramp in two phases, one side of the
7  ramp at a time --
8  A   Yes.
9  Q   -- while allowing a pedestrian
10  access?
11  A   You mean constructing one side while
12  the other side is still open?  Yes.  We talked
13  about that specifically with them, yes.
14  Q   Do you know whether or not that's
15  feasible or not before design work is done?
16  A   On the face of it, it is feasible.
17  Q   My question is before -- you
18  mentioned in here, barring any unforeseen
19  conditions, that it may take more than you say
20  56 weeks or 24 months.  I don't know what --
21  what you say in Number 19, but is it
22  conceivable that the -- you cannot construct it
23  one side at a time?
24  MR. BRANUM:  So hold up.  You're

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 210

1  misrepresenting his Declaration.  So you
2  just combined the construction of the ramp
3  in two phase, two sides, with the
4  unforeseen conditions language and those
5  are in separate paragraphs, talking about
6  separate things.  So you completely
7  misrepresented the Declaration.
8  If you want to ask a clean
9  question that doesn't misrepresent the
10  document.
11  MR. MORRISSEY:  Mr. Branum, I'm going
12  to move on.  I'm not going to comment about
13  you.
14  BY MR. MORRISSEY:
15  Q   In Paragraph 9 [sic] you say:
16  Barring any unforeseen conditions that may
17  arise during demolition or removal of the
18  exiting ramp.
19  MR. BRANUM:  You said Paragraph 9?
20  MR. MORRISSEY:  19.
21  MR. BRANUM:  Oh, 19.
22  BY MR. MORRISSEY:
23  Q   So is it an unknown whether or not
24  you can construct and alter the Cermak ramp one

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 211

1  side at a time at this stage of the process?
2  A   I don't know anything that would
3  preclude that.  The unforeseen conditions
4  reference is about the feasibility of
5  constructing the new, not about removing the
6  old.
7  So if we get down there, for example,
8  and let's say that there's been water getting
9  in there, and it has eroded away the soil
10  underneath the existing Cermak ramp and there's
11  a void down there.  Well, that would require us
12  to get in, do some geological testing, probably
13  bring in additional fill, do what's called
14  engineered fill before you can come back and
15  pour the rest of the ramp or it might be fine.
16  We have no idea.
17  Q   So let's assume that there's a void.
18  Let's assume that the ramp is -- there's a void
19  underneath the ramp --
20  A   Yeah.
21  Q   -- and it's not possible to do it
22  piecemeal.  That's an unforeseen condition?
23  A   I didn't say that.  The void would
24  just mean that it would take longer to build

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 53

ERIC DAVIS
March 12, 2024

Page 212

1   that side.
2        Q    In Paragraph 19, you say:  The County
3   expects the design work to be completed, to
4   obtain the permit and begin removal and
5   replacement of the ramp this year.
6        Now, based upon -- you mentioned that
7   you were involved in another ramp at the Cook
8   County Jail, correct?
9        A    There was a replacement of a ramp
10  from the tunnel into the Leighton courthouse
11  that occurred while I was here.  I wasn't
12  really directly involved in that one.
13       Q    How long did that take?
14       A    As I said --
15       MR. BRANUM:  Objection --
16  BY THE WITNESS:
17       A    -- I wasn't directly involved.  I
18  don't recall.
19  BY MR. MORRISSEY:
20       Q    During that period of time, was the
21  ramp closed off to your knowledge?
22       A    To my knowledge, they did it exactly
23  the way we are talking about this one.  They
24  built half of it, and then they built the other

ERIC DAVIS
March 12, 2024

Page 213

1   half.
2        Q    By "half," there's two ramps actually
3   to the Leighton court building, correct?
4        MR. BRANUM:  Objection to form.
5   BY THE WITNESS:
6        A    There's the main ramp into the
7   building, and then the ramp splits and goes
8   like this (indicating).  So the configuration
9   is a little different.
10  BY MR. MORRISSEY:
11       Q    And you have no knowledge how long
12  that ramp took?
13       A    Not offhand.  Although I do know that
14  our construction management team that helped us
15  assemble the estimate of the duration for the
16  project did consult with people that were
17  involved in that project when they came up with
18  this number.
19       Q    In regards to Globetrotters, why did
20  it take almost two years to -- from the point
21  of asking for a request for a proposal -- I'm
22  sorry.
23       From the time that there was a
24  request for a qualification, I believe that was

ERIC DAVIS
March 12, 2024

Page 214

1   in early 2021 or '20 until the Globetrotters'
2   report was finally tendered in December of
3   2024, why did it take so long just to get an
4   assessment by Globetrotters?
5        A    I don't think your starting time is
6   correct.  I will have to look but I don't --
7   that doesn't sound right.
8        Q    Well, give me a moment.  I will find
9   out specifically what it was.
10       MR. BRANUM:  Well, I've got to take a
11  short break.
12       MR. MORRISSEY:  All right.  We will
13  take a five-minute break, and I will come
14  back with the (audio muted).
15            (WHEREUPON, a short
16             break was had.)
17  BY MR. MORRISSEY:
18       Q    All right.  We are going to show you
19  an exhibit in regards to when Cook County
20  initially started an RFQ for design services.
21       MR. BRANUM:  And what Exhibit Number
22  is this?
23       MR. MORRISSEY:  It's 103.
24  Exhibit 103.

ERIC DAVIS
March 12, 2024

Page 215

1        MR. BRANUM:  I don't have that
2   exhibit.
3        MR. MORRISSEY:  Well, it should be
4   coming to you momentarily.
5   BY MR. MORRISSEY:
6        Q    Mr. Davis --
7        MR. BRANUM:  Well, hold up.  I don't
8   have the exhibit yet.
9   BY MR. MORRISSEY:
10       Q    Do you see that on the screen --
11       A    No.
12       Q    -- Exhibit 103?
13       A    No.
14       Q    Now do you see this document which is
15  Exhibit 103, Exhibit 103, Cook County
16  Government --
17       A    Yes.
18       Q    -- Office of Chief Procurement
19  Officer.  My question is in January of 2020,
20  did you begin the process of seeking out
21  architects to do an assessment of the Cermak
22  ramp to see whether or not it complied with the
23  ADA standards?
24       MR. BRANUM:  And before you answer

Exhibit 5 Page 54

Page 216

```
1    that question, has this exhibit been
2    produced in the case?
3         MR. MORRISSEY:  Yeah, it was in his
4    first deposition, Mr. Branum.
5         MR. BRANUM:  Okay.  Continue.  I just
6    wanted to make sure.  Continue.
7    BY MR. MORRISSEY:
8         Q    Do you understand the question?
9         A    No.  I'm sorry.  I didn't pick up on
10   the question.  I just --
11        Q    Okay.  So the question is in January
12   of 2020, did you begin the process of trying to
13   obtain an assessment of the Cook County Cermak
14   ramp?
15        A    So what you're putting on the screen
16   appears to be the cover page from an RFP, and I
17   think it's significant to say RFP, for what is
18   listed as improvements of the DOC campus.  I
19   don't know if this -- hold on.  Go to Page 3
20   there.
21        Q    All right.  I will you scroll down.
22        A    Keep going.  Right there.  Okay.
23   Now, let me see.  Oh, yeah.  This was long ago.
24   Yeah, this was long ago.  Okay.  Yeah.
```

Page 217

```
1         Q    So my question is back in January of
2    2020 --
3         A    Yeah.
4         Q    -- did you, as the person in charge
5    of this renovation of the Cermak ramp, did you
6    begin this process of seeking out or getting
7    approval to hire an architect to assess whether
8    or not the RTU -- RT -- the Cermak ramp
9    complied with the ADA?
10        A    So a couple of things to note.  This
11   is a request for proposal.  And if you look in
12   the first paragraph there, this is a proposal
13   to prequalified firms.
14             And if you look at RFP Number 1855,
15   that was a pool of architects and engineers
16   that were identified by the County and then
17   it's called a prequalified pool to do this
18   work.
19             Between the time that this document
20   which is a request for proposal was developed,
21   it's my recollection that somewhere in that
22   period after this was issued, a determination
23   was made by the procurement office that they
24   wanted, first of all, not to use the pool
```

Page 218

```
1    anymore because it was taking too long; second
2    of all to -- instead of doing a request for
3    proposal to do a request for qualification.
4             We did not at the time -- this was
5    after, Tom, you may recall, the inability to
6    achieve the Cermak ramp, and Cermak
7    specifically, through the task orders in 2019.
8             So this was an attempt to procure
9    these services in 2020 through the prequalified
10   pool on a proposal basis.
11             And somewhere along the line, the
12   procurement office decided that they wanted to
13   go to an RFQ format, which was different than
14   an RFP.  And so we had to -- this procurement
15   never made it to market.  We never got
16   proposals on it.  This never got consummated as
17   a contract, and I also --
18        Q    Did you --
19             MR. BRANUM:  Hey, Tom.  Don't
20   interrupt him.
21   BY MR. MORRISSEY:
22        Q    I was just going to ask you --
23             MR. BRANUM:  Tom, no.  Don't
24   interrupt him.
```

Page 219

```
1    BY THE WITNESS:
2         A    I would also note that the first
3    sentence is for ADA improvements at the DOC
4    campus.  I believe, if my memory serves
5    correctly, this was for the design for ADA
6    improvements across the entire campus and not
7    specific to Cermak.
8             Now, maybe it was.  I don't think
9    this was broken out just for Cermak.  My
10   recollection was that we were looking at
11   wanting to do the whole campus which is a much
12   larger undertaking.
13             Somewhere along the line the
14   determination was made that we weren't going to
15   secure the services this way, and that's why we
16   went for the RFQ specific to Cermak, which is
17   how Globetrotters was hired.
18             So somewhere in that period after
19   this was developed and the dates that you saw
20   were on there, the determination was made to
21   not pursue and obtain the services this way.
22   BY MR. MORRISSEY:
23        Q    On this Document 103, on Page 7,
24   Scope of Services --
```

Exhibit 5 Page 55

ERIC DAVIS
March 12, 2024

Page 220

1     **A**    **Yes.**

2     Q   -- does it include the Cermak Health

3  Service building?

4     **A**    **It's one of them, yes. But as you**

5  **notice, that's one of seven packages assessing**

6  **almost the entire campus, which is a very large**

7  **undertaking.**

8     Q   All right. So part of this

9  package --

10    **A**    **Yes.**

11    Q   -- in January of 2020 included Cermak

12  in and the Cermak ramp.

13        Is that fair to say?

14    **A**    **Yes.**

15    Q   And you hit a roadblock then. The

16  procurement office said we are not going to do

17  this, correct?

18        MR. BRANUM: Objection to your

19     characterization.

20  BY THE WITNESS:

21    **A**    **That's my recollection of how --**

22  **of -- that they decided they wanted to go to an**

23  **RFQ format and not use the prequalified pool.**

24  **What you're showing is a void.**

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 221

1  BY MR. MORRISSEY:

2     Q   In 2019, the task method was rejected

3  either by the procurement office or the County

4  Board or both, correct --

5    **A**    **Yeah.**

6     Q   -- in order to renovate the ramp?

7    **A**    **Weren't able to do it through the**

8  **task orders in '19. Weren't able to do it**

9  **through the pool in 2020 or '21.**

10    Q   So finally in April of 2022, you

11  tried to do it and you successfully did it

12  through a request for qualifications, correct?

13    **A**    **Correct.**

14    Q   And that took how long before you got

15  approval of allowing Globetrotter to bid on

16  assessing the Cermak ramp?

17    **A**    **My recollection is that procurement**

18  **took over a year. So that would have put the**

19  **completion of the contract in the middle of '23**

20  **at that point before they actually had an**

21  **approved Notice to Proceed.**

22    Q   So it took from April of 2022 to mid

23  2023 before you could even negotiate with

24  Globetrotter on a price to do the assessment of

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 222

1  the Cermak ramp.

2        Is that fair to say?

3    **A**    **No. By the middle of '23, we had --**

4  **I think whenever that was. I want to say it**

5  **was around June. It may have been later. You**

6  **know, we were going to do the whole building**

7  **once, right? So -- but their fee was already**

8  **in that by -- that period includes their fee**

9  **negotiations.**

10    Q   Okay. And would it be fair to say to

11  wrap this up that you've done your best efforts

12  through the task program, through the proposal

13  program and now through the request for

14  qualification to get an assessment of the

15  Cermak ramp, whether it's successful or not,

16  correct?

17    **A**    **Understanding that the situation and**

18  **parameters evolved over that time, yes.**

19    Q   And during that three- or four-year

20  period, you had expectations that this process

21  would take a shorter period of time, correct?

22        MR. BRANUM: Objection to form.

23  BY THE WITNESS:

24    **A**    **Are you asking me if it turns out**

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 223

1  **that bureaucracy takes time?**

2  BY MR. MORRISSEY:

3     Q   Well, I'm asking you that you gave

4  projections --

5    **A**    **Yeah.**

6    Q   -- previously that turned out to be

7  false in regards to your ability to get

8  Globetrotter or a firm on hand to do the

9  assessment of the Cermak ramp, correct?

10        MR. BRANUM: Objection to the form of

11     the question, misstates previous testimony.

12  BY THE WITNESS:

13    **A**    **Which is also why we've gone and**

14  **successfully obtained the task order architects**

15  **of which HDR is one, and we're using the JOC**

16  **process, which is a faster way of constructing**

17  **it. So did it take a long time? Yes. Have we**

18  **undertaken measures to expedite and increase**

19  **the certainty that we would actually get the**

20  **work done? Yes.**

21    Q   So your previous expectations or

22  timetable that you've given in several

23  depositions in this case have not panned out.

24        Is that fair to say?

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 56

ERIC DAVIS
March 12, 2024

Page 224

```
 1        MR. BRANUM:  Objection to the form of
 2   the question.
 3   BY THE WITNESS:
 4        A    You would have to tell me specific
 5   cases and depositions, Tom.  You guys sue us
 6   all the time.  I have trouble remembering which
 7   deposition in which case.
 8   BY MR. MORRISSEY:
 9        Q    Now, it's your testimony today that
10   you, individually, are fully invested in
11   following through with Globetrotters'
12   recommendations to make the Cermak ramp comply
13   with the ADA, correct?
14        A    It is my 100 percent commitment to
15   work diligently, consistently and as fervently
16   as I can to achieve that recommendation which I
17   would note converts it from being a ramp to
18   being a walkway, but I'm absolutely committed
19   to trying to make that happen as expeditiously
20   as possible.
21        Q    And in your capacity as an employee
22   of Cook County, you're not in a policy position
23   where you can commit Cook County to any
24   timetable for completion of the renovation of
```

ERIC DAVIS
March 12, 2024

Page 225

```
 1   the Cermak ramp?
 2        MR. BRANUM:  Objection to the form of
 3   the question.
 4   BY THE WITNESS:
 5        A    So the first part of your question
 6   asks if I'm in a policy position, and the
 7   answer to that question is yes.
 8        So if you want to rephrase the second
 9   part of your question.  To be able to achieve
10   things in time, I think I've indicated that
11   there are still unknowns in this project that
12   may alter the timetable.
13        However, as I also mentioned, we have
14   endeavored to develop and achieve ways like the
15   task order contracts that we have now through
16   which HDR has been hired, and he is working on
17   their fee, to increase the certainty likelihood
18   and decrease the duration of achieving the
19   project.
20   BY MR. MORRISSEY:
21        Q    You mentioned that there's certain
22   unknowns about your ability.  Even though
23   you're personally committed, and I appreciate
24   that, what are the unknowns as far as
```

ERIC DAVIS
March 12, 2024

Page 226

```
 1   projecting a commitment from Cook County to do
 2   this project, renovating the Cermak ramp?
 3        MR. BRANUM:  Objection.  You're
 4   misstating his testimony.
 5   BY THE WITNESS:
 6        A    Well, but if I understand your -- as
 7   you've covered in the course of this
 8   deposition, the Cook County Board approves the
 9   Capital Improvement Plan.  While I have never
10   seen any instance of them cancelling a project
11   through that process, do they have that right
12   and opportunity?  Yes, they do.  I can't
13   control that.  I think it's highly unlikely,
14   but I can't control that.
15        Is there a possibility, which you've
16   asked before in this deposition that the
17   procurement office could reject either the
18   construction or the design proposals when they
19   come to them?  I suppose it is but that will be
20   a first.
21        You know, so as far as uncertainty is
22   concerned, can I absolutely guarantee it?  No.
23   Are we setting -- am I involved in setting up
24   the policies to expedite it?  Yes, absolutely.
```

ERIC DAVIS
March 12, 2024

Page 227

```
 1   BY MR. MORRISSEY:
 2        Q    If a -- are you open to assistance to
 3   expedite this process to get it through the
 4   County Board in an expeditious manner?
 5        MR. BRANUM:  Objection to the form of
 6   the question.
 7   BY THE WITNESS:
 8        A    Expedite getting it through the
 9   Board?  I mean --
10   BY MR. MORRISSEY:
11        Q    Well, let me rephrase the question.
12        A    Most people that try to do that end
13   up in prison, Tom.  I wouldn't recommend it.
14        Q    Give me one moment.  I thank you for
15   your time today, and I'm sure we'll meet again
16   soon, I think, about the RTU and Globetrotters'
17   report, but that's coming soon, I assume, on
18   your radar --
19        MR. BRANUM:  All right.  I've got a
20   few questions.
21   BY MR. MORRISSEY:
22        Q    -- would that be fair to say?
23        MR. BRANUM:  Well, he is not going to
24   talk about that.  So I have got a few
```

Exhibit 5 Page 57

ERIC DAVIS
March 12, 2024

Page 228

1   questions.
2          C R O S S - E X A M I N A T I O N
3              BY MR. BRANUM:
4       Q     Earlier counsel was asking you about
5   the decision to renovate the Cermak ramp, and I
6   know the word intent came up a few times as far
7   as what the County intended to do, and I just
8   want to be clear.
9          Renovating the Cermak ramp is more
10  than an intent because there's steps that have
11  already been taken toward that goal, correct?
12      A     Yes.
13          MR. MORRISSEY:  Mr. Branum, I'm going
14      to object.  It's leading and you're trying
15      to put words in the deponent's mouth.  So
16      it's an improper question.
17  BY MR. BRANUM:
18      Q     Isn't it true, Mr. Davis, that it's
19  more than an intent?
20          MR. MORRISSEY:  Mr. Branum, I think
21      that's leading and it's improper.
22  BY THE WITNESS:
23      A     If you're asking have there been
24  steps taken to make the outcome more likely,

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 229

1   absolutely.  You know, the intent in that case
2   is a shorthand for that's the direction that
3   we're going.  So, yes, absolutely there have
4   been additional steps taken.
5   BY MR. BRANUM:
6       Q     Right.  That's the direction it's
7   going, and that's the steps that are being
8   taken.
9          What I was trying to say it's not an
10  intent as if we're going to do it, but we
11  haven't decided yet?
12      A     Yeah, I think that's fair to say.  We
13  are doing it, yes.  If you want to say that,
14  you know, at the time of the -- that we have an
15  intent, you know, yes.  But I don't want to
16  over-characterize and say -- you know, as I
17  said, because of those qualifications.  I can't
18  100 percent say we are, but, yeah, that's
19  where we're going.
20      Q     Let me share my screen.  Give me one
21  second.  And I have got your Declaration on the
22  screen.  It's Exhibit 1.  We will go to
23  Paragraph 15.  It says:  The County has
24  accepted GEC's recommendation to remove the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 230

1   existing concrete ramp and re-pour it.
2          So the decision has already been made
3   to renovate the Cermak ramp?
4          MR. MORRISSEY:  Objection, leading.
5   BY THE WITNESS:
6       A     Has that decision been made?  Yes.
7   Because I've said the County has accepted the
8   recommendation.  That is the recommendation.
9   We have proceeded as I mentioned with getting a
10  proposal from the task order architect to
11  implement that recommendation.  We are making
12  arrangements with the contractor to construct
13  that recommendation.  So, yes, we are going
14  forward with that.
15      Q     Plaintiff's counsel also asked you
16  questions about the procurement process.  Is
17  the procurement process a necessary step to
18  renovate the Cermak ramp?
19      A     Yes.
20      Q     And why are you going through this,
21  the procurement process?
22      A     There is a large lengthy and
23  complicated body of laws around how governments
24  are and are not allowed to spend money.  These

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 231

1   laws include things like fair competition, open
2   processes, in some cases the participation of
3   minority women-owned firms, any number of other
4   legal requirements around it.
5          It is a complex -- it is a
6   complicated enough process that you can get a
7   master's degree in government procurement.  It
8   is a complicated endeavor.  University of
9   Dayton.
10      Q     And so to renovate the Cermak ramp
11  and also stay in compliance with the laws, the
12  procurement process is a necessary function of
13  staying in compliance with the laws?
14      A     Absolutely.
15      Q     What about the transfer package?
16  There was testimony and questions about the
17  transfer package.  Is the transfer package a
18  necessary step in renovating the Cermak ramp?
19      A     No, it's not.  It's a step for a
20  combination of expediency and consistency.  And
21  as I mentioned, we are expediting that part of
22  it in the case of the ramp itself and going
23  ahead and engaging the architect of record.
24  For the work for the rest of the building, they

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 58

Page 232

1 will complete the transfer package, and then an
2 architect of record will be engaged for the
3 rest of the building. But HDR is doing the
4 ramp, just the ramp.
5    Q    And is the reason for having the
6 transfer package put together is to renovate
7 the ramp, like that's the purpose of putting
8 this in place?
9    A    We are doing transfer packages in
10 most of the other ADA procurements. That's to
11 achieve a balance between, you know, the
12 consistency of treatment and the requirements
13 for open procurement. In other words, so that
14 multiple firms have opportunities to
15 participate in the program. The procurement
16 office has asked us to provide opportunities
17 for as many different firms to participate as
18 possible, and the transfer package is a
19 methodology for us to offer a wider range of
20 firms the ability to participate in the process
21 while, nevertheless, keeping a firm with a good
22 level of expertise like Globetrotters at the
23 front end to provide their expertise.
24           It takes longer to do that, to do a

Page 233

1 transfer-package version because then you have
2 a second procurement for the architect of
3 record.
4           In this case, we're doing -- the
5 architect of record, they've already been
6 procured. So the ramp, we are expediting; but
7 the larger work, yeah, we're going to have to
8 go out on the street for an architect of record
9 for the rest of the building.
10    Q    So it's not necessary but the
11 transfer package is being put together to
12 expedite?
13    A    Well, it's being put together for the
14 balance of the building, Sam. We're -- as I
15 said, we are jumping over that a little bit
16 with the ramp because the recommendation is
17 fairly straightforward. So we can expedite
18 that part of it.
19    Q    Right. That part of it is being
20 expedited.
21    A    Right. So the ramp can be expedited.
22    Q    What about submitting this
23 information to be placed on the budget, is that
24 a necessary part to renovate the Cermak ramp?

Page 234

1    A    Yes. As I said, right now, the
2 budget in this the CIP only includes monies for
3 design. In order to include the larger monies
4 for construction, that's in the current budget
5 formulation cycle that we are in now for fiscal
6 year 2025, and that will be a larger number.
7           So that's a necessary requirement to
8 be dealing with the budget over multiple fiscal
9 years, yes.
10    Q    And what about submitting the budget
11 to the Board, is that a necessary step in order
12 to renovate the ramp?
13    A    100 percent.
14    Q    And what about the other steps that
15 are outlined in your Declaration such as
16 getting the architect, doing the design plans,
17 getting the construction company, negotiating
18 the fees, are all of these necessary steps in
19 the process of renovating the Cermak ramp?
20    A    Yes. To the greatest extent
21 possible, if there are faster ways, we're open
22 to suggestions but this is the fastest way we
23 know how to do. And as I said --
24    Q    And if you can't -- yeah, go ahead.

Page 235

1    A    If they came to us tomorrow and said
2 do it faster on an emergency basis, honestly, I
3 can't think of a faster way to it. Given the
4 requirements that we have, I can't think of a
5 faster way. Right now, today, I can't think of
6 a faster way to accomplish it.
7    Q    And is part of that reason because
8 you cannot just skip over --
9           MR. MORRISSEY:  Objection, leading.
10           MR. BRANUM:  Tom, I'm asking a
11    question.
12           MR. MORRISSEY:  No, it's leading,
13    Mr. Branum, because you're going to put
14    this in a response and say it's his
15    statement. It's your statement. It's
16    leading.
17           MR. BRANUM:  I'm asking a question.
18 BY MR. BRANUM:
19    Q    I want to know if part of the --
20           MR. MORRISSEY:  Make sure it's not
21    leading.
22           MR. BRANUM:  Well, can I --
23           MR. MORRISSEY:  Don't have it
24    leading, Mr. Branum.

Exhibit 5 Page 59

Page 236

1   MR. BRANUM:  Let me ask a question.
2   MR. MORRISSEY:  I'm just asking.
3  BY MR. BRANUM:
4   Q   Part of the reason this cannot be
5  done faster, if I understand you correctly,
6  because you just testified that these are
7  necessary steps:  Procurement, submitting the
8  budget, submitting the budget to the Board.
9  Can you skip over any of these steps to
10 renovate the Cermak ramp faster?
11   MR. MORRISSEY:  Leading.  Objection,
12  leading.
13 BY THE WITNESS:
14   A   I can't think of a way given what has
15 to get done between now and when it would open.
16 I can't think of a way unless there was an
17 especially egregious -- egregiously expensive
18 alternative to -- you know, I don't know of an
19 extra detention-grade health facility out there
20 that you can move everybody to, to allow us to
21 do this faster.  I can't think of a faster way
22 to do it.  It takes time.  It really does.
23 BY MR. BRANUM:
24   Q   Like, you cannot decide not to go

Page 237

1  through procurement so that you can do this
2  faster?
3   A   Correct.  And as I said, I don't
4  think it would qualify as an emergency.  Even
5  if it was a court order, I still don't think we
6  could do it faster.
7   Q   And you can't decide not to submit it
8  into the budget because you want to do it
9  faster?
10   MR. MORRISSEY:  Objection, leading.
11 BY THE WITNESS:
12   A   I don't know of a faster way to get
13 to -- like, if you're asking is there a faster
14 way to get the construction funds in the
15 budget, there may be but we're not going to
16 need -- we need to have the design first.
17 We've got to have the design first.  You can't
18 price anything until you have the design, which
19 we're working on getting right now.  So I can't
20 think of anything that would even suggest that
21 we try to jump the line on construction
22 funding.
23 BY MR. BRANUM:
24   Q   Now for a project such as renovating

Page 238

1  the Cermak ramp, are the steps that you
2  outlined, for instance, procurement, budget,
3  design, architect, construction company,
4  negotiating fees, all of those steps, are those
5  normal steps in a project like this?
6   A   No.  I think we've tried to
7  accelerate that process, and I say that
8  because, as I mentioned, if we were doing this
9  as a matter of course for the whole building,
10 we would have waited and gone out to the street
11 for a whole separate architect of record to
12 execute Globetrotters' plan for the whole
13 building.
14   Instead, we're breaking it out and
15 having a task order and starting the design
16 now, instead of a year now, and getting one of
17 the JOC contractors going as soon as we can.
18 We've accelerated it I think as much as we can
19 at this point.
20   Q   And plaintiff's counsel tried to
21 paint a picture as if going through all of
22 these different steps it means the ramp is not
23 going to be renovated.
24   Do you agree with that assessment,

Page 239

1  that the fact that you have to go through these
2  necessary steps, that that means the ramp is
3  not going to be renovated?
4   A   Well, I don't want to -- to use
5  your -- I don't want to characterize Tom's
6  thought process but, yeah, I don't -- as I
7  said, to the extent that we can be certain that
8  this is actually going to go forward, this is
9  actually going to go forward.  Not only is it
10 going to go forward, it is going to go forward.
11 So we're doing it as fast as we can.
12   There are -- I mean, there are -- if
13 I understand, capital construction is subject
14 to a couple of things.  One of them is, as I
15 mentioned, the County does zero-based
16 budgeting.
17   So at the beginning of the year, they
18 wipe everything -- they close out the books.
19 They wipe everything out and they construct the
20 budget.  It's a zero-based budget.
21   Second thing to understand is this is
22 capital construction.  It's funded by municipal
23 bonds.  Those municipal bonds come with
24 limitations imposed by the Internal Revenue

Exhibit 5 Page 60

ERIC DAVIS
March 12, 2024

Page 240

1   Service on bonds sold on the open market.
2           So there are things we can and cannot
3   do in terms of the construction that are part
4   and parcel of the fact that we are building
5   with money that comes from sale of municipal
6   bonds.
7           We've gotten pretty good at dealing
8   with that, but there are some limitations.  It
9   does take time.
10      Q    Now, if we go back to Exhibit 1, your
11  Declaration, if we can go to Paragraph 19.
12  This paragraph has the estimated time where it
13  states:  The County estimates it will take
14  approximately 56 weeks, right, and I think it
15  says 14 months, but that should be what?
16      A    I think it should be 60 weeks.  I'll
17  double check.  It's a variance of a month or so
18  but, obviously, 14 months is not equal to
19  56 weeks.
20      Q    So either 56 weeks to 14 months?
21      A    Yeah, something in that range, 13 or
22  14 months.
23      Q    To reach substantial completion on
24  the project.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 241

1           Is that still true today?  Is that
2   still in line with your expectations of when
3   substantial completion will be met?
4       A    Yes.
5       Q    And then, in total, the estimate is
6   that the removal and replacement of the ramp
7   will be completed within 24 months, and is that
8   estimate still accurate as of today?
9       A    Yes, I would expect it to be done
10  around the 1st of the year in '26, maybe
11  January, something like that, February,
12  something like that, depending on what we find.
13      Q    Counsel asked you if you could have
14  included in the budget construction of the
15  ramp.
16           Do you remember those questions?
17      A    Yes.
18      Q    I believe it's -- you know, a few
19  times, you said if we were to do that, it would
20  be irresponsible.
21      A    Yeah.
22      Q    Can you just explain what you mean?
23      A    So we have to put together a Capital
24  Improvement Plan that is an estimate of the

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 242

1   monies that we expect to spend or plan to spend
2   in a given fiscal year.
3           As I said, the expectation is we will
4   be doing design for most, if not all, of '24.
5   If we -- let's say that the ramp cost $2 million
6   to construct.  If the fiscal 2024 CIP included
7   the $2 million for construction, that would be
8   $2 million that can't use during the year
9   because we know we are not going to spend it
10  until 2025.
11          So we would tie up $2 million in
12  funding capacity for work that we know that we
13  are not going to do in this fiscal year.  It
14  would be irresponsible.
15          We need to try to get as much work
16  done in the physical year as we can and give as
17  honest and clear as possible an estimate of
18  what we can accomplish during the year.
19          If we put the construction money in
20  there, we would be identifying capacity that we
21  know would -- we know up front we are not going
22  to need.  2024, because of the start of the
23  Task Order A/E process, we know we are going to
24  be doing a lot of design work in '24.

