IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EUGENE WESTMORELAND, individually and for a class, )
Plaintiff, )
v. ) 1:23-cv-01851
THOMAS DART, SHERIFF OF COOK COUNTY, and COOK COUNTY, ILLINOIS, )
Defendants. )

The deposition of DARREON THOMPSON, taken on behalf of the defendants in the above-entitled case before Debra L. Kleszyk, a Certified Shorthand Reporter within and for the State of Illinois, taken remotely via videoconference on April 22, 2024, commencing at 11:06 a.m., pursuant to the Federal Rules of Civil Procedure. The witness was located at Cook County Correctional Center, 2700 South California Avenue, Chicago, Illinois.

A P P E A R A N C E S

THOMAS G. MORRISSEY LTD.
BY: MR. THOMAS G. MORRISSEY
MR. PATRICK W. MORRISSEY
10257 South Western Avenue
Chicago, Illinois 60643
(773) 233-7900
tgm@morrisseylawchicago.com
pwm@morrisseylawchicago.com

Appeared via videoconference on behalf of the plaintiff

DeVORE RADUNSKY, LLC
BY: MR. ZACHARY STILLMAN
230 West Monroe Street, Suite 230
Chicago, Illinois 60606
(312) 300-4479
zstillman@devoreradunsky.com

Appeared via videoconference on behalf of the defendants

I N D E X

WITNESS: DARREON THOMPSON

| EXAMINATION | PAGE |
|---|---|
| By Mr. Stillman | 5, 58 |
| By Mr. T. Morrissey | 53 |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | photograph | 23 |
| Exhibit 2 | photograph | 24 |
| Exhibit 3 | grievance | 30 |
| Exhibit 4 | Declaration of Darreon Thompson | 47 |
| Plaintiff's Exhibit 17 | video | |

THE COURT REPORTER: My name is Debbie Kleszyk. I am an Illinois Certified Shorthand Reporter.

The parties participating in this deposition acknowledge that I am not physically present in the room with the witness and that I will be reporting this deposition remotely. At this time I ask counsel to identify yourself and then indicate your stipulation to waive any objections to the validity of the oath administered remotely, starting with the noticing attorney.

MR. STILLMAN: Yes. Zachary Stillman with DeVore Radunsky for defendants. And we --

MR. T. MORRISSEY: Thomas Morrissey on behalf of Mr. Thompson, and we agree to the administration of the oath remotely.

MR. STILLMAN: We also agree.

(The witness was duly sworn.)

DARREON THOMPSON,
called as a witness herein, having been first duly sworn, was examined and testified as follows:

/ / /

EXAMINATION

BY MR. STILLMAN

Q. All right. So, Darreon, this is -- this is the deposition of Darreon Thompson taken pursuant to notice.

Can you please state your full name and spell it for the record?

A. Darreon Thompson. D-a-r-r-e-o-n. T-h-o-m-p-s-o-n.

Q. So good morning, Mr. Thompson. My name is Zachary Stillman. I represent the defendants in this case, as I said before.

Have you ever given a deposition before?

A. No, sir.

Q. And so today we are going to be asking you a series of questions. Just to make things easier, I'll go over a couple of ground rules just so we're all on the same page before we get started.

First off, as you see, we have a court reporter here today. To make things easier on her, we're all going to take our turns talking, keep the record as clean as possible, and not speak over one another. So when I'm asking you a

question, I would ask that you wait until I finish that question before giving an answer. And when you're giving an answer, any of us will wait and refrain from interrupting.

A. Okay.

Q. Next, any questions we ask we ask that you answer verbally and refrain from any kind of gestures or pointing because that will not be quite clear on the paper record after. Is that clear?

A. Yes, sir.

Q. And then, third, if you do not understand any questions that I or anyone asks, please do not hesitate to let us know or let me know. I can rephrase the question and ask it a different way. If you do answer, I'm going to assume that you understood the question.

And if there's something you don't recall, please don't guess. Just -- the answer that you don't recall is good.

A. All right.

Q. Finally, if you need to take a break any time, let us know, we can get off the record and figure that out.

A. Okay.

Q. Do you understand all these rules as I've kind of laid them out?

A. Yeah, I understand.

Q. All right. So let's begin.

Do you go by any other names?

A. What you mean by that?

Q. Do you have any other -- I mean, Darreon Thompson, that would be your government name. Right?

A. Yeah.

Q. Do you have any other names you go by?

A. Yeah. Some people call me Li'l D or DT. You know what I'm saying? I go by a couple different names.

Q. What was the first one you just said?

A. Li'l D or DT.

Q. And what is your date of birth?

A. 11/01/1998.

Q. Are you married?

A. No.

MR. STILLMAN: Off the record.

(A discussion was held off the record.)

MR. STILLMAN: We can go back on the record now.

BY MR. STILLMAN:

Q. And what did you do to prepare for this deposition today?

A. I didn't. I really didn't do nothing. Just appeared for a deposition. I went to sleep last night.

Q. Did you get a good night of rest?

A. Yeah, I'm decent. I woke up a little too early, but. I just hopped in the shower before I came here. I had an accident, so I was a little late.

Q. And did you review any documents or records before this?

A. What you mean?

Q. Did you review any -- anything, any documents, anything you might have created, written at the jail?

A. No. As far as like -- as far as what? Like, what you mean by that?

Q. Anything. Did you -- did you review anything in anticipation of coming to this deposition today?

A. I think -- I believe so.

Q. And what would that have been?

A. I think I just -- I just -- I just

signed off on a paper that got sent in the mail to me the other day by -- by my attorney but basically letting me know, like, what my deposition was about. You get what I'm saying? I went over it.
Q. And that was sent to you by your attorney, as in the Morrisseys here?
A. Yes, sir.
Q. Okay. Did you review any kind of medical records of yours?
A. No. No medical records.
Q. No grievances?
A. Yeah. I reviewed my grievance. I wanted to know exactly what this was about. You know what I'm saying?
Q. Did you ever meet with anyone before this in anticipation of this deposition today?
A. Uh-huh.
Q. You did?
A. Yeah.
Q. You met -- and who would that have been with?
A. The Morrisseys, my attorney.
Q. And when -- when did you meet with them?

A. Not too -- not even a whole week ago.
Q. And that was only one time that you met with them?
A. No. I did meet with them just one time about this, like, they let me know, like, I had a deposition coming up, you get what I'm saying, what exactly was it. They broke it down to me about like twice, like two times.
Q. And how long did you meet with them for?
A. I want to say like 30 minutes.
Q. And did they make any representations to you as far as what they expected you to say when testifying today?
A. It would be --
MR. T. MORRISSEY: Objection. Attorney-client privilege.
Don't testify to anything that we said during our meeting.
THE WITNESS: Okay.
BY MR. STILLMAN:
Q. Yes. So, again, like I was asking, not about what they -- what you discussed, just did they tell you anything that they expected you to testify as to?

MR. T. MORRISSEY: I'm going to object. Anything that was discussed during our meeting with our client is attorney-client privilege. You can't ask what we talked about during a meeting.
MR. STILLMAN: I believe I can ask if you told him the material contents of what he's going to testify. Not about what the contents of that testimony would be.
MR. T. MORRISSEY: I'm going to object and instruct my witness not to -- not to answer anything in regards to attorney-client privilege.
BY MR. STILLMAN:
Q. And would you say the Morrisseys are your attorneys?
A. Mm-hmm.
Q. Did anyone other than the Morrisseys here help you prepare for your deposition?
A. No.
Q. Did you have any -- so when you met with them a week ago, was that over Zoom?
A. No.
Q. Would that have been over the phone?
A. No.
Q. In person?

A. Yes.
Q. Okay. Did you also communicate with them over the phone or e-mail at all -- or I guess phone or -- you have e-mail on tablets. Right? Or texting. Right?
A. We get that. But I don't -- I don't text. I don't do all that. I don't do that.
Q. Okay. And have you ever reviewed any ADA standards or Cook County jail policies and procedures specifically -- well, have you ever reviewed any ADA standards or Cook County jail policies and procedures?
A. Yes.
Q. Have you ever specifically reviewed any regarding how inmates are supposed to be transported through the jail in wheelchairs?
A. I don't recall.
Q. And are you familiar with Eugene Westmoreland?
A. Who? I don't think so.
Q. Have you ever heard the name Eugene Westmoreland?
A. I don't think so. I don't recall.
Q. Do you know if you would have seen it or heard of it in the documentation you reviewed

prior to this deposition, like the notice of the deposition?

A. I don't -- I don't think so. I don't recall.

Q. Do you know any details about this case?

A. What you mean by that?

Q. The case you're being deposed in right now, do you know any of the material details of the case or the claims being made?

A. Like you get -- I still don't understand that question. What do you mean?

Q. Do you -- do you know why you're being deposed right now?

A. Oh yeah. Uh-huh. I know why I'm being deposed right now.

Q. And what is your impression of -- what have you been told about why you're being deposed right now?

MR. T. MORRISSEY: Objection to anything that's attorney-client privilege.

BY MR. STILLMAN:

Q. What -- what do you -- what are you aware of as far as why you're being deposed right now?

A. I know -- I know that this is about -- can I answer that question?

MR. T. MORRISSEY: You can answer your understanding of what the case is about.

THE WITNESS: All right. So ask me the question one more time.

BY MR. STILLMAN:

Q. What is your understanding of what the case is about?

A. About -- about the ramps. About the ramps at Cermak.

Q. In the last ten years, have you been convicted of any crimes?

A. Like -- I'm on probation, yeah. I been convicted of crimes within the last ten years. I'm on probation right now.

Q. And during your -- on your current booking number at Cook County jail right now, when did you first arrive? When were you first detained?

A. 11/07/2022.

But I'm just -- just stating for the record I'm not answering no questions about my case or anything, so I don't -- I'm not talking about none of that.

Q. Understandable. It wasn't -- it was not what I was asking. Don't worry.

A. Okay.

Q. And how long have you been there right now?

A. Since November of 2022.

Q. Where were you housed when you were first booked?

A. In Cook County, Division 8.

Q. And Division 8, that goes by -- do you know any other names that goes by?

A. RTU.

Q. Have you been in the RTU your entire time?

A. Yeah. RTU and Cermak, I been here my entire time. I never went nowhere else.

Q. And so you were at Cermak a bit, too, then?

A. It's really like the same thing, yeah.

Q. How often would you say that you have transported back and forth between Cermak during your time at Cook County jail?

A. I can't -- I can't -- I won't be able to count on my -- on my hands, man. I been here for a minute, like 18 months. You know what I'm

saying?

Q. Could you give an estimate of about how, like, how many times a week you think?

A. A week? That's what I'm -- it all -- honestly, it all depends on the schedule, you get what I'm saying, about going to the hospital. I can't answer that. You know what I'm saying? It all -- it all may vary. You know what I'm saying? At least probably like once a month. I want to say like at least once a month, depending on what route I'm taking, like am I going to court, if I'm going here, if I'm going there. You get what I'm saying? I don't know whether they're going to make me move or when I'm going to go. I could go out now and they could take me down that same ramp. You get what I'm saying?