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 243

1           We've got over 100 projects
2   identified for the Task Order A/E process.
3   They are accelerating.  They are happening
4   fast.  We are going to be doing a lot of design
5   work in '24.  That's going to lead to lots of
6   construction money in '25.  But if we put all
7   of that construction money in '25, in '24, we'd
8   be asking the Board for permission to do a
9   bunch of things we know we're not going to do.
10  To me, that would be irresponsible.  That's my
11  opinion.  To me, it would be irresponsible.
12      Q    You mean in that budget year?
13      A    We wouldn't get it done because of
14  the zero-based budget because we start fresh
15  each year.  Now --
16      Q    If we go to -- go ahead.
17      A    We do projections of what we think
18  the future year expenditures are going to be in
19  what are called the out years, but that's not
20  an encumbrance.  That's not a commitment.  We
21  are only giving them a heads-up to say, hey,
22  this is where we think this is going.  There's
23  a lot more work to get done before we get to
24  '25, '26, '27, '28.  We are just giving them an

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 61

ERIC DAVIS
March 12, 2024

Page 244

1  indication what we think the future holds.  But
2  we do -- we know we are going to be doing a lot
3  of construction work in '25 because we are
4  doing all of this design work in '24, but we're
5  not going to encumber the monies for the
6  construction work now because we're not going
7  to be there yet in '24.
8        Q    If you go to your Declaration,
9  Exhibit 1, if we go to Paragraph 12, this is
10 where you discuss GEC documented the Cermak
11 ramp has handrails mounted the full length of
12 the ramp that are compliant, but because of the
13 obstructions with the adjacent doors, the
14 handrails do not extend 12 inches beyond the
15 ramp, and GEC determined that that aspect of
16 the handrails is not compliant.
17       A    Yes.
18       Q    And then, you know, the next
19 paragraph, 13, goes into the handrails and the
20 walls angling 45 degrees, and then the
21 information about types of fittings and
22 anti-ligature handrails.
23            And earlier counsel was asking you a
24 lot of questions about the installation of the

ERIC DAVIS
March 12, 2024

Page 245

1  current handrails on the Cermak ramp and some
2  of the obstacles that you ran up against in
3  being able to obtain the necessary components
4  to --
5        A    To finish.
6        Q    Yeah, to finish the installation of
7  the handrails.
8            Is there anything that you could have
9  done beyond what you did to bring the handrail
10 component of the Cermak ramp into compliance?
11       A    Not that I can think of, no.  I'm
12 thinking about -- if memory serves, the
13 installation of the handrails was the fall of
14 2022 by which time from the exhibit that Tom
15 was showing us earlier, we were already
16 underway hiring the design firm to look at the
17 whole building.
18            So I guess it's fair to say that if
19 there were additional measures, the hope was
20 that the architects would be on the Board.
21 We'd be looking at the whole building before
22 those things could be achieved.
23       Q    And now that we -- a report from
24 Globetrotters in December gave the

ERIC DAVIS
March 12, 2024

Page 246

1  recommendation.
2        A    Yeah.
3        Q    Their recommendation is that actually
4  the handrails can be removed?
5        A    When the ramp has been removed and
6  the new, I guess you'd say, sloped walkway has
7  been constructed, at that point, it would not
8  be steep enough to be characterized as a ramp
9  by the ADA; and as such, a hallway doesn't need
10 handrails.  It's essentially a hallway, and a
11 hallway doesn't need handrails.
12            MR. BRANUM:  I have no further
13 questions.  Thank you for your time.
14            MR. MORRISSEY:  I have some follow-up
15 questions, Mr. Branum, based upon your --
16            THE WITNESS:  Imagine my surprise.
17            MR. MORRISSEY:  I would like to have
18 a clear record here, Mr. Davis.
19       R E D I R E C T  E X A M I N A T I O N
20            BY MR. MORRISSEY:
21       Q    In July of 2022, there was an agreed
22 court order to put in handrails that were
23 compliant with the ADA.  We've looked at that
24 exhibit, correct?  And that work, because there

ERIC DAVIS
March 12, 2024

Page 247

1  was a court order, was done within six months
2  or less, correct?
3            MR. BRANUM:  I will just object to
4  your characterization of the Court's order.
5  BY THE WITNESS:
6        A    Approximately, yeah, okay.
7  BY MR. MORRISSEY:
8        Q    And that work was expedited due to
9  the fact that there was a court order, correct?
10       A    That's why we had DFM buy the
11 handrail directly and install it themselves was
12 the fastest way to get it done.
13       Q    That was based upon you had to do it
14 because there was a court order, correct?
15            MR. BRANUM:  Objection to your
16 characterization of the order.
17 BY THE WITNESS:
18       A    I think it's -- well, I mean, we want
19 to try to get things done as expeditiously as
20 possible in any circumstance.  So it's probably
21 just a case of what's the fastest way to
22 accomplish it.
23 BY MR. MORRISSEY:
24       Q    That was after the court ordered you

Exhibit 5 Page 62

ERIC DAVIS
March 12, 2024

Page 248

```
1   to do it, correct?
2            MR. BRANUM:  Again, I object to your
3       characterization of the Court's order.
4   BY THE WITNESS:
5       A   As I mentioned, it was our opinion
6   that everything was all right going in.  But
7   then, yeah, if you say we've got to change out
8   the handrails, then, okay, we've got to change
9   out the handrails.  That was the fastest way to
10  accomplish it.
11  BY MR. MORRISSEY:
12      Q   Was it your department's opinion that
13  in 2022 the ramp complied, even though it
14  didn't have handrails?  Is that what you're
15  saying?
16      A   Yeah, because it was our
17  understanding -- it was our understanding that
18  at the time that, because the Sheriff had
19  discretion in -- so, again, I'm reconstructing
20  from before.  It's my recollection that when we
21  looked into it, that there was a provision that
22  if the area is considered, I want to say, a
23  path of work, if you will, for Sheriff's
24  deputies and if Sheriff deputies have to be
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 249

```
1   physically fit and if the policy is if you are
2   on the ramp, you're getting pushed in a
3   wheelchair, that it was our understanding that
4   there was -- that it was feasible to say the
5   Sheriff doesn't want handrails.  It's okay with
6   bumpers because they're pushing people up and
7   down the ramp, that that's the information we
8   had, and that's -- but as I said, we learn
9   things over time about it.  And the decision
10  was made, yeah, okay, fine.  We'll put
11  handrails in.
12          But my recollection is that initially
13  our expectation was that it was that -- that it
14  was -- that the Sheriff's discretion in a
15  security environment was such that if was a
16  workplace for sheriffs and those are the people
17  that are using the ramp that you're allowed to
18  not do that.
19          Now, I can't say whether that's --
20  you know, turned out to be the case or not
21  because that's operations.  We don't do
22  operations.
23      Q   Now, you mentioned that you're in
24  contact with Sabrina Canchola-Rivero [sic] on a
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 250

```
1   monthly basis, correct?
2       A   Yeah, fairly regularly.  Yes.
3       Q   And Sabrina Canchola-Rivero put in a
4   business case in regards to the Cermak ramp.
5   You recall that?
6       A   I think they put in a business case
7   for Cermak.  I don't remember if it was just
8   the ramp or not.
9       Q   But in that business case report, she
10  acknowledged that the ramp was being used for
11  both employee passage and inmate passageway,
12  correct?  So it wasn't specifically utilized
13  for workers at the jail, correct, employees?
14      A   I believe that those people that
15  needed assistance were there to follow the sign
16  that says if you need assistance ask for a
17  sheriff.
18      Q   That wasn't the question.  Will you
19  please answer the question?
20          MR. BRANUM:  He did answer the
21      question.
22          MR. MORRISSEY:  No.
23  BY MR. MORRISSEY:
24      Q   You're aware that the Cermak ramp is
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 251

```
1   utilized both by employees and by inmates at
2   the Cook County Jail to access the infirmary,
3   correct?
4            MR. BRANUM:  Objection to form.
5   BY THE WITNESS:
6       A   Right.  But if you're asking does
7   that mean that we thought that they, therefore,
8   needed handrails, again, I referred to you
9   earlier the initial impression was that if
10  there is a detainee that they had to be
11  escorted, I don't think they had people
12  walking -- maybe they did, and maybe during the
13  course of this we learned -- I seem to recall
14  some video that you might have had of somebody
15  walking up and down.  I don't know.  But
16  initially I think -- and, again, timetable
17  line, you asked a question earlier about
18  timetable.  At one point, yeah, I think we
19  thought that it was all right.  And then
20  decided -- and then figured out that it wasn't.
21      Q   Well --
22      A   But that was our understanding of
23  what they were doing.
24      Q   All right.  Now you know definitively
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 63

ERIC DAVIS
March 12, 2024

Page 252

```
1   that that ramp doesn't comply with the ADA?
2       A    I'm sorry.  I missed the beginning of
3   your --
4       Q    You know definitively that ramp
5   doesn't comply with the ADA?
6       A    We know more now because of the LIDAR
7   scan, yes, that the ramp either was constructed
8   wrong or should have been constructed with a
9   landing.  We know that now because of the LIDAR
10  scan.
11      Q    And you also know without the LIDAR
12  scan that it needs handrails, correct, to be
13  compliant with the ADA?
14          MR. BRANUM:  Objection to the form of
15      the question.
16  BY THE WITNESS:
17      A    I believe that -- I think that was
18  in -- I think GEC concluded that they needed
19  them.  I seem to recall that they said they
20  concluded that they needed them.  We put them
21  in -- as you know, we tried to put them in
22  anyway.
23      Q    And when you put in the handrails,
24  there was no monitoring for the Court to make
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 253

```
1   sure that the handrails were properly installed
2   pursuant to the ADA, correct?
3           MR. BRANUM:  Objection to the form of
4       the question.
5   BY THE WITNESS:
6       A    I'm not an attorney, Tom.  I think
7   that -- I thought that the order that you're
8   talking about constituted monitoring by the
9   Court.  I don't know what you're getting at.
10  BY MR. MORRISSEY:
11      Q    I'm getting at after the handrails
12  were installed, do you know if the Court
13  approved the installation of the handrails that
14  were done under the order pursuant to the ADA?
15  It was in compliance with the ADA?
16      A    I don't know what the Court did or
17  didn't do.
18      Q    Now, you're projecting that the ramp
19  will remain noncompliant for the next couple of
20  years, correct?
21          MR. BRANUM:  Objection, form.
22  BY THE WITNESS:
23      A    It's our projection that -- and I
24  think it's in the testimony that in the
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 254

```
1   meantime, they'll be pushing people up and down
2   the ramp.
3       Q    My question -- can you answer the
4   question?  Between now and the substantial
5   completion of the ramp --
6       A    Yeah.
7       Q    -- it will remain noncompliant with
8   the ADA?
9           MR. BRANUM:  Objection to the form of
10      the question.
11  BY THE WITNESS:
12      A    Yes.  I think that's fair to say.
13  Otherwise, we wouldn't be replacing it.
14  BY MR. MORRISSEY:
15      Q    And people that are disabled for the
16  next two years will have to go up and down the
17  ramp with a noncompliant -- with noncompliance
18  by the defendants under the ADA?
19      A    Which is why they have to be -- they
20  need assistance, which is why there are signs
21  at the top and bottom of the ramp saying if you
22  need assistance, ask the sheriff for it.  I
23  don't understand what you're getting at.  I
24  mean, in the meantime, if they need to go up
```

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 255

```
1   and down the ramp, they are supposed to ask for
2   help.
3       Q    Well, let me ask you, as an architect
4   and a person who has some knowledge of the ADA,
5   is the purpose of the ADA to allow a disabled
6   person to independently utilize facilities such
7   as the toilet and a ramp so that they don't
8   have to reach out to somebody for assistance
9   just to go up and access an infirmary or
10  healthcare facility?
11      A    There are a wide --
12          MR. BRANUM:  You're asking him about
13      the -- go ahead.
14  BY THE WITNESS:
15      A    There are a wide range of
16  accommodations and circumstances that may
17  require somebody to get assistance.  There are
18  also circumstances where a facility can be
19  designed and be perfectly compliant with the
20  requirements of the ADA and still not address
21  the needs of an individual who may need
22  different accommodations.
23          The range of people and what they
24  need and whatever varies widely and, you know,
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 64

ERIC DAVIS
March 12, 2024

Page 256

1    are there circumstances where somebody needs to
2    be lifted into a shower seat?  Absolutely.  I
3    mean, there are all kinds of situations where
4    someone may need assistance in terms of
5    accessing facilities.  I mean, the ADA is
6    dealing with a very wide spectrum of needs and
7    accommodations.
8         Q    And the reason why the rise
9    limitation in this case is 30 inches under the
10   ADA is to give a wide range of people the
11   opportunity to have an intermediate landing for
12   a ramp such as Cermak that is over -- with a
13   rise over 32 inches?
14        MR. BRANUM:  Objection to the extent
15    you are asking about the purpose of the
16    ADA.
17        But go ahead.
18   BY THE WITNESS:
19        A    I can tell you that the intent of the
20   establishment of an intermediate landing is for
21   any kind of ramp in any kind of circumstance,
22   right?  You've got a ramp, and it's out in the
23   middle of a yard, and it's going in and you
24   have it, and somebody needs to be able to take

ERIC DAVIS
March 12, 2024

Page 257

1    a break.
2         In a situation like this where,
3    operationally, they're directed to provide
4    assistance, then somebody doesn't need a break
5    because they're getting pushed.
6         Q    Well, let me ask you.  This building
7    was required under -- it was built after the
8    passage of the ADA, correct, in 1996 or 1997?
9         A    Okay.  All right.
10        Q    And it was required to have a ramp
11   that complied with the --
12        A    I thought it was before '93.
13        Q    Pardon?
14        A    I thought it was -- I don't remember
15   the date.  I don't remember the date.
16        Q    The ramp was built after 1992,
17   correct?
18        A    I think that's right.
19        Q    And you previously said you're not an
20   operations person and you don't dictate what
21   the Sheriff may or may not do as far as moving
22   people up and down a ramp?
23        A    Yeah.  So as we have been through in
24   great detail, Tom, when we hired a surveyor to

ERIC DAVIS
March 12, 2024

Page 258

1    tell us what the slope of the ramp was, it
2    appeared that it was compliant, okay?
3         When we found out through the LIDAR
4    that not only was there a slight variance at
5    the top or bottom of the ramp, but it was a
6    significant variance as you characterized it,
7    the 2.4 inches.
8         We said wait a minute.  This is going
9    to -- we agreed with Globetrotters' recommendation,
10   and it's got to come out.  Before then, we
11   thought we were able to work with the ramp
12   that's there.
13        Q    So it was --
14        A    We looked at things like can we grind
15   down the top of it.  Can we -- you know, so
16   when we learned that it was that far out of
17   compliance, yes, absolutely, we will try to fix
18   it.
19        Q    So you agree it's significantly out
20   of compliance as far as the requirement for the
21   rise and the requirement for an intermediate
22   landing?
23        MR. BRANUM:  No.  He said that's how
24    you characterized it.

ERIC DAVIS
March 12, 2024

Page 259

1        MR. MORRISSEY:  Mr. Branum, I would
2     appreciate you not --
3    BY THE WITNESS:
4         A    At this point, it's --
5         MR. BRANUM:  Well, don't put words in
6     his mouth.
7    BY THE WITNESS:
8         A    At this point, the variation is such
9    that it seems prudent and in the best interest
10   of the citizenry and the people occupying the
11   facility to go ahead and replace it.  The
12   offset is greater than we thought it was.
13   BY MR. MORRISSEY:
14        Q    So can you explain to me how the --
15   for the next two years people that are
16   disabled, people that are in wheelchairs or
17   with crutches or with walkers are going to be
18   accommodated as far as going up and down that
19   ramp if it is not in compliance with the ADA?
20        MR. BRANUM:  Objection, lack of
21    foundation.
22   BY THE WITNESS:
23        A    Again, that's why they have signs
24   saying if you need assistance, ask for it.

Exhibit 5 Page 65

ERIC DAVIS
March 12, 2024

Page 260

```
 1  BY MR. MORRISSEY:
 2       Q    If it's built after 1992, does a
 3  person -- is the requirement that the Sheriff
 4  and the County had to make it accessible so a
 5  person could independently just have the
 6  same -- on the same basis as an able-body
 7  person move up and down that ramp to the best
 8  of their ability or does a disabled person have
 9  to be reliant and dependent upon other people
10  to ask for assistance when the government
11  builds a building after 1992 and it's not
12  compliant?
13           So can you tell me why for the next
14  two years, people that are disabled are going
15  to have to go up this ramp because the County
16  can't do it faster?
17           MR. BRANUM:  That's not even a
18       question.  That's a soliloquy.
19  BY THE WITNESS:
20       A    Is there a question in there?
21           MR. BRANUM:  Are you done, Tom?  I
22       think we have reached the end.
23           MR. MORRISSEY:  No, no, no.
24
```

ERIC DAVIS
March 12, 2024

Page 261

```
 1  BY MR. MORRISSEY:
 2       Q    There is a question.  The question is
 3  you don't provide operational support to the
 4  Sheriff --
 5           MR. BRANUM:  Asked and answered.
 6  BY MR. MORRISSEY:
 7       Q    -- in regards to the ADA, correct?
 8       A    That's correct.
 9           THE REPORTER:  I'm sorry, Tom.  What
10       was the last part of your question?  You
11       don't provide operational.
12           MR. MORRISSEY:  Operational
13       assistance in regards to the ADA to the
14       Sheriff.
15  BY MR. MORRISSEY:
16       Q    And can you point me to any portion
17  of the regs for the ADA where the government
18  can build a structure after 1992 and leave it
19  up to a citizen to ask for assistance, why is
20  that permissible under the ADA?
21           MR. BRANUM:  Objection to the extent
22       you're mischaracterizing the facts.
23  BY THE WITNESS:
24       A    Well, I think it's fair to say, Tom,
```

ERIC DAVIS
March 12, 2024

Page 262

```
 1  that we're talking about a custody environment,
 2  right, that the people in there are not just
 3  random citizens walking by, that they are
 4  people in custody.  Is that fair to say?  Would
 5  you agree that somebody in the jail that's not
 6  a sheriff is someone in custody using that?
 7           If they're in custody, then they are
 8  in the custody of the Sheriff and there are --
 9  it only seems logical to me that there are
10  different requirements or allowances for
11  safety, for security, because it's a custody
12  environment.  I don't understand -- it's not
13  like somebody just walking by on the sidewalk
14  out on California Avenue.  These people are --
15  where they go, what they do is subject to the
16  approval of the Sheriff or operations largely
17  for security and safety reasons.
18           So I don't understand why you're
19  getting on your horse about, you know, denying
20  the public accommodations when they're in an
21  environment where, you know, unfortunately,
22  their liberty, their mobility is subject to the
23  approval of the Sheriff.
24       Q    So their ability to seek medical
```

ERIC DAVIS
March 12, 2024

Page 263

```
 1  care --
 2           MR. BRANUM:  Tom, we're getting --
 3  BY MR. MORRISSEY:
 4       Q    -- if a person --
 5           MR. BRANUM:  No, no, no, no, no.  We
 6       are getting way off track here.  We are not
 7       getting into medical rights and 14th
 8       Amendment rights here.  We are getting way
 9       off base.  So you're just having -- right
10       now, you're having an argument with the
11       witness about trying to convince him of
12       your view on the world, and he's already
13       answered your question.  You just -- this
14       is not productive.  You're not -- this
15       isn't even permissible.  It's becoming
16       harassing.
17  BY MR. MORRISSEY:
18       Q    Well, let me ask you this.  You
19  mentioned on Mr. Branum's testimony, and I
20  would say it's testimony, characterize it as
21  testimony, that the County currently has over
22  100 projects in the design phase, correct?
23           MR. BRANUM:  Wait.  You said my -- I
24       got way confused there.  You said my
```

Exhibit 5 Page 66

ERIC DAVIS
March 12, 2024

Page 264

```
 1    testimony was that 100 projects -- what
 2    did you just ask?  It made no sense.
 3  BY THE WITNESS:
 4       A    I think what you're referring to is
 5  the earlier discussion of the meetings with the
 6  Sheriff where we have over 100 projects that
 7  are in various stages, whether it's planning,
 8  design, construction, closeout, procurement in
 9  various stages, active projects.
10  BY MR. MORRISSEY:
11       Q    I think you mentioned on Mr. Branum's
12  cross-examination that there are 100 projects
13  that Capital Improvement has supervision over
14  in regards -- in the design stage in the year
15  2024.
16       A    We have over 100 projects that we are
17  hoping to achieve the design for through the
18  task order contracts, yes.
19       Q    And those projects after the design
20  is completed would be filtered into the Capital
21  Improvement Projects -- I'm sorry -- Capital
22  Improvement Program for 2025 or 2026, correct?
23       A    They would move to construction
24  phase, yes.
```

ERIC DAVIS
March 12, 2024

Page 265

```
 1       Q    And then the County, after passing
 2  the Capital Improvement Program, has to
 3  prioritize in 2025 what projects are going to
 4  go forward and which ones aren't?
 5       A    Yes.
 6       Q    And that decision is made by who?
 7       A    That recommendation comes from the
 8  department to the president.  I can tell you
 9  that it is our policy and has been stated in
10  the budget book that if we have a project
11  underway that is an active carryover, in other
12  words, the project has been started and work
13  has been carried over, that those are the first
14  projects that we include in the plan for the
15  next year to ensure that they are continued.
16  This is an active project.
17            It is in the first -- when we
18  assemble the '25 CIP, it is in the first group
19  of projects that we will include in 2025.
20       Q    The renovation of the Cermak ramp,
21  when you say it's an active project --
22       A    Yes.
23       Q    -- there's still -- the first step is
24  going to be for the architectural firm, HDR, to
```

ERIC DAVIS
March 12, 2024

Page 266

```
 1    do design drawings.  That hasn't been done yet,
 2    correct?
 3            MR. BRANUM:  Well, no.  Object to
 4       your characterization as "the first step."
 5  BY THE WITNESS:
 6       A    Yeah.  No, if it's in design, that's
 7  an active project.  We are expending funds.  We
 8  are encumbering Capital Improvement dollars by
 9  having GEC do work.  It's an active project
10  right now.
11            Just because the construction isn't
12  underway, it's an active project.  And by our
13  processes, it will be carried over into the
14  fiscal '25 CIP doubly because it's an ADA
15  project.  It will be in the -- if I could pick
16  one project, it might be this one that's going
17  to be in the fiscal year '25 CIP.  If they
18  said, Eric, you can only do one, honest to God,
19  I think it might be this project.
20  BY MR. MORRISSEY:
21       Q    Eric, when there is a ground breaking
22  for the ramp, will you invite me over for a cup
23  of coffee?
24            MR. BRANUM:  And you don't have to
```

ERIC DAVIS
March 12, 2024

Page 267