Q. I gotcha. And so when you're transported to Cermak, how would you be brought there?

A. I was escorted, though. Somebody -- somebody walk on the side of me and I pushed myself there.

Q. And that would be through the tunnels?

A. Yeah. A lot of -- like, you could say that. It's not just through the tunnels, though.

It's like -- it's like -- I don't know what you -- I don't know -- yeah, it's basically through the tunnels. You could say that, through the tunnels. But there's just so many different, like, secret compartments throughout Cook County it's crazy. You don't necessarily just got to go through the tunnels.

Q. And so it's my understanding you're in a wheelchair. Correct?

A. Yes, sir.

Q. And can you tell me a little bit about your medical history and what -- how you have been immobilized?

A. I got shot in my back.

Q. And when did that occur?

A. In 2018, August.

Q. And when you -- so when you're in those transports, you're being escorted at the jail, you said you push your chair?

A. Mm-hmm.

Q. Do you ever have any other detainees push your chair?

A. Sometimes. If they nice enough, sometimes.

Q. And are you aware of any policies,

procedures, or rules at the jail that would dictate whether someone should be pushing your wheelchair when you're being transported from one location to another?

A. I'm not -- I'm not -- I'm not quite sure. It been a minute since I did read that handbook.

Q. When do you think the last time you would have read the handbook would have been?

A. Probably like last year. Like probably like last year sometime, last year or sometime, probably in like the summer or something like that.

Q. Would you have been reading that for a specific reason or just to pass time?

A. I got -- I had a bedroll. Every time you -- I have, like, like accidents often, and usually like when they give us, like, bedrolls the handbook for the Cook County will be up in there. So I probably was just bored and decided to pick it up, wanted to see all the stuff they would be getting away with doing with me and stuff like that, I just wanted to see was it okay.

Q. And are you aware of any policies, procedures, or rules at the jail preventing

another detainee from pushing your wheelchair during transport from one location to another?

A. Nuh-uh. I'm not sure. I did have COs ask detainees to push my wheelchair.

Q. And so you're -- as we just kind of discussed a minute ago, you're familiar with the ramps and corridors of hallways in the tunnels of the RTU?

A. I'm very familiar with them.

Q. And would you be in those tunnels for any reason other than transport to Cermak?

A. Court I think. I think every time I go to court I go down them ramps. That's why I said at least once a month.

Q. And when was the last time you were -- you were under the RTU in those tunnels?

A. Not long ago. I usually -- that's what I'm saying. Let me see. I just -- I just -- I just went down the ramp not too long ago. I just -- I just had an x-ray on my mouth I want to say like a month, month and a half ago.

Q. Do you recall there being handrails on any of the ramps you've used under the RTU?

A. Say that again.

Q. Do you recall there being handrails on

any of the ramps that you've used under the RTU?

A. I think -- I think so. Yeah, I think so.

Q. And do you recall any ramps specifically under the RTU that you've had issues with?

MR. T. MORRISSEY: Object to the form. Can you be more specific?

BY MR. STILLMAN:

Q. Can you recall any specific ramps under the RTU that you've had issues getting your wheelchair up on?

A. Yes. It's -- it's -- it's one for sure in particular. It's the one that I went -- it's the one that I went down November 17 of last year. It's that ramp for sure. That ramp way, way, way, way too steep.

I don't got -- as you can see, I don't -- I don't have no brakes on my wheelchair. I have broke, like, my wheelchair. My brakes broke. So if I'm going down, I'm going down, I'm going down that ramp real, real fast, I can't really brake myself. You get what I'm saying? My wheelchair all broke. I can't brake myself. It be burning my hands, hurting my hands real bad

going down them -- going down them things by myself with the speed that I be going.

Q. Okay. So if -- have you ever -- the ramp that you -- the ramp that you've had those issues on where you've been burning your hands allegedly, is that -- is that the one with -- do you know if that one has handrails?

A. I believe -- I believe it -- I don't recall. I don't recall.

Q. And have you ever made any complaints to anyone at the jail that you either needed a landing or handrails to help you traverse any tunnel under the RTU or any ramp under the RTU?

A. I filled out a grievance on it before.

Q. You said you have filed a grievance about that?

A. Yes, sir.

Q. And so would you say that whenever you've used that ramp that you filed a grievance about, you had issues every time getting up and down that ramp?

MR. T. MORRISSEY: I'm going to object. Misstates the testimony.

You can answer.

THE WITNESS: Say that one more time,

please.

BY MR. STILLMAN:

Q. So when you -- when you've traversed that ramp that you filed the grievance regarding when you've gone up and down, you know, self-propelled, you had issues each time where you've been burning your hands and unable to brake?

A. Yeah.

Q. If I were to show you two ramps under the RTU, would you be able to identify which one was the one that is the issue one?

MR. T. MORRISSEY: I'm going to object. Until he sees it, he can't -- he can't really respond to your question.

BY MR. STILLMAN:

Q. Do you believe that you would recognize the ramp if shown it?

MR. T. MORRISSEY: Objection. I mean, show him the exhibit and he can tell you whether or not he can recognize it.

MR. STILLMAN: All right. So I'm going to show a photo that we'll be marking Exhibit 1.

(A discussion was held off the record with the court

reporter.)

MR. STILLMAN: All right. So this photo that I'm putting on the screen we'll be marking Exhibit 1.

(Thompson Deposition Exhibit 1 was marked.)

BY MR. STILLMAN:

Q. Darreon, do you recognize this ramp?

A. I believe so.

Q. And would this be the ramp that you've had issues with about getting up and down?

A. I didn't -- I didn't -- I didn't have issues getting up and down that ramp too -- well, I want to say I had real issues, though, but I did have a lot of times where they had to help me down this longer ramp. It's fast, though. I mean, I went fast down that ramp going down. And going down by myself probably is a different -- it's a different story, though.

Q. This wouldn't -- you're saying this wouldn't be the ramp that you filed the grievance about?

A. I don't -- I don't -- I don't think so.

MR. STILLMAN: I'm pulling the next

one up. We'll mark this Exhibit 2.

(Thompson Deposition Exhibit 2 was marked.)

BY MR. STILLMAN:

Q. And does this ramp look familiar to you, Darreon?

A. I don't see -- is that a ramp?

Q. I believe it is.

A. It look like the same -- it look like the same -- it look like the same thing just -- you just -- it wasn't -- just, like, you just took off the handrails or something. Like, one before with handrails. Without the handrails it looks like.

Q. Is this not a ramp that you recall having any issues with?

A. I'm not even sure if I ever even seen that ramp. It don't -- it look just like a hallway or something. I don't even know if that's a ramp or not. I don't know if they going up or if they walking straight.

Q. Okay. Thank you.

Have you ever fallen out of your wheelchair while being pushed before?

A. Nope. Now, you talking -- what you

mean? Like, as far as me being in jail by like one of the COs?
Q. Yeah. Or any other context.
A. Yeah. For sure.
Q. You have fallen out --
A. Yeah.
Q. And how would that have occurred?
A. A couple different ways. I probably had a muscle spasm or somebody probably hit a bump or was going too fast. All different -- all different type of ways. Stopped too fast. Stopped too hard.
Q. And in -- in the past, we briefly talked about this a few minutes ago, but in the past you said you had asked officers at the jail to push your wheelchair for you. Right?
A. Say that one more time.
Q. In the past you've asked COs to push your wheelchair for you. Correct?
A. Uh-huh.
Q. And how often would they indulge that request?
A. Would they -- would they turn down the request?
Q. Would they -- would they push your

wheelchair when asked.
A. It be -- it be -- it's -- it all depends, though. Some of them be -- it be like I will say 50/50. I will say 50/50.
Q. Are there -- are there just some COs you kind of can depend on less to do so than others?
A. Yeah.
Q. And you said, before, you asked other detainees to push your jail -- to push your wheelchair if it's -- if they're nice enough. Right?
A. Yeah.
Q. What's -- how would you determine whether another detainee is nice enough to push your wheelchair?
A. Well, I done been here for a minute. I probably -- like I said, I been here 18 months. I done been here almost day in Division 8. So I did been on deck with a lot of these brothers and I know a lot of them. You know what I'm saying? So I just -- I open my mouth. A lot of times you won't know until you ask, too. If I don't know them, I'm just going -- you don't know until you ask, so I just ask.

Q. And how often would you ask other detainees to push you versus officers?
A. Like I -- like it's, like I said, sometimes the officer tell a detainee to push me. You know what I'm saying? It usually be like, "Well, push him for me." You know what I'm saying? They probably hold the door for me or something like. The COs will probably press their little button to hold the doors open for every-body. But the detainees be the one who would really help me before they would.
Q. If you were given a choice between another detainee pushing you and a CO, no other kind of factors considered, which would -- which would be your preference?
A. I rather -- I rather a CO push me.
Q. And have you ever been told -- I know you said that some COs would tell detainees to push you. But have you ever been told by anyone at the jail that another inmate could not push your chair?
A. No. Never. Not one time.
Q. Do you know of any specific instances when an officer might have refused to push you?
A. Yeah. I did -- I did have a little

incidence where officers go where they -- where they tell me basically like fuck myself, push myself. You get what I'm saying?
Q. Do you know what officer that might have been or when that might have been?
A. I know exactly what officer it was. I'm going to tell you -- his name like Ramirez. Ramirez. I believe that's his name. And he -- I had to get a DNA swab from -- I had made him mad one time I guess when I went to go get my DNA swab for, like, my case that I'm fighting right now, and I guess I made him mad. And since I made him mad, he ain't want to -- he ain't want to -- he ain't want to help me in my wheelchair.
Q. And when would that have been?
A. Let me see. Last year. It had to been sometime -- let me see, I got my DNA swab, I can't tell you when, I believe sometime in -- it had to been from November, sometime in November, let me see, October, between I want to say October and December for sure. I want to say November. But whenever I went to go get my DNA swab. It should be on camera in their thing.
But I asked him -- I asked him for his assistance, and basically he told me fuck

myself.
Q. So you remember filing a grievance about your issues with the -- traversing the ramp?
A. Uh-huh.
Q. So we're -- I'm now going to be showing you -- well, do you remember the date of that grievance, first of all?
A. Say that again.
Q. Do you remember the date that grievance would have been written or filed?
A. I believe -- no, not really. Not really. I wanted -- I wanted to say on the 17th, but I don't know for sure so I don't want to speak on what I don't know.
Q. 17th of what month? Let's see if you -- you're going pretty well so far. Pretty good memory.
A. November.
Q. Okay. Wow. I wouldn't have remembered that.
A. I ain't never forget that day. A shitty day for me.
Q. And do you recall the basic content kind of of your grievance?
A. Yeah. I basically was letting them

know like what was going on with the wheelchair ramp and how it was -- it was burning my hand going down the ramp and my cell.
Q. So I'm now -- I'm now going to show you a document that we're going to be marking as Exhibit 3.
(Thompson Deposition Exhibit 3 was marked.)
MR. STILLMAN: Can you all see that?
THE WITNESS: Uh-huh.
BY MR. STILLMAN:
Q. All right. So you recognize this document, Darreon?
A. Uh-huh.
Q. What is -- can you identify what this document is for me?
A. That's a grievance.
Q. And this is the grievance we were just speaking about?
A. Uh-huh.
Q. So you're saying right here essentially that you were having issues getting up the ramp and it's common for you to roll down fast and burn your hands. Correct?
A. Yes.