```
 1    answer that, Eric.
 2
 3  BY THE WITNESS:
 4       A    You're an Irishman, Tom.  So I'm
 5  going to assume you're going to have something
 6  stronger than coffee.
 7  BY MR. MORRISSEY:
 8       Q    Let me ask.  So has one penny been
 9  given to HDR presently to design the renovation
10  of the Cermak ramp?
11            MR. BRANUM:  Objection to the form of
12       the question.
13  BY THE WITNESS:
14       A    That's not how it works.
15  BY MR. MORRISSEY:
16       Q    Well, I'm just asking.  Has $1 been
17  expended to HDR?
18       A    HDR, no.  They will be once we get
19  their proposal approved and they do their work
20  and they invoice it, it will be.
21       Q    You mentioned several qualifications
22  that perhaps can be barriers for you in
23  completing the Cermak ramp eventually, correct?
24            MR. BRANUM:  Objection --
```

Exhibit 5 Page 67

## Page 268

ERIC DAVIS
March 12, 2024

Page 268

1  BY THE WITNESS:
2     **A**   **"Barriers" is your word.**
3  BY MR. MORRISSEY:
4     Q   It's an appropriate word because
5  we're talking about the ADA.
6     **A**   **There are a lot of regulations**
7  **involved, Tom.  So barriers is your word.**
8     Q   All right.  Well, let's use
9  impediments, potential impediments, correct?
10     MR. BRANUM:  Objection.  Just ask
11  your question.  He doesn't have to
12  subscribe to your language.
13     MR. MORRISSEY:  Give me one more
14  minute and we'll wrap this up.
15     I have no further questions.
16  Maybe I will next week but not today.
17     MR. BRANUM:  And I don't have any
18  other questions.
19     Mr. Davis, thank you so much for
20  your time.  We will reserve.
21     THE WITNESS:  Hold on just a moment.
22  I just want to check something.
23     MR. MORRISSEY:  The deposition is
24  concluded.

TOOMEY REPORTING
312-853-0648

## Page 269

ERIC DAVIS
March 12, 2024

Page 269

1     THE REPORTER:  We are off the record?
2     MR. MORRISSEY:  We are off the
3  record.
4     THE REPORTER:  Okay.
5
6     FURTHER DEPONENT SAITH NOT....

TOOMEY REPORTING
312-853-0648

## Page 270

ERIC DAVIS
March 12, 2024

Page 270

1     IN THE UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ILLINOIS
2     EASTERN DIVISION
3
CORNELIUS WALKER,   )
4     )
   Plaintiff,   )
5     )
   vs.   )  No. 20-cv-00261
6     )
THOMAS DART, SHERIFF OF   )
7  COOK COUNTY and COOK   )
COUNTY, ILLINOIS,   )
8     )
   Defendants.   )
9
10     I, ERIC DAVIS, being first duly
11  sworn, on oath, say that I am the deponent in
12  the aforesaid deposition, that I have read the
13  foregoing transcript of my deposition,
14  consisting of pages 1-170 inclusive, taken at
15  the aforesaid time and place and that the
16  foregoing is a true and correct transcript of
17  my testimony so given.
18
   _____
19     ERIC DAVIS
20
SUBSCRIBED AND SWORN TO
21  me before this _____ day
22  of _____, A.D. 2024.
23     _____
24  Notary Public

TOOMEY REPORTING
312-853-0648

## Page 271

ERIC DAVIS
March 12, 2024

Page 271

1  STATE OF ILLINOIS )
2     )  ss:
COUNTY OF C O O K )
3     I, Peggy A. Anderson, a Certified
4  Shorthand Reporter in the State of Illinois do
5  hereby certify:
6     That previous to the commencement of
7  the examination of the witness, the witness was
8  duly sworn to testify the whole truth
9  concerning the matters herein;
10     That the foregoing deposition
11  transcript was reported stenographically by me,
12  was thereafter reduced to typewriting under my
13  personal direction, and constitutes a true
14  record of the testimony given and the
15  proceedings had;
16     That the said deposition was taken
17  before me at the time and place specified;
18     That the said deposition was
19  adjourned as stated herein;
20     That I am not a relative or employee
21  or attorney or counsel, nor a relative or
22  employee of such attorney or counsel for any of
23  the parties hereto, nor interested directly or
24  indirectly in the outcome of this action.

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 68

IN WITNESS WHEREOF, I do hereunto set my hand this 19th day of March, 2024.

Peggy A. Anderson
Certified Shorthand Reporter
License No. 084-003813

## A

**A.D** 270:22
**A/E** 242:23 243:2
**A/Es** 85:12
**ability** 54:16 92:7 93:15 117:21 130:18 196:5 223:7 225:22 232:20 260:8 262:24
**able** 8:10 15:2 18:16 54:20 65:18 110:6 118:2 123:2 125:8 126:2,20,21 129:20 130:16 131:6,7 143:13 145:6,7 221:7,8 225:9 245:3 256:24 258:11
**able-body** 260:6
**absolute** 114:18
**absolutely** 164:14,15 196:10 201:17 224:18 226:22,24 229:1,3 231:14 256:2 258:17
**accelerate** 238:7
**accelerated** 238:18
**accelerating** 243:3
**accept** 65:5 187:10
**acceptable** 154:19 155:24 156:6,16 196:22
**acceptance** 68:3 87:23 168:15 196:19 197:16,20
**accepted** 61:22 62:7 85:15 90:3 90:10,15 192:19 229:24 230:7
**access** 159:20 209:10 251:2 255:9
**accessibility** 43:6 52:14 55:22 61:12 84:23 115:7 115:10 130:17 152:3
**accessible** 13:19 130:16 131:15 173:19 260:4
**accessing** 256:5
**accommod...** 259:18
**accommod...** 150:22,24
**accommod...** 255:16,22 256:7 262:20
**accomplish** 122:21 125:9 183:21 235:6 242:18 247:22 248:10
**accomplish...** 168:19
**account** 139:11
**accurate** 6:7 14:22 241:8
**accurately** 30:8
**achieve** 29:24 41:11 54:11 54:19 68:14 143:14 218:6 224:16 225:9,14 232:11 264:17
**achieved** 39:16 99:19 245:22
**achieving** 225:18
**acknowled...** 250:10
**acquaint** 100:8
**acquire** 201:20
**acquiring** 51:12
**acquisition** 99:16
**act** 17:5 41:14 45:20 53:19
**action** 47:20 76:17 271:24
**actions** 134:11
**active** 8:6 264:9 265:11,16 265:21 266:7,9,12
**activities** 105:8 118:14
**activity** 103:16
**actual** 15:3 34:20 104:21 109:14 178:23
**ADA** 10:24 11:22 12:10 16:23 17:18 18:23 23:17 27:6,22 31:16 39:6 40:3,18 43:1,19 45:20 52:14 54:1 74:1 74:23 80:5 80:18 81:23 90:18 91:20 98:4 115:7 116:6 123:3 124:2,24 125:16,22 126:13,13 127:17 133:13 135:15,20 136:12,15 137:16 140:2 141:5 141:13,20 143:8 144:22 145:4 152:18 153:5 215:23 217:9 219:3 219:5 224:13 232:10 246:9,23 252:1,5,13 253:2,14,15 254:8,18 255:4,5,20 256:5,10,16 257:8 259:19 261:7,13,17 261:20 266:14 268:5
**ADAAG** 61:11 145:5
**add** 93:6
**additional** 31:4 43:7 126:16 211:13 229:4 245:19
**address** 14:24 141:1 149:16 255:20
**adequate** 199:17
**adequately** 54:20
**adjacent** 244:13
**adjourned** 271:19
**adjustments** 113:21 145:7
**adopt** 185:8 185:10
**adopted** 98:9
**adopting** 50:12 185:23
**Adriaan** 21:7
**advance** 191:6
**advocating** 207:4
**affirmative** 193:8
**aforesaid** 270:12,15
**afternoon** 129:23 180:4
**agencies** 99:4 99:4,11
**agency** 63:2
**ago** 11:16 15:17 19:14 19:16 51:9 98:7 120:23 121:3 216:23,24
**agree** 37:11 40:8 238:24 258:19 262:5
**agreed** 53:18 62:20 89:21 246:21 258:9
**agreement** 9:14,15 45:13 46:1 49:2 129:3 189:1

**ahead** 6:22 11:4 18:7,9 40:23 47:12 55:18 69:5 96:14,15 107:18 132:8 172:8 183:16 189:12 231:23 234:24 243:16 255:13 256:17 259:11
**ahold** 188:4
**alerted** 141:19
**align** 149:1
**allocated** 94:16
**allocation** 94:22
**allow** 17:10 18:12 26:20 54:17 79:24 85:16,19 117:3 138:1 157:10 159:20 236:20 255:5
**allowable** 134:19
**allowances** 134:16 262:10
**allowed** 79:16 116:18 146:17 230:24 249:17
**allowing** 209:9 221:15
**allows** 30:7 68:4 74:8 114:1,2
**alter** 118:18 210:24 225:12
**alteration** 109:20 113:6 209:5
**alterations** 114:1
**altering** 111:24
**alternative** 236:18
**Amendment** 263:8
**Americans** 45:20 53:19
**amount** 24:23 197:2
**Anderson** 1:16 271:3 272:7
**angle** 145:21 145:23 148:20
**angling** 244:20
**annual** 90:17 91:18 100:20 116:4
**ANSI** 61:11
**answer** 5:22 5:24 6:2,3 8:11 15:21 22:16 23:2 24:21 26:9 26:14,18,21 27:9 29:10 40:24 42:8 49:8,15,16 50:5,8,11 57:12 63:14 64:22 65:10 82:24 96:4 97:11,17 98:2 114:8 116:24 117:3 120:5 122:13 127:2,8 128:2,11 129:14 133:14 136:20 138:2,20 141:14 142:7 144:4 144:14 153:14,16 155:12,16 157:11 158:19 165:11 169:20 173:11 175:8 180:2 193:5 198:2 198:15,17 207:11 215:24 225:7 250:19,20 254:3 267:1
**answered** 13:22 15:18 31:24 42:17 60:16,20 70:14,16 93:18,20 97:8,13 112:22 135:6 153:8 153:10 159:16 166:4 169:23 181:6 182:21 190:10 193:3 198:1 198:6,17 207:10 261:5 263:13
**answering** 37:18 166:16,17
**Anthony** 108:9 109:18 111:5,6,10 117:11
**anti-ligature** 143:21 144:2,10,17 144:20,23 145:8,20 147:12,17 148:7 244:22
**anticipate** 187:1 200:10
**anybody** 37:23 38:14 113:1 191:20 204:7
**anymore** 218:1
**anyway** 11:8 75:9 81:7 197:7 252:22
**appear** 35:14 36:3 147:14
**appeared** 2:7 2:13 258:2
**appears** 216:16
**applicable** 40:2,4 42:1 43:4,15 61:5 87:11 145:1 152:2 152:23 190:3
**applies** 157:15
**apply** 136:5
**appointee** 89:3
**appointme...** 59:4
**appreciate** 143:1,2 157:6 225:23 259:2
**approach** 14:10
**approached** 177:3
**approaching** 202:20
**appropriate** 268:4
**approval** 15:12 17:23 66:21 71:19 104:12 112:8 118:16 190:5 200:19 217:7 221:15 262:16,23
**approve** 16:1 16:5 41:8 41:10 66:2 67:5 87:20 88:19 94:1 94:10 100:15 198:10
**approved** 18:11,14 24:5,8 25:10,17,18 29:24 65:10 67:10 85:23 86:7 88:14 91:24 92:1 96:20 104:20 109:14 112:4,6 113:15,16 117:22 119:6 121:16 176:12 177:23 178:8,11 179:2,19 221:21 253:13 267:19
**approves** 91:17 109:5 116:8 168:6 226:8
**approving** 178:23
**approxima...** 14:13 68:1 101:19 118:23 158:17 159:19

180:20 188:14 240:14 247:6
**April** 33:7 99:14 102:13 191:21 192:3 221:10,22
**Arcadis** 33:24 35:2
**architect** 8:9 9:22 15:1 25:18 30:3 35:15,18,19 36:22 40:5 41:24 43:13 73:21 79:15 80:22 127:10 154:23 155:8 156:5 156:7 158:8 158:9,13,18 169:12,18 176:7 178:16 182:3 190:24 191:3 196:13 217:7 230:10 231:23 232:2 233:2 233:5,8 234:16 238:3,11 255:3
**architect's** 36:14 37:8 82:6 179:1
**architects** 9:12 35:11 41:23 63:20 85:1 103:16 120:14 182:7 183:16 194:1 215:21 217:15 223:14 245:20
**architectural** 9:19 10:23 13:18 16:6 29:2,4 65:15 160:9 160:12 182:12 183:1 185:3 193:17 265:24
**Architecture** 10:8
**Architectu...** 194:2
**Ardmore** 33:24 34:11 35:1,21 39:4 73:3
**area** 7:20 35:11 51:16 62:2 126:3 130:15 146:24 147:2 149:2 149:9 208:4 208:7 248:22
**areas** 121:2 144:9 149:21
**argument** 263:10
**arguments** 126:16 133:20,20
**arms** 183:6,8
**arranged** 73:7
**arrangement** 30:6
**arrangeme...** 188:10 230:12
**arranging** 54:3 99:23 188:3
**arrow** 82:3
**articulates** 29:22
**aside** 95:8
**asked** 13:5,22 15:18 31:23 43:22 60:19 64:11 70:14 70:16 74:12 88:21 97:21 115:15 129:8 130:12 140:8 153:9 165:17 166:4 170:2 170:8 181:6 190:10 198:16 207:10 226:16 230:15 232:16 241:13 251:17 261:5
**asking** 8:1 9:5 22:6,20 26:11,12,16 38:11,19 46:21 48:8 50:9 62:15 74:17 92:20 101:13,14 111:20 116:16 119:5,11,12 119:13 120:20 124:4 125:4 127:10,12 127:14,21 132:7 133:24 135:7,21 136:2,9 152:12 155:15,17 156:19 161:23,24 162:2 167:11 168:2,3 171:12 182:18 185:5,8 208:15 213:21 222:24 223:3 228:4 228:23 235:10,17 236:2 237:13 243:8 244:23 251:6 255:12 256:15 267:16
**asks** 225:6
**aspect** 52:13 244:15
**aspects** 53:2
**assemble** 213:15 265:18
**assert** 82:24
**asserting** 138:4 157:17
**assertion** 84:10
**assess** 10:24 11:9,21 13:18 18:22 20:4,18 23:16 24:17 25:13 29:18 31:4 46:16 217:7
**assessing** 19:7 172:3 220:5 221:16
**assessment** 12:19 13:9 31:12,19 55:22 60:3 69:5,6 71:12 80:23 85:1 103:20 103:24 106:17 130:6 131:10 137:14 152:16 204:20 214:4 215:21 216:13 221:24 222:14 223:9 238:24
**assessments** 22:13 27:4 31:13
**Asset** 52:1
**assign** 9:17
**assigned** 9:11
**assigning** 178:6
**assignment** 9:15,22 10:5 29:16 29:17 65:22 67:9 178:17 181:10,14 195:9 196:8 199:24
**assistance** 227:2 250:15,16 254:20,22 255:8,17 256:4 257:4 259:24 260:10 261:13,19
**assume** 5:2 5:13 22:1,3 161:11 188:18 192:1 211:17,18 227:17 267:5
**assuming** 14:21 39:2 41:17 95:17 108:8,10 117:4,8 152:20 160:22 164:16,23 165:22 166:24 168:5,11
**assumption** 42:15 97:15 185:7,10

## Page 4

```
assumptions         average           211:14          175:12          85:18 89:14      186:14
139:12,14           67:23             214:14          176:1           89:14            big 165:18
139:16              aware 44:11       217:1           195:20          90:9,12,16       bill 13:5
168:23              45:7,24           240:10          202:24          98:3,3,7         billed 25:2
169:1               48:20 53:17       background      204:10          103:21           bills 24:24
attach 150:3        53:23 54:23       161:1           208:1           104:2            bind 63:7
attempt             56:14 59:10       baked 185:21    218:10          105:23           64:16
171:15              59:22 60:11       baking 185:6    235:2 250:1     110:2,8,9        bit 233:15
180:11              71:24 72:12       balance         260:6           110:10,24        blade 163:7
218:8               73:2 80:3         205:20          batch 14:9      145:3 153:4      block 139:17
attempted           93:11             232:11          180:24          159:16           blocking
14:8 85:8           124:21            233:14          Bates 145:16    170:24           150:2
attack 57:3         125:7,12,20       barbs 137:4     becoming        179:20           board 8:9,10
attended            126:6,19,22       barriers        263:15          180:19          14:14 17:17
56:17               127:15            267:22          began 12:8      213:24           17:23 23:11
attention           142:4             268:2,7         beginning       219:4           23:12,13,15
61:6                180:17            barring         2:14            241:18          23:23,23
attorney            186:11            209:18          81:10 87:1      250:14          24:7,8
253:6               207:21            210:16          99:21           252:17          25:10 41:9
271:21,22           250:24            base 136:23     102:10          BELL 2:9        62:19,24
attorney's          awhile 15:21      263:9           102:9           bend 54:16      65:11 85:18
157:1               50:22 163:6       based 30:9      120:12          best 60:7       86:6,7,8
attorneys           163:14            42:15 64:12     135:18          85:2 150:21     88:11 89:4
157:16              166:10            78:6 112:24     168:15,21       150:24          89:6,10,11
audio 214:12        178:8 183:2       128:3           205:19          166:1           90:7,10,14
August 32:7                           134:23          239:17          179:16          90:18,21,22
32:10 33:7                   B        136:21          266:22         196:1           91:5,12,17
34:6 48:14          B 3:10            139:14,17       behalf 2:7,13   170:21          91:23,24
56:2,15,20          back 8:5 11:6     140:18          11:20          better 149:7     92:2,6 93:3
57:3,5              29:12 45:23       150:16,20       belief 151:24   151:10          93:14 94:7
58:4 60:10          47:14 51:16       150:22,23      157:3,17        180:2           94:9 95:14
99:22 100:2         73:1,5,11         151:22         believe 11:11    beveling        100:1,3,18
100:3 101:1         75:10 85:14       161:1 174:2     23:10 24:9      54:14          101:3
100:10              85:9 94:22        174:9           34:2,3,15       beyond 84:23    105:4
authority           88:4 95:18        189:19          33:21 34:6     244:14          109:15
23:20 63:7          96:23 98:6        212:6           43:21 47:19    brd 195:24      110:21
110:8               115:15            246:14          50:17 51:13    140:18          111:10,13
117:17              116:15            247:13          54:3 56:18     196:1           111:15
authorizing         124:14,16         basically       57:21 66:11    201:17,19       112:2,4,6,8
109:7,13            142:23            106:16          66:12 70:5     212:17,19       112:9,12,14
availability        148:24            178:1          71:2 73:10     222:23,3        113:5 115:3
169:1               174:8             basis 14:10     74:5,24       202:23          114:1,2
Avenue 2:4          184:11            64:8 91:18      78:17 81:4     221:15          115:3 116:4
262:14              193:21            98:13 127:8     81:8 85:11     bidding         116:8 117:4
```

## Page 5

```
117:4 119:7       49:9,21          135:4,17        207:10          263:19          104:9 107:7
168:6             53:9 52:9        136:8,22        168:20          brewery         107:9,17,19
170:19            52:23 55:3       137:1,9,18      210:11,19       branum@...      110:19
221:4 226:8       55:8,12          138:2,3,20      210:21          2:12            110:19
227:4,9           56:9 59:14       140:3 141:6     141:14,22       break 75:4,5    112:5
234:9             60:13,19         61:2,12         142:22          12:5            113:9,10,11
236:8 243:4       62:13,22         142:7,11,15     214:10,21       75:9,13         113:18
245:20            63:13,14,23      142:21          142:1,2        115:14,17        118:10
body 230:23       64:6,20          146:4,10        146:9 147:6     75:9,13        122:23,24
bonds 239:23      66:23 67:3       146:7,14        148:9,14       brick 47:21     160:11
239:23            69:18 70:14      146:13,14       153:8,15       213:14          177:24
240:1,6           70:17,22         153:8,15        222:22         brief 133:20    233:23
217:3,5,10        72:6 73:14       154:10,14       223:10         bring 8:8,9     234:2,4,8
56:17 57:9        80:7 82:9        155:12,15      227:19,23       260:12          234:10
58:19             81:20 82:10      155:17,21      226:3 227:5     238:14          236:8,8
bottom 71:14      82:23 83:10      157:9,23       228:20         bright 133:20     237:2,9,20
77:17,20,21       88:6 90:24       157:13,22      229:10         bring 8:8,9     239:20,20
149:23            91:7,15          159:7          230:1          130:23          241:14,24
199:5             92:12,24         164:8,23       251:4          149:15          243:12,14
254:21            93:17 94:7       165:12         176:12,2       157:11          245:10
258:5             95:12,24         165:12         253:21         163:3           budgeted
Brad 191:1        96:3 97:8        166:4          259:4          brought         118:16
Branum 2:10       97:12,18         167:14         257:17         27:11 30:1      122:2
3:6 5:19,23       104:15           169:22         24:12,15       35:20 56:21     budgeting
6:10 7:4          105:19           170:21         247:3,15       brush           239:16
8:11,12           109:17           173:5,8,12     248:2          171:23 261:8    build 162:23
11:23 12:11       114:3,6          173:22         250:20         building        203:3
13:4,20           112:20           174:13,16      251:4          27:11 30:1      221:24
15:18 16:7        114:7            175:6          252:19         35:20 56:21     261:18
19:1,9,18         116:13           176:19         253:3,21       Brooks 17:4     budding
22:16,19          117:1,13         181:6          254:9          building        239:9
24:19 25:23       119:9,14         182:18         255:8          130:10          35:20 56:2
26:8,21,23        121:10,21        185:5,13,17    256:4,10      budget          56:23 58:12
27:7 29:7         124:3 125:2      187:6 189:8    258:23        171:23 261:8     81:6 120:23
31:6,23           125:17           190:10         259:10       buildings         166:7,9,22
36:23 37:12       126:11           260:17,21      260:8        167:18,20         167:18,20
38:2,5,17         127:2,11,18      194:21         261:5,21     budget 28:3       167:21
40:9,21           128:10           196:2          262:3,23     28:14,22        171:23
41:20 42:13       129:2,7          197:24         266:3,24     30:8,8          172:12
43:21 44:15       132:6,12,16      198:14         267:11,24     94:11,12,23     188:5
44:19 46:6        136:2,4          200:15         268:10,17     99:24 100:1      264:20
46:11 47:5        132:22           201:1          270:9         100:9,10,16      208:4,24
48:5,24           133:14           202:14         131:19        100:21           213:3,7
```

## Page 6

```
220:3 222:6       4:1 228:2        242:12,20        care 97:1        250:4,6,9       66:5,20
231:24            246:19          capital 11:20     127:11          256:9           72:14 78:22
232:3 233:9       271:2           17:16,19,24      263:1           cases 5:13       80:17 81:9
233:14            calendar 5:1    18:14,19         carried 28:3    41:9 71:13       85:10 86:12
238:9,13          59:4            27:24 41:16      93:21 97:5      96:8 150:14       91:13,20
240:4             California      48:22 51:23      106:13          224:5 231:2      95:9,22
245:17,21         262:14          62:9 63:1,5     119:2 121:4     categorical      97:7 101:6
257:6             called 1:3 205:6 63:6 68:23      263:13          128:1           102:23
260:11            called 1:11     72:19 88:24     263:13          categorically    103:2,9,20
buildings         4:8 16:16       90:3 91:14      carries          31:9            104:5,13,17
27:4 158:15       17:4 25:15      91:18 92:1      120:18          categorizing     105:6,10,17
builds 260:11     17:24 25:15     92:12,16        carryover       99:23            109:23
built 37:21       29:21 30:3      93:5,7,9       105:17           cell 121:2       110:22
39:23 40:1        33:24 68:3      95:17,20       106:2            cells 148:3      111:24
212:24,24         74:8 86:22      98:20,22       Cermak 8:4       Cermak 8:4       112:18
257:7,16          87:22           99:5 100:10     11:1,22         112:18          113:6,13
260:2             113:10          101:10         112:19          113:16           114:3,14,21
bulk 105:11       164:4           104:6,11,19    265:11          114:21          114:24
126:20            211:13          105:3 107:5    5:5,7 7:21      14:6,7           115:16
143:3             217:17          107:18         14:6,7          16:10,19         117:10,15
bumped            188:19          108:11,16      16:10,19         29:16 48:19      120:6 134:9
149:2             243:19          108:18,23      29:16 48:19       63:4 74:6       125:6 129:6
bumpers           249:6           100:13,13      63:4 74:6        81:20 84:16      134:24
249:6             calls 36:24     110:3,4,11      81:20 84:16     95:20 96:7       135:3,14,16
bunch 162:5       63:10,12        110:18          95:20 96:7     Cernak 8:4        134:24
243:9             64:21 74:2      111:11         18:16 19:5      11:1,22          137:16
bureau 51:24      141:23          114:22         262:6 266:8     certain 77:2     136:21
52:2,3            165:3           118:21          218:6,6        113:18           157:7,20
107:21,22         204:12          119:7,19,21    219:7,19,20     184:10,15        159:11
129:17            149:2           124:5 157:3    63:2            184:20           180:2
bureaucracy       148:2           123:1,4        63:2            186:12,16        266:22
223:1             216:18          175:16         189:5           187:13           267:11
business          219:4,6,11      160:18         190:12          191:9 203:8      267:24
95:20 96:8        72:8 86:22      161:18         169:10,11       206:13,15        268:10,17
96:21 97:3        93:15           191:2          40:16 41:17     206:19,23        270:9
97:6 98:3,4       cancelling      205:4,7,21     42:23 43:18     207:9,21,23      Branum's
98:17             93:11           205:22         43:18 45:8      208:3,5          100:21
201:21            cancel 91:9     226:9          45:16 46:2      209:3,6
250:4,6,9         104:3           239:13,22      47:18 52:7      210:15
busting           249:24          241:23         52:13 51:15     211:10,18
162:18            250:3           264:13,20      56:7,7,16       212:11,15
buy 247:10        capacity        264:21         58:1 59:11      213:9
                  224:21          265:2 266:8    59:22 63:9      214:3,17
         C                                                       143:18
C 2:1 3:16                                                       242:17
```

## Page 7