MR. T. MORRISSEY: I think that's an improper. It says the RTU ramp, the basement of the RTU.
MR. STILLMAN: I believe I said -- I don't think I said any -- it wasn't that, but okay.
BY MR. STILLMAN:
Q. And you also -- you said right here -- can you read the last sentence in there or the last two sentences?
A. I said: "In the basement of the RTU. On the above date, I went up the ramp and had trouble getting up the ramp without assistance. It is common for me to roll down fast and my hands burn when braking. It's rare for staff to assist me up the ramp."
Q. So was it -- how common would you say that the burns on your hands would have been when you were traversing this ramp?
A. They -- they happen real common. Every time I go down the ramp for sure.
Q. And would you ever seek medical attention for those burns?
A. They -- they -- they not -- they not those type of burns. You get what I'm saying?

They like -- they more so -- they more so like the -- how I explain this? Like, you know, it's like burn rubber. You get what I'm saying? Like when burn -- you ain't never been in a wheelchair to know, so it would be hard for me to describe it to you. You know what I'm saying?
But, no, I never -- I never -- I never seek medical -- medical attention for a burn on my hand.
Q. Darreon, would you -- would you describe the burns you received going down that ramp as injuries?
A. Would I describe them as injuries?
Q. Yeah.
A. I describe them as -- as rug burns. So, yeah, I guess so, or carpet burns. It's hard to explain.
Q. And if you got injured in any other capacity at the jail in a fight or incident or you fell out of your wheelchair while being pushed or anything, wouldn't you seek medical attention?
A. If I had -- if I -- if any of that stuff happened, they was going to make me seek medical attention even if I denied it.
Q. And did you get medical attention

after the incident in this grievance?
A. No.
Q. But in any other situation when you had an injury, the jail would have forced medical intervention?
A. Yeah.
Q. Do you know why that might have been that you didn't have any medical attention after this?
A. 'Cuz I wanted -- I wanted them to do something about -- I wanted them to do something about the ramp. I wasn't -- I wasn't -- I wasn't really -- you get what I'm saying?
Q. You weren't requesting medical attention? You were just kind of calling attention to the ramp you're saying?
A. Yeah. I wanted -- I wanted them to fix the ramp. I been going through that same thing for -- I was locked up just maybe a year around that time and I was going through that same thing due to, like, with the ramp. So I just -- I just -- I filled out the grievance. I got tired of the COs not helping me, everything, so I filled that out.
Q. And so you said it's rare for staff to

assist you with the ramp there. Would you say like a 50/50 chance of them helping you is rare? That's like half the time.
A. But don't they supposed to help me all the time, though? Ain't that their job to help me? I'm in a wheelchair. You don't think that's their job to help me? You don't think --
Q. Well, Darreon, are you aware of any -- or, Darreon, are you -- are you aware of any policies that say they do have to do that?
A. No.
Q. Do you remember the response you got to this grievance?
A. No, not at all.
Q. Do you remember that you -- do you remember that you would have received a response?
A. You said would I remember if I did receive a response?
Q. I mean, do you recall ever receiving a response to this at least, I guess?
A. The ADA lady came and seen me.
Q. And who -- who is the ADA lady?
A. Her name is Sabrina, I believe. I believe that's -- Sabrina came and seen me about this grievance. I'm almost a hundred percent

positive she came to see me about this grievance.
Q. All right. So we're going to move to the next page of this grievance, which is the response. Would you like to take a minute to review it before I -- before I ask you any questions?
A. No. You could -- you could read it.
Q. Like, I'd like you to take a moment to read the response so I -- and let me know when you're finished.
A. The words are a little small to me. You feel like reading it out loud for me, sir?
Q. I can zoom in, if you --
MR. T. MORRISSEY: All right. That isn't -- Zach, that's not terribly clear because it's --
MR. STILLMAN: Is this not -- is this not --
MR. T. MORRISSEY: Mr. Thompson, would you like me to read it for you?
THE WITNESS: Yes, sir.
MR. T. MORRISSEY: Do you mind if I read it? Or could you read it, Zach?
MR. STILLMAN: I could read it.
MR. T. MORRISSEY: Why don't you read

it. That would make it easier.
BY MR. STILLMAN:
Q. All right, Darreon. So it says Grievance 2023x18002. Response issued December 8, 2023.

"After reviewing available evidence and speaking with the movement officer and Detainee Thompson, the officer is in compliance with CCSO policy. On November 17 at 1745 hours, officer is observed escorting two wheelchair-using detainees from Cermak to RTU. The movement officer is pushing the wheel-chair of one detainee, whose arms are unavailable due to holding a cane, while walking beside and supervising Detainee Thompson who is self-propelling his wheelchair. Detainee Thompson is observed on video self-propelling his wheelchair with no difficulty and appears to be in no distress. The movement officer maintains a visual on Detainee Thompson the entire time. By detainee's own admission, at no time did he tell the officer that he is having difficulty

wheeling himself back to RTU. Detainee Thompson did not inform anyone that he had burns on his" -- "to his hands from his wheelchair, nor were there any wounds or healed wounds to his hand during my discussion with him on 12/8/23. Additionally, Detainee Thompson did not request medical attention for these alleged wounds verbally or via written health service request. Had Detainee Thompson informed the movement officer that he could not wheel himself back to the division, the officer would have called for a second movement officer to assist with the escort. Should this happen in the future, Detainee Thompson is advised to notify the movement officer of his need for assistance."

MR. T. MORRISSEY: I'm going to object to the statement by a representative of the sheriff. It's hearsay. It's obviously the position of the sheriff. He can answer.

BY MR. STILLMAN:

Q. So, Darreon, is what I just read clear to you? Do you understand the content of what

I've been reading to you?

A. I understand what you said. But that don't -- that don't mean it's true.

Q. So you recall, though, speaking to Sabrina?

A. Yeah. Sabrina full of shit.

Q. And it states in there that you never actually identify any difficulties going up and down the ramps to the officers. Right?

A. You don't think me going down the wheelchair a hundred miles per hour with no brakes on my chair is not difficult when I got to stop myself --

Q. Well, Darreon --

A. -- the same thing. Sabrina -- look, okay, wait, real fast. I filled out that grievance November 17 of 2023. Sabrina came and seen me November 20 -- November 27. That's almost -- that's two -- that's two weeks later.

Q. And, Darreon, is it your testimony that you believe in two weeks you wouldn't have had any healed wounds on your hands?

A. You said is it my testimony? I just said it was -- it was like rug burns on my hands. I still have them same rug burns on my hands.

Sabrina wanted to make it seem like -- to me, like somebody put this in my head, like, write my grievance or like I was lying to her about my grievance like.

Q. So you said a hundred miles per hour is what you would have experienced going down the ramp. Was that -- was that not what you just said a couple seconds ago?

A. That's what I said a couple seconds ago.

Q. Obviously it wasn't a hundred miles per hour. So your experience of your allegedly kind of uncontrolled descent of the ramp, how fast would you think you were going?

A. I don't know. I think I was going -- I was going fast enough to burn my hands. I was going fast enough for it to hurt.

Q. And the response also states that you were observed on video self-propelling the wheel-chair without any difficulties. Right?

A. I guess that's what that letter says.

Q. It also says that you appeared to be in no distress. Is that right?

A. That's what that letter says. But that's hearsay, though. I don't got gloves. You

know --

Q. I understand. All right, Darreon, just let's keep the testimony to answering the questions.

A. You know, people in wheelchairs have gloves, right, like, you know. Sabrina don't have gloves, like the situation like this, and she still haven't brung me a pair yet.

Q. Have you -- have you requested a pair of gloves?

A. I asked her. Verbally I did.

Q. And the response also notes that you never requested any medical attention or received any. Correct?

A. That's what that say.

Q. And so you don't recall receiving this response?

A. I recall receiving a response.

Q. And do you recall the final line where she advised you to notify movement officers if you're in need of assistance in the future?

A. I can't notify no movement officer if I need assistance. I can't. But I'm saying what you mean? Like, what, I suppose to call him on a walkie-talkie or something?

Q. I mean, when you're being moved and you're being escorted by an officer, can they not hear you?

A. Yeah, they can.

Q. Just like -- you just said you orally requested the gloves from Sabrina. Couldn't you do the same thing with assistance to the movement officers?

A. But he already had -- he already was pushing somebody in a wheelchair. What, he supposed to -- supposed to push both of us in a wheelchair?

Q. Darreon, would you like me to read the last few lines of this again where the response states that in the future they would call another officer over?

A. Oh, okay. We will see how that works out.

Q. Since that incident, have you taken their advice to notify movement officers about needs for assistance?

A. Since then I don't think I ever even been -- yeah, I been -- I been back down there, and I have notified movement officers.

Q. And did that result in getting

assistance?

A. I believe so. These -- come to me -- but I believe so. If not by them, by an inmate.

Q. Do you remember if you appealed this response?

A. Yeah, I believe I did appeal this response. I didn't agree with it.

Q. Pardon?

A. I didn't agree with it. Nine times out of ten I probably did appeal this response right here.

Q. Do you know what the content of your appeal would have been, your response?

A. Yeah. My content of appeal probably would have been like -- like, all right, like the thing with Sabrina is what I didn't -- what I didn't -- what I didn't like about -- like, what I don't like Sabrina is, like, anything that I ask her, especially you could like -- like, you could, like, look into this. Like, anything that I asked her, like, as far as my wheelchair go, Sabrina -- Sabrina always trying to throw it off on the next person. Like, for my therapy, like, for my wheelchair, you get what I'm saying, it's always something the next person don't do.

Like, all right, the County don't pay for it. Like, people, like, in wheelchairs, like, I need a wheelchair right now, like my -- like my -- I got to -- from going down, like, them ramps and stuff like that, like, going so fast, my wheel, my left wheel, my little wheel up in the front of my wheelchair, it's loose. You get what I'm saying? But I tried to -- I basically been trying to -- since this grievance, I been trying to get her to help me with getting another wheelchair. But Sabrina basically keeps saying like I got to have my family look into it and this, that, and a third, and the County don't pay for my wheelchair, you know, things like that. But my thing is this, like, how do you know I got family? You keep on telling me my family have to do this and my family. Everybody in here have wheelchairs don't have family. How you know I'm not homeless in the world? How you know my family even pick up the phone for me? Which they don't. You get what I'm saying?

I need -- I need help doing certain things and I don't have to keep going down these wheelchair ramps. I can't have a normal wheel-chair because it's not meant for my -- for my

injury. You get what I'm saying? These -- the wheelchair that's in RTU and things like that, the ones that they got in Cermak, they not built for my injury. You get what I'm saying? I need like a lightweight wheelchair. I'm a T-6. I can't have a -- I can't have just no any type of wheelchair.

Sabrina really not no help. This right here teach you, like, she's really not no help like. She's not going to do nothing about the ramp or nothing like that. She just going to make it seem like I'm lying. Or she came to see if she can --

Q. Darreon, I understand. Okay. Let's -- let's get back to the question.

So just the question was, do you remember what your response would have been for your appeal?

A. Did you just hear anything I just said?

Q. I'm not -- I'm not asking -- Darreon, I'm not asking why you would appeal. I'm asking what -- what your appeal was. Do you remember? You can say you don't.