```
184:20            123:15          characterize      66:1,17,21      175:2           246:18
186:12,16         167:17          130:3 239:5      67:18 68:2      198:20          clearly 84:16
187:13            certainty       263:20           87:18 88:3      247:20          139:15
191:9 203:8       223:19          characteriz...   107:23          256:21         clerical 23:21
205:8             223:19          246:8 258:6      128:12         256:21          close 239:18
206:13,15         Certified       258:24          113:16         characteriza...  closed 212:21
206:19,23         1:16 271:3      characteriz...    114:2 116:9    118:1          closeout
204:9             certify 23:3    129:17           121:22 127:1   125:2,7         128:6
207:9,21,23       26:19 83:7      107:19           128:5          123:15          code 42:2
208:3,22          136:23          109:6 119:6      175:21          256:1          43:6,7 61:5
209:6             136:23          109:6 119:6     215:18          259:10          62:2
210:15            136:23          193:3           261:19          261:19          codes 43:15
211:10            155:20          205:17          258:7          citizenry       152:3,23
215:21            155:20          296:20          39:21          259:10          coffee 266:23
216:3             271:5           21:7            citizens        citizens        26:6
217:5,8           cetera 31:16   charged 39:4      175:18         175:18          combination
218:6,6           62:4 178:8     63:2             262:3          262:3           231:20
219:7,19,20       CFO 108:5      check 5:1 8:6     182:13        city 43:7        combined
221:16            105:3 107:5    14:4 15:11        15:15,20       Civil 1:13       210:2
222:1,15          117:11         15:15,20          166:22        clarification    come 80:22
challenge         117:11         166:22           16:3           27:8 119:15      96:22
224:12            54:8           16:3             62:24 64:18    clarified        comes 138:20
225:1 226:2       chance 71:11   16:3             59:7 55:17     122:7            164:3 240:5
228:5,9           change 5:17    55:24 56:12      55:24 56:12    clarify 23:18    267:5
230:3,18          99:7 60:22     99:7 60:22       111:1,11       189:15          comfortable
231:10,18         134:21         78:9 73:1,5      112:3,16       189:19          192:15
233:24            135:21         75:22 81:3       114:16         clarity 66:24    coming 56:15
239:24            175:1 248:7    98:6 170:7       114:16         267:18          93:14 99:9
236:10            248:8          181:16 116:12    162:2          clean 49:12     179:12
238:1             changed        184:12,17        177:8,22       49:15,24        119:12
244:10            189:10         240:17           178:3 210:8    208:6           215:4
250:4,7,24        91:3           118:21           44:9           cleaner 49:11    227:17
256:12            characteriz... 32:14 57:11     234:2 242:6     8:23 9:5,20
256:20            35:20          50:7,13         265:18          164:3 240:5
267:10,23         69:19          109:19          103:13         267:5
certain 77:2      184:10,15      checks 190:2     266:14,17      comfortable
113:18            186:16         Chicago 2:5      265:18         192:15
175:12            248:3,266:4    2:11 30:6       CIPs 121:5      coming 56:15
225:21            248:3 266:4    41:8 65:11      circles 13:23   93:14 99:9
239:7             247:4,16       24:14 33:2      116:14          179:12
certainly         248:3 266:4    41:8 65:11      circumstance    119:12
```

Exhibit 5 Page 70

ERIC DAVIS
March 12, 2024

Page 8

| | | | | |
|---|---|---|---|---|
| commence... 271:6 | 65:18 234:17 | 39:19 231:5 | 18:23 39:6 | 268:24 |
| comment 210:12 | 238:3 | compliance 53:18 | 53:18 137:16,21 | conclusion 63:11 64:21 |
| commentary 173:4 | compare 44:9 | 10:24 11:22 | 215:22 | 70:1 74:3 |
| comments 137:2 | competing 202:24 | 23:17 27:5 36:3 39:15 | 217:9 | 127:3 |
| commissio... 77:4 151:24 | complete 8:11 22:7 | 64:18 67:8 69:13 70:1 | 248:13 257:11 | 133:16,17 135:8,22 |
| commissio... 108:11,17 | 63:21 67:23 79:13 | 70:10,13 106:1 115:8 | complies 40:17 41:18 | 136:2 confuse |
| Commissio... 14:14 65:11 | 120:15 125:6 131:6 | 125:22 130:23 | 43:1 136:12 136:14 | 141:15 154:15 |
| 85:19 89:4 90:18 100:7 | 131:8 143:14 | 140:1 141:12,20 | comply 42:11 43:19 45:19 | 155:13,18 187:23 |
| 100:14 116:5 | 143:13,31 245:10 | 143:14 174:19 231:11,13 | 53:24 73:24 74:23 80:5 | conclusions 127:4,22 |
| commit 224:23 | 168:12 196:15 | 245:10 253:15 258:17,20 | 124:2,24 125:16 126:6,24 | 161:22 168:23 |
| commitment 224:14 | 232:1 completed | 259:11 compliant | 127:17 141:15 156:12,20 | consider 61:24 158:6 |
| 226:1 243:20 | 10:3 12:4 38:21 82:15 | 17:4 40:1,2 42:1 43:12 | concrete 161:8 10:13 | 161:8,10,13 161:14,20 |
| committed 84:22 | 92:14,24 120:3,9 126:3 | 43:14 59:12 61:10 87:11 | 161:16,13 161:14,20 | 195:7 201:13 |
| 128:18 225:23 committing | 125:7 140:12,18 | 125:7 140:12,18 | 162:13 162:8,9,11 | considered 248:22 |
| 63:8 | 142:5 152:2 152:6,7,18 | 176:11 244:12,16 | 163:18 165:1 166:3 | consistency 231:20 |
| common 30:6 212:3 | 152:23 176:11 246:23 | 246:23 252:11 255:19 | 16:4 167:3,4 230:1 | 232:12 consistent |
| 115:9 171:15 | 252:13 255:19 258:2 | 258:2 260:12 | 224:22 | condition 197:12 |
| communica... 79:21 115:16 | 260:12 complicated | complicated 120:5 167:23 | conditions 32:8 161:5 | consisting 270:14 |
| communica... 83:18 | 118:11,17 120:19 | 120:19 175:2 230:23 | 181:17 199:10 | constitute 175:20 |
| companies 34:22 | 231:21 240:23 | 231:6,8 complied | 210:4,16 211:3 | constituted 253:8 |
| 163:18,20 163:22 164:13 | 241:3 254:5 complex | 252:6,7,22 concerning 271:9 | conducted 32:6 57:20 | constrain 84:2 |
| company | complied | concluded 252:18,20 | 56:24 99:2 configuratio... | construct |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 9

| | | | | |
|---|---|---|---|---|
| 64:16 86:18 87:2 96:24 | 79:23 82:7 86:20 94:19 | 238:3 239:13,22 | context 9:1 126:17 | 130:21 176:15 | 209:3 conversatio... |
| 97:3,6 103:22,22 | 94:19,21 95:2,9,21 | 241:14 242:7,19 | continue 136:19 | 181:4 contracting | 21:22 32:11 32:16 201:9 |
| 106:19 114:14 | 96:16 98:11 102:22 | 243:6,7 244:3,6 | 139:22 continued | 17:6 34:22 72:21 86:19 | conversion 265:1 |
| 122:9,14 209:5,22 | 103:9,12 104:4,13,22 | 246:8 265:1 266:11 | 261:5 186:18 | 86:24 87:7 103:23 | converts 224:17 |
| 230:12 239:19 | 105:1,2 106:20,23 | 271:13 constructs | 120:16 continuous | 201:18 contractor | 263:11 convinced |
| 242:6 | 107:18 108:21 112:1,17 | 42:3 consult | 61:9 126:8 128:7 | 68:5 69:12 164:3 | 83:23 139:24 convincing |
| 34:21 36:18 38:15 39:19 | 112:1,17 113:5,13 | 100:23 122:19 | 132:21 134:8 144:13,23 | 164:4 184:8 188:16 | 140:24 Cook 1:7,7 |
| 39:20 51:6 | 33:16,17,20 20:3,5,13 | 123:13 consultant | 175:5,10 217:12,13 | 183:11 183:15,17 | 8:16 22:14 23:12,15 |
| 124:8 120:12 114:13,23 | 114:13,23 115:10,16 | 9:7 18:4,12 18:17,21 | 118:4 consultants | 224:9 161:8 | 24:21 34:12 36:17 36:19 |
| 1236:11 175:5,10 | 118:14 162:9,16 | 162:9,16 123:1 | 122:19 consultation | consists 270:16 | 37:23,22 52:5,20 |
| 246:7 252:7 252:8 | 120:10,17 122:19 | consultations 100:13 | 190:21 124:14,17 | 183:3 230:12 | 53:13 54:22 62:12,19 |
| constructing 35:17 | 122:19 124:14,17 | 25:20 26:2 26:3,7 28:1 | 100:13 contractors | 47:22 65:14 | 63:7 64:3 64:16 66:15 |
| 211:1 223:16 | 134:6 140:18 153:1 | 31:3 33:3 | 65:18,23 | 111:11 14:15 | 66:22 68:23 69:11 72:13 |
| construction 159:13,22 | 159:13,22 160:13,14 | 33:22 34:5 contain | 73:6 76:15 19:21 25:21 | 19:21 25:21 26:12,17 | 79:16 104:21 |
| 160:13,14 | 160:24 164:11 | 82:8,8,20 81:9 89:7 | 26:12,17 69:11 72:13 | 28:11 65:10 | 105:4 111:9 117:11 |
| 32:21 33:5 33:10 34:1 | 168:8,10,17 170:20 | 91:9 92:8,9 85:23 87:20 | 79:16 88:18,20 | 79:16 88:18,20 | 121:6 127:14,15 128:10 |
| 168:8 170:20 171:1,8 | 171:1,8 182:4 52:12,19,19 | 88:13 181:9,11 115:19 | 65:13 66:4 | 88:13 | 135:1 141:3 |
| 182:4 189:16,18 | 189:16,18 181:17 182:15 | 181:17 182:15 192:12,13 | 120:1 127:14,15 | 120:1 | 143:6,24 144:9 |
| 224:23 224:3 254:5 | 191:9 201:12,20 | 201:12,20 207:1 210:2 | 120:14 contained | contains 185:19 | 147:16 163:4 153:6 |
| | 202:12,21 207:1 210:2 | 213:14 187:14 204:23 | 33:11 176:17 | 73:7 120:14 | 160:23 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 10

| | | | | |
|---|---|---|---|---|
| 170:12 172:20 | 78:23 80:6 82:8 86:17 | 195:20 198:10 | 199:5 cost 150:17 | 38:21 39:19 41:9 42:22 | 144:9 145:13 |
| 175:13,23 176:1,15 | 88:1,5 95:11,14 104:7 | 200:4,6,7 201:23,24 | 150:20,23 160:12,14 | 43:18 45:13 46:1 47:24 | 146:7,16 148:5,6 |
| 180:6 188:24 | 105:18 106:9,14,15 | 202:8,13,18 203:9,10,20 | 162:18 203:13 242:5 | 48:2,20 51:20 52:13 | 150:16,19 150:20 |
| 190:9 191:1 192:8,10 | 107:3,7,8 107:11 | 203:21 206:21 208:17 | costs 149:18 counsel 13:4 | 53:13,17 61:22 62:6 | 151:24 163:6 168:5,6 |
| 202:7,17 212:7 | 108:14 110:23 111:15 | 210:4,14,21 212:8 213:3 | 47:19 64:6 83:19 93:17 | 63:8,8 64:3 64:16 65:3 | 170:12,18 171:2,15 |
| 214:19 215:15 216:13 | 212:6 214:6 217:9 | 218:3 219:22 220:17 | 97:8 135:4 64:16 65:3 | 66:12 67:20 71:3 | 175:13,23 176:1,15 |
| 224:22,23 226:1,8 | 221:4,12,13 222:16,21 | 221:13 224:13 228:11 | 137:22 156:13,14 | 72:10 72:13 177:24 | 177:24 180:6 |
| 251:2 270:7 270:7 | 222:16,21 224:13 228:4 | 223:7 224:13 228:11 | 174:14 193:1 197:24 | 76:24 79:17 84:22 87:12 | 188:24 190:9 191:1 |
| cooperate 46:13 | 228:11 230:10 238:20 | 230:10 238:20 241:13 | 76:24 91:24 92:2 | 89:6,10,11 90:7,10,14 | 192:8,11 193:16,24 |
| cooperation 143:3 | 241:13 242:4,14 | 243:13 248:1 250:1 | 200:7 202:7 202:13 | 90:22 91:5 91:12,17,23 | 196:12 200:2 202:7 |
| copy 45:11 55:6 | 248:1 250:1,12,13 | 250:12,13 251:3 252:12 | 92:6 93:3 93:14 96:13 | 93:14 96:13 98:23 99:3 | 202:18 212:8 214:19 |
| CORNELL... 1:3 270:3 | 251:3 252:12 253:2,20 | 253:2,20 257:8,17 | 94:1 96:13 96:19 99:3 | 100:14 101:6 115:4 | 215:15 216:13 |
| convert 4:20 5:3 13:1,10 | 257:8,17 258:7,8 | 258:7,8 261:7,8 263:22 | 100:14,15 104:21 | 104:21 105:4 106:3 | 217:22 219:4 222:23 |
| 15:10 22:2 23:7,14 | 263:22 264:2 266:2 | 266:2 267:23 268:9 | 105:4 106:3 111:9,13,14 | 111:9,13,14 112:2,6,24 | 223:9 224:13 228:1 |
| 29:14 36:12 36:15,16,22 | 267:23 268:9 270:16,19 | 270:16,19 271:10,23 | 112:12,14 113:3,15 | 113:15 117:14 118:6 | 230:17 231:1 235:5 |
| 40:19,20 48:11 53:20 | 270:16,19 271:10,23 | 271:10,23 corrections | 117:14 118:6 118:9 | 118:6,9 119:17 123:24 | 236:4 237:7 240:3 |
| 55:14 68:8 68:8,19 | 271:10,23 correct 6:5 | 6:5 14:8 16:11 17:16 | 119:17 123:24 127:19 | 123:24 127:19 131:7,14 | 241:3 252:10 256:6 |
| 69:17 70:21 71:12,24 | 17:16,23 | 17:16,23 24:12 25:1 | 131:7,14 131:14 132:9 | 132:9 133:6,23 135:2 | 258:14 261:20 |
| 73:9,13 75:17 77:9 | 178:21 191:15 | 78:21 191:15 219:5 | 133:23 135:2 141:1,11 | 141:1,11 141:13,24 | County's 42:9 47:20 |
| 77:10,12 78:3,11,16 | 192:11 194:14,15 | 521:58 78:22 | 37:4,23 143:6 141:1,11 | 135:2 141:24 143:16,24 | 51:22 52:5 |

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 11

| | | | | |
|---|---|---|---|---|
| 52:20 54:22 69:11 | Court's 4:4 13:7 22:19 | 94:13 95:6 119:3 234:4 | 58:17 60:6 128:14 | 157:13 December | 46:22 47:2 51:11 61:15 |
| 122:22 141:12 151:24 | 26:15 27:19 46:17,18 | 245:1 currently 103:1 | 186:19 257:15,15 | 45:17 51:15 60:16 62:1 | 61:17,17 62:18 63:15,18 |
| couple 43:22 99:10 100:4 | 48:22 49:1 49:17 | 174:8 189:7 dated 62:21 | dated 62:21 70:5 86:15 | 70:5 86:15 129:16 | 64:15 68:15 72:1,5 |
| 148:18 196:22,24 217:10 | 121:12 124:8 126:4 | 70:5 86:15 129:16 | 129:16 139:16 181:1 | 139:16 181:1 193:9 | 75:15 76:20 81:14,16,22 |
| 239:14 251:13 | 148:7 181:1 193:9 | 193:9 196:12 224:8 | 193:16,24 248:9 | 248:9 | 82:18 83:4 83:9,11,13 |
| courthouse 217:10 231:4 | 196:12 238:3 courthouse | 196:12 200:24 263:21 | 196:12 200:24 263:21 | 263:21 219:19 | 86:15 106:6 111:4,6,22 |
| course 21:11 54:3 103:19 | 217:10 121:3 159:1 | 219:19 custody 145:2,9 | Davis 1:10 3:3 4:4,7,13 | Davis 1:10 3:3 4:4,7,13 | 111:22 121:8,9 123:9 |
| 112:5 155:5 159:22 | 212:10 121:3 custom | 160:3 262:1 147:3 | 49:8 64:4 68:9 109:10 | 187:22,24 188:17 189:8 | 123:9 131:18 132:13 |
| 168:13,20 179:1 18:4,14 | Courts 1:14 cover 205:16 | 149:19 cover 205:16 | 134:8 137:7 236:24 | 236:24 237:7 | 133:9 134:1 137:13 |
| 198:21 216:16 | 216:16 covered 150:12 | 150:12 137:22 236:24 | 134:8 137:7 237:3 | 237:3 | 137:17 139:3 |
| 238:9 251:13 coursing | CPI 105:16 cut 160:1 | 160:7 196:23 218:18 | custom-cast 149:8 | decided 70:9 76:21 88:11 | 141:16 151:9 159:19,20 |
| 21:17 247:2 CPO 21:7 | 105:18 140:15 218:18 | 12:16 162:17 163:3 | cut-and-cast 149:8 | 138:17 193:20 76:21 88:11 | 159:24 165:2,8 169:4,6 |
| CPO's 21:23 CREA 94:19 | 163:10,11 163:20,22 | 166:20 268:19 270:10,19 | cut 160:1 160:7 | 195:5,23 218:12 220:22 | 265:6 272:2 |
| coursing 94:19 166:20 | 201:22 179:9 cutting 54:13 | 148:20 cycle 100:20 | cutting 54:13 148:20 | 220:22 227:10,16,19 | days 4:19 206:6 210:8 |
| create 149:1 148:20 | 234:5 cross-exam... | 234:5 D D 3:1,16 4:11 | D D 3:1,16 4:11 246:19 | 246:19 deciding 169:4,6 | 229:6 234:5 decline 196:1 |
| 22:24 27:9 27:14 42:24 | 3:5 264:12 cross-slope | 3:5 264:12 daily 208:1 | daily 208:1 dark 178:1 | 178:1 DART 1:6 | 14:14 decrease |
| 46:12 120:23 125:13 129:8 | 129:8 cross-slopes 153:11 | cross-slopes 153:11 | DART 1:6 270:6 | 270:6 data 84:18 | 22:22 45:13 defendant |
| 129:12 134:16 146:13 | data 84:18 246:22 | data 4:5 5:2 | data 4:5 5:2 8:13 11:17 | 8:13 11:17 12:14 14:21 | 45:13 |
| 157:12 153:2 246:22 | 253:9,12,16 dealing 63:3 | 12:14 14:21 18:13 32:13 | 18:13 32:13 57:23,23 | 57:23,23 | |
| 213:3 237:5 246:22 | 234:8 240:7 current 61:5 | current 61:5 86:13 94:13 | 86:13 94:13 | | |
| 252:24 253:9,12,16 | 270:1 | | | | |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 71

ERIC DAVIS
March 12, 2024

Page 12

| | | | | |
|---|---|---|---|---|
| defendants | deponent's | 36:4,9,14 | 237:18 | 29:19 |
| 1:8 2:14 | 228:15 | 36:21 37:8 | 238:3,15 | 225:14 |
| 8:16 254:18 | deposed 4:19 | 37:21 38:1 | 242:4,24 | developed |
| 270:8 | 4:24 5:4 | 39:15 40:1 | 243:4 244:4 | 31:13,19 |
| define 178:24 | deposition | 40:11 41:24 | 245:16 | 217:20 |
| 201:1 | 1:10 4:3 5:9 | 43:13 44:10 | 263:22 | 219:19 |
| definite | 6:16,20 7:8 | 63:20 65:3 | 264:8,14,17 | developing |
| 122:20 | 7:17 27:15 | 65:7,19 | 264:19 | 11:13 85:2 |
| definitely | 46:12,17,19 | 66:9 69:4 | 265:1,6 | development |
| 41:5,15 | 74:6,11 | 73:19 77:7 | 267:9 | 9:23 10:1 |
| 122:1 | 75:23 76:1 | 82:6 85:9,9 | designated | 18:18 69:9 |
| definition | 76:24 85:24 | 88:1,5 | 65:2 90:5 | 80:21 98:22 |
| 175:19 | 125:10,24 | 94:14,17 | designed | 120:1 |
| definitive | 134:11 | 105:7,10 | 123:10 | DFM 247:10 |
| 144:14 | 146:17 | 106:16 | 158:15 | dictate |
| definitively | 153:11 | 115:16 | 255:19 | 257:20 |
| 20:10 21:1 | 179:23 | 118:13 | designing | difference |
| 184:1 | 180:2 198:3 | 120:8 | 183:5 | 28:9 53:9 |
| 251:24 | 206:9 216:4 | 122:14 | 197:21 | 87:6 |
| 252:4 | 218:10 | 130:18 | destroy 163:2 | different |
| degree | 228:23 | 151:23 | detail 29:23 | 16:13 20:14 |
| 118:14 | 268:23 | 168:12 | 257:24 | 33:23 37:9 |
| 231:7 | 270:12,13 | 169:2 | detailed | 44:2 54:10 |
| degrees | 271:10,16 | 171:4 | 172:5 | 54:18 64:5 |
| 244:20 | 271:18 | 176:16 | details 27:11 | 99:4 103:14 |
| delay 71:6 | depositions | 177:3 | detainee | 122:4 |
| delegated | 1:15 5:15 | 179:18 | 251:10 | 148:18 |
| 109:15 | 6:13 13:6 | 181:4,14 | detainees | 170:15 |
| deliver 65:15 | 223:23 | 186:15 | 207:3 | 176:2 |
| 66:4 | 224:5 | 188:2,4 | detention-g... | 260:20 |
| delivery | department's | 190:19 | 260:10 | 213:9 |
| 67:20 71:21 | 3:11 15:1 | 191:9 | determinant... | 218:13 |
| 86:16,20 | deputies | 192:11,19 | 184:9,13 | 232:17 |
| demolish | 248:24,24 | 194:6 | 207:22 | 238:22 |
| 159:5,14 | deputy 21:6 | 197:12 | 219:14,20 | 255:22 |
| 161:19 | 41:16 48:23 | 199:10 | determine | 262:10 |
| 165:2 | DeRoo 191:1 | 199:15 | 80:15 | difficulty |
| 167:17,19 | described | 212:3 | determined | 51:10,12 |
| demolished | 19:2 | 214:20 | 60:11 | digesting |
| 164:10 | 170:15 | 214:24 | 143:13 | 99:22 |
| demolition | design 9:12 | 226:18 | digging | digging 197:6 |
| 161:14,17 | 9:17 24:13 | 234:3,16 | 214:20 | diligently |
| 163:13 | 25:15 28:11 | 237:16,17 | 234:16 | 224:15 |
| 164:14 | 28:13,15,23 | | | direct 3:4 |
| 168:3,4,8,9 | 28:24 29:1 | | | |
| | 29:4,13,19 | | | |

ERIC DAVIS
March 12, 2024

Page 13

| | | | | |
|---|---|---|---|---|
| 23:19 26:13 | disclosure | Division 1:2 | 35:4 56:6 | 31:13,19 | 3:16,16,16 |
| 83:21 | 32:19 | 144:10 | 68:16 69:5 | 55:17,21 | 411:1,11 |
| directed 46:8 | discoverable | 208:10,13 | 71:7 82:18 | 60:2 99:24 | 228:2 |
| 46:23 48:1 | 138:24 | 208:14,16 | 85:2 94:14 | 100:24 | 246:19,19 |
| 175:24 | discovered | 270:2 | 118:2 130:9 | 106:23 | 246:19 |
| 186:22 | 24:6 | doable | 134:22 | 107:16 | e-mail 76:14 |
| 257:3 | discretion | 149:12 | 164:15 | 107:16 | e-mails 58:24 |
| direction | 41:6 93:8 | DOC 216:18 | 172:3 | drafted 15:6 | 59:3 |
| 23:1 27:8 | 108:19,20 | 219:3 | 183:13,19 | 181:20 | Earl 88:23 |
| 36:1 127:7 | 111:12 | dock 208:4 | 186:15 | drafting 83:4 | 89:12,20 |
| direction | 112:15 | docks 257:22 | 191:21 | draw 29:12 | earlier 12:5 |
| 175:19 | 113:17,21 | doctrine 83:1 | 192:11,15 | drawing | 24:10 51:21 |
| 50:20 89:23 | 116:9 | 191:21 | 199:7,13 | 36:10 77:7 | 56:19 |
| 128:1 229:2 | 175:21 | 137:23 | 202:17 | 138:11 | 128:13 |
| 229:6 | 249:14 | 202:18 | 153:21 | 153:21 | 129:14 |
| 271:3 | 249:14 | 211:6 | 218:2 | 154:8 | 160:2 |
| directly 63:3 | discuss 22:5 | 159:19 | 223:9 | drawings | 169:9 184:5 |
| 102:4 151:8 | 244:10 | 155:19 | 232:3,9 | 30:21 36:14 | 37:9,22 |
| 212:12,17 | discussed | 156:14,23 | 244:4 | 37:9,22 | 228:4 |
| 247:11 | 103:3,10,17 | 17:19 | 251:23 | 38:1 42:5 | 244:23 |
| 103:21 | document | 239:11 | 269:21 70:4 | 44:10 69:1 | 245:15 |
| director | 9:24 12:15 | 242:4,24 | 71:18 73:19 | 69:21 71:9 | 251:9,17 |
| 31:15 32:20 | 69:22 70:4 | 243:4 244:2 | 264:5 | 71:18 73:19 | 264:5 |
| 48:23 87:15 | 206:22 | 85:7 88:17 | 244:4 | carly 57:15 | early 57:15 |
| 88:24 90:3 | 207:6 209:4 | 139:2 | 251:23 | 82:2,7 | 99:1 141:3 |
| discussing | 187:24 | 187:24 | 176:9,21 | 172:6 | 192:3 214:1 |
| 108:18,23 | 101:9 | dollars | 139:2 | 72:16 | carmarked |
| 109:18 | 206:15 | 203:13,18 | 251:23 | 188:8,10 | 106:23 |
| 110:3,10,11 | discussion | 215:14 | 266:8 | 266:1 | easier 49:23 |
| 110:18 | 219:23 | 217:19 | door 149:23 | driven | easily 115:12 |
| 122:12 | 43:10 44:8 | door 149:23 | 199:7 | 208:13,14 | EASTERN |
| 186:22 | dispassionat... | double | 199:7 | due 247:8 | 1:2 270:2 |
| 189:12 | 44:10 | 240:17 | doors 125:24 | duly 4:2,9 | easy 166:8 |
| 191:2 | documented | doubly | 147:5 | E | edge 162:22 |
| Disabilities | 8:2,15 9:4 | 266:14 | 210:9 | E 2:1,1 3:1,10 | efficient 18:3 |
| 53:19 | disrupted | doubt 186:3 | draft 15:9 | | E |
| Disability | 118:13 | 225:19 | | | efforts 103:2 |
| 45:20 | 29:13 | dozens | | | 116:5 |
| disabled | distinguish | 123:17 | | | 222:11 |
| 254:15 | 139:21 | doing 12:19 | | | |
| 255:5 | District 1:1,1 | 187:21 | | | |
| 259:16 | 1:14 270:1 | 30:13 34:23 | | | |
| 260:8,14 | 270:1 | | | | |

ERIC DAVIS
March 12, 2024

Page 14

| | | | | |
|---|---|---|---|---|
| egregious | 250:13 | 217:15 | establishm... | 118:13 | 9:2,4,16,21 |
| 236:17 | 251:1 | ensure 30:11 | 256:20 | 181:3 182:2 | 10:4 11:12 |
| egregiously | encumber | 36:21 41:18 | estate 99:16 | 185:11 | 19:21 23:11 |
| 236:17 | 244:5 | 41:23 42:10 | 205:24 | 212:22 | 24:2 34:5 |
| eight 99:13 | encumbering | 143:7 | 216:1,3 | examination | 120:11 |
| either 8:16 | 266:8 | 265:15 | estimate | 1:12 3:4,7 | 122:19 |
| 15:7 16:22 | encumbran... | entered 45:8 | 68:13 94:11 | 271:7 | executing |
| 36:19 65:10 | 18:4 243:20 | 166:1 | 195:16 | exception | 9:21 |
| 73:22 74:6 | endeavor | entire 11:10 | 213:15 | 118:17 | execution |
| 74:21 86:8 | 167:23 | 25:13 172:3 | 241:5,8,24 | exemption | 80:17 |
| 88:13 89:14 | 231:8 | 219:6 220:6 | 242:17 | 211:7 | exhibit 3:12 |
| 102:3 | endeavored | entrance | 242:17 | exhibit 3:12 | 3:12,13,13 |
| 112:15 | 225:14 | 206:24 | 28:19 | 3:12,13,13 | 3:14 7:3 |
| 208:23 | ended 14:17 | 208:23 | estimated | 136:7 203:7 | 44:12,13,23 |
| 221:3 | 88:13,13 | 208:23 | 240:13 | 136:7 203:7 | 49:14 55:4 |
| 226:17 | 120:18 | entrances | estimates | 24:18 56:8 | 55:8,10 |
| 240:20 | 148:17 | 207:9 | 240:13 | 59:23 73:13 | 129:8,11,13 |
| 252:7 | ends 54:19 | environment | estimating | 73:23 74:22 | 145:16 |
| elected | 125:9 | 145:3,10 | 30:14 | 78:11 79:4 | 146:2 |
| 111:14 | 126:21 | 163:24 | 41:31:16 62:4 | 82:21 | 214:19,21 |
| element | 129:21 | 169:3 | 178:8 | 214:19,21 | 214:24 |
| 28:21 139:9 | 150:11 | 249:15 | evaluating | 138:19 | 215:2,8,12 |
| elements | 151:3 | 262:1,12,21 | 195:10 | 138:19 | 215:15,15 |
| 35:14 43:8 | 160:17 | equal 240:18 | evaluation | 214:19,21 | 216:1 |
| 67:8 69:3 | enforce 22:24 | Eric 1:10 3:3 | 80:2 81:11 | 215:15,15 | 229:22 |
| 82:1 199:10 | 26:15 27:9 | 4:4,7 46:19 | 140:14 | 216:1 | 240:10 |
| Ellen 12:9,18 | enforcement | 47:5 64:4 | 140:14,17 | exceeds 78:14 | 244:9 |
| 13:15 52:8 | 145:7 | 75:6 96:1 | eventual | 123:21 | 245:14 |
| 52:15 139:7 | engaged | 266:18,21 | 17:12 | exception | 246:24 |
| 152:15 | 24:10 176:8 | 267:1 | eventually | 84:21 | 245:14 |
| 174:7 | 176:8 232:2 | 270:10,19 | 16:4 80:23 | 107:17 | 246:24 |
| Ellen's 14:22 | engagement | Eric's 96:4 | 267:23 | 110:13 | exhibits |
| emergency | 23:24 28:7 | ended 211:9 | every-other... | exhibits | 160:14 |
| 175:11,20 | engaging | error 23:21 | 179:22 | 160:14 | existing 32:8 |
| 176:1,10 | 231:23 | 24:6 | everybody | exclude | 61:8,24 |
| 235:2 237:4 | engineered | escorted | 112:18 | 112:18 | 124:18 |
| employ 39:10 | 211:14 | 251:11 | excuse 108:9 | 153:6 | 163:1,5,20 |
| employed | engineering | 236:20 | 153:6 | 163:1,5,20 | 165:2 166:3 |
| 72:13 | 10:18,24 | 237:16 | 236:20 | execute 14:15 | 211:10 |
| employee | 14:19 15:4 | especially | exact 57:7,23 | 23:16 30:4 | 220:1 |
| 224:21 | 29:2,4 | 236:10 | 57:23 | 42:4 96:20 | exiting |
| 250:11 | 65:15 | encombered | 123:17 | 123:1 | 159:14 |
| 271:20,22 | 160:10 | 42:16 | 238:12 | 159:14 | 210:18 |
| employees | 123:17 | 40:13 73:18 | executed 8:1 | 210:18 | exits 126:4 |
| | engineers | | 8:15,22,24 | | |

ERIC DAVIS
March 12, 2024

Page 15

| | | | | |
|---|---|---|---|---|
| expand 94:22 | expediting | 54:13 | facilities | facts 127:20 | fall 60:8,24 |
| expect 11:17 | 231:21 | extend 126:1 | 27:17,23 | 135:6 | 71:3 148:11 |
| 14:23 16:21 | 233:6 | 149:19,20 | 47:21 51:23 | 139:12 | 245:13 |
| 94:23 | expeditious | 150:7,18 | 52:1,13 | 176:20 | falls 27:18 |
| 195:24 | 176:6 227:4 | 168:20 | 53:22 54:4 | 193:2 | false 42:14 |
| 122:18 | expeditiously | 244:14 | 63:3 101:23 | 261:22 | 49:5,11 |
| 155:16 | 224:19 | extended | 124:23 | factual 66:8 | 97:15 |
| 161:12 | 247:19 | 124:9 | 128:18 | 74:13 | 185:20,21 |
| 162:12 | expense | extending | 129:18 | 133:18 | 223:7 |
| 164:24 | 1:16 10:9 | 199:1 | 133:15,23 | 135:19,23 | familiar 45:5 |
| 165:10 | 118:7 | extension | 158:21 | factually | 120:21 |
| 168:16 | expensive | 61:9 69:16 | 184:18 | 183:17 | 183:17 |
| 183:7 | 106:12 | 148:13,13 | 205:11,22 | 64:23 135:7 | far 27:5 |
| 198:18 | 148:15 | 148:15 | 206:14 | fair 12:8,12 | 47:22 50:20 |
| 199:18 | 267:17 | 151:5 | 255:6 256:5 | 52:4,22 | 51:5 52:4 |
| 191:7 197:9 | expending | 199:17 | 31:12 34:3 | 53:16 82:22 | 80:17 |
| 200:11 | 94:21 266:7 | extensions | 121:19 | 85:10 113:7 | 103:11 |
| 221:8 227:2 | expenditure | 14:9 | 99:21 98:5 | 110:8,21 | 110:8,21 |
| expectation | 93:23 94:6 | extensive | 147:6 | 120:10 | 112:1 134:9 |
| 18:10 105:7 | 95:1 103:8 | 147:6 | 105:24 | 163:21 | 154:3 |
| 242:3 | 103:8,18 | extent 24:19 | 130:4 151:6 | 177:13 | 177:13 |
| 249:13 | 94:17 109:7 | 26:10,16 | 183:21 | 174:16 | 183:20 |
| expectations | 109:13,14 | 40:22 64:20 | 176:4 | 182:11 | 182:11 |
| 222:20 | 243:18 | 75:1 126:12 | 180:14 | 194:4 | 194:4 |
| 243:22 | expenses | 159:21 | 182:1 | 200:24 | 200:24 |
| 241:2 | 236:17 | 164:13,14 | 172:3,4,13 | 225:24 | 225:24 |
| expected | experience | 172:4 | 201:16 | 226:21 | 226:21 |
| 14:24 28:15 | 239:7 | 176:9 205:8 | 72:15 | 220:13 | 220:13 |
| 120:10 | 232:22,23 | 261:21 | 236:19 | 257:21 | 257:21 |
| expects 212:3 | expert 139:7 | expertise | 256:19 | 258:16,20 | 258:16,20 |
| expectancy | extra 236:19 | extenuating | 122:16 | 258:18 | 258:18 |
| 33:22 | fact 16:24 | 255:10,18 | 124:16 | fast 239:11 | fast 239:11 |
| expedient | explain 46:22 | extreme | 39:16 59:22 | 243:4 | 243:4 |
| 201:12 | 259:14 | 66:12 98:11 | 24:18 | fasteners | fasteners |
| 223:18 | explained | 99:2 128:3 | 261:24 | 162:16 | 162:16 |
| 226:24 | 185:20 | 261:24 | 262:4 | faster 179:12 | faster 179:12 |
| 227:3,8 | F 3:16 | 128:5 | 131:1 | 201:19 | 201:19 |
| 233:12,17 | fabricate | 141:19 | 179:9 | 223:16 | 223:16 |
| expedited | 151:4 | 131:1 | 191:10,11 | 234:21 | 234:21 |
| 233:20,21 | fabricated | 179:9 | 240:4 247:9 | 235:2,3,5,6 | 235:2,3,5,6 |
| 247:8 | 148:14 | 191:10,11 | 250:2 | 236:21 | 236:21 |
| | 248:20 | 179:21 | | | |
| | exploring | face 209:2,16 | | | |

Exhibit 5 Page 72

## Page 16

237:2,6,9
237:12,13
260:16
fastest
234:22
247:12,21
248:9
feasibility
54:13 211:4
feasible
149:19
150:5,7
151:4
175:23
208:21
209:5,15,16
214:9
February
8:14 15:5
86:15
100:19
177:13
182:24
241:11
federal 1:13
16:24 17:1
17:5,7,11
43:19
fee 16:15
21:17 24:2
24:16
184:19
185:4 189:1
189:2,6
191:8
192:10,13
192:14
194:11,13
194:16,20
195:3,8,12
199:17
200:24
222:7,8
225:17

fees 28:23,24
29:1,4 30:9
160:12
182:12
183:1
180:18
194:2
196:13
214:24
238:4
feet 77:22
78:8,14
132:5,21
133:3,7
134:4
159:19
felt 70:10
130:19
131:8
160:21
188:22
figured
251:20
figuring
167:22
figure 54:21
96:10
166:21
214:8
241:12
finding 59:9
130:8
Findings
61:5
figure 75:8
fill 211:13,14
filtered
264:20
final 39:10
43:11 44:8
55:17 70:7
final 30:2
final2 25:2
figure 9:19
188:19

197:2
finalize
189:24
finalized
100:19
finally 15:12
178:11
214:2
221:10
finance
107:22,22
100:19
financial
107:23
111:2,4
113:17
114:2
116:10
find 59:7
68:24
245:16
firms 11:9
149:12
217:13
231:3
232:14,17
232:10
first 4:2,8
10:21,22
14:8 15:3
19:6 26:24
32:24 36:8
43:2,4 45:7
45:12,24
48:24 50:6
50:15 53:24
55:20 66:10
107:6 115:9
116:3 118:7
116:15
176:15
178:10,19
178:22
179:4,8

11:21 12:18
12:22 13:18
187:15,18
187:19
189:19
202:19
26:14
217:12,24
219:2 225:5
226:20
237:16,17
265:13,17
265:18,23
266:4
270:10
fiscal 18:1
27:23 28:4
92:24 93:13
93:16 94:23
95:4,7 97:2
174:19
flat 163:7
floor 53:10
101:10,12
101:15,20
102:9,17,18
102:23
103:12
104:19
105:2,11,13
105:16
107:1
108:14,24
109:22
110:23
111:14
112:3,16
114:15,22
115:4 116:8
117:18 119:5
121:17,18

122:4,5,17
123:1 168:6
168:13,20
170:19
234:5,8
242:2,6,13
246:14,17
fit 249:1
fittings
244:21
five 11:12
19:20 58:20
five-minute
75:4 151:14
214:13
174:16
258:17
fixing 174:12
174:19
flat 163:7
floor 53:10
53:11 208:6
focused
126:5
folks 33:4
52:2
follow 250:15
follow-up
246:14
following
13:14 93:3
114:3 190:3
224:11
follows 4:10
forces 47:24
foregoing
270:13,16
form 5:19 6:11
6:17 8:19
17:22 19:7
21:24 16:2
19:1,9
25:23 29:7

## Page 17

31:6 39:10
41:20 42:13
43:11 44:8
48:6 52:9
52:23 56:9
59:14 62:13
62:22 67:3
73:14 79:19
88:6 90:24
91:7,15
92:4,17
94:7 95:12
95:24 96:3
97:13
100:24
104:15
105:19
107:1 109:3
111:16
112:24
113:6
119:9 125:2
128:10
140:3 141:6
144:3
157:22
159:7
167:14
170:21
173:4,22
176:21
194:7 196:2
196:10
202:14
213:4
223:10
224:1 225:2
227:5 251:4
253:3,21
254:9
267:11

formally
100:5
format
202:12
218:13
220:23
formulation
234:5
forth 48:2
175:12
forward
42:23 81:5
103:11
106:20
115:22
118:24
201:14
231:12
231:18
239:8,9,10
95:21
265:4
forwarded
203:15
found 6:21
197:22
foundation
16:8 36:23
38:2,5,17
144:4,11
259:21
four 20:11
99:12
150:11
180:20
four-year
222:19
fourth
102:11
171:3
fraction 78:22
78:2
frame 167:7

242:12
free 195:22
fresh 234:14
front 10:13
16:21 70:4
206:8
207:16
232:23
242:21
123:3
166:24
170:19
113:3
237:14
239:6
244:11
fully 152:6,17
174:10
224:10
99:15
fund 39:8
function
231:12
131:12
145:14
166:1 167:3
246:12
268:15
269:6
future 17:11
41:14 171:4
243:18
244:2