A. No, I don't remember.

Q. All right. So we will move on to the next page now. And this is where your appeal would be going. Correct?
A. Yes.
Q. And your response there, can you read it?
A. "I don't agree with the response."
Q. Thank you.
And this is your signature. Correct?
A. Yes, sir.
Q. And it says that you received her response on 12/14/23. Correct?
A. I believe so.
Q. And your appeal was done on the same day? Yes?
A. I don't know. It say -- it look like the next day.
Q. It looks like 12/14/23 is the next day from here?
A. No. The one on the bottom.
Q. Is that your signature on the bottom?
A. That's not my signature.
Q. Darreon, this -- do you know what this date is for on the grievance?

A. No, I don't know.
Q. This is the date you received the appeal response. Is that right?
A. That's not right. That can't be right. What you talking about? December 10, 2023?
Q. I think that says the 18th, Darreon.
A. I didn't -- I didn't -- I didn't -- I didn't -- I didn't get no -- I thought after I put in for the appeal they never -- they never got back -- I believe --
Q. I believe -- Darreon, I believe it says 18th, not 10th.
A. Oh, okay. But they never -- they never let me know nothing about nothing appeal or they -- a response on the appeal. They never -- they never let me know anything about any of that.
Q. Okay. I'm getting off of this exhibit.
And it's your testimony that Sabrina's response was incorrect and wrong. Yes?
A. Yes.
Q. Did you ever see any of the footage they reviewed?
A. Did I ever see the footage that who

reviewed?
Q. The video footage they reviewed of your -- of you going down the ramp.
A. I didn't -- I didn't see it.
MR. STILLMAN: All right. So we have one last exhibit here. Just a couple more questions, and we should be done.
Okay. Is that visible for every-one?
MR. T. MORRISSEY: This is Exhibit 4, Zach?
MR. STILLMAN: Yeah, this will be Exhibit 4. Sorry.
MR. T. MORRISSEY: Okay. Thank you.
(Thompson Deposition Exhibit 4 was marked.)
MR. STILLMAN: And everyone can see that. Correct? Yeah? Darreon?
THE WITNESS: I can see.
BY MR. STILLMAN:
Q. Okay. Do you recognize this document, Darreon?
A. I recognize it.
Q. And what is this document?
A. It's a declaration. Right?

Q. Were you involved in the creation of this declaration?
A. Yes, I was.
Q. And you recall taking part in signing this?
A. Yes, I did.
Q. So can you just take me through your declaration a little bit? Can you read these -- are you able to read what it says here?
A. Can you read it for me?
Q. Yes. So, okay, I'm going to -- I'll go through and I'll read each now. I just want you to confirm that that is the testimony that is on each paragraph or number here.
So it says at the top Declaration of Darreon Thompson.
"Under penalties of perjury as provided by law, the undersigned certifies that the following statements are true:
One, my name is Darreon Thompson. I am incarcerated in Division 8, Tier 3G at the Cook County jail under booking number 2022-1107066."
Is that right?

A. Mm-hmm.

Q. "Number two. I use a wheelchair to move from place to place because I was shot in the back in 2018 and have a T-6 spinal cord injury."

Is that correct?

A. That's correct.

Q. "Three, there is a steep and long ramp in the basement of the RTU that is used for me to travel to various places at the jail, including Cermak. A photograph of this ramp is below."

Is that correct?

A. That's correct.

Q. And this photograph, is this -- do you recognize this photograph as the ramp that you experienced issues with at the -- in the RTU?

A. Mm-hmm.

Q. And do you recognize this ramp also, just another question, as the same as any of those other two that I showed you?

MR. T. MORRISSEY: I'm going to object. I think Exhibit 1 was looking up the ramp for the RTU. This is from the -- Cermak looking down, I believe. So it's a different view of the RTU ramp than Exhibit 1. Exhibit 1 is looking up, and this looks like it's going down.

BY MR. STILLMAN:

Q. All right. Well, Darreon, do you recognize the ramp at least either way?

A. I recognize this picture. I recognize this ramp from this picture.

Q. And regardless of different angles, are you able to recognize this as the same ramp as either of the other two that I showed you before?

A. I can't -- I can't answer that question.

Q. Number four states that: "This ramp is steep and it is difficult to move up and down as a wheelchair user. When I navigate this ramp without assistance, it is common for me to roll down fast and my hands burn when braking. It is also challenging to move up the ramp."

Is that right?

A. That's right.

Q. And five: "It is very rare for staff to assist me when traversing this ramp."

Is that correct?

A. That's correct.

Q. So this would have been written very shortly after your grievance. Correct?

A. That's correct.

Q. It's -- the material content of your declaration is pretty similar to your grievance claims. Correct?

A. Correct.

Q. And this is your signature right here?

A. Yes, sir.

Q. Did you have any assistance writing that November 17 grievance?

A. What you mean did I have any assistance writing the grievance?

Q. Either other detainees, any advice, maybe your attorneys gave you advice on it. I don't need to know the content of any advice. Just were you advised on the content of your grievance?

A. No.

Q. Have you ever spoken to any other detainees who filed grievances about ramps or for any other handicap accessible or non-accessible features of the jail?

A. Say that again.

Q. Have you ever spoken to any other detainees about their own grievances about ADA issues?

A. Of, what, about my -- about the ramp

in general or like --

Q. The ramp in general or any other issues.

A. You got to -- you got to -- it got to either be one or the other. Like, I didn't -- I didn't -- I didn't had -- I didn't have people -- I didn't talk to people in wheelchairs about how difficult to use. Like, as a whole, yes, I have.

Q. And specifically with this ramp have you talked to any other detainees?

A. I don't believe so.

Q. How did you get the wording of your declaration to the Morrisseys to get typed out for you? Were you -- did you speak with them on the phone about it? Did you send them your grievance?

A. You said did I speak on them -- did I speak to them on the phone about that?

Q. About the declaration, yes.

A. I believe I probably did. But I don't recall.

Q. But you don't have access to any computers to typewrite something like this and print it out. Correct?

A. Nuh-uh. No, I don't.

Q. So you would have received this

typewritten grievance from the Morrisseys, signed it, and returned it to them?

A. No. I said -- I don't know, say that again.

Q. So you -- the way that they received this -- your signature on this declaration was they would have typed it out for you, sent it to you, and you would have signed it and returned it?

A. And sent it back. Yes. That's correct.

Q. Okay. I have no further questions for now.

MR. T. MORRISSEY: I have a few --

MR. P. MORRISSEY: Hey, Dad --

MR. T. MORRISSEY: -- questions.

MR. P. MORRISSEY: -- could we -- could we talk for a minute? Can we take a break?

MR. T. MORRISSEY: Can we take a five-minute break?

MR. STILLMAN: Yeah.

(A break was taken from 12:10 p.m. until 12:12 p.m.)

EXAMINATION

BY MR. T. MORRISSEY

Q. Mr. Thompson, I want to show you what is being marked as Plaintiff's Exhibit Number 17. It should be on your screen in one moment.

(Plaintiff's Deposition Exhibit 17 was previously marked.)

MR. P. MORRISSEY: Do you want me to play it?

MR. T. MORRISSEY: I can play it.

MR. P. MORRISSEY: No. I have to play it.

MR. T. MORRISSEY: All right. Then why don't you play it.

(A video was played.)

MR. T. MORRISSEY: Can you stop it, Pat? Can you stop it?

(The video was stopped.)

BY MR. T. MORRISSEY:

Q. Mr. Thompson, looking at the start of Exhibit Number 17, do you see yourself in the video?

A. Yes, sir.

Q. And where are you in the video?

A. I'm on the left-hand side.

Q. And is there another wheelchair in the

video with --

A. Yeah, I do.

Q. -- an officer?

A. Uh-huh.

MR. T. MORRISSEY: All right. Pat, you can continue.

(A video was played.)

MR. T. MORRISSEY: Can you stop it, Pat?

(The video was stopped.)

BY MR. T. MORRISSEY:

Q. I'm showing you the video at --

Does it have the time on this, Pat?

MR. P. MORRISSEY: It says 5:46:03 p.m. on November 17, 2023.

BY MR. T. MORRISSEY:

Q. At 5:46 p.m. on November 17, 2023, can you tell me what you're -- what -- what you see in the video at that time?

A. I'm going down the ramp.

Q. And what time -- how fast were you going?

A. I'm going fast down the ramp. I'm going --

MR. T. MORRISSEY: Pat, you can continue the video.

(A video was played and stopped.)

MR. T. MORRISSEY: Thank you, Pat.

BY MR. T. MORRISSEY:

Q. Can you explain why you were going so fast down that ramp?

A. Because it's steep.

Q. Is there any -- any sufficient -- well, let me -- let me go back a step.

You see at the top of the video there's a handrail. Correct?

A. Uh-huh.

Q. Does the handrail extend past the start of the ramp that you can see?

A. That I can see?

Q. Yes.

A. I don't -- I can't -- I can't really see it.

Q. Okay. If the handrail extended an extra 12 inches before you got to the ramp, would that allow you a chance to collect yourself before going down the ramp?

A. Yeah, it would -- it would help me

collect myself before I went down the ramp.

Q. To the best of your knowledge, there wasn't a handrail that extended past the ramp when you started going down the ramp. Is that fair to say?

A. Yeah, that's fair to say.

Q. And as you were going down this -- the ramp, was there a sufficient area, flat area, where you could stop or slow down so you could catch your breath --

A. No.

Q. -- to your recollection?

A. No.

Q. And why is it important for you to have a sufficient landing area in the middle of a steep ramp like that as a --

A. Well --

Q. -- wheelchair user?

A. So I could collect myself again so I could slow down if I am going too fast.

Q. And as you were proceeding down that ramp, at the end of the ramp does it extend and does the handrail extend an extra 12 inches so that you can collect yourself at the bottom of the ramp?

A. No.

Q. I have nothing further.

MR. STILLMAN: I have a couple questions.

MR. P. MORRISSEY: Do you want me to stop the video and get off the share screen?

MR. STILLMAN: Would you -- actually, would you mind just, like, playing it through one more time from the beginning?

MR. P. MORRISSEY: Sure. All right. Just let me know what you want me to do.

(A video was played.)

THE WITNESS: I'm already going fast.

MR. STILLMAN: Okay. Stop it now.

(The video was stopped.)

RE-EXAMINATION

BY MR. STILLMAN

Q. Is it your testimony that you were going any faster than the officer walking next to you?

A. What you mean?

Q. I mean, you were -- you were --

Can you rewind a little bit just to the walk up to that ramp -- or up to the railing?

/ / /

(A video was played and stopped.)

BY MR. STILLMAN:

Q. So you guys passed through that door about the same time. Correct?

MR. P. MORRISSEY: Do you want me to play it?

MR. STILLMAN: Yeah. Yeah. Play it. Sorry.

(A video was played and stopped.)

MR. P. MORRISSEY:

Q. Isn't it true that you guys passed through that door about the same time?

A. Yeah, I believe. I believe so.

Q. And you're holding on to the railing during the entire descent down. Correct?

A. Yeah. You right.

Q. And it's your testimony that that is an uncontrolled speed that you are descending while holding on to the ramp?

A. I'm saying that it's a fast speed. That's exactly what I'm saying, if you believe it or not.

Q. And you actually -- your grievance

mentioned that you had burns on your hands, multiple as in both hands. Correct?