___ G ___

G 2:3
gathering
195:2,7,11
GEC 54:12
65:6 133:5
133:12
140:14
152:3
184:4,6
266:9
GEC's 62:7
229:24
262:19

100:9
161:18
165:1
generally
15:9 30:21
35:10,12
37:15 41:3
45:6 98:5
99:13 100:7
100:11,16
100:23
113:10
237:14
generating
29:22
geological
241:16
55:14 59:5
generators
148:23
geometry
122:4
GES's 61:23
getting 35:10
37:16 54:7
83:11 88:14
116:22
141:8
143:18
154:20
156:11
174:23
178:6,7,9
195:13
211:8 217:6
227:8 230:9
234:16,17
237:19
239:22
231:21

263:2,6,7,8
give 8:10
9:10 41:13
61:16
102:15
124:13
130:13
191:20
194:13
199:16
100:23
214:8
227:14
229:20
242:16
236:18
given 39:8
98:14 102:6
122:4
223:22
233:1
235:3
236:14
242:2 267:9
270:17
271:14
gives 35:11
167:8
giving 167:21
243:21,24
Globally
32:13
Globetrotter
10:18 15:4
17:22 19:7
263:3,17
21:14 30:15
30:17 32:6
32:12 33:9
58:18 60:9
69:12 70:13

## Page 18

89:21 167:5
169:5 170:2
172:16
176:14
184:18
185:1 204:6
221:15,24
223:7
Globetrotte...
11:16 14:18
18:17,22
20:6,8,20
20:24 21:23
22:1,6,12
23:7,9,16
24:17,24
25:9,21
26:6 27:3
28:7 29:18
31:3,5,22
56:14 57:16
57:19 59:2
60:11 64:19
68:17,21
79:1,8,11
80:24 83:22
106:17
130:2
143:16
171:19,24
172:11
174:23
178:15
186:5
198:24
204:18
213:19
214:4
219:17
222:22
245:24
Globetrotte...
22:20 28:11
28:8 31:11

55:2,6,21
57:4 58:3
61:4 62:20
71:6 81:12
90:4,8,11
124:15,16
224:11
214:1
227:16
238:12
258:9
go 6:22 8:5
11:4 15:10
15:15,20
18:7,9
19:22 22:21
202:4,11
27:10 35:18
36:5 40:23
45:23 47:12
48:2 51:16
55:18 59:7
67:13 71:11
73:1,5 77:4
87:3 95:18
96:14,15
98:5 106:19
107:18
178:1 190:1
213:7
169:12
181:20
187:16,24
187:16
178:11
187:16
181:20
187:16
178:11
187:16
181:20

192:1 200:3
208:22
216:19
218:13
219:2
116:14
117:2
234:24
236:24
239:1,8,9
239:10,10
240:10,11
243:16,16
244:8,9
249:3
254:16,24
255:9,13
256:17
257:1,15
262:15
265:4
God 228:11
God 266:18
goes 24:24
42:23
163:10,11
163:16,17
164:14
164:19
167:8,16,19
167:19
169:2
170:12
171:10
172:16
174:8
178:14,16
178:17
179:13,14
180:10
181:2 183:3
184:13,14
184:22

186:11,16
190:24
191:3,4,5
192:18,21
193:24
240:7
gosh 103:4
Goss 190:23
gotten 179:3
191:19
240:7
government
42:9 51:20
52:5,20
62:12 64:4
66:16
201:19
215:16
215:23
231:7
260:10
261:17
governments
230:23
great 84:21
257:24
greater 78:14
79:24
140:21
259:12
greatest
234:20
grind 258:14
ground 208:6
266:21
group 115:6
145:15
146:2
265:18
266:16
267:5,5
245:18
246:6
guesstimate

117:18
120:4
189:24
232:21
240:7
145:22
240:7
125:4
guidance
123:18
123:16
235:2
239:3
235:2
239:3
hope 245:19
hoped 184:18
hoping
264:17
horse 262:19
hours 67:15
166:16
hundreds
123:8
hypothetical
37:13 63:11
92:18 94:8
121:22
121:23
165:4
hypothetic...
123:18

___ I ___

IAC 61:12
idea 211:16
identified
65:24 123:4
177:7,11,12
177:14
174:23
143:15
148:21
164:5
hypothesis
195:9
181:21
195:9
243:2
identify
16:14 18:16

## Page 19

166:13
168:2
guidelines
61:6 113:19
143:18
gun 188:17
188:20
guys 163:15
224:5

___ H ___

H 3:10
H-e-e-r-y
13:3
half 51:9
102:2
132:18
160:1,3,4
166:20
212:24
213:1,2
hallway
246:9,10,11
hand 149:2
163:11
188:6 223:8
271:15
Hand-raili...
45:15
handled
14:12
handrail
54:14 126:1
145:20,23
146:5 147:8
271:11
148:15,23
150:1,4,6
199:8 245:9
247:11
handrails
45:14 46:2
47:3,18
48:3,9,21

50:18,22
51:2,14
53:18,24
54:5,11,20
61:8 62:4
62:24
124:18,21
124:22
143:21
146:21,22
146:23
147:16,19
148:11
149:5,11
147:16,19
147:19
150:12,17
151:3,4
174:12,20
213:2
244:11,14
244:16,19
244:23
245:1,7,11
245:1,7,11
246:8,9,14
248:8,9,14
249:5,11
251:8
252:12,23
253:1,11,13
254:9
267:5

197:1
199:11
224:19
HDR's 183:1
head 189:22
51:3 54:7
59:6 177:16
243:21
health 11:1
124:18,21
124:22
26:13,17
27:13,22
91:21 205:8
208:22
220:2
236:19
260:11
94:3 109:11
172:6
180:8
193:13,20
197:11,21
200:10,23
237:11
196:13
206:20
189:17
190:16
191:8,20
192:5,16,18
196:9
197:11,21
171:7
262:5,8
251:8
200:10,23
222:1
hey 35:16
189:23

207:14
241:23
243:21
hide 34:15
high 69:15
139:17
165:5
highly 203:5
207:2
210:24
211:18
213:18
217:24
231:3
heart 84:11
136:11
161:19
162:5,8
164:17
165:6
166:19
hereto 271:23
hereunto
272:1
hey 35:16
189:23

187:4,9,10
honest
242:17
266:18
honestly 5:11
85:21 86:3
86:8 108:3
100:10
117:16
hope 245:19
hoped 184:18
hoping
264:17
horse 262:19
hours 67:15
166:16
hundreds
123:8
hypothetical
37:13 63:11
92:18 94:8
121:22
121:23
165:4
hypothetic...
123:18

___ I ___

IAC 61:12
idea 211:16
identified
65:24 123:4
177:7,11,12
177:14
identify
16:14 18:16

Exhibit 5 Page 73

ERIC DAVIS
March 12, 2024

Page 20

| | | | | |
|---|---|---|---|---|
| 178:24 | imposed | 216:18 | 244:14 | 242:6 | 79:4 82:2 |
| identifying | 239:24 | 219:3,6 | 256:9,13 | includes | 102:7 |
| 242:20 | impossible | inability | 258:7 | 16:20 28:11 | indicated |
| Illinois 1:1,7 | 126:1 | 218:5 | include 22:13 | 34:2 91:19 | 73:16,17 |
| 1:17 2:5,11 | impractical | inaccurate | 28:19 29:3 | 94:10 | 77:1,6,22 |
| 158:11 | 207:2,17 | 5:17 6:12 | 30:20 32:19 | 101:18 | 81:17 82:20 |
| 270:1,7 | 209:1 | 36:10 | 69:16 82:19 | 103:15 | 133:4 |
| 271:1,4 | impression | inaudible | 101:21 | 105:22 | 153:19 |
| illustration | 139:3 | 142:10 | 105:5 | 117:5,9 | 171:1 |
| 12:21 | 140:12,16 | 193:9,17 | 106:22 | 222:8 234:2 | 225:10 |
| imaginary | 152:22 | inches 36:11 | 108:20,23 | including | indicates |
| 64:13 | 251:9 | 38:4,16 | 112:17 | 25:14 51:20 | 69:23 84:7 |
| imagine | impressions | 40:7,13 | 113:5,8,9 | 52:15 54:12 | 135:5 |
| 163:4 207:4 | 83:2,17 | 56:8 59:23 | 114:21 | 152:24 | indicating |
| 246:16 | 124:4 127:4 | 60:12 69:15 | 170:11,17 | 179:13 | 213:8 |
| IMG_3765... | 136:13 | 73:13,18,24 | 170:19 | intended | indication |
| 145:17 | 137:20 | 74:14,22 | 204:21 | 270:14 | 102:16 |
| immediately | 138:23 | 76:18 77:1 | 220:2 231:1 | incomplete | 171:18 |
| 38:8 84:17 | 139:1 | 77:23 78:1 | 234:3 | 37:12 63:11 | 244:1 |
| impact | 156:12,20 | 78:3,10,1 | 265:14,19 | 92:18 94:8 | indirectly |
| 175:17 | 157:2 | 78:15,20 | included | 121:21 | 271:24 |
| impacts | improper | 79:5,5,17 | 12:21 17:15 | 141:22 | individual |
| 47:11 | 228:16,21 | 79:24 81:19 | 17:19,24 | 143:11 | 98:13 |
| impediments | Improveme... | 82:5 84:5 | 18:19 27:23 | 162:15 | 255:21 |
| 268:9,9 | 17:16 18:1 | 123:21 | 28:5 50:7 | 165:4 | individually |
| implement | 91:14,18 | 128:8 | 68:13,14 | incorrect | 115:7 150:8 |
| 230:11 | 92:15,16 | 131:21 | 81:22 84:18 | 5:16 35:14 | 224:10 |
| implement... | 93:6,8,9 | 132:11,23 | 88:17,20 | 50:7 97:14 | individuals |
| 94:1,5 | 98:23 99:5 | 133:3,6,11 | 106:1 | 139:13 | 21:3 |
| 102:7 103:7 | 100:10 | 133:11 | 107:10 | 157:14 | inexact |
| 105:9 | 101:10 | 134:6,12 | 110:22 | 195:16 | 139:18 |
| implemented | 104:6,11,20 | 135:3,11,14 | 112:2 | incorrectly | infirmary |
| 180:6,9 | 105:3 | 136:7 138:9 | 113:14 | 35:17 | 251:2 255:9 |
| implementi... | 116:22 | 138:11,14 | 114:5 | increase | information |
| 102:22 | 118:21 | 138:19 | 116:11 | 28:18 95:1 | 14:23 30:12 |
| 103:11 | 119:7,20,21 | 140:22 | 118:4,22 | 223:18 | 46:15,15 |
| 198:23 | 119:22 | 141:10 | 225:17 | 225:17 | 60:1 64:12 |
| implies 175:4 | 205:4 226:9 | 149:20 | 130:7 139:2 | independent | 64:13 79:7 |
| implying | 241:24 | 150:1,8 | 167:6 171:9 | 89:23 80:23 | 79:13 84:16 |
| 85:4 | 264:13,21 | 151:15 153:7 | 202:11 | 81:11 | 85:6 115:15 |
| importance | 266:2 | 160:19 | 203:14 | indepede... | 122:9 |
| 196:8 | 265:2 266:8 | 164:5,9 | 205:9,12,14 | 259:6 260:5 | 140:15,21 |
| important | improveme... | 154:3 159:6 | 220:11 | indicate | 140:22 |
| 116:2 | 120:6 | 165:24 | 241:14 | 29:19 59:1 | 153:19 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 21

| | | | | |
|---|---|---|---|---|
| 154:6 | 167:20,20 | instance | 142:20 | 213:17 | 87:22 197:3 |
| 122:11 | 168:1 174:8 | 39:18 | 138:17 | 216:22 | 197:10,15 |
| 174:3,10,22 | inspect 37:23 | 138:17 | 78:16,20 | 268:7 | 197:17 |
| 174:24 | 56:15 57:19 | 226:10 | 80:18 | involvement | 199:20 |
| 188:1,12,21 | 186:11 | 238:2 | 134:13 | 10:20 22:22 | issuing 12:20 |
| 194:10 | inspected | insufficient | 154:5 | 31:2,5,21 | item 6:6 9:24 |
| 195:2,8,11 | 38:8 57:14 | 77:4 | 155:11 | 34:15 72:24 | 10:7 13:13 |
| 233:23 | inspection | insurance | 135:21 | involves 7:20 | 17:18,20,21 |
| 244:9 | 56:2,6 60:9 | 196:24 | 144:24 | 9:23 156:24 | 26:3,4 19:4 |
| 249:7 | 79:2 176:14 | intake 99:14 | Internal | involving 8:4 | 46:3 61:19 |
| informed | 185:1 186:4 | intend 63:19 | 239:24 | 11:22 99:15 | 65:17 84:4 |
| 59:16 | 186:21 | 63:19,20,21 | internally | 205:24 | 84:4 87:1 |
| inhibiting | 187:2,5 | 64:3,6 | 49:17 | iota 200:22 | 88:19 93:7 |
| 199:7 | 202:3 | 86:18 122:9 | interpretat... | 201:1 | 110:13 |
| initial 23:24 | inspections | 123:13 | 49:17 | Irishman | 112:5 |
| 24:2 32:24 | 57:20 58:4 | 139:7 185:3 | interrupt | 267:8 | 128:17 |
| 36:14 87:18 | 58:8 204:6 | intended | 218:20,24 | irresponsible | 160:9 171:2 |
| 181:22 | install 45:13 | 25:16 36:11 | introduce | 95:15 105:1 | 171:3 |
| 189:14 | 46:1 47:22 | 64:4 86:16 | 134:12 | 241:20 | items 108:13 |
| 201:3 251:9 | 48:21 53:18 | 115:22 | invested | 244:12 | |
| initially | 96:15 | 228:7 | 54:14 | 243:10,11 | J |
| 14:20 20:13 | 247:11 | intent 16:13 | investigation | isolated | J-O-C 86:24 |
| 23:19 24:10 | installation | 23:9 24:10 | 151:8 | 126:12 | jackhammer |
| 176:17 | 51:13 | 40:12 41:3 | invite 266:22 | issuance | 163:16 |
| 214:20 | 124:21 | 41:11 43:10 | invoice | 13:15 52:7 | jackhamm... |
| 249:12 | 125:5 | 43:16 44:7 | 267:20 | issue 15:13 | 161:22 |
| 251:16 | 127:8 | 53:2 65:4 | involve 96:11 | 16:11 35:22 | 162:19 |
| initiated | 143:10 | 66:3 84:10 | 96:12,16,17 | 68:2,4 | jail 22:14 |
| 129:24 | 148:11 | 84:15 100:9 | involved | 98:16 102:6 | 27:5,12 |
| 143:15 | 158:14 | 103:21 | 10:17,22 | 159:18 | 101:21 |
| injection | 244:24 | 112:13,16 | 11:20 20:23 | 179:2 190:4 | 144:9 148:5 |
| 26:22 | 245:6,13 | 218:16 | 21:8,16 | 190:5,6 | 148:6 |
| injunction | 253:11 | 122:20 | 196:13,20 | 196:13,20 | 160:23 |
| 4:17 131:20 | installed | 123:8,16 | 50:18 72:21 | 197:3,13 | 164:3,7,11 |
| inmate | 47:20,23 | 138:8,11 | 93:10 98:15 | issued 12:9 | 164:15,16 |
| 250:11 | 124:21 | 228:6,10,19 | 104:9 | 16:12 25:21 | 164:23 |
| inmates | 226:8,10,19 | 229:1,10,15 | 158:14,21 | 45:3 52:15 | 166:22 |
| 208:3,21 | 128:6 | 256:19 | 158:22,24 | 84:23 | 167:3,18 |
| 231:1 | 129:19 | intention | 163:17 | 105:13 | 186:11 |
| input 206:18 | 141:3 143:8 | 114:21 | 163:17 | 116:4 | 202:18 |
| inserting | 144:1 146:5 | interest 259:9 | 176:19 | 141:14 | 206:19 |
| 49:13 | 253:1,12 | interested | 196:7 199:4 | 184:14 | 212:8 |
| inside 166:6 | installing | 271:23 | 204:19 | 217:22 | 250:13 |
| 166:8 | 51:22 | interjecting | 212:7,12,17 | issues 36:2 | |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 22

| | | | | |
|---|---|---|---|---|
| 251:2 262:5 | 128:22 | 26:10 28:20 | 177:7 179:6 | 262:19,21 | 233:7 234:3 |
| January 4:13 | 129:12 | 34:18 37:17 | 179:23,24 | knowledge | 234:6 |
| 5:5,16 | 246:21 | 38:10,23 | 180:1 | 26:6 30:23 | laser 76:24 |
| 74:12,17 | jump 169:19 | 41:10,22 | 181:16 | 37:20,22 | 79:3 140:9 |
| 127:16 | 237:21 | 42:6,6,7,19 | 182:5 | 38:14 48:2 | laugh 175:9 |
| 141:11 | jumping | 42:24 43:2 | 184:11,12 | 71:5 89:20 | laugh 115:9 |
| 178:3 | 233:15 | 43:6 44:2 | 184:22 | 92:2,6 | laughing |
| 187:13 | June 102:14 | 44:13 48:15 | 186:5,7 | 118:10 | 174:14 |
| 215:19 | 222:5 | 48:16,18 | 187:9 | 118:20 | law 2:2,8 |
| 216:11 | jurisdictions | 50:16,17,17 | 188:16,18 | 123:24 | 35:11 |
| 217:1 | 208:10 | 55:16,23 | 188:22 | 137:12 | 117:23 |
| 220:11 | justice 182:6 | 56:3,11,12 | 189:23 | 211:21 | 143:6 |
| 241:11 | justified | 58:11,12,13 | 192:16 | 223:11 | 149:4 |
| Jelks-Brown | 113:22 | 59:3,8,18 | 201:8 203:9 | 213:1 | laws 43:15 |
| 2:9 | justify 118:1 | 59:24 60:23 | 206:2,6,7,9 | 255:4 | 152:3,23 |
| job 30:13 | | 62:14 63:14 | 206:10 | known 69:11 | 230:23 |
| 34:22 39:5 | K | 69:24 70:3 | 208:19 | 183:24 | 231:1,11,13 |
| 67:5 86:19 | K 271:2 | 70:6 78:2 | 209:14,20 | knows 47:19 | layout 126:3 |
| 86:22,24 | keep 121:11 | 81:1 82:13 | 211:2 | 127:20 | lead 52:5,6 |
| 87:13,21 | 137:2,3 | 89:13,15,16 | 213:13 | 178:13 | 53:14 182:3 |
| 90:22 | 172:23 | 89:17,18 | 216:19 | | 243:5 |
| 103:23 | 204:20 | 90:7 91:2 | 216:19 | L | leading |
| 162:10 | keeping | 98:6,18 | 222:6 | lack 259:20 | 131:10 |
| 195:24 | 232:21 | 103:1,1 | 226:21 | land 110:15 | 228:14,21 |
| 201:17 | kind 206:11 | 109:23,24 | 228:6 229:1 | landing 62:4 | 230:4 235:9 |
| job-order-c... | kind 84:15 | 110:6 114:2 | 229:16 | 78:15,16,21 | 235:12,16 |
| 67:7,21 | 85:5 153:5 | 115:24 | 229:16 | 80:18 | 235:21,24 |
| JOC 86:24 | 206:3 | 116:18,18 | 232:11 | 134:13 | 236:11,12 |
| 256:18 | 256:21,21 | 117:16,18 | 232:18 | 154:5 | 236:16 |
| 91:6 201:14 | kinds 256:3 | 117:24 | 235:19 | 155:11 | 237:16 |
| 202:16 | knew 48:8 | 122:6 125:4 | 236:18,18 | 147:8 | 238:22 |
| 203:6 | 79:3 82:6 | 127:18,19 | 237:12 | learn 249:8 | 249:10 |
| 223:15 | 138:17 | 131:3 | 235:19 | learned | 251:13 |
| 238:17 | 140:15 | 144:13,16 | 242:9,12,21 | 251:13 | 258:16 |
| JOHNSON | 172:21 | 144:19 | 242:21,23 | leave 266:16 | |
| 2:9 | 174:9 | 147:15,20 | 243:9 244:2 | leave 261:18 | |
| judge 45:2 | knew 5:6 | 148:6,9 | 244:18 | large 107:15 | |
| 175:24 | 7:10 8:1,23 | 149:14 | 249:20 | 110:14 | |
| 205:17 | 9:1,3,13 | 151:10 | 251:15,24 | 220:6 | |
| July 45:3 | 12:16 13:12 | 160:19,20 | 252:8,22 | 230:22 | |
| 53:21 | 14:5,5,7,13 | 163:6,8,23 | 252:11,21 | largely | |
| 102:13,14 | 14:18 15:10 | 169:8,14 | 253:9,12,16 | 116:19 | |
| 125:13 | 19:11 21:9 | 171:11,13 | 255:3 | larger 219:12 | 146:18 |
| 127:1 | 21:21 24:10 | 176:23 | 258:15 | | |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 23

| | | | | |
|---|---|---|---|---|
| left 73:12,23 | 206:10 | 219:13 | 214:3 | 147:11 | 230:11 |
| 74:14 77:11 | 211:8,17,18 | 220:22 | 216:23,24 | 151:22 | manage 35:3 |
| 78:5,7 79:4 | 242:5 268:8 | 241:2 | 218:1 | 170:23,23 | 35:5,6 90:6 |
| 79:18 81:18 | level 76:24 | 251:17 | 221:14 | 188:19 | management |
| 138:18 | 94:11 140:9 | list 115:20 | 223:11 | 200:8 | 34:1 35:2 |
| legal 63:7,11 | 164:7 | 116:15 | 223:17 | 219:10 | 47:21 51:23 |
| 64:21 74:3 | 165:2 168:2 | 164:4,5 | longer 21:5 | 245:21 | 52:1,1 54:4 |
| 127:3,22 | 232:22 | listed 216:18 | 164:15 | looks 7:11 | 124:7 |
| 133:16,17 | levels 110:7 | literally | 167:17,19 | 35:16 | 128:7 |
| 133:20 | liberty 93:6 | 180:3 | 179:8 | 129:18 | 129:18 |
| 135:5,8,21 | 262:22 | litigation | 231:24 | lot 5:12,12 | 182:5 |
| 136:2,9 | license | 146:6 83:3 | 232:24 | 54:10 | 190:20 |
| 136:13 | 158:10 | 124:5 127:5 | look 11:6,17 | 116:18 | 205:12,23 |
| 141:15 | 272:9 | 127:23 | 12:2 13:12 | 146:18,18 | 206:14 |
| 153,22 | licensed 76:6 | 136:9 | 19:23 68:24 | 174:4 245:6 | 213:14 |
| 154:15 | 190:24 | 137:22 | 77:6 78:2 | lots 147:5 | manager |
| 155:13,18 | 191:3 | 138:23 | 130:1,21 | 170:14,15 | 31:16 32:21 |
| 231:4 | LIDAR | 156:13,21 | 138:23 | 170:15,18 | 35:8,10 |
| Leighton | 59:12 133:4 | little 76:8,9 | 140:11,24 | 243:5 | 34:10 36:19 |
| 120:23 | 140:14 | 197:7 213:9 | 143:17 | | 39:4 189:16 |
| 121:2,9 | 152:13 | 233:15 | 145:5,22,24 | lottery 176:1 | 189:17,19 |
| 122:10 | 154:11 | 245:5,12 | 146:8 148:8 | 177:4 | manner |
| 213:3 | 184:11 | loaded 185:6 | 146:8 148:8 | 243:5 | 227:4 |
| length 78:17 | 252:6,9,11 | loading | 151:1 188:8 | lower 208:4 | Manning |
| 244:11 | 258:3 | 207:22 | | | 88:23 89:12 |
| lengthy 11:14 | lifted 256:2 | 240:6 240:9 | 194:2,14,6 | | 89:20 90:2 |
| 98:23 | likelihood | logic 12:2 | 217:11,14 | M | 108:10 |
| 100:22 | 225:17 | logical 262:9 | 245:16 | M 4:11 228:2 | 110:19 |
| 225:17 | limitation | 12:12 | looked 4:18 | 246:19 | Manning's |
| 258:10 | 256:9 | 215:16 | 5:11 7:21 | main 51:14 | 108:20,22 |
| let's 9:9 | limitations | 159:15 | 54:9,10,18 | 104:24 | manufactu... |
| 15:22 34:17 | 239:24 | 160:23 | 162:11 | majority | 148:16 |
| 36:5 43:4 | 240:8 | 162:11 | 148:17,19 | 99:24 | March 1:17 |
| 51:7 55:2 | limited 22:20 | 164:24 | 149:4,7 | making | 13:10 25:7 |
| 77:16 118:5 | 224:4 | 165:4,23 | 169:4,7,18 | 52:9,19 | 52:8 137:14 |
| 124:14 | line 3:17 | 166:1,8 | 169:22 10:9 | 61:1 114:18 | 152:11,14 |
| 137:2,3 | 17:18 45:12 | 248:14 | 47:8 61:4 | 133:20 | 173:18 |
| 140:10 | 70:23 112:5 | 169:2 179:7 | | 139:16 | 186:16 |
| 149:14,15 | | 170:9 | | 160:23 | 222:5 |
| 161:11,15 | 147:3 | 195:17 | 77:18,21 | 161:2 | 272:2 |
| 184:16 | 171:2,3 | 200:9,9 | | 168:23 | marked 3:11 |
| 188:17 | 196:23 | 212:13 | 106:5 | 169:1 188:9 | 49:14 |
| 192:1 | 218:11 | 213:11 | 144:6,22 | 193:2 | market |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 74

ERIC DAVIS
March 12, 2024

| | | | | | |
|---|---|---|---|---|---|
| 218:15 | 188:7 | 32:24 33:8 | 23:6 32:22 | 86:17,20 | minutes 75:6 |
| 240:1 | 191:12 | 34:4 57:16 | 33:5 34:19 | 221:2 | 206:8 |
| master 9:14 | 200:7 204:3 | 58:10 66:13 | 35:1 41:5 | methodology | Mischaract... |
| master's | 208:6 | 100:16 | 43:9 65:9 | 86:23 | 181:8 |
| 231:7 | 209:11 | 101:3 | 67:21 71:20 | 232:19 | mischaract... |
| material | 211:24 | 179:22 | 81:15 81:8 | microphone | 75:2 82:10 |
| 54:16 | 227:9 | 180:21 | 81:11 87:8 | 175:9 | 194:8,22 |
| 134:15 | 239:12 | 204:18,22 | 87:14 91:19 | mid 178:2 | mischaract... |
| 164:10,10 | 241:22 | 205:2,3,6 | 94:12,18 | 221:22 | 24:20 40:22 |
| materials | 243:12 | 205:18,19 | 104:4 | middle 73:18 | 200:16 |
| 54:5 | 247:18 | meetings | 105:12 | 77:6,9 82:4 | 261:22 |
| math 158:11 | 251:7 | 20:19 21:10 | 120:5 122:6 | 82:4 83:22 | misconstru... |
| Matt 183:10 | meaning 63:4 | 21:12,19 | 125:9,23 | 84:1,5 | 176:20 |
| matter 84:11 | 103:7 | 31:9,10,14 | 134:14 | 99:22 100:2 | misread |
| 133:11 | means 9:1 | 32:11 57:3 | 153:2 | 153:20 | 132:16 |
| 135:10,13 | 58:17 59:1 | 57:9,10,18 | 162:21 | 221:19 | misrepresent |
| 135:13,19 | 59:6,8 99:3 | 58:17 59:1 | 166:12 | mireprese... | 210:9 |
| 161:14 | 103:3,19 | 59:6,8 99:3 | 169:9 | 221:11 | mireprec... |
| 238:9 | meant | 103:3,19 | 171:24 | 222:3 | 210:7 |
| matters | 239:2 | 204:10,20 | 181:14 | 256:23 | mireprec... |
| 90:18 271:9 | measure | 205:9,13,15 | 185:15 | million | 210:1 |
| mean 5:23 | 72:13 83:22 | 206:8,10,13 | 190:15 | 160:15 | missed 119:1 |
| 7:18 8:5 9:1 | measured | 264:5 | 203:7 | 192:13 | 121:7 252:2 |
| 9:2,21 | 264:5 | members | 203:8 | 203:8,8,13 | mistated |
| 13:20 20:5 | measureme... | 31:17 | 209:18 | 203:18,18 | 198:12 |
| 23:12 29:1 | 36:20 | 111:15 | 212:6 | 203:21 | misstates |
| 35:6 41:22 | 78:6 83:24 | 186:20 | 225:13,21 | 242:5,7,8 | 12:12 80:7 |
| 42:19,22 | 56:24 81:24 | memory | 230:9 | 242:11 | 132:12 |
| 53:6 62:7 | 84:7 | 88:16 219:4 | 231:21 | 242:12 | 223:11 |
| 62:12,19 | measures | 245:12 | 238:9 | mind 113:22 | misstating |
| 64:3 72:17 | 84:24 | mending | 239:15 | 116:3 | 49:1 226:4 |
| 80:10 85:4 | mechanism | 149:5 | 248:5 | minimus | mistaken |
| 91:2 92:13 | 67:22 | mental 83:12 | 249:23 | 133:10,17 | 110:10 |
| 118:6 119:2 | 114:17 | 83:12,17 | 261:8,19 | 153:23 | miter 148:20 |
| 120:17 | 124:4 | 124:4 127:3 | 264:11 | 154:3,8,15 | mobility |
| 121:18 | 127:19,24 | 136:12 | 267:21 | 154:17,24 | 262:22 |
| 127:19,24 | 132:6 | 137:20 | mentions | 155:10,15 | modificatio... |
| 152:9 | 135:2 | 138:22 | 32:5 | 166:11 | 25:17 29:24 |
| 153:15 | merits 137:3 | 139:1,3 | met 21:21 | 168:1 170:1 | 39:11,16 |
| 161:7 | met 21:21 | 156:11,20 | 102:21 | 221:3 | 71:10 206:2 |
| 167:22 | 99:6 102:11 | 157:1 | 180:3 241:3 | minute 86:5 | moment 9:10 |
| 173:13,14 | 227:15 | mention | 246:14 47:1 | 258:9 258:8 | 61:16 |
| 177:18 | meeting 21:9 | 204:21 | 67:21 71:21 | 268:14 | 124:14,15 |
| | | mentioned | | | 147:7 214:8 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

| | | | | | |
|---|---|---|---|---|---|
| 227:14 | 191:12 | 111:21 | 177:1 | 260:1,23 | 89:15,17 |
| 240:1 | 209:20 | 104:18 | 181:12 | 261:1,6,12 | municipal |
| momentarily | 240:15,18 | 116:23 | 182:22 | 261:15 | 239:22,23 |
| 215:4 | 240:20,22 | 117:2,7,14 | 185:13,15 | 263:3,17 | 240:5 |
| money 93:23 | 241:7 247:1 | 119:16,17 | 185:24 | 264:10 | mute 175:9 |
| 94:6 95:8 | 241:11,15 | 121:13,15 | 186:2 | 266:7 | muted 214:14 |
| 103:8,14,15 | 2:3,4 3:4,7 | 124:13 | 187:11 | 267:7,15 | |
| 105:5 113:5 | 4:3,12 7:1,6 | 125:11,19 | 190:7,14 | 268:3,13,23 | **N** |
| 115:6,16 | 9:6 12:7,17 | 126:3 | 193:6,14,22 | 269:2 | N 2:1 3:1,16 |
| 118:7 | 13:8 15:23 | 127:9,13 | 194:12 | 265:4 | 4:11,11 |
| 230:24 | 19:5,13 | 128:4,17 | 195:18 | motivation | 228:1,2 |
| 240:5 | 20:1 23:3,5 | 129:4,9,10 | 196:3 198:7 | 130:4 | 246:19,19 |
| 243:6,7 | 27:2,20 | 132:1,3,9 | 198:14 | mound | 88:23 |
| monies 234:3 | 29:11 32:3 | 132:24 | 200:1,21 | 244:11 | 75:19 87:14 |
| 234:3 242:1 | 376,19 | 133:1,23 | 201:7 | mouth | 88:23 |
| 244:5 | 38:3,12 | 135:9 136:6 | 202:15 | 228:15 | 107:24 |
| monitoring | 39:1 40:14 | 136:22 | 210:11,14 | 259:6 | 108:2,4 |
| 252:24 | 42:21 44:4 | 137:6,11,24 | 212:19 | move 118:24 | 190:23 |
| 253:8 | 44:22 46:9 | 138:9 139:5 | 214:20 | 119:2 | nature 182:9 |
| Monroe 52:10 | 47:1,13 | 141:8,9,17 | 214:12,17 | 190:3 | navigate |
| month 56:5 | 48:10 49:7 | 142:1,3,9 | 214:23 | 196:18 | 240:2 |
| 99:14,21,22 | 49:19 51:18 | 142:12,19 | 215:3,5,9 | 197:22 | necessarily |
| 100:8,11,16 | 52:17 53:5 | 143:1,4 | 216:3,7 | 236:20 | 92:13 118:6 |
| 161:21 | 55:5,10,14 | 144:6,7,15 | 218:21 | 260:7 | 127:18 |
| 177:6 178:2 | 55:19 56:13 | 146:8,12,21 | 219:22 | 264:23 | 184:23 |
| 179:4 | 59:20 60:11 | 152:7 53:5 | 221:1 223:2 | moved 43:5 | necessary |
| 191:13,16 | 61:2 62:16 | 153:12,13 | 224:8 | moving 94:21 | 28:19 29:23 |
| 200:12 | 62:18 63:16 | 154:1,12,16 | 228:22 | 103:11 | 82:18 |
| 240:17 | 64:1,14 | 154:22 | 229:22 | 173:1 | 171:13 |
| monthly | 66:17 70:18 | 155:7,14,20 | 238:23 | 188:23 | 172:8 |
| 98:13 103:3 | 70:19 71:4 | 156:3,15,24 | 239:4 235:9 | 194:8 200:20 | 230:17 |
| 204:22 | 72:9 73:20 | 157:6,10,18 | 251:21 | 257:21 | 231:12,18 |
| 205:3,6,20 | 74:10 75:3 | 158:7 | 255:2,23 | multipart | 234:7,11,18 |
| 205:14 | 75:14 80:12 | 159:11 | 256:2,11 | 99:17 | 236:7 237:24 |
| 206:13 | 82:16 87:1 | 164:20,22 | 197:9 | multiple 33:3 | need 13:6 |
| 236:21 | 88:7 90:9 | 165:9,12,21 | 246:24 | 50:16 57:18 | 28:16,17 |
| months 100:4 | 91:11 92:10 | 166:1 | 246:20 | 59:8 74:18 | 46:15 47:5 |
| 103:4 151:9 | 92:22 93:22 | 168:1 170:1 | 247:7,23 | 204:19,24 | 51:2 74:20 |
| 152:8 | 95:5,16 | 171:6 173:5 | 248:11 | 206:4 | 82:9 92:23 |
| 163:14,18 | 97:10,16 | 173:10,15 | 250:22,23 | 213:24 | 96:21 97:4 |
| 168:22 | 104:4 107:4 | 174:5,15 | 253:10 | 234:8 | 98:10,16 |
| 184:17 | 109:8,17 | 175:10 | 254:14 | multistep | |
| | | | | 10:1 15:14 | |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

| | | | | | |
|---|---|---|---|---|---|
| 134:21 | negotiate | nice 162:22 | 196:19 | 201:11 | 79:19 80:7 |
| 140:24 | 16:15 183:4 | nightmares | 197:3,10,14 | 209:21 | 82:9 88:6 |
| 141:1 | 184:19 | 35:12 | 197:16,18 | 213:18 | 90:1,24 |
| 145:22,24 | 185:3 189:1 | ninth 93:9 | 197:19,23 | 214:21 | 91:7,15 |
| 146:19 | 192:20 | noncompli... | 205:5 | 217:14 | 92:4,17 |
| 151:14 | 221:23 | 12:10 | 221:21 | 231:3 234:6 | 94:7 95:12 |
| 153:16 | negotiating | 254:17 | notified | 146:10 | 14:9,19 |
| 154:19 | 20:3,17 | noncompli... | 56:11 70:12 | | 17:10,14 |
| 155:4 | 21:13,24 | 253:19 | notify 196:18 | **O** | 22:19,24 |
| 170:12,18 | 31:3 169:16 | 254:7,17 | notion 78:19 | O 3:16 4:11 | 34:22 45:1 |
| 171:22 | 182:13 | NOPA 68:4 | November | 228:2,2 | 45:2,5,8 |
| 172:5,10 | 87:23 | 87:23 | 60:18 75:16 | 246:19 | 46:17,18 |
| 173:3 | 192:17 | 105:12 | 80:15 81:2 | 271:2,2 | 48:22 49:1 |
| 184:23 | 193:9,16 | 196:19 | 81:3,16 | o'clock 1:18 | 49:14,17 |
| 188:20,21 | 194:1 195:3 | 197:20 | 93:14 94:24 | oath 270:11 | 50:19 51:4 |
| 195:10 | 200:10 | 102:19,20 | 100:12,17 | 119:9 | 57:6 80:7 |
| 198:18 | 234:17 | 112:13,15 | 100:20 | 121:21 | 77:2 85:12 |
| 199:6 | 238:4 | 113:4 120:1 | 102:19,20 | 125:2 | 90:18 93:11 |
| 208:21 | negotiation | 120:1 | 112:13,15 | 126:14 | 96:2,4,9,21 |
| 237:16,16 | 195:8 | Notary | 113:4 120:1 | 128:10 | 103:23 |
| 242:15,22 | negotiations | 270:23 | 120:1 | 137:18 | 106:19 |
| 246:9,11 | 20:13,24 | note 43:4 | nowadays | 140:1 141:6 | 115:18 |
| 250:16 | 21:11,17,18 | 90:17 | 197:12 | 141:22 | 121:12 |
| 254:20,22 | 194:19 | 105:24 | number 10:9 | 142:22 | 125:13,18 |
| 256:24 | 107:14 | 107:14 | 11:10 17:20 | 143:14 144:5 | 127:1 |
| 255:21,24 | 200:18,19 | 131:12,12 | 27:21,24 | 158:21 | 128:13,22 |
| 256:4 257:4 | 222:9 | 140:13 | 28:6,21 | 177:20 | 129:12 |
| 259:24 | neither | 30:17 32:5 | 32:11 16:7 | 173:8,22 | 129:16 |
| never | 118:19 | 162:16 | 36:5 37:7 | 185:14 | 131:21,22 |
| needed 69:6 | never 218:15 | 217:10 | 44:23,24 | 187:22 | 131:22,22 |
| 84:13 | 218:15,16 | 219:2 | 47:2,11 | 268:9 | 132:11 |
| 129:20 | noted 9:8,11 | 224:17 | 55:8,10 | 191:2 | 168:21 |
| 130:8 151:1 | 129:17,22 | 55:8,10 | 92:3,15,23 | 192:10 | 177:8,22 |
| 171:18 | 149:22 | 93:15,24 | 148:9 22:14 | 198:6 212:5 | 178:3 |
| 184:9 | notes 14:4 | 168:18 169:9 | 212:16 | 212:16 | 194:11 |
| 250:15 | 18:15 54:12 | 118:15 | 42:13 49:22 | 222:20 | 197:11 |
| 252:18,20 | notice 59:18 | 120:7 122:4 | 52:9,23 | 223:10 | 197:15 |
| needs 131:15 | 166:15 | 128:21 | 59:20 60:11 | 224:1 225:2 | 197:20 |
| 176:9 | 164:17,17,9 | 59:20 60:11 | 61:22 63:10 | 230:4 235:9 | 198:6 |
| 199:11 | 177:18 | 168:14 | 62:22 63:10 | 236:11 | 199:16 |
| 252:12 | 178:4 | 179:2 190:4 | 151:22 | 237:10 | 212:21 |
| 256:1,6,24 | 189:10 | 190:6 | 151:22 | 247:15 | 215:15 |
| | 211:5 246:6 | 196:13,16 | 158:1 177:2 | | |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

| | | | | | |
|---|---|---|---|---|---|
| 251:4 | occur 96:9 | 110:20 | 10:11,15 | 179:11 | opposed 53:7 |
| 252:14 | 123:6,7 | 111:1 | 22:18 34:22 | 265:4 | 209:3 |
| 253:3,21 | occurred | 197:13,15 | 44:18,21 | ongoing 7:19 | options 54:10 |
| 254:9 | 212:11 | 199:8 200:3 | 45:2 47:4,6 | 7:22 8:3 | order 4:5 7:8 |
| 256:14 | OCJ 205:18 | 204:1,8,22 | 47:4,10,10 | 204:10 | 9:12,24 |
| 259:20 | October 51:7 | 204:23 | 47:18 50:1 | open 160:5 | 14:24 |
| 261:21 | 51:15 100:8 | 215:18 | 55:16 58:6 | 161:24 | 14:9,19 |
| 267:11,24 | 100:12 | 206:2 207:5 | 66:2 75:5 | 166:19 | 17:10,14 |
| 268:10 | 101:2 | 215:18 | 75:10 96:23 | 79:9 | 22:19,24 |
| objections | offer 232:19 | 217:23 | 101:17 | 209:12 | 34:22 45:1 |
| 157:8 | offhand 9:10 | 218:12 | 106:7 | 227:2 231:1 | 27:9,19 |
| objective | 12:14 19:12 | 220:16 | 111:22 | 231:3 | 34:22 45:1 |
| 43:10 44:7 | 25:1 32:14 | 221:3 | 114:20 | 234:21 | 45:2,5,8 |
| 130:13 | 48:13 54:2 | 226:17 | 129:1,9 | 236:15 | 46:17,18 |
| objectively | 54:6 55:23 | 230:18 | 147:4 162:4 | 240:7 | 48:22 49:1 |
| 84:12 | 56:20 58:19 | officer 20:21 | 169:10,21 | opening | 49:14,17 |
| 130:11 | 58:21 59:24 | 23:20 24:5 | 171:14 | 100:21 | 50:19 51:4 |
| observe | 60:6 69:9 | 33:4 41:8 | 180:9 | operational | 77:2 85:12 |
| 54:12 | 148:9 | 67:13,18 | 190:1 | 261:3,11,12 | 90:18 93:11 |
| observing | 176:23 | 68:2 87:18 | 199:4 | 261:13,16 | 96:2,4,9,21 |
| 36:2 | 177:10 | 107:23 | 207:15 | operationally | 93:2 95:1 |
| obstacles | 179:6 | 111:3,4 | 215:6 | 53:3,7 | 103:23 |
| 245:2 | 213:13 | 113:17 | 216:24 | 164:1 | 106:19 |
| obstruction | office 16:1,4 | 116:10 | 216:5,11,22 | 206:19,20 | 115:18 |
| 150:13 | 20:7,20,22 | 122:20 | 216:24 | 225:7 | 121:12 |
| obstructions | 23:22 | 249:5,10 | 249:5,10 | 262:16 | 125:13,18 |
| 234:21 | 21:13,3,23 | 77:22 | 259:17 | 127:1 | 127:1 |
| obtain 14:19 | 31:17 32:23 | 189:4 | 200:4 | 128:13,22 | 128:13,22 |
| 43:10 50:22 | 33:2 41:7 | 215:19 | 201:6 | opinions | 129:12 |
| 81:10 125:8 | 43:17 66:1 | OFFICES | 211:6 | 223:7 | 129:16 |
| 129:20 | 83:24 113:2 | 2:2,8 | once 56:22 | 136:9 | 131:21,22 |
| 212:4 | 86:2 87:4 | offset 139:16 | 58:12 65:19 | 156:21 | 131:22,22 |
| 216:13 | 95:19 98:12 | 139:19 | 65:23 99:19 | obviously | 132:11 |
| 219:10 | 98:21 100:5 | 139:12 | 111:10 | 100:11 | 168:21 |
| 245:3 | 101:9,16 | oftentimes | 160:3,7 | opportuni... | 199:16 |
| obtained | 104:10 | 205:16 | 166:23 | 136:9 | 200:10 |
| 223:14 | 106:21 | 175:2 | 222:7 | 212:16,22 | 212:21 |
| obviously | 107:5,6,7,9 | oh 35:20 | 136:9 | opportunity | 215:15 |
| 177:12 | 107:17,20 | 191:13 | 267:18 | 5:8 226:12 | 221:6 |
| 240:18 | 107:21 | 210:21 | one 58:14 | 256:11 | 225:15 |
| occupying | 108:13 | 216:23 | 178:12 | | |
| 259:10 | 109:21 | okay 5:7 | 178:11,22 | | |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 75

ERIC DAVIS
March 12, 2024

Page 28