A. You right.

Q. It doesn't look like you were holding on to the wheelchair at all with your left hand there. Is that --

A. I'm holding on to my wheel -- my wheelchair with one hand from my right and the rail on my left. I'm holding on to something on both sides.

Q. And so the burns on your left hand then, would you say those would have been from the railing as opposed to your wheelchair?

A. I would say that. I'm going too fast.

Q. So you didn't bring your left -- your left hand would not have been burned on the wheelchair like you described before then. Correct?

A. You correct.

MR. STILLMAN: And just play -- play the video to the end there now. I have a couple more questions.

MR. P. MORRISSEY: Let me know when you want me to stop it.

MR. STILLMAN: I don't really need to

stop I don't think. We'll just kind of let it play.

(A video was played and stopped.)

MR. P. MORRISSEY:

Q. And you guys passed that end door about the same time also. Correct?

MR. T. MORRISSEY: I'm going to object. I don't think that's what the video reflects.

MR. STILLMAN: You don't think it reflects that they passed through the end at about the same time also?

MR. T. MORRISSEY: It appeared that Mr. Thompson was trying to steady himself on the railing and he ended up scooting ahead of the officer going down with the other wheelchair person.

MR. STILLMAN: All right. You can take the video off screen.

Okay. I'm good.

MR. T. MORRISSEY: You have no further questions?

MR. STILLMAN: I have no further questions.

MR. T. MORRISSEY: All right. Thank you, Mr. Thompson, for your time this afternoon.

MR. STILLMAN: Thank you, Darreon.

MS. P. MORRISSEY: Are you going to waive signature, Dad?

MR. T. MORRISSEY: Yeah, we'll waive signature.

(The deposition was concluded at 12:21 p.m.)

(Signature was waived.)

--oo0oo--

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

I, DEBRA L. KLESZYK, a Certified Shorthand Reporter of the State of Illinois, CSR License 084-002981, do hereby certify:

That previous to the commencement of the examination of the aforesaid witness, the witness was duly sworn by me to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was stenographically reported by me and was there-after reduced to typewriting under my personal direction and constitutes, to the best of my ability, a true and accurate record of the testimony given and the proceedings had at the aforesaid deposition;

That the said deposition was taken before me remotely via videoconference at the time and place specified;

That I am not a relative or employee or attorney or counsel for any of the parties herein, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor am I

interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my verified digital signature this 5th day of May, 2024.

DEBRA L. KLESZYK
Certified Shorthand Reporter
License No. 084-002981

**0**
**01851** 1:6
**084-002981** 63:7 64:9
**1**
**1** 3:13 22:23 23:4,6 49:21 49:24,24
**10** 46:5
**10257** 2:4
**10th** 46:13
**11/01/1998** 7:18
**11/07/2022** 14:21
**11:06** 1:18
**12** 56:22 57:23
**12/14/23** 45:13 45:19
**12/8/23** 37:6
**12:10** 53:22
**12:12** 53:23
**12:21** 62:9
**17** 3:18 20:15 36:10 38:17 51:8 54:2,5,20 55:16,18
**1745** 36:10
**17th** 29:12,15
**18** 15:25 26:18
**1875** 64:8
**18th** 46:7,13
**1:23** 1:6
**2**
**2** 3:14 24:1,3
**20** 38:18
**2018** 17:16 49:4
**2022** 15:6
**2022-1107066** 48:24
**2023** 36:5 38:17 46:6 55:16,18
**2023x18002** 36:4
**2024** 1:18 64:5
**22** 1:18
**23** 3:13
**230** 2:11,11
**233-7900** 2:5
**24** 3:14
**27** 38:18
**2700** 1:21
**3**
**3** 3:15 30:6,8
**30** 3:15 10:11
**300-4479** 2:12
**312** 2:12
**3g** 48:22
**4**
**4** 3:16 47:10,13 47:16
**47** 3:16
**5**
**5** 3:5
**50/50** 26:4,4 34:2
**53** 3:6
**58** 3:5
**5:46** 55:18
**5:46:03** 55:16
**5th** 64:4
**6**
**6** 44:5 49:4
**60606** 2:12
**60643** 2:5
**7**
**773** 2:5
**8**
**8** 15:9,10 26:19 36:4 48:22
**a**
**a.m.** 1:18
**ability** 63:16
**able** 15:23 22:10 48:9 50:7
**above** 1:14 31:12
**access** 52:21
**accessible** 51:19,19
**accident** 8:10
**accidents** 18:17
**accurate** 63:16
**acknowledge** 4:5
**action** 64:2
**actually** 38:8 58:7 59:25
**ada** 12:9,11 34:21,22 51:23
**additionally** 37:7
**administered** 4:11
**administration** 4:17
**admission** 36:24
**advice** 41:20 51:11,12,13
**advised** 37:17 40:20 51:14
**aforesaid** 63:9 63:18
**afternoon** 62:2
**ago** 10:1 11:21 19:6,17,19,21 25:14 39:8,10
**agree** 4:16,18 42:7,9 45:7
**ahead** 61:16
**ain't** 28:13,13 28:14 29:21 32:4 34:5
**alleged** 37:9
**allegedly** 21:6 39:12

**allow** 56:23
**angles** 50:6
**answer** 6:2,3,7 6:16,19 11:11 14:2,3 16:7 21:24 37:22 50:9
**answering** 14:23 40:3
**anticipation** 8:21 9:17
**appeal** 42:6,10 42:13,14 44:18 44:22,23 45:2 45:15 46:3,10 46:15,16
**appealed** 42:4
**appeared** 2:7 2:14 8:5 39:22 61:14
**appears** 36:20
**april** 1:18
**area** 57:8,8,15
**arms** 36:14
**arrive** 14:19
**asked** 25:15,18 26:1,9 28:24 28:24 40:11 42:20
**asking** 5:16,25 10:22 15:2 44:21,22,22
**asks** 6:13
**assist** 31:15 34:1 37:15 50:20
**assistance** 28:25 31:13 37:18 40:21,23 41:7,21 42:1 50:14 51:7,10
**assume** 6:16
**attention** 31:23 32:8,21,24,25 33:8,15,16 37:8 40:13
**attorney** 4:12 9:2,7,23 10:17 11:3,12 13:21 63:23,24
**attorneys** 11:15 51:12
**august** 17:16
**available** 36:6
**avenue** 1:21 2:4
**aware** 13:24 17:25 18:24 34:8,9
**b**
**back** 7:24 15:21 17:14 37:1,12 41:23 44:15 46:11 49:4 53:9 56:11
**bad** 20:25
**basement** 31:2 31:11 49:8
**basic** 29:23
**basically** 9:3 17:2 28:2,25 29:25 43:8,11
**bedroll** 18:16
**bedrolls** 18:18
**beginning** 58:9
**behalf** 1:14 2:7 2:14 4:16
**believe** 8:23 11:6 21:8,8 22:16 23:9 24:8 28:8,18 29:11 31:4 34:23,24 38:21 42:2,3,6 45:14 46:11,12,12 49:23 52:11,19 59:15,15,23
**best** 57:2 63:15
**birth** 7:17
**bit** 15:17 17:11 48:8 58:23
**body** 27:10
**booked** 15:8
**booking** 14:18 48:23
**bored** 18:20
**bottom** 45:21 45:22 57:24
**brake** 20:23,24 22:7
**brakes** 20:19 20:20 38:11
**braking** 31:15 50:15
**break** 6:22 53:17,19,21
**breath** 57:10
**briefly** 25:13
**bring** 60:15
**broke** 10:7 20:20,21,24
**brothers** 26:20
**brought** 16:18
**brung** 40:8
**built** 44:3
**bump** 25:9
**burn** 30:24 31:15 32:3,4,8 39:16 50:15
**burned** 60:16
**burning** 20:25 21:5 22:7 30:2
**burns** 31:18,23 31:25 32:11,15 32:16 37:3 38:24,25 60:1 60:11
**button** 27:9
**c**
**c** 2:1
**california** 1:21
**call** 7:12 40:24 41:15
**called** 4:22 37:14
**calling** 33:15
**camera** 28:23
**cane** 36:15

**capacity** 32:19
**carpet** 32:16
**case** 1:15 5:12 13:6,8,10 14:4 14:9,24 28:11
**catch** 57:10
**ccso** 36:9
**cell** 30:3
**center** 1:21
**cermak** 14:11 15:15,17,21 16:18 19:11 36:12 44:3 49:10,22
**certain** 43:22
**certificate** 63:1
**certified** 1:15 4:2 63:3,5 64:9
**certifies** 48:19
**certify** 63:7
**chair** 17:19,22 27:21 36:14 38:12 39:20 43:25
**challenging** 50:16
**chance** 34:2 56:23
**chicago** 1:21 2:5,12
**choice** 27:12
**civil** 1:19
**claims** 13:10 51:3
**class** 1:4
**clean** 5:24
**clear** 6:9,10 35:15 37:24
**client** 10:17 11:3,3,12 13:21
**collect** 56:23 57:1,19,24
**come** 42:2
**coming** 8:21 10:6
**commencem...** 63:8
**commencing** 1:18
**common** 30:23 31:14,17,20 50:14
**communicate** 12:2
**compartments** 17:5
**complaints** 21:10
**compliance** 36:9
**computers** 52:22
**concerning** 63:11
**concluded** 62:9
**confirm** 48:13
**considered** 27:14
**constitutes** 63:15
**content** 29:23 37:25 42:12,14 51:1,13,14
**contents** 11:7,8
**context** 25:3
**continue** 55:6 56:2
**convicted** 14:13,15
**cook** 1:7,8,20 12:9,11 14:18 15:9,22 17:5 18:19 48:23
**cord** 49:4
**correct** 17:9 25:19 30:24 40:14 45:3,10 45:13 47:18 49:5,6,11,12 50:21,22,24,25 51:3,4 52:23 53:10 56:13 59:5,17 60:2 60:18,19 61:7
**correctional** 1:20
**corridors** 19:7
**cos** 19:3 25:2 25:18 26:5 27:8,18 33:23
**counsel** 4:8 63:23,25
**count** 15:24
**county** 1:8,8,20 12:9,11 14:18 15:9,22 17:5 18:19 43:1,13 48:23
**couple** 5:18 7:13 25:8 39:8 39:9 47:6 58:3 60:21
**court** 1:1 4:1 5:22 16:11 19:12,13 22:25
**crazy** 17:5
**created** 8:16
**creation** 48:1
**crimes** 14:13 14:15
**csr** 63:6
**current** 14:17
**cuz** 33:10
**cv** 1:6
**d**
**d** 3:1 5:8 7:12 7:16
**dad** 53:14 62:5
**darreon** 1:13 3:3,16 4:21 5:3 5:4,8 7:8 23:8 24:6 30:13 32:10 34:8,9 36:3 37:24 38:14,20 40:2 41:13 44:14,21 45:24 46:7,12