```
230:10          168:22          122:24          166:7           124:17          21:2 34:23
234:3,11        195:15,17       124:17          part 14:7       41:15 51:21     53:11
237:5           oversaw         206:7           271:23          parties'        123:12
238:15          148:10          216:16,19       46:22 50:6      45:12 49:2      164:9
242:23          oversee 35:7    219:23          50:9 51:24      162:9           213:16
243:2           overseeing      pages 270:14    62:2 61:7       129:3           227:12
246:22          34:1            paid 24:16,23   76:20 80:1      partition       249:6,16
247:1,4,9       overseen        paint 238:21    81:7,23         160:2           250:14
247:14,16       158:18          pandemic        90:1 91:13      parts 126:13    250:11
248:3 253:7     oversimplify    118:13          92:12,15        party 110:4     251:11
253:14          53:9            122:6           100:10          131:11          254:1,15
264:18          owners 37:15    panned          105:22          134:20         255:23
ordered                         223:23          pass 88:12      256:10         257:22
27:14 50:24     ___P___         paper 197:12    109:1           256:6          259:10,15
247:24          P 2:1,1         pan 1:18        113:9 130:4     passage        259:6 26:9
ordering        p.m 1:18        paragraph       138:13          118:10         260:9,14
148:17          package         10:27 27:21     151:10          250:11         262:2,4,14
orders 218:7    25:16 29:21     36:8 46:7       152:21          257:8          percent
221:8           29:22 30:5      47:6 61:7       172:16          passageway     62:18
ordinance       30:9,16,19      72:6,10         193:13          250:11         68:22
109:6,9         67:23 68:19     81:15 106:5     195:3,8         passed 24:18   224:18
110:2           68:22 69:11     131:23          202:9           119:18         228:12
original 36:9   69:7,10         132:2,7,8       203:11          pass 117:8     234:13
151:23          71:7,8          136:6,7         204:11          passing 265:1  percentage
188:2,4,7       87:10           143:19          220:8 225:5     path 248:23    118:23
outcome         109:22          157:19,23       225:9           pause 135:17   120:2
89:22           112:3           193:24          231:21          paused         perfectly
271:24          114:22          210:15,19       233:24          142:21         192:15
outlined        169:5,7,9       212:2           235:7,19        147:3          255:19
88:22           170:3,6         217:12          236:4 261:6     payment        period 9:4
122:12          171:18          229:23          261:10          24:13          52:5 67:16
234:15          172:1,12,17     240:11,12       partial 57:12   Peggy 1:15     102:13
238:2           178:15          249:9,19        participate     47:13 49:19    151:9
outside 13:20   220:9           paragraphs      18:20           50:1 97:20     177:7
22:22 26:12     231:15,17       210:5           232:15,17       129:4 271:3    204:20,24
27:12,18        231:17          parallel        232:20          pen 197:11     212:20
35:7 36:19      232:1,6,18      163:7           participated    pending        217:22
41:15 88:18     233:11          parameters      19:4 20:19      126:8 211:8    219:18
146:19          packages        222:18          33:8 124:20     permanent      223:8,20,21
166:6 207:3     220:5 232:9     parcel 240:4    participating   4:16 26:22     221:4
over-chara...   page 3:2,11     Pardon          31:18           pennies 86:8   136:20
229:16          3:17 58:2       187:16          participation   people 20:11   131:19
overall         61:3,16,18      257:13          45:22 231:2     20:12,15       permissible
101:18          71:15 81:14     park 158:24     particular                     135:1
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 29

```
261:20          145:18          27:24 40:11     234:16          82:20 150:6     preclude
263:15          146:3,4,22      86:14 88:4      please 67:16    ports 208:5     211:3
permission      photographs     91:14,18        97:17 129:5     position        predict
68:22 136:6     149:23          92:1,12,16      250:19          66:15 89:19     118:18
243:8           physical        93:6,8,10       pleasure 89:5   111:7           prefer 195:24
permit 25:19    43:11 44:8      94:2,5,10       plus 78:1       141:12,21       preliminary
30:5 176:12     242:16          94:14 98:23     point 17:10     152:5           25:15 29:19
212:4           physically      99:6 100:10     23:6 65:20      224:22          204:22 60:7
person 20:2     160:24          102:7 104:7     116:21          225:6           170:10
33:11,14        161:21          104:11,20       163:1 110:9     positive        premise
52:6 53:10      161:21          105:3 110:9     123:15          80:4,11         24:15 49:3
53:14,14        pick 216:9      119:22          131:5 176:5     149:4 207:7     49:6,10
104:2           266:15          123:1,4         183:4           226:15          97:1
109:15          picking         226:9           213:20          possible 18:4   preparation
139:6 143:6     126:12          238:12          221:20          150:21,24      185:20,21
157:2 164:6     picture         241:24          238:19          156:7          7:17 83:3
190:22          145:1,15        242:1           246:7           198:23         prepare
196:6,9         146:7           265:14          251:18          211:21         68:22
217:4 255:4     238:21          planning        256:18          242:17         preparing
255:6           piece 50:23     259:4,8         261:16          232:18         83:12,17
257:20          149:8 150:8     48:23 51:24     264:3           234:21         prequalified
260:3,5,7,8     piecemeal       92:9 95:17      policies        242:17         217:13,17
263:4           211:22          63:7 68:23      122:11          247:20         218:9
person's 66:9   pieces 51:12    72:19 88:24     possibly 21:2   217:13         220:23
107:24          54:8 125:8      90:3 95:17      190:13          54:19          present 33:10
personal        place 161:12    95:20 98:20     224:22          148:18         57:10 58:7
137:2,4         161:13          147:8           225:6 249:1     151:7          59:9 76:8
271:13          180:12          105:8           265:9           207:19         62:22
personally      232:8           108:19,23       pool 217:15     potential      143:24
11:19 13:17     270:15          110:3,11,18     217:17,24       268:9          173:18
20:16           271:17          122:11          218:10          potentially    195:23
225:23          placed          175:16          220:23          148:19         203:17
personnel       233:23          189:6           221:8           pour 161:10    266:10
206:23          Plaintiff 1:4   190:12          poor 6:4        166:15         presentation
pertaining      1:12 2:7        191:2           portfolio       167:4          88:15
1:14            219:14          191:6           16:7 165:1      211:15         presently
phase 28:14     plaintiff's     205:21,22       34:9,10         pouring        267:9
210:3           3:12,12,13      264:7           101:17          168:4          president
263:22          3:13,14         Planning's      168:4           peak           89:3,5,6,10
264:24          50:6,12         111:11          portion 24:6    practice       89:11 90:14
phased          230:15          portion 24:6    65:4 86:21      precise        100:6,24
168:17          228:20          40:1 110:5      168:4           163:15         110:8
phases 209:6    plan 17:16,19   151:23          261:16          Preckwinkle    111:9,12
photograph      18:1,14,19      188:2,4,5       portions 40:3   89:8           112:9,10
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 30