47:18,22 48:16 48:21 50:2 62:3
**dart** 1:7
**date** 7:17 29:6 29:9 31:12 45:25 46:2
**day** 9:2 26:19 29:21,22 45:16 45:18,19 64:4
**debbie** 4:2
**debra** 1:15 63:5 64:8
**december** 28:21 36:4 46:5
**decent** 8:8
**decided** 18:20
**deck** 26:20
**declaration** 3:16 47:25 48:2,8,15 51:2 52:13,18 53:6
**defendants** 1:9 1:14 2:14 4:14 5:12
**denied** 32:24
**depend** 26:6
**depending** 16:10
**depends** 16:5 26:3
**deposed** 13:8 13:14,16,18,24
**deposition** 1:13 4:5,7 5:4,13 8:3,5,22 9:4,17 10:6 11:18 13:1,2 23:5 24:2 30:7 47:15 54:4 62:8 63:12,18 63:19
**descending** 59:20
**descent** 39:13 59:17
**describe** 32:5 32:11,13,15
**described** 60:17
**description** 3:12
**details** 13:5,9
**detained** 14:20
**detainee** 19:1 26:15 27:4,13 36:8,14,16,18 36:22 37:1,7 37:10,16
**detainee's** 36:23
**detainees** 17:21 19:4 26:10 27:2,10,18 36:12 51:11,18 51:23 52:10
**determine** 26:14
**devore** 2:10 4:14
**devoreraduns...** 2:13
**dictate** 18:2
**different** 6:15 7:14 17:4 23:18,19 25:8 25:10,11 49:23 50:6
**difficult** 38:12 50:12 52:8
**difficulties** 38:8 39:20
**difficulty** 36:20 36:25
**digital** 64:4
**direction** 63:15
**directly** 64:1
**discussed** 10:23 11:2 19:6
**discussion** 7:22 22:24 37:6
**distress** 36:21 39:23
**district** 1:1,1
**division** 1:2 15:9,10 26:19 37:13 48:22
**dna** 28:9,10,17 28:22
**document** 30:5 30:13,16 47:21 47:24
**documentation** 12:25
**documents** 8:12,16
**doing** 18:22 43:22
**door** 27:7 59:4 59:14 61:6
**doors** 27:9
**dt** 7:13,16
**due** 33:21 36:15
**duly** 4:19,23 63:10
**e**
**e** 2:1,1 3:1 5:8 12:3,4
**early** 8:9
**easier** 5:18,22 36:1
**eastern** 1:2
**either** 21:11 50:3,8 51:11 52:5
**employee** 63:22 63:24
**ended** 61:16
**entire** 15:13,16 36:23 59:17
**entitled** 1:14
**escort** 37:15
**escorted** 16:20 17:18 41:2
**escorting** 36:11

**especially** 42:19
**essentially** 30:22
**estimate** 16:2
**eugene** 1:4 12:19,22
**everybody** 43:17
**evidence** 36:6
**exactly** 9:14 10:7 28:6 59:23
**examination** 3:4 5:1 53:24 58:16 63:9
**examined** 4:23
**exhibit** 3:12,13 3:14,15,16,18 22:19,23 23:4 23:6 24:1,3 30:6,8 46:19 47:6,10,13,16 49:21,24,24 54:2,5,20
**exhibits** 3:11
**expected** 10:13 10:24
**experience** 39:12
**experienced** 39:6 49:15
**explain** 32:2,17 56:7
**extend** 56:15 57:22,23
**extended** 56:21 57:3
**extra** 56:22 57:23

**f**

**factors** 27:14
**fair** 57:4,6
**fallen** 24:23 25:5
**familiar** 12:18 19:6,9 24:5
**family** 43:12,16 43:16,17,18,19
**far** 8:18,18 10:13 13:24 25:1 29:16 42:21
**fast** 20:22 23:16,17 25:10 25:11 30:23 31:14 38:16 39:13,16,17 43:5 50:15 55:22,24 56:8 57:20 58:13 59:22 60:14
**faster** 58:19
**features** 51:20
**federal** 1:19
**feel** 35:12
**fell** 32:20
**fight** 32:19
**fighting** 28:11
**figure** 6:24
**filed** 21:15,19 22:4 23:21 29:10 51:18
**filing** 29:2
**filled** 21:14 33:22,23 38:16
**final** 40:19
**finally** 6:22
**finish** 6:1
**finished** 35:10
**first** 4:23 5:21 7:15 14:19,19 15:8 29:7
**five** 50:19 53:19
**fix** 33:18
**flat** 57:8
**following** 48:19
**follows** 4:24
**footage** 46:23 46:25 47:2
**forced** 33:4
**foregoing** 63:12
**forget** 29:21
**form** 20:7
**forth** 15:21
**four** 50:11
**front** 43:7
**fuck** 28:2,25
**full** 5:6 38:6
**further** 53:11 58:2 61:22,24
**future** 37:16 40:21 41:15

**g**

**g** 2:3,3
**general** 52:1,2
**gestures** 6:8
**getting** 18:22 20:11 21:20 23:11,13 30:22 31:13 41:25 43:10 46:18
**give** 16:2 18:18
**given** 5:13 27:12 63:17
**giving** 6:2,3
**gloves** 39:25 40:6,7,10 41:6
**go** 5:18 7:5,11 7:13,24 16:14 16:14 17:6 19:13,13 28:1 28:10,22 31:21 42:21 48:12 56:11
**goes** 15:10,11
**going** 5:16,23 6:16 11:1,8,10 16:6,11,12,12 16:13,14 20:21 20:21,22 21:1 21:1,2,22 22:12,22 23:17 23:17 24:20 25:10 26:24 28:7 29:5,16

30:1,3,4,5 32:11,23 33:18 33:20 35:2 37:19 38:8,10 39:6,14,15,16 39:17 43:4,5 43:23 44:10,11 45:3 47:3 48:11 49:20,25 55:21,23,24,25 56:7,24 57:4,7 57:20 58:13,19 60:14 61:8,17 62:4
**good** 5:10 6:20 8:7 29:16 61:21
**gotcha** 16:17
**government** 7:8
**grievance** 3:15 9:13 21:14,15 21:19 22:4 23:21 29:2,7 29:10,24 30:17 30:18 33:1,22 34:13,25 35:1 35:3 36:4 38:17 39:3,4 43:9 45:25 50:24 51:2,8 51:10,15 52:15 53:1 59:25
**grievances** 9:12 51:18,23
**ground** 5:18
**guess** 6:19 12:3 28:10,12 32:16 34:20 39:21
**guys** 59:4,13 61:6

**h**

**h** 5:9
**half** 19:21 34:3
**hallway** 24:19
**hallways** 19:7
**hand** 30:2 32:9 37:5 54:24 60:5,8,11,16
**handbook** 18:7 18:9,19
**handicap** 51:19
**handrail** 56:13 56:15,21 57:3 57:23
**handrails** 19:22,25 21:7 21:12 24:12,13 24:13
**hands** 15:24 20:25,25 21:5 22:7 30:24 31:14,18 37:3 38:22,24,25 39:16 50:15 60:1,2
**happen** 31:20 37:16
**happened** 32:23
**hard** 25:12 32:5,16
**head** 39:2
**healed** 37:5 38:22
**health** 37:10
**hear** 41:3 44:19
**heard** 12:21,25
**hearsay** 37:21 39:25
**held** 7:22 22:24
**help** 11:18 21:12 23:15 27:11 28:14 34:4,5,7 43:10 43:22 44:8,10 56:25
**helping** 33:23 34:2
**hereto** 63:25
**hereunto** 64:3
**hesitate** 6:14
**hey** 53:14
**history** 17:12
**hit** 25:9
**hmm** 11:16 17:20 49:1,16
**hold** 27:7,9
**holding** 36:15 59:16,21 60:4 60:7,9
**homeless** 43:19
**honestly** 16:5
**hopped** 8:9
**hospital** 16:6
**hour** 38:11 39:5,12
**hours** 36:10
**housed** 15:7
**huh** 9:18 13:15 25:20 29:4 30:10,14,20 55:4 56:14
**hundred** 34:25 38:11 39:5,11
**hurt** 39:17
**hurting** 20:25

**i**

**identify** 4:8 22:10 30:15 38:8
**illinois** 1:1,8,17 1:22 2:5,12 4:2 63:6
**immobilized** 17:13
**important** 57:14
**impression** 13:17
**improper** 31:2
**incarcerated** 48:22
**inches** 56:22 57:23
**incidence** 28:1
**incident** 32:19 33:1 41:19

**including** 49:9
**incorrect** 46:21
**index** 3:11
**indicate** 4:9
**indirectly** 64:1
**individually** 1:4
**indulge** 25:21
**inform** 37:2
**informed** 37:11
**injured** 32:18
**injuries** 32:12 32:13
**injury** 33:4 44:1,4 49:4
**inmate** 27:20 42:3
**inmates** 12:15
**instances** 27:23
**instruct** 11:11
**interested** 64:1
**interrupting** 6:4
**intervention** 33:5
**involved** 48:1
**issue** 22:11
**issued** 36:4
**issues** 20:5,11 21:5,20 22:6 23:11,13,14 24:16 29:3 30:22 49:15 51:24 52:3

**j**

**jail** 8:17 12:9 12:11,16 14:18 15:22 17:19 18:1,25 21:11 25:1,15 26:10 27:20 32:19 33:4 48:23 49:9 51:20
**job** 34:5,7

**k**

**keep** 5:24 40:3 43:16,23
**keeps** 43:11
**kind** 6:7 7:2 9:9 19:5 26:6 27:14 29:24 33:15 39:13 61:1
**kleszyk** 1:15 4:2 63:5 64:8
**know** 6:14,14 6:23 7:13 9:3 9:14,15 10:5 12:24 13:5,9 13:13,15 14:1 14:1 15:11,25 16:7,8,13 17:1 17:2 21:7 22:5 24:19,20 26:21 26:21,23,23,24 27:5,6,17,23 28:4,6 29:13 29:14 30:1 32:2,5,6 33:7 35:9 39:15 40:1,5,6 42:12 43:14,15,18,19 45:17,24 46:1 46:15,17 51:13 53:3 58:11 60:23
**knowledge** 57:2

**l**

**l** 1:15 63:5 64:8
**lady** 34:21,22
**laid** 7:2
**landing** 21:12 57:15
**late** 8:11
**law** 48:18
**left** 43:6 54:24 60:5,9,11,15,16
**letter** 39:21,24
**letting** 9:3 29:25
**li'l** 7:12,16
**license** 63:6 64:9
**lightweight** 44:5
**line** 40:19
**lines** 41:14
**little** 8:8,11 17:11 27:9,25 35:11 43:6 48:8 58:23
**llc** 2:10
**located** 1:20
**location** 18:4 19:2
**locked** 33:19
**long** 10:9 15:4 19:17,19 49:7
**longer** 23:16
**look** 24:5,9,9 24:10,18 38:15 42:20 43:12 45:17 60:4
**looking** 49:21 49:22,24 54:19
**looks** 24:13 45:19 49:25
**loose** 43:7
**lot** 16:24 23:15 26:20,21,22
**loud** 35:12
**lying** 39:3 44:12

**m**

**m** 5:9
**mad** 28:9,12,13
**made** 13:10 21:10 28:9,12 28:12
**mail** 9:1 12:3,4
**maintains** 36:22
**make** 5:17,22 10:12 16:14 32:23 36:1 39:1 44:12