```
112:12,14       62:10 104:2     190:19          99:18           41:8 65:11      135:15
203:16          principal       191:18          100:18,22       66:1,6,17       136:3,16,21
265:8           196:7           192:14 197:6    103:23          66:21 67:13     137:23
president's     prior 7:7       211:12          123:17          67:18,22        138:22
98:21 100:5     52:10,16        127:20          143:6 144:8     68:2 85:16      141:14
101:16          33:7,22         problem         170:14          85:20 86:1      159:19
104:9           47:19 60:3      148:22          177:9,17        86:9 87:4       156:14,22
109:21          60:18 74:5      160:20          178:5,20        87:10,18        156:24
111:1           75:22,24        problems        179:10,18       88:4,9          157:15
pretty 6:8      76:16,23        164:2           179:24          productive      171:13
12:4 23:24      93:23           procedure       180:5,10,18     175:20,21       263:14
51:3 57:6,8     100:21          1:13 200:2      183:14          176:11          professional
79:9 117:18     112:8           proceed 65:6    202:10          178:12          17:6 73:21
131:6 183:7     186:14          68:5,5          211:1           179:19,22       79:15 137:3
240:7           191:21          86:12 118:7     215:20          180:7 181:6     program
previous 13:6   206:9           175:24          216:12          199:9 196:18    81:7 85:1
40:23 65:9      prioritize      176:16          217:6           197:13,19       90:23 91:3
75:2 194:8      265:3           179:3           220:22          198:9 200:3     91:6 201:15
223:11,21       priority        180:11          226:11          202:16         96:24 124:8
271:6           115:8,11,17     190:4,6         226:21          215:18         110:16
previously      123:4           196:14,16       227:3           216:24         142:12,22
4:19 125:10     178:13,13       197:4,14,20     217:23          222:12,13      143:11
153:2           prison          197:18          218:12,14       224:6          149:20
160:15          227:13          221:21          220:16          265:2          142:1,2
223:6           prisoners       proceeded       231:6,12        programs        145:21
257:19          257:22          230:9           236:2 231:17    119:18         147:13
price 16:20     privilege       proceeding      236:7 239:24    118:9          255:8,24
65:24 87:9      83:1 127:8      66:19 174:2     240:21          progress 99:7   258:9
182:16          138:4           176:6           231:7,12        project 7:22    202:16
186:14          157:16          proceedings     232:13,24       8:3,7 16:22     221:24
191:21          privileged      271:15          233:2 236:7     17:18 18:8     262:16
202:24          83:13           175:17          234:17          18:11,13,18    237:6
221:24          127:12,14       process 9:21    procure         21:8 24:24     241:23
237:18          136:18          10:2,2 11:9     218:8           27:24 28:3     243:6
                probably        11:13,15,18     procured        27:16,18,24    242:6
pricing 65:20   12:4 14:11      12:12 15:14     236:13          28:6,9,10      246:22
67:24 99:23     14:11 39:9      16:13 17:12     produce         30:14 33:17    249:2,6
168:14          40:16 41:13     18:6 19:22      12:3 15:7       30:17 31:15    258:9
169:16          58:23 60:5      23:6            produced        32:16 32:20    250:11
183:19          50:16 51:1      procurement     216:2           62:11 65:5     252:5
202:5           75:22 78:9      12:3 15:7       product         60:19 67:17    258:9
primarily       79:21 80:21     17:3 20:7       37:10 83:1      67:19,20       238:22
7:10            147:22          20:21,23        83:6,8          68:14 71:20    242:22
primary         163:11          21:5 23:20      124:6 125:6     86:16 97:6     243:6
52:12,18,19     189:14          24:4 33:3       127:5,24        90:6 91:19     232:7
```

TOOMEY REPORTING
312-853-0648

---

ERIC DAVIS
March 12, 2024

Page 31