**man** 15:24
**mark** 24:1
**marked** 23:6 24:3 30:8 47:16 54:2,6
**marking** 22:22 23:4 30:5
**married** 7:19
**material** 11:7 13:9 51:1
**matters** 63:11
**mean** 7:6,7 8:14,19 13:7 13:12 22:18 23:16 25:1 34:19 38:3 40:24 41:1 51:9 58:21,22
**meant** 43:25
**medical** 9:10 9:11 17:12 31:22 32:8,8 32:21,24,25 33:4,8,14 37:8 40:13
**meet** 9:16,24 10:4,9
**meeting** 10:19 11:3,5
**memory** 29:17
**mentioned** 60:1
**met** 9:21 10:3 11:20
**middle** 57:15
**miles** 38:11 39:5,11
**mind** 35:22 58:8
**minute** 15:25 18:6 19:6 26:17 35:4 53:17,19
**minutes** 10:11 25:14
**misstates** 21:23
**mm** 11:16 17:20 49:1,16
**moment** 35:8 54:3
**monroe** 2:11
**month** 16:9,10 19:14,21,21 29:15
**months** 15:25 26:18
**morning** 5:10
**morrissey** 2:3,3 2:4 3:6 4:15,15 10:16 11:1,10 13:20 14:3 20:7 21:22 22:12,18 31:1 35:14,19,22,25 37:19 47:10,14 49:20 53:13,14 53:15,16,18,25 54:7,9,10,12,15 54:18 55:5,8 55:11,15,17 56:1,5,6 58:5 58:10 59:6,12 60:23 61:5,8 61:14,22 62:1 62:4,6
**morrisseylaw...** 2:6,6
**morrisseys** 9:7 9:23 11:14,17 52:13 53:1
**mouth** 19:20 26:22
**move** 16:14 35:2 45:1 49:3 50:12,16
**moved** 41:1
**movement** 36:7 36:13,21 37:11 37:14,17 40:20 40:22 41:7,20 41:24
**multiple** 60:2
**muscle** 25:9

**n**

**n** 2:1 3:1 5:8,9
**name** 4:1 5:6 5:11 7:9 12:21 28:7,8 34:23 48:21
**names** 7:5,11 7:14 15:11
**navigate** 50:13
**necessarily** 17:6
**need** 6:22 37:18 40:21,23 43:3 43:22,22 44:4 51:13 60:25
**needed** 21:11
**needs** 41:21
**never** 15:16 27:22 29:21 32:4,7,7,8 38:7 40:13 46:10,10 46:14,15,16,17
**nice** 17:23 26:11,15
**night** 8:6,7
**nine** 42:9
**non** 51:19
**nope** 24:25
**normal** 43:24
**northern** 1:1
**notes** 40:12
**notice** 5:5 13:1
**noticing** 4:11
**notified** 41:24
**notify** 37:17 40:20,22 41:20
**november** 15:6 20:15 28:19,19 28:21 29:18 36:10 38:17,18 38:18 51:8 55:16,18
**nuh** 19:3 52:24
**number** 14:18 48:14,23 49:2 50:11 54:2,20

**o**

**o** 5:8,9,9
**oath** 4:10,17
**object** 11:2,10 20:7 21:23 22:13 37:19 49:21 61:9
**objection** 10:16 13:20 22:18
**objections** 4:10
**observed** 36:11 36:19 39:19
**obviously** 37:21 39:11
**occur** 17:15
**occurred** 25:7
**october** 28:20 28:20
**officer** 27:4,24 28:4,6 36:7,8 36:10,13,22,25 37:11,13,14,17 40:22 41:2,16 55:3 58:19 61:17
**officers** 25:15 27:2 28:1 38:9 40:20 41:8,20 41:24
**oh** 13:15 41:17 46:14
**okay** 6:5,25 9:9 10:20 12:2,8 15:3 18:23 21:3 24:22 29:19 31:6 38:16 41:17 44:14 46:14,18 47:8,14,21 48:11 53:11 56:21 58:14 61:21
**once** 16:9,10 19:14
**ones** 44:3
**oo0oo** 62:11
**open** 26:22 27:9
**opposed** 60:13
**orally** 41:5
**outcome** 64:1
**own** 36:24 51:23

**p**

**p** 2:1,1 5:9 53:14,16 54:7 54:10 55:15 58:5,10 59:6 59:12 60:23 61:5 62:4
**p.m.** 53:22,23 55:16,18 62:9
**page** 3:4,12 5:19 35:3 45:2
**pair** 40:8,9
**paper** 6:9 9:1
**paragraph** 48:14
**pardon** 42:8
**part** 48:4
**participating** 4:4
**particular** 20:14
**parties** 4:4 63:23,25
**pass** 18:15
**passed** 59:4,13 61:6,12
**past** 25:13,15 25:18 56:15 57:3
**pat** 54:16 55:5 55:9,14 56:1,5
**patrick** 2:4
**pay** 43:2,13
**penalties** 48:17
**people** 7:12 40:5 43:2 52:6 52:7
**percent** 34:25
**perjury** 48:17
**person** 11:25 42:23,25 61:18
**personal** 63:14
**phone** 11:23 12:3,4 43:20 52:15,17
**photo** 22:22 23:3
**photograph** 3:13,14 49:10 49:13,14
**physically** 4:5
**pick** 18:20 43:20
**picture** 50:4,5
**place** 49:3,3 63:21
**places** 49:9
**plaintiff** 1:5 2:8
**plaintiff's** 3:17 54:2,4
**play** 54:8,9,10 54:13 59:7,8 60:20,20 61:2
**played** 54:14 55:7 56:3 58:12 59:1,10 61:3
**playing** 58:8
**please** 5:6 6:13 6:19 22:1
**pointing** 6:8
**policies** 12:9,12 17:25 18:24 34:10
**policy** 36:9
**position** 37:22
**positive** 35:1
**possible** 5:24
**preference** 27:15
**prepare** 8:2 11:18
**present** 4:6
**press** 27:8

**pretty** 29:16,16 51:2
**preventing** 18:25
**previous** 63:8
**previously** 54:5
**print** 52:23
**prior** 13:1
**privilege** 10:17 11:4,12 13:21
**probably** 16:9 18:10,11,12,20 23:18 25:8,9 26:18 27:7,8 42:10,14 52:19
**probation** 14:14,16
**procedure** 1:19
**procedures** 12:10,12 18:1 18:25
**proceeding** 57:21
**proceedings** 63:17
**propelled** 22:6
**propelling** 36:17,19 39:19
**provided** 48:18
**pulling** 23:25
**pursuant** 1:18 5:5
**push** 17:19,22 19:4 25:16,18 25:25 26:10,10 26:15 27:2,4,6 27:16,19,20,24 28:2 41:11
**pushed** 16:21 24:24 32:20
**pushing** 18:2 19:1 27:13 36:13 41:10
**put** 39:2 46:9
**putting** 23:3
**pwm** 2:6

**q**

**question** 6:1,2 6:15,17 13:12 14:2,6 22:14 44:15,16 49:18 50:10
**questions** 5:17 6:6,13 14:23 35:6 40:4 47:7 53:11,15 58:4 60:22 61:23,25
**quite** 6:9 18:5

**r**

**r** 2:1 5:8,8
**radunsky** 2:10 4:14
**rail** 60:9
**railing** 58:24 59:16 60:13 61:16
**ramirez** 28:7,8
**ramp** 16:16 19:19 20:16,16 20:22 21:4,4 21:13,19,21 22:4,17 23:8 23:10,13,16,17 23:21 24:5,7 24:15,18,20 29:3 30:2,3,23 31:2,12,13,16 31:19,21 32:12 33:12,16,18,21 34:1 39:7,13 44:11 47:3 49:7,10,14,17 49:21,24 50:3 50:5,7,11,13,16 50:20 51:25 52:2,9 55:21 55:24 56:8,16 56:22,24 57:1 57:3,4,8,16,22 57:22,25 58:24 59:21
**ramps** 14:10,11 19:7,13,23 20:1,4,10 22:9 38:9 43:5,24 51:18
**rare** 31:15 33:25 34:2 50:19
**rather** 27:16,16
**ray** 19:20
**read** 18:6,9 31:9 35:7,9,20 35:23,23,24,25 37:24 41:13 45:5 48:8,9,10 48:12
**reading** 18:14 35:12 38:1
**real** 20:22,22 20:25 23:14 31:20 38:16
**really** 8:4 15:19 20:23 22:14 27:11 29:11,12 33:13 44:8,9 56:19 60:25
**reason** 18:15 19:11
**recall** 6:19,20 12:17,23 13:4 19:22,25 20:4 20:10 21:9,9 24:15 29:23 34:19 38:4 40:16,18,19 48:4 52:20
**receive** 34:18
**received** 32:11 34:16 40:13 45:12 46:2 52:25 53:5
**receiving** 34:19 40:16,18
**recognize** 22:17,20 23:8 30:12 47:21,23 49:14,17 50:3 50:4,4,7

**recollection** 57:12
**record** 5:7,24 6:9,23 7:21,23 7:25 14:23 22:25 63:16
**records** 8:13 9:10,11
**reduced** 63:14
**reflects** 61:10 61:12
**refrain** 6:4,7
**refused** 27:24
**regarding** 12:15 22:4
**regardless** 50:6
**regards** 11:12
**relative** 63:22 63:24
**remember** 29:2 29:6,9 34:12 34:15,16,17 42:4 44:17,23 44:25
**remembered** 29:20
**remotely** 1:17 4:7,11,17 63:20
**rephrase** 6:15
**reported** 63:13
**reporter** 1:16 4:1,3 5:22 23:1 63:3,6 64:9
**reporting** 4:7
**represent** 5:11
**representations** 10:12
**representative** 37:20
**request** 25:22 25:24 37:8,10
**requested** 40:9 40:13 41:6
**requesting** 33:14
**respond** 22:14
**response** 34:12 34:16,18,20 35:4,9 36:4 39:18 40:12,17 40:18 41:14 42:5,7,10,13 44:17 45:5,7 45:13 46:3,16 46:21
**rest** 8:7
**result** 41:25
**returned** 53:2,8
**review** 8:12,15 8:20 9:9 35:5
**reviewed** 9:13 12:8,11,14,25 46:24 47:1,2
**reviewing** 36:6
**rewind** 58:23
**right** 5:3 6:21 7:4,9 12:4,5 13:8,14,16,19 13:24 14:5,16 14:18 15:4 22:21 23:2 25:16 26:12 28:11 30:12,21 31:8 35:2,14 36:3 38:9 39:20,23 40:2 40:6 42:11,15 43:1,3 44:9 45:1 46:3,4,5 47:5,25 48:25 50:2,17,18 51:5 54:12 55:5 58:10 59:18 60:3,8 61:19 62:1
**roll** 30:23 31:14 50:14
**room** 4:6
**route** 16:11
**rtu** 15:12,13,15 19:8,16,23 20:1,5,11 21:13,13 22:10 31:2,3,11 36:12 37:1 44:2 49:8,15 49:22,24
**rubber** 32:3
**rug** 32:15 38:24,25
**rules** 1:19 5:18 7:1 18:1,25