```
92:3,7,8,11     201:14          158:4           230:10          84:22 157:7     219:21
92:13,15,23     203:7,19        160:10          267:19          172:17          130:20
93:11,15,24     204:2 205:1     175:12          proposals       provision       pushed 249:2
94:11 96:19     205:20          178:24          67:6 111:11     248:21          257:5
94:21 96:21     206:21          205:5,7,16      189:3           prudent         pushing
96:10,18        223:16,17       243:1           218:16          39:14 259:9     249:6 254:1
98:10,18        225:11,19       184:3 16:16     190:21          public 11:10    174:18,7
101:11          226:2,10        233:12          proposed        30:6 34:2       167:24
103:24          237:24          244:6,9         86:14 109:1     101:17,19       101:22
105:24          238:5           264:12,16       114:22          101:22          50:18 81:15
106:8           240:24          264:19,21       142:18          255:7,9         95:20,23
107:16          265:10,12       265:3,14,19     protected       published       96:24 97:3
116:10          265:16,21       protected       83:4 124:5     98:20 104:6     97:6 98:2
118:4,7,11      266:7,9,12      83:4 124:5      125:8           134:8,16        160:24
120:18,18       266:15,16      125:7 31:8      133:15           126:12         138:16
121:1,4,14     123:3           prospective     136:3,15        136:18          141:10
121:16          159:17          265:10          137:22          pull 10:12     142:5,22
122:22          226:1           property        138:21          25:19 36:6     143:11
123:22          253:18          164:5,11,20    139:4           58:8 88:10      149:20
129:24          255:18          66:6 68:3      156:13,22       161:10          147:13
133:17          projections     107:15         156:3,22        purchase        144:9
158:3,6         223:4           property        projected       54:5 110:15    197:11
159:3,4,17      243:17          253:3           253:1           pulled 85:20    206:7
159:24          projects 7:22   property        137:22          purchases      228:15
167:12          16:23 17:7      169:17          138:21          130:17         235:13
172:24          76:9,11         169:17          provide         110:14         242:23
176:3,9         78:7,17         169:16          25:15 44:7     purchasing      243:6
179:1,16,18     99:7,15,15     191:8           46:14 60:2      87:12           241:23
180:16,24       99:24 101:4     193:4          77:5 79:7       240:23          246:22
182:8,17        101:8,18,20     194:20          130:17          purpose        249:2,6
186:22          101:21          195:21          174:8           198:2 232:7    243:6
189:15,16       102:2,5,8       196:7,19        185:12          235:14         232:7
191:22          196:17          197:23         192:10          purposes
192:14,19,16    115:21          30:16 43:17     230:14          1:12 4:4       252:23
192:14,19       197:3           140:22          234:14         49:8            259:5
195:15,17       159:8,13        140:22          pursuant        167:4 253:2    216:15
196:6           198:20          156:3           253:1          pursue          232:7
198:22          120:12          217:20          192:10                         
199:20          233:18          222:12         providing       253:14         216:15
200:24                          220:12                         pursue         232:7
```

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 76

**Q**
**qualification**
11:14
213:24
218:3
222:14
**qualificatio...**
15:6,13
16:3,12,19
17:15
134:13
221:12
229:17
267:21
**qualificatio...**
16:17 17:3
17:6
**qualified**
16:14
**qualify** 14:3
237:4
**quarter**
102:10,10
102:11
154:9
155:10
156:6
**question** 5:20
6:1,4,18,23
7:20 8:11
10:21 11:3
12:12 19:2
22:17 23:2
23:4 26:5
26:14,18,20
26:24 27:1
27:18 28:5
29:8 37:18
38:13 42:8
42:14,14,17
43:22,24
44:6 46:10
47:14 48:1
48:6 49:3,5
49:6,10,11
49:13,15,16
49:20,24
50:8 52:10
55:1 57:12
60:14 62:14
63:15 64:11
64:22 76:17
80:13 81:21
82:24 83:5
83:8 86:13
89:9 92:18
93:18 94:4
97:5,9,14
97:17,21
104:17
105:15
111:17,17
113:12
114:6,20
116:24
117:3,6
119:24
120:4,19
122:8
123:23
124:8,12
126:5
128:11
129:5,6,14
133:21
135:21
136:1,24
137:8,10,12
138:1,21
140:4 141:7
141:15
142:8,18,23
142:24
143:9
146:10,14
152:14,20
153:9,14
155:13,16
155:21
156:2
157:11
159:8
164:21
165:11,14
166:17
169:20
170:10
173:9,16,23
175:7
176:21
182:19
185:6,7,11
185:18,19
185:22
186:1 189:5
189:9,10,11
193:3 198:6
198:8,15
200:2 207:6
209:17
210:9
215:19
216:1,8,10
216:11
217:1
223:11
224:2 225:3
225:5,7,9
227:6,11
228:16
235:11,17
236:1
250:18,19
250:21
251:17
252:15
253:4 254:3
254:4,10
260:18,20
261:2,2,10
263:13
267:12
268:11
**questioned**
140:9
**questioning**
27:15 70:23
**questions**
4:14 13:5
22:20 46:8
46:23 74:12
74:18 83:15
83:16 84:14
113:2
114:18
116:16,17
116:19
121:11
128:2,2
130:11
133:19
135:7
136:18,19
151:12
153:17
165:17,20
201:10
227:20
228:1
230:16
231:16
241:16
244:24
246:13,15
268:15,18
**quicker**
175:12
179:14,15
**quickly**
178:18
179:10
188:23
191:10,11
**quite** 37:9
50:22 52:14
68:11 103:6
111:19
**quizzing**
84:19
**R**
**R** 2:1 3:16
4:11 228:2
246:19,19
**R-a-f-f-i**
66:10
**radar** 173:20
227:18
**Raffi** 66:8
87:15
**railing**
149:19
**Railings**
45:19
**rain** 207:4
**raise** 199:6
**ramp** 8:4
9:13,19
11:22 12:10
12:19 13:10
13:16,18
14:11 15:1
18:23 19:8
20:4,18
22:15 23:17
24:17 25:14
29:5 31:4
31:22 32:9
32:12 34:13
34:16,21
36:9,11,20
38:14,16,22
39:3,6,18
40:6,7,17
41:18 42:1
42:4,11,24
42:24 43:11
43:18 44:9
45:9,16
46:2 47:19
50:19 51:3
52:7,21
53:4,8,15
55:21 56:7
56:7,16
57:1,5,14
58:1,2
59:23 61:8
61:24 62:2
63:9,19
64:17 65:8
66:5,20
69:13 71:15
71:16 72:14
73:13,18,23
73:24 74:13
74:15,22,23
76:18 77:6
77:9,15,17
77:19,20,21
78:5,7,13
78:18,19,22
79:16,18
80:5,17
81:18 82:4
82:5,20,21
84:6,6,18
85:10 86:12
86:18 87:3
89:24 91:13
95:2,10,22
97:7 98:8
101:6
102:23
103:2,10,23
104:5,14,23
105:6,8,17
105:22
106:21,24
109:21
110:22
112:1,18
113:6,13
114:14,14

114:24
115:16
117:11,15
122:10
123:9,20
124:1,18
125:15
129:19
130:12,13
131:11,21
134:2,9,21
134:24
135:3,14,16
136:6,12,14
137:16,20
138:13,19
139:8,13
140:1,12,18
145:19
146:6,23
147:2,8
148:5,6
149:24
150:7 152:2
152:6,17,22
153:7,21
155:9 156:5
156:16,17
157:20
158:5,6,19
159:1,5,9,9
159:12,14
159:18,19
160:6,21,22
161:2,3,20
161:24
162:1,2,4
162:11,17
162:18,24
164:23
165:2,2,5,5
165:6,6,7
165:22
166:1,3,15
166:19,21
167:19
168:9,18
169:11,13
172:4,7
173:7,13,19
174:19
176:2,18
177:4
180:11
181:5,15
184:20
186:12,16
187:13
191:9
197:13,22
199:1,5
202:7,17
203:3,9
206:15
207:1,8
209:6,7
210:2,18,24
211:10,15
211:18,19
212:5,7,9
212:21
213:6,7,12
215:22
216:14
217:5,8
218:6
220:12
221:6,16
222:1,15
223:9
224:12,17
225:1 226:2
228:5,9
230:1,3,18
231:10,18
231:22
232:4,4,7
233:6,16,21
233:24
234:12,19
236:10
238:1,22
239:2 241:6
241:15
242:5
244:11,12
244:15
245:1,10
246:5,8
248:13
249:2,7,17
250:4,8,10
250:24
252:1,4,7
253:18
254:2,5,17
254:21
255:1,7
256:12,21
256:22
257:10,16
257:22
258:1,5,11
259:19
260:7,15
265:20
266:22
267:10,23
**ramps** 128:9
144:2
158:14,17
158:21,23
163:20,23
213:2
**ran** 245:2
**random**
262:3
**range** 22:4
80:20 102:5
161:15
232:19
240:21
255:15,23
256:10
**re-allocation**
99:17
**re-allocatio...**
113:18
**re-ask** 83:5
97:21 136:1
**re-looping**
116:15
**re-pour**
61:24 230:1
**re-request**
98:11
**reach** 240:23
255:8
**reached**
260:22
**read** 47:13,16
50:4 97:23
270:12
**reading**
126:13
139:9 174:9
**real** 99:16
122:8
205:24
206:1,3
**reality**
198:20
199:14
**really** 12:15
117:24
133:10
160:19
212:12
236:22
**reason** 16:18
46:14 80:1
117:19
162:20
195:22
206:6 232:5
235:7 236:4
256:8
**reasonable**
192:4
**reasonably**
191:7
**reasons**
54:15 69:14
122:5
262:17
**reassess** 27:1
**rebuild** 160:1
**recall** 4:21,23
5:14 6:6,9
7:18 12:14
12:18,20
21:15,19
33:13 51:6
74:11,17
75:21 76:14
76:16,23
85:24 88:8
107:16
110:12,16
115:19,23
118:12
147:20
209:2
212:18
218:5 250:5
251:13
252:19
**receive** 16:24
17:1,7 26:6
26:7 55:21
189:6
**received**
45:11 81:17
90:8 99:19
152:15
194:3
200:22
201:3
**receives**
111:10
**receiving**
80:14
**recognition**
130:7
**recognize**
131:4 146:5
146:23
**recollection**
60:8 150:10
179:16
217:21
219:10
220:21
221:17
248:20
249:12
**recommend**
89:15
112:16
227:13
**recommen...**
62:7 65:5
71:14 89:21
98:20 100:6
100:24
101:2 112:7
112:11,23
112:24
123:10
143:18
167:5 172:9
189:22
191:5
203:15
224:16
229:24
230:8,8,11
230:13
233:16
246:1,3
258:9 265:7
**recommen...**
29:20 30:10
61:23 62:20

64:19 90:4
90:8,11,15
99:20
108:12
111:13
124:17
130:22
224:12
**recommen...**
71:15,16
198:24
**recommen...**
207:20
**reconstruct...**
39:21 43:11
44:9 71:17
**reconstruct...**
248:19
**reconstruct...**
71:18
**record** 6:10
12:12 25:19
30:4 35:18
35:20 41:24
43:13 47:15
50:3 76:3
97:22 129:2
165:16
169:12,19
174:13
178:16
231:23
232:2 233:3
233:5,8
238:11
246:18
269:1,3
271:14
**records** 11:7
14:5 15:11
18:7,15
32:15 33:12
45:10
**REDIRECT**
3:7
**reduced**
271:12
**refer** 18:15
34:17 108:4
121:6,7
122:23
**reference**
46:4 211:4
**referenced**
140:23
**referencing**
44:15
157:23
**referred**
56:19
157:20
251:8
**referring** 9:3
9:7 14:2
36:13 58:14
71:23 84:8
85:13 119:3
131:24
134:2
139:10
184:4
204:17
264:4
**refers** 47:3
84:6
**reflect** 43:12
94:16
**regard** 110:1
**regarding**
45:8
**regardless**
85:22 98:9
**regards** 4:14
8:3,17
12:10 19:7
32:12 52:6
52:20 53:14
57:5 63:8
74:13 101:9
101:14,15
102:22
105:16
108:13
121:14
134:9,24
135:15
154:13
155:10
171:8
176:17
194:19
202:7 204:2
205:4
206:17,18
213:19
214:19
223:7 250:4
261:7,13
264:14
**regs** 261:17
**regular** 103:3
164:11
**regularly**
250:2
**regulations**
40:4 43:4
87:12 268:6
**reissued**
14:16
**reject** 226:17
**rejected**
221:2
**relate** 7:23
**related** 13:13
26:17
136:10
138:23
156:12,21
**relating** 32:8
**relation**
31:22
**relationship**
181:9
194:18
**relative** 7:22
18:13 89:23
271:20,21
**relatively**
38:19,20
50:23
163:15
177:18
**relevance**
37:7
**relevant** 8:17
26:21
164:19
**reliant** 260:9
**relies** 97:15
**remain**
156:17
176:9
253:19
254:7
**remaining**
162:23
**remains**
160:3
**remediate**
85:3
**remedied**
84:13
**remedy** 84:12
141:21
174:12
**remember**
20:11 50:21
51:10 54:7
56:20 73:3
85:21,22
86:3,4,8,10
88:12
105:23
108:3
147:22,23
148:3,4
181:23
182:2,9
183:11
187:14,17
187:19
241:16
250:7
257:14,15
**rememberi...**
224:6
**removal**
131:11,13
158:5
210:17
212:4 241:6
**remove** 61:23
162:12
166:2,14
167:3
229:24
**removed**
246:4,5
**removes** 59:5
**removing**
211:5
**renovate**
34:13 53:15
63:19 64:17
176:1 203:8
221:6 228:5
230:3,18
231:10
232:6
233:24
234:12
236:10
**renovated**
39:5 40:17
41:18 42:11
43:19 139:8
238:23
239:3
**renovating**
34:16 63:9
202:7 226:2
228:9
231:18
234:19
237:24
**renovation**
39:2 42:23
66:20 85:9
86:11 91:13
95:9,21
96:17 97:7
101:6
102:23
103:9 104:5
104:13,22
105:6,8,21
106:20,24
108:21
109:20
112:18
117:10
120:22
157:20
159:4
180:12
186:15
197:22
206:15
207:8 217:5
224:24
265:20
267:9
**renovations**
27:22 91:20
105:9 121:1
**repeat** 49:20
49:21 129:5
198:4
**repeating**
116:20
153:17
**rephrase**
62:16 80:13
86:13

104:16
111:23
114:19,20
117:6
123:22
124:7,12
135:12
141:8 142:1
144:6 162:7
165:14
173:15
186:1 225:8
227:11
**replace** 51:2
89:2,24
161:6
166:23
172:9
259:11
**replacement**
9:13 42:3
65:7 66:5
86:19
103:22
122:9 123:9
158:5,21,23
159:1 212:5
212:9 241:6
**replacing**
160:6
196:23
254:13
**report** 12:9
13:9,16
14:22 32:4
52:8 55:2,7
58:3 60:3
61:4,13,15
62:21 69:19
70:7 71:24
73:11 90:17
90:21 116:4
124:15
139:7
169:13
172:5 174:7
186:6
187:21,23
188:19
204:13
214:2
227:17
245:23
250:9
**reported**
271:11
**Reporter**
1:16 96:1,4
109:10
142:17
155:4
193:12,19
195:4 261:9
269:1,4
271:4 272:8
**representat...**
191:19,24
**representat...**
64:7,9
**representat...**
54:23 62:11
65:2
**representat...**
57:4 204:8
**request** 14:15
15:6,13
16:1,5,11
16:12,18,20
17:14 18:8
98:7 102:15
189:6
190:16
191:8
213:21,24
217:11,20
218:2,3
221:12
222:13
**requested**
47:16 50:4
96:19 97:23
102:3
**requests**
11:13 99:14
194:3
**require** 15:24
16:4 62:3
66:20 91:12
151:7 207:3
211:11
255:17
**required**
67:8 80:19
125:21
133:12
134:8
189:20
257:7,10
**requirement**
17:5 78:15
78:18 80:18
144:22
155:11
171:12
234:7
258:20,21
260:3
**requireme...**
43:5 67:12
124:24
126:7
135:16
152:3,24
183:9 190:3
198:13
231:4
232:12
235:4
255:20
262:10
**requiring**
24:6 78:20
**rereads** 50:2
**rescind** 92:7
**reserve**
126:15
268:20
**reshaped**
14:16
**resolve** 130:8
**resolved**
51:13 130:9
**respect** 175:7
**respond** 44:5
**response**
4:16 97:19
131:19
185:12
235:14
**responsibil...**
42:7
**responsibil...**
42:2,4
43:14 110:1
169:15
**responsible**
41:17 42:10
108:11
110:4 143:6
188:24
**rest** 100:11
163:11
172:12
211:15
231:24
232:3 233:9
**result** 180:21
**resulting**
25:17
**retain** 143:16
**retained** 11:8
34:12
**retaining**
10:23 11:9
**retention**
15:4
**rethink** 64:11
**revealed**
140:15
174:24
**Revenue**
239:24
**review** 5:9
6:6 7:12,14
7:16 8:2
47:6 98:13
150:15
188:21
189:4,19
190:16
**reviewed** 7:8
66:1 91:21
196:17
**reviewing**
18:21 99:23
139:7,20
187:21,24
188:1
198:21
**reviews**
31:12,18
91:17 189:2
**RFP** 17:10
216:16,17
217:14
218:14
**RFQ** 17:9
80:22 81:2
130:1
179:15
214:20
218:13
219:16
220:23
**right** 7:11
15:8 47:4
48:17 57:24
65:14,18
66:14 73:12
73:23 74:14
75:18 77:11
77:14,16,18
77:24 79:4
79:17 81:17
85:6,7
108:4
114:19
116:13
120:21
130:16
138:18
142:19
146:8
153:20,21
154:20
156:4 163:7
163:9
165:22
169:16
170:4 171:5
181:9
182:13,14
187:12,22
188:6
190:15
192:1 208:8
208:19
214:7,12,18
216:21,22
220:8 222:7
226:11
227:19
229:6
233:19,21
234:1 235:5
237:19
240:14
248:6 251:6
251:19,24
256:22
257:9,18
262:2 263:9
266:10
268:8

rights 126:15
rise 26:3,8 36:4,15,22 40:7 56:7 59:22 60:12 69:14 73:12 73:17,22 74:13,21 76:18 77:1 77:5,14,22 77:23 78:14 79:5,24 80:16 82:21 123:20 124:1 130:12 131:20 133:4,5,12 134:2,6,9 135:2,11,14 136:7 138:9 152:1,20 153:6 154:2 154:8 155:2 155:9 156:5 165:23 256:8,13 258:21
rising 78:19
roadblock 220:15
Robert 21:6
Rockwell 101:23
Roderick 33:24 35:1
roughly 99:20 100:19 167:7
Rowland 45:2
RT 217:8

RTU 144:16 145:14,19 146:6 147:2 147:8,9 208:15 217:18 227:16
Rule 64:9
rules 1:13 87:12

**S**
S 2:1 3:10,16 3:16 228:2 228:2
S-a-r-a-f-i-... 66:12
Sabrina 104:3 249:24 250:3
safety 11:10 34:2 101:17 101:19,23 145:8 175:15,15 175:17 262:11,17
SAITH 269:6
sale 240:5
sales 201:18
salient 199:20
sally 208:5
salvaged 96:13
Sam 5:22 142:20 233:14
SAMUEL 2:10
Sarafian 66:8 66:11 87:17
Sarvan 87:16

sat 204:1,3,7
saw 162:17 163:3,4,8,9 163:20 219:19
saying 14:4 14:22 83:15 131:3 152:13 154:23 175:3 248:15 254:21 259:24
says 9:23 10:7 11:7 11:10 29:17 35:20 51:11 71:14 110:2 132:15 153:21 192:18 193:23 196:11 197:4 229:23 240:15 240:15
scan 39:12 252:7,10,12
scenarios 198:23
scheme 158:3
schools 30:6 158:22
scope 211:16 22:5 24:3 25:8 25:12 27:18 29:23 46:16 66:16 71:19 121:11 169:14 178:6 179:11

198:21
scopes 85:2
scoring 149:5
screen 7:5,13 10:12 36:7 44:20,24 45:1 55:4 55:13 215:10 216:15 229:20,22
screws 164:8
scroll 216:3
seat 256:2
second 30:2 50:8 61:7 102:10 151:20 179:1 218:1 225:8 229:21 232:3 239:21
section 61:10 148:20,24 149:5
sections 54:14
secure 148:12 219:15
security 249:15
see 7:2 9:9 32:5 34:17 37:24 45:1 51:7 58:3 61:13 70:8 77:16 96:9 116:5 117:6 117:18 121:7 145:22 148:5

149:22 160:16,18 184:20 207:19 215:10,14 216:23
seeing 140:20 148:4
seek 262:24
seeking 119:15 215:20 217:6
seen 88:18 147:21 226:10
send 190:1
sending 108:12 110:9
sense 187:20 264:2
sensitive 182:9
sent 109:21 sentence 85:6 135:19,23 162:18 176:2 219:3
separate 204:18 207:5,6 238:11
separately 21:21 219:24
set 4:5 30:21 30:22 95:8 186:3,20,23
setting

69:12 70:20 152:5,8,10 152:16 153:4 172:20 176:13 181:18 183:24 184:2,10,23 185:2 186:5 203:24 204:5,13
sequentially 183:20
series 4:14 71:9 99:3
serve 89:1,4 169:11,18
served 52:12
serves 88:16 219:4 245:12
Service 11:1 227:3
serving 213:22 216:9 252:2
set 141:11 181:18

226:23,23
seven 11:13 67:15 220:5
shadow 147:13
shallower 122:16
share 7:5 229:20
Sheevy 21:4
sheriff's 16:12 96:7,22 97:2 101:5 101:24 122:4,12 103:10 104:1 135:2 144:1 145:6 204:4,8 205:4,7,20 205:23 206:13,22 208:20 248:18,24 249:5 250:17 254:22 257:21 264:11,16 264:6 270:6
Sheriff's 21:13 31:17 32:22 95:19 98:12 101:9 204:1,22,23 249:14
sheriffs

249:16
shield 84:15
shielding 160:5
short 75:12 116:16 214:11,15
shorter 166:17 222:21
shorthand 1:16 229:2
shortfall 9:16,22 97:22
shortly 56:1 56:3 82:14 172:21
shorts 116:9
show 143:23 264:7
showed 36:10 38:1 40:12 138:11,12
shower 256:2
showing 7:13 44:23 55:13 69:22
similar 165:24 146:2 220:24 245:18
sic 10:18 12:23 45:20 53:19 61:23 87:16 104:3 132:11 143:23 164:5 173:17

84:7 138:19 68:16 69:23 164:12 176:13 209:23 211:1 212:1 184:4,7,17 186:21 185:1,4 186:16
sign 18:12 250:15
signal 35:1 81:12
significant 190:10 216:17
signed 160:4
signs 254:20 259:23
silent 81:23 169:4
similar 256:3
sin 152:8
simply 54:16 96:12 126:1 162:18
simultaneo... 142:14 154:3 173:1 193:11 194:23
simultaneou... 183:21
single 26:2 159:5 161:3 164:5,5
site 32:6,17 35:19 58:4

133:2,6,8 164:2 134:2 176:13 184:4,7,17
sides 61:8 126:7 210:3
185:1,4 186:21 187:2,5 188:6,8 186:4 189:12 250:1 189:10 191:14 202:2 204:6
sitting 175:9 218:10
situation 258:9 258:6 258:18 259:22 257:2
situations 256:3
six 45:17 146:17 162:18 174:2 175:4 194:3 193:1
skip 235:9 236:9
slight 123:21 131:20 132:5
slightly 16:13 59:8 31:9

sorry 21:17 94:3 96:1 202:20
slope 62:1 82:3 139:13 139:11 258:1
sloped 246:6
small 157:21 159:3,4
smaller 158:3 158:6 160:10
snow 207:4
soil 211:9
sold 240:1
sole 41:6
solicitation 11:17 141:7 18:10
soliloquy 260:18
solution 199:22
somebody 12:15 145:11 155:5
speaking 142:14 153:3 185:14 193:1 193:11

71:10 73:6 88:15 93:11 109:15 127:20 149:9 157:23 196:23 199:2 219:7 219:16 224:4
specifically 5:14 7:24 20:12 22:14 31:21 47:3 90:22 69:2 71:3 73:2 96:18 103:21 105:15 116:1 123:3 135:1 147:23 152:19 177:10 209:13 214:9 219:7 250:12
specificatio... 30:22 69:2 69:3
specifics 4:21 6:9 19:23 51:5 67:5 88:12 89:13 89:16,18 96:10 109:24 110:7 117:20 130:3 183:9 199:23
specified 37:17 82:1 43:1,20 59:13 61:12

spectrum 256:6
speculating 162:15
speculation 36:24 63:12 141:23 163:3
speculative 161:23
spell 66:9 108:6
spelled 13:2
spend 99:20 230:24 242:1,1,9
spending 103:14,15 242:22 243:14
started 12:5
spoke 187:17
spoken 76:13 71:17 80:21 81:1,8 99:2 142:23 178:9 199:15 200:8 201:5 214:20 265:12
starting 51:1 102:8 142:22 188:17,20 214:5
steps 13:17 50:16 66:18 68:8,10 148:12 170:1,16 179:9,9 201:11 271:1,4
stated 8:8 46:18 265:9 236:7,9 238:1,4,5

statement 84:5,17 121:20 170:13,18 170:24 193:8,23 235:15,15
statements 6:12,16,19 138:7
states 1:1,14 7:19 49:2 61:7 129:3 240:13 188:6
Stoner 12:9 52:15 137:14 174:7
stay 231:11
staying 231:13
step 69:14 162:15
stenograph... 117:12 127:2
step 15:3 45:23 68:7 153:10
straight 148:19 149:5
straightfor... 233:17
street 2:10 179:15 208:12,18 233:8
strick 30:23 49:4 108:21
stricken 143:22
stringent 114:4
stronger 267:6

238:22
Stewart 21:6
stick 13:6
stipulate 37:4 117:18 147:3,7
stipulated 115:20
stipulation 118:6 161:7 166:2
subject 92:8 239:13 262:15,22
submit 96:8 98:17 100:23 107:6 110:20 122:16 194:11 237:7
submits 87:9 94:19 189:3
submittal 95:3 102:12
submitted 80:14
swamped 195:23
sworn 4:2,9 270:11,20 271:8 223:17

structure 261:18
stuff 199:14 205:18
STV 12:9,23 13:2,3 33:17,22 34:9 73:3
subcontrac... 12:23 162:16 162:6 165:1 166:2
submitting 233:8
subscribing

6:15
subsequent 28:1 30:9
171:1
subsequently 23:23
subsoil 161:4
substantial 240:23 241:3 254:4
substitute 155:23
substrate 165:18
subtract 93:7
successful 222:15
successfully 221:11 223:14
sue 224:5
sufficient 64:8 65:19
suggest 84:14 119:16 237:20
suggestion 84:21
suggestions 234:22
Suite 2:11 43:23
summarizing 90:20
Summary 61:4
summer 165:8
summertime 161:11
superseded 88:22
supervise 30:24
supervision

264:13
support 17:11 261:3
suppose 151:23
surveyor 122:3 192:18,23 192:23 226:19
surveyor's 92:13 254:9
survived 96:22 102:14 119:16 121:9
survive 96:3 123:15 134:11 255:1
sure 12:5 229:4
surface 62:3 216:6
surprise 246:16
surprised 203:4,22
survey 39:13 72:1,5,20 161:20,21

80:14 81:17 82:19 84:6 84:18 140:8 150:5 162:1,5 73:6 75:16 76:11,13 75:20 76:4 76:6,11,13 78:7 79:3 84:1 138:12 138:18 140:7,10 142:4 165:2 171:1 214:3,10,13 222:21 223:1,7,12 271:8 273:12 sworn 4:2,9 270:11,20 271:8 system 59:5 147:6

**T**
T 3:10,16,16 4:14,11 73:4 81:24 107:17 228:2 246:19,19 228:11,24 229:4,8 110:12 111:4 take 13:17 takes 48:1 98:24 178:8 183:2 223:1 155:11,13 159:5,15 160:5,21,24 161:5,12,13 161:20,21

162:12 163:6,14 164:15 166:2,9,13 167:2,13,16 167:17,19 168:9,10 169:2,10 178:10 179:7,23 194:19 162:6 208:15 228:11,24 229:4 231:13 232:2 236:22 240:9 254:4 256:24 241:3 256:1 264:23 271:16 279:22 276:16 277:6,17,22 276:16 281:6 283:3 287:21 290:2 295:19,24 297:10

205:20 227:24 22:12 48:16 79:1 84:24 103:5 148:16 242:23 193:22 182:10 212:1 159:9,10,12 140:14 141:9 tasked 65:15 team 32:6,16 33:23 34:8 35:2,21 103:20,24 talking 5:22 6:11 21:9 teams 182:5 166:14,20 technically 112:23 tell 10:20

221:8 222:12 225:15 230:20 231:15 238:15 241:23 242:23 264:18 tasked 65:15 team 32:6,16 33:23 34:8 35:2,21 103:20,24 teaspoon talking 5:22 6:11 21:9 213:14 teams 182:5 166:14,20 technically 112:23 tell 10:20 25:1,5 31:2 31:20 32:13 36:2,12 39:17 46:7 48:12 54:2 54:6 57:7 57:11 58:19 58:21 59:17 60:9,24 72:20 79:10 80:5,10,18 195:19,24 218:7 221:2 160:2

Exhibit 5 Page 78

ERIC DAVIS
March 12, 2024

Page 40

| | | | | | |
|---|---|---|---|---|---|
| 75:6,11 | 198:12 | 239:14 | 214:5 | 140:10 | 143:12,15 |
| 179:12,24 | 200:16 | 240:2 243:9 | 216:17 | 230:6 251:7 | 149:12,13 |
| ten-minute | 223:11 | 245:22 | 219:8 222:4 | 251:19 | 155:5 161:9 |
| 75:5 | 224:9 226:4 | 247:19 | 225:10 | 253:7 | 163:19,23 |
| tendered | 231:16 | 249:9 | 226:13 | 257:12,14 | 165:19 |
| 214:2 | 253:24 | 258:14 | 227:16 | 258:1 | 167:7,9 |
| term 41:12 | 263:19,20 | think 5:11 | 228:20 | 259:12 | 174:11 |
| 62:6 88:16 | 263:21 | 6:8,13,14 | 229:12 | thoughts | 176:15 |
| 113:20,24 | 264:1 | 6:20 7:10 | 235:3,4,5 | 157:1 | 181:19 |
| 132:10 | 270:17 | 9:23 12:4 | 236:14,16 | 200:10 21:2 | 189:17 |
| 133:8,16 | 271:14 | 13:21 14:2 | 236:21 | 38:9 99:12 | 195:5 201:4 |
| 134:2,3 | testing | 17:20 21:15 | 237:4,5,20 | 146:16 | 205:21 |
| 152:13 | 211:12 | 21:20 29:17 | 238:6,18 | 161:15 | 207:23 |
| 154:14 | tgm@morr... | 41:11 47:11 | 240:14,16 | 166:13,18 | 209:7,23 |
| 156:4 | 2:6 | 49:23 51:11 | 243:17,22 | three-222:19 | 211:1 |
| terminate | thank 47:4 | 53:16 58:9 | 244:21 | 242:21 | 212:20 |
| 89:7,12 | 96:5 129:1 | 60:16 69:21 | 245:11 | 243:16 | 213:23 |
| 91:6 92:3 | 227:14 | 69:22 72:11 | 247:18 | threshold | 214:5 |
| terminated | 246:13 | 75:22 76:20 | 250:6 | 24:2,4,12 | 217:19 |
| 89:9 | 246:18 22:19 | 78:19 82:17 | 251:11,16 | 24:14 | 218:4 |
| term 10:4 | theories | 99:11 | 251:18 | throw 137:4 | 222:18,21 |
| 16:15,23 | 127:22 | 112:22 | 252:17,18 | throwing | 223:1,17 |
| 30:13 64:2 | 126:14 | 114:5 | 253:6,24 | 135:22 | 224:6 |
| 120:19 | thing 149:15 | 123:20 | 254:12 | thwarted | 225:10 |
| 134:14 | 151:2 203:1 | 124:11 | 257:18 | 130:17 | 227:15 |
| 139:16 | 206:3 | 125:9 | 260:22 | tie 242:11 | 228:19 |
| 160:11 | 239:21 | 128:4 129:1 | 261:24 | till 152:5 | 229:14 |
| 161:7 178:1 | things 5:12 | 129:7 130:3 | 264:4,11 | time 4:8 | 236:22 |
| 190:23 | 6:8 41:7 | 131:5 145:4 | 266:19 | 19:24 23:7 | 240:9,12 |
| 200:23 | 44:3 50:15 | 145:4 146:6 | thinking | 28:13,21 | 245:14 |
| 240:3 256:4 | 54:12 59:6 | 146:7 148:2 | 199:15 | 29:10 30:7 | 246:13 |
| testified 4:9 | 71:13 77:3 | 150:10,13 | 245:12 | 34:5 37:5 | 248:18 |
| 13:21 | 79:22 90:19 | 154:2,19 | third 102:10 | 47:6 53:24 | 249:9 |
| 160:15 | 103:14 | 161:5 | 130:6 | 58:15 67:14 | 268:20 |
| 206:17 | 110:15 | 166:16,17 | 134:20 | 67:16 69:5 | 270:15 |
| 236:6 | 153:1 158:4 | 166:21 | 179:11 | 70:2 80:20 | 271:17 |
| testify 7:9 | 183:20,21 | 167:6,16 | third-party | 93:12 94:13 | time-consu... |
| 271:8 | 188:3 | 169:8 172:7 | 10:23 80:2 | 98:14 102:6 | 164:19 |
| testimony | 196:22,24 | 183:9,12,22 | 84:3 134:20 | 107:14 | timeline |
| 6:19 24:20 | 218:20 | 191:23 | 143:17 | 116:3 | 195:15 |
| 40:23 75:2 | 217:10 | 192:3,21 | THOMAS | 123:16 | 202:10 |
| 80:3 82:10 | 225:10 | 195:13,15 | 1:6 2:3,4 | 129:15,22 | timely 259:19 |
| 194:8 | 231:1 | 207:13 | 270:6 | 129:24 | 48:17 58:11 |
| | | | | thought 6:3 | 115:6 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 41

| | | | | | |
|---|---|---|---|---|---|
| 204:24 | 63:15 69:21 | 241:5 | 171:21 | two 4:19 | ultimately |
| 228:8 | 84:3 92:21 | totally | 174:15 | 15:16 19:14 | 115:3 |
| 241:19 | 112:10 | 175:11 | 184:3 | 19:16,21 | unanswera... |
| timetable | 116:13 | 188:13 | 184:3 | 20:10 21:2 | 49:6,9 |
| 176:3 | 119:14 | track 263:6 | 228:18 | 57:20 58:22 | uncertain |
| 222:11 | 121:10 | trades 36:1 | 241:1 | 63:22 64:17 | 137:13 |
| 223:22 | 124:11 | transcript | 270:16 | 64:18 69:14 | uncertainty |
| 224:24 | 129:15 | 5:10 70:17 | 271:11 | 69:15 70:3 | 137:11 |
| 225:12 | 142:17 | 270:13,16 | truly 62:10 | 103:13 | 226:21 |
| 251:16,18 | 154:21 | 271:11 | trust 182:5 | 226:1 | unclear 27:1 |
| timing 18:16 | 155:5,23 | transfer | 196:9 | 150:11,14 | uncommon |
| 18:17 | 173:4 | 25:16 29:21 | truth 27:18 | 150:14,17 | 28:10 |
| today 5:18 | 176:19,23 | 29:22 30:4 | 59:11,18,19 | 151:3 | unconvinced |
| 7:9 11:12 | 178:18 | 30:9,16,19 | 59:7 85:3 | 163:15 | 182:12 |
| 166:24 | 182:18 | 68:19,22 | 227:12 | 184:6 | undermine |
| 176:5 | 184:11 | 227:12 | 184:3 | 191:12,18 | 195:14 |
| 178:10,11 | 185:5 | 242:15 | 242:15 | 209:6 210:3 | underneath |
| 180:22 | 193:12,19 | 169:5,7,9 | 247:19 | 210:3 213:2 | 147:13 |
| 185:2 224:9 | 198:20 | 170:3,5 | 258:17 | 213:20 | 168:24 |
| 227:15 | 206:10 | 171:18 | trying 11:20 | 234:16 | 211:13,20 |
| 235:5 241:1 | 218:5,19,23 | 172:1,11,17 | 131:14,14 | 256:19 | understand |
| 241:8 | 254:21 | 178:14 | 131:16 | 266:14 | 43:23 71:12 |
| 268:16 | 227:13 | 231:15,17 | 180:20 | two-and-a... | 102:14 |
| today's 4:5 | 251:18 | 231:17 | 202:4 | 132:5,11,21 | 114:8 118:2 |
| 7:7,17 | 245:14 | 232:1,6,9 | 216:12 | 132:23 | 137:8 |
| 58:17 | 253:6 | 232:18 | 224:19 | 133:2,7 | 165:13 |
| toilet 255:7 | 257:24 | 233:1 | 231:1 | 165:3 | 173:7 |
| told 56:6 | 260:21 | 246:16 | tunnel 147:5 | two-hour-o... | |
| 185:9 | 261:9,24 | 263:2 267:4 | 156:6 | 146:17 | 196:7 197:6 |
| 191:17 | 263:2 267:4 | transmits | 159:6 | two-stage | 198:1 |
| 192:5 198:3 | 268:7 | 248:21 | 207:10 | 199:6 | 199:18,21 |
| 198:13 | Tom's 239:5 | transverse | turn 7:2,2 | two-step | 207:17 |
| tolerance | tomorrow | 62:4 | 44:12 95:2 | 183:14 | 216:8 226:6 |
| 153:5 | 235:1 | treatment | 95:18 | two-year | 256:3 |
| tolerances | Toni 89:8 | 61:17 | 169:7,9 | 167:7,9 | 239:13,21 |
| 79:23 | tool 164:4 | 148:21 | turned 150:1 | types 161:22 | 254:23 |
| 134:15 | 164:19 | 149:6 199:4 | 174:20 | 244:21 | 262:12,18 |
| 140:19 | top 116:15 | turning 61:3 | 174:20 | typewriting | understand... |
| 152:24 | 128:8 182:6 | 121:11 | 223:6 | 271:12 | 44:6 74:7 |
| Tom 6:11 | 254:21 | 238:6,20 | 249:20 | | 79:22 |
| 14:3 26:11 | 256:5,15 | 252:22 | regular 6:1 | U | 134:17 |
| 46:6 48:16 | topics 146:19 | trouble 224:6 | turnover | U 3:16 | 143:9 145:1 |
| 57:13 60:22 | total 43:3 | true 37:8 | 177:24 | Uh-huh | 152:1 |
| | 159:17 | 105:5 | turns 222:20 | 124:19 | 162:14 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 42

| | | | | | |
|---|---|---|---|---|---|
| 183:18 | untoward | variation | 68:16 | 56:19 | 217:24 |
| 189:20 | 117:24 | 74:9 259:8 | 186:17 | walkway | 218:12 |
| 222:17 | unusual | variations | 191:14 | 224:18 | 220:22 |
| 248:17,17 | 203:5 | 134:18 | visits 69:23 | 246:6 | wanting |
| 249:3 | update 99:7 | varies 255:24 | void 211:11 | wall 148:24 | 219:11 |
| 251:22 | 180:4 | various 84:24 | 211:17,18 | 162:23,23 | warehouse |
| understands | upgrades | 99:3 100:13 | 211:23 | 163:1,2,5,7 | 101:23 |
| 185:18,19 | 17:19 98:4 | 101:22 | 220:24 | wants 244:20 | washroom |
| understood | way 37:5 62:6 | 102:5 138:7 | Volume | want 23:18 | 151:15 |
| 114:7 | 63:18 64:2 | 264:7,9 | 113:11 | 26:20,23 | wasn't 81:21 |
| undertaken | 66:4 68:11 | vehicle 15:11 | vote 86:6,7 | 37:16 46:13 | 141:18 |
| 223:18 | 113:24 | 73:6 | 88:11 91:9 | 49:12 51:15 | 149:2 |
| undertaking | 151:14 | vehicles | 93:4,5 94:6 | 64:10 77:18 | 151:11 |
| 149:11 | 154:14 | 102:1 | 113:4 115:4 | 83:5 84:2 | 164:16 |
| 154:22 | 156:4 177:8 | vendor 10:5 | vs 1:4 173:3 | 96:12 102:4 | 180:1 |
| 220:7 | 177:15 | 10:6 151:9 | | 140:18 | 187:23 |
| underway | 197:12 | 190:4,6 | W | 115:21 | 212:11,17 |
| 98:18 99:8 | 202:22 | vendors | wait 32:3,23 | 116:19 | 250:12,18 |
| 103:17 | 217:24 | 65:14 | 124:3 | 123:5 124:7 | 251:20 |
| 120:1 | 220:23 | verification | 178:14 | 127:20 | water 211:8 |
| 168:14 | 239:4 242:8 | 39:10,24 | 258:8 | 128:18 | way 8:23 |
| 245:16 | 268:8 | 43:17 82:14 | 263:23 | 133:8 | 10:2 12:16 |
| 265:11 | user 99:3 | verified | waited | 142:15 | 15:21,22 |
| 266:12 | users 96:7 | 38:21 67:9 | 124:12 | wait 133:16 | 29:2 39:24 |
| unencumb... | uses 134:1 | 82:7 | walk 53:12 | 140:21 | 34:11 19:6 |
| 116:19 | usually 6:8 | verify 32:8 | 56:21 | 186:18 | 64:5 86:6 |
| unforeseen | 32:23 33:2 | 38:14 41:4 | 183:12,16 | 203:2 210:8 | 86:8 88:13 |
| 161:4 | 102:11 | 76:22 140:7 | 183:22 | 222:4 225:8 | 98:15 |
| 209:18 | utilize 255:6 | version 233:1 | 56:21 | 228:8 | 128:13 |
| 210:4,16 | utilized | vertical 77:5 | 210:17 | 130:9,19,19 | 124:8 130:8 |
| 211:3,22 | 250:12 | 133:5 134:6 | 202:3 210:8 | 131:1,9,16 | 133:10 |
| unfortunat... | 251:1 | 152:1,20 | 203:2 | 117:17 | 137:22 |
| 59:5 262:21 | V | vetoed 88:4 | walk 53:10 | 181:1 | 145:14,23 |
| United 1:1,14 | value 25:4 | video 251:14 | walkthrou... | 188:5,7,16 | 161:23 |
| 270:1 | variability | videoconfe... | | 98:15 | 167:19 |
| University | 151:3 | 1:11 | | 71:1 72:7 | 202:2 |
| 231:8 | variance | view 134:20 | | 50:14 52:11 | 268:4,7 |
| unknown | 76:16 | 143:17 | | 53:1 55:15 | 268:8 |
| 210:23 | 123:22 | 263:12 | | 165:7,15 | wording |
| unknowns | 240:17 | vigilantly | | 89:2 92:19 | 105:23 |
| 225:11,22 | 258:4,6 | 131:2 | | 195:6 | 202:22 |
| 225:24 | variances | violation | | 202:2 | 226:8 268:2 |
| unrenovated | 74:7 153:22 | 117:23 | | 207:12 | 268:4,7 |
| 156:11 | | visit 32:6 | | 216:12 | 259:5 |

TOOMEY REPORTING
312-853-0648

ERIC DAVIS
March 12, 2024

Page 43

| | | | | | |
|---|---|---|---|---|---|
| 212:23 | 176:6 | 187:1 | wish 96:9 | 119:10,14 | 224:3 225:4 |
| 219:15,21 | 178:14,17 | 188:15 | witness 3:2 | 122:14 | 226:5 227:7 |
| 223:16 | 181:1 | 192:2 | 4:1,8 5:21 | 124:10 | 228:22 |
| 234:22 | 184:13,14 | 268:16 | 6:5,14,15 | 125:3 | 230:5 |
| 235:3,5,6 | 188:19,23 | weeks 70:3 | 8:20 11:5 | 128:18 | 231:3 |
| 236:14,16 | 195:23 | 191:18 | 12:1,13 | 127:7 | 237:11 |
| 236:21 | 200:13 | 209:20 | 14:1 15:19 | 128:12 | 246:12 |
| 247:12,21 | 229:3,10,19 | 240:14,16 | 16:9 19:3 | 132:19 | 249:8 |
| 248:9 263:6 | 233:4,7,14 | 240:19,20 | 19:10,19 | 132:19 | 252:16 |
| 263:8,24 | 234:21 | 110:16 | 24:22 26:1 | 136:20 | 253:5,22 |
| ways 54:18 | 237:15,19 | 144:18 | 26:14 27:8 | 140:5 | 254:11 |
| 148:18 | 238:14 | 51:14 57:2 | 29:9 31:7 | 144:12 | 255:14 |
| 225:14 | 239:11 | 79:2 82:12 | 32:1 37:1 | 146:11 | 256:18 |
| we'll 23:3 | 244:6 262:1 | 32:17 34:9 | 146:1 | 153:18 | 259:3,7,22 |
| 46:11,12 | 263:2 268:5 | 34:24 35:12 | 155:22 | 257:12 158:1 | 260:19 |
| 83:7 137:24 | we've 39:8 | 21:20 54:20 | 156:12 | 163:1 | 261:23 |
| 154:4 | 71:11 84:24 | 44:18,21 | 158:2 | 264:3 266:5 | 267:3,13 |
| 157:11 | 99:10,19 | 131:6 142:5 | 162:5 | 165:11,13 | 268:1,21 |
| 205:18,19 | 103:21 | 143:13 | 48:7 50:1 | 165:15 | 271:7 |
| 227:15 | 116:3 | 219:14 | 50:14 52:11 | 166:5 | 271:2 |
| 249:10 | 130:24,24 | 221:7,8 | 53:1 55:15 | 167:15 | witness' |
| we're 10:4 | 146:15 | 253:5 | 60:15,21 | 174:1,17 | 156:11 |
| 13:21 19:23 | 175:1,4 | West 2:10 | 60:15,21 | 175:3 | 175:8 |
| 25:2 28:13 | 178:8,12 | Western 2:4 | 62:3 63:13 | 176:23 | women-own... |
| 30:13 41:10 | 179:3,9,12 | wheelchair | 69:20 70:15 | 181:7 | 231:3 |
| 46:21 70:6 | 181:24 | 249:3 | 71:1 72:7 | 184:22 | word 25:6 |
| 94:14,20 | 195:9 | wheelchairs | 72:9 87:17 | 185:8,9 | 40:15 132:5 |
| 101:12 | 198:22 | 69:20 70:15 | 81:7 | 188:9 | 132:17 |
| 102:16 | 199:1,2,6,9 | WHEREOF | 75:8 79:20 | 189:8 | 141:11 |
| 116:13,21 | 207:13 | 272:1 | 80:9 82:11 | 191:1 | 154:12 |
| 120:7,10 | 225:11,23 | wide 159:20 | 89:13 | 194:9 195:1 | 154:14,23 |
| 131:14,16 | 237:17 | 169:5,18 | 88:7 91:1,8 | 196:2 | 202:22 |
| 134:22 | 238:6,18 | 170:2 199:8 | 93:21 95:18 | 197:2 | 226:8 268:2 |
| 153:17 | 246:23 | 170:12 | 96:6 97:20 | 200:12 | 268:4,7 |
| 159:24 | 248:7,8 | wildly 207:16 | 107:2 109:4 | 207:12 | 259:5 |
| 160:4,21 | 207:20 | 102:14 | 109:12 | 216:12 | |
| 167:8 171:4 | week 70:2 | winter 165:8 | 112:21 | 220:20 | |
| 172:6 174:6 | 99:12,13 | 239:19 | 116:22 | 223:12 | |

TOOMEY REPORTING
312-853-0648

Exhibit 5 Page 79

**ERIC DAVIS**
**March 12, 2024**

Page 44

| | | | | | |
|---|---|---|---|---|---|
| 265:12 | 199:10,13 | 187:20 | 147:10 | 98:19,24 | 221:18 |
| work 7:19 | 201:5 | 227:13 | 160:17 | 99:1,9,11 | 234:6 |
| 8:7 14:9 | 204:11 | 243:13 | 163:13 | 100:22 | 238:16 |
| 16:22,23 | 209:15 | 254:13 | 167:1 168:7 | 101:10,12 | 239:17 |
| 17:12 22:5 | 212:3 | wrap 146:20 | 169:9 | 101:15,20 | 241:10 |
| 22:11 28:8 | 217:18 | 222:11 | 170:24 | 102:9,17,18 | 242:2,8,13 |
| 29:2,5,13 | 223:20 | 268:14 | 179:3 183:2 | 102:23 | 242:16,18 |
| 29:19 35:15 | 224:15 | writing 81:2 | 184:13 | 103:12 | 243:12,15 |
| 37:3 53:11 | 231:24 | wrong 35:21 | 191:16 | 104:19 | 243:18 |
| 54:15 82:14 | 233:7 | 185:11 | 192:3 | 105:2,11,11 | 244:14 |
| 83:1,6,8 | 242:12,15 | 252:8 | 193:10,18 | 105:13 | 265:15 |
| 84:3 88:5 | 242:24 | wrongly | 203:2 208:9 | 106:9,11,13 | 266:17 |
| 94:14 120:8 | 243:5,23 | 39:20 | 211:20 | 107:11 | year's 100:21 |
| 120:10,15 | 244:3,4,6 | | 216:3,23,24 | 108:14,24 | 178:3 |
| 124:6 | 246:24 | **X** | 216:24 | 108:24 | years 15:16 |
| 126:20 | 247:8 | X 3:1,10 4:11 | 217:3 221:5 | 109:22 | 19:14,16 |
| 127:5,24 | 248:23 | 228:2 | 223:5 | 110:23 | 38:9,9 |
| 131:16 | 258:11 | 246:19 | 229:12,18 | 111:14 | 63:22 64:17 |
| 133:15 | 265:12 | | 233:7 | 112:3,17 | 64:18 103:4 |
| 135:23 | 266:9 | **Y** | 234:24 | 113:4 118:8 | 110:17 |
| 136:3,15,21 | 267:19 | yada 47:10 | 239:6 | 113:23 | 116:3 |
| 137:23 | worked | 47:10 | 240:21 | 114:15,23 | 120:23 |
| 138:22 | 115:13 | yard 256:23 | 241:21 | 115:4 116:8 | 121:3,5 |
| 141:16 | workers | yeah 9:10 | 245:6 246:2 | 117:9 118:5 | 128:13,18 |
| 145:12,13 | 250:13 | 15:8,9 | 247:6 248:7 | 118:8,22,24 | 159:2 |
| 149:3,6 | working 10:14 | 17:20 32:2 | 248:16 | 119:8,19,23 | 172:23,24 |
| 150:15,20 | 19:23 65:16 | 37:2,15 | 249:10 | 119:24 | 173:7 175:4 |
| 156:13,23 | 151:8 164:2 | 41:2 43:21 | 250:2 | 120:9 | 213:20 |
| 156:24 | 173:6,13 | 44:2 45:18 | 251:18 | 121:17,19 | 234:9 |
| 157:15 | 175:4 181:1 | 46:6 47:7 | 254:6 | 122:4,5,17 | 243:19 |
| 161:8,13,14 | 182:14 | 47:10 48:4,4 | 257:23 | 123:18 | 253:20 |
| 167:13 | 199:22 | 57:9 60:16 | 266:6 | 151:10 | 254:16 |
| 168:12 | 225:16 | 62:5 63:14 | year 11:16 | 156:17 | 259:15 |
| 174:21 | 237:19 | 68:20 72:3 | 15:5 18:1,9 | 164:9 | 260:14 |
| 176:11 | workplace | 72:11 113:8 | 18:11 23:9 | 165:19 | Yep 151:21 |
| 179:18 | 249:16 | 114:13 | 24:11 27:23 | 168:6,13,20 | |
| 181:4,14 | works 12:22 | 119:14 | 28:4 31:20 | 170:19 | **Z** |
| 182:4 | 33:15 | 121:10 | 51:8 64:5 | 174:6 | zero-based |
| 186:15 | 267:14 | 123:7 | 90:20 91:22 | 177:19,21 | 239:15,20 |
| 191:9,21 | world 263:12 | 125:23 | 92:14,24 | 177:23 | 243:14 |
| 192:11,15 | wouldn't | 131:5 | 93:3,10,13 | 178:2 180:6 | Zoom 1:11 |
| 194:5 | 8:10 54:15 | 132:22 | 93:16 94:16 | 180:13 | 57:9 |
| 195:23 | 76:1 85:16 | 134:5,7 | 94:23,24 | 181:18 | |
| 197:4 198:9 | 149:1,6 | 140:11,16 | 95:4,7 97:2 | 182:1 212:5 | **0** |

**TOOMEY REPORTING**
**312-853-0648**

---

**ERIC DAVIS**
**March 12, 2024**

Page 45

(index continues — columns of numeric references)

**TOOMEY REPORTING**
**312-853-0648**

---

**ERIC DAVIS**
**March 12, 2024**

Page 46

(index continues — columns of numeric references)

**TOOMEY REPORTING**
**312-853-0648**

Exhibit 5 Page 80