**s**

**s** 2:1 5:9
**sabrina** 34:23 34:24 38:5,6 38:15,17 39:1 40:6 41:6 42:16,18,21,22 43:11 44:8
**sabrina's** 46:21
**saying** 7:13 9:4 9:15 10:7 16:1 16:6,7,8,13,16 19:18 20:23 23:20 26:21 27:5,7 28:3 30:21 31:25 32:3,6 33:13 33:16 40:23 42:24 43:8,11 43:21 44:1,4 59:22,23
**says** 31:2 36:3 39:21,22,24 45:12 46:7,13 48:9,15 55:15
**schedule** 16:5
**scooting** 61:16
**screen** 23:3 54:3 58:6 61:20
**second** 37:14
**seconds** 39:8,9
**secret** 17:4
**see** 5:21 18:21 18:23 19:18

20:18 24:7 28:16,17,20 29:15 30:9 35:1 41:17 44:12 46:23,25 47:4,17,19 54:20 55:19 56:12,16,17,20
**seek** 31:22 32:8 32:21,23
**seem** 39:1 44:12
**seen** 12:24 24:17 34:21,24 38:18
**sees** 22:13
**self** 22:5 36:17 36:19 39:19
**send** 52:15
**sent** 9:1,6 53:7 53:9
**sentence** 31:9
**sentences** 31:10
**series** 5:17
**service** 37:10
**set** 64:3
**share** 58:6
**sheriff** 1:7 37:21,22
**shit** 38:6
**shitty** 29:22
**shorthand** 1:16 4:3 63:3,5 64:9
**shortly** 50:24
**shot** 17:14 49:3
**show** 22:9,19 22:22 30:4 54:1
**showed** 49:19 50:8
**shower** 8:9
**showing** 29:6 55:12
**shown** 22:17
**side** 16:21 54:24
**sides** 60:10
**signature** 45:9 45:22,23 51:5 53:6 62:5,7,10 64:4,8
**signed** 9:1 53:1 53:8
**signing** 48:4
**similar** 51:2
**sir** 5:15 6:11 9:8 17:10 21:17 35:12,21 45:11 51:6 54:22
**situation** 33:3 40:7
**sleep** 8:5
**slow** 57:9,20
**small** 35:11
**somebody** 16:20,21 25:9 39:2 41:10
**sorry** 47:13 59:9
**south** 1:21 2:4
**spasm** 25:9
**speak** 5:25 29:13 52:14,16 52:17
**speaking** 30:19 36:7 38:4
**specific** 18:15 20:8,10 27:23
**specifically** 12:10,14 20:5 52:9
**specified** 63:21
**speed** 21:2 59:20,22
**spell** 5:7
**spinal** 49:4
**spoken** 51:17 51:22
**staff** 31:15 33:25 50:19
**stand** 6:13 13:12
**standards** 12:9 12:11
**start** 54:19 56:16
**started** 5:20 57:4
**starting** 4:11
**state** 1:16 5:6 63:6
**statement** 37:20
**statements** 48:19
**states** 1:1 38:7 39:18 41:15 50:11
**stating** 14:22
**steady** 61:15
**steep** 20:17 49:7 50:12 56:9 57:16
**stenographic...** 63:13
**step** 56:11
**stillman** 2:11 3:5 4:13,13,18 5:2,11 7:21,24 8:1 10:21 11:6 11:13 13:22 14:7 20:9 22:2 22:15,21 23:2 23:7,25 24:4 30:9,11 31:4,7 35:17,24 36:2 37:23 47:5,12 47:17,20 50:1 53:20 58:3,7 58:14,17 59:3 59:8 60:20,25 61:11,19,24 62:3
**stipulation** 4:9
**stop** 38:12 54:15,16 55:8

57:9 58:6,14 60:24 61:1
**stopped** 25:11 25:12 54:17 55:10 56:4 58:15 59:2,11 61:4
**story** 23:19
**straight** 24:21
**street** 2:11
**stuff** 18:21,22 32:23 43:5
**sufficient** 56:10 57:8,15
**suite** 2:11
**summer** 18:12
**supervising** 36:16
**suppose** 40:24
**supposed** 12:15 34:4 41:11,11
**sure** 18:6 19:3 20:14,16 24:17 25:4 28:21 29:13 31:21 58:10
**swab** 28:9,10 28:17,22
**sworn** 4:20,23 63:10

**t**

**t** 3:6 4:15 5:9 10:16 11:1,10 13:20 14:3 20:7 21:22 22:12,18 31:1 35:14,19,22,25 37:19 44:5 47:10,14 49:4 49:20 53:13,15 53:18,25 54:9 54:12,15,18 55:5,8,11,17 56:1,5,6 61:8 61:14,22 62:1 62:6
**tablets** 12:4
**take** 5:23 6:22 16:15 35:4,8 48:7 53:17,18 61:20
**taken** 1:13,17 5:4 41:19 53:21 63:19
**talk** 52:7 53:17
**talked** 11:4 25:14 52:10
**talkie** 40:25
**talking** 5:23 14:24 24:25 46:5
**teach** 44:9
**tell** 10:24 17:11 22:19 27:4,18 28:2,7,18 36:24 55:19
**telling** 43:16
**ten** 14:12,15 42:10
**terribly** 35:15
**testified** 4:24
**testify** 10:18,25 11:8 63:10
**testifying** 10:14
**testimony** 11:9 21:23 38:20,23 40:3 46:20 48:13 58:18 59:19 63:17
**text** 12:7
**texting** 12:5
**tgm** 2:6
**thank** 24:22 45:8 47:14 56:5 62:1,3
**therapy** 42:23
**thing** 15:19 24:10 28:23 33:19,21 38:15 41:7 42:16 43:15
**things** 5:17,22 21:1 43:14,23 44:2
**think** 8:23,25 12:20,23 13:3 16:3 18:8 19:12,12 20:2 20:2,2 23:23 31:1,5 34:6,7 38:10 39:14,15 41:22 46:7 49:21 61:1,9 61:11
**third** 6:12 43:13
**thomas** 1:7 2:3 2:3 4:15
**thompson** 1:13 3:3,16 4:16,21 5:4,8,10 7:8 23:5 24:2 30:7 35:19 36:8,17 36:18,23 37:2 37:7,11,16 47:15 48:16,21 54:1,19 61:15 62:2
**thought** 46:9
**three** 49:7
**throw** 42:22
**tier** 48:22
**time** 4:8 6:23 10:2,5 14:6 15:14,16,22 18:8,15,16 19:12,15 21:20 21:25 22:6 25:17 27:22 28:10 31:21 33:20 34:3,5 36:23,24 55:13 55:20,22 58:9 59:5,14 61:7 61:13 62:2 63:20
**times** 10:8 16:3 23:15 26:22 42:9

**tired** 33:22
**today** 5:16,22 8:3,22 9:17 10:14
**told** 11:7 13:18 27:17,19 28:25
**took** 24:11
**top** 48:15 56:12
**transcript** 63:12
**transport** 19:2 19:11
**transported** 12:16 15:21 16:18 18:3
**transports** 17:18
**travel** 49:9
**traverse** 21:12
**traversed** 22:3
**traversing** 29:3 31:19 50:20
**tried** 43:8
**trouble** 31:13
**true** 38:3 48:20 59:13 63:16
**truth** 63:10
**trying** 42:22 43:9,9 61:15
**tunnel** 21:13
**tunnels** 16:23 16:25 17:3,3,7 19:7,10,16
**turn** 25:23
**turns** 5:23
**twice** 10:8
**two** 10:8 22:9 31:10 36:11 38:19,19,21 49:2,19 50:8
**type** 25:11 31:25 44:6
**typed** 52:13 53:7
**typewrite** 52:22
**typewriting** 63:14
**typewritten** 53:1

**u**

**uh** 9:18 13:15 19:3 25:20 29:4 30:10,14 30:20 52:24 55:4 56:14
**unable** 22:7
**unavailable** 36:15
**uncontrolled** 39:13 59:20
**under** 6:12 13:11 19:16,23 20:1,5,11 21:13,13 22:9 48:17,23 63:14
**undersigned** 48:18
**understand** 7:1 7:3 37:25 38:2 40:2 44:14
**understandable** 15:1
**understanding** 14:4,8 17:8
**understood** 6:17
**united** 1:1
**use** 49:2 52:8
**used** 19:23 20:1 21:19 49:8
**user** 50:13 57:18
**using** 36:11
**usually** 18:18 19:17 27:5

**v**

**v** 1:6
**validity** 4:10
**various** 49:9
**vary** 16:8
**verbally** 6:7 37:9 40:11
**verified** 64:4
**versus** 27:2
**video** 3:17 36:19 39:19 47:2 54:14,17 54:21,23 55:1 55:7,10,12,20 56:2,3,12 58:6 58:12,15 59:1 59:10 60:21 61:3,9,20
**videoconfere...** 1:17 2:7,14 63:20
**view** 49:23
**visible** 47:8
**visual** 36:22

**w**

**w** 2:4
**wait** 6:1,3 38:16
**waive** 4:9 62:5 62:6
**waived** 62:10
**walk** 16:21 58:24
**walkie** 40:25
**walking** 24:21 36:16 58:19
**want** 10:11 16:9 19:20 23:14 28:13,13 28:14,20,21 29:13 48:12 54:1,7 58:5,11 59:6 60:24
**wanted** 9:14 18:21,23 29:12 29:12 33:10,10 33:11,17,17 39:1
**way** 6:16 20:16 20:17,17,17 50:3 53:5

**ways** 25:8,11
**week** 10:1 11:21 16:3,4
**weeks** 38:19,21
**went** 8:5 9:5 15:16 19:19 20:14,15 23:17 28:10,22 31:12 57:1
**west** 2:11
**western** 2:4
**westmoreland** 1:4 12:19,22
**wheel** 36:13 37:12 39:19 43:6,6,6,24 60:7
**wheelchair** 17:9 18:3 19:1 19:4 20:12,19 20:20,24 24:24 25:16,19 26:1 26:11,16 28:14 30:1 32:4,20 34:6 36:11,18 36:20 37:4 38:11 41:10,12 42:21,24 43:3 43:7,11,14,24 44:2,5,7 49:2 50:13 54:25 57:18 60:5,8 60:13,17 61:17
**wheelchairs** 12:16 40:5 43:2,18 52:7
**wheeling** 37:1
**whereof** 64:3
**witness** 1:20 3:3 4:6,19,22 10:20 11:11 14:5 21:25 30:10 35:21 47:19 58:13 63:9,9 64:3
**woke** 8:8
**wording** 52:12
**words** 35:11
**works** 41:17
**world** 43:19
**worry** 15:2
**wounds** 37:4,5 37:9 38:22
**wow** 29:19
**write** 39:3
**writing** 51:7,10
**written** 8:17 29:10 37:9 50:23
**wrong** 46:21

**x**

**x** 3:1 19:20

**y**

**yeah** 7:3,10,12 8:8 9:13,20 13:15 14:14 15:15,19 16:24 17:2 20:2 22:8 25:3,4,6 26:8 26:13 27:25 29:25 32:14,16 33:6,17 38:6 41:4,23 42:6 42:14 47:12,18 53:20 55:2 56:25 57:6 59:8,8,15,18 62:6
**year** 18:10,11 18:11 20:16 28:16 33:19
**years** 14:12,16

**z**

**zach** 35:15,23 47:11
**zachary** 2:11 4:13 5:11
**zoom** 11:21 35:13
**zstillman** 2:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.